**UNITED STATES DISTRICT COURT**
**FOR THE**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| HBP I, LLC, as assignee of the Antitrust Claims of GREAT ATLANTIC & PACIFIC TEA COMPANY, | ) ) ) ) |
|      Plaintiff, | ) ) ) |
| v. | ) **COMPLAINT** ) **AND** ) **JURY DEMAND** |
| ACTAVIS HOLDCO US, INC.; ACTAVIS PHARMA, INC.; AKORN, INC.; ALVOGEN, INC.; AMNEAL PHARMACEUTICALS, INC.; AMNEAL PHARMACEUTICALS, LLC.; ARA APRAHAMIAN; AUROBINDO PHARMA U.S.A., INC.; BAUSCH HEALTH AMERICAS, INC.; BAUSCH HEALTH US, LLC; DAVID BERTHOLD;  BRECKENRIDGE PHARMACEUTICAL, INC.; JAMES (JIM) BROWN; CAMBER PHARMACEUTICALS, INC.; MAUREEN CAVANAUGH; CITRON PHARMA, LLC; DR. REDDY'S LABORATORIES, INC.; EMCURE PHARMACEUTICALS, LTD.; ENDO INTERNATIONAL, PLC; EPIC PHARMA LLC;  MARC FALKIN; FOUGERA PHARMACEUTICALS, INC.; G&W LABORATORIES, INC.; GLENMARK PHARMACEUTICALS, INC., USA; JAMES (JIM) GRAUSO; KEVIN GREEN; GREENSTONE LLC; ROBIN HATOSY; HERITAGE PHARMACEUTICALS, INC.; HI-TECH PHARMACAL CO., INC.; IMPAX LABORATORIES, INC.; JUBILANT CADISTA PHARMACEUTICALS INC.; KAVOD PHARMACEUTICALS LLC (F/K/A RISING PHARMACEUTICALS, LLC AND F/K/A RISING PHARMACEUTICALS, INC).; ARMANDO KELLUM; LANNETT COMPANY, INC.; | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

LUPIN PHARMACEUTICALS INC.;                    )
MALLINCKRODT, INC.;                            )
MAYNE PHARMA USA, INC.;                        )
MORTON GROVE PHARMACEUTICALS, INC;             )
MYLAN N.V.; MYLAN INC.;                         )
MYLAN PHARMACEUTICALS INC.;                     )
JILL NAILOR; JAMES (JIM) NESTA;                 )
NOVARTIS AG;                                    )
OCEANSIDE PHARMACEUTICALS, INC.;               )
KONSTANTIN OSTAFICIUK;                          )
PAR PHARMACEUTICAL COMPANIES, INC.,            )
PAR PHARMACEUTICAL, INC.;                       )
NISHA PATEL; PERRIGO NEW YORK, INC.;           )
PFIZER, INC.;  PLIVA, INC.;                     )
DAVID RECKENTHALER;                             )
RICHARD (RICK) ROGERSON;                        )
SANDOZ, INC.; SANDOZ AG;                        )
STRIDES PHARMA, INC.;                           )
SUN PHARMACEUTICAL  INDUSTRIES, INC.;          )
TARO PHARMACEUTICALS USA, INC.;               )
TELIGENT, INC.; TEVA                            )
PHARMACEUTICALS USA, INC.;                     )
UDL LABORATORIES, INC.; UPSHER-SMITH           )
LABORATORIES, LLC; VALEANT                      )
PHARMACETICALS NORTH AMERICA, LLC;            )
VALEANT  PHARMACEUTICALS,                       )
INTERNATIONAL; VERSAPHARM, INC.;               )
WEST-WARD PHARMACEUTICALS CORP.;               )
WOCKHARDT  USA LLC; and ZYDUS                   )
PHARMACEUTICALS  (USA), INC.,                   )
                                                )
        Defendants.                             )

ii

**TABLE OF CONTENTS**

COMPLAINT ...................................................................................................................... 1

I.      INTRODUCTION .................................................................................................... 2

II.     DRUGS INVOLVED IN THE CONSPIRACY ...................................................... 11

III.    JURISDICTION AND VENUE .............................................................................. 17

IV.     THE PARTIES ........................................................................................................ 18

A.  Plaintiff ....................................................................................................................... 18

B.  Defendants .................................................................................................................. 19

C.  Co-Conspirators and Agents ..................................................................................... 43

V.      TRADE AND COMMERCE ................................................................................... 50

VI.     GENERIC DRUGS, THE FDCA AND THE HATCH-WAXMAN .................................. 51

A.      The Generic Drug Market ...................................................................................... 54

1.      Upstream Players In The Drug Distribution System ............................................. 54

        a)      Manufacturers/Suppliers .............................................................................. 54

VII.    THE DOJ AND STATE ATTORNEYS GENERAL INVESTIGATIONS ......................... 56

A.      The DOJ's Broad-Ranging Criminal Investigation Into the Anticompetitive Conduct of Generic Drug Manufacturers ............................................................................... 56

B.      At Least 49 State Attorneys General are Also Investigating the Anticompetitive Conduct in the Generic Drug Industry .................................................................... 62

VIII.   CONGRESSIONAL RESPONSES TO GENERIC DRUG PRICE INCREASES .............. 65

IX.     THE GENERIC DRUG INDUSTRY WAS CHARACTERIZED BY AN EXTREMELY HIGH LEVEL OF COMPETITOR CONTACTS, WHICH ................................................ 66

A.      Defendants Used Trade Association Meetings to Facilitate Their Collusion .......... 67

B.      Industry Dinners and Private Meetings .................................................................. 74

C.      Defendants Communicated in Secret Through E-Mail, Telephone, and Text Messages . 77

X.      THE OVERARCHING CONSPIRACY BETWEEN GENERIC DRUG MANUFACTURERS – PLAYING NICE IN THE SANDBOX ...................................... 77

XI.     CORPORATE AND INDIVIDUAL RELATIONSHIPS THAT ALLOWED ................... 93

A.      Ranking "Quality of Competition" to Identify Price Increase Candidates .......................... 95

B.      The "High Quality" Competitor Relationships .................................................................. 98

1.      Mylan (+3) ........................................................................................................................ 99

2.      Watson/Actavis (+3) ........................................................................................................ 100

3.      Sandoz (+3) ...................................................................................................................... 101

4.      Glenmark (+3) .................................................................................................................. 101

5.      Taro (+3) .......................................................................................................................... 102

6.      Lupin (+2) ........................................................................................................................ 102

C.      Individual Relationships .................................................................................................. 103

1.      Ara Aprahamian ............................................................................................................... 103

2.      David Berthold ................................................................................................................. 104

3.      Jim Brown ........................................................................................................................ 105

4.      Maureen Cavanaugh ......................................................................................................... 106

5.      Marc Falkin ...................................................................................................................... 107

6.      Jim Grauso ....................................................................................................................... 108

7.      Kevin Green ...................................................................................................................... 110

8.      Armando Kellum .............................................................................................................. 112

9.      Jill Nailor .......................................................................................................................... 113

10.     James Nesta ...................................................................................................................... 114

11.     Konstantin Ostaficiuk ....................................................................................................... 115

12.     Nisha Patel ....................................................................................................................... 116

13.     David Rekenthaler ............................................................................................................ 117

14.     Rick Rogerson ................................................................................................................... 119

15.     Tracy Sullivan ................................................................................................................... 119

XII.    THE CONSPIRATORIAL PRICE-FIXING, BID-RIGGING AND CUSTOMER AND
        MARKET ALLOCATION AGREEMENTS ................................................................... 120

A. Examples of Drug Specific Collusion. ...................................................................... 124

1.   Acetazolamide.................................................................................................. 124

   a)   Acetazolamide Tablets.......................................................................... 124

   b)   Acetazolamide Capsules ....................................................................... 125

2.   Adapalene ........................................................................................................ 126

3.   Albuterol .......................................................................................................... 127

4.   Alclometasone Dipropionate........................................................................... 129

5.   Allopurinol (Tablet and Injection) .................................................................. 131

6.   Amantadine HCL .............................................................................................. 133

7.   Amiloride HCL/HCTZ....................................................................................... 134

8.   Amitriptyline..................................................................................................... 136

9.   Amoxicillin/Clavulanate .................................................................................. 139

10.   Amphetamine/Dextroamphetamine (Adderal) (ER and IR)............................. 140

11.   Atenolol Chlorthalidone.................................................................................. 143

12.   Atropine Sulfate .............................................................................................. 144

13.   Baclofen .......................................................................................................... 145

14.   Balsalazide Disodium ..................................................................................... 150

15.   Benazepril HCTZ............................................................................................. 151

16.   Betamethasone Diproprionate........................................................................ 154

17.   Betamethasone Dipropionate Augmented ...................................................... 156

18.   Betamethasone Dipropionate Clotrimazole ................................................... 157

19.   Betamethasone Valerate.................................................................................. 159

20.   Bethanechol Chloride...................................................................................... 160

21.   Bromocriptine Mesylate.................................................................................. 161

22.   Budesonide DR Capsules................................................................................ 163

23.   Budesonide Inhalation .................................................................................... 164

24. Buspirone Hydrochloride Tablets ..................................................................................... 165

25. Butorphanol Tartrate ........................................................................................................ 166

26. Cabergoline ...................................................................................................................... 167

27. Capecitabine ..................................................................................................................... 168

28. Captopril ........................................................................................................................... 171

29. Carbamazepine (tablets, chewable tablets, and extended release tablets) ......................... 173

30. Carisoprodol ..................................................................................................................... 175

31. Cefdinir (Capsule and Oral Suspension) and Cefprozil .................................................... 176

32. Cefuroxime Axetil ............................................................................................................ 177

33. Celecoxib .......................................................................................................................... 178

34. Cephalexin (Cefalexin) ..................................................................................................... 179

35. Chlorpromazine HCL ........................................................................................................ 182

36. Cholestyramine ................................................................................................................. 183

37. Ciclopirox ......................................................................................................................... 184

38. Cimetidine ........................................................................................................................ 185

39. Clarithromycin .................................................................................................................. 186

40. Clindamycin Phosphate ..................................................................................................... 188

41. Clobetasol ......................................................................................................................... 189

42. Clomipramine .................................................................................................................... 193

43. Clonidine-TTS Patch ......................................................................................................... 199

44. Desmopressin Acetate ....................................................................................................... 206

45. Desogestrel/Ethinyl Estradiol Tablets (Kariva) ................................................................ 208

46. Desonide ............................................................................................................................ 209

47. Dexmethylphenidate HCL Extended Release .................................................................... 212

48. Dextroamphetamine Sulfate Extended Release .................................................................. 215

49. Diclofenac Potassium ........................................................................................................ 216

50.    Digoxin ..................................................................................................... 218

51.    Diltiazem HCL........................................................................................... 222

52.    Diphenoxylate Atropine HCL.................................................................... 224

53.    Divalproex ER .......................................................................................... 225

54.    Doxazosin Mesylate.................................................................................. 229

55.    Doxycycline .............................................................................................. 233

        a)     The Doxy Hyclate Collusive Price Increase ............................. 234

        b)     The Doxy Mono Collusive Price Increase ................................ 237

        c)     Collusion on Doxy DR .............................................................. 239

56.    Drospirenone and Ethinyl Estradiol (Ocella)............................................ 241

57.    Econazole ................................................................................................. 244

58.    Enalapril Maleate...................................................................................... 251

59.    Entecavir .................................................................................................. 255

60.    Estradiol Tablets ...................................................................................... 257

61.    Estradiol/Norethindrone Acetate Tablets (Mimvey)................................. 258

62.    Ethinyl Estradiol and Levonorgestrel....................................................... 259

63.    Etodolac and Etodolac ER ........................................................................ 261

64.    Exemestane .............................................................................................. 267

65.    Fenofibrate ............................................................................................... 268

66.    Fluconazole .............................................................................................. 276

67.    Fluocinolone Acetonide ........................................................................... 280

68.    Fluocinonide ............................................................................................ 282

69.    Fluoxetine HCL ........................................................................................ 290

70.    Fluticasone Propionate............................................................................. 292

71.    Fosinopril HCTZ...................................................................................... 292

72.    Gabapentin Tablets .................................................................................. 296

73.    Glimepiride ...................................................................................................... 297

74.    Glipizide-Metformin ........................................................................................ 298

75.    Glyburide ......................................................................................................... 299

76.    Glyburide-Metformin ...................................................................................... 303

77.    Griseofulvin ..................................................................................................... 305

78.    Halobetasol Propionate ................................................................................... 306

79.    Haloperidol ...................................................................................................... 309

80.    Hydralazine ...................................................................................................... 311

81.    Hydrocodone Acetaminophen.......................................................................... 312

82.    Hydrocortisone Valerate .................................................................................. 313

83.    Irbesartan.......................................................................................................... 315

84.    Isosorbide Dinitrate.......................................................................................... 317

85.    Ketoconazole (Cream and Tablets)................................................................... 319

86.    Ketoprofen ....................................................................................................... 322

87.    Ketorolac Tromethamine ................................................................................. 323

88.    Labetalol ........................................................................................................... 325

89.    Lamivudine/Zidovudine (Generic Combivir) .................................................. 326

90.    Latanoprost ....................................................................................................... 330

91.    Leflunomide...................................................................................................... 331

92.    Levothyroxine ................................................................................................... 332

93.    Lidocaine-Prilocaine ........................................................................................ 336

94.    Loperamide HCL Capsules............................................................................... 339

95.    Meprobamate .................................................................................................... 340

96.    Metformin ER.................................................................................................... 341

97.    Methadone HCL................................................................................................ 342

98.    Methylphenidate................................................................................................ 343

99. Methylprednisolone ........................................................................................... 345

100. Metronidazole ................................................................................................... 346

a) Metronidazole Cream ....................................................................................... 347

b) Metronidazole Jelly .......................................................................................... 347

c) Metronidazole Lotion ....................................................................................... 348

d) Metronidazole Vaginal ..................................................................................... 348

101. Moexipril Hydrochloride Tablets ..................................................................... 349

102. Nadolol .............................................................................................................. 351

103. Naproxen Sodium ............................................................................................. 354

104. Neomycin Polymyxin Hydrocortisone .............................................................. 356

105. Niacin ER ........................................................................................................... 357

106. Nimodipine ........................................................................................................ 360

107. Nitrofurantoin Macrocrystal Capsules ............................................................. 362

108. Norethindrone Acetate ...................................................................................... 363

109. Norethindrone/Ethinyl Estradiol (Balziva®) ................................................... 364

110. Nortriptyline Hydrochloride ............................................................................. 365

111. Nystatin .............................................................................................................. 369

    a) Nystatin Cream ............................................................................................ 369

    b) Nystatin Ointment ....................................................................................... 370

    c) Nystatin Tablets ........................................................................................... 371

112. Nystatin Triamcinolone ..................................................................................... 373

113. Omega-3-Acid Ethyl Esters .............................................................................. 374

114. Oxaprozin Tablets ............................................................................................. 377

115. Oxybutynin Chloride ......................................................................................... 383

116. Oxycodone/Acetaminophen .............................................................................. 384

117. Oxycodone HCL ................................................................................................ 385

118. Paricalcitol .................................................................................................................. 387

119. Paromomycin .............................................................................................................. 393

120. Permethrin................................................................................................................... 394

121. Perphenazine ............................................................................................................... 395

122. Phenytoin Sodium ....................................................................................................... 396

123. Pilocarpine HCL .......................................................................................................... 399

124. Piroxicam .................................................................................................................... 400

125. Potassium Chloride ...................................................................................................... 403

126. Pravastatin................................................................................................................... 404

127. Prazosin HCL ............................................................................................................. 412

128. Prednisolone Acetate ................................................................................................... 416

129. Prednisone................................................................................................................... 418

130. Propranolol.................................................................................................................. 420

    a) Propranolol Capsules ........................................................................................ 420

    b) Propranolol Tablets........................................................................................... 421

131. Raloxifene HCL........................................................................................................... 423

132. Ranitidine HCL............................................................................................................ 426

133. Silver Sulfadiazine ....................................................................................................... 429

134. Spironolactone HCTZ.................................................................................................. 429

135. Tamoxifen Citrate ....................................................................................................... 431

136. Temozolomide ............................................................................................................ 434

137. Theophylline ER.......................................................................................................... 438

138. Timolol Maleate........................................................................................................... 439

139. Tobramycin ................................................................................................................. 440

140. Tobramycin Dexamethasone........................................................................................ 444

141. Tolmetin Sodium ......................................................................................................... 445

142.    Tolterodine.................................................................................................................446

a)    Tolterodine ER.........................................................................................................446

b)    Tolterodine Tartrate .................................................................................................452

143.    Trazodone HCL .........................................................................................................455

144.    Triamcinolone Acetonide..........................................................................................456

145.    Triamterene HCTZ....................................................................................................457

146.    Trifluoperazine HCL.................................................................................................458

147.    Ursodiol .....................................................................................................................460

148.    Valsartan HCTZ.........................................................................................................462

149.    Verapamil...................................................................................................................466

150.    Zoledronic Acid ........................................................................................................466

XIII.    THE CONSPIRATORS INCREASE PRICES IN BUNCHES........................................468

A.    Nisha Patel's First List of Increase Candidates: Adapalene Gel; Nabumetone; Fluconazole Tablets; Ranitidine; Moexipril; Moexipril HCTZ; Pravastatin; and Onadansetron ...........468

1.    Glenmark ...................................................................................................................471

2.    Sandoz........................................................................................................................474

3.    Taro............................................................................................................................476

B.    Teva/Patel's July 3, 2013 Price Increases: Adapalene Gel, Cefaclor ER Tablets, Cefadroxil Tablets, Cefdinir Capsules and Oral Suspension, Cefprozil Tablets. Cimetidine Tablets, Fluconazole Tablets,  Floucinonide Cream, Gel, and Ointment, Methotrexate Tablets, Moexipril HCL Tablets, Moexipril HCL/HCZT Tablets, Nabumetone Tablets, Nadolol Tablets, Oxybutynin Chloride Tablets, Prazosin HCL Capsules, Ranitidine HCL Tablets477

1.    Upsher-Smith .............................................................................................................480

2.    Mylan.........................................................................................................................481

3.    Sandoz........................................................................................................................485

C.    Price Increases – Summer 2013:  Sandoz and Mylan Coordinate to Orchestrate Price Increases on Diltiazem HCL, Haloperidol, Clomipramine, Tizanidine, Levothyroxin, and Nadolol .......................................................................................................................487

1.    Haloperidol and Trifluoperazine HCL......................................................................489

2.      Tizanidine ...........................................................................................................491

3.      Enalapril Maleate ...............................................................................................494

D.      August 9, 2013 Price Increases ("Patel's Round 2"): Amiloride HCL/HCTZ Tablets, Clemastine Fumarate Oral Liquid and Tablets, Diclofenac Tablets, Diltiazem HCL Tablets, Etodolac ER Tablets, Ketoprofen Capsules, Ketorolac Tablets, Pravastatin Tablets, Tolmetin Sodium Capsules ...............................................................................499

1.      Mylan ...................................................................................................................503

2.      Etodolac and Etodolac ER ..................................................................................506

3.      Impact of Price Increases ...................................................................................511

4.      Price Increase Hiatus..........................................................................................512

5.      March 7, 2014: Niacin ER ...................................................................................513

E.      April 4, 2014 Price Increases: Azithromycin Suspension and Oral Suspension, Bumetanide Tablets, Cephalexin Suspension, Clarithromycin ER Tablets, Cyproheptadine HCL Tablets, Dicloxacillin Sodium Capsules, Diflunisal Tablets, Estazolam Tablets, Ethosuximide Capsules and Oral Suspension, Hydroxyzine Pamoate Capsules, Ketoconazole (Cream and Tablets), Medroxyprogesterone Tablets, Estradiol/Norethindrone Acetate Tablets, Nystatin Oral Tablets, Pentoxifylline Tablets, Tamoxifen Citrate Tablets, Theophylline ER Tablets ...............................................................................................................................516

1.      Lupin (Cephalexin Oral Suspension)...................................................................522

2.      Greenstone (Azithromycin Oral Suspension, Azithromycin Suspension, and Medroxyprogesterone Tablets)............................................................................524

3.      Actavis (Clarithromycin ER Tablets, Tamoxifen Citrate and Estazolam) ..........528

4.      Multiple Manufacturers (Ketoconazole Cream and Tablets)..............................531

5.      New Relationships Emerge..................................................................................535

        a)      Breckenridge ...........................................................................................535

        b)      Rising.......................................................................................................537

        c)      Versapharm .............................................................................................539

6.      Impact ..................................................................................................................540

F.      August 28, 2014 Price Increases: Amiloride HCL/HCTZ Tablets, Amoxicillin/Clavulanate Chewable Tablets, Carbamazepine Chewable Tablets, Carbamazepine Tablets, Clemastine Fumarate Tablets, Clotrimazole Topical Solution, Desmopressin Acetate Tablets, Diclofenac Potassium Tablets, Disopyramide Phosphate Capsules, Enalapril Maleate Tablets, Epitol Tablets, Flurbiprofen Tablets, Flutamide Capsules, Fluvastatin Sodium

Capsules, Hydroxyurea Capsules, Loperamide HCL Capsules, Penicillin VK Tablets, Prazosin HCL Capsules, Prochlorperazine Tablets, Topiramate Sprinkle Capsules, Warfarin Sodium Tablets ............................................................................................... 540

1.    Mylan ........................................................................................................ 543

2.    Taro............................................................................................................ 548

3.    Zydus......................................................................................................... 552

4.    Competitors Follow Teva ......................................................................... 553

G.    January 28, 2015 Price Increases: Bethanechol Chloride Tablets, Ciprofloxacin HCL Tablets, Diltiazem HCL Tablets, Estradiol Tablets, Fluoxetine HCL Tablets, Glimepiride Tablets, Griseofulvin Suspension, Isoniazid, Ketoprofen Capsules, Ketorolac Tromethamine Tablets, Nortriptyline HCL Capsules, Propranolol ............. 554

1.    Ciprofloxacin HCL and Glimepiride ....................................................... 556

2.    Griseofulvin ............................................................................................. 558

XIV.    AFTER SUCCESSFULLY COLLUDING, DEFENDANTS' QUALITY RANKINGS IMPROVE ............................................................................................................ 559

A.    Apotex....................................................................................................... 560

B.    Zydus ........................................................................................................ 562

C.    Heritage..................................................................................................... 564

D.    Lupin ......................................................................................................... 565

E.    Par ............................................................................................................. 566

F.    Greenstone ................................................................................................ 568

G.    Amneal....................................................................................................... 569

H.    Rising......................................................................................................... 570

I.    Breckenridge ............................................................................................. 572

J.    Glenmark ................................................................................................... 573

K.    A Commitment To The Overcharging Conspiracy Was Instrumental To The Success Of The Price Fixing Agreements ................................................................ 574

L.    "Quality Competitor" Rankings Relate To Price Increases, But Even "Low Quality" Competitors Comply With The Overarching Conspiracy .................................. 576

1.    Camber Pharmaceuticals, Inc. (and its President, Defendant Ostaficiuk) and Teva fix prices

on Ranitidine HCL ................................................................................................................ 576

XV.    CONCIOUSNESS OF GUILT – DEFENDANTS AND THEIR EXECUTIVES
       KNOWINGLY VIOLATED THE ANTITRUST LAWS ................................................ 582

XVI.   THE GENERIC DRUG INDUSTRY WAS SUSCEPTIBLE TO COLLUSION ............. 587

XVII.  DEFENDANTS' CONSPIRACY WAS EFFECTIVE AND IS STILL ........................... 589

A.     The Statute of Limitations Was Tolled on Numerous Grounds ........................................ 592

B.     Spoliation of Evidence ..................................................................................................... 598

C.     Obstruction of Justice ...................................................................................................... 599

XIX.   MARKET EFFECTS ............................................................................................................ 601

XX.    ANTITRUST INJURY ......................................................................................................... 602

XXI.   ANTITRUST VIOLATIONS ................................................................................................ 602

A.     Count 1 – Overarching Conspiracy On All Price-Fixed Generic Drugs For Direct
       Purchases under Section 1 of the Sherman Act Against Teva, Actavis, Akorn, Alvogen,
       Amneal, Aurobindo, Dr. Reddy's, Lannett, Lupin, Mylan, Par, Upsher-Smith,
       Wockhardt, Zydus, Aprahamian, Cavanaugh, Berthold, Falkin, Grauso, Green, Nesta,
       Ostaficiuk, Patel, Reckenthaler and Rogerson ............................................................... 602

B.     Count 2 – Overarching Conspiracy On All Price-Fixed Generic Drugs For Indirect
       Purchases under Certain State Antitrust and Consumer Protection Statutes Against All
       Defendants ........................................................................................................................ 611

C.     Count 3 (Pled In The Alternative To Count 1) For Direct Purchases Under Section 1 of
       the Sherman Act Against Teva, Actavis, Amneal, Aurobindo, Dr. Reddy's, Lannett,
       Lupin, Mylan, Par, Upsher-Smith, Wockhardt, Zydus, Aprahamian, Cavanaugh,
       Berthold, Falkin, Grauso, Green, Nesta, Ostaficiuk, Patel, Reckenthaler and Rogerson
       .......................................................................................................................................... 620

D.     Count 4 (Pled In The Alternative To Count 2) For Indirect Purchases Under the Certain
       State Antitrust and Consumer Protection Statutes Against Teva, Actavis, Amneal,
       Aurobindo, Breckenridge, Dr. Reddy's, Fougera, Glenmark, Greenstone, Lannett,
       Lupin, Mylan, Novartis, Par, Pfizer, Sandoz, Taro, Upsher-Smith, Wockhardt, Zydus,
       Aprahamian, Brown, Cavanaugh, Berthold, Falkin, Grauso, Green, Hatosy, Kellum,
       Nailor, Nesta, Ostaficiuk, Patel, Reckenthaler and Rogerson ...................................... 627

E.     Counts 5 Through 209 (Individual Conspiracies) For Direct Purchases Under Section 1
       of the Sherman Act Against Teva, Actavis, Akorn, Alvogen, Amneal, Aurobindo, Dr.
       Reddy's, Lannett, Lupin, Mylan, Par, Upsher-Smith, Wockhardt, Zydus, Aprahamian,
       Cavanaugh, Berthold, Falkin, Grauso, Green, Nesta, Ostaficiuk, Patel, Reckenthaler
       and Rogerson .................................................................................................................... 634

F.	Counts 210 Through 420 (Individual Conspiracies) For Indirect Purchases Under Certain State Antitrust and Consumer Protection Statutes Against All Defendants ...... 647

G.	Count 421 (Against Defendant Ara Aprahamian) – For Direct Purchases under Section 1 of the Sherman Act – Horizontal Conspiracy to Allocate Markets and Fix Prices For Multiple Generic Drugs .................................................................................... 661

H.	Count 422 (Against Defendant Ara Aprahamian) – For Indirect Purchases under Certain State Antitrust and Consumer Protection Statutes – Horizontal Conspiracy to Allocate Markets and Fix Prices For Multiple Generic Drugs .................................... 663

I.	Count 423 (Against Defendant David Berthold) – For Direct Purchases under Section 1 of the Sherman Act – Horizontal Conspiracy to Allocate Markets and Fix Prices for Multiple Generic Drugs .................................................................................... 665

J.	Count 424 (Against Defendant David Berthold) – For Indirect Purchases under Certain State Antitrust and Consumer Protection Statutes – Horizontal Conspiracy to Allocate Markets and Fix Prices for Multiple Generic Drugs ....................................... 667

K.	Count 425 (Against Defendant James (Jim) Brown) – For Indirect Purchases under Certain State Antitrust and Consumer Protection Statutes – Horizontal Conspiracy to Allocate Markets and Fix Prices for Multiple Generic Drugs .................................... 668

L.	Count 426 (Against Defendant Maureen Cavanaugh) – For Direct Purchases under Section 1 of the Sherman Act – Horizontal Conspiracy to Allocate Markets and Fix Prices for Multiple Generic Drugs .................................................................... 670

M.	Count 427 (Against Defendant Maureen Cavanaugh) – For Indirect Purchases under Certain State Antitrust and Consumer Protection Statutes – Horizontal Conspiracy to Allocate Markets and Fix Prices for Multiple Generic Drugs .................................... 674

N.	Count 428 (Against Defendant Marc Falkin) – For Direct Purchases under Section 1 of the Sherman Act – Horizontal Conspiracy to Allocate Markets and Fix Prices for Multiple Generic Drugs .................................................................................... 677

O.	Count 429 (Against Defendant Marc Falkin) – For Indirect Purchases under Certain State Antitrust and Consumer Protection Statutes – Horizontal Conspiracy to Allocate Markets and Fix Prices for Multiple Generic Drugs ....................................... 679

P.	Count 430 (Against Defendant James (Jim) Grauso) – For Direct Purchases under Section 1 of the Sherman Act – Horizontal Conspiracy to Allocate Markets and Fix Prices for Multiple Generic Drugs .................................................................... 681

Q.	Count 431 (Against Defendant James (Jim) Grauso) – For Indirect Purchases under Certain State Antitrust and Consumer Protection Statutes – Horizontal Conspiracy to Allocate Markets and Fix Prices for Multiple Generic Drugs .................................... 682

R.	Count 432 (Against Defendant Kevin Green) – For Direct Purchases under Section 1 of the Sherman Act – Horizontal Conspiracy to Allocate Markets and Fix Prices for Multiple Generic Drugs .................................................................................... 684

S.   Count 433 (Against Defendant Kevin Green) – For Indirect Purchases under Certain State Antitrust and Consumer Protection Statutes – Horizontal Conspiracy to Allocate Markets and Fix Prices for Multiple Generic Drugs ......................................................686

T.   Count 434 (Against Defendant Robin Hatosy) – For Indirect Purchases under Certain State Antitrust and Consumer Protection Statutes – Horizontal Conspiracy to Allocate Markets and Fix Prices for Multiple Generic Drugs ......................................................688

U.   Count 435 (Against Defendant Armando Kellum) – For Indirect Purchases under Certain State Antitrust and Consumer Protection Statutes – Horizontal Conspiracy to Allocate Markets and Fix Prices for Multiple Generic Drugs ......................................................690

V.   Count 436 (Against Defendant Jill Nailor) – For Indirect Purchases under Certain State Antitrust and Consumer Protection Statutes – Horizontal Conspiracy to Allocate Markets and Fix Prices for Multiple Generic Drugs ......................................................692

W.   Count 437 (Against Defendant James Nesta) – For Direct Purchases under Section 1 of the Sherman Act – Horizontal Conspiracy to Allocate Markets and Fix Prices for Multiple Generic Drugs ......................................................694

X.   Count 438 (Against Defendant James Nesta) – For Indirect Purchases under Certain State Antitrust and Consumer Protection Statutes – Horizontal Conspiracy to Allocate Markets and Fix Prices for Multiple Generic Drugs ......................................................696

Y.   Count 439 (Against Defendant Konstantin Ostaficiuk) – For Direct Purchases under Section 1 of the Sherman Act – Horizontal Conspiracy to Allocate Markets and Fix Prices for Multiple Generic Drugs ......................................................698

Z.   Count 440 (Against Defendant Konstantin Ostaficiuk) – For Indirect Purchases under Certain State Antitrust and Consumer Protection Statutes – Horizontal Conspiracy to Allocate Markets and Fix Prices for Multiple Generic Drugs ......................................................700

AA.  Count 441 (Against Defendant Nisha Patel) – For Direct Purchases under Section 1 of the Sherman Act – Horizontal Conspiracy to Allocate Markets and Fix Prices for Multiple Generic Drugs ......................................................701

BB.  Count 442 (Against Defendant Nisha Patel) – For Indirect Purchases under Certain State Antitrust and Consumer Protection Statutes – Horizontal Conspiracy to Allocate Markets and Fix Prices for Multiple Generic Drugs ......................................................705

CC.  Count 443 (Against Defendant David Rekenthaler) – For Direct Purchases under Section 1 of the Sherman Act – Horizontal Conspiracy to Allocate Markets and Fix Prices for Multiple Generic Drugs ......................................................708

DD.  Count 444 (Against Defendant David Rekenthaler) – For Indirect Purchases under Certain State Antitrust and Consumer Protection Statutes – Horizontal Conspiracy to Allocate Markets and Fix Prices for Multiple Generic Drugs ......................................................712

EE.  Count 445 (Against Defendant Richard (Rick) Rogerson) – For Direct Purchases under Section 1 of the Sherman Act – Horizontal Conspiracy to Allocate Markets and Fix

Prices for Multiple Generic Drugs .................................................................... 715

FF.    Count 446 (Against Defendant Richard (Rick) Rogerson) – For Indirect Purchases under Certain State Antitrust and Consumer Protection Statutes – Horizontal Conspiracy to Allocate Markets and Fix Prices for Multiple Generic Drugs .............. 717

GG.    Count 447 (Against All Defendants) – Unjust Enrichment ......................................... 719

XXII.  REQUEST FOR RELIEF ........................................................................................ 721

XXIII. JURY TRIAL DEMANDED .................................................................................... 722

**COMPLAINT**

HBP I LLC ("Plaintiff"), as assignee of all rights of Great Atlantic & Pacific Tea Company ("A&P"), to any A&P antitrust claims relating to or arising out of the purchase of generic drugs directly and indirectly brings this action for damages and declaratory relief, by and through its attorneys, bring this action against Actavis Holdco US, Inc.; Actavis Pharma, Inc.; Akorn, Inc.; Alvogen, Inc.; Amneal Pharmaceuticals, Inc.; Amneal Pharmaceuticals, LLC; Ara Aprahamian; Aurobindo Pharma U.S.A., Inc.; Bausch Health Americas, Inc.; Bausch Health US, LLC; David Berthold; Breckenridge Pharmaceutical, Inc.; James (Jim) Brown; Camber Pharmaceuticals, Inc.; Maureen Cavanaugh; Citron Pharma, LLC; Dr. Reddy's Laboratories, Inc.; Emcure Pharmaceuticals, Ltd..; Endo International, plc; Epic Pharma LLC; Mark Falkin; Fougera Pharmaceuticals, Inc.; G&W Laboratories, Inc.; Glenmark Pharmaceuticals, Inc., USA; James (Jim) Grauso; Kevin Green; Greenstone LLC; Robin Hatosy; Heritage Pharmaceuticals, Inc.; Hi-Tech Pharmacal Co., Inc.; Impax Laboratories, Inc.; Jubilant Cadista Pharmaceuticals Inc.; Kavod Pharmaceuticals LLC (f/k/a Rising Pharmaceuticals, LLC and f/k/a Rising Pharmaceuticals, Inc.); Armando Kellum; Lannett Company, Inc.; Lupin Pharmaceuticals Inc.; Mallinckrodt, Inc.; Mayne Pharma USA, Inc.; Morton Grove Pharmaceuticals, Inc.; Mylan N.V.; Mylan Inc.; Mylan Pharmaceuticals Inc.; Jill Nailor; James (Jim) Nesta; Oceanside Pharmaceuticals, Inc.; Konstantin Ostaficiuk; Par Pharmaceutical Companies, Inc.; Par Pharmaceutical, Inc.; Nisha Patel; Perrigo New York, Inc.; Pfizer, Inc.; Pliva, Inc.; David Reckenthaler; Richard (Rick) Rogerson; Sandoz, Inc.; Strides Pharma, Inc.; Sun Pharmaceutical Industries, Inc.; Taro Pharmaceuticals USA, Inc.; Teligent, Inc.; Teva Pharmaceuticals USA, Inc.; UDL Laboratories, Inc.; Upsher-Smith Laboratories, LLC; Valeant Pharmaceuticals North America, LLC, Valeant Pharmaceuticals International; Versapharm, Inc.; West-Ward Pharmaceuticals Corp.; Wockhardt USA LLC; and

1

Zydus Pharmaceuticals (USA), Inc. (collectively, the "Defendants")[1] and allege as follows:

## I.    INTRODUCTION

1.    For many years, beginning at least as early as 2009, the generic pharmaceutical industry operated pursuant to an understanding among generic manufacturers not to compete with each other and, instead, to settle for what these competitors refer to as "fair share." This understanding permeated every segment of the industry, and the purpose of the agreement was to avoid competition among generic manufacturers that would normally result in significant price erosion and great savings to purchasers such as A&P here.  Rather than enter a particular generic drug market by competing on price in order to gain market share, competitors in the generic drug industry would systematically and routinely communicate with one another directly, divvy up customers to create an artificial equilibrium in the market, and then maintain anticompetitively high prices. This "fair share" understanding was not the result of independent decision making by individual companies to avoid competing with one another. Rather, it was a direct result of specific discussion, negotiation and collusion among industry participants over the course of many years.

2.    By 2012, Teva and other co-conspirators decided to take this understanding to the next level. Unsatisfied with the status quo of "fair share" and the mere avoidance of price erosion, Teva and its competitors leveraged the collusive nature of the industry to not only maintain their "fair share" of each generic drug market, but also to significantly raise prices on as many drugs as possible. In order to accomplish that objective, Teva selected a core group of competitors with which it already had very profitable collusive relationships – Teva referred to them as "High Quality" competitors – and targeted drugs where they overlapped. Teva had agreements and

---

[1] Plaintiff brings a claim for damages as an indirect purchaser against All Defendants.  Plaintiff brings a claim for damages as a direct purchaser under Section 1 of the Sherman Act against all Defendants except Breckenridge, Emcure, Greenstone, Heritage, Pfizer, Sandoz, Fougera, Novartis, Sun, Taro, Glenmark, Jim Brown, Jill Nailor, Armando Kellum, and Robin Hatosy.  Each Count specifies the Defendants against whom it is directed.  Finally, Plaintiff does not seek to bring any claim for damages as an opt out arising out its role or status as an end payor.

2

understandings with its highest quality competitors to lead and follow each other's price increases, doing so with great frequency and success, resulting in many billions of dollars of harm to purchasers of generic drugs over several years.

3.    At the height of this collusive activity involving Teva, during a 19-month period beginning in July 2013 and continuing through January 2015, Teva significantly raised prices on approximately 112 different generic drugs. Of those 112 different drugs, Teva colluded with its "High Quality" competitors on at least 86 of them (the others were largely in markets where Teva was exclusive). The size of the price increases varied, but a number of them were well over 1,000%.

4.    In July 2014, the State of Connecticut initiated a non-public investigation into suspicious price increases for certain generic pharmaceuticals (the "AG Investigation"). Over time, the AG Investigation expanded and Connecticut was joined in its efforts by forty-eight (48) additional states and U.S. territories. The allegations in this Complaint are, in addition to Plaintiff's own review of available facts and evidence, based in large part on, and supported by, publicly available information and evidence gleaned from the Connecticut Attorney General Complaints arising from the AG Investigation, which Plaintiff understands included (1) the review of many thousands of documents produced by dozens of companies and individuals throughout the generic pharmaceutical industry, (2) an industry-wide phone call database consisting of more than 11 million phone call records from hundreds of individuals at various levels of the Defendant companies and other generic manufacturers, and (3) information provided by several as-of-yet unidentified cooperating witnesses cooperating with the AG Investigation and who were directly involved in the conduct alleged herein.

5.    The AG investigation exposed a marketplace in which generic drug manufacturers communicated with each other to determine and agree on the amount of market share each

3

"competitor" would be allocated. These shares were determined by the timing of each manufacturer's entry into the market (with early entrants entitled to a proportionately larger share than later entrants).

6.     Currently, the State AGs are pursing claims against dozens of manufacturing Defendants alleging collusion that distorted the prices of more than one hundred generic drugs. The State AGs' investigation is ongoing, and they have indicated that many other manufacturers and up to three hundred additional drugs are implicated in widespread anticompetitive conduct. Moreover, executives and others at the highest levels in many of the Defendant companies, including but not limited to Defendants Ara Aprahamian, David Berthold, James (Jim) Brown, Maureen Cavanaugh, Marc Falkin, James (Jim) Grauso, Kevin Green, Robin Hatosy, Armando Kellum, Jill Nailor, James (Jim) Nesta, Konstantin (Kon) Ostaficiuk, Nisha Patel, David Rekenthaler, and Richard (Rick) Rogerson, among others, conceived, directed and ultimately benefited from these schemes.

7.     The existence of a broader generic drug price fixing conspiracy is further revealed or supported by other activities of U.S. law enforcement. The DOJ convened a grand jury to investigate a number of the Defendants identified in this Complaint. To empanel a grand jury, DOJ's Guidelines require senior executives in the Antitrust Division to conclude that sufficient credible evidence of collusion exists. Upon information and belief, nearly all of the manufacturer Defendants identified in this Complaint were served with grand jury subpoenas. (The following companies (some of whom are not yet Defendants in the MDL) have publicly acknowledged receiving the grand jury subpoenas: Aceto (which purchased Citron in 2016), Actavis, Aurobindo, Citron, Dr. Reddy's, Heritage, Impax, Lannett, Mallinckrodt, Mayne, Mylan, Par, Perrigo, Pfizer, Sandoz, Sun, Taro, Teva, West-Ward, and Zydus. (Privately-held companies are under no obligation to make this disclosure.) The DOJ also executed search warrants at the corporate

4

offices of Perrigo, Mylan, and Aceto/Citron. For this to occur, DOJ had to persuade a federal judge that there was probable cause to believe that one or more antitrust violations had occurred, and that evidence of these violations would be found at the corporate offices of Mylan, Perrigo, and Aceto/Citron. Finally, upon information and belief, the DOJ has granted conditional amnesty to one of the Defendants in this case. (This company has not yet publicly acknowledged its amnesty status.) Under its Guidelines, for the DOJ to grant a company conditional amnesty, the amnesty applicant had to confess to criminal violations of the U.S. antitrust laws and inform on its co-conspirators based on information known to the amnesty applicant.

8.      As noted above the purpose of the unlawful "fair share" allocation was to fix, maintain and stabilize prices – either for a particular generic drug or any number of generic drugs. In this way, each entrant would benefit from coordination as a whole, even if a manufacturer did not seek a market allocation for a particular drug. Manufacturers implemented the "fair share" agreement by refusing to bid for a particular customer or by providing a pretextual bid that they knew would not be successful. This prevented prices from declining even when a new "competitor" joined the market.

9.      Additionally, in conjunction with their market allocation agreement, manufacturers also agreed to raise prices above competitive levels for certain drugs, and were able to maintain or slow the decline of prices for other drugs that would have been lower absent their conspiratorial agreements.

10.     Through this industry-wide market allocation agreement, Defendants were also able to implement substantial price increases on a number of additional generic drugs. As detailed below, during the conspiracy, Defendants' price increases were almost always more than 100% and in some instances approached 5000%. All of these price increases were collusive, and nearly all of these abrupt and substantial price increases were carried out by two or more Defendants that

5

are the subject of the pending state and federal enforcement actions.

11.     Indeed, the United States Department of Justice ("DOJ") has publicly acknowledged that its criminal investigation has uncovered evidence that a "significant number" of the drugs that are not yet the subject of government enforcement actions were nonetheless subject to collusion. Specifically, the DOJ informed the Court that "[e]vidence uncovered during the criminal investigation implicates other companies (including a significant number of the Defendants here) and individual employees in collusion with respect to ... a significant number  of the [additional drugs]." The DOJ further noted that the lack of complete overlap between its criminal investigation and the drugs that are not yet subject to enforcement actions should not be read as an indication that any of these drugs was not the subject of collusion by Defendants, explaining that: "[s]till more companies and individuals, and additional drugs, may be implicated as the investigation continues to develop." Based on the substantial overlap between the allegations in this and other civil Complaints and the DOJ's pending investigation, the DOJ has repeatsedly sought to stay discovery by private litigants in MDL 2724.

12.     The existence of the conspiracy alleged in this Complaint is further supported by the fact that Heritage executives Jeffrey Glazer and Jason Malek have pled guilty to participating in a conspiracy to fix prices of Glyburide and Doxycycline between at least 2013 and 2015 and Armando Kellum (Sandoz) has plead guilty to participating in a conspiracy to fix the price of Clobetasol.  Additionally, Heritage and co-conspirator Rising Pharma have entered into deferred prosecution agreements that involved admissions that they conspired to fix the prices of Glyburide and Benazepril HCTZ, respectively. Heritage also resolved False Claims Act claims brought  by the United States related to its price fixing of Hydralazine and Theophylline ER. Likewise, Sandoz, Apotex, Teva and Taro have also entered into deferred prosecution  agreements which are set forth in further detail in ¶ 140 *infra.*  By operation of law, these guilty pleas and judicial

admissions merely define the minimum parameters of the generic drug price fixing conspiracy. Thus, the scope of the conspiracy actionable in this civil antitrust action may be and, as alleged in this Complaint, is broader than the judicial admissions to date. While these admissions establish that a conspiracy did exist, discovery is necessary to determine the full scope of the conspiracy in terms of products, time period, and participants.

13.     Moreover, for the drugs that are not yet the subject of pending enforcement actions, the collusive nature of Defendants' price increases on these drugs is supported by the facts from those enforcement actions that have been made publicly available. For example, Digoxin is an essential heart medication that was widely used in the U.S. prior to the 1938 passage of the Federal Food, Drug, and Cosmetic Act. Between 2010 and 2013, the price for Digoxin was remarkably stable, with one tablet costing as little as 12 cents. Beginning in  October 2013, however, Defendants Impax, Lannett, Mylan, Par, Sun, and West-Ward successfully raised prices from 12 cents per tablet to more than a dollar per tablet, an increase of 750%. Furthermore, we know for certain (from Glazer's and Malek's guilty pleas) that Heritage conspired to fix prices of Doxycycline, and the State AGs' investigation confirms that Mylan and Mayne were the unidentified co-conspirators with which Malek and Glazer pled guilty to conspiring. Additionally, the State AGs' investigation further reflects that Mylan, Lannett, Par and Sun adhered to the generic drug industry's overarching market allocation agreement. Accordingly, under the circumstances alleged here, the unprecedented 750% price increase on Digoxin is also shown to be the result of collusion. (Or put differently, this enormous price increase was not the result of competitive and independent decision-making but by documented collusion among competitors).

14.     Further, each of the price increases that are the subject of this Complaint was against each Defendant's self-interest at the time in the absence of collusion. This is because, among other reasons, based on fundamental economic theory and the nature of price competition in the generic drug industry, in the absence of collusion, each Defendant that raised prices would

7

lose substantial market share to rivals that continued to price competitively. This is particularly so where, as here, the price increases were so large.

15.    Thousands of generic drugs have been sold in the United States since the passage of the Hatch-Waxman Act in 1984. Prior to approximately 2007, nearly all of the pricing behavior of generic drugs was consistent with economic theory, i.e., when generic entry occurred, generic drug prices declined. But this was not so for the more than 200 generic drugs that are the known subject of this Complaint; their pricing pattern – considered alone or in comparison with Benazepril HCTZ, Doxycycline, and Glyburide – is so unusual and extraordinary as to demonstrate the existence of a conspiracy. (Plaintiff reserves the right to amend this Complaint to add allegations about other generic drugs subject to discovery or further proceedings in this case.)

16.    Still other economic evidence confirms the broader scope of the conspiracy alleged in this Complaint.

17.    As alleged below, each of the generic drug price increases covered by this Complaint is not explained by changes in supply, the costs of production, or demand. Indeed, there are no market forces that explain the pricing of the drugs identified in this Complaint other than collusion. Moreover, as alleged below, each Price-Fixed Generic Drug has commodity-like characteristics, there are barriers to entry of a new competitor, the demand is highly inelastic, and the market for the sale of each generic drug is relatively concentrated. These economic conditions make the market for the manufacture and sale of the Price-Fixed Generic Drugs conducive to cartelization.

18.    As noted above, the State AGs' and DOJ's investigations are ongoing and likely involve additional conspirators and additional drugs beyond those named in this Complaint. For example, Pfizer Inc. reported in an SEC filing dated August 10, 2017 that:

> As of July 2017, the U. S. Department of Justice's Antitrust Division is investigating our Greenstone generics business. We believe this is related to

8

an ongoing antitrust investigation of the generic pharmaceutical industry. The government has been obtaining information from Greenstone.

19.     In addition to the information made public from these government investigations, the allegations in this Complaint are further supported by the fact that Defendants engaged in an extremely high level of interfirm communications. These communications included a large number of in-person meetings facilitated by an almost constant stream of industry trade events such as the trade association meetings sponsored by the Generic Pharmaceutical Association. In addition to these in-person meetings, Defendants frequently communicated by telephone, e-mail, and text message. As demonstrated in this Complaint, these interfirm communications involved high-level executives with pricing authority, including the individual Defendants, and directly affected Defendants' pricing decisions on the generic drugs identified in this Complaint.

20.     Defendants and their co-conspirators carried out their continuing conspiracy regarding generic drugs through in-person meetings including frequent industry trade shows, conferences and other similar events, regular "industry dinners," "girls' nights out," lunches, parties, golf outings, and frequent communications, including e-mails, text messages, and telephone calls. During these meetings and communications, they conspired on the terms alleged in this Complaint, and coordinated price increase announcements or pricing terms, allocated markets and customers, rigged bids, secretly and collusively exchanged pricing information and prospective pricing announcements and business plans, and collectively reduced quantity and restrained output of generic drugs sold to A&P and others in the United States.

21.     Considered collectively – (1) the guilty pleas and judicial admissions; (2) the State AGs' civil enforcement action and allegations; (3) the unprecedented price increases with respect to the generic drugs covered in this Complaint (particularly given the economic and market conditions in the generic drug industry); (4) the absence of any reasonable economic or market explanation for these price increases other than collusion; (5) the correlation between the

9

unprecedented and indisputably collusive pricing on Glyburide, Doxycycline, Hydralazine, Benazepril HCTZ, and Theophylline ER and the other generic drugs covered in this Complaint; (6) the economic and structural factors rendering the market for the manufacture and sale of generic drugs conducive to cartelization; (7) the extremely high level of interfirm communications by senior executives with pricing authority that occurred in-person through trade association meetings as well as by telephone, e-mail, and text message; and (8) the other U.S. law enforcement activities, including the search warrants and criminal subpoenas – all support the existence of the conspiracy alleged in this Complaint.

22.      Upon information and belief, a single group of core conspirators consisting of Actavis, Heritage, Mylan, Par, Sun/Taro, Teva, and the Sandoz Defendants (collectively the "Core Conspirators") engaged in the conduct alleged in this Complaint and directed the implementation of an overarching conspiracy. All, or nearly all, of the Price-Fixed Generic Drugs alleged in this Complaint were manufactured by at least one of the Core Conspirators. All other Defendants named in this Complaint joined the Core Conspirators and were active participants in the overarching conspiracy. In some cases, some Defendants only manufactured one or two of the Price-Fixed Generic Drugs, but their participation in the overarching conspiracy was necessary to raise the price of the Price Fixed Generic Drugs that they manufactured because it would have been in their independent interests not to follow the price increases of the other conspirators and thereby increase their market share. The existence of the overarching conspiracy permitted the Core Conspirators to induce all other Defendants to participate as necessary to increase prices on each of the Price Fixed Generic Drugs to fully implement and maintain the overarching conspiracy.

23.      Defendants understood and acted upon an underlying code of conduct that is widespread in the generics industry: an expectation that any time a competitor is entering a particular generic drug market, it can contact its competitors and allocate the market according to a generally agreed-upon standard of "fair share" in order to avoid competing and keep prices high.

While different drugs may involve different sets of companies, this background understanding remains constant and is an important component of Defendants' ability to reach agreements for specific drugs.

24.     Defendants knew their conduct was unlawful. The conspirators usually chose to communicate in person or by cell phone, in an attempt to avoid creating a written record of their illegal conduct. The structure of the generic drug industry provided numerous opportunities for collusive communications at trade shows, customer events and smaller more intimate dinners and meetings. When communications were reduced to writing or text message, Defendants often took overt and calculated steps to destroy evidence of those communications.

25.     As a result of the conspiratorial conduct identified in this Complaint, A&P paid substantially inflated and anticompetitive prices for numerous generic pharmaceutical drugs, and Defendants illegally profited as a result.

26.     The allegations in this Complaint are pled in the alternative if necessary to avoid inconsistency.

## II.     DRUGS INVOLVED IN THE CONSPIRACY

27.     As it is used in this Complaint, the term "Price-Fixed Generic Drugs" (individually or collectively, as context requires) refers to all dosages, strengths, and formulations (whether or not any are specified), of all or nearly all generic drugs, including at least the following generic drugs (which as noted above are expected to expand during the course of this litigation).

| 1. | ACETAZOLAMIDE CAPSULES |
|---|---|
| 2. | ACETAZOLAMIDE TABLETS |
| 3. | ADAPALENE GEL |
| 4. | ALBUTEROL |
| 5. | ALCLOMETASONE DIPROPIONATE CREAM |
| 6. | ALCLOMETASONE DIPROPIONATE OINTMENT |

11

| 7. | ALLOPURINOL INJECTION |
|---|---|
| 8. | ALLOPURINOL TABLET |
| 9. | AMANTADINE HCL/HCTZ |
| 10. | AMILORIDE HCL/HCTZ TABLETS |
| 11. | AMITRIPTYLINE |
| 12. | AMOXICILLIN/CLAVULANATE CHEWABLE TABLETS |
| 13. | AMPHETAMINE/DEXTROAMPHETAMINE ER (AKA MIXED AMPHETAMINE SALTS) |
| 14. | AMPHETAMINE/DEXTROAMPHETAMINE IR (AKA MIXED AMPHETAMINE SALTS) |
| 15. | ATENOLOL CHLORTHOLIDONE |
| 16. | ATROPINE SULFATE |
| 17. | AZITHROMYCIN ORAL SUSPENSION |
| 18. | AZITHROMYCIN SUSPENSION |
| 19. | BACLOFEN |
| 20. | BALSALAZIDE DISODIUM |
| 21. | BENAZEPRIL HCTZ |
| 22. | BETAMETHASONE DIPROPIONATE |
| 23. | BETAMETHASONE DIPROPIONATE AUGMENTED |
| 24. | BETAMETHASONE DIPROPIONATE CLOTRIMAZOLE |
| 25. | BETAMETHASONE VALERATE |
| 26. | BETHANECHOL CHLORIDE TABLETS |
| 27. | BROMOCRIPTINE MESYLATE |
| 28. | BUDESONIDE DR CAPSULES |
| 29. | BUDESONIDE INHALATION |
| 30. | BUMETANIDE TABLETS |
| 31. | BUSPIRONE HYDROCHLORIDE TABLETS |
| 32. | BUTORPHANOL TARTRATE |
| 33. | CABERGOLINE |
| 34. | CAPECITABINE |
| 35. | CAPTOPRIL |
| 36. | CARBAMAZEPINE CHEWABLE TABLETS |
| 37. | CARBAMAZEPINE EXTENDED RELEASE TABLETS |
| 38. | CARBAMAZEPINE TABLETS |
| 39. | CARISOPRODOL |

12

| | |
|---|---|
| 40. | CEFACLOR ER |
| 41. | CEFDINIR ORAL SUSPENSION |
| 42. | CEFPROZIL TABLETS |
| 43. | CEFUROXIME AXETIL |
| 44. | CELECOXIB |
| 45. | CEPHALEXIN (CEFALEXIN) |
| 46. | CHLORPROMAZINE HCL |
| 47. | CHOLESTYRAMINE |
| 48. | CICLOPIROX |
| 49. | CIMETIDINE TABLETS |
| 50. | CIPROFLOXACIN HCL TABLETS |
| 51. | CLARITHROMYCIN |
| 52. | CLEMASTINE FUMARATE TABLETS |
| 53. | CLINDAMYCIN PHOSPHATE |
| 54. | CLOBETASOL |
| 55. | CLOMIPRAMINE HCL |
| 56. | CLONIDINE TTS PATCH |
| 57. | CLOTRIMAZOLE TABLETS |
| 58. | CLOTRIMAZOLE TOPICAL SOLUTION |
| 59. | CYPROHEPTADINE HCL TABLETS |
| 60. | DESMOPRESSIN ACETATE |
| 61. | DESOGESTREL/ETHINYL ESTRADIOL TABLETS (KARIVA) |
| 62. | DESONIDE |
| 63. | DEXMETHYLPHENIDATE HCL ER CAPSULES |
| 64. | DEXTROAMPHETAMINE SULFATE ER |
| 65. | DICLOFENAC POTASSIUM TABLETS |
| 66. | DICLOXACILLIN SODIUM CAPSULES |
| 67. | DIFLUNISAL TABLETS |
| 68. | DIGOXIN |
| 69. | DILTIAZEM HCL TABLETS |
| 70. | DIPHENOXYLATE ATROPINE HCL |
| 71. | DISOPYRAMIDE PHOSPHATE CAPSULES |
| 72. | DIVALPROEX ER |
| 73. | DOXAZOSIN MESYLATE TABLETS |
| 74. | DOXYCYCLINE |
| 75. | DOXY DR |
| 76. | DOXY HYCLATE |

13

| 77. | DOXY MONO |
|---|---|
| 78. | DROSPIRENONE AND ETHINYL ESTRADIOL (OCELLA) |
| 79. | ECONAZOLE |
| 80. | ENALAPRIL MALEATE TABLETS |
| 81. | ENTECAVIR |
| 82. | EPITOL TABLETS |
| 83. | ESTAZOLAM TABLETS |
| 84. | ESTRADIOL TABLETS |
| 85. | ETHINYL ESTRADIOL AND LEVONORGESTREL (PORTIA AND JOLESSA) |
| 86. | ETHOSUXIMIDE CAPSULES |
| 87. | ETHOSUXIMIDE ORAL SOLUTION |
| 88. | ETODOLAC |
| 89. | ETODOLAC ER |
| 90. | EXEMESTANE |
| 91. | FENOFIBRATE |
| 92. | FLUCONAZOLE TABLETS |
| 93. | FLUOCINOLONE ACETONIDE |
| 94. | FLUOCINONIDE |
| 95. | FLUOCINONIDE CREAM |
| 96. | FLUOCINONIDE GEL |
| 97. | FLUOCINONIDE OINTMENT |
| 98. | FLUOXETINE HCL TABLETS |
| 99. | FLURBIPROFEN TABLETS |
| 100. | FLUTAMIDE CAPSULES |
| 101. | FLUTICASONE PROPIONATE |
| 102. | FLUVASTATIN SODIUM CAPSULES |
| 103. | FOSINOPRIL HCTZ |
| 104. | GABAPENTIN TABLETS |
| 105. | GLIMEPIRIDE TABLETS |
| 106. | GLIPIZIDE-METFORMIN |
| 107. | GLYBURIDE |
| 108. | GLYBURIDE-METFORMIN |
| 109. | GRISEOFULVIN SUSPENSION |
| 110. | HALOBETASOL PROPIONATE |
| 111. | HALOPERIDOL |
| 112. | HYDRALAZINE |

14

| | |
|---|---|
| 113. | HYDROCODONE ACETAMINOPHEN |
| 114. | HYDROCORTISONE VALERATE |
| 115. | HYDROXYUREA CAPSULES |
| 116. | HYDROXYZINE PAMOATE CAPSULES |
| 117. | IRBESARTAN |
| 118. | ISONIAZID |
| 119. | ISOSORBIDE DINITRATE |
| 120. | KETOCONAZOLE CREAM |
| 121. | KETOCONAZOLE TABLETS |
| 122. | KETOPROFEN CAPSULES |
| 123. | KETOROLAC TROMETHAMINE TABLETS |
| 124. | LABETALOL HCL TABLETS |
| 125. | LAMIVUDINE/ZIDOVUDINE (GENERIC COMBIVIR) |
| 126. | LATANOPROST |
| 127. | LEFLUNOMIDE |
| 128. | LEVOTHYROXINE |
| 129. | LIDOCAINE-PRILOCAINE |
| 130. | LOPERAMIDE HCL CAPSULES |
| 131. | MEDROXYPROGESTERONE TABLETS |
| 132. | MEPROBAMATE |
| 133. | METFORMIN ER |
| 134. | METHADONE HCL |
| 135. | METHOTREXATE TABLETS |
| 136. | METHYLPHENIDATE |
| 137. | METHYLPREDNISOLONE |
| 138. | METRONIDAZOLE |
| 139. | METRONIDAZOLE CREAM |
| 140. | METRONIDAZOLE JELLY |
| 141. | METRONIDAZOLE LOTION |
| 142. | METRONIDAZOLE VAGINAL |
| 143. | MIMVEY (ESTRADIOL/NORETHINDRONE ACETATE) TABLETS |
| 144. | MOEXIPRIL HYDROCHLORIDE TABLETS |
| 145. | NABUMETONE TABLETS |

15

| 146. | NADOLOL TABLETS |
|---|---|
| 147. | NAPROXEN SODIUM |
| 148. | NEOMYCIN POLYMYXIN HYDROCORTISONE |
| 149. | NIACIN ER TABLETS |
| 150. | NIMODIPINE |
| 151. | NITROFURANTOIN MACROCRYSTAL CAPSULES |
| 152. | NORETHINDRONE ACETATE |
| 153. | NORETHINDRONE/ETHINYL ESTRADIOL (BALZIVA) |
| 154. | NORTRIPTYLINE HCL CAPSULES |
| 155. | NYSTATIN |
| 156. | NYSTATIN CREAM |
| 157. | NYSTATIN OINTMENT |
| 158. | NYSTATIN TABLETS |
| 159. | NYSTATIN TRIAMCINOLONE |
| 160. | OMEGA-3-ACID ETHYL ESTERS |
| 161. | ONDANSETRON |
| 162. | OXAPROZIN TABLETS |
| 163. | OXYBUTYNIN CHLORIDE TABLETS |
| 164. | OXYCODONE HCL |
| 165. | OXYCODONE/ACETAMINOPHEN |
| 166. | PARICALCITOL |
| 167. | PAROMOMYCIN |
| 168. | PENICILLIN VK TABLETS |
| 169. | PENTOXIFYLLINE TABLETS |
| 170. | PERMETHRIN |
| 171. | PERPHENAZINE |
| 172. | PHENYTOIN SODIUM |
| 173. | PILOCARPINE HCL |
| 174. | PIROXICAM |
| 175. | POTASSIUM CHLORIDE |
| 176. | PRAVASTATIN |
| 177. | PRAZOSIN HCL CAPSULES |
| 178. | PREDNISOLONE ACETATE |
| 179. | PREDNISONE |
| 180. | PROCHLORPERAZINE TABLETS |
| 181. | PROPRANOLOL |

| 182. | PROPRANOLOL CAPSULES |
| 183. | PROPRANOLOL TABLETS |
| 184. | RALOXIFENE HCL TABLETS |
| 185. | RANITIDINE HCL TABLETS |
| 186. | RANITIDINE HCL CAPSULES |
| 187. | SILVER SULFADIAZINE |
| 188. | SPIRONOLACTONE HCTZ |
| 189. | TAMOXIFEN CITRATE TABLETS |
| 190. | TEMOZOLOMIDE |
| 191. | THEOPHYLLINE ER |
| 192. | TIMOLOL MALEATE |
| 193. | TIZANIDINE |
| 194. | TOBRAMYCIN |
| 195. | TOBRAMYCIN DEXAMETHASONE |
| 196. | TOLMETIN SODIUM CAPSULES |
| 197. | TOLTERODINE |
| 198. | TOLTERODINE ER |
| 199. | TOLTERODINE TARTRATE |
| 200. | TOPIRAMATE SPRINKLE CAPSULES |
| 201. | TRAZODONE HCL |
| 202. | TRIAMCINOLONE ACETONIDE |
| 203. | TRIAMCINOLONE ACETONIDE CREAM |
| 204. | TRIAMCINOLONE ACETONIDE OINTMENT |
| 205. | TRIAMTERENE HCTZ |
| 206. | TRIFLUOPERAZINE HCL |
| 207. | URSODIOL |
| 208. | VALSARTAN HCTZ |
| 209. | VERAPAMIL |
| 210. | WARFARIN SODIUM TABLETS |
| 211. | ZOLEDRONIC ACID |

## III.    JURISDICTION AND VENUE

28.     This Court has jurisdiction over this action under Section 1 of the Sherman Act, 15 U.S.C. § 1 & 26, and under 28 U.S.C. §§ 1331 and 1337.

29.     This Court may exercise personal jurisdiction over all of the Defendants because they either transact business in this District, or they have engaged in anticompetitive and illegal

17

conduct that has had an impact in this District. Specifically, the corporate Defendants market and sell generic pharmaceutical drugs in interstate and intrastate commerce to direct purchasers like A&P nationwide directly, and through drug wholesalers and distributors. The individual Defendants were executives of various Defendants or non-Defendant co-conspirators who engaged in and directed some of the unlawful conduct addressed herein. The acts complained of have, and will continue to have, substantial effects in this District.

30.    Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b)-(c). At all times relevant to this Complaint, Defendants resided, transacted business, were found, or had agents in this District, and a portion of the affected interstate trade and commerce described below has been carried out in this District.

## IV.    THE PARTIES

### A. Plaintiff

31.    Plaintiff HBP I LLC is the rightful owner of the antitrust claims of A&P being asserted against Defendants ("Antitrust Claims") as follows. On or about July 19, 2015, The Great Atlantic & Pacific Tea Company, Inc. and its affiliates ("A&P" or Debtors) filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York, jointly administered under Case No. 15-23007. On or about May 14, 2021, the Debtors transferred certain assets of their estates ("Transferred Assets") to Mount Kellett Master Fund, L.P. and MK Fund I AP SPV, LLC (together, "Original Transferee"). The Transferred Assets include, among other things, any and all right, title, and interest in and to claims, and any related litigation and settlement proceeds, held by A&P in any antitrust litigation ("Antitrust Class Action Rights"). Pursuant to a Purchase and Assignment of Claims Agreement dated as of November 29, 2021, by and among Original Transferee and Assignor, Haybeach Special Opportunities Fund, L.P. acquired the Antitrust Class Action Rights. Haybeach assigned all of its rights, title and interest to the Antitrust Claims to HBP I LLC.

18

32.    Great Atlantic & Pacific Tea Company ("A&P") was a corporation organized under the laws of the State of Maryland. During the relevant time period, A&P operated retail grocery stores containing pharmacies primarily in New York (120), Pennsylvania (60), New Jersey (90), Connecticut (20), Delaware (10), Maryland (25) and the District of Columbia (5). During the relevant time period, A&P purchased generic drugs directly and indirectly from Defendants and their co-conspirators. The process for A&P's purchase of generic drugs started with a customer seeking to fulfill a prescription at one of A&P's pharmacies located in New York, Pennsylvania, New Jersey, Connecticut, Delaware, Maryland or the District of Columbia.  The pharmacist in the particular pharmacy then ordered the particular generic drug to fill the prescription. The pharmacist ordered the particular generic drug either from A&P warehouse in Edison, New Jersey, or from McKesson, a large wholesaler.  Generic drugs in the A&P warehouse were purchased directly from some or all of the Defendants.  Generic drugs ordered from McKesson were shipped directly to the pharmacy that ordered the drug and that pharmacy was charged for the drug by McKesson. Finally, the consumer paid for the particular generic drug at the particular pharmacy.

33.    A&P sustained injury and damage as a proximate result of the antitrust violations alleged in this Complaint.

### B. Defendants

34.    Defendant Teva Pharmaceuticals USA, Inc. ("Teva") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 1090 Horsham Road, North Wales, Pennsylvania. Teva is a wholly-owned subsidiary of Teva Pharmaceutical Industries, Ltd., an Israeli corporation. Teva is defined to include its managers, officers, employees, and agents acting on its behalf. During the time period relevant to Plaintiff's claims: Teva directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and

19

engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

35.    Defendant Actavis Holdco US, Inc. ("Actavis Holdco"), is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Parsippany, New Jersey. In August 2016, Teva Pharmaceuticals USA, Inc. acquired the Actavis generics business of Allergan plc, including Actavis, Inc. Upon the acquisition, Actavis, Inc. – the acquired Allergan plc generics operating company (formerly known as Watson Pharmaceuticals) – was renamed Allergan Finance, LLC, which in turn assigned all of the assets and liabilities of the former Allergan plc generic business to the newly formed Actavis Holdco, including subsidiaries Actavis Pharma, Inc. and Actavis Elizabeth LLC (a research and development and manufacturing entity for Actavis generic operations), among others. Actavis Holdco is a wholly-owned subsidiary of Teva Pharmaceuticals USA, Inc., which is a Delaware corporation with its principal place of business in North Wales, Pennsylvania. Actavis Holdco is defined to include its managers, officers, employees, and agents acting on its behalf. During the time period relevant to Plaintiff's claims, Actavis Holdco directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, knowingly received conspiracy proceeds from Defendant Actavis Pharma, Inc., and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

36.    Defendant Actavis Pharma, Inc. is a Delaware corporation with its principal place of business at 400 Interpace Parkway, Parsippany, New Jersey. It is a wholly-owned subsidiary of Actavis Holdco and is a principal operating company in the U.S. for Teva's generic products acquired from Allergan plc. It manufactures, markets, and/or distributes generic pharmaceuticals. Unless addressed individually, Actavis Holdco and Actavis Pharma, Inc. are collectively referred

20

to herein as "Actavis." Actavis is defined to include its managers, officers, employees, and agents acting on its behalf. At all times relevant to the Complaint, Actavis has marketed and sold generic pharmaceuticals in this District and throughout the United States. During the time period relevant to Plaintiff's claims, Actavis Holdco directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act. Actavis Holdco (and its predecessors, including Watson) and Actavis Pharma are collectively defined as "Actavis." Actavis is defined to include its managers, officers, employees, and agents acting on its behalf.

37. Defendant Akorn, Inc. ("Akorn") is a Louisiana corporation with its principal place of business located in Lake Forest, Illinois. Akorn is the parent company of Defendant Hi- Tech (defined below). Akorn is defined to include its managers, officers, employees, and agents acting on its behalf. During the time period relevant to Plaintiff's claims, Akorn directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price- Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

38. Defendant Alvogen Inc. ("Alvogen") is a Delaware corporation with its principal place of business in Pine Brook, New Jersey. Robert Wessman, the former CEO of Actavis, stepped down from that position in order to found Alvogen in 2009. Alvogen is defined to include its managers, officers, employees, and agents acting on its behalf. During the time period relevant to Plaintiff's claims, Alvogen directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

39.    Defendant Amneal Pharmaceuticals, Inc. ("Amneal, Inc.") is a Delaware corporation with its principal place of business located in Bridgewater, New Jersey. Amneal is defined to include its managers, officers, employees, and agents acting on its behalf. At all times relevant to the Complaint, Amneal produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

40.    Defendant Amneal Pharmaceuticals LLC ("Amneal LLC") is a limited liability company organized and existing under the laws of the state of Delaware, with a principal place of business at 400 Crossing Boulevard, Bridgewater, New Jersey. Defendant Amneal Pharmaceuticals Inc. ("Amneal Inc.") is a Delaware corporation also with its principal place of business at 400 Crossing Boulevard, Bridgewater, New Jersey. Amneal Inc. owns a portion of Amneal LLC and, as the managing member of Amneal LLC, conducts and exercises full control over all activities of Amneal LLC (Amneal LLC and Amneal Inc. are collectively referred to herein as "Amneal"). Amneal is defined to include its managers, officers, employees, and agents acting on its behalf. At all times relevant to the Complaint, Amneal directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

41.    Defendant Ara Aprahamian ("Aprahamian") is an individual residing at 14 Catalpa Court, Bardonia, New York. Defendant Aprahamian was the Director, Pricing & Contracting at Defendant Actavis from August 2010 to March 2013, and was the Vice President of Sales and Marketing at Defendant Taro from March 2013 to August 2018.

42.    On February 4, 2020, a federal grand jury in this District returned an indictment against Defendant Aprahamian, charging him with two counts of per se unlawful restraint of

interstate trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), and one count of making unlawfully, willfully, and knowingly materially false, fictious, and fraudulent statements and representations in connection with a federal investigation, in violation of 18 U.S.C. § 1001(a)(2).

43.    The indictment charges that Aprahamian formed agreements with co-conspirators in the generic drug manufacturing industry to increase prices and to allocate customers for numerous drugs from at least as early as March 2013 until at least December 2015. The indictment specifically describes agreements Aprahamian made with Defendant Sandoz regarding Clotrimazole cream, Desonide ointment, Fluocinonide ointment, Lidocaine ointment, and Nystatin-Triamcinolone cream and ointment, and with Defendant Teva regarding Carbamazepine tabs and chews, Clotrimazole topical solution 1%, Etodolac Immediate Release ("IR") and Extended Release ("ER") tablets, Fluocinonide cream, emollient cream, gel, and ointment, and Warfarin tablets.

44.    Defendant Aurobindo Pharma U.S.A., Inc. ("Aurobindo") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 6 Wheeling Road, Dayton, New Jersey. Aurobindo is defined to include its managers, officers, employees, and agents acting on its behalf. During the time period relevant to Plaintiff's claims, Aurobindo directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

45.    Defendant Bausch Health Americas, Inc. (formerly Valeant Pharmaceuticals International, Inc.) is a Delaware corporation with its principal place of business in Bridgewater, New Jersey.    Bausch Health Americas, Inc is defined to include its managers, officers,

23

employees, and agents acting on its behalf. During the time period relevant to Plaintiff's claims, Bausch Health Americas, Inc directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

46.     Defendant Bausch Health US, LLC (formerly Valeant Pharmaceuticals North America LLC) is a Delaware limited liability company with its principal place of business in Bridgewater, New Jersey. Bausch Health US, LLC is defined to include its managers, officers, employees, and agents acting on its behalf. During the time period relevant to Plaintiff's claims, Bausch Health US, LLC directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

47.     Defendant Oceanside Pharmaceuticals, Inc. is a wholly-owned subsidiary of Bausch Health Americas, Inc. It is a Delaware corporation with its principal place of business in Bridgewater, New Jersey.  Oceanside Pharmaceuticals, Inc. is defined to include its managers, officers, employees, and agents acting on its behalf. During the time period relevant to Plaintiff's claims, Oceanside Pharmaceuticals, Inc. directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

48.     Unless addressed individually, Bausch Health Americas, Inc., Bausch Health US, LLC, and Oceanside Pharmaceuticals, Inc. are collectively referred to herein as "Bausch." Bausch is defined to include its managers, officers, employees, and agents acting on its behalf. During the time period relevant to Plaintiff's claims, Bausch directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United

States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

49. Defendant David Berthold ("Berthold") is an individual residing at 21 Hillcrest Road, Towaco, New Jersey. At all times relevant to the Complaint, Berthold was the Head of Sales or Vice President of Sales – U.S. Generics at Defendant Lupin Pharmaceuticals, Inc.

50. Defendant Breckenridge Pharmaceutical, Inc. ("Breckenridge") is a Florida corporation with its principal place of business at 15 Massirio Drive, Berlin, Connecticut. Breckenridge is wholly-owned by Pensa Pharma S.A. Breckenridge is defined to include its managers, officers, employees, and agents acting on its behalf. During the time period relevant to Plaintiff's claims, Breckenridge directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

51. Defendant James (Jim) Brown ("Brown") is an individual residing at 4521 Christensen Circle, Littleton, Colorado. At all times relevant to the Complaint, Brown was the Head of Sales or Vice President of Sales – U.S. Generics at Defendant Glenmark Pharmaceuticals, Inc.

52. Defendant Camber Pharmaceuticals, Inc. ("Camber") is a Delaware corporation with its principal place of business in Piscataway, New Jersey. Camber is defined to include its managers, officers, employees, and agents acting on its behalf. During the time period relevant to Plaintiff's claims, Camber directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

53.     Defendant Maureen Cavanaugh ("Cavanaugh") is an individual residing at 529 North York Road, Hatboro, Pennsylvania. From January 2009 until April 2018, Cavanaugh was the Senior Vice President, Commercial Officer, North America, Senior Vice President Sales and Marketing, or Vice President Customer Operations and Marketing for Defendant Teva Pharmaceuticals USA, Inc. She then became Senior Vice President and Chief Commercial Officer for Defendant Lannett.

54.     Defendant Citron Pharma, LLC ("Citron") is a Delaware corporation with its principal place of business located in East Brunswick, New Jersey. Citron is defined to include its managers, officers, employees, and agents acting on its behalf. During the time period relevant to Plaintiff's claims Citron directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

55.     Defendant Dr. Reddy's Laboratories, Inc. ("Dr. Reddy's") is a corporation organized and existing under the laws of the State of New Jersey with its principal place of business at 107 College Road East, Princeton, New Jersey. Dr. Reddy's is a wholly-owned subsidiary of Dr. Reddy's Laboratories Ltd., an Indian pharmaceutical company. Dr. Reddy's is defined to include its managers, officers, employees, and agents acting on its behalf. During the time period relevant to Plaintiff's claims, Dr. Reddy's directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

56.     Defendant Emcure Pharmaceuticals, Ltd. ("Emcure") is an Indian company with its principal place of business located in Pune, India. In April 2011, Emcure acquired Defendant

26

Heritage (defined below). Heritage, as a subsidiary of Emcure, conducts Emcure's U.S. commercial operations. Emcure is defined to include its managers, officers, employees, and agents acting on its behalf. During the time period relevant to Plaintiff's claims, Emcure directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories both directly and through its wholly owned subsidiaries, directly and/or through its subsidiaries sold Price-Fixed generic drugs to A&P and others in the United States, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act. In addition, during the time period relevant to this Complaint, Defendant Emcure purposefully directed its activities at the United States (including the forum state) and also purposefully derived the benefit of conspiracy proceeds taken from the United States (including the forum state).

57.    Defendant Epic Pharma, LLC ("Epic") is a Delaware limited liability company with its principal place of business in Laurelton, New York. Epic is defined to include its managers, officers, employees, and agents acting on its behalf. During the time period relevant to Plaintiff's claims, Epic directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

58.    Defendant Marc Falkin ("Falkin") is an individual residing at 2915 Weston Road, Westin, Florida. From August 2013 to February 2018, Defendant Falkin was the Vice President, Marketing, Pricing and Contracts at Defendant Actavis or Senior Vice President, U.S. Generic Sales at Defendant Teva. Since March 2018, he is Senior Vice President and Chief Commercial Officer at non-Defendant drug manufacturer Cipla.

59.    Defendant Fougera Pharmaceuticals, Inc. ("Fougera") is a New York corporation

27

with its principal place of business in Melville, New York. In 2012, Novartis International AG acquired Fougera. Fougera is defined to include its managers, officers, employees, and agents acting on its behalf. During the time period relevant to Plaintiff's claims, Fougera directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act. The term "Sandoz Defendants" refers to Fougera and Sandoz, collectively.

60.     Defendant G&W Laboratories, Inc. ("G&W") is a New Jersey Corporation with its principal place of business in South Plainfield, New Jersey. G&W is defined to include its managers, officers, employees, and agents acting on its behalf. During the time period relevant to Plaintiff's claims, G&W directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

61.     Defendant Glenmark Pharmaceuticals Inc., USA ("Glenmark") is a corporation organized and existing under the laws of the State of Delaware with a principal place of business at 750 Corporate Drive, Mahwah, New Jersey. Glenmark is defined to include its managers, officers, employees, and agents acting on its behalf. During the time period relevant to Plaintiff's claims, Glenmark directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

62.     Defendant James (Jim) Grauso ("Grauso") is an individual residing at 113 Windsor Lane, Ramsey, New Jersey. Defendant Grauso worked at Defendant Aurobindo as a Senior Vice

28

President, Commercial Operations from December 2011 through January 2014. Since February 2014, Grauso has been employed as the Executive Vice President, N.A. Commercial Operations at Defendant Glenmark. Prior to his time at Aurobindo, he served as Vice President, Sales & Marketing at Defendant G&W.

63.    Defendant Kevin Green ("Green") is an individual residing at 110 Coachlight Circle, Chalfont, Pennsylvania. Defendant Green worked at Defendant Teva as a Director of National Accounts from January 2006 through October 2013. Since November 2013, Green has worked at Defendant Zydus Pharmaceuticals (USA) Inc. and is currently the Vice President of Sales.

64.    Defendant Greenstone LLC ("Greenstone") is a limited liability company located at 100 Route 206, North Peapack, New Jersey. Greenstone is a wholly-owned subsidiary of Defendant Pfizer Inc. ("Pfizer"), a global pharmaceutical company headquartered in New York, New York, and has at all relevant times operated as the generic drug division of Pfizer. Greenstone operates out of Pfizer's Peapack, New Jersey campus, and a majority of  Greenstone's employees are also employees of Pfizer's Essential Health Division, including Greenstone's President. Greenstone employees also use Pfizer for financial analysis, human resources and employee benefit purposes, making the two companies essentially indistinguishable. At all times relevant to the Complaint, Greenstone has – under the direction and control of Pfizer – marketed and sold generic pharmaceuticals in this District and throughout the United States. Greenstone and Pfizer are defined to include their managers, officers, employees, and agents acting on its behalf. During the time period relevant to Plaintiff's claims, Greenstone and Pfizer directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price- Fixed Generic Drugs throughout the United States and its territories, received the proceeds of their unlawful in the United States, and engaged in the unlawful conduct alleged in this Complaint in violation of

29

Section 1 of the Sherman Act.

65.     Defendant Robin Hatosy ("Hatosy") is an individual residing at 155 Providence Forge Road, Royersford, Pennsylvania. At all times relevant to the Complaint, Hatosy was employed as a Director of National Accounts at Defendant Greenstone.

66.     Defendant Heritage Pharmaceuticals, Inc. ("Heritage") is a Delaware corporation with its principal place of business located in Eatontown, New Jersey. In April 2011, Emcure acquired Heritage. Heritage is defined to include its managers, officers, employees, and agents acting on its behalf. During the time period relevant to Plaintiff's claims, Heritage directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

67.     Defendant Hi-Tech Pharmacal Co., Inc. ("Hi-Tech") is a Delaware corporation with its principal place of business located in Amityville, New York. Hi-Tech is a wholly-owned subsidiary of Defendant Akorn, which purchased Hi-Tech in April 2014, for $640 million. Hi-Tech is defined to include its managers, officers, employees, and agents acting on its behalf. During the time period relevant to Plaintiff's claims, Hi-Tech directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

68.     Defendant Impax Laboratories, Inc. ("Impax") is a Delaware corporation with its principal place of business located in Philadelphia, Pennsylvania. Defendant Impax is defined to include its managers, officers, employees, and agents acting on its behalf. During the time period relevant to Plaintiff's claims, Impax directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation

of Section 1 of the Sherman Act.

69.     Defendant Kavod Pharmaceuticals LLC, formerly known as Rising Pharmaceuticals, LLC and Rising Pharmaceuticals, Inc. (collectively referred to as "Rising"), is a Delaware corporation with, upon information and belief, its principal place of business in Saddle Brook, New Jersey. Defendant Rising is defined to include its managers, officers, employees, and agents acting on its behalf. On December 3, 2019, Rising admitted to fixing prices and allocating customers for Benazepril-HCTZ. It has been charged with one count of a felony conspiracy in restraint of trade, and agreed to a deferred prosecution agreement with the Department of Justice. During the time period relevant to Plaintiff's claims, Rising directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price- Fixed Generic Drugs, including but not limited to Benazepril-HCTZ, throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

70.     Defendant Armando Kellum ("Kellum") is an individual residing at 56 Gravel Hill Road, Huntingdon Valley, Pennsylvania. At all times relevant to the Complaint, Kellum was the Vice President, Contracting and Business Analytics at Defendant Sandoz, Inc. On February 14, 2020, Kellum pleaded guilty to one count of unlawful restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1). The criminal information notes that from at least as early as March 2013, and continuing until at least June 2015, Kellum, on behalf of Sandoz, along with Defendant Ara Aprahamian and co-conspirators at Sandoz and Defendant Taro "knowingly entered into and engaged in a conspiracy to suppress and eliminate competition by agreeing to allocate customers and rig bids for, and stabilize, maintain, and fix prices of, generic drugs sold in the United States."

71.     The criminal information provides several examples of this conduct. For instance, it notes that Kellum worked with Aprahamian and co-conspirators at Sandoz and Taro to discuss

drug launches that either company planned to make on generic drugs that the other was already in the market for, including the soliciting and relinquishing of customers. Kellum would then agree with his co-conspirators on which customers the launching company would solicit, so as to allow "the launching company to obtain customers quickly at the highest price possible, and minimize the decline of price for the drugs being launched." Such discussions could include the "dead net price(s)" for certain customers of the drug. The information also notes that Kellum, other co-conspirators at Sandoz, and Aprahamian agreed to increase prices of certain generic drugs by discussing the amount of the increase, receiving non-public prices for Taro's various classes of trade, and declining requests for bids from Taro's customers. As an example, such activity was undertaken for multiple formulations and sizes of clobetasol, allowing Sandoz and Taro to increase WAC prices on many of those formulations in excess of 1000%. Kellum also instructed Sandoz employees not to poach Taro's clobetasol customers.

72. Defendant Jubilant Cadista Pharmaceuticals Inc. (Cadista) is a Delaware corporation with its principal place of business in Salisbury, Maryland. It is a wholly-owned subsidiary of Jubilant Life Sciences Company, an Indian pharmaceutical company. Defendant Cadista is defined to include its managers, officers, employees, and agents acting on its behalf. During the time period relevant to Plaintiff's claims, Cadista directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

73. Defendant Lannett Company, Inc. ("Lannett") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 9000 State Road, Philadelphia, Pennsylvania. Defendant Lannett is defined to include its managers, officers, employees, and agents acting on its behalf. During the time period relevant to Plaintiff's claims, Lannett directly participated in the conspiracy alleged in this Complaint, produced and sold one or

32

more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

74.    Defendant Lupin Pharmaceuticals, Inc. ("Lupin") is a Delaware corporation with its principal place of business in Baltimore, Maryland. Lupin is a wholly-owned subsidiary of Lupin Limited, an Indian company with its principal place of business in Mumbai, India. Lupin is defined to include its managers, officers, employees, and agents acting on its behalf. During the time period relevant to Plaintiff's claims, Lupin directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

75.    Defendant Mayne Pharma USA, Inc. ("Mayne") is a Delaware corporation with its principal place of business located in Paramus, New Jersey. Mayne is defined to include its managers, officers, employees, and agents acting on its behalf. During the time period relevant to Plaintiff's claims, Mayne directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

76.    Defendant Mallinckrodt, Inc. ("Mallinckrodt") is a Delaware corporation with its principal place of business in Webster Groves, Missouri. Mallinckrodt is defined to include its managers, officers, employees, and agents acting on its behalf. During the time period relevant to Plaintiff's claims, Mallinckrodt directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

77.    Defendant Morton Grove Pharmaceuticals, Inc. ("Morton Grove") is a Delaware corporation with its principal place of business located in Morton Grove, Illinois. Wockhardt, Ltd., an Indian company, is the parent company of Morton Grove. Defendant Morton Grove is defined to include its managers, officers, employees, and agents acting on its behalf. During the time period relevant to Plaintiff's claims, Morton Grove directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

78.    Defendant Mylan N.V. is Dutch corporation with its principal place of business and global headquarters in Canonsburg, Pennsylvania. Mylan N.V. is the direct parent corporation of Defendant Mylan Inc. and the ultimate parent and owner of Defendants Mylan Pharma and UDL (both defined below). During the time period relevant to Plaintiff's claims, Mylan N.V. directly participated in the conspiracy alleged in this Complaint, produced and/or sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, either on its own or through its subsidiaries, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

79.    Defendant Mylan Inc. is a Pennsylvania corporation with its principal place of business in Canonsburg, Pennsylvania. Mylan Inc. is the parent company of Defendant UDL (defined below) and Defendant Mylan Pharma (defined below). Mylan Inc. is defined to include its managers, officers, employees, and agents acting on its behalf. During the time period relevant to Plaintiff's claims, Mylan Inc. directly participated in the conspiracy alleged in this Complaint, produced and/or sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, either on its own or through its subsidiaries, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

80.    Defendant Mylan Pharmaceuticals Inc., ("Mylan Pharma") is a West Virginia corporation with its principal place of business in Morgantown, West Virginia. Mylan Pharma is a subsidiary of Defendant Mylan Inc. Mylan Pharma is defined to include its managers, officers, employees, and agents acting on its behalf. During the time period relevant to Plaintiff's claims, Mylan Pharma directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act. Mylan N.V., Mylan Inc., Mylan Pharma, and UDL (defined below) are collectively defined as "Mylan."

81.    Defendant Jill Nailor ("Nailor") is an individual residing at 1918 McRae Lane, Mundelein, Illinois. Since August 2010, Nailor has been Senior Director, Sales and National Accounts or Director, Generics and Analytics at Defendant Greenstone.

82.    Defendant James (Jim) Nesta ("Nesta") is an individual residing at 9715 Devonshire Drive, Huntersville, North Carolina. At all times relevant to the Complaint, Nesta was the Vice President of Sales at Defendant Mylan.

83.    Defendant Konstantin Ostaficiuk ("Ostaficiuk") is an individual residing at 29 Horizon Drive, Mendham, New Jersey. At all times relevant to the Complaint, Ostaficiuk was the President or Vice President of Sales and Marketing of Camber Pharmaceuticals, Inc. ("Camber").

84.    Defendant Par Pharmaceutical Companies, Inc. ("Par") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at One Ram Ridge Road, Chestnut Ridge, New York. Defendant Par is defined to include its managers, officers, employees, and agents acting on its behalf. During the time period relevant to Plaintiff's claims, Par directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and

35

engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

85.     Defendant Par Pharmaceutical, Inc. ("Par Pharma") is a New York corporation with its principal place of business located in Chestnut Ridge, New York. Defendant Par Pharma is defined to include its managers, officers, employees, and agents acting on its behalf. During the time period relevant to Plaintiff's claims, Par Pharma directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

86.     Defendant Endo International plc ("Endo") is an Irish company with its principal place of business in Dublin, Ireland, and its U.S. headquarters located in Malvern, Pennsylvania. Endo is the ultimate parent and owner of Par. Unless addressed individually, Par and Endo are collectively referred to herein as "Par." Defendant Endo is defined to include its managers, officers, employees, and agents acting on its behalf At all times relevant to the Complaint, Endo has marketed and sold generic pharmaceuticals in this District and throughout the United States participated in the conspiracy alleged in this Complaint, either on its own or through its owned and controlled subsidiaries/affiliates, and knowingly received proceeds of the unlawful conduct. In addition, during the time period relevant to this Complaint, Defendant Endo purposefully directed its activities at the United States (including the forum state) and also purposefully derived the benefit of conspiracy proceeds taken from the United States (including the forum state).

87.     Defendant Nisha Patel ("Patel") is an individual residing at 103 Chinaberry Lane Collegeville, Pennsylvania. Between April 2013 and December 2016, Patel worked as a Director of Strategic Customer Marketing and as a Director of National Accounts at Defendant Teva. Since September 2017, Patel works at non-Defendant drug manufacturer Cipla.

36

88.     Defendant Perrigo New York, Inc. ("Perrigo") is a Delaware corporation with its principal place of business in Allegan, Michigan. Perrigo is a subsidiary of Perrigo Company, plc, an Irish company. Perrigo is defined to include its managers, officers, employees, and agents acting on its behalf. During the time period relevant to Plaintiff's claims, Perrigo directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price- Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

89.     Defendant Pfizer, Inc. ("Pfizer") is a corporation organized and existing under the laws of Delaware, with its principal place of business at 235 East 42nd Street New York, New York. Pfizer is a global biopharmaceutical company and is the corporate parent of Defendant Greenstone. Pfizer is defined to include its managers, officers, employees, and agents acting on its behalf. During the time period relevant to Plaintiff's claims, Pfizer directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

90.     Defendant Pliva, Inc. ("Pliva") is a New Jersey corporation with its principal place of business in East Hanover, New Jersey. Pliva is a wholly-owned subsidiary of Defendant Teva (defined below). Pliva is defined to include its managers, officers, employees, and agents acting on its behalf. During the time period relevant to Plaintiff's claims, Pliva directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

91.     Defendant David Rekenthaler ("Rekenthaler") is an individual residing at 2626 Lulworth Lane, Marietta, Georgia. At all times relevant to the Complaint, Rekenthaler was the

Vice President, Sales US Generics at Defendant Teva. After a short time at Wilshire Pharmaceuticals, Inc., he became Vice President of Sales at Apotex starting in June 2016.

92.     Defendant Richard (Rick) Rogerson ("Rogerson") is an individual residing at 32 Chestnut Trail, Flemington, New Jersey. Rogerson was the Executive Director of Pricing and Business Analytics (March 2014 – August 2016) and Director of Pricing, U.S. Generics (April 2002 – March 2014) at Defendant Actavis. From August 2016 to March 2018 he was Senior Director, New Product Launch & Business Analytics at Teva.Defendant Sandoz, Inc. is a Delaware corporation with its principal place of business in Princeton, New Jersey. Sandoz is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.

93.     Defendant Novartis AG is a global pharmaceutical company organized and existing under the laws of Switzerland with its principal place of business is in in Basel, Switzerland.

94.     Defendant Sandoz AG is a company organized and existing under the laws of Switzerland with its principal place of business is in in Basel, Switzerland.

95.     Prior to October 4, 2023, Sandoz was an indirect, wholly owned subsidiary of Novartis through which Novartis operated its generic pharmaceutical business in the United States, and Sandoz AG was an indirect, wholly owned subsidiary of Novartis through which Novartis operated its global generic pharmaceutical business. On October 4, 2023, pursuant to a spin-off transaction, Sandoz became a direct subsidiary of Defendant Sandoz AG, and an indirect, wholly owned subsidiary of a new, standalone entity named Sandoz Group AG.

96.     Defendant Fougera Pharmaceuticals Inc. ("Fougera") is a New York corporation with its principal place of business in Melville, New York. Foguera is a wholly-owned subsidiary of Defendant Sandoz, Inc. In 2012, Sandoz acquired and integrated Fougera into its US-based generic pharmaceutical business.

38

97.    Unless addressed individually, Fougera, Novartis AG, Sandoz AG, and Sandoz Inc. are collectively referred to herein as "Sandoz." During the Class Period, Sandoz marketed and sold generic pharmaceuticals in this District and throughout the United States.

98.    Sandoz is defined to include its managers, officers, employees, and agents acting on its behalf. On March 2, 2020, in a deferred prosecution agreement following criminal charges filed by the Department of Justice, Defendant Sandoz, Inc. admitted that it had conspired with Rising "to suppress and eliminate competition by agreeing to allocate customers for, and stabilize, maintain, and fix prices of, Benazepril-HCTZ sold in the United States, from at least as early as April 2014 and continuing until at least September 2015." During the time period relevant to Plaintiff's claims, Sandoz directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs, including but not limited to, Benazepril-HCTZ, throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

99.    Defendant Strides Pharma, Inc. ("Strides") is a New Jersey corporation with its principle place of business in East Brunswick, New Jersey. Strides is the U.S. subsidiary and sales agent of Strides Pharma Science Limited, an Indian pharmaceutical conglomerate. Strides is defined to include its managers, officers, employees, and agents acting on its behalf. During the time period relevant to Plaintiff's claims, Strides directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

100.    Defendant Sun Pharmaceutical Industries, Inc. (f/k/a Caraco Pharmaceutical Laboratories, Ltd.) ("Sun") is a Michigan corporation with its principal place of business in Cranbury, New Jersey. Co-conspirator Sun Pharmaceutical Industries Ltd., ("Sun Ltd."), based in

39

Mumbai, India, along with certain of its wholly-owned subsidiaries, owns 100% of Sun. Sun Ltd. also owns approximately 70% of Defendant Taro (defined below) and Taro's parent, Taro Pharmaceutical Industries, Ltd. In late 2012, Sun acquired URL Pharma, Inc., which is a wholly owned subsidiary of co-conspirator Mutual Pharmaceutical Company, Inc. ("Mutual"). Mutual is a wholly-owned subsidiary of Sun. Sun is defined to include its managers, officers, employees, and agents acting on its behalf. During the time period relevant to Plaintiff's claims, Sun directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

101.    Defendant Taro Pharmaceuticals USA, Inc. ("Taro") is a corporation organized and existing under the laws of the State of New York, with its principal place of business at 3 Skyline Drive, Hawthorne, New York. Taro is defined to include its managers, officers, employees, and agents acting on its behalf. During the time period relevant to Plaintiff's claims, Taro directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

102.    Defendant Teligent, Inc. (f/k/a IGI Laboratories, Inc.) ("Teligent") is a Delaware corporation with its principal place of business located in Buena, New Jersey. Teligent is defined to include its managers, officers, employees, and agents acting on its behalf. During the time period relevant to Plaintiff's claims, Teligent directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

103.    Defendant UDL Laboratories, Inc. ("UDL") is an Illinois corporation with its

40

principal place of business in Rockford, Illinois. UDL, n/k/a Mylan Institutional Inc., is a subsidiary of Defendant Mylan Inc. UDL is defined to include its managers, officers, employees, and agents acting on its behalf. During the time period relevant to Plaintiff's claims, UDL directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

104.   Defendant Upsher-Smith Laboratories, LLC (formerly known as Upsher-Smith Laboratories, Inc.) ("Upsher-Smith"), is a Minnesota limited liability company located at 6701 Evenstad Drive, Maple Grove, MN. Upsher-Smith is a subsidiary of Sawaii Pharmaceutical Co., Ltd., a large generics company in Japan. Upsher-Smith is defined to include its managers, officers, employees, and agents acting on its behalf. During the time period relevant to Plaintiff's claims, Upsher-Smith directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

105.   Defendant Valeant Pharmaceuticals International ("Valeant International") is a Canadian company with its principal place of business in Bridgewater, New Jersey. Valeant International was a California company until September 2010, when it merged with Biovail Corporation, a Canadian company. Defendant Valeant Pharmaceuticals North America, LLC ("Valeant North America") is a Delaware corporation with its principal place of business in Bridgewater, New Jersey. It is a wholly-owned subsidiary of Valeant International. Defendant Oceanside Pharmaceuticals, Inc. ("Oceanside") is a Delaware corporation with its principal place of business in Aliso Viejo, California. Oceanside is a wholly-owned subsidiary of Valeant. In this Complaint, Valeant International, Valeant North America, and Oceanside are referred together as

"Valeant." Valeant is defined to include its managers, officers, employees, and agents acting on its behalf. During the time period relevant to Plaintiff's claims, Valeant directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price- Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

106.    Defendant Versapharm, Inc. ("Versapharm") is a corporation organized and existing under the laws of the State of Georgia with its principal place of business in Marietta, Georgia. Versapharm is defined to include its managers, officers, employees, and agents acting on its behalf. During the time period relevant to Plaintiff's claims, Versapharm directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

107.    Defendant West-Ward Pharmaceuticals Corp. ("West-Ward") is a Delaware corporation with its principal place of business located in Eatontown, New Jersey. West-Ward is defined to include its managers, officers, employees, and agents acting on its behalf. During the time period relevant to Plaintiff's claims, West-Ward directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

108.    Defendant Wockhardt USA LLC ("Wockhardt") is a Delaware limited liability company located at 20 Waterview Boulevard, 3rd Floor, Parsippany, New Jersey. Wockhardt is a wholly-owned subsidiary of Defendant Morton Grove Pharmaceuticals, Inc. Wockhardt is defined to include its managers, officers, employees, and agents acting on its behalf. During the time period relevant to Plaintiff's claims, Wockhardt directly participated in the conspiracy alleged in this

42

Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, either on its own or through its subsidiaries, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

109.    Defendant Zydus Pharmaceuticals (USA), Inc. ("Zydus") is a corporation organized and existing under the laws of the State of New Jersey with its principal place of business at 73 Route 31 North, Pennington, New Jersey. Zydus is defined to include its managers, officers, employees, and agents acting on its behalf.  During the time period relevant to Plaintiff's claims, Zydus directly participated in the conspiracy alleged in this Complaint, produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

110.    Whenever any reference is made in any allegation of the Complaint to any representation, act or transaction of Defendants or their co-conspirators, or any agent, employee or representative thereof, such allegation shall be deemed to mean that such principals, officers, directors, employees, agents or representatives of Defendants, while acting within the scope of their actual or apparent authority, whether they were acting on their own behalf or for their own benefit, did or authorized such representations, acts or transactions on behalf of Defendants, respectively.

### C. Co-Conspirators and Agents

111.    Other entities and individuals not named as Defendants also combined, conspired, or agreed with Defendants and committed acts in furtherance of the unlawful conspiracy alleged in this Complaint.

112.    The true names and capacities of additional co-conspirators, whether individual, corporate, associate, or representative, are presently unknown to Plaintiff. Plaintiff reserves the right to amend this Complaint to allege the true names and capacities of additional co- conspirators

43

as they are discovered.

113.   At all relevant times, other persons, firms, and corporations, referred to in this Complaint as "co-conspirators," the identities of which are presently unknown, have willingly conspired with Defendants in their unlawful scheme as described herein.

114.   The acts alleged in this Complaint that were done by each of the co-conspirators were fully authorized by each of those co-conspirators, or were ordered or committed by authorized officers, managers, agents, employees, or representatives of each co-conspirator while actively engaged in the management, direction, or control of its affairs.

115.   The wrongful acts alleged to have been done by any one Defendant or co-conspirator were authorized, ordered, or done by its directors, officers, managers, agents, employees, or representatives while actively engaged in the management, direction, or control of such Defendant's or co-conspirator's affair.

116.   Prior to the Sandoz spin-off, Sandoz and Novartis operated as a single entity and Novartis exercised control over Sandoz's actions.

117.   Before the October 4, 2023 spin-off, Sandoz, Inc. was an indirect, wholly owned subsidiary of Novartis through which it operated its generic pharmaceutical business in the United States. Novartis was formed in 1996 by the merger of Ciba-Geigy AG and Sandoz AG. After the merger, the Sandoz name became dormant, with Novartis operating its generic business as Novartis generics. Novartis relaunched its global generics businesses under the Sandoz brand in 2003.[2] Novartis operated its generics business under the revived Sandoz brand through various subsidiary companies, including Sandoz, Inc., Sandoz AG, and Sandoz International GmbH, but all these companies acted as a single functioning entity without regard to corporate formalities.

---

[2] http://test.pharmabiz.com/news/novartis-generics-to-be-rebranded-as-sandoz-15681; https://www.my-sandoz.com/za-en/en/about-sandoz.

For all practical purposes, Novartis treated Sandoz as part of a larger integrated company and exercised control over its actions, including its decisions related to the manufacture and sale of the generic drugs at issue in this litigation.

118.    The Sandoz, Inc. board of directors operated as a mere formality. Globally, the Novartis generics operation was supervised by Sandoz International GmbH based out of Germany, and a subsidiary of Sandoz AG. Meaningful corporate oversight was also exercised by, and strategic direction was dictated by, the Novartis Board of Directors and the Executive Committee of Novartis.

119.    When Peter Goldschmidt was appointed CEO of Sandoz, Inc. in 2013, he was, and remained, an employee of Sandoz International GmbH who was seconded or loaned to Sandoz, Inc.[3] As part of the organizational reporting structure of Sandoz Inc., he initially reported to the president of another Novartis subsidiary, Novartis Pharmaceutical Company, who would define his operational objectives.[4] The CEO of Sandoz regularly reported to and received direction from Novartis and the head of Sandoz's global operations.

120.    Sandoz's revenues and financial success were rolled up into the financial results of Sandoz's global operations, and then further consolidated into Novartis's financial statements with the ultimate objective of transferring value and profits to the Novartis organization as a whole, including the illegal profits that arose from the conspiracy alleged herein. As a result, Novartis dictated Sandoz's financial targets and how Sandoz needed to achieve those targets in order for Novartis to reap the profits. For example, in 2012, the Executive Committee of Novartis dictated to the global head of Sandoz that to improve the profitability of Novartis as a whole, the Sandoz business needed to generate substantial additional revenue through pricing actions.[5] The global

---

[3] SDZMDL-009185562.
[4] SDZMDL-009185562, at 5563.
[5] SDZMDL-009107013, at 7016-17.

45

head of Sandoz then communicated this directive throughout the Sandoz organization, explaining the work they needed to perform "to help Novartis deliver the results we need to deliver."[6]

121.    Pursuant to Sandoz's internal guidelines, "certain management matters," such as capital expenditures in excess of certain values, were "assigned and require[d] coordination or escalation of approvals to certain Novartis governance bodies."

122.    Consistent with the commercial realities, Novartis continually identified Sandoz in its Annual Reports and investor communications as its generics "division" or "segment" or part of the "Novartis Group." Additionally, pursuant to formal marketing guidelines directed by Novartis and intended to present the image of an integrated company, the Sandoz name in presentations and other documents was typically accompanied by the squib "A Novartis Company" or "A Novartis Division." When dealing with customers and the public, Novartis presented the image of a single unified Novartis and blurred the distinctions between the various subsidiaries. For example, when one of its largest customers, McKesson, requested information on the relationship between Sandoz entities, Sandoz would say nothing other than "Sandoz Inc., Sandoz AG and Sandoz International GmbH are all affiliates ultimately owned by Novartis AG."[7] When McKesson sought further clarification, Sandoz continued its obfuscation by refusing to provide any more information and stating, "Ultimately, all of the Sandoz companies come under the Novartis umbrella, which is the key aspect to keep in mind."[8]

123.    Prior to the Sandoz spin-off, Novartis performed important business functions for Sandoz that an independent corporate entity would typically perform on its own, including accounting, finance, quality and pharmacovigilance, human resources operations, pension administration, legal, real estate and facility services, procurement, information technology,

---

[6] SDZMDL-009107013, at 7013.
[7] SDZMDL-002379650, at 9652.
[8] SDZMDL-002379650, at 9651.

information security, commercial and medical support services, financial reporting and accounting operations.[9] While controlling Sandoz's financial functions, Novartis handled billing issues for Sandoz products and communicated directly with Sandoz customers.[10]

124.    Prior to the spin-off, Novartis' technical operations unit also managed the production, supply chain and quality of the Sandoz division.[11] At least two of the drugs at issue in this MDL—timolol maleate and prednisolone acetate—were manufactured at Novartis facilities.[12]

125.    The intermingling of Sandoz and Novartis operations was so extensive that even employees were not sure which of Sandoz or Novartis was technically their employer. As one employee testified, I "cannot define it, am I Sandoz or Novartis. . . . It may be both, I do not know."[13] Sandoz employees appeared on Novartis organizational charts as part of the "US Generics Operating Unit."[14] Sandoz employees received employee evaluations on Novartis letterhead.[15] Additionally, Sandoz received bonuses tied to both Sandoz's and Novartis' financial performance.[16]

126.    To promote a "more integrated Novartis," "[b]usiness units, functions, working groups and teams," including Sandoz, were instructed to "avoid creating their own distinct mission, vision or purpose" and instead "determine what and how they contribute to fulfilling the Novartis mission and vision." SDZCTAG-06491657, at 658-659; *see also* SDZCTAG-06491663.

127.    Moreover, Novartis was heavily involved in—and exercised control over—the conduct at issue in this case. For example, Novartis approval was required for increases to

---

[9] *See* Listing Prospectus dated August 18, 2023 Sandoz Group AG ("Prospectus) at 58-59, available at https://prod.cms.sandoz.com/sites/spare53_sandoz_com/files/2023-10/Sandoz-Group-AG-Prospectus-2023-08_17.pdf; Toby Bonagura (Sandoz (30(b)(6)) Tr. at 149:5-152:4.

[10] *See, e.g.*, SDZCTAG-00171712 & SDZCTAG-00171713-16.

[11] Prospectus at 58; *see also* Tony Fang (Sandoz 30(b)(6)) Tr. at 21:20-23:2.

[12] Tony Fang (Sandoz 30(b)(6)) Tr. at 71:6-73:6.

[13] Tony Fang (Sandoz 30(b)(6)) Tr. at 23:4-16.

[14] SDZMDL-000000069.

[15] *See, e.g.*, SDZCTAG-00065619.

[16] Luis Jorge Tr. at 64:2-14.

Wholesale Acquisition Cost (WAC)-related pricing increases on Sandoz products. Toby Bonagura (Sandoz (30(b)(6)) Tr. at 145:9-147:22. The WAC price is the list price at which wholesalers purchase a product from Sandoz. Toby Bonagura (Sandoz (30(b)(6)) Tr. at 169:15-171:18. According to Sandoz's 30(b)(6) representative, any increases to the WAC price for a particular product would first go through the Sandoz pricing committee, then to "the appropriate people at Novartis" for their final approval. Toby Bonagura (Sandoz (30(b)(6)) Tr. at 147:14-22. Sandoz's pricing procedure documents also reflect that Sandoz global leadership had involvement with and authority over Sandoz's U.S. pricing decisions. *See, e.g.*, SDZMDL-004319027, at 19031 & 19057.

128.    In addition to having final approval over certain Sandoz pricing decisions, Novartis employees also participated in the Sandoz pricing committee. For example, Sara Mastandrea was a Novartis employee who chaired the Sandoz pricing committee. Toby Bonagura (Sandoz (30(b)(6)) Tr. at 167:9-16; *see also* SDZCTAG-06393555. During this time, Ms. Mastandrea often performed financial analyses related to pricing decisions put before the committee.

129.    Novartis personnel were also heavily involved in Sandoz's launch of generic drugs, including drugs at issue in this litigation, particularly with respect to drugs for which Novartis was the brand manufacturer. Novartis placed immense of pressure on Sandoz to be successful with these drugs, and directed Sandoz to provide Novartis with competitive intelligence on these drugs so that Novartis could use the information in its business plans.

130.    Novartis also participated in, and exercised control over, bidding decisions at Sandoz. For example, when Sandoz was considering bidding for certain generic drugs with McKesson (a significant Sandoz customer), Terence O'Sullivan, who held himself out as a Novartis employee at the time, attempted to steer Sandoz away bidding with McKesson for fear of "pinching" a competitor's business. Toby Bonagura (Sandoz (30(b)(6)) Tr. at 155:14-16,

158:11-161:16; *see also* SDZMDL-001955787-91. In other instances, Sandoz and Novartis personnel coordinated in contract negotiations with large customers to understand the impact of those negotiations on all Novartis divisions and to ensure alignment on a joint communication plan with customers. *See, e.g.*, SDZCTAG-02796927; SDZCTAG-05190408; SDZCTAG-03448876.

131.    Novartis personnel were also involved in formulated responses to media inquiries in response to the dramatic price increases on generic drugs at issue in this case, which had the effect of concealing the fact that these increases were caused by Defendants' unlawful and anticompetitive activities. *See, e.g.*, SDZMDL-002908140; SDZMDL-002908143; SDZMDL-003537073; SDZMDL-003584545; SDZMDL-004715341. Additionally, Sandoz personnel were governed by the Novartis antitrust and fair competition policies, *See, e.g.*, SDZMDL-001862455; SDZMDL-001862463. which Novartis and Sandoz used to assure the public that it was not engaging in the type of collusion alleged in this Complaint.

132.    Novartis also exercised control over the investigation into, and litigation over, the conduct at issue in this case. For example, upon receiving a criminal subpoena from the United States Department of Justice in spring 2016, Novartis retained outside counsel to conduct an internal investigation. Edward Stueck (Sandoz 30(b)(6)) Tr. at 64:1-3. Based on that investigation, the general counsel for Novartis advised the Novartis executive committee and board of directors on how to proceed with the resolution. Edward Stueck (Sandoz 30(b)(6)) Tr. at 64:3-7. Sandoz general counsel, Karen McDonnell, was then authorized to sign a Deferred Prosecution Agreement with the Department of Justice. Edward Stueck (Sandoz 30(b)(6)) Tr. at 64:7-9. Moreover, Sandoz did not conduct any additional investigation beyond that which was conducted by Novartis's chosen outside counsel. Edward Stueck (Sandoz 30(b)(6)) Tr. at 65:11-23.

133.    In August 2022, Novartis announced its intention to "separate Sandoz, its generics and biosimilars division into a new publicly traded standalone company, by way of a 100% spin-

49

off. Press Release, *Novartis Announces Intention to Separate Sandoz Business to Create a Standalone Company by way of a 100% Spin-Off* (Aug. 25, 2022), https://www.novartis.com/news/media-releases/novartis-announces-intention-separate-sandoz-business-create-standalone-company-way-100-spin. As a result of the spin-off, Sandoz, Inc. became a direct subsidiary of Sandoz AG, alongside AG.

134.    Co-Conspirator Apotex Corp. ("Apotex") is a corporation organized and existing under the laws of the State of Delaware. Its principal place of business is 2400 North Commerce Parkway, Weston, Flo=rida. At all times relevant to the Complaint, Apotex has marketed and sold generic pharmaceuticals in this District and throughout the United States.  Apotex is defined to include its managers, officers, employees, and agents acting on its behalf. At all times relevant to the Complaint, Apotex directly participated in the conspiracy alleged in this Complaint,  produced and sold one or more Price-Fixed Generic Drugs throughout the United States and its territories, and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

135.    Co-Conspirator Tracy Sullivan DiValerio ("Sullivan") is an individual residing at 2 Pierre Court, Marlton, New Jersey. At all times relevant to the Complaint, Sullivan was a Director of National Accounts or a National Account Manager, Generic Pharmaceuticals at Defendant Lannett Company, Inc.

## V.    TRADE AND COMMERCE

136.    During the time period relevant to Plaintiff's claims, Defendants and their co-conspirators engaged in business that affects or is within the flow of interstate or foreign commerce, and the effect of that business on interstate or foreign commerce is substantial. In particular, the activities of Defendants and their co-conspirators are within the flow of interstate and foreign commerce or have a substantial effect upon interstate or foreign commerce in that:

50

(a)     Defendants and their co-conspirators sold and shipped substantial quantities of generic drugs in a continuous and uninterrupted flow in interstate commerce to customers located in States other than the States in which the Defendants and their co-conspirators produced the generic drugs;

(b)     Data, information, correspondence and/or financial material were exchanged between each Defendant in the State in which each is located, incorporated, or has its principal place of business and other States;

(c)     Money flowed between banks outside of the State in which each Defendant is located, incorporated, or has its principal place of business and other States; and/or

(d)     Defendants and their co-conspirators imported substantial quantities of raw materials for generic drugs from outside the United States.

137.    The effect of Defendants and/or their co-conspirators' anticompetitive conduct on United States commerce gives rise to Plaintiff's claims.

## VI.    GENERIC DRUGS, THE FDCA AND THE HATCH-WAXMAN AMENDMENTS

138.    Under the Federal Food, Drug, and Cosmetic Act ("FDCA"), manufacturers that create a new drug must obtain Food and Drug Administration ("FDA") approval to sell the product by filing a New Drug Application ("NDA"). 21 U.S.C. §§ 301-392. An NDA must include specific data concerning the safety and effectiveness of the drug, as well as any information on applicable patents. 21 U.S.C. § 355(a), (b). The Hatch-Waxman Amendments, enacted in 1984, simplified the regulatory hurdles for prospective generic manufacturers by eliminating the need for them to file lengthy and costly NDAs. *See* Drug Price Competition and Patent Term Restoration Act, Pub. L. No. 98-417, 98 Stat. 1585 (1984). A manufacturer seeking approval to sell a generic version of a brand drug may instead file an Abbreviated New Drug Application ("ANDA"). An ANDA relies on the scientific findings of safety and effectiveness included in the brand manufacturer's original NDA by showing that the generic drug contains the same active ingredient(s), dosage form, route of administration, and strength as the brand drug, and is absorbed at the same rate and to the same extent as the brand drug – that is, that the generic drug is pharmaceutically equivalent and bioequivalent (together, "therapeutically equivalent") to the brand drug.  The FDA assigns generic

51

drugs that are therapeutically equivalent to their brand-name counterpart an "AB" rating.

139.    Congress enacted the Hatch-Waxman Amendments to expedite the entry of legitimate generic competitors, thereby reducing healthcare expenses nationwide. Congress also sought to protect pharmaceutical manufacturers' incentives to create new and innovative products.

140.    The Hatch-Waxman Amendments achieved both goals, advancing substantially the rate of generic product launches, and ushering in an era of historic high profit margins for brand manufacturers. In 1983, before the Hatch-Waxman Amendments, only 35% of the top-selling drugs with expired patents had generic alternatives; by 1998, nearly all did. In 1984, prescription drug revenue for branded and generic drugs totaled $21.6 billion; by 2009, total prescription drug revenue had soared to $300 billion.

141.    Generic versions of brand name drugs contain the same active ingredient, and are determined by the FDA to be just as safe and effective, as their brand name counterparts.  The only material difference between generic and brand name drugs is their price: generics are usually at least 25% less expensive than their brand name counterparts when there is a single generic competitor, and this discount typically increases to 50% to 80% (or more) when there are multiple generic competitors on the market for a given brand. The launch of a generic drug thus usually brings huge cost savings for all drug purchasers. The Federal Trade Commission ("FTC") estimates that about one year after market entry, the generic version takes over 90% of the brand's unit sales and sells for 15% of the price of the brand name product.  Because each generic is readily substitutable for another generic of the same brand drug, the products behave like commodities, with pricing being the main differentiator and the basis for competition among manufacturers. Over time, generics' pricing nears the generic manufacturers' marginal costs.

142.    Generic competition usually enables purchasers to purchase generic versions of the brand drug at a substantially lower price than the brand drug. Generic competition to a single

blockbuster brand drug (*i.e.*, a drug that generates annual sales of $1 billion or more) can resultin billions of dollars in savings to direct purchasers, consumers, insurers, local, state, and federal governments, and others. Indeed, one study found that the use of generic drugs saved the United States healthcare system $1.68 trillion between 2005 and 2014.[17]

143.    Due to the price differentials between brand and generic drugs, and other institutional features of the pharmaceutical industry, pharmacists liberally and substantially substitute for the generic version when presented with a prescription for the brand-name counterpart. Since passage of the Hatch-Waxman Amendments, every State has adopted substitution laws that either require or permit pharmacies to substitute generic equivalents for branded prescriptions (unless the prescribing physician has specifically ordered otherwise by writing "dispense as written" or similar language on the prescription).

144.    There is an incentive to choose the less expensive generic equivalent in every link in the prescription drug chain. Pharmaceutical wholesalers and retailers pay lower prices to acquire generic drugs than to acquire the corresponding brand-name drug. Health insurers and patients also benefit from the lower prices that result from generic competition.

145.    Further, the more generic manufacturers that enter a market, the more the price for the drug decreases. As an FDA study reflects, "generic competition is associated with lower drug prices, with the entry of the second generic competitor being associated with the largest price reduction," as average prices fall to roughly half the price of the branded drug. Further, with the entry of each additional generic manufacturer up to the ninth manufacturer, the price continues to fall. In mature markets with 19 or more generic manufacturers, the price of the generic drug is as low as 6% of the branded version. This phenomenon is demonstrated in the following chart

---

[17] GPhA, Generic Drug Savings in    the    U.S.    (7th    ed.    2015)    at    1,    *available    at* http://www.gphaonline.org/media/wysiwyg/PDF/GPhA_Savings_Report_2015.pdf.

prepared by the FDA:



**Generic Competition and Drug Prices**

Source: FDA analysis of retail sales data from IMS Health, IMS National Sales Perspective (TM), 1999-2004, extracted February 2005

146.    Generic manufacturers typically report a Wholesale Acquisition Cost ("WAC") for their drugs.  WAC prices represent the manufacturer's benchmark or reported list price.  The WAC typically functions as the manufacturer's list or benchmark price in sales to wholesalers or other direct purchasers and typically does not include discounts that may be provided, *e.g.*, for volume sales.  Manufacturers generally provide their WACs to purchasers or report them to publishers that compile that information for the market.

### A.  The Generic Drug Market

#### 1.  Upstream Players In The Drug Distribution System

##### a)  *Manufacturers/Suppliers*

147.    Drug manufacturers are the source of the prescription drugs in the pharmaceutical supply chain. Unlike branded drug manufacturers, generic manufacturers typically do not develop new drug therapies, but instead manufacture generic drugs that can be substituted (often automatically under state law) for the branded drug after expiration of the brand's exclusivity. Generic pharmaceuticals can be manufactured in a variety of forms, including tablets, capsules, injectables, inhalants, liquids, ointments and creams. A manufacturer seeking to sell a "new drug"

in the United States (including generic versions of previously approved drugs) must obtain approval from the FDA, which evaluates many factors, including drug safety, efficacy, raw material suppliers, manufacturing processes, labeling and quality control.

148.    Generic drug manufacturers operate manufacturing facilities, and in the absence of collusion, ostensibly compete with each other to sell the generic drugs they produce to wholesalers, distributors, and in some cases, directly to retail pharmacy chains, mail-order and specialty pharmacies, hospital chains, and some health plans.

149.    In marketing their generic drugs, manufacturers often do not attempt to differentiate their products because, primarily, a generic drug is a commodity. Consequently, competition is dictated by price and supply. As a result, generic drug manufacturers usually all market the drug under the same name, which is the name of the active ingredient (e.g., Acetazolamide).

150.    Drug suppliers include the manufacturers themselves, as well as other companies that have agreements to sell or distribute certain generic pharmaceutical drugs manufactured by another company. The corporate Defendants in this action are all drug manufacturers and suppliers who compete with one another for the sale of generic pharmaceutical drugs in the United States.

151.    Drugs sold in the United States may be manufactured either domestically or abroad. Many manufacturers that produce drugs for the United States market are owned by, or are, foreign companies. Generic drugs may be manufactured by the same companies that manufacture brand-name drugs (even in the same factories), or may come from companies that manufacture generics exclusively. Drug manufacturers typically sell their products through supply agreements negotiated with their customers.

152.    The corporate manufacturer Defendants in this case are among the largest generic pharmaceutical manufacturers in the industry. Each has a broad portfolio of generic drugs which it sells to distributors, retailers and group purchasing organizations, many of whom have a

nationwide presence. Competitors for particular pharmaceutical products vary given the shifting pharmaceutical landscape as drugs lose exclusivity, and as manufacturers decide to enter or exit an existing drug market. At all time relevant to this Complaint, every manufacturer Defendant's portfolio remained broad, and was sold to purchasers in virtually every state across the United States.

153.    The generic pharmaceutical portfolios of the Defendants run the gamut of indications, servicing a wide range of health needs. These include by way of example potentially less common health problems such as human immunodeficiency virus (HIV) treated with Lamivudine/Zidovudine and long-term kidney disease treated by Paricalcitol, as well as more commonplace conditions such as high blood pressure treated with medications including Clonidine-TTS Patch, Irbesartan, Moexipril HCL and Enalapril Maleate, high cholesterol treated with medications such as Fenofibrate, Pravastatin or Niacin ER, and attention deficit hyperactivity disorder (ADHD) treated by Dexmethylphenidate or Amphetamine/Dextroamphetamine.

## VII.    THE DOJ AND STATE ATTORNEYS GENERAL INVESTIGATIONS

154.    As noted above, Defendants' conduct regarding generic drugs is under investigation by the DOJ, State Attorneys General, the United States Congress and others.

### A.    The DOJ's Broad-Ranging Criminal Investigation Into the Anticompetitive Conduct of Generic Drug Manufacturers

155.    No later than November 3, 2014, as noted above, the DOJ opened a wide-ranging grand jury investigation into the marketing and pricing practices of generic drugs, which has resulted in the issuance of grand jury subpoenas to several generic drug manufacturers, including nearly all Defendants and/or their affiliates.

156.    A source at the Policy and Regulatory Report says "prosecutors see the case much like its antitrust probe of the auto parts industry, which has gone on for years and morphed into the department's largest criminal antitrust probe ever. Like in that case, prosecutors expect to move

56

from one drug to another in a similar cascading fashion."[18]

157.    According to BLOOMBERG NEWS, the investigation encompasses more than a dozen companies and at least two dozen generic drugs. The source quoted by the BLOOMBERG article correctly predicted in November 2016 that the DOJ would file criminal charges against at least one member of the generic drug price-fixing conspiracy by the end of 2016.[19]

158.    Sure enough, on December 12, 2016, DOJ filed criminal charges against Jeffrey Glazer (the former CEO of Heritage) and Jason Malek (the former president of Heritage). Both Glazer and Malek have since pled guilty to violations of Section 1 of the Sherman Act for their participation in conspiracies to fix prices, rig bids, and allocate customers for Glyburide and Doxycycline. The Hon. Barclay Surrick of this Court determined that there was a factual basis for both Glazer's and Malek's pleas, and convicted each individual of a felony violation of the Sherman Act. Sentencing for both Glazer and Malek was originally set for April 2017, but both sentencings have been repeatsedly rescheduled as Glazer and Malek continue to cooperate with the DOJ. As alleged above, by operation of law, these guilty pleas merely define the minimum parameters of the conspiracy alleged in this Complaint.

159.    Following the plea agreements of Malek and Glazer, the DOJ has obtained and executed search warrants against at least Aceto Corporation (which purchased Citron's generic drugs business in December 2016), Perrigo, and Mylan in connection with the generic drug price fixing probe. Accordingly, at least one federal judge has necessarily found probable cause that such a conspiracy existed, and that it was probable that evidence of the conspiracy would be found in the offices of Perrigo, Mylan, and Citron.

---

[18] *See* Eric Palmer, *DOJ criminal probe takes a look at trade associations*, FIERCE PHARMA (July 10, 2015), http://www.fiercepharma.com/regulatory/doj-criminal-probe-takes-a- look-at-trade-associations.
[19] *See* D. McLaughlin & C. Chen, *U.S. Charges in Generic-Drug Probe to be Filed by Year-End*, BLOOMBERG NEWS (Nov. 3, 2016,), *available at* https://www.bloomberg.com/ news/articles/2016-11- 03/u-s-charges-in-generic-drug-probe-said-to-be-filed-by-year-end.

160.    In addition to the raid of Perrigo's, Mylan's, and Aceto's corporate offices, the grand jury empanelled by DOJ as part of its investigation has issued subpoenas to numerous Defendants and/or their employees. The following companies have publicly acknowledged receiving grand jury subpoenas: Aceto, Actavis, Aurobindo, Citron, Dr. Reddy's, Greenstone/Pfizer, Heritage, Impax, Lannett, Lupin, Mallinckrodt, Mayne, Mylan, Par, Perrigo, co-conspirator Rising, Sandoz, Sun, Taro, Teva, West-Ward, and Zydus. Upon information and belief, additional companies have also received subpoenas but has not publicly acknowledged this fact.

161.    The fact that most Defendants and/or their employees received criminal subpoenas from a federal grand jury is significant, as is reflected in Chapter 3 of the 2014 edition of the DOJ's Antitrust Division Manual, *available at* https://www.justice.gov/atr/division-manual. Section F.1 of that chapter notes that "staff should consider carefully the likelihood that, if a grand jury investigation developed evidence confirming the alleged anticompetitive conduct, the Division would proceed with a criminal prosecution." *Id*. at III-82. The staff request needs to be approved by the relevant field chief and is then sent to the Antitrust Criminal Enforcement Division. *Id*. "The DAAG [Deputy Assistant Attorney General] for Operations, the Criminal DAAG, and the Director of Criminal Enforcement will make a recommendation to the Assistant Attorney General. If approved by the Assistant Attorney General, letters of authority are issued for all attorneys who will participate in the grand jury investigation." *Id*. at III-83. "The investigation should be conducted by a grand jury in a judicial district where venue lies for the offense, such as a district from or to which Price-Fixed sales were made or where conspiratorial communications occurred." *Id*. Thus, the fact that one or more of the Defendants and certain of their employees received federal grand jury subpoenas is an indication that antitrust offenses have occurred involving these companies.

162.    Additionally, public sources have reported that at least one Defendant or co-conspirator has applied for conditional amnesty under ACPERA. That a target has applied for leniency is significant. As the DOJ notes on its web site (https://www.justice.gov/atr/page/file/926521/download):

> Does a leniency applicant have to admit to a criminal violation of the antitrust laws before receiving a conditional leniency letter? Yes.  The Division's leniency policies were established for corporations and individuals "reporting their illegal antitrust activity," and the policies protect leniency recipients from criminal conviction. Thus, the applicant must admit its participation in a criminal antitrust violation involving price fixing, bid rigging, capacity restriction, or allocation of markets, customers, or sales or production volumes before it will receive a conditional leniency letter. Applicants that has not engaged in criminal violations of the antitrust laws have no need to receive leniency protection from a criminal violation and will receive no benefit from the leniency program. The DOJ further provides that the leniency applicant must also satisfy the following condition, among others, to avail itself of the government's leniency: "[t]he confession of wrongdoing is truly a corporate act, as opposed to isolated confessions of individual executives or officials.[20]

*Id.*

163.    The Department of Justice continues to pursue a parallel criminal investigation of the generic pharmaceutical industry's price-fixing practices. As of the filing of this complaint, the DOJ's investigation has resulted in guilty pleas from Defendant Heritage's CEO and President, Jeffrey Glazer and Jason Malek as noted above.  Heritage itself paid a fine and restitution for price-fixing of Glyburide and signed non-prosecution and deferred prosecution agreements for other drugs.

164.    Recently, the DOJ filed criminal charges against Defendant Ara Aprahamian (Taro) regarding illegal agreements he secured with competitors Sandoz and Teva. Defendant Armando Kellum (Sandoz) pleaded guilty to having made illegal agreements with Aprahamian and Taro. Defendant Rising admitted in a deferred prosecution agreement

---

[20] https://www.justice.gov/atr/page/file/926521/download.

that it had conspired to allocate customers and fix prices with Sandoz. And in its own deferred

prosecution agreement, Defendant Sandoz admitted to the DOJ that it made illegal agreements

to allocate customers and fix prices with at least Taro, Teva, Rising, and Perrigo. The following

chart shows various outcomes of the DOJ's investigation thus far:

| Indictment/ Information Date | Defendant | Status | 15 U.S.C. § 1 violations charged include these drugs | Co-conspirators (if specified by DOJ in charges) |
|---|---|---|---|---|
| 12/16/2016 | Jason Malek (Heritage) | Plead Guilty | Count 1: Doxycycline Hyclate Count 2: Glyburide | |
| 12/16/2016 | Jeffrey Glazer (Heritage) | Plead Guilty | Count 1: Doxycycline Hyclate Count 2: Glyburide | |
| 5/31/2019 | Heritage | DPA admits anticompetitive Conduct | Count 1: Glyburide | |
| 12/3/2019 | Rising | DPA admits anticompetitive conduct | Count 1: Benazepril-HCTZ | |
| 2/4/2020 | Ara Aprahamian[21] (Taro) | Indicted | Count 1: Clotrimazole, Desonide, Fluocinonide, Lidocaine, Nystatin-Triamcinolone<br><br>Count 2: Carbamazepine, Clotrimazole, Etodolac IR and ER, Fluocinonide, Warfarin | Count 1: Sandoz<br><br>Count 2: Teva |

---

[21] The grand jury also indicted Defendant Aprahamian for making false statements to federal investigators, a violation of 18 U.S.C. § 1001.

| 2/14/2020 | Armando Kellum (Sandoz) | Plead Guilty | Count 1: Clobetasol | Count 1: Taro, Aprahamian, unnamed Sandoz employees |
|---|---|---|---|---|
| 3/2/2020 | Sandoz | DPA admits anticompetitive conduct | Count 1: Clobetasol, Desonide, Nystatin-Triamcinolone<br>Count 2: Benazepril-HCTZ<br>Count 3: Desonide<br>Count 4: Tobramycin | Count 1: Taro<br>Count 2: Rising<br>Count 3: Perrigo<br>Count 4: Teva |
| 5/6/2020 | Apotex | DPA admits anticompetitive conduct | Count 1: Pravastin | Count 1: "other persons and corporate entities […]" |
| 7/23/2020 | Taro | DPA admits anticompetitive conduct | Count 1: Clobetasol, Desonide, Nystatin<br>Count 2: Carbamazepine, Etodolac | Count 1: Sandoz<br>Count 2: "Company A" |
| 8/25/2020 | Teva and Glenmark | Teva DPA admits anticompetitive conduct of Teva | Count 1: Pravastin<br>Count 2: Carbamazepine Clotrimazole, Etodolac IR and ER tablets, Fluocinonide cream, emollient cream, gel, and ointment and Warfarin<br>Count 3: Etodolac IR, Nadolol; Temozolomide and Tobramycin. | Count 1: Glenmark and Apotex<br>Count 2: Taro and Ara Aprahamian<br>Count 3: Teva and Sandoz |

165.    The DOJ has intervened in MDL 2724 as well as numerous civil antitrust actions alleging price-fixing, bid rigging, and market and customer allocation of generic pharmaceuticals stating that these cases overlap with the DOJ's ongoing criminal investigation. For example, in a civil antitrust action related to the generic pharmaceutical Propranolol, the DOJ intervened and requested a stay, stating that "the reason for the request for the stay is the government's ongoing criminal investigation and overlap of that investigation and this case," and that "the government's ongoing investigation is much broader than the [Glazer and Malek] informations that were

unsealed.'' The DOJ filed a brief with the United States Judicial Panel on Multidistrict Litigation noting that: "The complaints in those civil cases – which typically allege that a group of generic pharmaceutical companies violated Section 1 of the Sherman Act by conspiring to fix prices and allocate customers for a particular drug - overlap significantly with aspects of the ongoing criminal investigation.'' As noted above, the DOJ also filed a motion to stay discovery in MDL 2724, stating that: "Evidence uncovered during the criminal investigation implicates other companies and individuals (including a significant number of the Defendants here) in collusion with respect to Doxy Hyclate, Glyburide, and other drugs (including a significant number of the drugs at issue here)."[22] DOJ has continued to maintain that a Stay of certain discovery is necessary to protect its investigation even after the judicial admissions by Heritage and Rising.

166.    Some of the companies that have received subpoenas have confirmed that the inquiry extends to other drugs. For example, Mayne disclosed that the criminal investigation into its conduct "is focused on [Doxy DR] and potassium chloride powders," and Impax disclosed that the DOJ subpoena focused on specific drugs including Digoxin and Lidocaine/Prilocaine. The DOJ's Spring 2017 Division Update notes that:

> Millions of Americans purchase generic prescription drugs every year and rely on generic pharmaceuticals as a more affordable alternative to brand name medicines. The Division's investigation into the generics market, however, has revealed that some executives have sought to collude on prices and enrich themselves at the expense of American consumers.[23]

### B. At Least 49 State Attorneys General are Also Investigating the Anticompetitive Conduct in the Generic Drug Industry

167.    In addition to the DOJ's criminal enforcement action, at least 49 States' Attorneys

---

[22] *See* Intervenor United States' Motion to Stay Discovery, *In re: Generic Pharm. Pricing Antitrust Litig.,* MDL No. 2724, ECF 279 (E.D. Pa. May 1, 2017).
[23] DOJ Website, Division Update Spring 2017 (Mar. 28, 2017), *available at* https://www.justice.gov/atr/division-operations/division-update-spring-2017/division-secures- individual-and-corporate-guilty-pleas-collusion-industries-where-products.

General, led by the State of Connecticut, have also filed several civil enforcement actions based on their investigation to date into generic drug pricing. To date, the States have identified as co-conspirators at least 25 corporate generic drug manufacturers that conspired to fix prices of more than 130 different generic drugs.[24]

168.    In essence the States allege that the market for more than 130 generic drugs was cartelized based on an agreement or understanding between or among Defendants and their co-conspirators to refrain from competing with each other on the pricing and sale of the generic drugs in the United States. This agreement or understanding that the Defendants and their co-conspirators adhered to provides that each generic manufacturer "is entitled to its [predetermined share] of the market, whether the market is a particular drug, or a number of generic drugs. [The predetermined share] is an approximation of how much market share each competitor is entitled to, based on the number of competitors in the particular drug market, with a potential adjustment based on the timing of their entry. The objective is to attain a state of equilibrium, where none are incentivized to compete for additional market share by eroding price." In other words, generic drug manufacturers followed an express agreement to apply a negotiated formula that allocated the market share for the manufacturers of numerous generic drugs.

169.    The State AGs establish that this formula was developed and agreed to as the result of "an almost constant ability for Defendants to meet in person and discuss their business plans." For example, anticompetitive agreements are reached at:

> [o]rganized recreational and social events, such as golf outings, lunches, cocktail parties, dinners, and other scheduled activities that provide further opportunity to meet with competitors outside of the traditional business setting. Of particular importance here, generic drug manufacturer representatives who attend these functions ... use these opportunities to discuss and share upcoming bids, specific generic drug markets, pricing strategies and pricing terms in their contracts with

---

[24] Those companies are Actavis, Ascend, Apotex, Amneal, Aurobindo, Breckenridge, Citron, Dr. Reddy's, Emcure, Glenmark, Greenstone, Heritage, Lannett, Lupin, Mayne, Mylan, Par, Pfizer, Sandoz, Sun, Taro, Teva, Upsher-Smith, Wockhardt, and Zydus.

customers, among other competitively sensitive information.

These trade shows and customer conferences provide generic drug manufacturers, including but not limited to [the identified Defendants], with ample opportunity to meet, discuss, devise and implement a host of anticompetitive schemes that unreasonably restrain competition in the United States' market for generic drugs.

170.    In furtherance of the conspiracy, the States allege that Defendants would frequently rig bids by increasing pricing to existing customers in order to allow another conspirator to win the business of that customer and obtain the market share to which it was entitled by the conspiracy's formula. This process of purposefully abandoning existing customers would occur most frequently when a new conspirator enters the market for a generic drug. Whereas fundamental economic principles dictate that the price of the drug should decrease as the number of suppliers of that drug increases, the opposite typically occurred as a direct result of the conspiracy, because the existing competitors would walk away from their customers in order to allow the new entrant a portion of the market.

171.    These market allocation and price-fixing agreements were often negotiated across more than one generic drug. In order to maintain supracompetitive prices, "customers in one drug market might be traded for customers in another drug market. Alternatively, competitors might allow price increases on one or more generic drugs without competing based on a quid pro quo from other competitors on different drugs."

172.    For example, Rajiv Malik of Mylan, N.V., spoke with Jeffrey Glazer of Heritage, and Malik agreed that Mylan would walk away from two large accounts for Doxycycline DR so that Heritage could win this business. Malik noted that Mylan's consideration for abandoning this business had been provided previously, when Heritage intentionally forfeited accounts to Mylan on a different drug. During this exchange, as with all collusive communications involving Mylan alleged in this Complaint, the senior executive from Mylan (in this case Mr. Malik) acted on behalf of and reached an agreement that bound all of the Mylan entities identified in this Complaint.

173.    By adhering to the common understanding regarding the market share that each conspirator was entitled to, the Defendants also facilitated substantial price increases. "As longas everyone in the 'sandbox' is playing fair, and the manufacturers believe that they have their [predetermined market share], the larger understanding dictates that they will not seek to compete or take advantage of a competitor's price increase by bidding a lower price to take that business. Doing so is viewed as 'punishing' a competitor for raising prices – which is against the rules."

174.    These allegations – and numerous others – from the States' investigation are supported by direct evidence from at least six cooperating witnesses.  The expected testimony from these cooperating witnesses will directly support and corroborate the allegations throughout this Complaint. Some of those cooperating witnesses include:

    a.    A former pricing executive at Defendant Sandoz during the time period relevantto this Complaint [referred to herein as CW-1];

    b.    A former sales and marketing executive at Rising Pharmaceuticals, Inc. ("Rising") and Defendant Sandoz during the time period relevant to this Complaint [referred to herein as CW- 2];

    c.    A former senior sales executive at Defendant Sandoz during the time period relevant to this Complaint [referred to herein as CW-3];

    d.    A former senior sales executive at Defendant Sandoz during the time period relevant to this Complaint [referred to herein as CW-4];

    e.    A former senior executive at Defendant Glenmark during the time period relevant to this Complaint [referred to herein as CW-5]; and

    f.    Jason Malek ("Malek"), the former Vice President of Commercial Operations at Defendant Heritage who pled guilty to his role in the price-fixing Glyburide and Doxycycline.

## VIII.    CONGRESSIONAL RESPONSES TO GENERIC DRUG PRICE INCREASES

175.    In addition to the investigations by the DOJ and the State AGs, Congress has raised concerns about the alarming price spikes for numerous generic pharmaceuticals.

176.    In the fall of 2014, Senator Bernie Sanders and Representative Elijah Cummings requested information from manufacturers of ten drugs that had experienced extraordinary price

increases.[25]  In November 2014, Senator Sanders conducted a hearing entitled "Why Are Some Generic Drugs Skyrocketing in Price?" ("Senate Hearing").  Various witnesses discussed the price hikes for generic drugs, but none of the industry executives that were invited to testify appeared.[26]

177.    Senator Sanders and Representative Cummings followed up with a request to the Office of the Inspector General of the Department of Health & Human Services ("OIG"), asking it to investigate the effect that price increases of generic drugs have had on the Medicare and Medicaid programs. The OIG issued its report in December 2015, confirming that price increases for numerous generic drugs far outpaced inflation.[27]

178.    In response to a Congressional request from Senators Susan Collins, Claire McCaskill, Bill Nelson, and Mark Warner, the United States Government Accountability Office ("GAO") issued a report in August 2016 entitled "Generic Drugs Under Medicare: Part D Generic Drug Prices Declined Overall, but Some Had Extraordinary Price Increases."[28] The GAO investigation confirmed that in a competitive market, generic drug prices decline and remain stable, absent shortages or other market disruptions,[29] and identified numerous drugs that experienced "extraordinary" increases, which it defined as an increase of more than 100%.[30]

### IX.    THE GENERIC DRUG INDUSTRY WAS CHARACTERIZED BY AN EXTREMELY HIGH LEVEL OF COMPETITOR CONTACTS, WHICH FACILITATED COLLUSION BETWEEN DEFENDANTS

179.    The generic drug market is structured in a way that allows generic drug

---

[25] Senator Sanders, Press Release, *Congress Investigating Why Generic Drug Prices Are Skyrocketing* (Oct. 2, 2014), *available at* https://www.sanders.senate.gov/newsroom/press- releases/congress- investigating-why-generic-drug-prices-are-skyrocketing.

[26] Senate Hearing (Nov. 20, 2014), *available at* https://www.help.senate.gov/ hearings/why-are-some- generic-drugs-skyrocketing-in-priced.

[27] HHS OIG, Average Manufacturer Prices Increased Faster than Inflation for Many Generic Drugs (Dec. 2015), *available at* https://oig.hhs.gov/oas/reports/region6/61500030.pdf.

[28] GAO Report to Congressional Requesters, *Generic Drugs Under Medicare* (Aug. 12, 2016) ("GAO Report"), *available at* http://www.gao.gov/products/GAO-16-706.

[29] GAO Report, at 23-25.

[30] *Id.* at 1 & Appendix III.

manufacturers, including but not limited to the Defendants, to interact and communicate with each other directly and in person, on a frequent basis.

180.   As Connecticut's Attorney General George C. Jepsen commented, there is "a culture of cronyism [in the generic drugs industry] where, whether it's over a game of golf or a dinner or drinks, there's just systematic cooperation."[31]

181.   As alleged in this Complaint, these numerous competitor contacts resulted in express agreements between Defendants and their co-conspirators to fix prices, allocate markets, and rig bids on the pricing and sale of generic drugs sold in the United States to A&P and others, including the Price-Fixed Generics. In other words, the Defendants got together and exchanged assurances of common action and also adopted a common plan to cartelize the pricing and sale of the Price-Fixed Generic Drugs.

### A. Defendants Used Trade Association Meetings to Facilitate Their Collusion

182.   As the civil and criminal enforcement actions indicate, Defendants were members of numerous trade associations and used the meetings of those associations to facilitate their collusion. The frequent trade association meetings provided an ideal mechanism through which Defendants could and did meet in person and reach agreements with their competitors to increase prices on the Price-Fixed Generic Drugs sold to A&P and others in the United States.

183.   Upon information and belief, Defendants' anticompetitive conduct was a result of an agreement (or series of agreements) to fix, maintain, and stabilize prices, rig bids, and allocate customers for the sale of the Price-Fixed Generic Drugs. The agreement (or series of agreements) was furthered by discussions held at industry meetings and events hosted by various trade associations, including Generic Pharmaceutical Association ("GPhA"), Healthcare Distribution

---

[31] K. Thomas, *20 States Accuse Generic Drug Companies of Price Fixing*, NY TIMES (Dec. 15, 2016), https://www.nytimes.com/2016/12/15/business/generic-drug-price-lawsuit-teva- mylan.html?mcubz=3.

Management Association ("HDMA") (now the Healthcare Distribution Alliance), Efficient Collaborative Retail Marketing ("ECRM"), and Minnesota Multistate Contracting Alliance for Pharmacy ("MMCAP") as well as other meetings and communications.

184.    In formulating and effectuating their conspiracy, Defendants engaged in numerous anticompetitive activities, including, among other acts:

     a.    Participating, directing, authorizing, or consenting to the participation of subordinate employees in meetings, conversations, and communications with coconspirators to discuss the sale and pricing of Price-Fixed Generic Drugs in the United States;

     b.    Participating, directing, authorizing, or consenting to the participation of subordinate employees in meetings, conversations, and communications with co-conspirators to engage in market and customer allocation or bid rigging for Price-Fixed Generic Drugs sold in the United States;

     c.    Agreeing during those meetings, conversations, and communications to engage in market and customer allocation or bid rigging for Price-Fixed Generic Drugs sold in the United States;

     d.    Agreeing during those meetings, conversations, and communications not to compete against each other for certain customers for Price-Fixed Generic Drugs sold in the United States;

     e.    Submitting bids, withholding bids, and issuing price proposals in accordance with the agreements reached;

     f.    Selling Price-Fixed Generic Drugs in the United States at collusive and noncompetitive prices; and

     g.    Accepting payment for Price-Fixed Generic Drugs sold in the United States at collusive and noncompetitive prices.

185.    To sustain a conspiracy, conspirators often communicate to ensure that all are adhering to the collective scheme. Here, such communications occurred primarily through: (1) trade association meetings and conferences, (2) private meetings, dinners, and outings among smaller groups of employees of various generic drug manufacturers, and (3) individual private communications between and among Defendants' employees through use of the phone, electronic messaging and similar means.

186.   These secret, conspiratorial meetings, discussions, and communications helped to ensure that all Defendants agreed to participate in, implement, and maintain an unlawful bid rigging, price-fixing, and market and customer allocation scheme.

187.   The industry intelligence-gathering reporting firm Policy and Regulatory Report has reportedly obtained information regarding the investigation of generic drug companies by the DOJ, and has indicated that the DOJ is investigating the extent to which trade associations and industry conferences have been used as forums for collusion among competing generic drug companies. The States have similarly noted the centrality of trade associations and industry conferences in their investigation, stating that they have uncovered evidence that certain generic drug companies "routinely coordinated their schemes through direct interaction with their competitors at industry trade shows, customer conferences, and other events, as well as through direct e-mail, phone, and text message communications."[32]

188.   Defendants were members of numerous trade associations, which they used to facilitate their conspiratorial communications and implement their anticompetitive scheme to raise, maintain, and stabilize prices, rig bids, and engage in market and customer allocation concerning Price-Fixed Generic Drugs, including but not limited to GPhA and HDMA. In addition, Defendants regularly attended industry events hosted by the MMCAP.[33]

189.   The GPhA bills itself as "the nation's leading trade association for manufacturers and distributors of generic prescription drugs, manufacturers of bulk active pharmaceutical chemicals, and suppliers of other goods and services to the generic industry." The trade association was the result of a 2000 merger between the GPhA and two rival trade associations (the National

---

[32] http://www.ct.gov/ag/cwp/view.asp?Q=590616&A=2341.
[33] Exhibit 1 to the Complaint contains a chart which details numerous trade association meetings, conferences, and/or events attended by Defendants from 2010-2016. The latter half of Exhibit 1 lists the names of individual attendees at each meeting.

Association of Pharmaceutical Manufacturers, and the National Pharmaceutical Alliance). According to GPhA's website, its "member companies supply approximately 90 percent of the generic prescription drugs dispensed in the U.S. each year." The GPhA's website touts the "business networking opportunities" and the "peer-to-peer connections" as the primary reasons to join the trade association. *See* http://www.gphaonline.org/about/ membership. GPhA members during the relevant time period have included Defendants Actavis, Amneal, Aurobindo, Cadista, Dr. Reddy's, Glenmark, Greenstone, Heritage, Impax, Lupin, Mallinckrodt, Mylan, Par, Perrigo, Sandoz, Sun, Teva, West-Ward, Wockhardt, Zydus and Co-Conspirator Apotex.

190. Throughout the period relevant to Plaintiff's claims, the GPhA held three conferences each year. The GPhA's Fall Technical Conference was held each year in late October in Bethesda, Maryland. The GPhA's Annual Meeting was held each year in mid-February in Orlando, Florida. The GPhA's CMC Workshop was held each year in early June in Bethesda, Maryland. Exhibit 1 lists GPhA meetings attended by Defendants.

191. Upon information and belief, each of the conspiratorial price increases alleged in this Complaint was discussed, at least in part, at the GPhA's three annual meetings (including the numerous social events that were attendant to these meetings, such as golf outings, cocktail parties, and even informal dinners). In many of the instances alleged above, attendees for each conspirator included individuals with pricing authority over generic pharmaceutical drugs, including the Price-Fixed Generic Drugs. Indeed, the States allege that the GPhA meetings and other events "provide generic drug manufacturers ... with ample opportunity to meet, discuss, devise and implement a host of anticompetitive schemes that unreasonably restrain competition in the United States' market for generic drugs."

192. Moreover, several of Defendants' high-ranking corporate officers served on GPhA's Board of Directors, which gave Defendants an opportunity to communicate with

each other. Listed below are the individuals and their companies.[34]

| Defendants' Membership in GPhA Board of Directors 2012-2016 | |
|---|---|
| Actavis | 2012-2013 (Charles Mayr) <br> 2015 (Bob Stewart) |
| Apotex | 2012-2016 (Jeff Watson) |
| Amneal | 2012-2013 (Chriag Patel) |
| Aurobindo | 2016 (Robert Cunard) |
| Dr. Reddy's | 2016 (Alok Sonig) |
| Heritage | 2012-2015 (Jeffrey Glazer) |
| Impax | 2012-2014 (Carole Ben-Maimon) <br> 2015-2016 (Marcy Macdonald) |
| Lupin | 2014-2016 (Paul McGarty) |
| Mylan | 2012-2014 (Tony Mauro) <br> 2015 (Marcie McClintic Coates) <br> 2016 (Heather Bresch) |
| Par | 2015-2016 (Tony Pera) |
| Perrigo | 2013-2015 (Doug Boothe) <br> 2016 (Richard Stec) |
| Sandoz | 2012-2013 (Don DeGolyer) <br> 2014-2016 (Peter Goldschmidt) |
| Sun | 2015-2016 (Jim Kedrowski) |
| Teva | 2012-2013 (Debra Barrett) <br> 2014 (Allan Oberman) <br> 2015-2016 (Debra Barrett) |
| West-Ward | 2016 (Michael Raya) |
| Zydus | 2012-2016 (Joseph Renner) |

193.    In addition to the GPhA meetings, other industry events provided Defendants with opportunities to collude, and Defendants did in fact use these opportunities to discuss their unlawful agreements.

194.    The HDMA (now called HDA) is a national trade association that represents "primary pharmaceutical distributors" which links the nation's drug manufacturers and more than 200,000 pharmacies, hospitals, long-term care facilities, and clinics. HDMA holds regular conferences where its members, including generic drug manufacturers, meet to discuss various issues affecting the pharmaceutical industry. HDMA members, during the relevant time period, have included Defendants Breckenridge, Citron, Dr. Reddy's, Heritage, Impax, Lannett, Lupin,

---

[34] Apotex is no longer a Defendant; rather, it is a Co-Conspirator.

71

Mayne, Mylan, Par, Sandoz, Sun, Teva, Upsher-Smith, Wockhardt, Zydus and Co-Conspirator Apotex. Exhibit 1 lists HDMA meetings attended by Defendants and Co-Conspirators.

195. Other events at which Defendants may have conspired included meetings held by the Minnesota Multistate Contracting Alliance for Pharmacy (MMCAP) and the Efficient Collaborative Retail Marketing (ECRM).

196. According to its website, MMCAP is a "free, voluntary group purchasing organization for government facilities that provide healthcare services. MMCAP has been delivering pharmacy and healthcare value to members since 1985. MMCAP's membership extends across nearly every state in the nation, delivering volume buying power.  Members receive access to a full range of pharmaceuticals and other healthcare products and services; such as, medical supplies, influenza vaccine, dental supplies, drug testing, wholesaler invoice auditing and returned goods processing."

197. MMCAP's Charter provides that "[i]n 1989, the Minnesota Department of Administration, an agency of the State of Minnesota, began a cooperative purchasing venture program to procure pharmaceutical products at the best price possible for the benefit of any other state interested in participating in the program In 1996, the cooperative purchasing venture was named Minnesota Multistate Contracting Alliance for Pharmacy ... and currently provide healthcare-related contracting to state and local government members located across the United States of America. Total purchases by MMCAP member facilities for all MMCAP programs exceed $1 billion annually."

198. MMCAP held its National Member Conference in Bloomington, Minnesota on May 12-15, 2014. At MMCAP's 2014 National Member Conference, topics included "RFPs under consideration for Pharmacy," "contract evaluation," and "pharmaceutical price increases." At the MMCAP conference, a Heritage employee met in person and discussed price increase

strategies with a number of different competitors and was able to personally confirm agreement to raise prices of one or more Price-Fixed Generic Drugs. Exhibit 1 lists MMCAP meetings attended by Defendants.

199.    According to its website, ECRM conducts Efficient Program Planning Sessions that are made up one on-on-one strategic meetings that connect decision makers in an effort to maximize time, grow sales, and uncover industry trends. Exhibit 1 lists ECRM meetings attended by Defendants.

200.    At these various conferences and trade shows, representatives from at least some Defendants, as well as other generic drug manufacturers, discussed their respective businesses and customers. These discussions would occur at social events, including lunches, cocktail parties, dinners, and golf outings, that usually accompanied these conferences and trade shows. Defendants' employees used these opportunities to discuss and share upcoming bids, specific generic drug markets, pricing strategies and pricing terms in their contracts with customers.

201.    In conjunction with meetings at these conferences and trade shows, representatives of generic drug manufacturers got together separately, in more limited groups, allowing them to further meet face-to-face with their competitors and discuss their business. In fact, high-level executives of many generic drug manufacturers got together periodically for what at least some of them referred to as industry dinners.

202.    Through these various interactions, Defendants' employees were often acutely aware of their competition and, more importantly, each other's current and future business plans. This familiarity and opportunity often led to agreements among competitors to fix prices or to allocate a given market so as to avoid competing with one another on price.

203.    Defendants also routinely communicated and shared information with each other about bids and pricing strategy. This included forwarding bid packages received from a customer

*(e.g.,* a Request for Proposal or "RFP") to a competitor, either on their own initiative, at the request of a competitor, or by contacting a competitor to request that the competitor share that type of information.  Upon information and belief, these information exchanges were made by individuals with pricing and bidding authority and impacted the prices charges by Defendants for the Price-Fixed Generic Drugs.

204.    Additionally, Defendants shared information regarding the terms of their contracts with customers, including various terms relating to pricing, price protection, and rebates. Defendants used this information from their competitors to negotiate higher prices or superior terms with their customers, which was to the ultimate detriment of their customers. Again, this information sharing was undertaken for the purpose of impacting (and increasing) Defendants and their conspirators' prices for the Priced Fixed Generic Drugs.

205.    In sum, during meetings of the GPhA, HDMA, ECRM, and MMCAP, and the other meetings described in Exhibit 1, Defendants and co-conspirators exchanged confidential, commercially sensitive information in furtherance of the conspiracy, or agreed to fix prices, or both.

### B.  Industry Dinners and Private Meetings

206.    In addition to these frequent conferences and trade shows, senior executives and sales representatives gather in smaller groups, allowing them to further meet face-to-face with their competitors and discuss competitively sensitive information.

207.    Many generic drug manufacturers, including several of the Defendants, are headquartered in close proximity to one another in New York, New Jersey or eastern Pennsylvania, giving them additional opportunities to foster connections and meet and collude. At least forty-one (41) different generic drug manufacturers are concentrated between New York City and Philadelphia, including, among others, Defendants Actavis, Aurobindo, Breckenridge, Dr.

Reddy's, Glenmark, Greenstone, Lannett, Par, Pfizer, Sandoz, Taro, Teva, Wockhardt and Zydus.

208.    High-level executives of many generic drug manufacturers get together periodically for what some of them refer to as "industry dinners." For example, in January 2014, at a time when the prices of a number of generic drugs were reportedly soaring, at least thirteen (13) high-ranking executives, including CEOs, Presidents and Senior Vice Presidents of various generic drug manufacturers, met at a steakhouse in Bridgewater, New Jersey. Executives (including individual Defendants Berthold, Falkin and Ostaficiuk) from Defendants Actavis, Aurobindo, Breckenridge, Dr. Reddy's and Lannett, among many other generic manufacturers, attended this particular dinner.

209.    At these industry dinners, one company is usually responsible for paying for all of the attendees. For example, in a group e-mail conversation among the competitors in December 2013, one of the participants -- a high-ranking executive for Defendant Dr. Reddy's -- joked "[y]ou guys are still buying for Mark and I, right?" The response from another executive:

> "Well. . . I didn't think the topic would come up so quickly but . . . we go in alphabetical order by company and [a certain generic drug manufacturer] picked up the last bill. . . . PS no backing out now! Its [sic] amazing how many in the group like 18 year-old single malt scotch when they aren't buying."

210.    Other groups of competitors gather routinely for golf outings, where they have the opportunity to spend several days at a time together without interruption. One such annual event was organized by a packaging contractor in Kentucky. From September 17-19, 2014, for example, high-level executives from Defendants Teva, Actavis, Amneal, Lannett, Par, Zydus, Co-Conspirator Apotex and others were invited to a gathering at a country club in Bowling Green, Kentucky where they would play golf all day and socialize at night. Defendant Rekenthaler was in attendance with high-level executives from Defendants Lannett, Amneal, Wockhardt, Co-Conspirator Apotex and other generic manufacturers. Rekenthaler and a high-level executive from

Apotex, J.H., actually stayed together in the home of the owner of the packaging company that sponsored the event. At the conclusion of the outing, one of the executives – Defendant Ostaficiuk – sent an e- mail to the other attendees, stating: "This is a crazy biz but I am grateful to have friends like all of you!!!! Happy and honored to have you all as 'fraternity brothers.'" As discussed more fully below, Defendants Rekenthaler and Ostaficiuk used this golf outing as an opportunity to negotiate Camber's anticompetitive entry into the market for two different Teva drugs.

211.    Some generic pharmaceutical sales representatives also get together regularly for what they refer to as a "Girls Night Out" ("GNO"), or alternatively "Women in the Industry" meeting or dinner. During these events, the sales representatives meet with their competitors and discuss competitively sensitive information.

212.    Many "Women in the Industry" dinners were organized by A.S., a salesperson from Defendant Heritage Pharmaceuticals, Inc., who resides in the State of Minnesota. Other participants in these meetings were employees of generic drug manufacturers located in Minnesota, or salespeople residing in the area. However, out-of-town sales representatives were also aware of these dinners and were included when in the area. For example, in November 2014, Defendant Sullivan of Defendant Lannett sent A.S. a text message asking "[w]hen is your next industry women event?  I'm due for a trip out there and I'd love to plan for it if possible. A.S. responded: "There is an XMas [sic] party at Tanya's house on Dec 6th. Yes that is a Saturday.  We do it about once a quarter and usually it is during the week -- this was an exception."

213.    Sometimes dinners were also planned around visits of out-of-town competitors. As A.S. stated in organizing the dinner:

> Sorry if the meeting/dinner invite is a little short notice, but [K.N., a National Account Representative at Defendant Dr. Reddy's] will [be] in MN on Sept 29th and it would be a great time for everyone to get together! So much has been happening in the industry too -- we can recap all our findings from NACDS [trade show] over a martini or glass of wine! :) Plus the food is super Yummy!

214.    Several different GNOs were held in 2015, including: (1) at the ECRM conference in February (involving Defendants Dr. Reddy's, Greenstone, Lannett, Teva, Upsher-Smith and Zydus, among others – including individual Defendants Nailor and Sullivan); (2) in Baltimore in May (involving Defendants Dr. Reddy's, Lupin and Teva among others); and (3) at the NACDS conference in August (involving Defendant Dr. Reddy's among others).

### C. Defendants Communicated in Secret Through E-Mail, Telephone, and Text Messages

215.    In addition to the in-person meetings, Defendants also communicated regularly in furtherance of the conspiracy via e-mail, telephone, and text, as set forth in further detail throughout this Complaint.

216.    Telephone records produced to the State AGs establish that senior sales executives and other individuals with responsibility for pricing at Heritage had at least 513 contacts with executives from Actavis, Apotex, Aurobindo, Citron, Dr. Reddy's, Glenmark, Lannett, Mayne, Par, Sandoz, Sun, Teva, and Zydus.

217.    Similarly, senior sales executives and other individuals responsible for pricing at Teva had at least 1,501 contacts with executives from Actavis, Apotex, Aurobindo, Citron, Dr. Reddy's, Glenmark, Heritage, Lannett, Mayne, Par, Sandoz, Sun, and Zydus.

218.    Collusion is the only plausible inference to draw from the extremely high number of high-level competitors' contacts revealed by Defendants' phone records. Upon information and belief, and as set forth in further detail throughout this Complaint, Defendants used these contacts to discuss the unlawful agreements alleged in this Complaint.

### X.    THE OVERARCHING CONSPIRACY BETWEEN GENERIC DRUG MANUFACTURERS – PLAYING NICE IN THE SANDBOX

219.    As a result of these communications, sales and marketing executives in the generic pharmaceutical industry are well aware of their competitors' current and future business plans.

This reciprocal sharing of inside information greatly facilitates agreements among competitors to allocate markets to avoid price competition.

220.    The overarching conspiracy among generic manufacturers, however – which ties together all of the agreements on individual drugs identified in this Complaint – is an agreed- upon code that each competitor is entitled to its "fair share" of the market, whether that market is a particular generic drug, or a number of generic drugs.  Coined "fair share," the term is  generally understood as an approximation of how much market share each competitor is entitled to, based on the number of competitors in the market, with a potential adjustment based on the timing of entry. Once a manufacturer has achieved its "fair share," it is generally understood that the competitor will no longer compete for additional business. The common goal or purpose of this overarching agreement is to keep prices high, avoid price erosion and serve as the basis for further supra-competitive price increases.

221.    This overarching agreement is widespread across the generic drug industry and is broader than the Defendant manufacturers named in this Complaint. The Plaintiff focuses here on the role of these named Defendants and their participation in, and agreement with, this overarching conspiracy. This Complaint describes conspiracies regarding the sale of specific drugs, and how these specific conspiracies are also part of the larger overarching conspiracy.

222.    The exact contours of this "fair share" understanding, which has been in place for many years (and pre-dates any of the specific conduct detailed herein), has evolved over time during the numerous in-person meetings, telephonic communications, and other interactions between generic manufacturers about specific drugs. These business and social events occur with such great frequency that there is an almost constant ability for Defendants to meet in person and discuss their business plans. For example, between February 20, 2013 and December 20, 2013 (a 41-week period), there were at least forty-four (44) different tradeshows or customer conferences

where the Defendants had the opportunity to meet in person. These in-person meetings gave the Defendants the opportunity and cover to have these conversations, and reach these agreements, without fear of detection.

223.    As described in more detail below, when necessary, this larger understanding was reinforced through phone calls and text messages between the Defendants to discuss "fair share" and the desire to maintain or raise prices with respect to specific drugs. These types of communications occur with great frequency across the industry, including among Defendants.

224.    For example, from the period of January 1, 2013 through December 31, 2013, senior sales executives and other individuals responsible for the pricing, marketing and sales of generic drugs at Defendant Teva spoke to representatives of every significant competitor by phone and/or text on multiple occasions.   Phone calls and text messages with several of those  key competitors during the 2013 calendar year are set forth below. The following Table (Table 1) -- which is conservative because it is based on phone and text message records from only some of the executives and salespeople at issue, and therefore shows only some of the phone calls and text messages between the Defendants during that period -- sheds some light on the frequency with which Defendants communicated with each other throughout 2013.

**Teva phone/text communications with other Defendants (by month)**
**January 1, 2013 – December 31, 2013**

|  | Jan-13 | Feb-13 | Mar-13 | Apr-13 | May-13 | Jun-13 | Jul-13 | Aug-13 | Sep-13 | Oct-13 | Nov-13 | Dec-13 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Actavis | 2 | 2 | 0 | 7 | 27 | 1 | 17 | 12 | 15 | 40 | 13 | 47 | 183 |
| Glenmark | 0 | 3 | 0 | 0 | 26 | 9 | 6 | 8 | 1 | 12 | 14 | 16 | 95 |
| Greenstone | 2 | 0 | 20 | 1 | 4 | 5 | 6 | 1 | 0 | 2 | 7 | 11 | 59 |
| Lupin | 10 | 5 | 9 | 3 | 33 | 9 | 19 | 9 | 5 | 13 | 6 | 0 | 121 |
| Mylan | 31 | 47 | 32 | 37 | 33 | 26 | 26 | 16 | 1 | 1 | 0 | 11 | 261 |
| Sandoz | 17 | 5 | 4 | 4 | 12 | 16 | 18 | 14 | 3 | 0 | 9 | 2 | 104 |
| Taro | 0 | 0 | 0 | 0 | 2 | 1 | 8 | 11 | 0 | 11 | 1 | 1 | 35 |
| Zydus | 13 | 23 | 42 | 20 | 30 | 40 | 59 | 21 | 34 | 148 | 58 | 43 | 531 |
| Totals | 75 | 85 | 107 | 72 | 167 | 107 | 159 | 92 | 59 | 227 | 108 | 131 | 1389 |

225.    Of the 1,389 calls listed in Table 1, 1,234 of them – or 89% – involved  Defendants Green, Patel and Rekenthaler of Teva speaking with competitors. Many – though not all – of those communications involve matters that are addressed throughout this Complaint.

226.    Similarly, from the period of January 1, 2014 through December 31, 2014, senior sales executives and other individuals responsible for the pricing, marketing and sales of generic drugs at Defendant Teva continued to speak to representatives of every significant competitor by phone and/or text on multiple occasions. Phone calls and text messages with several of those key competitors during the 2014 calendar year are set forth below. The following Table (Table 2) -- which is conservative because it is based on phone and text message records from only some of the executives and salespeople at issue, and therefore shows only some of the phone calls and text messages between the Defendants during that period -- sheds similar light on the frequency with which Defendants communicated with each other throughout 2014.

**Teva Phone/Text Communications With Other Defendants (By Month)**
**January 1, 2014 – December 31, 2014**

| | Jan-14 | Feb-14 | Mar-14 | Apr-14 | May-14 | Jun-14 | Jul-14 | Aug-14 | Sep-14 | Oct-14 | Nov-14 | Dec-14 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Actavis | 31 | 17 | 47 | 42 | 76 | 9 | 38 | 24 | 36 | 23 | 8 | 14 | 365 |
| Glenmark | 4 | 11 | 11 | 7 | 7 | 2 | 9 | 6 | 1 | 6 | 3 | 3 | 70 |
| Greenstone | 17 | 3 | 13 | 3 | 1 | 1 | 6 | 1 | 9 | 0 | 0 | 0 | 54 |
| Lupin | 11 | 5 | 13 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 33 |
| Mylan | 6 | 1 | 1 | 1 | 7 | 2 | 0 | 10 | 13 | 5 | 2 | 9 | 57 |
| Sandoz | 5 | 10 | 7 | 10 | 0 | 1 | 28 | 7 | 4 | 1 | 6 | 3 | 82 |
| Taro | 1 | 1 | 7 | 4 | 17 | 16 | 5 | 2 | 1 | 0 | 0 | 1 | 55 |
| Zydus | 18 | 36 | 44 | 24 | 37 | 14 | 19 | 15 | 5 | 5 | 4 | 4 | 225 |
| Totals | 93 | 84 | 143 | 95 | 145 | 45 | 105 | 65 | 69 | 40 | 23 | 34 | 941 |

227.    Of the 941 calls listed in Table 2, 778 of them – or 83% – involved Defendants Patel and Rekenthaler of Teva speaking with competitors (by this time, Defendant Green no longer worked at Teva). Many – though not all – of those communications involve matters that are addressed throughout this Complaint.

228.    It was not just Teva personnel speaking to their competitors, however. All of these individuals were speaking to each other, when needed, hundreds or even thousands of times to ensure adherence to the overarching conspiracy. Because it would be too voluminous to list the total number of calls among all of the Defendants, the following graphic shows the interlocking web of communications and relationships between just some of the individuals employed by Teva

and its key competitors. Each line in the graphic below demonstrates that at least one phone call or text message was sent between those individuals (identified by their initials) while they were competitors. For many of these individuals, there were hundreds of calls and texts with competitors, but the volume of those communications is not captured by this graphic.



229.    In order to provide some organizational principle around the massive amount of collusive behavior by the Defendants described in this Complaint, certain sections are centered around the relationship between Defendant Teva and another conspirator. However, this convenience should not imply that the Complaint is solely concerned with bilateral relationships involving Teva.

230.    The specific drug agreements often involve overlapping sets of Defendants in communication with each other, all following their agreed-upon "fair share" code of conduct.  For example, to view only a small portion of the interlocking, overlapping web of collusion formed by Defendants: Teva, Taro and Wockhardt discussed amongst themselves the allocation of the Enalapril Maleate market; Teva and Taro communicated with Sandoz concerning the prices for Ketoconazole Cream; Sandoz worked with Mylan to allocate the market for Valsartan HCTZ;

Teva, Mylan and Par all communicated with each other in the spring of 2014 concerning the market for Budesonide DR Capsules. These are not isolated, one-off agreements, but rather demonstrate the ongoing, sprawling nature of the Defendants' overarching conspiracy.

231. Referred to sometimes as the "rules of engagement" for the generic drug industry, the fair share understanding among Defendants dictates that when two generic manufacturers enter the market at the same time, they generally expect that each competitor is entitled to approximately 50% of the market. When a third competitor enters, each competitor expects to obtain 33% share; when a fourth competitor enters, each expects 25%; and so on, as additional competitors enter the market.

232. When a generic drug manufacturer is the first to enter a particular drug market on an exclusive basis, it is commonly understood that that manufacturer is entitled to a little more than its proportional share of the market. For example, when Defendant Dr. Reddy's was about to enter the market for a drug in January 2013, the Vice President of Sales and Marketing explained during negotiations with his competitor that "he views it this way. If they [Dr. Reddy's] are first and others come out after, he deserves 60%. If he launches with others on day [one], he considers fair share 2-50%, 3-33%, 4-25%, etc."

233. Conversely, those generic manufacturers that enter later are typically entitled to a little less than their proportional share. One of the many examples of this occurred in March 2014, when – as discussed more fully below – Defendant Lupin entered the Niacin ER market after Defendant Teva had previously been exclusive. Defendants Patel of Teva and Berthold of Lupin spoke directly by phone a number of times during this period, including three (3) calls on March 24, 2014. That same day, Defendant Rekenthaler of Teva sent an internal e-mail to Defendant Patel stating: "We should concede Optum then defend everything else. This should be it for Lupin. I believe this should be the 40% we were okay with conceding." Here, Teva's expectation to

maintain 60% share in a two-player market, after being the first in that market, was consistent with the overarching conspiracy.

234. Defendant Taro went so far as to create a graphic representation of that understanding, taking into account both the number of competitors and order of entry to estimate what its "fair share" should be in any given market:

**Market Share - Fair Unit Share assumptions**
Order of Entry Grid
Number of Competitors

| | Number of Competitors | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|---|
| Order of Entry | 1 | 100% | 60% | 45% | 35% | 30% | 30% | 30% |
| | 2 | | 40% | 35% | 30% | 25% | 25% | 25% |
| | 3 | | | 20% | 20% | 20% | 20% | 20% |
| | 4 | | | | 15% | 15% | 15% | 15% |
| | 5 | | | | | 10% | 10% | 10% |
| | 6 | | | | | | 10% | 10% |
| | 7 | | | | | | | 10% |
| Total | | 100% | 100% | 100% | 100% | 100% | 100% | 100% |

235. These general parameters were well-known. The shared objective was to attain a state of equilibrium, where no competitors are incentivized to compete for additional market share by eroding price.

236. This common goal was stated succinctly by Defendant Aprahamian, who advised the Taro Pricing Department in training documents from September and November 2013 that "[g]iving up share to new entrant (as warranted) shows responsibility and will save us in the long run" and "[d]on't rock the boat – [g]reedy hogs go to slaughter." As demonstrated throughout the Complaint, Aprahamian's idea of "responsibility" meant constantly reaching out to competitors in order to coordinate giving up share to reach a "fair" allocation and keep prices high.

237. This scheme to minimize competition and allocate "fair share" is typically implemented as follows. First, Defendants allocate the market for an individual drug based on the number of competitors and the timing of their entry so that each competitor obtains an acceptable

83

share of the market. Then, the competitors agree on ways to avoid competing on price and, at times, significantly raise price. This pattern is frequently followed even in the absence of direct communication between the competitors, demonstrating the universal code of conduct agreed to by Defendants.

238.    This "fair share" understanding has been particularly effective when a new competitor enters the market – a time when, in a free-functioning, competitive market for generic drugs, prices would be expected to go down. In today's generic drug markets, a new competitor will either approach or be approached by the existing competitors. Existing competitors will agree to "walk away" from a specific customer or customers by either refusing to bid or submitting a cover bid. The new competitor's transition into the market is seamless; the new entrant  is  ceded market share and immediately charges a supra-competitive price.  The competitors then continue this process of dividing up customers until the market reaches a new artificial equilibrium. This is referred to as a "stable" market.

239.    "Fair share" principles also dictate how generic drug manufacturers respond when a competitor experiences supply issues. If the disruption is temporary, the existing competitors will refrain from taking any action that might upset the market balance. By contrast, if the disruption is for a longer term, the competitors will divide up customers until each player achieves a revised "fair share" based on the number of players remaining in the market. For example, in July 2013, a retail pharmacy customer e-mailed Defendant Taro stating that one of Defendant Mylan's products was on back order and asked Taro to bid for the business.  Defendant Aprahamian sent an internal e-mail stating "Not inclined to take on new business. Wholesalers have product, let them pull from there temporarily and we can certainly review if shortage persists. Don't want to overreact to this product. Not sure how long Mylan is out."

240.    These rules about "fair share" apply equally to price increases. As long as everyone

is playing fair, and the competitors believe that they have their "fair share," the larger understanding dictates that they will not seek to compete or take advantage of a competitor's price increase by bidding a lower price to take that business. Doing so is viewed as "punishing" a competitor for raising prices – which is against the "rules." Indeed, rather than competing for customers in the face of a price increase, competitors often use this as an opportunity to follow with comparable price increases of their own.

241.    For example, in May 2013 after a Glenmark price increase on a number of different drugs (discussed more fully below), Teva was approached by a large retail customer requesting a bid for several drugs. Defendant Green immediately sought to determine whether this request was due to a competitor price increase, in order to determine what Teva's strategy should be:

> On May 29, 2013, at 11:52 PM, "Kevin Green" <Kevin.Green@tevapharm.com> wrote:
>
> Do you think the Fluconazole Tabs below is due to a recent price increase. I don't have my list here at home. We are in a great inventory position, but not sure I want to steal it on an increase.

Teva declined to bid, after conversations with its competitors confirming that the reason for the request was due to a competitor's price increase.

242.    Teva declined to bid, after conversations with its competitors confirming that the reason for the request was due to a competitor's price increase.

243.    When a generic manufacturer participates in this scheme, and prices stay high, this is viewed as "playing nice in the sandbox." For example – as discussed more fully below – in December 2014 Defendant Teva was approached by someone on behalf of Defendant Greenstone. That person indicated that Greenstone was entering the market for Cabergoline and was seeking to target specific customers. That person specifically requested that Teva give up a large customer to the new entrant, and indicated that "Greenstone has promised to play nice in the sandbox." After

85

discussing the matter internally, a Teva representative responded to the customer: "[t]ell Greenstone we are playing nice in the sandbox and we will let them have [the targeted customer.]"

244. Similarly, when a generic manufacturer is "playing nice in the sandbox," it is generally referred to as a "responsible" or "rational" competitor. For instance, in May 2013, R.T., a senior sales and marketing executive at Defendant Sandoz, sent an internal e-mail to J.G., another Sandoz senior executive, stating "My sense is that Sandoz is viewed by customers and competition as a respectful/responsible player in the market, which we should be proud of and has taken years to develop. I would be very careful to destroy this through behavior that is too aggressive or desperation."

245. Defendant Sandoz, in turn, uses that same terminology to refer to its competitors that are acting in accordance with "fair share" principles. For example, in internal company presentations throughout 2014, Sandoz consistently referred to Defendant Actavis as a "responsible competitor" and Defendant Taro as a "very responsible price competitor."

246. Defendant Teva had its own term of art – referring to the competitors it had the most collusive relationships with as "high quality" competitors. As explored more fully below, Teva had long-standing relationships with these competitors, including several of the corporate Defendants, which affected nearly every overlapping drug they sold. As just one example, Defendant Patel of Teva exchanged seven (7) text messages and had two (2) long phone calls with Defendant Aprahamian of Taro on June 3 and 4, 2014. After a lengthy twenty-five (25) minute call with Aprahamian on the morning of June 4, Patel sent an internal e-mail to K.G., a Teva senior marketing executive, stating "[w]e should probably discuss how we want to handle all Taro increase items. Taro is a high quality competitor – I think we need to be responsible where we have adequate market share."

247. Adherence to the rules regarding "fair share" is critical in order to maintain high

prices. Indeed, that is the primary purpose of the agreement. If even one competitor does not participate in (and, thus behave in accordance with) the larger understanding, it can lead to unwanted competition and lower prices. In the relatively few instances where a competitor prioritizes gaining market share over the larger understanding of maintaining "fair share," that competitor is viewed as "irresponsible," and is spoken to by other competitors. For example, in the Spring of 2015, Defendant Upsher-Smith learned that Defendant Sandoz had submitted a bid on Chlorpromazine HCL at one of Upsher-Smith's GPO customers. B.P., a senior account manager at Upsher-Smith, forwarded that information internally stating "I can't believe they have chosen to compete against us since we had this business. How does this help us? We play fair and they don't?"

248.    "Fair share," "playing nice in the sandbox," and similar terminology have become part of the industry lexicon, and thus part of the larger understanding between Defendants. Generic drug manufacturers actively and routinely monitor their fair share and that of their competitors, as well as discuss customer allocation amongst each other within the context of agreements on specific drugs, as set forth more fully below. For example, in July 2013, L.J., a senior marketing executive at Sandoz, sent an internal e-mail identifying 47 products where Sandoz did not have "fair share" of the market. After some back-and-forth internal joking among Sandoz executives about the idea that Sandoz might actually attempt to compete for business in those markets by driving prices down, Defendant Kellum responded by emphasizing the truly industry-wide nature of the agreement:

| From: | Kellum, Armando |
|---|---|
| Sent: | Tuesday, July 02, 2013 12:31 AM |
| To: | ██████████████████ |
| Subject: | Re: Product Sales and Market Share Performance_v17 (3).xls |

Fair Share for all!!!

249.    Indeed, the concept of "fair share" is so well ingrained in the generic pharmaceutical industry that some large customers such as wholesalers are aware of, and at times facilitate, collusion among generic manufacturers. For example, in September 2014, a large wholesale customer reached out to several large generic manufacturers, including Defendant Teva, asking them to submit a "Priority Wishlist of items to gain increased volume in the market."  The customer reported to Teva that "7 of the global suppliers have created and submitted wish lists and that [the customer] will be reviewing next week and taking a look at how they can move things around. He said they are hoping to be able to horse trade without having to do ROFR [right of first refusal]."

250.    The "fair share" agreement is not limited to any one drug; these principles constantly inform and guide the market actions that generic drug manufacturers decide to take (or not take) both within and across individual-drug markets. For example, in November 2013, Defendant Dr. Reddy's won the "B" slot[35] business at a large wholesale customer on Divalproex ER. Dr. Reddy's had previously won the "A" slot business at that customer because Defendant Mylan had "walked away" from the business. J.A., a senior account executive at Dr. Reddy's, sent an internal e-mail stating "My concern here is that [Mylan] will retaliate somewhere else. I'm

---

[35] Sometimes customers contract with multiple suppliers – referring to them as primary ("A slot") or secondary ("B slot") suppliers – so that in the event of a supply disruption for a particular drug, there is a secondary source of supply.

unsure of the $ volume, but this would pull somewhere around 4% share from Mylan, and I don't think they would take that lying down."

251.    Similarly, in October 2013, CW-1, a senior pricing executive at Sandoz, sent an internal e-mail, including to Defendant Kellum, stating that Sandoz had decided not to bid on Haloperidol and Trifluoperazine HCL at a large retail customer. CW-1 explained his reasoning as follows: "We have been running up against Mylan a lot lately (Nadolol/Benaz/Hctz), and fear blowback if we take any more products at this moment. Trying to be responsible in the sandbox." Similarly, in June 2014, Sandoz chose not to bid at a customer on the drug Benazepril HCTZ out of concern that Defendant Mylan would retaliate. As CW-1 explained, "I do not want to pursue, I believe this is due to a Mylan increase. We have a lot of products crossing with Mylan right now, I do not want to ruffle any feathers." These decisions were made by Sandoz executives as a direct result of communications between the competitors, and in the context of an ongoing understanding between Defendants Sandoz and Mylan to fix prices and avoid competition on a number of different drugs, including Haloperidol, Trifluoperazine HCL, Nadolol and Benazepril HCTZ, among others.

252.    A similar scenario occurred in August 2015, when Defendant Taro declined to bid on Etodolac Extended Release (ER) Tablets at a large supermarket chain where Defendant Zydus was the incumbent. Taro voiced concerns internally that Zydus might retaliate and take share from them on another product, Warfarin Sodium Tablets. As C.L., an analyst at Taro, reasoned in an internal e-mail, Zydus "could hit us on Warfarin.  Not worth a fight in the sandbox over  300 annual units for Etodolac." As discussed more fully below, both Etodolac ER and Warfarin were drugs where Taro had previously agreed with its competitors, including Teva and Zydus, to fix prices and allocate customers in 2014. Taro's focus on playing nice in the sandbox was merely an extension of those already-existing agreements.

253. As these examples make clear, the interdependence among generic manufacturers transcends product markets as these companies make decisions not only based on what impact their actions will have in a given product market, but also on how those actions will impact other product markets where the competitors overlap, and any future markets where they might eventually compete.

254. In fact, as explained in more detail below, certain Defendants had long-standing agreements with some of their competitors to limit competition on any products on which the companies overlapped. For instance, shortly after Defendant Patel was hired by Teva in 2013, she reached out to CW-1 and asked how Sandoz handled price increases. Patel explained that she had been hired by Teva to identify products where Teva could increase prices. CW-1 told Patel that Sandoz would follow any Teva price increases and that Sandoz would not poach Teva's customers after Teva increased price. CW-1 reiterated his conversation to Defendant Kellum, who understood and approved.

255. In addition, generic manufacturers often communicated about, and colluded on, multiple drugs at any given time. As just one example, in July 2013, Defendant Teva increased pricing on a list of 21 different products. There was a great deal of internal pressure from management at Sandoz – including from Defendant Kellum and CW-1 – to obtain a copy of the Teva price increase list. As a result, CW-2 (then a Sandoz employee) reached out to his former colleague, Defendant Rekenthaler, the Vice President of Sales at Teva, to obtain a copy of the full Teva price increase list. Defendant Rekenthaler forwarded the list to his own personal e-mail address before then forwarding it to CW-2's personal e-mail address. Upon receiving the list, CW-2 read it to his supervisor – CW-1 – over the phone. Notably, the Teva list included a number of products that Defendant Sandoz did not even sell.

256. It was not uncommon for generic manufacturers to communicate with each other

90

about products that they did not sell. In another example, Defendants Teva, Wockhardt, and Mylan collusively raised pricing on Enalapril in July 2013 (discussed more fully below). After a lengthy conversation with Defendant Patel in the midst of the price increases, Defendant Aprahamian of Taro (not in the market for Enalapril at that time) sent an internal e-mail, including to M.P., a senior Taro executive, stating "[t]here has been some significant changes in the market landscape with this product and I'd like to get product back in Taro label (and fast)." And Taro did move fast. By December 2013, Aprahamian spoke again with Defendant Patel, M.A., an account manager at Defendant Mylan, and M.C., a senior sales and marketing executive at Defendant Wockhardt. Taro then re-entered the Enalapril market at higher than competitive pricing.

257.    In another example, on January 1, 2013 – the day before a substantial Mylan price increase on a number of items – Defendant Green of Teva spoke five (5) times with Defendant Nesta of Mylan. The next day, Defendant Green spoke with Defendant Kellum of Sandoz. Defendant Kellum then sent an internal e-mail to the Sandoz team stating "[j]ust heard from a customer that – Teva and Mylan . . . have raised price on Nadolol to our levels and Mylan took a significant price increase on Levothyroxine. Let's please be cautious on both these products." Despite that fact that Teva did not sell Levothyroxine, Green still conveyed to Sandoz that Mylan raised price on that product.

258.    Unlike their branded counterparts, generic drugs are commodities and generic manufacturers are constantly making decisions to enter new markets and leave existing markets. Often these decisions are made, at least in part, based on who the competitors are and how strong the relationship is between the two companies. As one example, in July 2013, Defendant Sandoz was looking to implement a "Taro Strategy" that involved temporarily delisting ten products that they overlapped on with Defendant Taro. This strategy would allow Taro to raise price on these products while Sandoz was out of the market, and then Sandoz could re-enter later at the higher

91

price.

259.    This interdependence between generic manufacturers is further demonstrated by the countless examples of companies sharing sensitive information with competitors as a matter of course. SAGs have gathered evidence going back more than a decade of generic companies routinely communicating and sharing information with each other about bids and pricing strategy. This includes forwarding bid packages received from a customer (e.g., a Request for Proposal or "RFP") to a competitor, either on their own initiative, or at the request of a competitor.

260.    Defendants and other generic drug manufacturers also share information among themselves regarding the terms of their contracts with customers, including pricing terms, price protection and rebates.  Defendants use this information to negotiate prices or terms that are more favorable to them, often to the ultimate detriment of direct purchasers. For instance, in December 2013, Defendant Teva was negotiating new price increase language in its customer contracts, and wanted some comfort that its competitors had similar language. On December 23, 2013, Defendant Rekenthaler spoke with Defendant Nesta of Mylan three times, including a thirteen (13) minute call. Immediately after hanging up the phone with Nesta after the third call, Rekenthaler sent the following e-mail:

From:    Dave Rekenthaler
Sent:    Mon 12/23/2013 10:41 AM (GMT-05:00)
To:      ███████████; Maureen Cavanaugh
Cc:      Nisha Patel02
Bcc:
Subject: RE: Proposed Price Increase Language

Mylans language is vague. "Pricing subject to change at Mylan's sole discretion."

261.    Defendants were well aware that what they were doing was illegal and took steps to cover up evidence of the overarching conspiracy. For example, in May 2014, a large customer of Taro's received a bid on a product not identified in the Complaint and gave Taro an opportunity

to bid to retain the business. A.L., a senior contracting executive at Taro, sent an internal e-mail stating "FS ok, will not protect." E.G., a senior managed care executive at Taro, responded "explain FS, (Fair Share)?" Defendant Aprahamian replied:

> No emails please. Phone call. ████let's discuss.

Similarly, handwritten notes from an internal Sandoz business review presentation from May 2017 – after the SAGs' investigation was well underway – read: "Avoid Fair Share terminology on slides – underdeveloped or overdeveloped is better."

262.    To avoid creating a potentially incriminating paper trail, Defendant Kellum of Sandoz routinely admonished colleagues for putting information that was too blatant in e-mails, understanding that it could lead to significant legal exposure for both the company and the individuals involved.

263.    It bears noting that the examples referenced in this section, and in the sections that follow, include only illustrative examples of the types of conduct described. Indeed, as noted in the State AG complaint, filed on May 10, 2019, many of the Defendants at that time had made no document productions in connection with the State AGs' investigation, including Defendants Amneal, Breckenridge, Glenmark, Lupin, Zydus, several other Defendants and Co-Conspirator Apotex made only limited productions focused on particular drugs or custodians, including Actavis, Mylan, Par, and Wockhardt. Even Teva, the central figure in this Complaint, had only produced documents from two custodians to the State AGs.

## XI.    CORPORATE AND INDIVIDUAL RELATIONSHIPS THAT ALLOWED THE CONSPIRACY TO EVOLVE

264.    An important event in the evolution of the conspiracy occurred in April 2013, when Teva took a major step toward implementing more significant price increases by hiring Nisha Patel as its Director of Strategic Customer Marketing.

265.    In this position, Patel's job responsibilities included, among other things: (1)

93

serving as the interface between the marketing (pricing) department and the sales force teams to develop customer programs; (2) establishing pricing strategies for new product launches and in-line product opportunities; and (3) overseeing the customer bid process and product pricing administration at Teva.

266.    Most importantly, she was responsible for – in her own words – "product selection, price increase implementation, and other price optimization activities for a product portfolio of over 1,000 products." In that role, Patel had 9-10 direct reports in the pricing department at Teva. One of Patel's primary job goals was to effectuate price increases. This was a significant factor in her performance evaluations and bonus calculations and, as discussed more fully below, Patel was rewarded handsomely by Teva for doing it.

267.    Prior to joining Teva, Defendant Patel had worked for eight years at a large drug wholesaler, AmerisourceBergen Corporation ("ABC"), working her way up to Director of Global Generic Sourcing. During her time at ABC, Patel had routine interaction with representatives from every major generic drug manufacturer, and developed and maintained relationships with many of the most important sales and marketing executives at Teva's competitors.

268.    Teva hired Defendant Patel specifically to identify potential generic drugs for which Teva could raise prices, and then utilize her relationships to effectuate those price increases.

269.    Even before Defendant Patel started at Teva, she was communicating with potential future competitors about the move, and about her new role. For example, on April 2, 2013 – nearly three weeks before Defendant Patel started at Teva – Defendant Ara Aprahamian, the Vice President of Sales and Marketing at Defendant Taro, sent an e-mail to the Chief Operating Officer ("COO") at Taro stating: "Nisha Going To Teva – Hush Hush for now…." The COO responded by saying "[m]aybe the industry will be better for it. Teva can only improve." Teva had, up to that point, acquired a reputation in the industry for being slow to follow price increases, and

the Taro COO viewed Defendant Patel as someone who would change that mindset at Teva. Defendant Patel had also worked with Defendant Aprahamian several years earlier at ABC.

270.    Patel's last day at ABC was April 11, 2013 and she started at Teva on April 22, 2013. Patel began communicating with competitors, by phone and text, the day after she left ABC, before she even started at Teva. For example:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 4/12/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 0:01:10 |
| 4/13/2013 | Text | Patel, Nisha (Teva) | Incoming | CW-5 (Glenmark) | 0:00:00 |
| 4/18/2013 | Text | Patel, Nisha (Teva) | Outgoing | R.T. (Sandoz) | 0:00:00 |
| 4/18/2013 | Text | Patel, Nisha (Teva) | Outgoing | R.T. (Sandoz) | 0:00:00 |
| 4/18/2013 | Text | Patel, Nisha (Teva) | Incoming | B.L. (Upsher-Smith) | 0:00:00 |
| 4/18/2013 | Text | Patel, Nisha (Teva) | Outgoing | R.T. (Sandoz) | 0:00:00 |
| 4/18/2013 | Text | Patel, Nisha (Teva) | Outgoing | B.L. (Upsher-Smith) | 0:00:00 |
| 4/18/2013 | Text | Patel, Nisha (Teva) | Outgoing | B.L. (Upsher-Smith) | 0:00:00 |
| 4/18/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 0:06:05 |
| 4/18/2013 | Text | Patel, Nisha (Teva) | Incoming | B.L. (Upsher-Smith) | 0:00:00 |

271.    Once Defendant Patel began her employment at Teva, her communications with certain competitors became much more systematic and frequent - and focused around events such as price increases, market entry, customer challenges and loss of exclusivity.

## A.  Ranking "Quality of Competition" to Identify Price Increase Candidates

272.    When she joined Teva, Defendant Patel's highest priority was identifying drugs where Teva could effectively raise price without competition. On May 1, 2013, Defendant Patel began creating an initial spreadsheet with a list of "Price Increase Candidates." As part of her process of identifying candidates for price increases, Patel started to look very closely at Teva's relationships with its competitors, and also her own relationships with individuals at those competitors. In a separate tab of the same "Price Increase Candidates" spreadsheet, Patel began ranking Teva's "Quality of Competition" by assigning companies into several categories, including "Strong Leader/Follower," "Lag Follower," "Borderline" and "Stallers."

273.    Patel understood- and stressed internally at Teva - that "price increases tend to stick

and markets settle quickly when suppliers increase within a short time frame." Thus, it was very important for Patel to identify those competitors who were willing to share information about their price increases in advance, so that Teva would be prepared to follow quickly. Conversely, it was important for Patel to be able to inform Teva's competitors of Teva's increase plans so those competitors could also follow quickly. Either way, significant coordination would be required for price increases to be successful – and quality competitors were those who were more willing to coordinate.

274.    As she was creating the list, Defendant Patel was talking to competitors to determine their willingness to increase prices and, therefore, where they should be ranked on the scale. For example, in one of her first conversations with CW-1 after Patel joined Teva, Patel told CW-1 that she had been hired by Teva to identify drugs where Teva could increase its prices. She asked CW-1 how Sandoz handled price increases. CW-1 told Patel that Sandoz would follow Teva's price increases and, importantly, would not poach Teva's customers after Teva increased. Not surprisingly, Sandoz was one of Teva's highest "quality" competitors. Patel and Teva based many price increase (and market allocation) decisions on this understanding with Sandoz over the next several years.

275.    It is important to note that Defendant Patel had several different ways of communicating with competitors. Throughout this Complaint, there are references to various phone calls and text messages that Patel exchanged with competitors. But she also communicated with competitors in various other ways, including but not limited to instant messaging through social media platforms such as LinkedIn and Facebook, encrypted messaging through platforms like WhatsApp, and in-person communications. Although the State AGs have been able to obtain some of these communications, many of them have been destroyed by Patel.

276.    Through her communications with her competitors, Defendant Patel learned more

96

about their planned price increases and entered into agreements for Teva to follow them. On May 2, 2013, Patel spoke to her contacts at Glenmark, Actavis and Sandoz several times:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-5 (Glenmark) | 0:05:02 |
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 0:00:06 |
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 0:00:03 |
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-5 (Glenmark) | 0:07:18 |
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 0:15:48 |
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 0:11:39 |

277.    After one of her calls with CW-5 of Glenmark, Defendant Patel sent an internal e-mail to one of her subordinates directing him to add six (6) different Glenmark drugs to Teva's "high priority" price increase list: Adapalene Gel; Nabumetone; Pravastatin; Ranitidine; Moexipril; and Moexipril HCTZ. As discussed more fully below, these are all drugs that Glenmark eventually increased prices on two weeks later, on May 16, 2013, and Teva followed with its own price increases shortly thereafter.

278.    By May 6, 2013, Patel had completed her initial ranking of fifty-six (56) different manufacturers in the generic drug market by their "quality." Defendant Patel defined "quality" by her assessment of the "strength" of a competitor as a leader or follower for price increases. Ranking was done numerically, from a +3 ranking for the "highest quality" competitor to a -3 ranking for the "lowest quality" competitor. The top ranked competitors at that time included the following companies:

| Strong Leader/Follower | Point Scale |
|---|---|
| Mylan | 3 |
| Mylan Institution | 3 |
| Watson/Actavis | 3 |
| Sandoz/Fougera | 3 |
| Glenmark | 3 |
| Taro | 3 |

The lowest ranked competitors were:

| Strong Leader/Follower | | Point Scale |
|---|---|---|
| Apotex | | -3 |
| Zydus | | -3 |

279.    Defendant Patel created a formula, which heavily weighted those numerical ratings assigned to each competitor based on their "quality," combined with a numerical score based on the number of competitors in the market and certain other factors including whether Teva would be leading or following the price increase. According to her formula, the best possible candidate for a price increase (aside from a drug where Teva was exclusive) would be a drug where there was only one other competitor in the market, which would be leading an increase, and where the competitor was the highest "quality." Conversely, a Teva price increase in drug market with several "low quality" competitors would not be a good candidate due to the potential that low quality competitors might not follow Teva's price increase and instead use the opportunity to steal Teva's market share.

280.    Notably, the companies with the highest rankings at this time were companies with whom Patel and other executives within Teva had significant relationships. Some of the notable relationships are discussed in more detail below.

### B.  The "High Quality" Competitor Relationships

281.    The highest quality competitors in Defendant Patel's rankings were competitors where Teva had agreements to lead and follow each others' price increases. The agreements and understandings regarding price increases were what made each of those competitors a high quality competitor. As part of their understandings, those competitors also agreed that they  would not seek to compete for market share after a Teva price increase.

98

### 1. Mylan (+3)

282. Mylan was Teva's highest-ranked competitor by "quality." The relationship between these two competitors was longstanding, and deeply engrained. It survived changes in personnel over time, and pre-dated Defendant Patel's creation of the quality competitor rankings.

283. Defendant Kevin Green, who was employed by Teva beginning in 2006 through late October 2013, first began communicating with Defendant Jim Nesta of Mylan by telephone on February 21, 2012. From that time until the time that Defendant Green left Teva, Defendants Green and Nesta were in almost constant communication, speaking by phone at least 392 times, and exchanging at least twelve (12) text messages – including at or around every significant price increase taken by either company. This amounts to an average of nearly one call or text message every business day during this period.

284. Shortly after Defendant Patel started her employment at Teva, she called Defendant Nesta on May 10, 2013 and the two spoke for over five (5) minutes. Because Defendant Green had already established a relationship with Mylan, Patel did not need to speak directly with Defendant Nesta very often. Typically, Patel would e-mail Green and ask him to obtain market intelligence about certain Mylan drugs; Green would then speak to Nesta – often about a long list of drugs – and report his findings back to Patel. Several examples of these communications are outlined more fully in various sections below.

285. When Defendant Green left Teva to join Zydus in late October 2013, the institutional relationship and understanding between Teva and Mylan remained strong. Defendant Rekenthaler promptly took over the role of communicating with Defendant Nesta. Starting in December 2013, through the time that Defendant Rekenthaler left Teva in April, 2015, Rekenthaler spoke to Nesta 100 times. Prior to Defendant Green leaving Teva in late-October 2013, Defendants Rekenthaler and Nesta had only spoken by phone once, more than a year earlier in 2012.

286.    The relationship between Teva and Mylan even pre-dated the relationship between Defendants Green and Nesta. For example, between January 1, 2010 and October 26, 2011, R.C., a senior executive at Teva, communicated with R.P., a senior executive counterpart at Mylan, by phone or text at least 135 times. The pace of communications between the two companies slowed dramatically in November 2011 after R.C. left Teva and before Green began communicating with Nesta – but continued nevertheless as needed during that time through communications between Defendant Rekenthaler and R.P. at Mylan.

### 2.    Watson/Actavis (+3)

287.    Actavis was Teva's next highest quality competitor by ranking. Defendant Patel had strong relationships with several executives at Actavis, including Defendant Rogerson, the Executive Director of Pricing and Business Analytics, and A.B., a senior sales executive at Actavis. Defendant Rekenthaler also communicated frequently with A.S., a senior sales executive at Watson – a relationship that pre-dated Defendant Patel joining Teva.

288.    Defendant Patel contacted A.B. shortly after she started her employment at Teva, as she was creating the quality competitor rankings. She called him on April 30, 2013, and the two exchanged several text messages the next day, May 1, 2013. But as detailed herein, Defendant Patel communicated on a more frequent basis with Defendant Rogerson, her counterpart in the pricing department at Actavis. From May 2, 2013 through November 9, 2015, Patel spoke and/or texted with Rogerson 157 times, including calls at or around every significant price increase taken by the respective companies.

289.    In August 2013, Defendant Marc Falkin joined Actavis and the relationship between Teva and Actavis grew stronger through his communications with Defendant Rekenthaler. From August 7, 2013 through the date that Rekenthaler left Teva in April, 2015, Rekenthaler and Falkin communicated by phone or text at least 433 times.

290. Defendant Maureen Cavanaugh also had a very strong relationship with Defendant Falkin. The two communicated with great frequency. From August 7, 2013 through the end of May 2016, Defendants Cavanaugh and Falkin spoke or texted with each other 410 times.

### 3. Sandoz (+3)

291. Sandoz was also considered a top-quality competitor by Teva. Defendant Patel had a very strong relationship with CW-1 at Sandoz.

292. Beginning on April 12, 2013 – the day after Defendant Patel's last day at ABC – until August 2016, Defendant Patel and CW-1 spoke 185 times by phone, including at or around every significant price increase taken by either company. As detailed above, in one of her initial calls with CW-1 after she joined Teva, Defendant Patel asked CW-1 how Sandoz handled price increases. Defendant Patel explained that she had been hired at Teva to identify products where Teva could increase prices. CW-1 reassured Defendant Patel that Sandoz would follow any Teva price increases on overlapping drugs, and that Sandoz would not poach Teva's customers after Teva increased price.

293. Defendants Green and Rekenthaler of Teva also both had a very strong relationship with CW-2, who was – at that time – a senior Sandoz executive. These relationships pre-dated Defendant Patel joining Teva.

### 4. Glenmark (+3)

294. Glenmark was one of Teva's highest-ranked competitors primarily because Defendant Patel had very significant relationships with several different individuals at Glenmark, including CW-5, Defendant Brown and J.C., a sales and marketing executive at Glenmark.

295. As stated above, Defendant Patel began communicating with CW-5 even before she began her employment at Teva. Patel was also communicating frequently with both CW-5 and J.C. during the time she created the quality competitor rankings, and agreed to follow several Glenmark price increases, in May 2013.

101

296.    Defendant Patel and CW-5 communicated by phone with great frequency – including at or around the time of every significant price increase affecting the two companies – until CW-5 left Glenmark in March 2014, at which point their communication ceased for nearly six (6) months. After CW-5 left Glenmark, Defendant Patel began communicating with Defendant Brown with much greater frequency to obtain competitively sensitive information from Glenmark. Defendants Patel and Brown had never spoken by phone before Patel started at Teva, according to the phone records produced.

### 5.    Taro (+3)

297.    Taro was highly rated because of Patel's longstanding relationship with the Vice President of Sales at Taro, Defendant Ara Aprahamian. Defendant Patel had known Defendant Aprahamian for many years, dating back to when Defendant Patel had started her professional career as an intern at ABC.

298.    Even though she knew Defendant Aprahamian well, they rarely ever spoke or texted by phone until Defendant Patel started at Teva. From April 22, 2013 through March 2016, however, Defendants Patel and Aprahamian spoke or texted at least 100 times, including calls or text messages at or around the time of every significant price increase affecting the companies during those years.

### 6.    Lupin (+2)

299.    Although initially not the highest ranked competitor, Lupin was assigned a high rating because of Defendant Patel's strong relationship with Defendant David Berthold, the Vice President of Sales at Lupin. The relationship between Teva and Lupin, however, pre-dated Defendant Patel. Prior to Patel starting at Teva, Defendant Green and others at Teva conspired directly with Berthold. Between January 2012 and October 2013, Defendants Berthold and Green, for example, communicated by phone 125 times.

300.     From May 6, 2013 through April 8, 2014, Defendants Patel and Berthold communicated by phone 76 times, including at or around the time of every significant drug price increase where the two companies overlapped.

301.     Demonstrating the strength of the relationship between the two companies, the price increase coordination continued between Defendants Teva and Lupin even when Defendant Green had left Teva and when Defendant Patel was out on maternity leave. For example, as discussed below, in October 2013 Lupin was preparing to increase its pricing on the drug Cephalexin Oral Suspension. Without Defendants Green or Patel to communicate with, Defendant Berthold instead communicated with Defendant Rekenthaler and T.S. of Teva in order to coordinate the price increase.

### C.  Individual Relationships

302.     In addition to the corporate relationships discussed above, individual relationships were also important to the conspiracy's evolution. The following sections discuss certain individuals Defendants who held senior positions at certain Manufacturer Defendants and who played key roles in the conspiracy's operation.

### 1.  Ara Aprahamian

303.     Defendant Aprahamian is the Vice President of Sales at Defendant Taro and has held that position since he moved to Taro from Actavis in March 2013. Aprahamian regularly communicated with competitors, including with several of his former colleagues at Actavis, and has established relationships with individuals at many of the corporate Defendants. For example, between March 2013 and October 2018, Aprahamian exchanged at least 706 phone calls and text messages with his contacts at Defendants Sandoz, Glenmark, Teva, Dr. Reddy's, Actavis, Mylan, Wockhardt, Lannett, Amneal, Greenstone, and Aurobindo. These communications are detailed in the table below:

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| CW-3 (Sandoz) | 190 | 3/19/2013 | 8/18/2016 |
| Grauso, Jim (Glenmark) | 106 | 7/1/2014 | 10/16/2018 |
| Patel, Nisha (Teva) | 100 | 5/22/2013 | 3/3/2016 |
| J.M. (Dr. Reddy's) | 61 | 3/27/2013 | 7/23/2018 |
| M.D. (Actavis) | 52 | 3/19/2013 | 9/2/2016 |
| M.A. (Mylan) | 50 | 4/4/2013 | 2/9/2016 |
| M.C. (Wockhardt) | 26 | 5/7/2013 | 8/20/2017 |
| A.B. (Lannett) | 22 | 11/15/2013 | 12/14/2017 |
| Falkin, Marc (Actavis) | 21 | 4/17/2014 | 3/8/2016 |
| A.B. (Actavis) | 16 | 8/16/2013 | 4/19/2016 |
| S.R.(1) (Amneal) | 13 | 6/6/2014 | 4/29/2016 |
| M.B. (Actavis) | 12 | 5/13/2013 | 8/22/2015 |
| M.B. (Glenmark) | 11 | 5/7/2013 | 3/26/2014 |
| Lannett Pharmaceuticals | 8 | 6/6/2014 | 4/29/2016 |
| A.G. (Actavis) | 4 | 4/23/2013 | 4/30/2013 |
| Rogerson, Rick (Actavis) | 4 | 6/17/2013 | 4/16/2014 |
| Hatosy, Robin (Greenstone) | 4 | 8/14/2014 | 8/20/2014 |
| T.D. (Actavis) | 3 | 4/12/2013 | 7/10/2013 |
| Grauso, Jim (Aurobindo) | 2 | 1/9/2014 | 1/10/2014 |
| A.S. (Actavis) | 1 | 1/9/2014 | 1/9/2014 |

### 2. David Berthold

304. Defendant Berthold is the Vice President of Sales at Defendant Lupin and has held that position since June 2006. During his tenure at Lupin, Defendant Berthold has been the primary person at the company communicating with competitors. Indeed, Defendant Berthold has relationships with individuals at many of the corporate Defendants and is one of the most prolific communicators of all the individual Defendants. For example, between March 2011 and October 2018, Berthold exchanged at least 4,185 phone calls and text messages with his contacts at Defendants Aurobindo, Glenmark, Greenstone, Actavis, Wockhardt, Zydus, Teva, Breckenridge, Mylan, Sandoz, Dr. Reddy's, Amneal, and Lannett. These communications are detailed in the table below:

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| Grauso, Jim (Aurobindo) | 977 | 12/10/2011 | 1/31/2014 |
| Grauso, Jim (Glenmark) | 959 | 2/3/2014 | 10/3/2018 |
| Hatosy, Robin (Greenstone) | 791 | 3/9/2011 | 7/14/2017 |
| A.G. (Actavis) | 301 | 3/22/2011 | 12/14/2017 |
| K.K. (Wockhardt) | 153 | 12/14/2011 | 7/30/2013 |
| A.T. (Aurobindo) | 123 | 8/15/2012 | 4/28/2013 |
| Green, Kevin (Zydus) | 124 | 11/8/2013 | 10/11/2017 |
| Green, Kevin (Teva) | 118 | 1/26/2012 | 10/9/2013 |
| Patel, Nisha (Teva) | 76 | 5/6/2013 | 4/8/2014 |
| P.G. (Breckenridge) | 76 | 3/10/2013 | 5/20/2016 |
| Nesta, Jim (Mylan) | 68 | 4/21/2013 | 10/13/2014 |
| P.M. (Aurobindo) | 60 | 3/30/2011 | 2/4/2016 |
| Falkin, Marc (Actavis) | 52 | 9/3/2013 | 4/1/2016 |
| Kellum, Armando (Sandoz) | 41 | 1/24/2012 | 8/14/2014 |
| B.R. (Dr. Reddy's) | 37 | 12/9/2011 | 6/13/2012 |
| T.S. (Teva) | 36 | 12/15/2011 | 1/15/2014 |
| V.B. (Dr. Reddy's) | 33 | 12/16/2014 | 9/21/2015 |
| S.R.(2) (Amneal) | 22 | 8/8/2012 | 11/16/2016 |
| P.M. (Teva) | 21 | 3/29/2011 | 1/20/2012 |
| K.R. (Zydus) | 21 | 9/25/2012 | 9/30/2012 |
| Ostaficiuk, Kon (Camber) | 19 | 5/14/2012 | 4/4/2016 |
| Brown, Jim (Glenmark) | 19 | 5/31/2013 | 6/2/2015 |
| S.R.(1) (Amneal) | 11 | 4/16/2013 | 2/13/2015 |
| Rekenthaler, David (Teva) | 9 | 10/14/2013 | 1/16/2014 |
| J.A. (Dr. Reddy's) | 7 | 6/12/2012 | 4/8/2014 |
| K.S. (Lannett) | 4 | 6/20/2014 | 6/23/2014 |
| Nailor, Jill (Greenstone) | 8 | 4/16/2013 | 6/19/2015 |
| S.G. (Sandoz) | 3 | 3/11/2014 | 11/26/2014 |
| L.S. (Zydus) | 3 | 8/23/2012 | 9/19/2013 |
| A.S. (Actavis) | 3 | 2/13/2012 | 5/24/2012 |
| K.S. (Zydus) | 2 | 9/18/2012 | 9/19/2012 |
| CW-3 (Sandoz) | 2 | 2/7/2012 | 10/18/2012 |
| B.M. (Amneal) | 2 | 9/26/2012 | 3/7/2018 |
| B.G. (Sandoz) | 1 | 7/31/2015 | 7/31/2015 |
| Teva Pharmaceuticals | 1 | 1/25/2012 | 1/25/2012 |
| K.A. (Wockhardt) | 1 | 8/25/2012 | 8/25/2012 |
| Zydus Pharmaceuticals | 1 | 1/17/2018 | 1/17/2018 |

### 3. Jim Brown

305.    Defendant Brown is the Vice President of Sales at Defendant Glenmark and has held that position since November 2012. Brown was one of several Glenmark executives that conspired with competitors. For example, between June 2012 and August 2018, Brown exchanged at least 1,060 calls and text messages with his contacts at Defendant Actavis, Teva, Lupin, Amneal, Wockhardt, Breckenridge, Lannett, Sandoz, Aurobindo, Zydus Par, Taro and Co-Conspirator Apotex. These communications are detailed in the table below:

105

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| S.R.(1) (Amneal) | 681 | 12/7/2012 | 3/12/2018 |
| Falkin, Marc (Actavis) | 270 | 8/9/2013 | 6/16/2016 |
| Patel, Nisha (Teva) | 36 | 8/6/2013 | 10/15/2014 |
| Berthold, David (Lupin) | 19 | 5/31/2013 | 6/2/2015 |
| B.W. (Wockhardt) | 9 | 6/25/2012 | 10/27/2017 |
| Grauso, Jim (Aurobindo) | 9 | 3/28/2013 | 12/6/2013 |
| D.N. (Breckenridge) | 8 | 11/12/2012 | 3/30/2015 |
| K.S. (Lannett) | 7 | 6/18/2012 | 8/10/2017 |
| CW-3 (Sandoz) | 4 | 6/10/2016 | 6/14/2016 |
| Green, Kevin (Zydus) | 4 | 4/12/2018 | 8/21/2018 |
| J.H. (Par) | 2 | 10/1/2013 | 11/1/2013 |
| S.R. (Lupin) | 2 | 11/28/2012 | 11/29/2012 |
| J.H. (Apotex) | 2 | 5/6/2015 | 3/10/2016 |
| L.P. (Taro) | 2 | 12/7/2012 | 12/7/2012 |
| P.M. (Aurobindo) | 1 | 2/28/2014 | 2/28/2014 |
| Breckenridge Pharmaceuticals | 1 | 10/17/2014 | 10/17/2014 |
| P.G. (Breckenridge) | 1 | 6/18/2012 | 6/18/2012 |
| Ostaficiuk, Kon (Camber) | 1 | 10/29/2014 | 10/29/2014 |
| Rekenthaler, David (Teva) | 1 | 3/24/2014 | 3/24/2014 |

### 4. Maureen Cavanaugh

306.    Defendant Cavanaugh was the Senior Vice President and Commercial Officer, North America, at Defendant Teva until April 2018. She is currently the Senior Vice President and Chief Commercial Officer at Defendant Lannett. During her employment at Teva,  Defendant Cavanaugh knew that her subordinates were communicating with competitors about pricing and customer allocation. In addition, Defendant Cavanaugh maintained her own relationship  with certain  competitors  and  coordinated  with  them  directly  when  necessary  to further the agreements. For example, between January 2011 and August 2017, Cavanaugh exchanged at least 568 phone calls and text messages with her contacts at Defendant Actavis, Amneal, Zydus, Sandoz, Glenmark, and Greenstone. These communications are detailed in the table below:

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| Falkin, Marc (Actavis) | 410 | 9/10/2013 | 7/29/2016 |
| A.B. (Actavis) | 113 | 8/12/2015 | 7/25/2016 |
| A.S. (Actavis) | 17 | 8/21/2015 | 7/26/2016 |
| K.R. (Zydus) | 10 | 9/16/2013 | 5/20/2016 |
| Green, Kevin (Zydus) | 8 | 5/14/2017 | 8/3/2017 |
| J.K. (Actavis) | 4 | 4/29/2014 | 3/31/2015 |
| R.S. (Sandoz) | 2 | 10/6/2016 | 10/6/2016 |
| S.R.(1) (Amneal) | 1 | 1/15/2013 | 1/15/2013 |
| M.K. (Zydus) | 1 | 3/15/2011 | 3/15/2011 |
| Grauso, Jim (Glenmark) | 1 | 7/8/2015 | 7/8/2015 |
| Nailor, Jill (Greenstone) | 1 | 12/5/2012 | 12/5/2012 |

### 5. Marc Falkin

307.    Defendant Falkin was the Vice President of Marketing, Pricing and Contracts at Defendant Actavis until Actavis was acquired by Teva in August 2016. For a period of time, Defendant Falkin was also the Senior Vice President, US Generic Sales, at Teva. During his employment at Actavis, which is the focus of this Complaint, Defendant Falkin was a prolific communicator and had established relationships with executives at many of the corporate Defendants. For example, between August 2013 and July 2016, Defendant Falkin exchanged at least 2,562 phone calls and text messages with his contacts at Defendant Zydus, Teva, Glenmark, Lannett, Aurobindo, Mylan, Lupin, Par, Greenstone, Taro, Amneal, Sandoz, Wockhardt and Co-Conspirator Apotex. These communications are detailed in the table below:

107

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| K.R. (Zydus) | 550 | 8/3/2013 | 4/13/2016 |
| Rekenthaler, David (Teva) | 433 | 8/7/2013 | 3/25/2015 |
| Cavanaugh, Maureen (Teva) | 410 | 9/10/2013 | 7/29/2016 |
| Brown, Jim (Glenmark) | 270 | 8/9/2013 | 6/16/2016 |
| C.B. (Teva) | 199 | 7/21/2015 | 7/29/2016 |
| K.S. (Lannett) | 181 | 8/1/2013 | 9/29/2015 |
| R.C. (Aurobindo) | 80 | 11/14/2013 | 3/16/2015 |
| Nesta, Jim (Mylan) | 78 | 12/3/2013 | 8/17/2015 |
| Berthold, David (Lupin) | 52 | 9/3/2013 | 4/1/2016 |
| J.H. (Par) | 48 | 9/24/2013 | 8/11/2015 |
| Nailor, Jill (Greenstone) | 41 | 1/6/2014 | 3/14/2016 |
| T.C. (Teva) | 36 | 12/28/2015 | 7/27/2016 |
| Teva Pharmaceuticals | 26 | 5/28/2015 | 7/19/2016 |
| T.K. (Apotex) | 22 | 3/4/2014 | 6/4/2015 |
| CW-5 (Glenmark) | 22 | 11/7/2013 | 2/26/2014 |
| Aprahamian, Ara (Taro) | 21 | 4/17/2014 | 3/8/2016 |
| S.R.(2) (Amneal) | 15 | 10/19/2013 | 11/16/2015 |
| Patel, Nisha (Teva) | 11 | 2/5/2016 | 6/16/2016 |
| J.B. (Teva) | 11 | 11/24/2015 | 6/2/2016 |
| C.D. (Teva) | 11 | 2/8/2016 | 6/22/2016 |
| M.P. (Taro) | 9 | 12/13/2013 | 8/4/2014 |
| J.P. (Teva) | 7 | 9/27/2014 | 3/22/2016 |
| J.H. (Apotex) | 6 | 4/7/2014 | 4/8/2014 |
| K.G. (Teva) | 6 | 1/14/2016 | 5/12/2016 |
| S.G. (Sandoz) | 5 | 4/30/2014 | 6/23/2014 |
| M.K. (Zydus) | 4 | 1/10/2014 | 1/11/2014 |
| M.C. (Wockhardt) | 3 | 5/24/2016 | 5/24/2016 |
| Ostaficiuk, Kon (Camber) | 2 | 9/27/2013 | 12/5/2013 |
| S.R. (Lupin) | 2 | 10/5/2013 | 10/5/2013 |
| B.H. (Apotex) | 1 | 6/10/2014 | 6/10/2014 |

### 6. Jim Grauso

308.    Defendant Grauso was employed as a Senior Vice President of Commercial Operations at Defendant Aurobindo until January 2014. In February 2014, Defendant Grauso moved to Defendant Glenmark and currently holds the position of Executive Vice President, North America, Commercial Operations. Defendant Grauso regularly communicated with competitors while he was at Aurobindo and continued those relationships when he transferred to Glenmark. For example, between December 2011 and January 2014, Defendant Grauso exchanged at least 1,762 phone calls and text messages with his contacts at Defendant Lupin, Teva, Actavis, Taro, Zydus, Amneal, Glenmark, Greenstone, Wockhardt, and Breckenridge. These communications

108

are detailed in the table below:

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| Berthold, David (Lupin) | 977 | 12/10/2011 | 1/31/2014 |
| T.S. (Teva) | 243 | 12/1/2011 | 1/21/2014 |
| Green, Kevin (Teva) | 158 | 12/6/2011 | 10/30/2013 |
| M.P. (Actavis and Taro) | 57 | 12/6/2011 | 1/13/2014 |
| D.L. (Zydus) | 54 | 1/7/2013 | 10/25/2013 |
| Ostaficiuk, Kon (Camber) | 39 | 3/21/2012 | 12/9/2013 |
| S.R.(1) (Amneal) | 32 | 3/27/2012 | 1/3/2014 |
| Brown, Jim (Glenmark) | 31 | 7/19/2012 | 1/6/2014 |
| Nailor, Jill (Greenstone) | 31 | 7/19/2012 | 1/6/2014 |
| M.C. (Wockhardt) | 26 | 12/8/2011 | 1/13/2014 |
| Green, Kevin (Zydus) | 20 | 11/11/2013 | 1/29/2014 |
| B.W. (Wockhardt) | 16 | 12/8/2011 | 1/14/2014 |
| K.K. (Wockhardt) | 11 | 8/6/2013 | 1/13/2014 |
| Patel, Nisha (Teva) | 12 | 5/14/2013 | 7/8/2013 |
| L.S. (Zydus) | 8 | 5/23/2013 | 6/6/2013 |
| M.B. (Taro) | 7 | 12/6/2011 | 3/22/2012 |
| K.S. (Zydus) | 6 | 9/19/2013 | 9/30/2013 |
| Aprahamian, Ara (Actavis) | 6 | 1/20/2012 | 1/27/2012 |
| J.P. (Teva) | 6 | 5/2/2012 | 12/19/2013 |
| S.R. (2) (Amneal) | 4 | 8/20/2012 | 12/4/2013 |
| D.N. (Breckenridge) | 4 | 6/25/2013 | 1/28/2014 |
| D.S. (Taro) | 3 | 8/6/2013 | 8/6/2013 |
| Teva Pharmaceuticals | 3 | 6/20/2012 | 3/21/2013 |
| M.B. (Glenmark) | 3 | 4/12/2013 | 6/17/2013 |
| Aprahamian, Ara (Taro) | 2 | 1/10/2014 | 1/10/2014 |
| Lupin Pharmaceuticals | 2 | 1/24/2013 | 1/24/2013 |
| E.S. (Lupin) | 1 | 9/6/2012 | 9/6/2012 |
| Rekenthaler, David (Teva) | 1 | 12/8/2011 | 12/8/2011 |

309.    Similarly, after moving to Glenmark, Defendant Grauso continued to communicate frequently with his contacts at competitor companies, including his former colleagues at Aurobindo. For example, between February 2014 and October 2018, he exchanged at least 2,018 phone calls and text messages with his contacts at Defendant Lupin, Aurobindo, Zydus, Teva, Taro, Wockhardt, Sandoz, Greenstone, Dr. Reddy's, Amneal, Rising, Par, Breckenridge, Upsher-Smith, and Mylan. These communications are detailed in the table below:

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| Berthold, David (Lupin) | 959 | 2/3/2014 | 10/3/2018 |
| R.C. (Aurobindo) | 215 | 2/3/2014 | 5/31/2017 |
| Green, Kevin (Zydus) | 161 | 2/4/2014 | 6/25/2018 |
| T.S. (Teva) | 128 | 2/3/2014 | 10/4/2018 |
| Aprahamian, Ara (Taro) | 106 | 7/1/2014 | 10/16/2018 |
| B.W. (Wockhardt) | 76 | 2/28/2014 | 10/2/2018 |
| M.P. (Taro) | 59 | 2/10/2014 | 2/3/2018 |
| Taro Pharmaceuticals | 59 | 3/5/2014 | 8/29/2018 |
| J.K. (Aurobindo) | 46 | 3/11/2014 | 10/3/2018 |
| J.J. (Aurobindo) | 36 | 2/19/2014 | 6/17/2018 |
| M.C. (Wockhardt) | 29 | 3/27/2014 | 10/1/2018 |
| J.H. (Sandoz) | 22 | 4/20/2018 | 9/27/2018 |
| R.S. (Sandoz) | 18 | 11/5/2015 | 8/8/2018 |
| Nailor, Jill (Greenstone) | 17 | 1/30/2015 | 5/26/2016 |
| P.S. (Aurobindo) | 10 | 2/20/2014 | 11/10/2017 |
| J.M. (Dr. Reddy's) | 10 | 9/27/2014 | 9/27/2017 |
| S.R.(1) (Amneal) | 9 | 2/3/2014 | 3/14/2018 |
| S.G. (Rising) | 9 | 3/2/2017 | 9/20/2018 |
| M.A. (Par) | 8 | 6/29/2015 | 7/12/2018 |
| Lupin Pharmaceuticals | 8 | 4/15/2014 | 4/10/2018 |
| L.C. (Lupin) | 7 | 4/30/2018 | 9/12/2018 |
| D.N. (Breckenridge) | 6 | 5/4/2018 | 8/10/2018 |
| Patel, Nisha (Teva) | 6 | 2/28/2014 | 1/5/2015 |
| Ostaficiuk, Kon (Camber) | 5 | 7/30/2014 | 10/29/2014 |
| M.M. (Upsher-Smith) | 3 | 10/4/2017 | 10/4/2017 |
| S.S. (Aurobindo) | 1 | 6/15/2017 | 6/15/2017 |
| Cavanaugh, Maureen (Teva) | 1 | 7/8/2015 | 7/8/2015 |
| J.P. (Teva) | 1 | 3/9/2015 | 3/9/2015 |
| L.W. (Lupin) | 1 | 8/22/2015 | 8/22/2015 |
| Teva Pharmaceuticals | 1 | 1/11/2018 | 1/11/2018 |
| Mylan Pharmaceuticals | 1 | 7/9/2018 | 7/9/2018 |

### 7.  Kevin Green

310.    Defendant Green worked at Defendant Teva as a Director of National Accounts until November 2013 when he took a position with Defendant Zydus. Defendant Green is currently the Vice President of Sales at Zydus. Defendant Green developed a number of relationships with individuals at many of the corporate Defendants. He regularly communicated with competitors while at Teva and then carried those relationships over to his time at Zydus. For example, between January 2010 and October 2013, Defendant Green exchanged at least 1,410 phone calls and text messages with his contacts at Defendant Zydus, Mylan, Dr. Reddy's, Aurobindo, Lupin, Sandoz, Greenstone, Breckenridge, Wockhardt, and Lannett. These communications are detailed in the table below:

110

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| Nesta, Jim (Mylan) | 461 | 2/21/2012 | 10/4/2013 |
| K.R. (Zydus) | 182 | 4/26/2010 | 10/31/2013 |
| B.R. (Dr. Reddy's) | 139 | 1/28/2010 | 6/29/2012 |
| Grauso, Jim (Aurobindo) | 158 | 12/6/2011 | 10/30/2013 |
| Berthold, David (Lupin) | 118 | 1/26/2012 | 10/9/2013 |
| CW-2 (Sandoz) | 84 | 4/26/2010 | 1/14/2013 |
| M.K. (Zydus) | 73 | 3/18/2010 | 10/28/2013 |
| P.H. (Zydus) | 52 | 3/29/2010 | 6/11/2012 |
| M.F. (Zydus) | 32 | 2/10/2013 | 10/30/2013 |
| R.H. (Greenstone) | 26 | 3/8/2010 | 10/16/2013 |
| P.M. (Aurobindo) | 19 | 9/27/2010 | 10/14/2013 |
| Kellum, Armando (Sandoz) | 14 | 3/21/2012 | 8/14/2013 |
| S.G. (Sandoz) | 9 | 4/25/2010 | 6/19/2013 |
| D.N. (Breckenridge) | 6 | 7/12/2012 | 3/3/2013 |
| M.M. (Wockhardt) | 5 | 2/19/2013 | 6/26/2013 |
| G.R. (Aurobindo) | 5 | 3/17/2010 | 3/24/2010 |
| M.A. (Mylan) | 5 | 10/27/2013 | 10/30/2013 |
| R.T. (Sandoz) | 4 | 5/23/2010 | 5/15/2013 |
| Sullivan, Tracey (Lannett) | 4 | 5/23/2011 | 11/14/2012 |
| Zydus Pharmaceuticals | 3 | 1/30/2013 | 8/20/2013 |
| S.R. (Lupin) | 3 | 10/17/2013 | 10/27/2013 |
| R.C. (Aurobindo) | 3 | 6/4/2012 | 6/29/2012 |
| CW-4 (Sandoz) | 2 | 5/20/2010 | 2/7/2012 |
| J.A. (Dr. Reddy's) | 1 | 7/23/2013 | 7/23/2013 |
| E.P. (Zydus) | 1 | 10/22/2013 | 10/22/2013 |
| K.K. (Wockhardt) | 1 | 7/15/2012 | 7/15/2012 |

311.    Similarly, when Defendant Green became employed at Zydus, he continued to communicate frequently with competitors including his former colleagues at Teva. For example, between November 2013 and August 2018, Defendant Green exchanged at least 969 phone calls and text messages with his contacts at Defendants Teva, Glenmark, Mylan, Lupin, Aurobindo, Rising, Amneal, Sandoz, Greenstone, Lannett, and Dr. Reddy's. These communications are detailed in the table below:

111

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| Patel, Nisha (Teva) | 184 | 11/8/2013 | 8/31/2016 |
| Grauso, Jim (Glenmark) | 161 | 2/4/2014 | 6/25/2018 |
| Nesta, Jim (Mylan) | 117 | 1/7/2014 | 8/17/2017 |
| Berthold, David (Lupin) | 124 | 11/8/2013 | 10/11/2017 |
| M.A. (Mylan) | 51 | 11/14/2013 | 3/16/2016 |
| P.M. (Aurobindo) | 49 | 11/4/2013 | 7/28/2016 |
| J.P. (Teva) | 44 | 9/15/2014 | 8/20/2017 |
| Rekenthaler, David (Teva) | 42 | 11/8/2013 | 3/30/2015 |
| Teva Pharmaceuticals | 36 | 11/3/2013 | 8/10/2017 |
| T.S. (Teva) | 31 | 1/8/2014 | 8/9/2017 |
| Grauso, Jim (Aurobindo) | 20 | 11/11/2013 | 1/29/2014 |
| CW-2 (Rising and Aurobindo) | 15 | 8/4/2014 | 4/23/2017 |
| L.K. (Amneal) | 14 | 9/15/2014 | 6/27/2018 |
| T.C. (Teva) | 13 | 12/4/2013 | 4/30/2017 |
| S.G. (Sandoz and Rising) | 10 | 6/22/2014 | 11/26/2016 |
| K.G. (Teva) | 9 | 5/3/2017 | 8/17/2017 |
| Cavanaugh, Maureen (Teva) | 8 | 5/14/2017 | 8/3/2017 |
| Kellum, Armando (Sandoz) | 8 | 4/30/2014 | 2/12/2017 |
| S.G. (Teva) | 5 | 11/4/2013 | 11/26/2013 |
| Brown, Jim (Glenmark) | 4 | 4/12/2018 | 8/21/2018 |
| J.L. (Teva) | 4 | 12/13/2016 | 2/20/2017 |
| Hatosy, Robin (Greenstone) | 4 | 10/12/2014 | 5/14/2017 |
| Sullivan, Tracey (Lannett) | 4 | 2/16/2014 | 2/16/2014 |
| S.R.(2) (Amneal) | 3 | 9/26/2016 | 3/15/2018 |
| M.W. (Mylan) | 3 | 5/15/2018 | 6/11/2018 |
| C.B. (Teva) | 3 | 12/20/2016 | 8/9/2017 |
| S.R. (Lupin) | 1 | 3/24/2014 | 3/24/2014 |
| J.A. (Dr. Reddy's) | 1 | 7/1/2014 | 7/1/2014 |
| T.G. (Aurobindo) | 1 | 7/9/2018 | 7/9/2018 |

### 8. Armando Kellum

312.    Defendant Kellum was the Director of Pricing and Contracts at Defendant Sandoz until July 2015. While at Sandoz, Defendant Kellum directed his subordinates, including CW-1, CW-2, CW-3, and CW-4, to enter into price fixing and market allocation agreements with competitors. In addition, Kellum had his own relationships with certain competitors and communicated with those contacts directly when necessary to further the agreements. For example, between, between May 2011 and April 2015, Defendant Kellum exchanged at least 182 phone calls and text messages with his contacts at Defendant Greenstone, Lupin, Teva, Upsher- Smith, Zydus, Actavis, Rising, Amneal, and Dr. Reddy's. These communications are detailed in the table below:

112

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| Hatosy, Robin (Greenstone) | 66 | 7/20/2011 | 8/14/2014 |
| Berthold, David (Lupin) | 41 | 1/24/2012 | 8/14/2014 |
| Green, Kevin (Teva) | 14 | 3/21/2012 | 8/14/2013 |
| J.M. (Upsher-Smith) | 10 | 8/7/2014 | 3/5/2015 |
| Nailor, Jill (Greenstone) | 9 | 4/2/2014 | 10/15/2014 |
| Green, Kevin (Zydus) | 8 | 11/7/2013 | 4/30/2015 |
| M.F. (Zydus) | 7 | 7/23/2012 | 1/23/2014 |
| S.H. (Upsher-Smith) | 6 | 9/17/2014 | 3/26/2015 |
| Upsher-Smith Laboratories | 4 | 9/15/2014 | 10/13/2014 |
| Rogerson, Rick (Actavis) | 3 | 5/5/2011 | 9/28/2011 |
| C.P. (Rising) | 3 | 4/28/2014 | 10/24/2014 |
| S.R.(1) (Amneal) | 2 | 5/20/2013 | 12/18/2013 |
| S.R.(2) (Amneal) | 2 | 11/27/2013 | 8/8/2014 |
| M.M. (Upsher-Smith) | 2 | 11/9/2013 | 11/20/2013 |
| E.H. (Upsher-Smith) | 2 | 9/12/2014 | 9/16/2014 |
| N.M. (Dr. Reddy's) | 1 | 7/23/2012 | 7/23/2012 |
| D.C. (Upsher-Smith) | 1 | 4/18/2013 | 4/18/2013 |
| B.L. (Upsher-Smith) | 1 | 9/12/2014 | 9/12/2014 |

### 9. Jill Nailor

313. Defendant Nailor has worked at Defendant Greenstone since August 2010 and is currently the Senior Director of Sales and National Accounts. Defendant Nailor directed her subordinate, Defendant Robin Hatosy, a national account executive, and others at Greenstone to fix prices and allocate customers with competitors on overlap drugs, including with several of the corporate Defendants. She also instructed them to avoid putting any evidence of such communications into writing.

314. In addition, Defendant Nailor regularly communicated directly with competitors herself. For example, between August 2010 and May 2017, Nailor exchanged at least 3,205 phone calls and text messages with her contacts at Defendants Amneal, Dr. Reddy's, Actavis, Aurobindo, Mylan, Glenmark, Zydus, Teva, Sandoz, Lupin, Wockhardt, Lannett, Upsher-Smith, Par, Taro and Co-Conspirator Apotex. These communications are detailed in the table below:

113

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| S.R.(1) (Amneal) | 2535 | 12/5/2012 | 5/1/2018 |
| V.B. (Dr. Reddy's) | 125 | 10/16/2014 | 5/8/2017 |
| A.B. (Actavis) | 86 | 9/21/2011 | 7/14/2016 |
| J.P. (Amneal) | 75 | 8/27/2010 | 9/28/2016 |
| T.W. (Dr. Reddy's) | 62 | 8/28/2010 | 5/23/2016 |
| A.T. (Aurobindo) | 46 | 8/26/2012 | 5/12/2013 |
| Falkin, Marc (Actavis) | 41 | 1/6/2014 | 3/14/2016 |
| Nesta, Jim (Mylan) | 40 | 12/5/2012 | 11/13/2015 |
| Grauso, Jim (Aurobindo) | 31 | 7/19/2012 | 1/6/2014 |
| Brown, Jim (Glenmark) | 23 | 9/5/2013 | 8/25/2016 |
| L.S. (Zydus) | 20 | 4/27/2012 | 8/22/2013 |
| Grauso, Jim (Glenmark) | 17 | 1/30/2015 | 5/26/2016 |
| D.C. (Glenmark) | 11 | 5/29/2013 | 7/7/2013 |
| Patel, Nisha (Teva) | 13 | 1/21/2014 | 3/6/2014 |
| Kellum, Armando (Sandoz) | 9 | 4/2/2014 | 10/15/2014 |
| K.S. (Zydus) | 8 | 6/13/2012 | 6/13/2012 |
| Berthold, David (Lupin) | 8 | 4/16/2013 | 6/19/2015 |
| M.C. (Wockhardt) | 7 | 8/9/2016 | 8/9/2016 |
| J.D. (Teva) | 6 | 2/16/2011 | 5/15/2012 |
| Teva Pharmaceuticals | 6 | 2/16/2011 | 1/22/2014 |
| D.S. (Actavis) | 5 | 11/27/2010 | 1/31/2012 |
| S.C. (Actavis) | 5 | 4/18/2012 | 4/22/2012 |
| Rekenthaler, David (Teva) | 4 | 12/12/2013 | 1/22/2014 |
| K.S. (Lannett) | 3 | 12/12/2014 | 1/6/2015 |
| R.C. (Aurobindo) | 3 | 10/8/2013 | 10/18/2013 |
| B.A. (Apotex) | 3 | 6/25/2015 | 6/28/2016 |
| P.M. (Aurobindo) | 2 | 7/22/2014 | 8/13/2014 |
| D.Z. (Upsher-Smith) | 2 | 5/24/2017 | 5/24/2017 |
| J.H. (Par) | 2 | 4/20/2016 | 4/21/2016 |
| Cavanaugh, Maureen (Teva) | 1 | 12/5/2012 | 12/5/2012 |
| CW-3 (Sandoz) | 1 | 5/29/2013 | 5/29/2013 |
| J.H. (Apotex) | 1 | 7/15/2015 | 7/15/2015 |
| Taro Pharmaceuticals | 1 | 3/23/2011 | 3/23/2011 |
| B.R. (Dr. Reddy's) | 1 | 3/15/2012 | 3/15/2012 |
| N.C. (Actavis) | 1 | 1/29/2013 | 1/29/2013 |
| Lupin Pharmaceuticals | 1 | 6/17/2015 | 6/17/2015 |

**10. James Nesta**

315.    Defendant Nesta started his employment with Mylan in 2000 and is currently the Vice President of Sales at Defendant Mylan. Nesta communicates regularly with his counterparts at many of the corporate Defendants. For example, between January 2011 and February 2016, Defendant Nesta exchanged at least 4,429 phone calls and text messages with his contacts at Defendants Greenstone, Amneal, Teva, Dr. Reddy's, Zydus, Aurobindo, Actavis, Lupin, Sandoz, Lannett, Taro, and Par.  These communications are detailed in the table below:

114

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| Hatosy, Robin (Greenstone) | 2310 | 6/9/2011 | 8/24/2015 |
| Green, Kevin (Teva) | 461 | 2/21/2012 | 10/4/2013 |
| B.R. (Dr. Reddy's) | 386 | 1/6/2011 | 6/28/2012 |
| S.R.(1) (Amneal) | 215 | 12/7/2012 | 12/17/2015 |
| K.R. (Zydus) | 121 | 7/21/2011 | 10/1/2014 |
| Green, Kevin (Zydus) | 117 | 1/7/2014 | 8/17/2017 |
| Rekenthaler, David (Teva) | 102 | 4/5/2012 | 3/17/2015 |
| A.T. (Aurobindo) | 95 | 8/26/2012 | 5/1/2013 |
| Falkin, Marc (Actavis) | 78 | 12/3/2013 | 8/17/2015 |
| J.K. (Aurobindo) | 76 | 10/1/2013 | 1/8/2016 |
| V.B. (Dr. Reddy's) | 71 | 8/7/2014 | 2/2/2016 |
| Berthold, David (Lupin) | 68 | 4/21/2013 | 10/13/2014 |
| CW-4 (Sandoz) | 67 | 9/6/2012 | 10/14/2013 |
| J.A. (Dr. Reddy's) | 52 | 3/9/2011 | 2/27/2014 |
| K.N. (Dr. Reddy's) | 42 | 6/7/2011 | 6/9/2011 |
| Nailor, Jill (Greenstone) | 40 | 12/5/2012 | 11/13/2015 |
| K.S. (Lannett) | 35 | 1/4/2013 | 4/23/2014 |
| T.W. (Dr. Reddy's) | 14 | 1/11/2013 | 2/5/2013 |
| P.M. (Aurobindo) | 13 | 4/5/2013 | 6/19/2013 |
| T.G. (Aurobindo) | 12 | 2/25/2016 | 2/25/2016 |
| S.R.(2) (Amneal) | 11 | 10/1/2014 | 1/15/2015 |
| R.C. (Teva and Aurobindo) | 10 | 7/20/2011 | 11/2/2011 |
| Patel, Nisha (Teva) | 10 | 5/10/2013 | 8/8/2013 |
| Sullivan, Tracy (Lannett) | 7 | 7/21/2014 | 7/22/2014 |
| L.P. (Taro) | 4 | 11/2/2012 | 1/17/2013 |
| B.P. (Zydus) | 4 | 7/21/2011 | 7/21/2011 |
| C.N. (Sandoz) | 3 | 12/2/2012 | 12/17/2012 |
| Teva Pharmaceuticals | 3 | 8/2/2011 | 8/2/2011 |
| J.H. (Par) | 2 | 2/4/2014 | 2/4/2014 |

## 11. Konstantin Ostaficiuk

316.    Defendant Ostaficiuk is the President of Camber Pharmaceuticals and has held that position since 2009. During his tenure at Camber, Defendant Ostaficiuk has been the primary person responsible for furthering price fixing and market allocation agreements with his competitors. Indeed, Defendant Ostaficiuk regularly communicated with competitors and maintained relationships with executives at many of the corporate Defendants. For example, between March 2011 and August 2017, Defendant Ostaficiuk exchanged at least 458 phone calls and text messages with his contacts at Defendants Amneal, Lannett, Breckenridge, Aurobindo, Lupin, Teva, Rising, Breckenridge, Taro, Glenmark, Zydus, Dr. Reddy's, Wockhardt, Sandoz, and Actavis. These communications are detailed in the table below:

115

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| S.R.(2) (Amneal) | 128 | 3/22/2011 | 6/11/2017 |
| K.S. (Lannett) | 122 | 3/10/2011 | 8/24/2017 |
| S.C. (Breckenridge) | 46 | 3/25/2011 | 7/24/2017 |
| Grauso, Jim (Aurobindo) | 39 | 3/21/2012 | 12/9/2013 |
| Berthold, David (Lupin) | 19 | 5/14/2012 | 4/4/2016 |
| R.M. (Lannett) | 10 | 12/15/2011 | 2/14/2012 |
| Rekenthaler, David (Teva) | 10 | 9/22/2014 | 2/19/2015 |
| C.M. (Aurobindo) | 9 | 5/27/2015 | 11/12/2015 |
| K.M. (Rising) | 8 | 7/17/2014 | 6/8/2016 |
| Breckenridge Pharmaceuticals | 7 | 11/9/2011 | 10/29/2014 |
| S.R.(1) (Amneal) | 6 | 9/15/2014 | 10/25/2016 |
| M.B. (Taro and Glenmark) | 6 | 5/30/2012 | 6/6/2012 |
| Sullivan, Tracy (Lannett) | 6 | 5/19/2011 | 8/28/2012 |
| P.H. (Zydus) | 5 | 5/8/2012 | 5/16/2012 |
| Grauso, Jim (Glenmark) | 5 | 7/30/2014 | 10/29/2014 |
| P.G. (Breckenridge) | 4 | 5/20/2011 | 12/17/2015 |
| M.K. (Zydus) | 4 | 1/5/2015 | 12/30/2015 |
| B.R. (Dr. Reddy's) | 4 | 1/18/2012 | 3/30/2012 |
| K.K. (Wockhardt) | 4 | 10/5/2011 | 2/1/2012 |
| D.P. (Sandoz) | 3 | 7/9/2014 | 7/14/2014 |
| CW-5 (Glenmark) | 3 | 11/19/2013 | 11/19/2013 |
| Falkin, Marc (Actavis) | 2 | 6/6/2013 | 12/5/2013 |
| P.M. (Aurobindo) | 2 | 8/20/2013 | 5/2/2014 |
| B.M. (Amneal) | 1 | 10/3/2011 | 10/3/2011 |
| Brown, Jim (Glenmark) | 1 | 10/29/2014 | 10/29/2014 |
| L.P. (Taro) | 1 | 6/26/2015 | 6/26/2015 |
| D.N. (Breckenridge) | 1 | 4/4/2016 | 4/4/2016 |
| A.T. (Aurobindo) | 1 | 2/1/2013 | 2/1/2013 |
| S.G. (Glenmark) | 1 | 4/27/2011 | 4/27/2011 |

**12. Nisha Patel**

317.    Defendant Patel worked at Defendant Teva from April 2013 to December 2016, first as a Director of Strategic Customer marketing and then as a Director of National Accounts. As discussed in great detail above, Defendant Patel was in frequent communications with her counterparts at the corporate Defendants to fix prices and allocate markets. For example, during her time at Teva, Defendant Patel exchanged at least 1,240 phone calls and text messages with her contacts at Defendants Zydus, Sandoz, Actavis, Glenmark, Greenstone, Taro, Lupin, Dr. Reddy's, Lannett, Par, Aurobindo, Mylan, Amneal, Upsher-Smith, Breckenridge and Co-Conspirator Apotex. As discussed in various sections of this Complaint, Defendant Patel also frequently communicated with competitors using Facebook Messenger, LinkedIn messaging, and the

116

encrypted messaging application WhatsApp. The communication detailed in the table below include only telephone calls and text messages:

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| Green, Kevin (Zydus) | 184 | 11/8/2013 | 8/31/2016 |
| CW-1 (Sandoz) | 183 | 4/26/2013 | 8/9/2016 |
| Rogerson, Rick (Actavis) | 157 | 5/2/2013 | 11/9/2015 |
| CW-5 (Glenmark) | 121 | 5/2/2013 | 3/4/2014 |
| Hatosy, Robin (Greenstone) | 105 | 5/7/2013 | 10/13/2016 |
| Aprahamian, Ara (Taro) | 100 | 5/22/2013 | 3/3/2016 |
| Berthold, David (Lupin) | 76 | 5/6/2013 | 4/8/2014 |
| J.C. (Glenmark) | 44 | 5/6/2013 | 7/28/2015 |
| Brown, Jim (Glenmark) | 36 | 8/6/2013 | 10/15/2014 |
| V.B. (Dr. Reddy's) | 28 | 6/10/2014 | 9/27/2016 |
| A.B. (Actavis) | 28 | 4/30/2013 | 10/16/2015 |
| A.S. (Actavis) | 28 | 9/16/2015 | 3/10/2016 |
| Nailor, Jill (Greenstone) | 18 | 1/21/2014 | 3/6/2014 |
| Sullivan, Tracy (Lannett) | 17 | 6/12/2014 | 4/6/2016 |
| T.P. (Par) | 16 | 6/26/2014 | 11/10/2014 |
| B.H. (Apotex) | 14 | 5/20/2013 | 6/12/2015 |
| Grauso, Jim (Aurobindo) | 12 | 5/14/2013 | 7/8/2013 |
| Falkin, Marc (Actavis) | 11 | 2/5/2016 | 6/16/2016 |
| Nesta, Jim (Mylan) | 10 | 5/10/2013 | 8/8/2013 |
| A.G. (Actavis) | 9 | 1/27/2015 | 6/9/2016 |
| S.R.(2) (Amneal) | 9 | 9/9/2014 | 5/29/2015 |
| B.L. (Upsher-Smith) | 8 | 4/29/2013 | 9/18/2014 |
| Grauso, Jim (Glenmark) | 6 | 2/28/2014 | 1/5/2015 |
| K.R. (Zydus) | 6 | 10/10/2013 | 9/18/2014 |
| S.G. (Zydus) | 4 | 2/29/2016 | 5/24/2016 |
| M.B. (Actavis) | 3 | 2/26/2016 | 6/6/2016 |
| M.B. (Glenmark) | 3 | 5/10/2013 | 5/23/2013 |
| S.C. (Breckenridge) | 2 | 2/7/2014 | 2/7/2014 |
| S.R.(1) (Amneal) | 2 | 9/9/2014 | 1/6/2015 |

### 13. David Rekenthaler

318.    Defendant Rekenthaler was the Vice President of Sales, US Generics at Defendant Teva until April 2015. Defendant Rekenthaler is now the Vice President of Sales at Apotex. During his time at Teva, Rekenthaler knew that his colleagues, including Defendants Green and Patel, were colluding with competitors. Indeed, Defendant Rekenthaler was also in frequent contact with competitors himself and had relationships with executives at nearly all the corporate Defendants. For example, between January 2011 and March 2015, Defendant Rekenthaler exchanged at least 1,043 phone calls and text messages with his contacts at Defendants Actavis, Mylan, Par, Aurobindo, Zydus, Sandoz, Rising, Amneal, Breckenridge, Lupin, Dr. Reddy's,

Glenmark, Greenstone, Taro, Lannett, Wockhardt and Co-Conspirator Apotex. These communications are detailed in the table below:

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| Falkin, Marc (Actavis) | 433 | 8/7/2013 | 3/25/2015 |
| Nesta, Jim (Mylan) | 102 | 4/5/2012 | 3/17/2015 |
| G.B. (Par) | 89 | 1/11/2011 | 2/13/2015 |
| R.C. (Aurobindo) | 75 | 10/6/2011 | 3/24/2015 |
| J.H. (Apotex) | 65 | 5/6/2013 | 3/9/2015 |
| Green, Kevin (Zydus) | 42 | 11/8/2013 | 3/30/2015 |
| A.S. (Actavis) | 26 | 1/11/2012 | 4/1/2013 |
| CW-2 (Sandoz and Rising) | 24 | 11/14/2011 | 11/20/2014 |
| J.H. (Par) | 19 | 9/16/2013 | 3/7/2015 |
| S.G. (Zydus) | 18 | 12/2/2013 | 1/29/2015 |
| B.P. (Mylan) | 18 | 9/12/2011 | 12/23/2013 |
| A.B. (Actavis) | 16 | 4/1/2013 | 9/16/2014 |
| J.K. (Actavis) | 15 | 10/11/2013 | 3/29/2015 |
| S.R.(2) (Amneal) | 13 | 5/8/2013 | 3/12/2015 |
| D.N. (Breckenridge) | 10 | 6/14/2012 | 6/10/2014 |
| Ostaficiuk, Kon (Camber) | 10 | 9/22/2014 | 2/19/2015 |
| Berthold, David (Lupin) | 9 | 10/14/2013 | 1/16/2014 |
| J.K. (Mylan) | 8 | 1/11/2012 | 2/7/2012 |
| K.M. (Rising) | 8 | 4/14/2011 | 1/4/2012 |
| B.R. (Dr. Reddy's) | 7 | 8/11/2011 | 4/16/2012 |
| K.R. (Zydus) | 5 | 10/10/2013 | 12/17/2013 |
| CW-5 (Glenmark) | 4 | 9/27/2013 | 3/11/2014 |
| Nailor, Jill (Greenstone) | 4 | 12/12/2013 | 1/22/2014 |
| E.G. (Taro) | 3 | 5/10/2011 | 3/8/2012 |
| K.S. (Lannett) | 3 | 10/31/2011 | 9/4/2014 |
| C.V. (Greenstone) | 3 | 11/14/2013 | 11/18/2013 |
| T.W. (Dr. Reddy's) | 3 | 7/29/2013 | 5/1/2014 |
| J.J. (Taro) | 2 | 1/31/2011 | 7/2/2012 |
| J.M. (Lannett and Glenmark) | 2 | 4/30/2011 | 11/19/2012 |
| M.B. (Glenmark) | 2 | 2/26/2013 | 2/28/2013 |
| B.W. (Wockhardt) | 2 | 1/5/2012 | 3/10/2014 |
| Brown, Jim (Glenmark) | 1 | 3/24/2014 | 3/24/2014 |
| G.R. (Aurobindo) | 1 | 11/1/2011 | 11/1/2011 |
| Grauso, Jim (Aurobindo) | 1 | 12/8/2011 | 12/8/2011 |

118

**14. Rick Rogerson**

319.    Defendant Rogerson was the Executive Director of Pricing and Business Analytics at Defendant Actavis until Actavis was acquired by Teva in August 2016. Defendant Rogerson now works at Defendant Amneal as a Senior Director of Marketing and Business Analytics. During his time at Actavis, Defendant Rogerson communicated with his contacts at several corporate Defendants. For example, between February 2010 and July 2016, Defendant Rogerson exchanged at least 635 phone calls and text messages with his contacts at Defendants Wockhardt, Teva, Dr. Reddy's, Sandoz, Lannett, Glenmark, Taro, and Zydus. These communications are detailed in the table below:

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| K.A. (Wockhardt) | 316 | 3/11/2010 | 1/28/2016 |
| Patel, Nisha (Teva) | 157 | 5/2/2013 | 11/9/2015 |
| N.M. (Dr. Reddy's and Sandoz) | 43 | 10/15/2013 | 3/6/2018 |
| J.M. (Lannett and Glenmark) | 32 | 6/24/2010 | 1/6/2012 |
| K.G. (Teva) | 29 | 12/15/2015 | 7/29/2016 |
| Teva Pharmaceuticals | 27 | 9/24/2015 | 7/29/2016 |
| C.B. (Teva) | 17 | 2/26/2016 | 7/26/2016 |
| Aprahamian, Ara (Taro) | 4 | 6/17/2013 | 4/16/2014 |
| S.G. (Glenmark) | 3 | 2/8/2010 | 2/8/2010 |
| Kellum, Armando (Sandoz) | 3 | 5/5/2011 | 9/28/2011 |
| Taro Pharmaceuticals | 2 | 6/14/2013 | 11/20/2013 |
| J.W. (Zydus) | 2 | 6/24/2014 | 6/25/2014 |

**15. Tracy Sullivan**

320.    Co-Conspirator Tracy Sullivan has been employed at Defendant Lannett since 2007 and is currently the Director of National Accounts. Sullivan regularly communicated with competitors and maintained relationships with executives at many of the corporate Defendants. For example, between March 2011 and August 2016, Defendant Sullivan exchanged at least 495 phone calls and text messages with her contacts at Defendants Zydus, Wockhardt, Teva, Greenstone, Dr. Reddy's, Par, Amneal, Aurobindo, Mylan, and Breckenridge. These communications are detailed in the table below:

119

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| K.R. (Zydus) | 124 | 6/5/2011 | 11/14/2014 |
| K.K. (Wockhardt) | 101 | 4/11/2012 | 1/16/2014 |
| J.P. (Teva) | 50 | 3/26/2014 | 3/3/2016 |
| Hatosy, Robin (Greenstone) | 37 | 7/29/2011 | 3/14/2016 |
| B.R. (Dr. Reddy's) | 28 | 3/28/2011 | 8/7/2011 |
| J.A. (Dr. Reddy's) | 22 | 4/28/2011 | 5/13/2014 |
| Patel, Nisha (Teva) | 17 | 6/12/2014 | 4/6/2016 |
| L.S. (Zydus) | 16 | 7/30/2011 | 8/15/2013 |
| D.V. (Dr. Reddy's) | 14 | 9/22/2015 | 8/19/2016 |
| K.O. (Par) | 14 | 7/26/2013 | 5/9/2015 |
| J.W. (Zydus) | 11 | 6/3/2014 | 3/7/2016 |
| J.P. (Amneal) | 11 | 5/24/2011 | 5/9/2015 |
| P.M. (Aurobindo) | 10 | 6/5/2013 | 6/10/2013 |
| K.N. (Dr. Reddy's) | 7 | 2/23/2016 | 3/7/2016 |
| Nesta, Jim (Mylan) | 7 | 7/21/2014 | 7/22/2014 |
| Ostaficiuk, Kon (Camber) | 6 | 5/19/2011 | 8/28/2012 |
| D.N. (Breckenridge) | 4 | 9/25/2012 | 9/17/2014 |
| Green, Kevin (Teva) | 4 | 5/23/2011 | 11/14/2012 |
| Green, Kevin (Zydus) | 4 | 2/16/2014 | 2/16/2014 |
| C.M. (Aurobindo) | 3 | 5/9/2015 | 5/9/2015 |
| G.R. (Aurobindo) | 2 | 6/14/2011 | 6/14/2011 |
| P.G. (Breckenridge) | 1 | 9/7/2011 | 9/7/2011 |
| S.K. (Wockhardt) | 1 | 10/6/2011 | 10/6/2011 |
| P.H. (Zydus) | 1 | 7/20/2012 | 7/20/2012 |

## XII.    THE CONSPIRATORIAL PRICE-FIXING, BID-RIGGING AND CUSTOMER AND MARKET ALLOCATION AGREEMENTS

321.    As a result of their frequent in-person meetings and the collusive communications that ensued as a result of these meetings via e-mail, telephone, and text messages, Defendants and their co-conspirators were able to implement, and did implement extraordinary and abrupt price increases on many of the Price-Fixed Generic Drugs identified in this Complaint.

322.    There were no market-based justifications for any of the abrupt price increases described below. The increases in price were not necessitated by increased manufacturing costs, or research and development costs. Federal law requires drug manufacturers to report potential drug shortages to the FDA, and no supply disruption was reported during the duration of the alleged conspiracy as to any of the Price-Fixed Generic Drugs (except where expressly alleged

120

below). Similarly, during the time frame relevant to these allegations, there were no known raw material shortages affecting the manufacture of any of the Price-Fixed Generic Drugs in the United States, nor did demand for any of these drugs suddenly increase.

323.    Each of the conspiratorial price increases would have been against each Defendant's self-interest if taken unilaterally and without advance agreement. As the last 30 years of generic drug pricing has demonstrated, in a competitive industry, a firm would cut its price with the expectation of increasing its market share if its competitors were setting prices above marginal costs.

324.    This economic reality is further compelled by the existence of MAC prices. As noted above, a MAC price represents the upper limit that a prescription drug payor will pay a pharmacy for a generic drug. Payors set the MAC price of a drug based on a variety of factors including, most significantly, the lowest acquisition cost for each generic drug paid by retail pharmacies purchasing from a wholesaler for each of a drug's generic versions. MAC pricing effectively requires pharmacies to purchase the least costly version of a generic drug available in the market, without regard to the manufacturer's list price.

325.    MAC pricing also incentivizes an individual generic manufacturer to refrain from unilaterally increasing its prices. Because MAC pricing bases reimbursement on the generic drug's lowest acquisition cost, a generic manufacturer that increases its price for a drug while competing manufacturers do not will swiftly lose sales to a competing generic manufacturer whose price remains constant.

326.    Given the existence of MAC pricing and the fact that AB-rated generic drugs are bioequivalent to both the branded version and also to other AB-rated generic versions of the same drug, A&P base their purchasing decisions almost exclusively on price. Due to this homogeneity, there is a very high cross-elasticity of demand for generic drugs from different

manufacturers.

327.    Consequently, in the absence of coordinated pricing activity among generic manufacturers, an individual generic manufacturer cannot significantly increase its price without incurring the loss of a significant volume of sales. Thus, the price increases of the Price-Fixed Generic Drugs described in this Complaint were against each Defendant's individual self-interest.

328.    While drug-specific agreements involve those Defendants that marketed and sold the particular drug, each Defendant, including the Defendants who did not manufacture the particular drug involved in each drug-specific agreement, was also a party to the broader, overarching conspiracy to abide by the "fair share" agreement covering all of the drugs that are the subject of this Complaint. From this broad agreement among all Defendants sprang additional agreements among the manufacturers relating to each of the individual drugs. The purpose and effect of all of these agreements was to lessen competition in the markets for each drug and throughout the industry and increase prices.

329.    When entering a generic drug market, Defendants routinely and systematically sought out their competitors in an effort to reach agreement to allocate market share, maintain high prices and/or avoid competing on price. These agreements had the effect of artificially maintaining high prices for a large number of generic drugs and creating an appearance of competition where in fact little to none existed. Some illustrative examples of these agreements are set forth below, describing specific examples relating to specific drugs over time.

330.    As evident from the many examples below, the overarching "fair share" conspiracy was well established in the industry by 2012, including among each of the Defendants. Generic manufacturers replaced competition with coordination in order to maintain their fair share of a given generic drug market and avoid price erosion. The structure and inner workings of the agreement were well understood and adopted throughout the industry.

122

331. As further detailed below, manufacturers eventually began to focus more on price increases than they had in the past. They were no longer satisfied to simply maintain prices at already supracompetitive levels – there was a concerted effort by many in the industry to significantly raise prices. Manufacturers started communicating with each other about those increases with greater and greater frequency.

332. Starting sometime in 2009 or even earlier, and continuing for several years, competitors would systematically communicate with each other as they were identifying opportunities and planning new price increases, and then again shortly before or at the time of each increase. The purpose of these communications was not only to secure an agreement to raise prices, but also to reinforce the essential tenet underlying the fair share agreement – i.e., that they would not punish a competitor for leading a price increase, or steal a competitor's market share on a price increase. There was an understanding among many of these generic drug manufacturers – including the Defendants – that a competitor's price increase be quickly followed; but even if it could not, the overarching conspiracy dictated that the competitors who had not increased their prices would, at a minimum, not seek to take advantage of a competitor's price increase by increasing their own market share (unless they had less than "fair share").

333. It is important to note that generic drug manufacturers could not always follow a competitor's price increase quickly. Various business reasons – including supply disruptions or contractual price protection terms with certain customers that might result in the payment of significant penalties – could cause such delays. In those instances when a co-conspirator manufacturer delayed following a price increase, the underlying fair share understanding operated as a safety net to ensure that the competitor not seek to take advantage of a competitor's price increase by stealing market share.

334. When entering a generic drug market, Teva and the other Defendants routinely and

123

systematically sought out their competitors in an effort to reach agreement to allocate market share, maintain high prices and/or avoid competing on price. These agreements had the effect of artificially maintaining high prices for a large number of generic drugs and creating an appearance of competition where in fact little to none existed.

### A. Examples of Drug Specific Collusion.

335. The following examples of drug-specific collusion, set forth alphabetically by drug, demonstrate how the conspiracy operated throughout the entire industry.

### 1. Acetazolamide

336. Acetazolamide is sold in at least two formulations – tablets (manufactured by Taro and Lannett) and sustained release capsules (manufactured by Heritage, Zydus, and Teva).

### a) *Acetazolamide Tablets*

337. The market for Acetazolamide tablets is dominated by Taro and Lannett. Since at least the spring of 2012, Taro and Lannett have coordinated pricing and market share on Acetazolamide tablets.

338. These tablets come in two dosages: 125 mg and 250 mg. Both Taro and Lannett make the 250 mg dosage, which is the predominant form. While only Taro makes the 125 mg dosage, this formulation appears to be included in the agreement between Taro and Lannett to elevate the prices of Acetazolamide.

339. In mid-2012, Taro and Lannett imposed list price increases of 40% to 50%, and brought list prices for Acetazolamide 250 mg tablets to identical levels.

340. By mid-2013, Taro and Lannett appeared to have worked out a remarkably stable split of the market, taking into account both 125 mg tablets and 250 mg tablets.

341. In late 2013, within weeks of each other, Taro and Lannett imposed identical list prices for Acetazolamide 250 mg tablets. The increases were well over 200%. Taro imposed a

similarly large list price increase on 125 mg tablets around this time. Average wholesale prices for both products increased dramatically.

342.    Throughout these coordinated increases, Lannett and Taro captured stable shares of the 250 mg tablet market. Lannett claimed approximately 56% and Taro claimed 44%. Taro was the lone manufacturer of 125 mg tablets and had 100% of sales of that dosage. Interestingly, the total dollar sales across both products was virtually identical. Lannett's larger share of the 250 mg tablet market was offset by Taro's sales of 125 mg tablets.

343.    Taro and Lannett's ability to reach market share and price increase agreements was aided by the prevalence of trade association events and conferences where the parties were able to meet in person. For example, in August 2013, not long before the large price increases imposed by Taro and Lannett, both Defendants attended the NACDS Total Store Expo in Las Vegas.

### b)  *Acetazolamide Capsules*

344.    During the relevant time period, Heritage, Teva, and Zydus sold generic Acetazolamide capsules to A&P and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

345.    In April 2014, Malek of Heritage discussed the possibility of a collusive price increase on Acetazolamide with a senior sales executive at Teva, Nisha Patel. (Heritage and Teva controlled almost 80% of the market for Acetazolamide.) During an April 15, 2014 phone call, Malek and Patel agreed that Heritage would lead the price increase (which would be approximately 75%) and Patel would communicate the details of the price increase to the sales executive at Zydus responsible for Acetazolamide.

346.    On April 16, 2014, sales executives responsible for Acetazolamide at Teva  (Patel) and Zydus (Kevin Green, the Senior Director of National Accounts at Zydus) discussed the collusive price increase by phone for approximately 20 minutes (on April 16)  and for 12 minutes

(on April 17).

347.    On April 24, 2014, Malek reached out to the Kristy Ronco, Zydus's Vice President of Sales, via LinkedIn, and the two communicated the next day about the Acetazolamide price increase as well.

348.    In order to ensure that the price increase was successful, Heritage, Zydus, and Teva agreed that they would not underbid each other's Acetazolamide business while they implemented the price increase.  Malek confirmed this agreement by telephone on May 7, 2014.

349.    On June 26, 2014, as agreed with Zydus and Teva, Heritage began notifying its customers that it was increasing prices of Acetazolamide by approximately 75%. Heritage fully implemented this price increase on all its major accounts (at least 17 customers) by July 9, 2014.

350.    Following Heritage's lead, Zydus and Teva increased prices of Acetazolamide by approximately 75% as well.

### 2.  Adapalene

351.    Adapalene, which is also discussed in additional detail in Section XIII. A. below, is a medication used to treat acne. It is available in a Gel formulation.

352.    It has been available in the United States in a generic form for many years.

353.    The market for Adapalene is mature. At all relevant times, there have been multiple manufacturers of Adapalene.

354.    During the relevant time frame, Defendants Glenmark, Taro, and Teva were the primary manufacturers of Adapalene.

355.    In May 2013, Teva, Taro and Glenmark wanted to fix, raise or stabilize the prices of Adapalene. Accordingly, the manufacturers engaged in a series of direct telephone communications to put their plan into action.

356.    For example, Teva's Patel communicated multiple times with multiple contacts at

126

Glenmark during May of 2013 to discuss prices of Adapalene and other drugs. Patel also spoke with Taro's Aprahamian in May to coordinate Adapalene prices.

357.    The ability of Glenmark, Taro, and Teva to reach agreements on Adapalene was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. *See* Exhibit 1 (Chart of Defendants' Trade Association Meetings Attendance).

358.    The coordination by Glenmark, Taro, and Teva is consistent with the Fair Share Agreement.

359.    The agreement between Defendants Glenmark, Taro, and Teva was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Adapalene Gel.

### 3.  Albuterol

360.    The market for Albuterol is mature, as Albuterol has been available in the United States for over twenty-five years. The World Health Organization ("WHO") includes Albuterol on its list of essential medicines. During the relevant time period, Mylan sold Albuterol pursuant to an ANDA approved by the FDA in or around January 1991. Sun (either directly or through its subsidiary Mutual) sold Albuterol to purchasers pursuant to ANDAs that were approved by the FDA in or around December 1989. Both Mylan and Sun sold Albuterol to A&P and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

361.    At all times relevant to this lawsuit there has been more than one manufacturer of Albuterol on the market. Defendants Mylan and Sun dominate the market for Albuterol.

362.    For more than two years prior to the conspiracy period, Defendants' average price in the U.S. for Albuterol was remarkably stable. Beginning in March 2013, the prices rose abruptly and, for the most part, in unison.

363.    By way of example, available WAC data demonstrates that beginning in March

127

2013, Defendants selling generic Albuterol took substantial price increases on the 2 mg strength that exceeded 3400%:[36]

| Product MG | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 100 ct | Mylan | 00378025501 | $0.13 | $5.88 | 6-Mar-13 | 4317% |
| 500 ct | Mylan | 00378025505 | $0.13 | $5.88 | 6-Mar-13 | 4549% |
| 100 ct | Sun | 53489017601 | $0.13 | $4.70 | 15-Apr-13 | 3485% |
| 500 ct | Sun | 53489017605 | $0.12 | $4.70 | 15-Apr-13 | 3674% |

364.    There are no legitimate reasons or explanations for the unprecedented and dramatic price increases of Albuterol. Demand for Albuterol has not materially changed between 2010 and the present, nor does any change in input costs explain these price increases. Furthermore, at the time Albuterol prices were increased in March 2013, there were no known raw material shortages that would have constrained Defendants' ability to supply the market.

365.    Upon information and belief, the price increases on Albuterol were the result of collusive agreements between and among Defendants to increase pricing and restrain competition for the sale of Albuterol in the United States. These collusive agreements were furthered at least in part, through in-person discussions conducted at meetings and industry events hosted by GPhA and HDMA as well as other meetings and communications described below.

366.    For example, on October 1-3, 2012, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from Defendants Mylan and Sun. *See* Ex. 1.

367.    On April 20-23, 2013, NACDS held its 2013 Annual Meeting in Palm Beach, Florida. NACDS's 2013 Annual Meeting was attended by representatives from Mylan and Sun. *See* Ex. 1.

---

[36] WAC prices referenced throughout this Complaint are rounded to the nearest cent, but the percentage increases are calculated on the actual reported WACs.

368. On June 2-5, 2013, HDMA held its 2013 BLC in Orlando, Florida. This meeting was attended by representatives from Mylan and Sun. *See* Ex. 1.

369. On August 10-13, 2013, NACDS held its 2013 Total Store Expo at the Sands Expo Convention Center in Las Vegas, Nevada. This conference was attended by representatives from both Mylan and Sun. *See* Ex. 1.

370. In 2014, 2015, and 2016, Defendants continued to regularly attend trade association meetings, conferences and events, including: (i) the February 19-21, 2014 GPhA Annual Meeting in Orlando, Florida; (ii) the April 26-29, 2014 NACDS Annual Meeting in Scottsdale, Arizona; (iii) the June 1-4, 2014 HDMA BLC in Phoenix, Arizona; (iv) the June 3-4, 2014 GPhA meeting in Bethesda, Maryland; (v) the August 23-26, 2014 NACDS Total Store Expo in Boston Massachusetts; (vi) the October 27-29, 2014 GPhA meeting in Bethesda, Maryland; (vii) the February 9-11, 2015 GPhA Annual Meeting in Miami, Florida; (viii) the April 14, 2015 HDMA Seventh Annual CEO Roundtable Fundraiser in New York, New York; (ix) the April 25-28, 2015 NACDS Annual Meeting in Palm Beach, Florida; (x) the June 7-10, 2015 HDMA BLC in San Antonio, Texas; (xi) the June 9-10, 2015 GPhA meeting in Bethesda, Maryland; (xii) the August 22-25, 2015 NACDS Total Store Expo in Denver, Colorado; (xiii) the April 12, 2016 HDMA Eighth Annual CEO Roundtable Fundraiser in New York; (xiv) the April 16-19, 2016 NACDS 2016 Annual Meeting in Palm Beach, Florida; (xv) the June 12-16, 2016 HDMA BLC in Colorado Springs, Colorado; and (xvi) the August 6-9, 2016 NACDS 2016 Total Store Expo in Boston, Massachusetts.

### 4. Alclometasone Dipropionate

371. Alclometasone Dipropionate is a commonly prescribed corticosteroid used to treat a variety of skin conditions (*e.g.,* eczema, dermatitis, allergies, rash). It has been on the market for decades and is available in several forms, including Ointment (0.05%) and Cream (0.05%).

129

372.    The market for Alclometasone Dipropionate is mature. At all relevant times, there have been multiple manufacturers. Defendants Glenmark, Sandoz, and Taro dominated sales of Alclometasone Dipropionate in the relevant period.

373.    Defendants' WAC pricing rose in a coordinated fashion. Taro and Sandoz announced new pricing on May 1, 2013 and May 10, 2013 respectively, which doubled and tripled their prior WAC prices for Alclometasone Dipropionate Cream. Glenmark announced new WACs on May 16, 2013. Weeks later, on June 10, 2013, Glenmark introduced WAC prices for Alclometasone Dipropionate Ointment that far exceeded its co-Defendants' existing WAC prices. This was a price it would not have risked without knowledge that Taro would essentially match Glenmark's price two days later with a WAC price that more than tripled Taro's prior WAC price for Alclometasone Dipropionate Ointment.

374.    Documentary evidence confirms that these parallel price increases were the result of collusion among generic drug manufacturers including Glenmark, Sandoz, and Taro. Defendant Teva identified Glenmark, Sandoz, and Taro as "quality" competitors, *i.e.,* competitors willing to coordinate price increases under the Fair Share Agreement. Defendants' coordination included raising Alclometasone Dipropionate prices.

375.    For example, documents show that Taro planned an increase in the price of at least the Alclometasone Dipropionate Cream in mid-2012. When it was announced on May 1, 2013, Sandoz internally noted that Taro represented only a quarter of the market at that time. Given its minority share, Taro would not have risked this increase without assurances.

376.    In addition, Defendants' frequent communication by telephone and text facilitated their price coordination. For example, Taro's Aprahamian exchanged 190 phone calls and texts with Sandoz's C.B. between March 19, 2013 and August 8, 2016, and eleven times with Glenmark's employee M.B., beginning on May 7, 2013, approximately a week before Glenmark

matched Taro's WAC price for Alclometasone Dipropionate Cream.

377.    The ability of Glenmark, Sandoz, and Taro to reach agreement regarding Alclometasone Dipropionate Ointment and Cream was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. *See* Exhibit 1 (Chart of Defendants' Trade Association Meetings Attendance).

378.    The agreement between Defendants Glenmark, Sandoz, and Taro was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Alclometasone Dipropionate Ointment (0.05%) and Cream (0.05%).

### 5.    Allopurinol (Tablet and Injection)

379.    Allopurinol is a xanthine oxidase inhibitor used to treat gout and certain kinds of kidney stones. It is available in, for example, Tablet and Injection formulations. It has been available in the United States for decades in a generic form. Due to, among other things, its clinical efficacy and safety, Allopurinol has been designated as an essential medicine by the World Health Organization.

380.    The market for Allopurinol is mature. At all relevant times, there have been multiple manufacturers of Allopurinol.

381.    Defendants Actavis, Dr. Reddy's, Mylan and Par were the primary manufacturers of Allopurinol.

382.    The GAO noted that Allopurinol had an "extraordinary price increase" in the years 2014-2015.

383.    Under the Fair Share Agreement, Actavis, Dr. Reddy's, Mylan, and Par did not attempt to undercut competitors' prices in order to gain additional market share. Evidence supporting this can be found in a March 2015, internal email chain between J.P. and Kate Neely

of Dr. Reddy's.

384.    The ability of Actavis, Dr. Reddy's, Mylan, and Par to reach agreements on Allopurinol was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. See Exhibit 1 (Chart of Defendants' Trade Association Meetings Attendance).

385.    Thus, throughout this period, Actavis, Dr. Reddy's, Mylan and Par/Qualitest met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Allopurinol and of their Fair Share agreement. For example, Falkin (Actavis) was in touch with Nesta (Mylan) in September 2014. Falkin (Actavis) also communicated with C.S., Dr. Reddy's Senior Director of National Accounts, in September. Mylan's M.A., National Account Director, spoke with Par's K.O., VP of National Accounts, on September 18, 2014. Actavis announced its list (WAC) price increases on Allopurinol on September 19, 2014.

386.    On September 26, 2014, a week after Actavis's price increase, A.S., Actavis VP of sales, spoke to T.P., VP of National Accounts at Par/Qualitest, for nearly 15 minutes. A few days later, Par announced list (WAC) prices for Allopurinol that were even higher than those of Actavis.

387.    Falkin (Actavis) again spoke to C.S. (Dr. Reddy's) multiple times in January and in early February of 2015. Dr. Reddy's announced its list (WAC) price increases on January 26, 2015.

388.    Falkin (Actavis) also spoke to Nesta (Mylan) again in March 2015, shortly after Mylan announced its list (WAC) price increases on Allopurinol on March 4, 2015.

389.    No non-collusive market factors *(e.g.,* product shortages) can explain the artificially inflated prices.

390.    The agreement between Defendants Actavis, Dr. Reddy's, Mylan, and Par was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices,

132

rig bids, and engage in market and customer allocation for generic drugs, including Allopurinol Tablets (100 and 300 mg).

### 6. Amantadine HCL

391. Amantadine Hydrochloride (HCL) is a drug used to treat Parkinson's disease. It has been available in the United States for decades in a generic form.

392. The market for Amantadine HCL is mature. At all relevant times, there have been multiple manufacturers of Amantadine HCL.

393. Defendants Lannett, Sandoz, and Upsher-Smith dominate sales of Amantadine HCL Capsules (100 mg).

394. Amantadine HCL capsules had relatively low and stable prices for years. In late 2011, however, Sandoz and Upsher-Smith imposed extraordinary price increases, They also imposed identical list (WAC) prices for their capsules. Lannett, which did not have much presence in the market, made a push into the market in early 2013. Rather than offer lower prices to win customers, Lannett announced an identical list price, and was careful not disturb market pricing, as required by the anticompetitive agreement between Lannett, Upsher-Smith and Sandoz.

395. Thus, the GAO noted that Amantadine HCL had an "extraordinary price increase" in the years 2012-2013.

396. On information and belief, the extraordinary price increase for Amantadine HCL were due to an agreement between Lannett, Sandoz, and Upsher-Smith in furtherance of the overarching conspiracy alleged herein.

397. The ability of Lannett, Sandoz, and Upsher-Smith to reach agreement regarding Amantadine HCL was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. *See* Exhibit 1 (Chart of Defendants' Trade Association Meetings Attendance).

398.     The Defendants also communicated directly with each other in furtherance of their price-fixing agreements on Amantadine HCL capsules and their Fair Share agreement.

399.     For example, in October 2011, as Sandoz and Upsher-Smith began their parallel and coordinated price increases, K.K., a Senior National Account Executive at Sandoz, and D.Z., Upsher-Smith Senior National Account Manager, were in contact throughout that year, with phone communications in (at least) March, April, July, September, November and December of 2011, as well as January and February of 2012. In February, 2012 Sandoz followed Upsher- Smith's October 2011 increase.

400.     No non-collusive market factors *(e.g.,* product shortages) can explain the artificially inflated prices.

401.     The agreement between Defendants Lannett, Sandoz, and Upsher-Smith was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Amantadine HCL Capsules (100 mg).

### 7.   Amiloride HCL/HCTZ

402.     The market for Amiloride HCL/HCTZ is mature, as the drug has been available in generic form for more than thirty years to treat edema and hypertension. Moduretic 5-50, the branded version of Amiloride HCL/HCTZ, was patented by Merck prior to 1982.

403.     At all times relevant to this lawsuit there has been more than one manufacturer of Amiloride HCL/HCTZ on the market. Defendants Mylan and Teva dominate the market for Amiloride HCL/HCTZ.

404.     Prior to June 2011, the prices for Amiloride HCL/HCTZ were stable at just a few cents per dose.

405.     However, in Summer 2011, Mylan and Teva – applying their common

understanding of the Fair Share overarching agreement – conspired to implement an abrupt and substantial price increase of more than 300%.

406. Mylan and Teva continued to conspire to stabilize and maintain this supracompetitive price increase. Indeed, after Nisha Patel arrived at Teva, the Defendants targeted Amiloride HCL/HCTZ for additional price increases in 2013 and 2014. As a result of this collusion, by 2014, Teva and Mylan were able to charge prices for Amiloride that were up to 700% higher than they were prior to June 2011.

407. These price increases were coordinated by telephone and in-person communications by high-level sales executives at Teva and Mylan, including Patel, Rekentheler, and Green of Teva, and James Nesta and Robert Potter of Mylan.

408. Teva's Rekenthaler communicated consistently with Mylan at least as early as April 2010, and continued thereafter with Mylan's J.K. (VP and Executive Director of Sales), B.P. (Senior VP of Sales) and Nesta over the following months and years.

409. In the spring and summer of 2013, Teva wanted to raise its Amiloride prices again. Accordingly, Teva's Kevin Green and Jim Nesta spoke numerous times via telephone to coordinate and agree to the price increase. They spoke at least on May 7, 8, 9, 10 and July 10, 11, 23 and August 1, 2, 6, 8 in 2013.

410. In 2014, Teva was eager to impose yet another price increase, and again coordinated with Mylan to do so. This time, Teva's Rekenthaler communicated with Mylan's Nesta. They spoke by phone at least on May 9, 20 and 27, 2014

411. As a result of these collusive communications and agreements, Defendants continue to charge supracompetitive prices for Amiloride HCL/HCTZ as of the filing of this Complaint.

### 8.  Amitriptyline

412.    The market for Amitriptyline is mature, as it has been available in the United States for over sixty years. Amitriptyline is on the WHO's List of Essential Medicines. During the relevant time period, Defendants Mylan, Par, and Sandoz sold Amitriptyline to A&P and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

413.    At all times relevant to this lawsuit there has been more than one manufacturer of Amitriptyline on the market. Defendants Mylan, Par, and Sandoz dominate the market for Amitriptyline.

414.    In the years prior to the conspiracy period, Defendants' average price in the U.S. for Amitriptyline were remarkably stable. Beginning in May 2014, Defendants increased their prices abruptly and, for the most part, in unison. Average prices for Amitriptyline increased 300% to nearly 2,000% across dosage strengths. The Financial Times reported on May 12, 2015 that the $1.07 price for a 100 mg pill of Amitriptyline "jumped by 2,487 per cent in under two years" noting that "in July 2013, the same pill cost just 4 cents."[37] The Boston Globe similarly reported: "The cost of the antidepressant drug Amitriptyline jumped 2,475 percent, from 4 cents for a 10-milligram pill in 2014 to $1.03 in 2015."[38]

415.    Defendants' WAC prices further illustrate these substantial price increases. By way of example, beginning in May 2014, Defendants Sandoz, Mylan, and Par set their WACs for their 50 mg product in lockstep, increasing from previous WACs that exceeded 900%:

---

[37] David Crow, Teva bids for Mylan amid pressure on copycat drugmakers, The Financial Times (May 12, 2015), *available at* https://wvv\:v.ft.com/content/8ff2fc5a-f5 l 3-l l e4- 8a42-00l44feab7de.
[38] Priyanka Dayal McCluskey, As competition wanes, prices for generics skyrocket, The Boston Globe (Nov. 6, 2015), *available at* https://www.bostonglobe.com/business /2015/11/06/generic-drug-price-increases-alarm-insurers-providers-andconsumers/l-13 iA9CSxA UylnCdGjLNKVN/story.html.

| Product 50 MG | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 100 ct | Sandoz | 00781148801 | $0.05 | $0.57 | 23-May-14 | 1032% |
| 1000 ct | Sandoz | 00781148810 | $0.05 | $0.48 | 23-May-14 | 945% |
| 100 ct | Mylan | 00378265001 | $0.05 | $0.57 | 16-Jul-14 | 1032% |
| 1000 ct | Mylan | 00378265010 | $0.05 | $0.57 | 16-Jul-14 | 1157% |
| 100 ct | Par | 00603221421 | * | $0.57 | 26-Sep-14 | * |
| 1000 ct | Par | 00603221432 | * | $0.48 | 26-Sep-14 | * |

416.    There are no legitimate reasons or explanations for the unprecedented and dramatic price increases of Amitriptyline. Changes in demand for Amitriptyline do not justify the price increases. If anything, the price should have gone down because demand was likely lower after 2012. In 2012, Amitriptyline was added to the American Geriatrics Society's Beers list of drugs that pose a high risk of adverse effects in seniors. When drugs are classified as high risk, doctors tend to prescribe them to seniors less causing total demand to decline. Lower total demand generally causes prices to drop. Here, the drop in demand does not explain the price increase.

417.    Furthermore, at the time Amitriptyline prices were increased in May 2014, there were no known raw material shortages that would have constrained Defendants' ability to supply the market. The huge price increases for Amitriptyline were not due to supply disruptions.

418.    Upon information and belief, the price increases on Amitriptyline were the result of collusive agreements between and among Defendants to increase pricing and restrain competition for the sale of Amitriptyline in the United States. These collusive agreements were furthered at least in part, through in-person discussions conducted at meetings and industry events hosted by GPhA and HDMA as well as other meetings and communications described below.

419.    For example, on February 20-22, 2013, GPhA held its 2013 Annual Meeting in

137

Orlando, Florida. GPhA's 2013 Annual Meeting was attended by representatives of Sandoz, Mylan, and Par, including key executives such as Mylan's President, Tony Mauro and Sandoz's President, Don DeGolyer. *See* Ex. 1.

420.    On June 2-5, 2013, the HDMA held a Business Leadership Conference ("BLC") in Orlando, Florida that was attended by representatives from Sandoz, Mylan, and Par, including key executives for generics prices and sales. For example, all three Defendants sent their National Account Directors. *See* Ex. 1.

421.    On June 4-5, 2013, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from Defendants Mylan, Par, and Sandoz. *See* Ex. 1.

422.    On August 10-13, 2013, NACDS held its 2013 Total Store Expo at the Sands Expo Convention Center in Las Vegas, Nevada. NACDS's August 2013 Total Store Expo was attended by representatives from Mylan, Par, and Sandoz. *See* Ex. 1.

423.    On October 28-30, 2013, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from Mylan, Par, and Sandoz. *See* Ex. 1.

424.    On December 3, 2013, NACDS held its 2013 Foundation Reception & Dinner that was attended by representatives from Defendants Mylan and Sandoz. *See* Ex. 1.

425.    On February 19-21, 2014, GPhA held its Annual Meeting in Orlando, Florida that was attended by representatives from Defendants Mylan, Sandoz, and Par. *See* Ex. 1.

426.    On April 1, 2014, the HDMA held its Sixth Annual CEO Roundtable Fundraiser in New York City that was attended by representatives of Mylan and Sandoz. *See* Ex. 1.

427.    On April 26-29, 2014, NACDS held its 2014 annual meeting in Scottsdale, Arizona.

428.    NACDS's 2014 annual meeting was attended by representatives from Mylan, Sandoz, and Par. *See* Ex. 1.

429.    On June 1-4, 2014, the HDMA held a BLC at the JW Marriott Desert Ridge in

Phoenix, Arizona. The June 1-4, 2014 BLC was attended by representatives from Mylan, Sandoz, and Par. *See* Ex. 1.

430.    On June 3-4, 2014, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from Mylan, Par, and Sandoz. *See* Ex. 1.

431.    On August 23-26, 2014, NACDS held its 2014 Total Store Expo at the Boston Convention Center in Boston, Massachusetts. NACDS's August 2014 Total Store Expo was attended by representatives from Mylan, Sandoz, and Par. *See* Ex. 1.

432.    On October 27-29, 2014, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from Mylan, Par, and Sandoz. *See* Ex. 1.

433.    On December 3, 2014, NACDS held its 2014 Foundation Reception & Dinner that was attended by Mylan and Sandoz employees. *See* Ex. 1.

434.    The price increases on Amitriptyline closely followed Mylan, Sandoz, and Par's, participation in the February 2014 GPhA Annual Meeting and their participation in the April 2014 Annual Meeting of the NACDS in Scottsdale, Arizona.

435.    In 2015 and 2016, representatives of Mylan, Sandoz, and Par continued to regularly attend trade association meetings and events.

### 9. Amoxicillin/Clavulanate

436.    Amoxicillin/Clavulanate, which is also discussed in additional detail in Section XIII. F. below, is a medication used to treat bacterial infections and is available in a Tablet formulation.

437.    It has been available in the United States in a generic form for many years.

438.    The market for Amoxicillin/Clavulanate is mature. At all relevant times, there have been multiple manufacturers of Amoxicillin/Clavulanate.

439.    During the relevant time frame, Defendants Sandoz and Teva were the primary

manufacturers of Amoxicillin/Clavulanate.

440.     In late summer and early fall of 2014, Teva and Sandoz orchestrated price increases on Amoxicillin/Clavulanate chewable tablets. Throughout this period, Teva and Sandoz were in regular contact. Patel spoke with the Associate Director of Pricing at Sandoz multiple times to fix the prices of Amoxicillin/Clavulanate and other drugs (including at least Diclofenac Potassium and Penicillin V Potassium).

441.     For example, on October 10, 2014, the day that Sandoz followed Teva's price increase for Amoxicillin/Potassium Clavulanate, Patel of Teva spoke to the Associate Director of Pricing at Sandoz.

442.     No non-collusive market factors (e.g., product shortages) can explain the artificially inflated prices.

443.     The ability of Sandoz and Teva to reach agreements on Amoxicillin/Clavulanate was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. *See* Exhibit 1 (Chart of Defendants' Trade Association Meetings Attendance).

444.     The coordination by Sandoz and Teva is consistent with the Fair Share Agreement.

445.     The agreement between Defendants Sandoz and Teva was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Amoxicillin/Clavulanate.

### 10. Amphetamine/Dextroamphetamine (Adderal) (ER and IR)

446.     Amphetamine/Dextroamphetamine Immediate and Extended Release, also known by the brand name Adderal, is a medication used in the treatment of attention deficit hyperactivity disorder (ADHD). The drug is comprised of a combination of dextroamphetamine salts and levoamphetamine salts and is sometimes referred to as "Mixed Amphetamine Salts" or "MAS."

447. During the time period relevant to this Complaint, Actavis, Impax, and Teva dominated the market for MAS Extended Release ("MAS-XR"), and Actavis, Aurobindo, Mallinckrodt, Sandoz, and Teva dominated the market for MAS Immediate Release ("MAS- IR").

448. On April 9, 2012, a large customer contacted Teva to request a price reduction because a new competitor had expressed an interest "all or some" of its MAS-XR business. A senior Teva sales director, T.C., insisted on knowing the identity of the competitor before deciding what Teva's response would be. The customer responded that the competitor was Actavis, and that Actavis was expecting approval soon to enter the market for that drug.

449. Teva deferred its decision on pricing until Actavis was in a position to ship the product.

450. Actavis obtained FDA approval to manufacture various formulations of MAS-XR on June 22, 2012. At 9:58 p.m. that same evening, Defendant Rekenthaler instructed Teva employees to find out Actavis's plans regarding its newly-approved generic, including shipping details and inventory levels. At 8:32 a.m. the next morning, Teva employee T.S. responded that she had spoken to M.P., a senior Actavis sales and marketing executive, and conveyed to Rekenthaler the details of their conversation:

> **From:** ▮▮▮▮▮▮
> **Sent:** Saturday, June 23, 2012 8:32 AM
> **To:** Dave Rekenthaler; ▮▮▮▮▮▮▮▮▮▮ Kevin Green
> **Subject:** Re: Actavis Adderall XR
>
> Spoke to ▮▮▮▮. Going after approx 15 share.
> 1 wholesaler (either McKesson or Cardinal) as backup and possibly Econdisc. NOT Walgreens and CVS.

The customer that had sought a price reduction from Teva in April 2012 was not among those named by Actavis as its targets.

451.    Upon learning which customers Actavis wanted, T.C. warned colleagues that this allocation of market share could be tricky. She cautioned that if Teva decided to concede a particular wholesaler to Actavis, it needed to be "mindful" that the wholesaler also did product warehousing for a different customer whose business Actavis was not soliciting.

452.    One year later, Teva's customer renewed its request for a price reduction on MAS-XR, citing Actavis's desire to gain a share of the customer's business for the drug. On May 7, 2013, T.C. informed the customer that Teva would agree to revise its price in order to retain 100% of the customer's business. T.C. made it clear that Teva had already conceded an appropriate amount of business to its competitor. She stated: " . . . we have plenty of supply and want to keep you [sic] full business [sic] we have already let other customers go to activis [sic] go to help the market dynamites [sic]."

453.    Also in 2012, Mallinckrodt entered the market for MAS-IR and sought to add share. In internal documents, Teva acknowledged that it had willingly conceded a number of accounts to Mallinckrodt, the new competitor, which was wholly consistent with the Fair Share agreement.

454.    In March 2014, Aurobindo was making plans to enter the market with its MAS-IR product. On March 18, 2014, Teva's J.P. shared with her colleagues that Aurobindo's market share target for the impending launch was 10%. Teva's senior marketing operations executive, K.G., indicated that Teva was aware that both Aurobindo and Actavis were launching.

455.    A flurry of telephone communications between Teva and these two competitors took place on the days surrounding the foregoing e-mail. The day before, on March 17, 2014, Defendant Patel had spoken to Actavis's Director of Pricing, Defendant Rick Rogerson, three (3) times.  Defendants Rekenthaler and Falkin of Actavis also spoke once on that day.  On March 18, 2014, the day of the e-mail, Rekenthaler and R.C., a senior-most executive at Aurobindo, had a thirty (30) minute telephone conversation. Rekenthaler and Falkin spoke again seven (7) times on

142

March 20, 2014.

456.    On April 16, 2014, Teva received word from a customer that a new competitor in the market had offered a lower price than Teva's current price for MAS-IR. Defendant Patel informed K.G. that the challenge was coming from Actavis, and recommended that Teva concede that customer's account. At 1:43 pm, she communicated to another colleague that the decision had been made to concede. Apparently closing the loop, she called Defendant Rogerson at Actavis at 1:55 pm. They spoke for just over four (4) minutes.

457.    As a result of these collusive communications, Actavis, Aurobindo, Impax, Mallinckrodt, Sandoz, and Teva were able to fix prices for both MAS-XR and MAS-IR, and those supracompetitive prices persist as of the filing of this Complaint.

### 11. Atenolol Chlorthalidone

458.    Atenolol Chlorthalidone is a combination beta blocker and water pill used to treat high blood pressure. It has been available in the United States for decades in a generic form.

459.    The market for Atenolol Chlorthalidone is mature. At all relevant times, there have been multiple manufacturers of Atenolol Chlorthalidone.

460.    Defendants Actavis and Mylan dominate sales of Atenolol Chlorthalidone Tablets (50-25 and 100-25 mg).

461.    For years, the prices for Atenolol Chlorthalidone tablets were relatively low and stable. Beginning in the spring of 2014, Mylan and Actavis began to steadily and consistently raise the prices of Atenolol Chlorthalidone tablets. By the end of 2014, list (WAC) prices for both manufacturers had more than doubled

462.    Thus, the GAO noted that the Atenolol Chlorthalidone had "extraordinary price increases" in the years 2014-2015.

463.    Under the Fair Share Agreement, Defendants did not attempt to undercut

competitors' prices in order to gain additional market share.

464. The ability of Actavis and Mylan to reach agreement regarding Atenolol Chlorthalidone was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. *See* Exhibit 1 (Chart of Defendants' Trade Association Meetings Attendance).

465. Nesta (Mylan) and Falkin (Actavis) also communicated directly and extensively throughout the time of the price increases.

### 12. Atropine Sulfate

466. Atropine Sulfate is an anticholinergic and is available as, for example, a 1% Ophthalmic Solution for use in eye examinations to dilate the pupil and to treat certain eye conditions. It has been available in the United States for over a decade in a generic form.

467. The market for Atropine Sulfate Ophthalmic Solution is mature. At all relevant times, there have been multiple manufacturers.

468. Defendants Bausch and Sandoz dominated the sales of Atropine Sulfate with close to an 80/20 split at all relevant times.

469. The GAO noted that Atropine Sulfate had "extraordinary price increases" in the years 2010-2011.

470. Under the Fair Share Agreement, Defendants did not attempt to undercut competitors' prices in order to gain additional market share.

471. The ability of Bausch and Sandoz to reach agreements on Atropine Sulfate Ophthalmic Solution was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. *See* Exhibit 1 (Chart of Defendants' Trade Association Meetings Attendance).

472. No non-collusive market factors *(e.g.,* product shortages) can explain the artificially inflated prices.

144

473.    The agreement between Defendants Bausch and Sandoz was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Atropine Sulfate Ophthalmic Solution (1%).

### 13. Baclofen

474.    Baclofen, also known by the brand names Gablofen and Lioresal, is a muscle relaxant used to treat muscle spasms caused by certain conditions such as multiple sclerosis and spinal cord injury or disease. It is generally regarded as the first choice by physicians for the treatment of muscle spasms in patients with multiple sclerosis.

475.    The market for Baclofen is mature, as Baclofen has been available in the United States for nearly 50 years.  During the relevant time period and continuing today, Defendant Lannett sells Baclofen pursuant to an ANDA that was approved by the FDA in or around July 2007 and Defendant Par sells Baclofen pursuant to an ANDA approved in or around August 2005. Teva sells Baclofen pursuant to an ANDA approved in February 1992, and Usher-Smith sells Baclofen pursuant to ANDAs approved in May 1988 and August 1996.  Lannett, Par, Teva, and Upsher-Smith each sold Baclofen to A&P and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

476.     At all times relevant to this lawsuit, there has been more than one manufacturer of Baclofen on the market. Defendants Lannett, Par, Teva, and Upsher-Smith dominate the market for Baclofen.  In the years prior to the conspiracy period, Defendants' average price in the U.S. for Baclofen was remarkably stable. Beginning in February 2014, Defendants increased their prices abruptly and in unison.

477.    Baclofen is among the drugs identified by the GAO, which concluded that Baclofen, in both the 10 mg and 20 mg tablet form "[e]xperienced an extraordinary price increase"

145

in 2014-2015. Similarly, American Pharmacies, a group of independent pharmacists that monitors the pricing of generic drugs and issues notices to customers, warned in February 2014 of the recently announced "[m]arketwide price increases of more than 500% … occurring on Baclofen tablets."

478.    Effective February 21, 2014, Defendant Upsher-Smith took a significant price increase on Baclofen, ranging from 350 - 420% to the WAC price, depending on the formulation. Prior to the increase, Baclofen was not a profitable drug for Upsher-Smith, and Upsher-Smith was considering whether to exit the market or significantly raise price. It chose the latter.

479.    The primary competitors in the market for Baclofen at this time were Teva (62.4%), Qualitest (22.5%), and Upsher-Smith (6.8%).

480.    Teva initially considered following the Upsher-Smith price increase quickly, as part of its April 4, 2014 price increases – but decided against it. The primary reason was that Qualitest was in the market, and Teva considered Qualitest a "low-quality" competitor. In other words, Qualitest would likely compete for market share if Teva increased its price.

481.    Starting on April 10, 2014, however, Teva learned that Qualitest was having supply problems, and could exit the market for at least 3-4 months, if not permanently.

482.    Upon learning that the only significant remaining competitor in the market would now be Upsher-Smith – a high-quality competitor – Teva immediately decided to follow the price increase. Defendant Patel asked one of her direct reports to start working up price increase scenarios for Baclofen that same day.

483.    Upsher-Smith was a highly-ranked competitor by Defendant Patel (+2) in large part because of Patel's relationship and understanding with B.L., a national account executive at Upsher-Smith. In the week before she started her employment at Teva (after leaving her previous employment), Defendant Patel and B.L. exchanged several text messages. During her first week

on the job, as she was beginning to identify price increase candidates and high quality competitors, Defendant Patel spoke to B.L. on April 29, 2013 for nearly twenty (20) minutes. During these initial communications, Defendant Patel and B.L. reached an understanding that Teva and Upsher-Smith would follow each other's price increases, and not compete for each other's customers after a price increase. Their agreement was further cemented in June and July 2013, when the two competitors agreed to substantially raise the price of Oxybutynin Chloride.

484.    There was no need for the two competitors to communicate directly in this situation because it was already understood between them that Teva would follow an Upsher- Smith price increase based on Defendant Patel's prior conversations with B.L., and based on the history of collusion between the two competitors.

485.    Effective April 15, 2014, Teva raised its WAC and SWP pricing to match Upsher-Smith's pricing exactly. Teva increased its WAC pricing from 350% – 447%, depending on the dosage strength. Teva would not have increased its prices on Baclofen unless it had an understanding in place with Upsher-Smith.

486.    The chart below shows the increases by Teva and Upsher-Smith on 20 mg strength doses of Baclofen:

| Product 20 MG | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 100 ct | Upsher-Smith | 00832102500 | $0.10 | $0.49 | 21-Feb-14 | 420% |
| 1000 ct | Upsher-Smith | 00832102510 | $0.10 | $0.49 | 21-Feb-14 | 420% |
| 100 ct | Teva | 00172409760 | $0.10 | $0.49 | 15-Apr-14 | 420% |
| 1000 ct | Teva | 00172409780 | $0.09 | $0.49 | 15-Apr-14 | 447% |

487.    Pursuant to the agreement between the companies, Teva did not seek to take any customers from Upsher-Smith during the time period after Upsher-Smith's increase and before Teva could follow. Even after Teva's increase, when Qualitest customers approached Teva for a bid due to Qualitest's supply problems, Teva deferred to Upsher-Smith. As Defendant Patel told

K.G. in a June 11, 2014 e-mail: "Dynamics have changed, but I think we need to see if Upsher wants to pick up share. We have an unreasonably high share." K.G. agreed: "I think this is the right thing to do. we should just give them a high bid."

488.    Upsher-Smith, on the other hand, was able to secure several new customers as a result of the Qualitest exit. In short order, Baclofen became a very profitable product for Upsher-Smith. On April 18, 2014 – only three days after the Teva price increase – J.M., a Senior Director of Sales and Marketing at Upsher-Smith, made the following pronouncement:

> > On Apr 18, 2014, at 3:07 PM, ██████████████ @upsher-smith.com> wrote:
> >
> > Qualitest is out. Teva matched our pricing. Bac is our newest ~$20M product.
> >
> > ██
> > Sent from my iPhone
> >

489.    Only two months later, Lannett would enter the market at the same WAC prices as Teva and Upsher-Smith. As discussed herein  Teva and Lannett colluded so that Lannett could enter the market seamlessly without significantly eroding the high prices in the market.

490.    In June 2014, Defendant Lannett was preparing to re-enter the market for Baclofen, but was faced with limited supply. In an internal e-mail sent to his sales staff, K.S., a senior sales executive at Lannett, stated: "Baclofen launch in four weeks, need market intelligence. We can only take a 10% market share." At that time, Teva had a large market share in relation to the existing competitors in the market.

491.    Defendant Sullivan, a Director of National Accounts at Lannett and a recipient of the e-mail, promptly communicated with Defendant Patel (Teva was a competitor for Baclofen) using Facebook Messenger. On June 12, 2014, Sullivan messaged Patel, stating:



The message was sent at 11:16am. At 11:30am, Defendant Patel called Defendant Sullivan and they spoke for seven (7) minutes. This was the first phone conversation between Sullivan and Patel since Patel had joined Teva in April 2013. During the conversation, Defendant Sullivan informed Defendant Patel that Lannett would be entering the market for Baclofen shortly. In a follow-up message through Facebook Messenger later that afternoon, Sullivan confirmed:



492.    True to her word, Defendant Sullivan called Defendant Patel on July 1, 2014 and left a voicemail. Patel promptly returned the call, and the two spoke for almost seven (7) minutes.

493.    On July 11, 2014, as Teva was evaluating future forecasting and whether to try and

149

take on additional Baclofen business with a large wholesaler, Patel stated to a Teva colleague: "[n]ot sure if it helps your review, but there is another entrant coming to market (Lannett). I'm not sure about their share targets, but I know it's probably soon." That same day, Patel sent a text message to Sullivan asking "Around?" Sullivan immediately called Patel and left a voicemail. Patel called Sullivan back promptly, and they spoke for more than three (3) minutes. After speaking, Patel sent another text message to Sullivan, stating: "Thank you!!" Sullivan responded: "No prob!"

494.    Shortly thereafter, on July 22, 2014, Teva was approached by a customer stating "[w]e were contacted by another mfg that is going to be launching Baclofen in the coming weeks." The customer asked whether Teva wanted to exercise its right of first refusal (i.e., offer a lower price to maintain the account). Even though the new manufacturer's price was only slightly below Teva's price, Teva declined to bid. Defendant Patel specifically agreed with the decision to concede, stating "I believe this is Lannett." Teva's internal tracking database noted that the customer had been conceded to a "Strategic New Market Entrant."

495.    Teva had significantly increased its price for Baclofen in April 2014 (following an Upsher-Smith price increase), and was able to maintain those prices even after Lannett entered the market a few months later. In fact, when Lannett entered the market it came in at the exact same WAC price as Teva.

### 14. Balsalazide Disodium

496.    Balsalazide Disodium is an aminosalicylate medication used to treat ulcerative colitis. It has been available in the United States for over a decade in a generic form.

497.    The market for Balsalazide Disodium is mature. At all relevant times, there have been multiple manufacturers of Balsalazide Disodium.

498.    Defendant West-Ward and Co-Conspirator Apotex dominate sales of Balsalazide

150

Disodium Capsules (750 mg).

499.    Plaintiff alleges that as part of Defendants' Fair Share Agreement, they conspired to fix, raise, maintain or stabilize the prices of Balsalazide Disodium beginning at least as early as the fall of 2013.

500.    Under the Fair Share Agreement, Defendants did not attempt to undercut competitors' prices in order to gain additional market share.

501.    The ability of Apotex and West-Ward to reach agreement regarding Balsalazide Disodium was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. *See* Exhibit 1 (Chart of Defendants' Trade Association Meetings Attendance).

502.    No non-collusive market factors (e.g., product shortages) can explain the artificially inflated prices.

503.    The agreement between Defendant West-Ward and Co-Conspirator Apotex were part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Balsalazide Disodium Capsules (750 mg).

### 15. Benazepril HCTZ

504.    Benazepril HCTZ, also known by the brand name Lotensin, is an angiotensin converting enzyme (ACE) inhibitor that is used to treat high blood pressure.

505.    The market for Benazepril HCTZ is mature, as Benazepril HCTZ has been available in the United States for over 25 years. At all times relevant to this lawsuit there has been more than one manufacturer of Benazepril HCTZ on the market. Defendants Mylan and Sandoz dominate the market for Benazepril HCTZ, and co-conspirator Rising entered the Benazepril HCTZ market following collusive discussions with Mylan and Sandoz during which Rising agreed to follow the conspiracy pricing.

506.    At issue here are three dosage strengths of Benazerpil HCTZ: 10 mg/12.5 mg, 20 mg/12.5 mg, and 20 mg/25 mg.

507.    In the years prior to the conspiracy period, Defendants' average price in the U.S. for Benazepril HCTZ was remarkably stable. Beginning in August 2013, Defendants increased their prices abruptly and in unison. This price increase was the result of an agreement reached during discussions between Mylan and Sandoz.

508.    In July 2013, Sandoz finalized its plan to re-launch Benazepril HCTZ. However, because Sandoz executives knew that Mylan planned to increase price on this product, it chose to wait to re-enter the market until after Mylan increased its price so that Sandoz could enter at the higher price.

509.    On July 12, 2013, a marketing executive at Sandoz sent an internal e-mail regarding "Benazepril Orders for Cardinal" stating: "[b]efore any release, we are expecting Mylan to raise their price." Similarly, during a Commercial Operations meeting on July 15, 2013, it was confirmed that Sandoz was just waiting for confirmation of a Mylan price increase before re-entering the market.

510.    The next day, on July 16, 2013, CW-4 spoke with Defendant Nesta and sent the July 2013 E-mail outlining the Mylan price increase drugs that Defendant Nesta had provided to her (discussed more fully above). That list did not include Benazepril HCTZ. CW-1 forwarded the July 2013 E-mail to Defendant Kellum stating "See [CW-4's] note below for Mylan increases… I'm surprised benazepril hctz isn't on the list below for Mylan?" CW-1 then e- mailed CW-4 asking, "Benazepril hctz? Was hoping to see that one."

511.    Over the next few days, CW-4 and Defendant Nesta communicated several times, during which they discussed Benazepril HCTZ.  These phone calls are detailed below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 7/18/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 14:32:56 | 0:00:31 |
| 7/18/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 14:41:59 | 0:01:21 |
| 7/19/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 13:13:44 | 0:00:04 |
| 7/19/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 13:14:20 | 0:01:57 |
| 7/19/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 13:24:49 | 0:03:11 |

512.    On August 2, 2013, CW-1 sent a spreadsheet to Defendant Kellum entitled, "Teva increases July 2013." In the e-mail, CW-1 stated: "Mylan is also in there. Be on the lookout for bumetanide and Benazepril/hctz."

513.    One week later, on August 9, 2013, Mylan increased WAC pricing on Benazepril HCTZ. The increase was large – nearly 334% on all dosage strengths.

514.    On August 20, 2013, consistent with their agreement to maintain high prices, Sandoz quickly re-entered the Benazepril HCTZ market and essentially matched Mylan's WAC pricing.

515.    By way of example, in August 2013, Mylan and Sandoz set nearly identical WAC prices on their 25 mg product for Benazepril HCTZ, reflecting increases of more than 300%:

| Product 25 MG | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 20 ct | Mylan | 00378477501 | $0.38 | $1.65 | 9-Aug-13 | 334% |
| 20 ct | Sandoz | 00185027701 | $0.32 | $1.62 | 20-Aug-13 | 407% |

516.    A third competitor – Rising Pharmaceuticals – entered the Benazepril HCTZ market on April 2, 2014 as an authorized generic. When Rising entered, it essentially matched the WAC pricing of Sandoz and Mylan. Both before and after entering the market, CW-2 – then at Rising – communicated with his former colleagues at Sandoz (CW-1, CW-3, and LJ) about

153

obtaining market share on Benazepril HCTZ. Through those communications, Sandoz ultimately agreed to relinquish ABC to Rising so that the new entrant could achieve its fair share of the market.

517.    In December 2019, Co-conspirator Rising reached a deferred prosecution agreement in which it admitted to price-fixing Benazepril HCTZ between at least April 2014 and September 2015.

518.    As a result of the overarching "fair share" understanding and these collusive communications, Mylan, Sandoz, and Rising sold Benazepril HCTZ to A&P and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

### 16. Betamethasone Diproprionate

519.    Betamethasone Dipropionate is a corticosteroid used to treat a variety of skin conditions. It has been available in the United States for over a decade in a generic form. It is available in ointment, cream, lotion, and jelly formulations. Due to, among other things, its clinical efficacy and safety, betamethasone has been designated as an essential medicine by the World Health Organization.

520.    The market for Betamethasone Dipropionate is mature. At all relevant times, there have been multiple manufacturers of Betamethasone Dipropionate.

521.    Defendants Actavis, Perrigo, Sandoz, and Taro dominate sales of Betamethasone Dipropionate Ointment (0.05%), Cream (0.05%), and Lotion (0.05%).

522.    The GAO noted that Betamethasone Dipropionate had an "extraordinary price increase" in the years 2011-2012.

523.    Documentary evidence confirms that these parallel price increases were the result of collusion among Actavis, Perrigo, Sandoz, and Taro.

154

524.    By late 2010, Actavis had increased its price on Betamethasone Dipropionate Cream, knowing that its competitors would mirror the increase.

525.    Because of the ongoing understanding of the Fair Share Agreement between the companies, they did not worry about their ostensible competitors cutting prices to gain market share. They also did not attempt to undercut their ostensible competitors' prices in order to gain additional market share.

526.    Various Sandoz documents from November 2013 indicate that Sandoz would not be pursuing more market share on Betamethasone Dipropionate Cream due to the Fair Share Agreement. One spreadsheet shows the relative market shares of each competitor on betamethasone dipropionate cream, as well as the implications for market share acquisition.

527.    These ostensible competitors were unwilling to compete for additional market share due to their obligations under the Fair Share Agreement.

528.    The ability of Actavis, Perrigo, Sandoz, and Taro to reach agreement regarding Betamethasone Dipropionate was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. *See* Exhibit 1 (Chart of Defendants' Trade Association Meetings Attendance).

529.    The coordinated price increases among Actavis, Perrigo, Sandoz, and Taro are consistent with the Fair Share Agreement.

530.    No non-collusive market factors *(e.g.,* product shortages) can explain the artificially inflated prices.

531.    The agreement between Defendants Actavis, Perrigo, Sandoz, and Taro was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Betamethasone Dipropionate Ointment (0.05%), Cream (0.05%), and Lotion (0.05%).

### 17. Betamethasone Dipropionate Augmented

532.    Betamethasone Dipropionate Augmented is a corticosteroid used to treat a variety of skin conditions. It has been available in the United States for over a decade in a generic form. Betamethasone Dipropionate Augmented is a more potent version of Betamethasone Dipropionate. It is available in multiple formulations including Lotion (0.05%). Due to, among other things, its clinical efficacy and safety, betamethasone has been designated as an essential medicine by the World Health Organization.

533.    The market for Betamethasone Dipropionate Augmented is mature. At all relevant times, there have been multiple manufacturers of Betamethasone Dipropionate Augmented, including Sandoz and Taro, who dominated sales of this drug.

534.    The Defendant manufacturers imposed extraordinary price increases on Betamethasone Dipropionate Augmented in the Fall of 2010.

535.    Because of the ongoing understanding of the Fair Share Agreement between the Defendants Sandoz and Taro, they did not worry about each other cutting prices to gain market share. They also did not attempt to undercut each other's prices in order to gain additional  market share. For example, a Sandoz spreadsheet from August 2012 detailing the expected response to a Cardinal Request for Proposal (RFP) indicates that Sandoz did not intend to bid on Betamethasone Dipropionate Augmented Lotion.  In another example, in April 2013, several months after the dramatic price increases, Publix requested a bid from Sandoz on Betamethasone Dipropionate Augmented due to the Taro price increase.  On information and belief, Sandoz did not seek to obtain this business as part of the fair share agreement.

536.    The ability of Sandoz and Taro to reach agreement regarding Betamethasone Dipropionate Augmented was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. *See* Exhibit 1 (Chart of Defendants'

Trade Association Meetings Attendance).

537.     No non-collusive market factors (e.g., product shortages) can explain the artificially inflated prices.

538.     The agreement between Defendants Sandoz and Taro was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Betamethasone Dipropionate Augmented Lotion (0.05% ).

### 18. Betamethasone Dipropionate Clotrimazole

539.     Betamethasone Dipropionate Clotrimazole is a combination medication used to treat inflamed fungal skin infections. This product contains two medications: Clotrimazole is an anti fungal that prevents the growth of fungus and betamethasone is a corticosteroid that works by reducing the swelling, redness, and itching that occurs in a skin infection.

540.     Betamethasone Dipropionate Clotrimazole has been available in the United States for over a decade in a generic form. It is available in, for example, cream and lotion formulations. Due to, among other things, their clinical efficacy and safety, the component drugs of Betamethasone Dipropionate Clotrimazole have both been designated as essential medicines by the World Health Organization.

541.     The market for Betamethasone Dipropionate Clotrimazole is mature. At all relevant times, there have been multiple manufacturers of Betamethasone Dipropionate Clotrimazole.

542.     Defendants Actavis, Sandoz, and Taro dominate sales of Betamethasone Dipropionate Clotrimazole Cream (0.05%) and Lotion (0.05%).

543.     The GAO noted that Betamethasone Dipropionate Clotrimazole had an "extraordinary price increase" in the years 2011-2012.

544.     Because of the ongoing understanding of the Fair Share Agreement between the

companies, they did not worry about their ostensible competitor cutting prices to gain market share. They also did not attempt to undercut their ostensible competitor's prices in order to gain additional market share. For example, on information and belief, a Sandoz presentation from June 2014 evidences Sandoz's fair-share market approach with respect to Clotrimazole-Betamethasone.

545.    In addition, D.L., Director of National Accounts at Sandoz and D.S., an Associate Vice President of National Accounts at Taro, communicated a number of times during the relevant period as Sandoz and Taro coordinated pricing.  In April 2011, when both companies raised prices on Betamethasone Dipropionate-Clotrimazole lotion, the two spoke by phone. In October 2012, when Sandoz announced another price increase on lotion, the two spoke again. In February 2013, when Taro raised its lotion prices to follow Sandoz, the two spoke yet again.

546.    During the same period that D.L (Sandoz) and D.S. (Taro) were communicating, M.B., Taro VP of Marketing, and M.P., Actavis VP of Sales and Marketing, also were communicating; the two men communicated by phone every month from February 2011 through May 2012.

547.    The ability of Actavis, Sandoz and Taro to reach agreement regarding Betamethasone Dipropionate Clotrimazole was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. *See* Exhibit 1 (Chart of Defendants' Trade Association Meetings Attendance).

548.    The coordinated price increases by Actavis, Sandoz, and Taro are consistent with the Fair Share Agreement.

549.    No non-collusive market factors *(e.g.,* product shortages) can explain the artificially inflated prices.

550.    The agreement between Defendants Actavis, Sandoz, and Taro was part of an

overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Betamethasone Dipropionate Clotrimazole Cream (0.05%) and Lotion (0.05%).

### 19. Betamethasone Valerate

551.   Betamethasone Valerate is a corticosteroid used to treat a variety of skin conditions. It has been available in the United States for decades in a generic form. It is available in Ointment and Cream formulations. Due to, among other things, its clinical efficacy and safety, Betamethasone has been designated as an essential medicine by the World Health Organization.

552.   The market for Betamethasone Valerate is mature. At all relevant times, there have been multiple manufacturers of Betamethasone Valerate.

553.   Defendants Actavis, Sandoz, and Taro dominate sales of Betamethasone Valerate Ointment (0.1 %) and Cream (0.1 %). For much of the relevant time period, Actavis, Sandoz, and Taro had roughly equal shares of the market for Betamethasone Valerate Cream. Defendants Actavis and Sandoz dominate sales of Betamethasone Valerate Ointment.

554.   The GAO noted that Betamethasone Valerate had "extraordinary price increases" in the years 2011-2012 and 2012-2013.

555.   On information and belief, documentary evidence exists that confirms that these parallel price increases were the result of collusion among Actavis, Sandoz, and Taro.

556.   By late 2010, Actavis had increased its prices on Betamethasone Valerate Cream and Ointment, knowing that its competitors would mirror the increase.

557.   Because of the ongoing understanding of the Fair Share Agreement between the companies, they did not worry about their ostensible competitor cutting prices to gain market share. They also did not attempt to undercut their ostensible competitor's prices in order to gain additional market share. This is reflected in February 2013 internal communication from Armando

Kellum of Sandoz to C.P ., also of Sandoz.

558. The ability of Actavis, Sandoz and Taro to reach agreement regarding Betamethasone Valerate was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. *See* Exhibit 1 (Chart of Defendants' Trade Association Meetings Attendance).

559. No non-collusive market factors *(e.g.,* product shortages) can explain the artificially inflated prices.

560. The agreement between Defendants Actavis, Sandoz, and Taro was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Betamethasone Valerate Cream (0.1%) and Ointment (0.1%).

### 20. Bethanechol Chloride

561. Bethanechol Chloride, which is also discussed in additional detail in Section XIII. G. below, is a medication used to treat bladder problems. It has been available in the United States in a generic form for many years. The market for Bethanechol Chloride is mature. At all relevant times, there have been multiple manufacturers of Bethanechol Chloride.

562. During the relevant time frame, Defendants Amneal, Teva, and Upsher-Smith were the primary manufacturers of Bethanechol Chloride Tablets.

563. Plaintiff alleges that as part of Defendants' Fair Share Agreement, they conspired to fix, raise, maintain or stabilize the prices of Bethanechol Chloride beginning at least as early as the fall of 2014.

564. In the fall of 2014, Amneal, Teva, and Upsher-Smith Amneal announced a list (WAC) price increase in early November, and Teva followed the list price increase. Teva's price increase spreadsheet identified the reason for the increase as "Follow Competitor -Amneal." Prior

160

to Teva's increase, Teva's Patel had a 51 minute phone call with an executive at Amneal.

565.    During this period, Amneal, Teva, and Upsher-Smith also met at trade conferences and communicated directly in furtherance of their agreement on Bethanechol Chloride and the Fair Share agreement.

566.    No non-collusive market factors (e.g., product shortages) can explain the artificially inflated prices.

567.    The agreement between Defendants Amneal, Teva, and Upsher-Smith was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Bethanechol Chloride Tablets.

### 21. Bromocriptine Mesylate

568.    Bromocriptine Mesylate is a dopamine promoter used to treat menstrual problems, growth hormone overproduction, Parkinson's disease, and pituitary tumors. It is available in tablet form. It has been available in the United States for over a decade in a generic form.

569.    The market for Bromocriptine Mesylate is mature. At all relevant times, there have been multiple manufacturers of Bromocriptine Mesylate.

570.    Defendants Mylan, Perrigo, and Sandoz dominate sales of Bromocriptine Mesylate Tablets (2.5 mg).

571.    For years the prices of Bromocriptine Mesylate tablets were relatively low and stable. In early 2013, however, things changed. Mylan was experiencing supply challenges. It did not exit the market, but reduced sales. Sandoz used this as an opportunity to more than triple its prices. Mylan promptly followed Sandoz's prices up. Perrigo did not immediately follow the price increases, but instead steadily and slowly raised prices over time.

572.    Under the Fair Share Agreement, Mylan, Perrigo, and Sandoz did not attempt to

undercut competitors' prices in order to gain additional market share. On information and belief, Sandoz' internal planning documents from June of 2013 and October 2014 provide evidentiary support for the fair share understanding between at least Sandoz and Perrigo on Bromocriptine Mesylate Tablets.

573. Throughout the period, however, all three manufacturers adhered to Fair Share principals. Sandoz and Perrigo had very close to equal units of sales of Bromocriptine Mesylate tablets throughout this period. Although Perrigo should have been able to gain much more share with lower prices, it stuck to its Fair Share.

574. The ability of Mylan, Perrigo, and Sandoz to reach agreement regarding Bromocriptine Mesylate was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. *See* Exhibit 1 (Chart of Defendants' Trade Association Meetings Attendance).

575. The Defendants also communicated directly with one another. For example, as Sandoz, Mylan and Perrigo coordinated pricing for Bromocriptine, they communicated directly by phone. Mylan's Jim Nesta communicated with D.L., Director of National Accounts at Sandoz, on March 4 and 11; May 8, 13 and, 29; June 13; and July 16 and 19, 2013. Another Sandoz Director of National Accounts, C.B., communicated with Perrigo's National Account Director, A.F., on July 16, 17, 18, 2013.

576. No non-collusive market factors (e.g., product shortages) can explain the artificially inflated prices.

577. The agreement between Defendants Mylan, Perrigo, and Sandoz was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Bromocriptine Mesylate Tablets (2.5 mg).

**22. Budesonide DR Capsules**

578.    Budesonide DR Capsules, also known by the brand name Entocort EC, is a  steroid used to treat Crohn's disease and ulcerative colitis when taken orally.

579.    Teva was preparing to enter the market for Budesonide DR in or about March 2014. At that time, it was a 2-player market: Par had 70% market share and Mylan had the remaining 30%.

580.    Shortly before Teva received approval to market Budesonide DR, Par decided to increase the price of the drug. On April 1, 2014, M.B., a senior national account executive at Par, called Defendant Rekenthaler at Teva. The two executives spoke for twenty-six (26) minutes. The next day, April 2, 2014 — which happened to be the same day that Teva received FDA approval to market Budesonide DR — Par increased its price for Budesonide DR by over 15%.

581.    That same day, Teva sales employees were advised to find out which customers were doing business with Par and which were with Mylan, so that Teva would have a better  sense of how to obtain its fair share: "it would be helpful to gather information regarding who is with Mylan and who is with par…they are the two players in the mkt…as well as usage."

582.    Par and Mylan were also communicating at this time. On April 3, 2014 – the day after the Par price increase – K.O., a senior account executive at Par, spoke to M.A., a senior account manager at Mylan, for fifteen (15) minutes.

583.    On April 4, 2014, Defendant Rekenthaler informed some members of Teva's  sales force that, although the company had received approval to market and manufacture Budesonide DR, Teva was not prepared to launch the product and he did not yet know when it would do so. Nonetheless, Rekenthaler spoke to both Defendant Nesta, the Vice President of Sales at Mylan, and M.B., a similarly high-level executive at Par, that same day.

584.    Although Teva did not launch Budesonide DR until approximately June 2016,

163

company executives clearly attempted to coordinate pricing and market share with its competitors in anticipation of its product launch date.

### 23. Budesonide Inhalation

585.    Budesonide Inhalation, also known by the brand name Pulmicort Respules, is an anti-inflammatory steroid, administered through inhalers or similar devices, used to prevent asthma attacks. It belongs to a class of drugs called corticosteroids, and works directly in the lungs to make breathing easier by reducing the irritation and swelling of the airways.

586.    Teva obtained approval to market Budesonide Inhalation in November 2008. As of February 2013, Teva was the only company in the market for generic Budesonide Inhalation Suspension. Teva knew, however, that a potential legal action challenging the validity of the patent on the brand drug could allow additional competition into the generic market shortly. So before any additional competition could enter the market, effective February 8, 2013, Teva raised the WAC price for its Budesonide Inhalation Suspension by 9%. Although a very modest increase in percentage terms, the 9% price increase added $51 Million to Teva's annual revenues.

587.    On April 1, 2013, Actavis won a legal challenge in federal district court against the brand manufacturer declaring the patent for the brand drug, Pulmicort Respules, invalid. Actavis immediately began planning to launch the product "at risk," which is when a generic manufacturer puts the product on the market before all appeals in the patent lawsuit are formally resolved and there is still a risk that the new generic entrant might ultimately be found to violate the patent. That same day, David Rekenthaler of Teva called his counterpart at Actavis, A.B., a senior sales and marketing executive – and they spoke for two (2) minutes. This was the first- ever phone call between them based on the phone records produced.

588.    The next day, April 2, 2013, Rekenthaler spoke to A.B two (2) more times, including one call lasting eight (8) minutes. Actavis then immediately began shipping the product.

Instead of competing to obtain market share as a new entrant, however, Actavis entered the market with the exact same WAC price as Teva. Indeed, when Teva inquired of a customer that same day to confirm Actavis's pricing, Teva was informed by the customer that Actavis's pricing was "in line with [Teva's] current wholesale pricing."

589.     At some point thereafter, further legal action from the brand manufacturer prevented Actavis from permanently entering the market, but in the interim Teva was able to continue to charge the agreed-upon prices. In addition, once Actavis entered the market in 2015, Teva immediately conceded customers to Actavis in accordance with the fair share agreement – after calls between Rekenthaler and Falkin, by then a Vice President at Actavis.

590.     On February 13, 2015, Rekenthaler informed other Teva employees of Actavis's plans to enter the market, saying: "[i]t appears that Actavis is intending on shipping" Budesonide Inhalation. Rekenthaler and Falkin of Actavis had spoken by phone three days earlier on February 10, 2015.

591.     On February 16, 2015, Rekenthaler and Falkin had another lengthy telephone conversation lasting twenty-three (23) minutes. The following morning, Teva's T.C. confirmed to her colleagues that Teva had conceded the Budesonide Inhalation accounts of two major customers to Actavis. She explained that Actavis's sense of urgency to obtain the accounts was due to concerns about getting its product into market before it faced legal action from the brand manufacturer.  Thus, she explained, she was working with the customers on an "exit strategy" to get Teva's product out of the supply channel, so as to streamline Actavis's entry into the market.

### 24. Buspirone Hydrochloride Tablets

592.     Buspirone HCL is an anti anxiety drug that was first approved for medical use in the United States in 1986.

593.     During the time period relevant to this Complaint, Actavis, Mylan, and Teva

dominated the market for Buspirone HCL.

594.    Buspirone HCL was one of eight drugs that Teva targeted for a price increase effective July 31, 2012. Prior to implementing the price increase for these drugs, Green and Rekentheler spoke with their competitors for each targeted drug to ensure that the understanding to increase prices would hold, including Mylan, Actavis, Breckenridge, and Alvogen. For example, in July 2012, Green spoke by phone with Nesta of Mylan, CW-2 of Sandoz, and William Hill, a senior sales and marketing executive at Alvogen. On July 31, Green and Nesta spoke five times, and immediately following some of these calls Green called Hill. Also, Rekentheler spoke with his counterparts at Actavis and Breckenridge. These communications solidified the agreement between the Defendants that each would adhere to the price increase for the drug that each manufactured.

595.    As a result of these collusive communications, Defendants have been able to maintain Buspirone HCL at anticompetitive prices since July 2012.

### 25. Butorphanol Tartrate

596.    Butorphanol Tartrate is a narcotic pain reliever used to treat moderate to severe pain. It is available in a Nasal Spray formulation. It has been available in the United States for decades in a generic form.

597.    The market for Butorphanol Tartrate is mature. At all relevant times, there have been multiple manufacturers of Butorphanol Tartrate.

598.    Defendants Mylan, West-Ward and Co-Conspirator Apotex dominate sales of Butorphanol Tartrate. During much of the relevant time period, Mylan and West-Ward divided the market in roughly a 40/60 split. Apotex briefly left the market around the time of the price increase, but when it reentered the market, it regained about 20% market share, leading to a 20/20/60 split between Apotex, Mylan, and West-Ward, respectively.

166

599. The GAO noted that the Butorphanol Tartrate had an "extraordinary price increase" in the years 2014-2015.

600. Under the Fair Share Agreement, Defendants did not attempt to undercut competitors' prices in order to gain additional market share.

601. The ability of Apotex, Mylan, and West-Ward to reach agreements regarding Butorphanol Tartrate was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. *See* Exhibit 1 (Chart of Defendants' Trade Association Meetings Attendance).

602. No non-collusive market factors (e.g., product shortages) can explain the artificially inflated prices.

603. The agreement between Defendants Mylan, West-Ward and Co-Conspirator Apotex was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Butorphanol Tartrate Nasal Spray.

### 26. Cabergoline

604. Cabergoline, also known by the brand name Dostinex, is used to treat medical problems that occur when too much of the hormone prolactin is produced. It can be used to treat certain menstrual problems, fertility problems in men and women, and tumors of the pituitary gland.

605. During the time period relevant to this Complaint, the market for Cabergoline was dominated by Greenstone, Par, and Teva.

606. In December 2014, as Greenstone was preparing to enter the market for Cabergoline, a senior Greenstone sales executive approached T.C. of Teva on Greenstone's behalf to discuss obtaining market share for Greenstone. The Greenstone executive made clear to Teva

that, in exchange for market share, Greenstone would adhere to the overarching Fair Share agreement.

607. The next day, after some internal conversation at Teva, T.C. agreed to the proposed allocation: "Tell Greenstone we are playing nice in the sandbox and we will let them have [ABC]."

608. Pursuant to this agreement, Greenstone was able to acquire ABC as a customer for Cabergoline without any fear that Teva would compete to retain the business. In exchange, Greenstone agreed to "play nice in the sandbox" – i.e., not compete with Teva for other customers and drive prices down in the market.

609. As a result of these collusive communications, Teva, Par, and Greenstone have been able to charge supracompetitive prices to A&P and others for Cabergoline since December 2014.

### 27. Capecitabine

610. Capecitabine, also known by the brand name Xeloda, is an anti-cancer chemotherapy drug used to treat a variety of cancers, including breast and colon cancer.

611. To resolve patent litigation, the brand manufacturer, Roche Pharmaceuticals, entered into settlement agreements with various generic manufacturers—including Teva and Mylan—that would allow those generic manufacturers to sell generic Capecitabine after a certain period of time.

612. As early as January 2014, both Teva and Mylan were making plans for their eventual launch of Capecitabine. Part of this planning included the sharing of confidential information so that they could allocate the market between them. For example, in a January 31, 2014 e-mail, J.P., a national accounts executive at Teva, informed K.G., Defendant Rekenthaler, and others at Teva that Mylan was courting a specific customer, Armada Health Care, and that "Mylan estimated Armada's share on [Capecitabine] at 37%." Teva incorporated this data it received from Mylan into its own launch plan for Capecitabine.

613.    On February 26, 2014, Defendant Nesta of Mylan called Defendant Rekenthaler of Teva and the two spoke for sixteen (16) minutes. Nesta informed Rekenthaler that Mylan would not be able to launch on time with Teva. Rekenthaler immediately reported this news internally at Teva.

614.    In early March 2014, Teva launched as the exclusive generic Capecitabine manufacturer. Teva remained the exclusive generic Capecitabine manufacturer until Mylan entered in August 2014.

615.    Dr. Reddy's began seeking share prior to its own launch, which was planned for summer 2014. On June 4, 2014, an individual at Dr. Reddy's learned that Teva would keep the McKesson Corporation ("McKesson") account.  The Defendants' anticompetitive conduct relating to Capecitabine continued throughout the summer as Mylan prepared to launch.

616.    On August 4, 2014, Defendants Nesta and Rekenthaler spoke by phone three times. On these calls, Nesta informed Rekenthaler that Mylan would soon enter the Capecitabine market and the pair discussed how to allocate the market.

617.    On August 4, 2014, at 12:46 p.m., Nesta called Rekenthaler and they spoke for a little more than five (5) minutes. Immediately after hanging up the phone, Rekenthaler sent the following e-mail:

From:    Dave Rekenthaler
Sent:    Mon 8/04/2014 12:51 PM (GMT-05:00)
To:    ████████████████████ Nisha Patel02
Cc:    Maureen Cavanaugh
Bcc:
Subject: Capcetibine

Hearing Mylan to get approval this week.  We need to look at our market and discuss defense strategy.

618.    Defendant Cavanaugh responded that she would be in the office the next day and wanted to discuss it with Rekenthaler in person.

619.    Less than an hour later, Rekenthaler sent another e-mail, just to Defendant Patel, asking her to run a customer report and indicating that Mylan will "be looking at ABC, McKesson, and Econdisc as well as a couple small guys, probably aiming at 35% share." Mylan did seek the business for each of these three companies and Teva conceded each of them, pursuant to the agreement Rekenthaler had reached with Nesta.

620.    On August 7, 2014, McKesson informed Teva that it received a bid for Capecitabine and gave Teva the opportunity to bid to retain the business. Defendant Patel then sent an e-mail to K.G., Defendant Rekenthaler, and C.B. at Teva to ask if they had "[t]houghts in regards to [loss of exclusivity]." C.B., a senior operations executive at Teva, replied that Teva did "have a plan," but C.B. did not want to put the plan in writing. Instead C.B. told Patel she "wi[ll] call" to discuss it. K.G., separately, questioned whether the competitive bid was coming from Mylan, and asked Defendant Rekenthaler whether he had any additional information. Defendant Rekenthaler also did not want to put that "additional information" in writing, so he responded: "I'll catch up with you today."

621.    The "plan" was the market allocation scheme previously agreed to by Defendants Nesta and Rekenthaler on behalf of Mylan and Teva. The same day that Mylan put a bid in to McKesson – August 7, 2014 – Defendants Nesta and Rekenthaler spoke by phone for nearly thirteen (13) minutes. On that call, Defendants Rekenthaler and Nesta discussed Mylan's bid to McKesson and reconfirmed their market allocation scheme.

622.    This market allocation "plan" was highlighted in other internal Teva e-mails as well. On August 10, 2014, C.B. e-mailed Defendant Rekenthaler, Defendant Patel, and K.G. about the plan. C.B. stated that C.B.'s "notes are showing that are (sic) plan is to concede McKesson, Econdisc, Rite-Aid, and Cardinal," but that C.B. wanted to confirm. Defendant Rekenthaler corrected C.B., stating that Mylan is "going after McKesson, ABC (only) and Econdisc," but that

170

Teva "ha[s] not heard from Econdisc yet." Rekenthaler knew Mylan was targeting Econdisc, even though Econdisc had not contacted Teva, because he and Defendant Nesta had previously discussed it.

623. The next morning, at 8:30 a.m. on August 11, 2014, Defendant Rekenthaler alerted others at Teva that Mylan had received formal approval to market Capecitabine and that he was "[c]hecking on shipping status." Five minutes later, Rekenthaler received a call from Defendant Nesta. After exchanging voicemails, the two spoke at 8:52 am. The call lasted nearly six (6) minutes. Shortly after hanging up the phone, at approximately 9:02 am, Rekenthaler e- mailed K.G., Defendant Patel and others at Teva to confirm that Mylan's "primary targets are ABC, McKesson and Econdisc." He added that Teva "may hear from some other smaller guys as well" and that he "do[es]n't expect price to be aggressive."

624. In accordance with their market allocation scheme, Mylan targeted and Teva conceded the Capecitabine business at ABC, Econdisc, and McKesson/Rite-Aid.

625. Teva also conceded some of the "smaller guys" as well, pursuant to the agreement. On August 14, 2014, for example, a smaller customer – Cigna – informed Teva that it received a bid for Capecitabine. On August 18, 2014, Rekenthaler called Nesta to discuss the market allocation scheme and Mylan's bid to Cigna. The pair talked for thirteen (13) minutes. The next day, K.G. circulated an internal e-mail confirming that Teva "will be conceding this business" at Cigna.

### 28. Captopril

626. Captopril is an angiotensin converting enzyme (ACE) inhibitor prescribed for treating high blood pressure, heart failure, and for preventing kidney failure due to high blood pressure and diabetes. It is available in Tablet and Oral Liquid formulations. It has been available in the United States for decades in a generic form.

627. The market for Captopril is mature. At all relevant times, there have been multiple manufacturers of Captopril.

628. Defendants Mylan, West-Ward and Wockhardt dominate sales of Captopril Tablets (12.5, 25, 50, and 100 mg). During much of the relevant time period, Wockhardt had approximately 85% of the market and Mylan had approximately 15%. West-Ward re-entered the market after the price increase and had a small share.

629. For years, the prices for Captopril tablets were relatively low and stable. West-Ward was the dominant manufacturer in the market up until 2013, when it experienced supply disruptions and essentially exited the market. In the spring of 2013, as West-Ward exited, Mylan and Wockhardt imposed very large price increases.

630. By spring of 2014, West-Ward was ready to re-enter the market. At the same time, Wockhardt was exiting the market, leaving only Mylan and West-Ward as the main Captopril suppliers. Rather than offer lower prices than Mylan to win back all of the market share it used to have, West-Ward instead announced—virtually simultaneously with Mylan—a large list (WAC) price increase. West-Ward's new list prices were identical to Mylan's and, for the 12.5 mg dosage, approximately 100 times higher than they were before it had exited the market. (Other dosages were "only" 35 to 45 times higher.) Mylan and West-Ward list (WAC) and NSP prices have remained elevated ever since.

631. The GAO noted Captopril Tablets had "extraordinary price increases" in the years 2013-2015.

632. Throughout this period, Mylan, Wockhardt and West-Ward met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Captopril and of their Fair Share agreement.

633. For example, Mylan's M.W., Director of National Accounts, communicated by

172

phone with K.B., West-Ward National Account Manager, in March, April, June and July 2013, including on July 1, 2013.

634.    Under the Fair Share Agreement, Defendants did not attempt to undercut competitors' prices in order to gain additional market share.

635.    Mylan announced its first list (WAC) price increase for Captopril on July 2, 2013.

636.    The ability of Mylan, West-Ward, and Wockhardt to reach agreements regarding Captopril was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. *See* Exhibit 1 (Chart of Defendants' Trade Association Meetings Attendance).

637.    Representatives from Wockhardt and West-Ward convened at the ECRM Retail Pharmacy Efficient Program Planning Session at the Omni Amelia Island Plantation Resort, in Amelia Island, Florida on February 23 to 26, 2014. In April, 2014 both companies announced large list (WAC) price increases on the heels of Mylan's second list price increase.

638.    No non-collusive market factors (e.g., product shortages) can explain the artificially inflated prices.

639.    The agreement between Defendants Mylan, West-Ward, and Wockhardt was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Captopril Tablets (12.5 mg, 25 mg, 50 mg, and 100 mg).

### 29. Carbamazepine (tablets, chewable tablets, and extended release tablets)

640.    Carbamazepine tablets, including regular tablets, chewable tablets, and extended release tablets, are anticonvulsants used to prevent seizures and treat bipolar disorder.

641.    During the period relevant to this Complaint, Apotex, Taro and Teva dominated the market for Carbamazepine tablets ("Tablets"); Taro and Teva dominated the market for

Carbamazepine chewable tablets ("Chewable Tablets"); and Sandoz and Taro dominated the market for Carbamazepine Extended Release tablets ("Carbamazepine ER").

642.    A senior sales executive at Taro – and CW-4 – a senior sales executive at Sandoz – spoke by phone on May 16, 2013, and again on May 17, 2013.

643.    Upon information and belief, the purpose of these calls was to coordinate a price increase on Carbamazepine ER.

644.    Following these calls between Taro Senior sales executive and CW-4, both Taro and Sandoz implemented substantial and abrupt price increases on Carbamazepine ER of more than 50%.

645.    One year later, in May 2014, Ara Aprahamian of Taro led price increases on all three formulations of Carbamazepine.

646.    Between May and July of 2014, Aprahamian texted or spoke with Nisha Patel of Teva a number of times. Following their first series of communications in May 2014, Patel added Carbamazepine to the list of drugs she was then targeting for price increases.

647.    In early June 2014, Taro increased prices on all formulations of Carbamazepine tablets, including price increases on the Carbamazepine Tablets and Chewable Tablets of between 200% and 1000%.

648.    As a result of the overarching Fair Share agreement, Aprahamian knew that his competitors would follow these massive price increases – which they did. Teva followed the Taro price increases on Carbamazepine Tablets and Chewable Tablets in July 2014, and Apotex increased prices on Carbamazepine Tablets simultaneously with Teva. Sandoz also followed the Taro price increase on Carbamazepine ER.

649.    Aprahamian continued to speak with Patel by phone in June and July 2014.

650.    Additionally, David Rekenthaler of Teva and (a senior vice president at Apotex)

174

texted and spoke by phone a number of times between June and September 2014.

651. Due to these collusive communications and each Defendant's commitment to the overarching Fair Share agreement, prices on Carbamazepine have remained elevated since May 2013.

652. For example, Defendants continue to sell Carbamazepine Tablets at prices more than 700% higher than in early 2014.

653. Additionally, Defendants' prices for Carbamazepine ER are more than 100% higher today than in early 2013, and their prices for Carbamazepine Chewable Tablets are more than 300% higher than before the collusive price increase.

### 30. Carisoprodol

654. Carisoprodol is a muscle relaxant and pain reliever. It is available in Tablet form, including 350 mg strength and has been available in the United States for many years in a generic form.

655. The market for Carisoprodol is mature. At all relevant times, there have been multiple manufacturers.

656. Defendants Par and Teva dominate sales of Carisoprodol Tablets with each accounting for roughly 55% and 35% of the market, respectively in the relevant times.

657. The GAO noted that Carisoprodol had "extraordinary price increases" in the years 2013-2014.

658. Under the Fair Share Agreement, Defendants did not attempt to undercut competitors' prices in order to gain additional market share.

659. The ability of Par and Teva to reach agreements on Carisoprodol was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. *See* Exhibit 1 (Chart of Defendants' Trade Association Meetings Attendance).

660. The parallel price increases by Par and Teva are consistent with the Fair Share Agreement.

661. No non-collusive market factors *(e.g.,* product shortages) can explain the artificially inflated prices.

662. The agreement between Defendants Par and Teva was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Carisoprodol Tablets (350 mg).

### 31. Cefdinir (Capsule and Oral Suspension) and Cefprozil

663. Cefidinir and Cefprozil, which are also discussed in additional detail in Section XIII. B. below, are medications used to treat bacterial infections. Cefdinir is available in Capsule and Oral Suspension formulations. Cefprozil is available in Tablet formulation.

664. They have been available in the United States in a generic form for many years.

665. The market for Cefdinir and Cefprozil is mature. At all relevant times, there have been multiple manufacturers of Cefdinir and Cefprozil.

666. During the relevant time frame, Defendants Lupin, Sandoz, and Teva were the primary manufacturers of Cefdinir and Cefprozil.

667. Not long after Patel started at Teva, she sent her first list of proposed price increases to her supervisor on May 24, 2013. The list included Cefdinir and Cefprozil.

668. Patel communicated with competitors to coordinate the proposed price increases. For example, Patel spoke to Berthold of Lupin six (6) times on May 16, two (2) times on May 17, once on May 20, once on May 21, and three (3) times on May 23, 2013.

669. By summer, Teva and Lupin had raised prices on Cefdinir and Cefprozil, as agreed. Patel and Rekenthaler at Teva also communicated with contacts at Sandoz, which joined the price-

fixing agreement on Cefdinir and Cefprozil.

670.    No non-collusive market factors *(e.g.,* product shortages) can explain the artificially inflated prices.

671.    The ability of Lupin, Sandoz, and Teva to reach agreements on Cefdinir and Cefprozil was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. *See* Exhibit 1 (Chart of Defendants' Trade Association Meetings Attendance).

672.    The coordination by Lupin, Sandoz, and Teva is consistent with the Fair Share Agreement.

673.    The agreement between Defendants Lupin, Sandoz, and Teva was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Cefdinir Capsules and Suspension and Ceprozil Tablets.

### 32. Cefuroxime Axetil

674.    Cefuroxime Axetil is an antibiotic used to treat bacterial infections. It is available in Tablet and Oral Suspension formulations. It has been available in the United States for over a decade in a generic form.

675.    The market for Cefuroxime Axetil is mature. At all relevant times, there have been multiple manufacturers of Cefuroxime Axetil.

676.    Defendants Aurobindo, Citron, and Lupin dominate sales of Cefuroxime Axetil Tablets (250 and 500 mg).

677.    The GAO noted that the Cefuroxime Axetil had "extraordinary price increases" in the years 2014-2015.

678.    Under the Fair Share Agreement, Aurobindo, Citron, and Lupin did not attempt to

177

undercut competitors' prices in order to gain additional market share. For example, in April 2014, Aurobindo submitted a bid to OptiSource for Cefuroxime Axetil. OptiSource responded asking Aurobindo to match a lower price. In discussing the proposal internally at Aurobindo, Tim Gustafson of Aurobindo wrote to colleagues, "[W]e don't need to be competitive (my opinion) ... If we want to hold firm, I can convey that message." Ultimately, Aurobindo declined to decrease its pricing to the level requested by OptiSource.

679.    The ability of Aurobindo, Citron, and Lupin to reach agreement regarding Cefuroxime Axetil 250 mg and 500 mg Tablets was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. *See* Exhibit 1 (Chart of Defendants' Trade Association Meetings Attendance).

680.    No non-collusive market factors (e.g., product shortages) can explain the artificially inflated prices.

681.    The agreement between Defendants Aurobindo, Citron, and Lupin was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Cefuroxime Axetil Tablets (250 and 500 mg).

### 33. Celecoxib

682.    Celecoxib, also known by the brand name Celebrex®, is a nonsteroidal anti-inflammatory medication used in the treatment of pain and inflammation associated with arthritis, juvenile rheumatoid arthritis, and other disorders.

683.    Teva received approval to market generic Celecoxib in May 2014.

684.    On November 20, 2014, as Teva was preparing to launch its generic Celecoxib capsules, a customer informed Teva that Actavis was vying for some of the customer's Celecoxib business. Rekenthaler took a cooperative – rather than competitive – stance upon hearing that

178

news.

685. By December 1, 2014, however, the issue of where Actavis would obtain its desired market share remained undecided. Another customer, a large retail pharmacy chain became actively involved in trying to broker an agreement between Teva and Actavis on how much share each company would take upon launch.

686. In the days leading up to Teva's December 10, 2014 launch, Teva executives had numerous telephone conversations with their counterparts at Actavis. Rekenthaler had a six (6) minute call with Falkin at Actavis on November 25. The two spoke twice more on December 3 – once for two (2) minutes and another time for one (1) minute. Patel spoke to a senior sales and marketing executive at Actavis, for over eight (8) minutes on December 5, and for over sixteen (16) minutes on December 8. Rekenthaler and Falkin resumed their communications the day before the Teva launch – December 9 – with a one (1) minute phone call. On the day of the launch – December 10 – Rekenthaler and Falkin spoke three times with calls of one (1) minute, nine (9) minutes, and three (3) minutes in duration.

687. As a result of these collusive communications, Defendants have been able to sell Celecoxib at supracompetitive prices since December 2014.

### 34. Cephalexin (Cefalexin)

688. Cephalexin (also spelled Cefalexin), which is also discussed below in Section XIII. E., is an antibiotic that has been available in the United States for decades. It is available in Capsule, Tablet, and Suspension formulations. Due to, among other things, its clinical efficacy and safety, Cephalexin has been designated as an essential medicine by the World Health Organization.

689. The market for Cephalexin is mature. At all relevant times, there have been multiple manufacturers of Cephalexin.

179

690. The GAO noted that Cephalexin had an "extraordinary price increase" in 2014-2015.

691. By way of example, on April 4, 2014, Teva raised its WAC prices on Cephalexin Oral Suspension to match Lupin's prices exactly. The increases to the WAC price ranged from 90% to 185% higher, depending on the formulation.

692. Defendants Lupin and Teva dominate sales of Cephalexin Suspension, which comes in two dosage strengths: 125mg/5ml and 250mg/5ml.

693. Documentary evidence confirms that these parallel price increases were the result of collusion between Lupin and Teva.

694. The ongoing understanding between Lupin and Teva was institutional, not dependent upon a relationship between specific individuals. For example, David Berthold of Lupin colluded with numerous individuals at Teva on a variety of drugs.

695. By mid-2013, Lupin and Teva became aware of the potential for price increases on Cephalexin. For example, on August 26, 2013, Teva's T.S. sent an internal email to Rekenthaler, Patel, K.G., and J.L. commenting on Cephalexin stating: "Possible price increase product? Perhaps this is old intel? Cephalexin Suspensions - Karalex is out of the market. Leaves Teva and Lupin."

696. By early October 2013, Lupin had decided to raise price on Cephalexin knowing that Teva would match the increase.

697. On October 14, 2013, Lupin's Berthold called Teva's Rekenthaler. They spoke for sixteen minutes that day. During that conversation, Lupin conveyed its intention to raise prices on Cephalexin.

698. On October 31, 2013, which was the day before Lupin was scheduled to increase its price on Cephalexin, Lupin's Berthold called Teva's T.S. at 9:18 am that morning and left a message. T.S. returned the call at 9:57 am and the two spoke for nearly five minutes. Within

180

minutes of hanging up the phone, T.S. notified others internally at Teva about the substantial Lupin price increase, stating: ["I have heard] Lupin is implementing a price increase today on Cephalexin Oral Suspension (4-6x's current price)." K.G. responded later that day asking: "Did Lupin increase the Caps as well?" Rekenthaler answered immediately, with information he had learned from Lupin's Berthold in mid-October: "Lupin did not increase the caps, only the susp[ension]." The Lupin price increase on Cephalexin became effective the next day, November 1, 2013.

699. On November 22, 2013, a large customer requested a bid from Teva on Cephalexin due to the Lupin price increase. Teva's T.S. forwarded the email from the customer to Rekenthaler, K.G., and others with the suggestion that, because Teva already had the majority share, it should not bid for the business. K.G. agreed, and simultaneously forwarded the email to Teva's Patel stating: "Nisha, let's add this to our list to discuss." Patel called Lupin's Berthold the same day and left a message.

700. In January 2014 Patel sent an initial list of possible Teva price increase candidates and forwarded it to K.G. Cephalexin was on the list. By April 2014, Teva raised its prices on Cephalexin to match Lupin's prices. Patel coordinated the increase with Lupin throughout this period.

701. Because of the ongoing understanding of the Fair Share Agreement between the two companies, they did not worry about their ostensible competitor cutting prices to gain market share.

702. The ability of Lupin and Teva to reach agreement regarding Cephalexin was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. *See* Exhibit 1 (Chart of Defendants' Trade Association Meetings Attendance). No non-collusive market factors (e.g., product shortages) can explain the artificially inflated prices.

703. The agreement between Defendants Lupin and Teva was part of an overarching

conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Cephalexin Suspension.

### 35. Chlorpromazine HCL

704.     Chlorpromazine HCL is an antipsychotic used to treat mood disorders such as schizophrenia or bipolar disorder. It is available in Tablet, Injection, and Oral Liquid formulations. It has been available in the United States for decades in a generic form. Due to, among other things, its clinical efficacy and safety, Chlorpromazine HCL has been designated as an essential medicine by the World Health Organization.

705.     The market for Chlorpromazine HCL is mature. At all relevant times, there have been multiple manufacturers of Chlorpromazine HCL.

706.     Defendants Sandoz and Upsher-Smith dominate sales of Chlorpromazine HCL Tablets. During much of the relevant time period, Sandoz and Upsher-Smith divided the market in a roughly 50/50 split.

707.     The GAO noted that the Chlorpromazine HCL had "extraordinary price increases" in the years 2011-2012.[39]

708.     Under the Fair Share Agreement, the defendants expected that their ostensible competitor would not undercut their prices in order to gain additional market share. When their ostensible competitor did seek additional market share, defendants showed surprise and dismay that one would not expect in a competitive market. For instance, in May 2015, B.P. of Upsher-Smith complained to B.L. and C.O. of Upsher-Smith that Sandoz challenged them at Armada for Chlorpromazine HCL. B.P. said, "I can't believe they have chosen to compete against us since we had this business. How does this help us? We play fair and they don't?"

---

[39] The chlorpromazine hydrochloride 100 mg and 200 mg tablets also experienced "extraordinary price increases" in the years 2014-2015, according to the GAO.

709.    The ability of Sandoz and Upsher-Smith to reach agreement regarding Chlorpromazine HCL was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. *See* Exhibit 1 (Chart of Defendants' Trade Association Meetings Attendance).

710.    No non-collusive market factors (e.g., product shortages) can explain the artificially inflated prices.

711.    The agreement between Defendants Sandoz and Upsher-Smith was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Chlorpromazine HCL Tablets (10, 25, 50, 100,200 mg).

### 36. Cholestyramine

712.    Cholestyramine is a commonly prescribed medication to reduce cholesterol levels in the blood. It has been on the market for decades and is available in several forms, including Powder (4 gm) and Oral Solids (4 gm).

713.    The market for Cholestyramine is mature. At all relevant times, there have been multiple manufacturers. Defendants Par, Sandoz, and Upsher-Smith dominated sales of Cholestyramine in the relevant period.

714.    For many years the price of Cholestyramine remained stable. However, prices began to rise dramatically in, or around, the summer of 2013 some months after Upsher-Smith entered the market.

715.    WAC pricing also rose in a coordinated fashion. Upsher-Smith raised prices on June 7, 2013, roughly doubling its prior WAC prices, a decision it would not have made unless it had pre-existing knowledge that the others would quickly match, as they did. Sandoz matched Upsher-Smith's WAC prices on July 26, 2013, which also resulted in significant increases,

including a 130% increase over its prior WAC price for 4gm Powder. On August 27, 2013, Par also matched Defendants' pricing, causing as much as a fourfold increase in its prior WAC prices.

716.    Pursuant to Defendants' agreement, their price increases had no significant impact of their respective market shares. Par and Sandoz roughly split the market with Upsher-Smith having a small but steady market share after its entry.

717.    Documentary evidence confirms that these parallel price increases were the result of collusion among generic drug manufacturers including Par, Sandoz, and Upsher-Smith. Defendant Teva identified both Par and Sandoz in this timeframe as "quality" competitors, *i.e.,* competitors willing to coordinate price increases under the Fair Share Agreement. Defendants' coordination included raising Cholestyramine prices.

718.    The ability of Par, Sandoz, and Upsher-Smith to reach agreement regarding Cholestyramine was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. *See* Exhibit 1 (Chart of Defendants' Trade Association Meetings Attendance).

719.    The agreement between Defendants Par, Sandoz, and Upsher-Smith was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including 4gm Cholestyramine Powder (4 gm) and Oral Solids (4 gm).

### 37. Ciclopirox

720.    Ciclopirox is a commonly prescribed antifungal medication that has been on the market for decades and is available in several forms, including a Dermatological Liquid (8%).

721.    The market for Ciclopirox is mature. At all relevant times, there have been multiple manufacturers. Defendants Akorn, G&W, and Perrigo dominated sales of Ciclopirox in the relevant period.

722. For many years the price of Ciclopirox remained stable. However, prices began to rise dramatically around 2013.

723. Defendants' WAC pricing also rose in a coordinated fashion. G&W and Akorn announced new pricing on May 9, 2013 and May 10, 2013 respectively, which doubled and tripled their prior WAC prices for Ciclopirox. Perrigo also substantially increased its WAC price on August 1, 2013.

724. Pursuant to Defendants' agreement, their price increases had no significant impact of their respective market shares. G&W and Akorn roughly split the market with Perrigo having a small but steady market share.

725. The GAO found that Ciclopirox had "extraordinary price increases" in 2013-2014.

726. The ability of Akorn, G&W, and Perrigo to reach agreement regarding Ciclopirox was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. *See* Exhibit 1 (Chart of Defendants' Trade Association Meetings Attendance).

727. The agreement between Defendants Akorn, G& W, and Perrigo was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Ciclopirox Dermatological Liquid (8% ).

### 38. Cimetidine

728. Cimetidine, which is also discussed in further detail below in Section XIII. B. regarding Defendants' July 3, 2013 price increases relating to twenty-one (21) different generic drugs, including Cimetidine, is a medication used to treat ulcers. It is available in tablet form.

729. Cimetidine has been available in the United States in a generic form for many

years.

730. The market for Cimetidine is mature. At all relevant times, there have been multiple manufacturers of Cimetidine.

731. During the relevant time frame, Defendants Mylan and Teva were the primary manufacturers of Cimetidine.

732. Beginning in the summer of 2012, Teva and Mylan began steady and coordinated price increases for Cimetidine.

733. No non-collusive market factors (e.g., product shortages) can explain the artificially inflated prices.

734. Throughout this period, Teva and Mylan met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Cimetidine tablets and of their Fair Share agreement.

735. For example, in order to coordinate the pricing of their products, including Cimetidine tablets, Teva's Green spoke to Nesta at Mylan on May 7, 2013 three times. Green and Nesta also spoke a number of times over the next several days, including on May 8, May 9, and May 10, 2013. On May 17, 2013, Green spoke to Nesta six (6) times.

### 39. Clarithromycin

736. Clarithromycin, which is also discussed below in Section XIII. E. regarding Defendants' April 4, 2014 coordinated price increases on twenty-two (22) different generic drugs including Clarithromycin, is an antibiotic used to treat bacterial infections affecting the skin and respiratory system. It is available in Tablet ER and Suspension formulations. It has been available in the United States for over a decade in a generic form. Due to, among other things, its clinical efficacy and safety, Clarithromycin has been designated as an essential medicine by the World Health Organization.

186

737. The market for Clarithromycin is mature. At all relevant times, there have been multiple manufacturers of Clarithromycin.

738. Defendants Actavis and Teva dominate sales of Clarithromycin Tablets ER.

739. The GAO noted that Clarithromycin had "extraordinary price increases" in the years 2011-2012.

740. In addition, Teva and Actavis were coordinating about several drugs increased by Teva on April 4, 2014. One of them was Clarithromycin ER Tablets.

741. As of December 2013, Teva, Actavis and Zydus were the only three generic manufacturers actively selling Clarithromycin ER.

742. On December 30, 2013, however, Cardinal approached Teva looking for a bid on Clarithromycin ER because Zydus was exiting the market. Teva informed Cardinal that it would not have adequate supply to be able to take on this additional market share until April 2014, but if Cardinal could wait until then for Teva to supply, Teva would make an offer. Cardinal agreed.

743. The Cardinal bid request was forwarded to Defendant Patel on the morning of January 2, 2014. At 9:37am that morning, L.R., a customer marketing manager at Teva, suggested providing an offer to Cardinal at "10% under market intel pricing for [the] Watson/Actavis product." L.R. also stated: "[i]f Cardinal is willing to wait until April, I suspect that Actavis isn't interested in picking up a lot of additional share."

744. Immediately after receiving that e-mail, at 9:40am, Defendant Patel called Defendant Rogerson at Actavis and the two spoke for more than seventeen (17) minutes. Shortly after hanging up the phone with Defendant Rogerson, at 10:12am, Defendant Patel responded to the e-mail, saying: "I think we have an opportunity to go higher. Let's aim for around $148 net and request feedback."

745. On January 9, 2014, Teva learned that Cardinal had accepted Teva's bid at the

187

higher price. At 9:19am that morning, Defendant Patel called Defendant Rogerson at Actavis and they spoke for more than six (6) minutes. Shortly after that call, at 9:45am, Patel sent an e- mail internally at Teva stating: "It looks like Cardinal accepted our bid at the higher price. We may have an opportunity to take some increases."

746.    When Defendant Patel sent her supervisor the initial list of "Increase Potentials Q1 2014" on January 14, 2014, Clarithromycin ER was on the list.

747.    The ability of Actavis and Teva to reach agreements on Clarithromycin Tablets was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. *See* Exhibit 1 (Chart of Defendants' Trade Association Meetings Attendance).

748.    No non-collusive market factors (e.g., product shortages) can explain the artificially inflated prices.

749.    The agreement between Defendants Actavis and Teva was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Clarithromycin Tablets ER.

### 40. Clindamycin Phosphate

750.    Clindamycin Phosphate is an antibiotic used to treat certain types of bacterial infections such as middle ear infections, vaginal infections, and acne. It is available in Lotion, Gel, Foam, Vaginal Cream, and Solution formulations. It has been available in the United States for decades in a generic form.

751.    The market for Clindamycin Phosphate is mature. At all relevant times, there have been multiple manufacturers of Clindamycin Phosphate.

752.    Defendants Actavis, Greenstone, Perrigo, Sandoz, and Taro dominate sales of Clindamycin Phosphate. Greenstone and Sandoz dominate sales of Clindamycin Phosphate 1 % Lotion, 1% Gel, and 2% Vaginal Cream. During much of the relevant time period, Greenstone and

Sandoz had a roughly 60/40 split on the Lotion and Vaginal Cream/Jelly. Greenstone and Sandoz had a roughly 50/50 split on the Clindamycin Phosphate Jelly. On the Liquid Solution, Greenstone had the majority of the share, and Sandoz, Perrigo, Taro, and Teva had smaller shares.

753. The GAO noted that Clindamycin Phosphate had extraordinary price increases in the years 2012-2014.

754. Under the Fair Share Agreement, Defendants did not attempt to undercut competitors' prices in order to gain additional market share.

755. The ability of Actavis, Greenstone, Perrigo, Sandoz, and Taro to reach agreements regarding Clindamycin Phosphate was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. *See* Exhibit 1 (Chart of Defendants' Trade Association Meetings Attendance).

756. No non-collusive market factors (e.g., product shortages) can explain the artificially inflated prices.

757. The agreement between Defendants Actavis, Greenstone, Perrigo, Sandoz, and Taro was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Clindamycin Phosphate Lotion (1%), Gel (1%), Vaginal Cream (2%), and Solution (1%).

### 41. Clobetasol

758. The market for Clobetasol is mature, as Clobetasol has been available in the United States for decades. During the relevant time period, Defendants Actavis, Akorn, Hi-Tech, Sandoz, Fougera, Perrigo, Taro, Wockhardt, and Morton Grove sold Clobetasol to A&P and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

189

759. For more than two years prior to June 2014, Defendants' average price in the U.S. for Clobetasol was remarkably stable.

760. Beginning in approximately June 2014, Defendants abruptly increased their prices for Clobetasol on multiple formulations and sizes. By way of example, Taro, Sandoz, Hi-Tech, Actavis, and Wockhardt all took price increases on their 0.05% cream product in near lockstep reflecting increases of more than 800%:

| Product crm .05% | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 15gm | Taro | 51672125801 | $0.38 | $6.84 | 3-Jun-14 | 1684% |
| 15gm | Sandoz | 00168016315 | $0.73 | $6.84 | 18-Jul-14 | 833% |
| 15gm | Hi-Tech | 50383026715 | $0.37 | $6.84 | 9-Aug-14 | 1732% |
| 15gm | Actavis | 00472040015 | * | $6.84 | 10-Mar-15 | * |
| 30gm | Taro | 51672125802 | $0.33 | $6.84 | 3-Jun-14 | 1993% |
| 30gm | Sandoz | 00168016330 | $0.50 | $6.84 | 18-Jul-14 | 1268% |
| 30gm | Hi-Tech | 50383026730 | $0.32 | $6.84 | 9-Aug-14 | 2026% |
| 30gm | Actavis | 00472040030 | * | $6.84 | 10-Mar-15 | * |
| 45gm | Taro | 51672125806 | $0.33 | $6.84 | 3-Jun-14 | 1971% |
| 45gm | Sandoz | 00168016346 | $0.59 | $6.84 | 18-Jul-14 | 1057% |
| 45gm | Hi-Tech | 50383026745 | $0.31 | $6.84 | 9-Aug-14 | 2138% |
| 45gm | Actavis | 00472040045 | * | $6.84 | 10-Mar-15 | * |
| 60gm | Taro | 51672125803 | $0.32 | $6.12 | 3-Jun-14 | 1832% |
| 60gm | Sandoz | 00168016360 | $0.50 | $6.12 | 18-Jul-14 | 1124% |
| 60gm | Hi-Tech | 50383026760 | $0.29 | $6.12 | 9-Aug-14 | 2016% |
| 60gm | Actavis | 00472040060 | * | $6.12 | 10-Mar-15 | * |

761. Upon information and belief, between June and August 2014, Akorn, Morton Grove, Fougera, and Perrigo all increased their list prices for Clobetasol by similar amounts, even though these prices were not publicly reported.

762. Clobetasol was one of the drugs identified in the GAO Report as having

190

experienced an "extraordinary price increase" in 2014-15.

763.    Defendants' dramatic price increases were not due to supply disruptions because there is no indication that there was a drug shortage.  These dramatic increases cannot be explained by any other market event.

764.    Upon information and belief, the price increases on Clobetasol were the result of collusive agreements between and among Defendants to increase pricing and restrain competition for the sale of Clobetasol in the United States.  These collusive agreements were furthered, at least in part, through in-person discussions conducted at meetings and industry events hosted by GPhA and HDMA as well as other meetings and communications described below.

765.    For example, on April 20-23, 2013, NACDS held its 2013 Annual Meeting in Palm Beach, Florida. NACDS's 2013 Annual Meeting was attended by representatives from Actavis, Perrigo, Sandoz, Taro, and Wockhardt. *See* Ex. 1.

766.    On June 4-5, 2013, GPhA held a meeting in Bethesda, Maryland, which was attended by representatives from Actavis, Fougera, Hi-Tech, Morton Grove, Perrigo, Sandoz, and Taro. *See* Ex. 1.

767.    On August 10-13, 2013, NACDS held its 2013 Total Store Expo at the Sands Expo Convention Center in Las Vegas, Nevada.  Representatives from Actavis, Akorn, Perrigo, Sandoz, Taro, and Wockhardt attended the Expo. *See* Ex. 1.

768.    On February 19-21, 2014, GPhA held its Annual Meeting at the JW Marriott in Orlando, Florida that was attended by representatives from Actavis, Sandoz, Hi-Tech, Perrigo, Taro, and Wockhardt. *See* Ex. 1.

769.    On April 26-29, 2014, NACDS held its 2014 annual meeting in Scottsdale, Arizona.

770.    NACDS's 2014 annual meeting was attended by representatives from Actavis, Perrigo, Sandoz, Taro, and Wockhardt. *See* Ex. 1.

191

771.    On June 1-4, 2014, the HDMA held a BLC at the JW Marriott Desert Ridge in Arizona. The June 1-4, 2014 BLC was attended by representatives from Actavis, Hi-Tech, Sandoz, Taro, and Wockhardt. *See* Ex. 1.

772.    On June 3-4, 2014, GPhA held a meeting at the Bethesda North Marriott Hotel in Bethesda, Maryland that was attended by representatives from Actavis, Fougera, Perrigo, Sandoz, Hi-Tech, and Taro. *See* Ex. 1.

773.    On August 23-26, 2014, NACDS held its 2014 Total Store Expo at the Boston Convention Center in Boston, Massachusetts. NACDS's August 2014 Total Store Expo was attended by representatives from Actavis, Hi-Tech, Perrigo, Sandoz, Taro, and Wockhardt. *See* Ex. 1.

774.    On October 27-29, 2014, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from Actavis, Sandoz, Fougera, Perrigo, Taro, and Wockhardt. *See* Ex. 1.

775.    On December 3, 2014, NACDS held its 2014 NYC Week and annual foundation dinner, which was attended by representatives from Actavis, Sandoz, and Perrigo. *See* Ex. 1.

776.    On February 9-11, 2015, GPhA held its Annual Meeting in Miami Beach, Florida. Representatives from Actavis, Sandoz, Akorn, Perrigo, Taro, and Wockhardt attended. *See* Ex. 1.

777.    On April 25-28, 2015, NACDS held its 2015 annual meeting at The Breakers in Palm Beach, Florida. NACDS's 2015 annual meeting was attended by representatives from Actavis, Akorn, Perrigo, Sandoz, Taro, and Wockhardt. *See* Ex. 1.

778.    The June 7-10, 2015 HDMA BLC was held in San Antonio, Texas.  The June 2015 BLC was attended by representatives from Actavis, Sandoz, and Wockhardt. *See* Ex. 1.

779.    On June 9-10, 2015, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from Actavis, Fougera, Sandoz, Perrigo, Taro and Wockhardt. See Ex. 1.

192

780.    On August 22-25, 2015, NACDS held its 2015 Total Store Expo at the Denver Convention Center. Representatives from Actavis, Akorn, Perrigo, Sandoz, Taro, and Wockhardt attended. See Ex. 1.

781.    In 2016, Actavis, Akorn, Fougera, Perrigo, Sandoz, Taro, and Wockhardt continued to attend trade association meetings and events. See Ex. 1.

### 42. Clomipramine

782.    Clomipramine HCL, also known by the brand name Anafranil, is used for the treatment of obsessive-compulsive disorder, panic disorder, major depressive disorder, and chronic pain. The market for Clomipramine is mature, as Clomipramine has been available in the United States for over 20 years. The World Health Organization ("WHO") includes Clomipramine on its list of essential medicines. During the relevant time period, Mylan sold Clomipramine pursuant to ANDAs approved by the FDA in or around January 1998. Sandoz sells Clomipramine to purchasers pursuant to ANDAs that were approved by the FDA in or around June 1997 and March 1998. Taro sells Clomipramine to purchasers pursuant to ANDAs approved by the FDA in December 1996.

783.    At all times relevant to this lawsuit there has been more than one manufacturer of Clomipramine on the market. Defendants Mylan, Sandoz, and Taro sold Clomipramine to A&P and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

784.    For more than two years prior to the conspiracy period, Defendants' average price in the U.S. for Clomipramine was remarkably stable. Beginning in approximately May 2013, Mylan, Sandoz, and Taro increased their prices abruptly and, for the most part, in unison.

785.    In addition to Defendants Sandoz and Mylan, Defendant Taro also manufactured Clomipramine HCL. Indeed, it was Taro that led a price increase on this product on May 1, 2013. The price increase was striking – more than a 3,440% increase to Taro's WAC pricing on certain

formulations.

786. In the weeks leading up to the Taro price increase on Clomipramine HCL, Defendant Aprahamian of Taro spoke several times with both CW-3 at Sandoz and M.A., a national account manager at Mylan. In fact, on several occasions during this time period, Defendant Aprahamian hung up the phone with one competitor and immediately called the next. At the same time, CW-4 of Sandoz was also speaking with D.S., a senior sales and national account executive at Taro. During these conversations, Defendants Taro, Sandoz, and Mylan agreed to raise the price of Clomipramine HCL. Certain of these phone calls are detailed in the table below:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 4/2/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:06:00 |
| 4/2/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:06:00 |
| 4/4/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.A. (Mylan) | 0:15:00 |
| 4/4/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:02:00 |
| 4/4/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:06:00 |
| 4/9/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:07:00 |
| 4/9/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:00:06 |
| 4/15/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:18:00 |
| 4/15/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:01:00 |
| 4/15/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:09:00 |
| 4/16/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 0:01:00 |
| 4/16/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:11:00 |
| 4/17/2013 | Voice | D.S. (Taro) | Outgoing | CW-4 (Sandoz) | 0:12:00 |
| 4/17/2013 | Voice | D.S. (Taro) | Incoming | CW-4 (Sandoz) | 0:02:00 |
| 4/17/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:04:00 |
| 4/19/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:13:00 |
| 4/19/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.A. (Mylan) | 0:01:00 |
| 4/19/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 0:01:00 |
| 4/19/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:09:00 |
| 4/22/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | M.A. (Mylan) | 0:04:00 |
| 4/24/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:01:00 |
| 4/24/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:05:00 |
| 4/25/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 0:01:00 |
| 4/26/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:08:00 |
| 4/30/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:14:00 |
| 4/30/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:02:00 |

787. CW-3 of Sandoz also took contemporaneous notes of some of his conversations with competitors. For example, after speaking with Defendant Aprahamian of Taro twice on April 30, 2013, CW-3 made the following notes identifying Clomipramine HCL as one of the products that Taro planned to increase on May 1st:



788.    Indeed, there are notations in CW-3's notebook that demonstrate that he began communicating with Defendant Aprahamian about Taro's May 1 increase as early as April 2, 2013.

789.    As part of the agreement to raise prices and not poach each other's customers on Clomipramine HCL, Defendant Sandoz consistently refused to bid for Taro's customers after Taro raised its price. For example, on April 30, 2013, Publix e-mailed Sandoz stating that it had received a price increase letter from Taro regarding several Sandoz overlap products, including Clomipramine HCL, and asked whether Sandoz wanted to bid for the business. Defendant Kellum e-mailed CW-4 stating "I'm not inclined to do anything here as these may be opportunities for us. We can blame supply if these are in fact opps for us." CW-4 replied, "Agreed! Especially the opportunities for us part!"

790.    Taro did agree to concede one customer to Sandoz so that the competitor could achieve its fair share of the market. On May 1, 2013, Rite Aid e-mailed Sandoz asking for a bid

791.    on Clomipramine HCL. Defendant Kellum responded: "I want to raise price and perhaps pick up share here if possible. [CW-4] try to keep Rite Aid warm and let them know we are evaluating but need to assess supply etc……"

792.    The next day, on May 2, 2013, Defendant Aprahamian of Taro called CW-3 at Sandoz and they spoke for five (5) minutes. CW-3 hung up the phone and then immediately called

195

Defendant Kellum. The two spoke for eight (8) minutes. First thing the next morning – on May 3, 2013 – CW-3 called Defendant Aprahamian back and they spoke for another five (5) minutes. Within a half hour, CW-3 again contacted Defendant Kellum and spoke for two (2) minutes. Later that day, CW-4 of Sandoz e-mailed Kellum regarding an upcoming call with Rite Aid stating: "[w]hen we speak to the clomipramine – let's reiterate we need to keep it on the DL from taro as long as possible …… like we don't already know the cat's out of the bag."

793.    Ultimately, Sandoz was awarded the Clomipramine HCL business at Rite Aid. When Rite Aid notified Taro, Defendant Aprahamian forwarded the e-mail to M.P., Chief Commercial Officer at Taro, stating "[a]s expected Rite Aid moving Clomipramine."

794.    Mylan was the next to increase price on Clomipramine HCL. On May 16, 2013, Mylan increased to the same WAC per unit cost as Taro. In the days leading up to the Mylan price increase, all three competitors were in contact with each other to coordinate efforts. Some of these calls are detailed in the table below:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 5/8/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.A. (Mylan) | 0:01:00 |
| 5/8/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:08:00 |
| 5/8/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:03:20 |
| 5/8/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:09:00 |
| 5/10/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.A. (Mylan) | 0:01:00 |
| 5/10/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.A. (Mylan) | 0:01:00 |
| 5/10/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | M.A. (Mylan) | 0:06:00 |
| 5/13/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:04:06 |
| 5/14/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:02:00 |
| 5/14/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:09:00 |
| 5/15/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.A. (Mylan) | 0:01:00 |
| 5/15/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | M.A. (Mylan) | 0:02:00 |
| 5/16/2013 | Voice | D.S. (Taro) | Outgoing | CW-4 (Sandoz) | 0:22:00 |
| 5/17/2013 | Voice | D.S. (Taro) | Outgoing | CW-4 (Sandoz) | 0:01:00 |
| 5/17/2013 | Voice | D.S. (Taro) | Incoming | CW-4 (Sandoz) | 0:02:00 |
| 5/17/2013 | Voice | D.S. (Taro) | Incoming | CW-4 (Sandoz) | 0:01:00 |

795.    On July 3, 2013, HEB Pharmacy informed Taro that Mylan was on back order for Clomipramine HCL and asked Taro to bid for the business. Defendant Aprahamian responded that

he was "[n]ot inclined to take on new business. Wholesalers have product, let them pull from there temporarily and we can certainly review if shortage persists. Don't want to over react to this product. Not sure how long Mylan is out."

796.   On July 16, 2013, CW-4 of Sandoz sent the July 2013 E-mail identifying Clomipramine HCL as a Mylan price increase product. By this time, Sandoz knew that Mylan had increased its price on this product.

797.   On July 20, 2013, Taro received a "Watch List" notification that Sandoz was increasing price on Clomipramine HCL. Defendant Aprahamian forwarded the notice to M.P. stating: "FYI, Sandoz is in the market (and adjusted price to match ours) now with product as expected. Don't want to alert the reps as they could overreact. They did take Rite Aid as you know. Will see what happens from here."

798.   Two days later - on July 22, 2013 - Sandoz increased its WAC pricing to match the per unit cost of Taro and Mylan.

799.   On August 5, 2013, Walgreens - a Mylan customer - e-mailed Sandoz and requested a bid on Clomipramine HCL. S.G., a national account executive at Sandoz, sent an internal e-mail asking "[s]hould we consider a 25% share of their business?" Defendant Kellum responded negatively, based on the agreement in place with Mylan, stating : "[t]hat is tempting but I worry very disruptive." On August 6, 2013, Defendant Nesta of Mylan called CW-4 at Sandoz twice. Both calls lasted less than a minute (likely voicemails). The next day, on August 7, 2013, S.G. replied to Defendant Kellum's e-mail, stating: "[b]ased upon your concerns, I will kill this unless I hear otherwise from you."

800.   In October 2013, CW-4 and Nesta spoke by phone several times. At least some of these calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 5/20/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:00:06 |
| 5/21/2013 | Voice | Nesta, Jim (Mylan) | Incoming | J.A. (Dr. Reddy's) | 0:00:00 |
| 5/21/2013 | Voice | Nesta, Jim (Mylan) | Incoming | J.A. (Dr. Reddy's) | 0:00:42 |
| 5/23/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:00:37 |
| 5/23/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:01:25 |
| 5/23/2013 | Text | Nesta, Jim (Mylan) | Outgoing | J.A. (Dr. Reddy's) | 0:00:00 |
| 5/23/2013 | Text | Nesta, Jim (Mylan) | Outgoing | J.A. (Dr. Reddy's) | 0:00:00 |
| 5/24/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | J.A. (Dr. Reddy's) | 0:00:20 |

801. After this series of calls, during the morning of October 15, 2013, CW-4 of Sandoz called Defendant Kellum. The call lasted one minute. Approximately one half hour later, Defendant Kellum e-mailed McKesson and asked if Sandoz could submit a bid for Clomipramine HCL.

802. On October 23, 2013, Sandoz submitted a bid to McKesson and the customer responded that a reduction was needed to bring the pricing in line with their current supplier, Taro. CW-1 was surprised and forwarded the request to CW-4, copying Defendant Kellum, stating: "I thought we were taking Mckessons Clomipramine from Mylan? Per below it appears that they have Taro on the 90s." CW-4 responded, "Hey, I'm only as good as my intel . . . which should have been good."

803. In December 2013, Sandoz received an inquiry from a Bloomberg reporter who questioned the propriety of the large increases that Sandoz had taken in recent months on a whole host of drugs, including Clomipramine HCL and several other drugs at issue in this Complaint. After several conversations with antitrust counsel, Defendant Kellum prepared the following response to Bloomberg with regard to Clomipramine HCL:

Here are the details on our price increase for Clomipramine.

1) On July 22, 2013 We raised WAC by the following %'s
    25mg    2,778%
    50m     2,325%
    75mg    1,778%

2) We were not the first to raise the price but rather followed Mylan and Taro when we learned they had taken a price increase which we first learned from the pricing services we subscribe to "Analysource" (First Databank) and Prospectorrx (Gold Standard).

3) We had a very small market share (1%) and have since gained ~15% market share Rite Aid and Mckesson by providing lower prices than their incumbent suppliers (Taro and Mylan/Taro).

804.    As is clear from the above allegations, Defendant Kellum's statement was a lie. In reality, Sandoz had raised its prices after coordinating the increases with Taro and Mylan in advance, and stayed true to its commitments to keep those prices high.

### 43. Clonidine-TTS Patch

805.    Clonidine-TTS Patch - also known by the brand name Catapres-TTS - is a medication in the form of a transdermal patch that is used to treat high blood pressure.

806.    As of September 2011, Mylan and Teva were at rough parity in the market for generic Clonidine-TTS, with Mylan having approximately 48.4% market share and Teva having approximately 44.4% market share. At the end of 2011 and beginning of 2012, however, Teva began to take more than its "fair share."

807.    In November 2011, Teva took over Mylan's business for Clonidine-TTS at Walgreens after Walgreens solicited Teva to provide a bid. Then, in late January 2012, Cardinal Health solicited a bid from Teva for a one-time-buy to cover an alleged short-term "supply disruption" that Mylan was experiencing. A few days after Teva submitted its offer

199

to Cardinal for the one-time-buy, Cardinal asked Teva to become Cardinal's primary supplier for Clonidine- TTS. Believing that Cardinal's request was prompted by Mylan having supply issues, Teva accepted and took over the primary position at Cardinal for Clonidine-TTS.

808.    On February 10, 2012, the move of Cardinal's business to Teva prompted K.G. of Teva to order his colleagues to get intelligence on the extent of Mylan's alleged supply issues. That same day, Defendant Rekenthaler called B.P., a senior national accounts executive at Mylan, to obtain the information and they spoke for six (6) minutes. Later that day, Rekenthaler reported back to his Teva colleagues that, contrary to Teva's assumptions, "Mylan is back in supply" and cautioned that Teva should "tread carefully." Rekenthaler was concerned that Mylan might retaliate against Teva for taking more than its "fair share" without consulting with Mylan. With the awards from Walgreens and Cardinal, Teva was projected to have between 65%-70% market share for Clonidine-TTS.

809.    To gain back some market share, Mylan challenged Teva's Clonidine-TTS business at McKesson. To de-escalate the situation, Teva "conceded the McKesson business to Mylan." Then, in April 2012, Mylan aggressively challenged Teva's Clonidine-TTS business at CVS to gain back market share and further signal its displeasure with Teva for taking the Cardinal business. Internally, Teva lamented that Mylan was "trashing the price in pretty much a two-player market." Ultimately, Teva "conceded [the CVS business] due to price."

810.    Teva heard Mylan's retaliatory message loud and clear. On May 4, 2012, just a few days after losing the CVS Clonidine-TTS business to Mylan, Teva was approached by Cardinal about a different drug, Doxazosin. At the time, Mylan was the primary supplier for Doxazosin at Cardinal. Cardinal representatives told Teva that Mylan was on backorder for one of the four Doxazosin dosage strengths until the end of June 2012, but Cardinal wanted

to move the entire Doxazosin line to Teva. Rather than take this business, K.G. cautioned his colleagues that Teva "will need to be cautious after what happened with Clonidine. I would rather cover them on a short-term basis where they have an issue and revisit if it becomes a more prolonged and extensive event."

811.    On July 18, 2012, E.G., a senior Teva product manager, circulated an internal e-mail to Teva's national account managers that the "[m]arket rumor is Mylan may be having Clonidine Patch supply issues." Teva learned of this "rumor" directly from Mylan over the course of at least two calls between Defendants Green and Nesta on July 17 and the morning of July 18, 2012. Those calls lasted three (3) minutes and five (5) minutes, respectively.

812.    On the morning of September 28, 2012, Defendants Nesta and Green spoke by phone at least twice, once for four (4) minutes and once for fourteen (14) minutes. On those calls, Nesta informed Green of Mylan's impending temporary exit from the Clonidine- TTS market. As expected, later in the day on September 28, 2012, Teva began getting

813.    solicitations from Mylan customers, such as Wal-Mart and CVS, seeking a bid from Teva for Clonidine-TTS because Mylan had just issued a temporary discontinuation notice.

814.    Mylan's exit from the Clonidine-TTS market presented an opportunity to raise prices and collusively reallocate the market at the inflated prices when Mylan fully reentered the market. For example, in April 2012, before Mylan had challenged Teva's Clonidine-TTS business at CVS, Teva's direct invoice price to CVS for the .1mg, .2mg, and 3mg Clonidine-TTS was $22.13, $37.81, and $54.41, respectively. Mylan's retaliation against Teva drove the prices for CVS down to below $10.49, $18.17, and $26.51 for those dosages, respectively. Because of Mylan's exit from the market, however, when Teva took back the CVS business in October 2012, Teva was able to charge CVS a direct invoice price of $33.28, $56.08, and

$80.76, respectively.

815.    Mylan and Teva maintained regular contact as former Mylan customers came to Teva because of Mylan's supply issues with Clonidine-TTS. For example, Teva submitted bids to CVS and Wal-Mart—which were ultimately accepted by those companies—on October 4, 2012 and October 5, 2012, respectively. In the days leading up to those bids, Teva and Mylan representatives had at least the following phone calls:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 10/1/2012 | Voice | Rekenthaler, David (Teva) | Outgoing | B.P. (Mylan) | 0:01:00 |
| 10/1/2012 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:00:10 |
| 10/1/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:00:04 |
| 10/1/2012 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:00:06 |
| 10/1/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:05:00 |
| 10/4/2012 | Voice | Green, Kevin (Teva) | Incoming | Nesta, Jim (Mylan) | 0:11:00 |

816.    Teva and Mylan representatives continued to keep in contact going forward so that if Mylan reentered the Clonidine-TTS market, Mylan could regain market share without eroding price through competitive bidding. For example, on October 10, 2012, Defendants

817.    Green and Nesta spoke for ten (10) minutes. That same day, E.G. of Teva sent an e-mail to Teva national account managers and other senior representatives reiterating that Teva representatives should "advise of any update to this market intelligence."

818.    In or about February 2013, Mylan relaunched Clonidine-TTS and began seeking market share. In early March 2013 Mylan sought to secure the Clonidine-TTS business at Econdisc. Rather than competitively bid for the business, Teva's internal documents state that they chose to "concede" Econdisc back to Mylan. By April 2013 Teva also "gave up Rite Aid" and "concede[d]" McKesson to Mylan.

819.    In a stark admission of Teva's willingness to help Mylan regain market share without competition, Defendant Rekenthaler acknowledged in an internal e-mail dated

202

February 28, 2013 that Teva was "trying to concede the Clonidine business at CVS" to Mylan. Because Teva had been able to increase the price at CVS following Mylan's exit, Mylan gave a bid to CVS that was higher than Mylan's "previous price prior to their supply problems." For its part, Teva was "not going to make any effort in the form of price concessions to retain the CVS business" if CVS brought Mylan's price challenge to Teva's attention. CVS pushed Mylan to lower its bid in light of its prior prices but, confident that its brinkmanship would work because of Teva's cooperation, Mylan would not do so. Ultimately, CVS declined Mylan's bid because of Mylan's refusal to lower its bid in light of its prior pricing. Nonetheless, because Mylan's bid to CVS was not competitive—but rather an effort to allocate the market without eroding price— Teva was able to maintain artificially higher prices at CVS.

820.    To carry out their scheme to allocate the Clonidine-TTS market without eroding price, representatives of Teva and Mylan remained in regular contact. In February and March 2013 alone, Teva and Mylan representatives called each other at least 33 different times and spoke for nearly 2 hours and 45 minutes.

203

821.    By April 2013, Teva had "conceded all customers [it] plan[ned] on conceding." Having successfully allocated the market, however, Mylan and Teva were now conspiring to raise prices on Clonidine-TTS. On April 8, 2013, J.L., a marketing manager at Teva, reported internally to his Teva colleagues, including Defendant Rekenthaler, that Mylan had agreed to raise prices:

> **From:** ▮▮▮▮▮▮▮▮▮
> **Sent:** Tuesday, April 09, 2013 2:24 PM
> **To:** ▮▮▮▮▮▮▮▮; Dave Rekenthaler
> **Cc:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
> **Subject:** Clonidine - Mylan Challenges
> **Importance:** High
>
> Kevin / Dave,
>
> Do we have a target share percentage we want to maintain/concede now that Mylan is back in supply?
>
> We just gave up Rite Aid which was worth ~5% of our business and we also have a challenge from Omnicare which is also worth ~5%. We received the Omnicare challenge yesterday.
>
> Based on a discussion with Kevin Green, Mylan would follow a price increase.

822.    Defendant Green knew that Mylan would follow a price increase on Clonidine-TTS because earlier that day, Green had two phone calls with Defendant Nesta (Mylan), with one lasting one (1) minute and the other lasting eight (8) minutes. In a follow up call the following day between Defendants Green and Nesta lasting eleven (11) minutes, Mylan and Teva reconfirmed their agreement that Mylan would follow a Teva price increase on Clonidine-TTS.

823.    On May 6, 2014, Actavis was granted approval to market Clonidine-TTS. Teva and Actavis immediately commenced an extensive negotiation over price and market share.

824.    Defendants Rekenthaler and Falkin spoke by phone three times that day for fifteen (15) minutes, one (1) minute, and three (3) minutes, respectively.

204

825.    The next day, Rekenthaler announced to his colleagues that Actavis was entering the market. K.G. of Teva responded by requesting that Defendant Patel come up with a recommendation as to which customers Teva should concede to Actavis. At the same time, Teva employees bemoaned Actavis's "ridiculous" low pricing for a new entrant, saying that price "is already eroded here."

826.    On May 8, 2014, Teva personnel accelerated their efforts to convince Actavis to revise its pricing and market share plans for Clonidine-TTS to more acceptable levels with an even more intensive flurry of phone calls. On that day, Rekenthaler spoke to Falkin three more times (5-, 10-, and 8-minute calls). Patel spoke to Defendant Rogerson at Actavis four times, the last call coming at 9:54am. At 10:02am, she informed her colleagues of the results of the negotiations, instructing them: "Please concede Ahold and HEB."

827.    The following day, May 9, 2014, Defendant Patel learned from yet another customer of a "competitive price challenge" on this drug. Suspecting the source of the challenge was Actavis, Patel called Rogerson three times. Following those conversations, Patel informed her colleagues that Actavis wanted 25% of the market. She also stated that Actavis would likely want 10%-15% of that share from Teva. During those conversations, she also likely conveyed her displeasure to Rogerson about how low Actavis's pricing was, because not long after those phone calls, she conveyed to her supervisor, K.G., that "I just found out that Actavis rescinded their offer." Shortly after that, Patel also learned that Actavis had "resent all of their offer letters at pricing that is higher than our [Teva's] current."

828.    Rekenthaler described to his colleagues the agreement he was willing to strike with Actavis over market share, saying: "I'm okay with adjusting 15% but we're not going to play any games with them. They take the 15% and I don't want to hear about this product again." Teva's senior sales executive, T.C., cautioned him on the importance of maintaining

a cooperative stance towards this competitor, saying: "now, now Mr. Rekenthaler play nice in the sand box …. If history repeatss itself activist [sic] is going to be responsible in the market…."

829. The market share give-and-take between Teva and Actavis continued over the coming weeks, with Teva conceding accounts to the new entrant in order to allow Actavis to achieve its fair share of the market for Clonidine-TTS. On May 14, 2014, for example, Defendant Patel told colleagues that Teva must be "responsible" and concede a particular wholesaler's account to Actavis. On May 17, 2014, Teva conceded a large retailer account to Actavis. On May 20, 2014, Patel again declined to bid at another customer due to the new entrant Actavis, stating: "We are trying to be responsible with share and price."

830. When L.R., Teva's analytics manager, recommended giving up yet another Clonidine-TTS account to Actavis on May 23, 2014, after several conversations between Defendants Patel and Rogerson the prior day, K.G. of Teva reluctantly approved, saying: "[o]kay to concede, but we are getting to the point where we will not be able to concede further."

### 44. Desmopressin Acetate

831. Desmopressin Acetate, which is also discussed in additional detail in Section XIII. F. below, is also known by the brand names Concentraid, DDAVP, and Stimate, and is an antidiuretic agent used in the treatment of central diabetes insipidus. It has been available in the United States in a generic form for many years.

832. The market for Desmopressin Acetate is mature. At all relevant times, there have been multiple manufacturers of Desmopressin Acetate.

833. During the relevant time frame, Teva and Actavis were the primary manufacturers of Desmopressin Acetate Tablets.

834.    Plaintiff alleges that as part of Defendants' Fair Share Agreement, they conspired to fix, raise, maintain or stabilize the prices of Desmopressin Acetate tablets beginning at least as early as the summer of 2014.

835.    In August 2014, Teva increased prices on Desmopressin Acetate tablets, along with a number of other drugs. In the lead up and follow-up to the price increases, Teva was in frequent contact with other drug manufacturers to coordinate price increases and Fair Shares.

836.    On October 15, 2014, Teva received a request from a customer asking Teva to reduce prices for Desmopressin Acetate. Teva's Patel - who already knew that Actavis would be raising prices - responded to the customer by declining to lower the price with the explanation: "[w]e believe the market is still settling on this product."

837.    On December 19, 2014, Actavis followed Teva's price increase on Desmopressin Acetate, announcing identical list (WAC) prices.

838.    Leading up to Actavis's price increase, Rekenthaler of Teva and Falkin of Actavis spoke frequently, including calls on November 18, November 21, and November 25, 2014.

839.    The ability of Teva and Actavis to reach agreements on Desmopressin Acetate Tablets was aided by the prevalence of trade association meetings and conferences where

840.    the parties were able to meet in person. See Exhibit 1 (Chart of Defendants' Trade Association Meetings Attendance).

841.    The coordination between Teva and Actavis is consistent with the Fair Share Agreement.

842.    The agreement between Defendants Teva and Actavis was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices,

207

rid bids, and engage in market and customer allocation for generic drugs, including Desmopressin Acetate Tablets.

### 45. Desogestrel/Ethinyl Estradiol Tablets (Kariva)

843.    Desogestrel/Ethinyl Estradiol ("Kariva") is a combination pill containing two hormones: progestin and estrogen. This medication is an oral contraceptive. Defendant Glenmark markets this drug under the name Viorele, while Defendant Teva markets the drug under the name Kariva. These drugs are also known by the brand name, Mircette. Glenmark entered the market for Kariva 0.15mg/0.02mg tablets on April 4, 2012.

844.    During the morning of May 19, 2014, Defendant Patel learned that Glenmark had bid a low price for its own version of Kariva - Viorele - at Publix, a retail pharmacy purchaser. S.B., an analyst at Teva, e-mailed Defendant Patel a list of suggested re-bid prices to send to Publix for various drugs including Kariva. The chart included a suggested re-bid price for Kariva of $76.14 - which was $52.64 higher than the $23.50 price that Glenmark had offered Publix.

845.    This sparked a flurry of communications that same day between Defendant Patel and three different Glenmark representatives - Defendants Brown and Grauso, and J.C., a sales and marketing executive at Glenmark - as set forth below:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 5/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Grauso, Jim (Glenmark) | 11:46:15 | 0:00:00 |
| 5/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | J.C. (Glenmark) | 11:47:03 | 0:24:09 |
| 5/19/2014 | Voice | Patel, Nisha (Teva) | Incoming | Brown, Jim (Glenmark) | 12:21:00 | 0:12:53 |
| 5/19/2014 | Voice | Patel, Nisha (Teva) | Incoming | Brown, Jim (Glenmark) | 13:37:08 | 0:00:00 |
| 5/19/2014 | Voice | Patel, Nisha (Teva) | Incoming | Brown, Jim (Glenmark) | 13:37:31 | 0:00:26 |
| 5/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Brown, Jim (Glenmark) | 13:50:15 | 0:06:51 |

846.    After this flurry of communications between the two competitors, Defendant Patel decided that Teva would offer Publix a re-bid price with a nominal 10% reduction off

the originally proposed re-bid price of $76.14 – virtually guaranteeing that the business would be awarded to Glenmark.

### 46. Desonide

847.    The market for Desonide is mature, as both the ointment and cream form of the drug have been available in the United States since the 1970s, and generic Desonide has been available in the United States since 1994.

848.    During the relevant time period, Defendants Actavis, Perrigo, Sandoz, Fougera, and Taro sold Desonide to A&P and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

849.    At all times relevant to this lawsuit there has been more than one manufacturer of Desonide on the market. Defendants Actavis, Perrigo, Sandoz, Fougera, and Taro dominate the market for Desonide.

850.    For at least five years prior to May 2013, Defendants' prices for Desonide in the United States remained stable. In May 2013, however, Defendants abruptly began implementing substantial price increases.

851.    For example, Defendants all set the same WACs for their ointment products beginning in May 2013, reflecting increases from previous WACs of more than 140%:

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---------|-----------|-----|---------|---------|------------------|---------------------|
| 15GM | Taro | 51672128101 | $0.84 | $3.21 | 1-May-13 | 282% |
| 60GM | Taro | 51672128103 | $0.53 | $3.21 | 1-May-13 | 501% |
| 15GM | Perrigo | 45802042335 | $1.30 | $3.21 | 21-May-13 | 146% |
| 60GM | Perrigo | 45802042337 | $0.31 | $3.21 | 21-May-13 | 932% |
| 15GM | Sandoz | 00168030915 | * | $3.21 | 1 7-Jan-14 | * |
| 60GM | Sandoz | 00168030960 | * | $3.21 | 17-Jan-14 | * |

209

852.    In August 2013, Actavis entered the market for Desonide and implemented the supracompetitive prices as well. Upon information and belief, just as the Defendants did with Glyburide and Doxy DR, Actavis communicated its intention to enter the market to Perrigo, Sandoz, Fougera, and Taro well in advance of its actual entity, and the Defendants reached an agreement on the supracompetitive pricing that each would charge its customers. This agreement on Desonide was facilitated by the overarching market allocation (or "fair share") agreement that was followed by all Defendants and conspirators and it prevented Actavis' entity into the market from eroding the conspiratorial pricing on Desonide.

853.    Desonide was one of the drugs identified in the GAO Report as having experienced an "extraordinary price increase."

854.    No competitive justifications explain the abrupt increase in price. Changes in ingredient costs do not explain Defendants' price increases. The gel and lotion formulations of Desonide did not experience the same coordinated and extraordinary price increases in May 2013 that the cream and ointment formulations experienced, even though all formulations have the same active ingredient.

855.    The abrupt price increases were not due to supply disruptions.

856.    Upon information and belief, the price increases on Desonide were the result of collusive agreements between and among Defendants to increase pricing and restrain competition for the sale of Desonide in the United States. These collusive agreements were furthered, at least in part, through in-person discussions conducted at meetings and industry events hosted by GPhA and HDMA as well as other meetings and communications, some of which are described below.

857.    For example, on October 1-3, 2012, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from Actavis, Perrigo, Sandoz, and Taro. See

Ex. 1.

858.    On February 20-22, 2013, GPhA held its Annual Meeting at the JW Marriott Orlando Grand Lake in Orlando, Florida that was attended by representatives from Actavis, Perrigo, Sandoz, and Taro. See Ex. 1.

859.    On April 20-23, 2013, shortly before the drastic May 2013 price increases, NACDS held its annual meeting at The Breakers, Palm Beach, Florida. This event was attended by representatives from Actavis, Perrigo, Sandoz, and Taro. See Ex. 1.

860.    On June 2-5, 2013, HDMA held its 2013 BLC in Orlando, Florida. HDMA's June 2013 BLC was attended by representatives from Actavis and Sandoz. See Ex. 1.

861.    On June 4-5, 2013, GPhA held a CMC Workshop meeting at Bethesda North Marriott Hotel, Bethesda, Maryland, that was attended by representatives from Actavis, Perrigo, Sandoz, and Taro. See Ex. 1.

862.    On August 10-13, 2013, NACDS held its 2013 Total Store Expo at the Sands Expo Convention Center. NACDS's August 2013 event was attended by representatives from Actavis, Perrigo, Sandoz, and Taro. See Ex. 1.

863.    On October 28-30, 2013, GPhA held its 2013 Fall Technical Conference in Bethesda, Maryland that was attended by representatives from all Defendants. See Ex. 1.

864.    On December 3, 2013, NACDS held its 2013 NACDS Foundation Reception and Dinner, which was attended by representatives from Actavis, Sandoz, and Perrigo. See Ex. 1.

865.    On April 26-29, 2014, NACDS held its 2014 annual meeting in Scottsdale, Arizona.

866.    This event was attended by representatives from Actavis, Perrigo, Sandoz, and Taro. See Ex. 1.

211

867. These Defendants continued to attend trade association meetings and events between 2014 and 2016. See Ex. 1.

### 47. Dexmethylphenidate HCL Extended Release

868. Dexmethylphenidate HCL Extended Release ("Dexmeth ER") is a generic version of the drug Focalin, and it is used to treat attention deficit hyperactivity disorder (ADHD).

869. As Sandoz was preparing to enter the market on the 40mg strength of Dexmeth ER in February 2014, Defendant Patel of Teva spoke frequently with CW-1 at Sandoz about how to divide the market so that Sandoz could obtain its fair share without significantly eroding the price. On February 10, 2014, for example, CW-1 began internal preparations to pursue the Rite Aid account for Dexmeth ER 40mg. Later that night, CW-1 called Patel and the two spoke for more than thirteen (13) minutes. On February 18, Patel left a voicemail for CW-1. That same day, Teva conceded the Rite Aid account to Sandoz. Patel and CW-1 then spoke again by phone on February 20, 2014.

870. Similarly, on February 12, 2014, Sandoz submitted a bid to ABC for the 40mg strength of Dexmeth ER. After Patel spoke with CW-1 on February 10 and again on February 12, 2014, Teva agreed to let Sandoz have the business. In an e-mail to her team on February 12, Patel summarized the understanding that Teva had reached with Sandoz:

From: Nisha Patel02
Sent: Wed 2/12/2014 6:34 PM (GMT-05:00)
To:
Cc:
Bcc:
Subject: Re: ABC Dexmethylphenidate 40mg - Challenge

We have 100% of the market, so will have to give someone up. ABC is the smallest wholesaler, so it makes sense for this class of trade. Sandoz is being responsible with their pricing. We should be responsible with our share. Plus, between the WBAD members, makes more sense to hold onto Walgreens than ABC, if we were going to lose one of them.

Sent from my iPhone

871.    One of the Teva national account managers on the e-mail responded by confirming that the approach "makes total sense."

872.    On February 14, 2014, Teva also refused to lower its price for Dexmeth ER when approached by a GPO customer, Anda, even though Sandoz's price was not significantly lower than Teva's – essentially conceding the business to Sandoz.

873.    Further, on February 20, 2014, another large retail customer approached Teva indicating that because a new competitor had launched for Dexmeth ER, the customer was entitled to certain price protection terms (i.e., a lower purchase price for the drug). Patel spoke to CW-1 the same day for almost twenty-one (21) minutes. The next day, February 21, Patel responded internally about the customer's request, with additional inside information from Sandoz, stating: "[t]he competitor (Sandoz) has not yet shipped. The new price will become effective on and the price protection should be calculated on the date that Sandoz ships. The expected date is 2/28/14.

874.    Also on February 21, 2014, Patel sent a calendar invite to Rekenthaler and other team members for a meeting on February 24 where one of the topics to be discussed was "Post Launch Strategy" for "Dexmethylphenidate 40mg: Sandoz (AG) entering market." Not

875.    surprisingly, she called CW-1 a few days later, on February 27, to further coordinate about Dexmeth ER.

213

876.    Throughout this time period, Sandoz abided by fair share principles and its ongoing understanding with Teva.

877.    Teva and Sandoz were not alone in allocating customers for certain formulations of Dexmeth ER. The agreement was also carried out by other manufacturers allowing Sandoz to take share from them. In February 2014, for example, as Sandoz was seeking share on the 15mg dosage strength of Dexmeth ER, Par "gave up the business to keep the market share even." As Sandoz was entering the market, Defendant Rekenthaler of Teva was speaking to M.B., a senior national account executive at Par, right around the same times that Patel had been speaking to CW-1 – including two calls on February 10 (18 and 3 minutes), two (2) calls on February 19 (2 and 22 minutes), and calls on February 24 and 25, 2014 – in order to effectuate the scheme.

878.    The market allocation scheme between Teva and Sandoz on Dexmeth ER continued through at least mid-2015. On May 6, 2015, for example, Teva declined to submit a bid to Walgreens for Dexmeth ER 5mg on the basis that "there is equal share in the market between competitors." Similarly, on June 30, 2015, Sandoz declined to put in a bid to Managed Health Care Associates, a large GPO, on Dexmeth ER 20mg, on the basis that Sandoz already had 57% market share – greater than its sole competitor on this dosage strength, Teva. When a Sandoz national account representative communicated this decision to the customer, he lied and explained that the decision not to bid was based on limited supply.

879.    No non-collusive market factors (e.g., product shortages) can explain the artificially inflated prices.

880.    The ability of Teva, Sandoz, and Par to reach agreements on Dexmeth ER was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. See Exhibit 1 (Chart of Defendants' Trade Association Meetings

214

Attendance).

881.    The agreement between Defendants Teva, Sandoz, and Par was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Dexmeth ER Capsules (5, 15, 20, 40 mg).

### 48. Dextroamphetamine Sulfate Extended Release

882.    Dextroamphetamine Sulfate Extended Release, also known by the brand name Dexedrine® and sometimes referred to as "Dex Sulfate XR," is a medication used to stimulate the central nervous system in the treatment of hyperactivity and impulse control.

883.    During the relevant time period, Actavis, Teva, and Mallinckrodt dominated the market for Dex Sulfate XR, with Teva having by far the largest share as the first generic entrant.

884.    In 2012, as Mallinckrodt entered the market for Dex Sulfate XR, internal Teva documents acknowledged that Teva had [willingly] conceded a large number of accounts for the drug to Mallinckrodt solely because it was entering the market and sought to add share. This was wholly consistent with the Fair Share agreement.

885.    On June 19, 2014, as Actavis was entering the market for Dex Sulfate XR, Defendant Patel reviewed a profitability analysis for that drug and asked Defendant Rekenthaler what share of the market Actavis was targeting. Rekenthaler responded: "20-25%." Rekenthaler knew Actavis's market share goals because he and Defendant Falkin of Actavis had spoken twice by phone that morning – once for more than eleven (11) minutes and again for more than nine (9) minutes.

886.    Five days later on June 24, 2014, Teva employee S.B. confirmed to her colleagues in an e-mail that Actavis had entered the market for Dex Sulfate XR. She remarked

that Teva had a 72.2% share of this "multi-player market" and thus recommended giving up a large customer to Actavis and reducing Teva's market share to 58.3% – in accordance with the industry understanding to allocate the market, and Teva's ongoing agreement with Actavis. Later internal e-mails confirmed Teva's decision to concede that customer to Actavis because "Actavis is entering the market and seeking share."

### 49. Diclofenac Potassium

887. Diclofenac Potassium, which is also discussed in additional detail in Sections XIII. D. and F. below, is also known by the brand name Cataflam, among others, and is a non-steroidal anti-inflammatory drug (NSAID) used to relieve pain and swelling. It has been available in the United States in a generic form for many years.

888. The market for Diclofenac Potassium was mature and at all relevant times had multiple manufacturers.

889. During the relevant time frame, Defendants Teva, Mylan, and Sandoz were the primary manufacturers of Diclofenac Potassium Tablets, and as part of Defendants' Fair Share Agreement, they conspired to fix, raise, maintain or stabilize the prices of Diclofenac Potassium beginning at least as early as the fall of 2012.

890. For years, the prices for Diclofenac Potassium tablets were relatively low and stable. In late 2012, however, Mylan, Teva and Sandoz began a series of coordinated price increases that resulted in list (WAC) prices nearly double the prior levels.

891. Throughout this period, Mylan, Teva, and Sandoz met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Diclofenac Tablets and their Fair Share Agreement.

892. For example, on August 9, 2013, Teva raised its list price on Diclofenac Potassium to match that of Mylan.

893. As with numerous other drugs during this period, Teva coordinated with Mylan and Sandoz before announcing a price increase. For example, Green of Teva spoke to Nesta of Mylan on August 1 (two times), August 2, August 6 (three times), and August 8 (three times), 2013. The day before the price increase went into effect-August 8, 2013, Patel called Nesta of Mylan twice and also called a contact at Sandoz.

894. On August 28, 2014, Teva again raised list prices on Diclofenac Potassium Tablets. This time it was the first manufacturer to increase prices. Leading up to the price increase, Patel and Rekenthaler were communicating with Mylan and Sandoz to coordinate. For example, Rekenthaler spoke to Nesta on August 4, 7, 11 (2 calls), 18 (2 calls), and 21. Patel spoke to a contact at Sandoz on August 11, 26, 27 (2 calls), and 28, 2014.

895. The coordination worked. Sandoz followed Teva's price increases on Diclofenac Potassium Tablets and announced an identical list price approximately 6 weeks later. Mylan followed, also matching Teva and Sandoz's list prices, on March 4, 2015. Rekenthaler coordinated with Nesta of Mylan during two phone calls on February 18 and one call on February 19, 2015.

896. No non-collusive market factors (e.g., product shortages) can explain the artificially inflated prices.

897. The ability of Teva, Mylan, and Sandoz to reach agreements on Diclofenac Potassium tablets was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. See Exhibit 1 (Chart of Defendants' Trade Association Meetings Attendance).

898. The agreements between Mylan, Teva, and Sandoz was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Diclofenac Potassium

Tablets.

### 50. Digoxin

899.    The market for Digoxin is mature, as Digoxin has been available in the United States for more than a decade. Generic Digoxin is prescribed to approximately 6.5 million patients in the United States and it is considered an essential medicine by the World Health Organization. Variants of the drug have been in existence since the 18th century. Because Digoxin was in existence prior to the 1938 passage of the Federal Food, Drug, and Cosmetic Act, the drug was manufactured and sold by a large number of companies outside the NDA/ANDA process.

900.    In 1997, GlaxoSmithKline obtained an NDA authorizing it to market Lanoxin, a branded version of Digoxin. Because Digoxin was not a new chemical compound, its NDA allowed for just a three-year period of exclusivity, and by 2003 there were at least eight manufacturers of generic Digoxin in the United States, including Defendants Impax, Lannett, Mylan, Par, and West-Ward.

901.    During the relevant time period, Defendants Impax, Lannett, Mylan, Par, and West- Ward sold Digoxin to A&P and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

902.    At all times relevant to this lawsuit there has been more than one manufacturer of Digoxin on the market. Defendants Impax, Lannett, Mylan, Par, and West-Ward dominate the market for Digoxin.

903.    Due to industry consolidation and manufacturing difficulties experienced by Mylan, Par, and West-Ward, by the end of 2012, just Lannett and Impax remained active in the market for generic Digoxin. Despite the existence of a duopoly, until October 2013, the price of Digoxin charged by Lannett and Impax remained stable.

218

904. Beginning in October 2013, however, Defendants issued abrupt and substantial price increases.

905. Defendants continued to increase the prices they charged to A&P and others for Digoxin during the first six months of 2014, despite Par's entry into the Digoxin market in early 2014 and West-Ward's re-entry soon after. Mylan also re-entered in early 2015 and followed the pricing agreed to by the conspirators. Upon information and belief, Par, West-Ward, and Mylan each communicated their entry into the generic Digoxin market to their co-conspirators well in advance of the date each entrant began marketing the drug, so that agreements could be reached on price without any disruption to the prevailing supracompetitive prices.

906. With respect to WAC pricing, in October 2013, Lannett and Impax implemented lockstep WAC prices on their 0.125 mg products, reflecting increases of more than 630%. Instead of competing on price, Par, West-Ward, and Mylan reported the same WAC benchmarks as Lannett and Impax as they entered the market:

| Product 0.125 mg | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 100 ct | Lannett | 00527132401 | $0.14 | $1.19 | 16-Oct-13 | 734% |
| 1000 ct | Lannett | 00527132410 | $0.12 | $0.99 | 16-Oct-13 | 738% |
| 100 ct | Impax | 00115981101 | $0.14 | $1.19 | 22-Oct-13 | 734% |
| 1000 ct | Impax | 00115981103 | $0.12 | $0.99 | 22-Oct-13 | 738% |
| 100 ct | Par | 49884051401 | * | $1.19 | 17-Jan-14 | * |
| 1000 ct | Par | 49884051410 | * | $0.99 | 17-Jan-14 | * |
| 100 ct | ·West-Ward | 00143124001 | $0.16 | $1.19 | 14-Apr-14 | 638% |
| 1000 ct | ·West-Ward | 00143124010 | $0.13 | $0.99 | 14-Apr-14 | 687% |
| 100 ct | Mylan | 00378615501 | * | $1.19 | 17-Nov-14 | * |
| 1000 ct | Mylan | 00378615510 | * | $0.99 | 17-Nov-14 | * |

907. In the fall of 2014, Senator Bernie Sanders and Representative Elijah

Cummings requested information from manufacturers of ten drugs, including Digoxin, which had experienced extraordinary price increases. In response to a Congressional request from Senators Susan Collins, Claire McCaskill, Bill Nelson and Mark Warner, in August 2016, the GAO issued a report in which Digoxin was identified as experiencing an "extraordinary price increase."

908.    There were no legitimate justifications for these abrupt shifts in pricing conduct.

909.    There were no drug shortages or supply disruptions which would cause large price spikes.

910.    Defendants' pricing of Digoxin is the exact opposite of what one would expect to see in a competitive market, where the entry of new manufacturers brings the price down. Instead, as a result of their collusion, Defendants' pricing for Digoxin in the United States increased as the number of "competitors" in the market grew. Thus, the pricing of Digoxin mirrors Defendants' collusion on Glyburide, where Mylan, Heritage, and Mayne agreed to increase prices on the diabetes drug in advance of the entry into the market by Heritage and Mayne.

911.    In early 2015, Mylan re-entered the market and Defendants continued to adhere to their anticompetitive agreements on pricing.

912.    Upon information and belief, the price increases on Digoxin were the result of collusive agreements between and among Defendants to increase pricing and restrain

913.    competition for the sale of Digoxin in the United States. As a result, Defendants have sold Digoxin at supracompetitive levels since October 2013.

914.    These collusive agreements were furthered at least in part, through in-person discussions conducted at meetings and industry events hosted by GPhA and HDMA as well

220

as other meetings and communications, some of which are described below.

915. For example, on April 20-23, 2013, NACDS held its 2013 Annual Meeting at the Sands Expo Convention Center in Palm Beach, Florida. This meeting was attended by representatives from Defendants Mylan and Par. See Ex. 1.

916. On June 2-5, 2013, HDMA held its 2013 BLC in Orlando, Florida. This meeting was attended by representatives from Impax, Lannett, Mylan, Par, and West-Ward. See Ex. 1.

917. On August 10-13, 2013, NACDS held its 2013 Total Store Expo at the Sands Expo Convention Center in Las Vegas, Nevada. This TSE was attended by representatives from Impax, Lannett, Mylan, Par, and West-Ward. See Ex. 1.

918. On April 26-29, 2014, NACDS held its 2014 annual meeting in Scottsdale, Arizona. Representatives from Mylan and Par attended this meeting. See Ex. 1.

919. On June 1-4, 2014, the HDMA held a BLC at the JW Marriott Desert Ridge in Phoenix, Arizona. The meeting was attended by representatives from Impax, Lannett, Mylan, Par, and West-Ward. See Ex. 1.

920. On August 23-26, 2014, NACDS held its 2014 TSE at the Boston Convention Center in Boston, Massachusetts. This TSE was attended by representatives from Impax, Lannett, Mylan, Par, and West-Ward. See Ex. 1.

921. On February 16-18, 2015 the National Pharmacy Forum ("NPF") took place at the Marriott Waterside Hotel & Marina in Tampa, Florida. The speaker topics included: "current pricing and spending trends"; "a critique of the rationale for high prices offered by manufacturers"; and "the U.S. pharmaceutical market and the ongoing changes within the pharmaceutical world," including "market trends." The NPF was attended by representatives of Defendants Mylan and Westward. See Ex. 1.

922.    On April 25-28, 2015, NACDS held its 2015 annual meeting at The Breakers, Palm Beach, Florida. This meeting was attended by representatives from Defendants Mylan, Par, and West-Ward. See Ex. 1.

923.    Defendants continued to regularly attend trade association meetings, conferences and events in 2015-16, including: (a) the June 7-10, 2015 HDMA BLC in San Antonio, Texas; (b) the June 9-10, 2015 GPhA meeting in Bethesda, Maryland; (c) the August 22-25, 2015 NACDS Total Store Expo in Denver, Colorado; (d) the November 2-4, 2015 GPhA meeting in Bethesda, Maryland; (v) the February 8-10, 2016 NPF meeting in Scottsdale, Arizona; (e) the April 12, 2016 HDMA Eighth Annual CEO Roundtable Fundraiser in New York; (f) the April 16-19, 2016 NACDS 2016 Annual Meeting in Palm Beach, Florida; (g) the June 12- 16, 2016 HDMA BLC in Colorado Springs, Colorado; and (h) the August 6-9, 2016 NACDS 2016 Total Store Expo in Boston, Massachusetts.

### 51. Diltiazem HCL

924.    Diltiazem HCL, also known by the brand name Cardizem, among others, is a medication to treat angina (severe chest pain) or hypertension (high blood pressure). It has been available in the United States in a generic form for many years.

925.    The market for Diltiazem HCL tablets was mature and at all relevant times had multiple manufacturers. During the relevant time frame, Defendants Teva and Mylan were the primary manufacturers of Diltiazem HCL Tablets (30, 60, 90, 120 mg).

926.    Plaintiff alleges that as part of Defendants' Fair Share Agreement, they conspired to fix, raise, maintain or stabilize the prices of Diltiazem HCL beginning at least as early as the spring of 2013.

927.    For years, the prices for Diltiazem HCL tablets were relatively low and stable. In the spring of 2013, however, Teva and Mylan imposed a series of coordinate price

222

increases, first in mid-2013, then again in late 2014 and early 2015.

928.    Throughout this period, Mylan and Teva met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Diltiazem HCL Tablets and of their Fair Share agreement.

929.    For example, immediately after she began at Teva, Patel began to investigate Mylan drugs as a potential source for coordinated price increases. She asked her colleague, Kevin Green, to "gather as much market intelligence as possible" for certain, specific items, including Diltiazem HCL Tablets.

930.    On, May 7, 2013, Teva's Green spoke to Nesta at Mylan three times. Green and Nesta also spoke a number of times over the next several days, including on May 8, May 9, and May 10, 2013.

931.    On May 14, 2013, Patel asked several Teva account managers, including Green, to obtain "price points" on certain drugs in preparation for a potential price increase. She indicated internally to another Teva colleague that she was expecting "additional Mylan intel" and that she was expecting Mylan "to take an additional increase" on those items. On May 17, 2013, Green spoke to Nesta six times.

932.    Green communicated extensively with Mylan to coordinate the price increases. For example, on July 10, 2013, Green and Mylan's Nesta spoke twice. Shortly after the second call, Green called Patel, and the two spoke for just over seven (7) minutes. The next day, on July 11, Nesta and Green exchanged several more calls.

933.    Patel and Green coordinated the increase with Mylan in the days and weeks leading up to the increase. For example, Green spoke to Nesta (Mylan) twice on August 1, once on August 2 and three times on August 6.

934.    The day before the price increase went into effect-August 8, 2013 - Patel had

three calls with Nesta of Mylan, and on August 9, 2013, Teva raised prices on numerous drugs, including Diltiazem HCL.

935. No non-collusive market factors (e.g., product shortages) can explain the artificially inflated prices.

936. The ability of Teva and Mylan to reach agreements on Diltiazem HCL was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. See Exhibit 1 (Chart of Defendants' Trade Association Meetings Attendance).

937. The agreement between Defendants Teva and Mylan was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Diltiazem HCL Tablets (30, 60, 90, 120 mg).

### 52. Diphenoxylate Atropine HCL

938. Diphenoxylate Atropine is a combination medicine used to treat diarrhea. It is available in Tablet and Oral Liquid formulations. It has been available in the United States for decades in a generic form.

939. The market for Diphenoxylate Atropine is mature. At all relevant times, there have been multiple manufacturers of Diphenoxylate Atropine.

940. Defendants Greenstone and Mylan dominate sales of Diphenoxylate Atropine Tablets (2.5-0.025 mg). During much of the relevant time period, Mylan had approximately 75% of the market, and Greenstone had approximately 25% of the market.

941. For years, the prices for Diphenoxylate Atropine tablets were relatively low and stable. Then, in the space of about six weeks in the spring of 2014, Mylan and Greenstone imposed large and identical price increases on Diphenoxylate Atropine tablets. Mylan and

224

Greenstone announced identical list (WAC) prices that were nearly double the old prices.

942.   Thus, the GAO noted that the Diphenoxylate Atropine had "extraordinary price increases" in the years 2014-2015.

943.   Under the Fair Share Agreement, Defendants did not attempt to undercut competitors' prices in order to gain additional market share.

944.   The ability of Greenstone and Mylan to reach agreement regarding Diphenoxylate Atropine was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. See Exhibit 1 (Chart of Defendants' Trade Association Meetings Attendance).

945.   In addition, M.A., Mylan's National Account Director, communicated by phone with R.H., Greenstone's Director of National Accounts, on April 3, 4, 22, 28 and 29. Mylan announced its list (WAC) price increases on April 17, 2004.

946.   No non-collusive market factors (e.g., product shortages) can explain the artificially inflated prices.

947.   The agreement between Defendants Greenstone and Mylan was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Diphenoxylate Atropine Tablets (2.5-0.025mg).

### 53. Divalproex ER

948.   The market for Divalproex ER is mature, as generic versions of the drug have been available in the United States for almost a decade. Valproate, the base compound in Divalproex ER, has been in use for more than a century and is recognized as an essential medicine by the World Health Organization.

949.   In 1999, Abbott Laboratories received FDA approval to market Depakote ER,

225

a branded version of the drug. Depakote ER was a blockbuster drug that achieved nearly $1,000,000,000 in sales for Abbott.

950.    Between January and May of 2009, Mylan, Zydus, and Par (through Anchen Pharmaceuticals, its predecessor-in-interest) all received ANDAs authorizing them to market Divalproex ER as generic versions of Depakote ER. Defendant Dr. Reddy's sells Divalproex ER pursuant to ANDAs approved by the FDA in March 2012.

951.    During the relevant time period, Defendant Mylan, Zydus, Dr. Reddy's and Par sold Divalproex ER to A&P and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

952.    At all times relevant to this lawsuit there has been more than one manufacturer of Divalproex ER on the market. Defendants Mylan, Zydus, Dr. Reddy's and Par dominate the market for Divalproex ER.

953.    Between 2009 and June 2013, Defendants' prices for Divalproex ER remained relatively stable. However, in early July 2013, Defendant implemented in unison abrupt and substantial price increases on Divalproex ER. For example, Defendants increased the price for a bottle of 500 pills at 250 mg strength from approximately $30 to more than $200 per bottle.

954.    Bottles of 500 mg strength pills increased at even greater rates, increasing from approximately $130 per bottle to more than $1600 per bottle, an increase of more than 1100%.

955.    With respect to WAC pricing, Mylan and Par set identical WAC prices within a couple weeks of each other in June 2013, and Dr. Reddy's and Zydus matched those WACs in August 2013, around the time they each entered the market. As noted below, the new WACs for 100 and 500 count bottles of 500 mg pills reflected increases of more than 300%.

226

| Product 500 mg ER | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 100 ct | Mylan | 00378047301 | $0.74 | $3.26 | 14-June-13 | 338% |
| 500 ct | Mylan | 00378047305 | $0.71 | $3.26 | 14-June-13 | 361% |
| 100 ct | Par | 10370051110 | $0.74 | $3.26 | 26-June-13 | 338% |

| Product 500mg ER | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 500 ct | Par | 10370051150 | $0.71 | $3.26 | 26-June-13 | 361% |
| 100 ct | Zydus | 68382031501 | * | $3.26 | 14-Aug-13 | * |
| 500 ct | Zydus | 68382031505 | * | $3.26 | 14-Aug-13 | * |
| 100 ct | Dr. Reddy's | 55111053401 | * | $3.26 | 19-Aug-13 | * |
| 500 ct | Dr. Reddy's | 55111053405 | * | $3.26 | 19-Aug-13 | * |

956.    In the Fall of 2014, Senator Bernie Sanders and Representative Elijah Cummings requested information from manufacturers of ten drugs, including Divalproex ER, which had experienced extraordinary price increases. In response to a Congressional request from Senators Susan Collins, Claire McCaskill, Bill Nelson and Mark Warner, in August 2016, the GAO issued a report in which Divalproex ER was identified as experiencing an "extraordinary price increase."

957.    There are no legitimate justifications for the abrupt increases in 2013. Divalproex ER was not listed on the FDA's list of Current and Resolved Drug Shortages and Discontinuations Reported to the FDA. Furthermore, the large price spike cannot be attributed to an increase in demand. If anything, in defiance of rational economic behavior, demand for Divalproex ER was actually decreasing when prices were increasing.

958.    Upon information and belief, the price increases on Divalproex ER were the

227

result of collusive agreements between and among Defendants to increase pricing and restrain competition for the sale of Divalproex ER in the United States. These collusive agreements were furthered, at least in part, through in-person discussions conducted at meetings and industry events hosted by GPhA and HDMA as well as other meetings and communications described below.

959.    For example, on October 1-3, 2012, GPhA held a meeting in Bethesda, Maryland which was attended by representatives from Dr. Reddy' s and Mylan. See Ex. 1.

960.    On February 20-22, 2013, representatives from Dr. Reddy's, Mylan, Par, and Zydus attended the 2013 GPhA Annual Meeting in Orlando, Florida. See Ex. 1.

961.    On April 20-23, 2013, representatives of Dr. Reddy's, Mylan, Par, and Zydus, attended the NACDS 2013 Annual Meeting in Palm Beach, Florida. See Ex. 1.

962.    Shortly before Mylan's and Par's Divalproex ER prices increased, Dr. Reddy's, Mylan, Par, and Zydus, attended the HDMA 2013 BLC in Orlando, Florida on June 2-5, 2013. See Ex. 1.

963.    On June 4-5, 2013, representatives from Dr. Reddy's, Mylan, Par, and Zydus attended the 2013 GPhA CMC Workshop in Bethesda, Maryland. See Ex. 1.

964.    On August 10-13, 2013, representatives from Dr. Reddy's, Mylan, Par, and Zydus, attended the NACDS 2013 Total Store Expo in Las Vegas, Nevada. See Ex. 1.

965.    On October 28-30, 2013, representatives from Dr. Reddy's, Mylan, Par, and Zydus attended the 2013 GPhA Fall Technical Conference in Bethesda, Maryland. See Ex. 1.

966.    On February 19-21, 2014 representatives from Dr. Reddy's, Mylan, Par, and Zydus attended the 2014 GPhA Annual Meeting in Orlando, Florida. See Ex. 1.

967.    On April 26-29, 2014, NACDS held its 2014 Annual Meeting in Scottsdale, Arizona. NACDS's 2014 Annual Meeting was attended by representatives from Dr. Reddy's,

228

Mylan, Par, and Zydus. See Ex. 1.

968.    On June 1-4, 2014, the HDMA held a BLC in Arizona. This event was attended by representatives from Dr. Reddy's, Mylan, Par, and Zydus. See Ex. 1.

969.    On June 3-4, 2014, representatives from Dr. Reddy's, Mylan, Par, and Zydus attended the 2013 GPhA CMC Workshop in Bethesda, Maryland. See Ex. 1.

970.    On August 23-26, 2014, NACDS held its 2014 Total Store Expo at the Boston Convention Center. This Expo was attended by representatives from Dr. Reddy's, Mylan, Par, and Zydus. See Ex. 1.

971.    On October 27-29, 2014, representatives from Dr. Reddy's, Mylan, Par, and Zydus attended the GPhA Fall Technical Conference. See Ex. 1.

972.    On October 27-29, 2014, representatives from Dr. Reddy's, Mylan, Par, and Zydus attended the GPhA Fall Technical Conference. See Ex. 1.

973.    On February 9-11, 2015, representatives from Dr. Reddy's, Mylan, Par, and Zydus attended the GPhA Annual Meeting in Miami, Beach, Florida. See Ex. 1.

974.    On June 9-10, 2015, representatives from Dr. Reddy's, Mylan, Par, and Zydus, attended the GPhA CMC Workshop. See Ex. 1.

975.    On November 2-4, 2015, representatives of Dr. Reddy's, Mylan, Par, and Zydus, attended the 2015 GPhA Fall Technical Conference in North Bethesda, Maryland. See Ex. 1.

### 54. Doxazosin Mesylate

976.    Doxazosin Mesylate is a commonly prescribed medication for the treatment of high blood pressure and the symptoms of benign prostatic hyperplasia (i.e., enlarged prostate gland). It has been available in the United States for decades and is one of the 200 most prescribed drugs in the United States. Doxazosin Mesylate tablets are available in I mg, 2 mg,

229

4 mg, and 8 mg dosage strengths.

977.    The market for Doxazosin Mesylate is mature. At all relevant times, there have been multiple manufacturers of Doxazosin Mesylate. Defendants Mylan, Teva and Co-Conspirator Apotex dominated sales of Doxazosin Mesylate. Greenstone and Par also sell Doxazosin Mesylate.

978.    The GAO noted that all four dosage strengths of Doxazosin Mesylate had an "extraordinary price increase" in 2013-2014. Documentary evidence confirms that these parallel price increases were the result of collusion among generic drug manufacturers including Apotex, Greenstone, Mylan, Par, and Teva.

979.    As explained above, Mylan was Teva's highest-ranked competitor by "quality." Teva is also known to have viewed at least Apotex and Greenstone as "high quality" competitors.

980.    For years Mylan and Teva were highly conscious of their respective shares in the Doxazosin Mesylate market and generally dared not cross each other. For example, on May 7, 2012, when Dale Hill at Cardinal Health asked if Teva had any interest in becoming its primary supplier, the first response of Teva's K.G. (Senior Director of Marketing) was to ask his colleague T.C. (Senior Director of National Sales): "Is Mylan having problems? The market is primarily supplied by Teva (76%) and Mylan (22%)." T.C. reported back that Mylan was "having [an] issue on the 4mg backordered until 6-30," but Cardinal Health wanted "to move the entire line." K.G. responded: "We will need to be cautious after what happened with Clonidine. I would rather cover them on a short-term basis where they have an issue and revisit if [it] becomes a more prolonged and extensive event." The Clonidine incident references a rare and brief incidence of competition between Teva and Mylan in late 2011 and early 2012 for market share of Clonidine-TTS, which ended first with Teva conceding its

"McKesson business" and then later CVS, its "largest customer," to make peace with Mylan, who, as Teva internally lamented, was "trashing the price in pretty much a two-player market."

981.    Determined not to let that happen again, Patel began immediately, after she was hired at Teva, to investigate Mylan drugs as a potential source for coordinated price increases. Teva and Mylan coordinated price increases on multiple drugs over time, including their drastic price increases on Doxazosin Mesylate in the summer of 2013. During each step in the process, Teva and Mylan executives kept their generic manufacturer co-conspirators apprised of their decisions. Between May and August 2013, for example, Teva and Mylan exchanged 101 phone and text communications. Patel typically initiated Teva's communication with Nesta of Mylan either directly or through Green, whom she asked to seek "intel" from Nesta on many different drugs.

982.    For example, on July 22, 2013, Defendant Patel sent Defendant Green an e-mail with an attached spreadsheet of "Round 2" increase items. She indicated that she was "seeking intel" for a group of drugs in the attached spreadsheet with a highlighted yellow "x" and included in a column titled "Follow Mylan/Other:"

| Product Family | Initial Comments | PM Related | Follow Mylan/Other |
|---|---|---|---|
| Amiloride | Mylan increase; Teva only has HCTZ | | x |
| Diclofenac Tab | Mylan increase; On historical PI list | x | x |
| Doxazosin Mesylate Tabs | Mylan increase; On historical PI list | | x |
| Enalapril Tab | Mylan increase; On historical PI list--COMPLETED | | x |
| Ketoprofen | Follow Mylan; Deletion candidate; PM related | x | x |
| Ketorolac | Follow Mylan; Deletion candidate; PM related | x | x |
| Metoprolol | Mylan increase (Teva does not have 25mg but small sku) | | x |
| Nystatin | Heritage involved  follow Mutual  deletion candidate  PM related | x | x |
| Pravastatin | Carried over from round 1 | | x |
| Sotalol | Mylan increase; On historical PI list | | x |
| Tolmetin Tab | Mylan increase; Teva has 94 share; On historical PI list | | x |
| Verapamil  (Isoptin SR) | Mylan increase (lost Kroger and OneStop--to who?) | | x |

231

983.    The next day-July 23, 2013 - at 4:30 pm, Green and Nesta spoke for more than six minutes. Immediately after hanging up the phone, Green called Patel to convey the "intel" he had obtained from Mylan. The call lasted more than three minutes.

984.    On July 26, 2013, Teva received a bid request from AmerisourceBergen for multiple products, including Doxazosin Mesylate. For many products, AmerisourceBergen described the reason for the bid as a "change in market dynamics." Patel interpreted this to refer to products, which were "[a]warded to Teva, but put out to bid due to our 7 /3 increase" or "[a]warded to Mylan and put out to bid due to their 7/1 increase." She proposed the following response, designed to support the Fair Share Agreement:

> We may plan to follow and will not bid.
> We may not follow and may bid at a higher price than normal (bid new business at higher prices)
> We may plan to take no pricing action and will bid as we normally would.

985.    Consistently, when Teva received requests from OptumRx and Rite Aid to bid on Doxazosin Mesylate and other drugs, Teva offered a bid only for the drug that was not subject to price coordination: "Etodolac and Doxazosin are strong increase candidates. We are unable to bid at this time."

986.    Likewise, on July 31, 2013, in response to a request from Walgreens, Teva's Green analyzed market share before determining Teva's response.

987.    Defendants and Co-Conspirator Apotex coordinated the amount and timing of their price increases. For example, Apotex increased its price on July 23, 2013 after a conversation between B.H. of Apotex and Patel of Teva. And similarly, approximately a week before Teva matched Apotex's and Mylan's prices after B.H. and Patel spoke again for almost fifteen minutes.

988.    The Defendants continued to police the Fair Share Agreement as it applied to Doxazosin Mesylate. For example, Par matched the elevated pricing when it entered the

market in late 2013. Additionally, when Greenstone entered the market, a year after the dramatic increase in the price of Doxazosin Mesylate Tablets, Patel cautioned against bidding on a supply agreement willing to cede share to keep prices high.

### 55. Doxycycline

989. The Doxycycline market is mature, as generic Doxycycline – which includes generic versions of branded Doxycycline such as Vibramycin, Vibra-Tabs, and Monodox – has been available in the United States since the mid-1980s in tablet and capsule form. Doxycycline has been designated by the WHO as an essential medicine. Doxy DR is the generic version of the branded acne medication, Doryx, for which Warner Chilcott received an NDA in May 2005. Although Doxy Hyclate and Doxy Mono are not bioequivalent drugs, doctors will often simply write a prescription for Doxycycline, which allows pharmacists to supply consumers with either Doxy Hyclate or Doxy Mono.

990. Although there were, at one point, approximately 20 manufacturers of Doxycycline, by early 2012, the primary manufacturers were Actavis, Par, Sun (including its subsidiaries Mutual and Caraco), and West-Ward (for Doxy Hyclate) and Heritage, Lannett, Mylan, and Par (for Doxy Mono). In 2012, Mylan received authorization to market both Doxy Hyclate and Doxy DR. Because Mylan was the first generic manufacturer to receive an ANDA for Doxy DR, it received 180 days of exclusivity as the sole authorized generic manufacturer, which expired in early 2013. Mylan remained the only generic manufacturer of Doxy DR until Heritage and Mayne entered the market in 2013. Historically, Doxy Mono cost more than Doxy Hyclate, and for that reason, Doxy Hyclate was the most commonly used version of Doxycycline.

991. Defendants Actavis, Heritage, Lannett, Mayne, Mylan, Par, Sun (including Mutual and Caraco), and West-Ward each sold at least one variation of Doxycycline to A&P

and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

### a) *The Doxy Hyclate Collusive Price Increase*

992. Although prices of Doxycycline had remained stable for several years, beginning in approximately November 2012, Defendants implemented an abrupt and substantial price increase across all doses of Doxy Hyclate. By May 2013, Defendants' prices for Doxy Hyclate increased on certain strengths by as much as 8,000%. For example, in mid-January 2013, West- Ward and Sun raised prices for a bottle of 500 tablets of 100 mg strength Doxy Hyclate pills from an average of less than $25 per bottle to approximately $2,000 per bottle.

993. Upon information and belief, the agreement to increase prices on Doxy Hyclate was discussed at the GPhA meetings in October 2012 in Bethesda and February 2013 in Orlando.

994. The October 2012 meeting was attended by Actavis, Teva, Sun, and Mylan, in addition to the other conspiring Defendants identified in Exhibit 1. The February 2013 meeting was attended by Actavis, Mylan, and Teva, in addition to the other conspiring Defendants identified in Exhibit 1.

995. In addition, Defendants raised Doxycycline WACs on the 100 mg capsules to identical prices over a two-week period reflecting increases of more than 2,500%:

| Product 100mg cap | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 50 ct | West-Ward | 00143314250 | $0.10 | $4.43 | 21-Jan-13 | 4326% |
| 500 ct | West-Ward | 00143314205 | $0.10 | $4.43 | 21-Jan-13 | 4370% |
| 50 ct | Actavis | 00591544050 | $0.10 | $2.74 | 1-Feb-13 | 2515% |
| 500 ct | Actavis | 00591544005 | $0.10 | $2.74 | 1-Feb-13 | 2663% |

| 50 ct | Sun | 53489011902 | $0.10 | $4.92 | 5-Feb-13 | 4847% |
| 500 ct | Sun | 53489011905 | $0.06 | $4.92 | 5-Feb-13 | 7844% |

996. In addition, Defendants increased WACs on the 100 mg tablets within a few days of each other, reflecting increases of more than 2,500%:

| Product 100 mg tab | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 50 ct | Actavis | 00591555350 | $0.10 | $2.74 | 1-Feb-13 | 2515% |
| 500 ct | Actavis | 00591555305 | $0.10 | $2.74 | 1-Feb-13 | 2663% |
| 50 ct | Sun | 53489012002 | $0.09 | $4.92 | 5-Feb-13 | 5631% |
| 500 ct | Sun | 53489012005 | $0.08 | $4.92 | 5-Feb-13 | 6268% |

997. In May 2013, after the price increases had been implemented, Teva discontinued production of Doxy Hyclate - a product that it had manufactured for three decades. This act was against Teva' s individual self-interest (given that pricing for Doxy Hyclate had been raised by orders of magnitude above Defendants' marginal costs) and in furtherance of Defendants' conspiracy.

998. By April 2014, DAVA launched Doxy Hyclate pursuant to an exclusive supply and distribution agreement with Chartwell Therapeutics Licensing, LLC and Chartwell Pharmaceuticals, LLC ("Chartwell"). Around this time, Endo was in discussions with DAVA to acquire it, which it did in August 2014.

999. Following DAVA's acquisition by Endo, Chartwell and Endo sued each other in New York state court for alleged failures to comply with the terms of the supply and distribution agreement for Doxycycline.40 Chartwell alleged that DAVA, DAVA's former President Aram Moezinia, and Endo (through its generics subsidiaries) were refusing to take

---

[40] *See Dava Pharm., LLC v. Chartwell Therapeutics Licensing, LLC,* Index No. 502775/15 (N.Y. Supreme Court, County of Kings).

delivery of Doxycycline shipments from Chartwell despite the fact that there was demand for Doxycycline in the market. Because Endo (through its generics subsidiaries including DAVA) refused to accept the available Doxycycline supply, Chartwell attempted to rescind its agreement with DAVA in order to find other generic drug marketers, which Chartwell claims it was able to accomplish.

1000. Chartwell recognized that its supply of Doxycycline provided an opportunity to "reduc[e] prices for consumers, all while earning significant profits." But Endo (and, subsequently, Par) withheld Doxycycline supply from the U.S. market and priced its Doxycycline at the supracompetitive price of its co-conspirators. Chartwell suggested a reason for Endo's economically irrational decision to withhold additional Doxycycline supply when there was ample demand in the market. It accused Endo and its generic subsidiaries of engaging in an illegal price- fixing and market allocation scheme: "Having bought DAVA, Endo implemented its withhold-and-price-gouge scheme, did virtually nothing to sell the Chartwell Entities' Doxycycline, and, in collusion with its alleged 'competitors,' set Doxycycline's price at the exact same level its competitors were charging for the drug." (Emphasis in original). Chartwell further alleged that "DAVA and Moezinia dedicated efforts to withhold [Doxycycline] from the marketplace, to keep the overall price of Doxy high." (Emphasis in original). For example, Chartwell cites to an e-mail dated on or about July 11, 2014 where Moezinia e-mailed Chartwell and stated that DAVA's plan was to sell Doxycycline "slowly not to disturb pricing." Upon information and belief, all actions taken by DAVA as described in Chartwell's complaint were done at the direction of Endo and targeted at the U.S. market.

1001. Chartwell sought discovery of the materials that Par and Endo have produced to the DOJ and the States. Notably, the regulators' inquiries to Endo have focused on at least

three drugs that Endo acquired rights to via DAVA: Doxy Hyclate, doxazosin mesylate, and methotrexate sodium. Chartwell and Endo settled their claims in November 2016.

### b)    *The Doxy Mono Collusive Price Increase*

1002.    In February 2013, because the abrupt and substantial price increase on Doxy Hyclate led it to cost more than Doxy Mono, large purchasers of Doxycycline began to increase their purchases of Doxy Mono, so that they could supply their customers with the cheaper drug. In February and March of 2013, Heritage and Lannett recognized this opportunity to implement a substantial collusive price increase on Doxy Mono as well.

1003.    In February 2013, Heritage believed that demand for some Doxycycline products was increasing, and wanted to use this as a pretext to raise the prices of Doxy Mono. Accordingly, Heritage began reaching out to Lannett, Mylan, and Par to institute a price increase for Doxy Mono. These pricing discussions occurred at the same time as Heritage and Dr. Reddy's were discussing pricing and market share for Zoledronic Acid and Meprobamate, as discussed below.

1004.    Starting in March 2013, Heritage began communicating with Lannett about pricing for Doxy Mono.

1005.    On March 7, 2013, a representative of Heritage spoke with a senior sales executive from Lannett by telephone for approximately 14 minutes, and executives from both companies followed up on March 13, 2013, through e-mail and a five-minute phone call.

1006.    Throughout the next several months, Heritage and Lannett representatives communicated about Doxy Mono by phone, text message and in person, including an eight minute phone call on April 25, 2013, and at a conference on May 14, 2013. At the conference, they discussed a possible increase on Doxy Mono.

1007.    Upon information and belief, these communications among others resulted in

237

an agreement between Heritage and Lannett to increase prices on Doxy Mono by approximately 400%.

1008. However, before they could implement the price increase, Lannett and Heritage had to confirm that Mylan and Par were on board as well. During a series of industry events in May and June, executives from all four companies met in person to discuss the Doxy Mono price increase. Lannett agreed to lead the price increase on June 12, 2013, and communicated this intention to Mylan, Par, and Heritage. For example, a Lannett executive, met with a Heritage executive, Sather, to discuss the price increase during a trade association event on June 4. Additional relevant call and text message communications about price increases occurred by telephone on June 7, and on June 11, a Heritage executive, and a Mylan executive, spoke by phone, while Lannett communicated through numerous text messages. The following day, when Lannett announced the price increase, Lannett's representative texted at least nine times.

1009. Upon information and belief, these communications by Mylan, Par, Lannett, and Heritage resulted in an agreement that each would follow Lannett's price increase of approximately 400% on Doxy Mono, which each Defendant did. For example, Par provided instructions to its sales employees to begin implementing the price increase of August 13, 2013. And upon information and belief, Mylan began announcing price increases on Doxy Mono to customers during Summer 2013 as well.

1010. Although Heritage had supply chain issues for Doxy Mono for a brief period in 2013 (and had to delay the implementation of the price increase), these issues arose after Defendants had reached the agreement to increase prices. By October 2013, Heritage began announcing the price increase on Doxy Mono and fully implemented the price increase by March 2014.

1011. Additionally, during the period that it delayed announcing the price increase, Heritage continued to speak with Lannett, Mylan, and Par to ensure that it remained committed to the price increase, notwithstanding its delay in implementation. For example, Par, Mylan, Lannett, and Heritage continued to communicate about the pricing of Doxy Mono throughout the Summer of 2013. Additionally, consistent with the overarching agreement that governed each Defendant's market share of each drug in the industry, Mylan, Heritage, and Par agreed to refrain from competing for any of Lannett's Doxy Mono business after Lannett led the price increase.

### c) *Collusion on Doxy DR*

1012. With respect to Doxy DR, as the sole generic manufacturer of the drug for a period of time in 2012, Mylan was able to charge a supracompetitive price during the period of generic exclusivity. (As explained in ¶ 121, the FDA estimates that, in a market with one generic manufacturer, the generic drug will typically sell at 94% of the branded drug.)

1013. In April 2013, Malek and then-Heritage CEO Jeffrey Glazer traveled to India and met with two executives of Heritage's parent company, Defendant Emcure, to discuss, among other things, their plans to enter the Doxy DR market and to coordinate how Heritage and Mylan could minimize competition between them. It was decided that Satish Mehta, the CEO of Emcure, would reach out first to a high-level counterpart at Mylan, Rajiv Malik, in order to facilitate subsequent communications between Glazer and Malek and their Mylan counterparts.

1014. Beginning in May 2013, Heritage reached out to Mylan for the purpose of colluding to allocate the Doxy DR market without disturbing the supracompetitive price. On May 2, 2013, Malek of Heritage contacted a senior executive at Mylan through the social networking website LinkedIn, and on May 7 and 8, 2013, Glazer of Heritage spoke with Rajiv

Malik senior executive by e-mail and then by telephone, first writing: "Rajiv: Would like to schedule a time for a call to catch up and discuss some recent Heritage news. Please let me know when you are available and we'll pencil it in." Malik responded with a phone number where he could be reached in England, and the two spoke the next day.

1015.    Upon information and belief, these discussions between Glazer and Malik – which were facilitated by Satish Mehta of Emcure – resulted in an agreement that Mylan would concede significant business in the Doxy DR market that accounted for approximately 30% of that market. Malik noted that Mylan was agreeing to concede this business to Heritage because Heritage had previously agreed to concede market share to Mylan for another generic drug.

1016.    In July 2013, Heritage began to sell Doxy DR to A&P and others in the United States subject to the terms of its unlawful agreement with Mylan. Again, Satish Mehta of Emcure spoke with Rajiv Malik of Mylan on July 18, 2013, to coordinate Heritage's entry into the market. Following Mehta's entreaty, Glazer spoke with Malik against to finalize the details. Following these calls between Mehta, Glazer, and Malik, Mylan arranged to put in a bid at Walgreens that it knew would be above Heritage's bid, so that Heritage could take this business and get its "fair share" of the market.

1017.    In January 2014, Mayne informed Heritage and Mylan that it planned to enter the Doxy DR market as well. For example, a senior executive with Mayne spoke with a senior executive with Heritage on January 7, 2014, about making room for Mayne in the market allocation agreement between Heritage and Mylan.

1018.    Senior executives from Heritage, Mylan, and Mayne communicated frequently via e-mail, text, and phone about their collusive market allocation agreement throughout 2014. Executives from Heritage and Mayne also met in person at the American Society of

240

Health System Pharmacist's conference in Anaheim, California in December 2014.

1019.    Mayne, Emcure, Heritage, and Mylan continued to adhere to their collusive agreements. For example, in May 2014, Heritage walked away from a large account so that Mayne could win the bid. Similarly, in January 2015, Heritage submitted a bid to Econdisc, a group purchasing organization, that it knew would be above Mayne's bid, so that Mayne could win the Econdisc business.

1020.    As a result of their collusion, the price in the United States for Doxy DR has remained at elevated and supracompetitive levels since 2013, despite the entry of two additional generic manufacturers. Indeed, whereas the FDA study mentioned in ¶ 121 would predict a market price of 44% of the branded price, Mylan, Emcure, Heritage, and Mayne, charged – and continue to charge – A&P the same or similar price that Mylan charged during its period of generic exclusivity. Accordingly, A&P paid substantial overcharges to Defendants on Doxy DR.

1021.    The market allocation agreement on Doxy DR and the price-fixing agreements on Doxy Hyclate and Doxy Mono still remain in force and/or effect.

### 56. Drospirenone and Ethinyl Estradiol (Ocella)

1022.    Drospirenone and Ethinyl Estradiol, commonly known by the brand name Ocella®, is a pair of drugs used in combination as an oral contraceptive. This drug is also marketed under the brand names Yaz®, Yasmin® and Gianvi®.

1023.    Barr Pharmaceuticals received approval to market generic Ocella in 2008, and Teva continued to market the drug after the acquisition of Barr in 2011 under the name Gianvi®.

1024.    In late 2012, Lupin received approval to market a generic Ocella product.

1025.    By April 2013, Lupin was making plans for a summer 2013 entry into the

241

market and contacted Teva to initiate negotiations on how the competitors would allocate fair share between themselves. On April 24, 2013, Defendant Berthold of Lupin called Defendant Green at Teva. The two spoke for over three (3) minutes. Berthold called Green two more times the following day.

1026.    The negotiations intensified the following week among Teva, Lupin, and a third competitor – Actavis. In preparation, on April 29, 2013, K.G. of Teva asked a colleague for current market share figures along with a list of Teva's generic Ocella customers. The colleague responded with a customer list, estimating Teva's current share of the market at 70-75%.

1027.    The next day, April 30, A.B., a senior sales and marketing executive at Actavis, and Defendant Rekenthaler of Teva spoke twice by phone. That same day, Defendant Patel of Teva also called A.B. On May 1, Patel sent A.B. four (4) text messages.

1028.    The competitors' communications continued into early May. On May 6, Defendants Patel and Berthold spoke twice by phone; the second call lasting twenty-two (22) minutes. Defendants Green and Berthold also spoke that same day. On May 7, Defendants Patel and Berthold had yet another call, this one lasting over ten (10) minutes. Patel also placed a call to Defendant Rogerson at Actavis, which lasted thirty-nine seconds.

1029.    Faced with the news it had received from a major customer on May 8 – that Actavis had bid for that customer's business for generic Ocella – Teva doubled down on its efforts to reach a deal with its competitors that would give each its fair share. Patel called Defendant Rogerson on May 8, and they spoke for nineteen (19) minutes. On May 9, Green spoke with Berthold twice, for one (1) and twelve (12) minutes, respectively.

1030.    The following day, Teva's L.R. complied with Defendant Rekenthaler's request for an analysis of the business Teva would lose by conceding its two major customers

242

for this drug to Actavis and/or Lupin. Armed with that analysis, Patel spoke to Berthold three times that afternoon – with one call lasting over seventeen (17) minutes. Patel also called Defendant Rogerson at Actavis and the two spoke for more than five (5) minutes.

1031.  On May 14, 2013, K.G. of Teva recommended to Rekenthaler that Teva concede the business to Actavis. Rekenthaler replied simply: "Agreed."

1032.  On July 10, 2013, Defendant Green spoke to Defendant Berthold twice (for more than eight (8) minutes and more than two (2) minutes). After the first of those calls, Green requested specific information from a colleague to help him continue to negotiate with Lupin:

> **From:** Kevin Green
> **Sent:** Wednesday, July 10, 2013 9:46 AM
> **To:** ██████
> **Cc:** ██████  ; Nisha Patel02
> **Subject:** Ocella
>
> Tom,
>
> Can you run me the normal profitability analysis on all customers with pricing and market share. Lupin is entering the market.

Later that day, Green called and spoke to Patel for more than seven (7) minutes, conveying what he had learned from Berthold. During that call, the two decided that Patel would call Berthold back and confirm the agreement between Teva and Lupin. Patel called Berthold shortly after and the two spoke for more than four (4) minutes. They spoke again first thing the next morning, for nearly one (1) minute.

1033.  The next day, Patel e-mailed Green, saying: "BTW, Ocella. Check!" Green, confused by the e-mail, responded: "Huh... you are calling....correct?" Patel confirmed that

243

she had indeed called her counterpart at Lupin: "Yes. I was saying it's all done."

1034.   Discussions between Teva and Lupin continued on July 17, 2013 with a call between Defendants Green and Berthold that lasted twenty (20) minutes.

1035.   On July 29, 2013, Defendant Green announced to his colleagues: "Lupin has entered and we need to evaluate."

1036.   The lines of communication between competitors Teva and Lupin remained open and active over the next few months as they worked on the details of which company would take which generic Ocella accounts. On September 5, 2013, for example, Defendant Rekenthaler conveyed to a colleague the importance of retaining a particular customer's account, along with his understanding of Green's discussions with Berthold about Lupin's desired market share. Green spoke to Berthold by phone twice the following day to confirm the understanding between the two companies.

1037.   On September 9, 2013, K.G. of Teva sent an internal e-mail to his colleagues conveying his thoughts about Lupin's bid for a portion of another customer's generic Ocella business. He informed them that because Teva had secured two other significant customers, "we will likely need to give up some of our formulary position to this new market entrant."

1038.   In mid-October 2013, as Teva and Lupin finalized the allocation of accounts between them, K.G. sent a word of caution to a co-worker, reminding her of the parameters of the furtive arrangement. He told her to be careful before conceding large customers on a "bucket basis" rather than drug-by-drug in order to "make sure we are not giving up volume on products where we do not have our fair share."

### 57. Econazole

1039.   The market for Econazole is mature, as Econazole has been available in the United States for almost 20 years. Defendants Taro and Fougera sell generic Econazole

244

pursuant to ANDAs approved by the FDA in November 2002. Defendant Perrigo sells Econazole pursuant to an ANDA approved in 2004. Teligent sells Econazole pursuant to an ANDA it acquired in February 2013.

1040. During the relevant time period, Defendants Fougera, Perrigo, Taro, and Teligent sold Econazole to purchasers throughout the United States.

1041. At all times relevant to this lawsuit there has been more than one manufacturer of Econazole on the market. Defendants Fougera, Perrigo, Taro, and Teligent sold Econazole to A&P and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

1042. Between 2009 and September 2013, Defendants' prices for Econazole remained relatively stable. However, beginning in September 2013 and continuing thereafter, Defendants began implementing abrupt and substantial price increases on Econazole.

1043. Between September 2013 and the Summer of 2014, Econazole, which had cost roughly 12 cents/unit shot up to more than $4/unit.

1044. This skyrocketing price cannot be explained by supply shortages or other market events. The only material change in the months preceding the price increases was Teligent's entry into the market.

1045. On February 1, 2013, Teligent acquired an ANDA for Econazole from Prasco LLC. During that month, the CEO of Teligent attended trade conferences with Perrigo and Taro, where the three Defendants had an opportunity to discuss Teligent's entry into the market.

1046. During this same time period, Teligent also became interested in entering the market for other generic pharmaceuticals. Teligent launched its first topical generic drug in late 2012, followed by its acquisition of the Econazole ANDA in February 2013. By

245

September 2013, Teligent had 12 ANDAs pending for FDA approval. By June 20, 2014, that number had jumped to 17, with four additional ANDAs submitted under joint-development plans with other manufacturers and another five ANDAs planned for submission by the end of 2014.

1047. When Teligent acquired the right to sell Econazole from Prasco LLC, it was the beginning of a publicly announced plan that would place Teligent in direct competition with Taro and Perrigo across numerous drugs. Teligent now makes 20 topical drugs. Seventeen of these drugs are also made by Taro; fifteen are made by Perrigo.

1048. Teligent's entry into the Econazole market demonstrates a "fair share" agreement. Where a drug manufacturer, like Teligent, plans to enter a market with established manufacturers, and where the established manufacturers are competitors across multiple drugs, such a situation sets the groundwork for a "fair share" agreement. Rather than allow the new entrant to drive the price of drugs lower, the incumbent manufacturers and the new entrant can "play nice in the sandbox" and keep prices high. The conduct of Teligent, Perrigo, Fougera and Taro after Teligent entered the Econazole market is the result of a market allocation or "fair share" agreement among these Defendants.

1049. Teligent launched Econazole under its own label in September 2013. In a competitive generic drug market, new market entrants typically price their product below the prevailing market price in order to gain market share. Teligent, however, announced a list price (WAC) increase in July 2013, even before its first sale of Econazole under its own label. Rather than competing for market share by lowering prices, Teligent made the economically irrational decision to raise prices. Upon information and belief, Teligent's conduct reflected an agreement with Perrigo, Fougera, and Taro that Teligent would enter with higher – rather than lower – prices in exchange for the incumbents' promise to cede market share to Teligent.

1050. On October 28-30, 2013, right before Teligent's higher prices took effect in the marketplace, representatives from Perrigo, Taro, Fougera and Teligent, met at a GPhA conference where they had an opportunity to discuss Econazole market shares and pricing. See Ex. 1.

1051. By January 2014, Teligent's effective pricing for Econazole was more than double that of Perrigo and Taro. Pursuant to their agreement, the incumbents also matched Teligent's high prices.

1052. In February 2014, Perrigo began to increase its effective prices, and by March, Perrigo's effective prices had risen to the level of Teligent's prices. Taro's prices remained relatively stable, but that changed after representatives from Perrigo, Teligent, and Taro, met at the June 3-4, 2014 GPhA meeting in Bethesda, Maryland.

1053. Consistent with their price-fixing agreement, in mid to late 2014, Teligent, Perrigo, Taro, and Fougera each implemented abrupt and substantial price increases on the Econazole products they sold to A&P and others in the United States in lockstep.

1054. With respect to WAC pricing, Taro, Teligent, and Perrigo raised their WACs to identical prices, reflecting increases of more than 600%:

| Product CRM | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 15 gm | Perrigo | 45802046635 | $0.79 | $5.80 | 24-Jul-14 | 637% |
| 30gm | Perrigo | 45802046611 | $0.69 | $5.80 | 24-Jul-14 | 736% |
| 85 gm | Perrigo | 45802046653 | $0.50 | $4.09 | 24-Jul-14 | 719% |
| 15 gm | Teligent | 52565002215 | $0.82 | $5.80 | 1-Sep-14 | 610% |
| 30gm | Teligent | 52565002230 | $0.72 | $5.80 | 1-Sep-14 | 704% |
| 85 gm | Teligent | 52565002285 | $0.52 | $4.09 | 1-Sep-14 | 688% |
| 15 gm | Taro | 51672130301 | $0.66 | $5.80 | 18-Nov-14 | 779% |
| 30gm | Taro | 51672130302 | $0.59 | $5.80 | 18-Nov-14 | 890% |
| 85 gm | Taro | 51672130308 | $0.42 | $4.09 | 18-Nov-14 | 871% |

1055.  Upon information and belief, by November 2014, Fougera increased its WAC prices to the same levels as Perrigo, Teligent, and Taro.

1056.  In the Fall of 2014, Senator Bernie Sanders and Representative Elijah Cummings requested information from manufacturers of ten drugs, including Econazole, which had experienced extraordinary prices increases. In response to a Congressional request from Senators Susan Collins, Claire McCaskill, Bill Nelson, and Mark Warner, in August 2016, the GAO issued a report in which Econazole was identified as experiencing an "extraordinary price increase."

1057.  Defendants continue to charge an average of more than $2.00 per dose for Econazole, which is roughly four times the prevailing market price before the conspiratorial price increases in late 2014.

1058.  Upon information and belief, the price increases on Econazole were the result of collusive agreements between and among Defendants to increase pricing and restrain competition for the sale of Econazole in the United States. These collusive agreements were furthered at least in part, through in-person discussions conducted at meetings and industry events hosted by GPhA and HDMA as well as other meetings and communications such as those identified below.

1059.  For example, on October 1-3, 2012, GPhA held a meeting in Bethesda, Maryland that was attended by representatives of Defendants Perrigo, Fougera, and Taro. See Ex. 1.

1060.  On February 20-22, 2013, GPhA held its 2013 Annual Meeting in Orlando, Florida that was attended by representatives from Perrigo, Taro, and Teligent. See Ex. 1.

1061.  On February 24-27, 2013, representatives from Perrigo, Fougera, Taro, and Teligent attended ECRM's Annual Retail Pharmacy and Efficient Program Planning Session.

248

See Ex. 1.

1062.    On April 20-23, 2013, NACDS held its 2013 Annual Meeting at The Breakers in Palm Beach, Florida. NACDS's 2013 Annual Meeting was attended by representatives of Perrigo and Taro. See Ex. 1.

1063.    On June 4-5, 2013, GPhA held a meeting in Bethesda, Maryland that was attended by representatives of Perrigo, Fougera, and Taro. See Ex. 1.

1064.    On August 10-13, 2013, NACDS held its 2013 Total Store Expo at the Sands Expo Convention Center in Las Vegas, Nevada. NACDS's August 2013 Total Store Expo was attended by representatives from Defendants Perrigo, Fougera, and Taro. See Ex. 1.

1065.    On October 28-30, 2013, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from Perrigo, Fougera, Taro, and Teligent. See Ex. 1.

1066.    On February 19-21, 2014, GPhA held its Annual Meeting at the JW Marriott in Orlando, Florida that was attended by representatives from Defendants Perrigo, Taro, and Teligent. See Ex. 1.

1067.    On February 23-26, 2014, representatives from Perrigo, Taro, and Teligent attended ECRM's Annual Retail Pharmacy and Efficient Program Planning Session. See Ex. 1.

1068.    On April 26-29, 2014, NACDS held its 2014 annual meeting in Scottsdale, Arizona. NACDS's 2014 annual meeting was attended by representatives from Defendants Perrigo and Taro. See Ex. 1.

1069.    On June 3-4, 2014, GPhA held a meeting at the Bethesda North Marriott Hotel in Bethesda, Maryland attended by representatives from Perrigo, Fougera, and Taro. See Ex. 1.

1070.    On August 23-26, 2014, NACDS held its 2014 Total Store Expo at the Boston

249

Convention Center in Boston, Massachusetts. NACDS's August 2014 Total Store Expo was attended by representatives from Defendants Perrigo and Taro. See Ex. 1.

1071. On October 27-29, 2014, GPhA held a meeting in Bethesda, Maryland that was attended by representatives of Perrigo, Fougera, Taro, and Teligent. See Ex. 1.

1072. The GPhA Annual Meeting in Miami Beach, Florida on February 9-11, 2015 was attended by representatives of Perrigo, Taro, and Teligent. See Ex. 1.

1073. On February 22-25, 2015, representatives from Perrigo, Taro, and Teligent attended ECRM's Annual Retail Pharmacy and Efficient Program Planning Session. See Ex. 1.

1074. On April 25-28, 2015, NACDS held its 2015 annual meeting at The Breakers, Palm Beach, Florida. NACDS's 2015 annual meeting was attended by representatives from Defendants Perrigo and Taro, who were key executives for generic drug sales and pricing. See Ex. 1.

1075. On June 9-10, 2015, GPHA held a meeting in Bethesda, Maryland that was attended by representatives of Perrigo and Taro. See Ex. 1.

1076. On August 22-25, 2015, NACDS held its 2015 Total Store Expo at the Denver Convention Center in Denver, Colorado. NACDS's August 2015 Total Store Expo was attended by representatives from Perrigo and Taro. See Ex. 1.

1077. On November 2-4, 2015, GPHA held a meeting in Bethesda, Maryland that was attended by representatives of Perrigo and Taro. See Ex. 1.

1078. Defendants continued to attend trade association meetings and conference throughout 2016, including: (i) NACDS's 2016 annual meeting at The Breakers, Palm Beach, Florida on April 16-19, 2016; and (ii) NACDS's 2016 Total Store Expo at the San Diego Convention Center in San Diego, California on August 19-22, 2016. See Ex. 1.

1079.    A number of individuals with leadership roles at Teligent have ties to other Defendants that are implicated in the conspiracy.

1080.    For example, Jason Grenfell-Gardner ("Grenfell-Gardner") joined Teligent as CEO in July 2012. Prior to that time, he had served in a number of roles at West-Ward.

1081.    Damian Finio, who worked with Grenfell-Gardner at West-Ward, served briefly on Teligent's Board in 2014 before leaving that job to become the CFO of Heritage. In 2018, he returned to Teligent and is now Teligent's CEO.

1082.    Carole Ben-Maimon joined the Teligent Board in 2016. She has held leadership positions at Impax, Par, and Teva.

1083.    Narendra Borkar served on the Board of Teligent and is the former CEO of Aurobindo and Caraco (now part of Sun).

1084.    Bhaskar Chaudhuri served on the Teligent Board and previously worked for Valeant and Mylan.

### 58. Enalapril Maleate

1085.    Enalapril Maleate ("Enalapril"), which is also discussed in additional detail in Sections XIII. C. and F. below, is also known by the brand name Vasotec®, and is a drug used in the treatment of high blood pressure and congestive heart failure.

1086.    In 2009, Taro discontinued its sales of Enalapril under its own label and effectively exited the market. It continued supplying Enalapril thereafter only to certain government purchasers under the "TPLI" label.

1087.    By mid-2013, the Enalapril market was shared by three players: Mylan with 60.3%, Wockhardt with 27.5%, and Teva with 10.7%. Those three companies coordinated a significant anticompetitive price increase for Enalapril in July 2013.

1088.    Shortly before the Teva and Wockhardt price increases, on or about July 12,

2013, Defendant Aprahamian, the Vice President of Sales and Marketing at Taro, was considering whether to renew or adjust Taro's price on Enalapril for its national contract (for government purchasers), which was slated to expire in September 2013.

1089. In the midst of that coordinated price increase, however, Aprahamian was communicating with both Defendant Patel of Teva as well as M.C., a senior sales and marketing executive at Wockhardt, about Enalapril. As a result of those conversations, Taro's plans changed.

1090. On July 17, 2013 – the same day that Teva was taking steps to implement the price increase – Defendant Patel called Defendant Aprahamian and left a message. He returned the call and the two spoke for almost fourteen (14) minutes. Then, on July 19, 2013 – the day that both Teva and Wockhardt's price increases for Enalapril became effective – Defendant Aprahamian called M.C. at Wockhardt on his office phone and left a message. He then immediately called M.C.'s cell phone, which M.C. answered. They spoke for nearly eleven (11) minutes.

1056. On the morning of July 19, Aprahamian sent an internal e-mail to Taro colleagues signaling a change in plans:

From: Ara Aprahamian/US/TARO
To: ███████████████
Cc: ████████
Date: 07/19/2013 07:19 AM
Subject: Taro Enalapril

Currently if I'm not mistaken we only supply the government with Enalapril in TPLI label (looks like we exited our label in 2009). There has been some significant changes in the market landscape with this product and I'd like to get product back in Taro label (and fast).

Aprahamian followed up with another e-mail shortly after, adding that Taro "[w]ould only look for 10-15% MS [market share] but with recent market changes and units on this product, it would be incremental."

1091. In the coming months, both Teva and Taro engaged in intensive analyses of how the market should look after Taro's re-launch so that each competitor would have its desired, or "fair," share of the market.

1092. On July 31, 2013, for example, Defendant Patel provided her analysis of the drugs Teva should bid on in response to a request for bids from a major customer, which was largely based on whether Teva had reached its "fair share" targets. Enalapril was one of the drugs where, according to Defendant Patel, Teva was "seeking share," so she authorized the submission of a bid. Prior to sending that e-mail, Patel had spoken to Defendant Aprahamian on July 30 (11 minute call) and July 31, 2013 (4 minute call). Based on the agreement between the two companies, and in accordance with the industry's "fair share" code of conduct, Taro understood that it would not take significant share from Teva upon its launch because Teva had a relatively low market share compared to others in the market.

1093. Meanwhile, as he worked on pricing for Taro's upcoming re-launch, Aprahamian emphasized to his colleagues that Taro's final prices would be set largely based on "continued market intelligence to secure share "

1094. In early December 2013, Taro was fully ready to re-enter the Enalapril market. On December 3, 2013, Aprahamian consulted twice by phone with Mylan's senior account executive, M.A., during conversations of two (2) and eleven (11) minutes.

1095. On December 4, 2013, one customer that had recently switched from Wockhardt to Teva expressed an interest in moving its primary business to Taro for the 2.5mg, 5mg, 10mg, and 20mg strengths. At 4:30 p.m. that afternoon, Defendant Aprahamian

instructed a colleague to prepare a price proposal for that customer for all four products.

1096. Before sending the proposal to the customer, however, Defendant Aprahamian sought the input of his competitor, Teva. On December 5, 2013, he and Defendant Patel spoke by phone for nearly five (5) minutes.

1097. Taro's fact sheet for the Enalapril re-launch generated on the day of Aprahamian's call with Teva showed a "[t]arget market share goal" of 15%, with pricing identical to Teva's and nearly identical to Wockhardt's and Mylan's.

1098. Taro began submitting offers on Enalapril the following day, December 6, 2013. But even with the bidding process underway, Defendant Aprahamian made certain to communicate with Mylan's M.A. during a brief phone conversation that afternoon. This particular communication was important since Mylan was the market share leader and Taro was targeting more of Mylan's customers than those of other competitors.

1099. Over the next ten days, the discussions between Taro and Mylan continued over how to allocate the Enalapril market. Defendant Aprahamian and M.A. talked for ten (10) minutes on December 11, and for seven (7) minutes on December 12.

1100. Thereafter, and with the likely consent of Mylan, Defendant Aprahamian reported on an internal Sales and Marketing call on December 16, 2013, that Taro's prior target Enalapril market share goal of 15% had been raised to 20%.

1101. Taro continued to gain share from both Mylan and Wockhardt, and to coordinate with both. For example, in late December, Taro submitted a competitive offer to Morris & Dickson, a Wockhardt customer. This caused M.C. of Wockhardt to call Defendant Aprahamian on December 31, 2013, to discuss the situation. During the call, M.C. agreed that so long as Wockhardt was able to retain McKesson as a customer, it would concede Morris & Dickson to Taro. In an e-mail on January 2, 2014, S.K. of Wockhardt conveyed the details

254

to his colleagues:



1102.    By May 2014 the market was stable, and market share for Enalapril was reasonably distributed among the companies. As Teva was considering whether to bid on specific drugs for an RFP sent out by a large wholesaler customer, Defendant Patel provided the following caution with regard to Enalapril: "no bid due to potential market/customer disruption, aka strategic reasons." The same day she sent that e-mail – May 14, 2014 – Patel spoke to Defendant Aprahamian for more than four (4) minutes, and exchanged eight (8) text messages with him.

1103.    By June 2014, Taro had obtained 25% market share for Enalapril in a 4-player market. Mylan and Teva each had approximately 28% market share.

### 59. Entecavir

1104.    Entecavir, also known by the brand name Baraclude, is a medication used to treat chronic Hepatitis B.

1105.    As Teva was preparing to enter the market for Entecavir in August 2014, T.C., a senior sales and business relations executive at Teva, informed an executive at WBAD that Teva was planning on launching Entecavir "shortly" depending on when the FDA approved the drug.

1106.    T.C. further noted: "We may or may not be alone on the market at launch.

255

Sandoz has a settlement and we do not know their terms. Apotex has recently filed a PIV [Paragraph IV certification] but we invalidated the patent. We are hearing PAR has the [authorized generic] and is stating they will launch after we launch, but there is still a good chance we may be alone in the market for a short time."

1107.   On August 28, 2014, Defendant Rekenthaler informed Teva sales employees that Teva had received approval on Entecavir and would circulate offers later that day or the next day. Rekenthaler noted: "[w]e are looking for at least a 60 share. Known competition is Par with an [authorized generic]." Defendant Rekenthaler also noted that Teva would be pricing as if they were "exclusive" in the market, and expressed concern that customers might react negatively to the launch of this drug "because of our recent price increase [on other drugs]."

1108.   The same day, August 28, 2014, Rekenthaler had three phone calls with M.B., a senior national account executive at Par. The two spoke two (2) more times the next day, August 29, 2014.

1109.   On August 29, a Teva sales employee reported that a customer had informed her that Par was launching Entecavir at a lower price point than Teva. The employee inquired whether Teva might consider reducing its price as well. Defendant Rekenthaler, after speaking with M.B. at Par several times on August 28 and 29, replied that Teva would remain firm on the price and noted that he was "doubtful PAR will be much lower." Despite Teva's refusal to lower its price, that customer signed an agreement with Teva to purchase Entecavir.

1110.   Also on August 29, Rekenthaler e-mailed T.C. asking if she had received any feedback from CVS on Entecavir. T.C. replied that she had not, and followed up later saying that ABC had indicated that it would sign Teva's offer letter. Defendant Rekenthaler replied: "Great, that helps. We may end up conceding our friends up north [CVS] if they make too

256

much fuss." T.C. dismissed that concern: "I think they will work with us really…We need them they need us so we just have to make it work."

1111.   Teva and Par both launched their respective Entecavir products on September 4, 2014. Within days of its launch, Teva had captured 80% of the market for new generic prescriptions and 90.9% of the total generic market (new prescriptions and refills).

1112.   Within a few weeks, however, Teva's share of the market was much more in line with "fair share" principles – 52.6% for new generic prescriptions, and 47% of the total generic market (new prescriptions and refills).

1113.   On October 9, 2014, another customer, who had already received a discount on Entecavir, asked for an additional discount to "help close the gap with current market prices." Teva declined to do so, citing that the "pricing is competitive and in line with the market." Rekenthaler had spoken to M.B. at Par twice on October 2, 2014.

1114.   The two-player market for Entecavir remained stable over time. By January 2, 2015, Teva's share of the market for new generic prescriptions was 52.2%, and its share of the total generic market (new prescriptions and refills) was 46.7%.

### 60. Estradiol Tablets

1115.   Estradiol is a form of estrogen that used to treat symptoms of menopause. During the time period relevant to this Complaint, Actavis, Mylan, and Teva dominate the market for Estradiol tablets.

1116.   Estradiol was one of eight drugs that Teva targeted for a price increase effective July 31, 2012. Prior to implementing the price increase for these drugs, Green and Rekentheler spoke with their competitors for each targeted drug to ensure that the understanding to increase prices would hold, including Mylan, Actavis, Breckenridge, and Alvogen. For example, in July 2012, Green spoke by phone with Nesta of Mylan, CW-2 of Sandoz, and

William Hill, a senior sales and marketing executive at Alvogen. On July 31, Green and Nesta spoke five times, and immediately following some of these calls Green called Hill. Also, Rekentheler spoke with his counterparts at Actavis and Breckenridge. These communications solidified the agreement between the Defendants that each would adhere to the price increase for the drug that each manufactured.

1117.  Numerous calls took place between these competitors in July 2012. For example, around July 31, Rekentheler spoke with Actavis and Breckenridge.

1118.  These communications solidified the agreement between the Defendants that each would adhere to the price increases for the drugs that each manufactured.

### 61. Estradiol/Norethindrone Acetate Tablets (Mimvey)

1119.  Estradiol/Norethindrone Acetate Tablets ("Mimvey") contains estrogen and progestin and is used to reduce the symptoms of menopause. During the time period relevant to this Complaint, Breckenridge and Teva dominated the market for Estradiol/Norethindrone Acetate tablets.

1120.  Estradiol/Norethindrone Acetate was one of eight drugs that Teva targeted for a price increase effective July 31, 2012. Prior to implementing the price increase for these drugs, Green and Rekentheler spoke with their competitors for each targeted drug to ensure that the understanding to increase prices would hold, including Mylan, Actavis, Breckenridge, and Alvogen. For example, in July 2012, Green spoke by phone with Nesta of Mylan, CW-2 of Sandoz, and William Hill, a senior sales and marketing executive at Alvogen. On July 31, Green and Nesta spoke five times, and immediately following some of these calls Green called Hill. Also, Rekentheler spoke with his counterparts at Actavis and Breckenridge. These communications solidified the agreement between the Defendants that each would adhere to the price increase for the drug that each manufactured.

1121. On November 14, 2013, Breckenridge increased its pricing on both Mimvey and Cyproheptadine HCL Tablets. For Cyproheptadine, Breckenridge increased its WAC pricing by as high as 150%, and raised its customer contract pricing even higher – 400%. The increases to Mimvey were a more modest 20-27% for both the WAC and customer pricing.

1122. In the weeks leading up to those increases – when Patel was still out on maternity leave – Rekenthaler had several phone calls with R.N. at Breckenridge to coordinate the price increases. The two spoke twice on October 14, 2013 and had a twenty-six (26) minute call on October 24, 2013. After those calls, they did not speak again until mid-January 2014, when Teva began preparing to implement its increase.

1123. Over the next several months – during the period of time before Teva was able to follow the Breckenridge price increases – Teva followed the "fair share" understanding to the letter and refused to increase market share while it had a lower price than its competitors.

1124. On April 4, 2014, Teva followed the Breckenridge price increases with a substantial increase of Mimvey (contract increases of as much as 393%). In addition, Teva increased the WAC price on Mimvey (Estradiol/Norethindrone Acetate Tablets) by 26% to exactly match Breckenridge's WAC price.

### 62. Ethinyl Estradiol and Levonorgestrel

1125. Ethinyl Estradiol and Levonorgestrel, when used in combination, is an oral contraceptive used to prevent pregnancy. During the relevant time period, both Teva and Sandoz marketed Ethinyl Estradiol and Levonorgestrel under multiple names – including both Portia and Jolessa.

1126. In or around May 2012, Teva had much higher market share than Sandoz for both Portia and Jolessa. Teva's market share for Portia was 37% compared to Sandoz's 17%, while Teva's market share for Jolessa was 43% compared to Sandoz's 11%.

1127.    On May 11, 2012, Walmart contacted Teva with a right of first refusal and explained that another supplier had made an offer for the sale of four drugs, including Portia and Jolessa. T.C., a senior sales executive at Teva, responded, "We really need to know who is challenging. Sandoz??? Glenmark???" The customer responded that it was Sandoz. T.C. had initially been very reluctant to let Sandoz have the business, candidly remarking to the customer that, "[w]e are not going to let Walmart go to Sandoz [because] we have conceded a number of accounts to Sandoz that were not as strategic to Teva."

1128.    After sending out a competitive offer for the sale of three drugs, including Portia and Jolessa, to the customer on May 16, 2012 and an even more competitive offer on May 18 – Teva abruptly backtracked on May 23, 2012 and removed Portia and Jolessa from the offer. The night before this change in plans, on May 22, Defendant Green of Teva spoke on the phone with CW-2, then at Sandoz, for five (5) minutes, and agreed to withdraw the offer for Portia and Jolessa. The decision to concede the Walmart business to Sandoz led to a more equal share split between the companies for both Portia and Jolessa. Teva discussed the decision internally and explained that the reason for the "change in plans" was that Teva was "going to concede this business to Sandoz."

1129.    Sandoz continued to coordinate with Teva to achieve its "fair share" of the markets for both Portia and Jolessa. On July 2, 2013, another key customer contacted Teva stating it had received bids on Portia and Jolessa and in order for Teva to retain the business, Teva would need to submit its "best bids." On July 9, 2013, CW-1 of Sandoz called Defendant Patel and left a voicemail. Shortly thereafter, they connected for a sixteen (16) minute call. On July 10, Teva learned that the challenger was Sandoz. At 12:16pm, Defendant Rekenthaler forwarded an e-mail to Defendant Patel and posed the question, "Who's over at Sandoz now?" Patel did not respond by e-mail, but due to the close proximity of their offices she likely

260

related her conversation with CW-1 directly to Defendant Rekenthaler.

1130.    Defendant Rekenthaler then called CW-2 at Sandoz at 1:26 p.m. that same day and they spoke for two (2) minutes. CW-2 called Rekenthaler back a few minutes later and they spoke for nine (9) minutes. CW-2 and Rekenthaler would speak once more later that day, at 4:48 pm, for seven (7) minutes. Later that same evening, Teva submitted a cover bid to the customer for Portia and Jolessa, which the customer described as "not aggressive enough" for their primary supply. Teva submitted an intentionally inflated bid for the two drugs in order to ensure that Sandoz obtained the primary award with the customer.

### 63. Etodolac and Etodolac ER

1131.    Etodolac, also known by the brand name Lodine, is a medication known as a non- steroidal anti-inflammatory drug (NSAID). It is used to reduce pain, swelling and joint stiffness from arthritis. It works by blocking the body's production of certain natural substances that cause inflammation. An extended release version of Etodolac – Etodolac ER –also known by the brand name Lodine XL, is also available.

1132.    Apotex, Taro, Teva and Sandoz dominated the market for Etodolac tablets; Teva, Taro, and Zydus dominated the market for Etodolac ER tablets; and Apotex, Teva, and Taro dominated the market for Etodolac capsules.

1133.    In early 2012, Apotex (which had received an ANDA to market Etodolac capsules in 2000) was planning to re-enter the market for the drug while Teva was planning to exit the market. Although the number of competitors in the market would remain the same, Apotex and Taro were able to coordinate a large price increase due to the overarching Fair Share Agreement. 1099.

1134.    As a result of this coordination, Taro was able to lead a price increase that more than tripled its previous price for Etodolac capsules from early 2012, while Apotex was able

to enter the market at the higher price and gain its "Fair Share." As a result, between May and August of 2012, Taro and Apotex were able to coordinate to increase prices by more 200%.

1135.   This coordination paved the way for a subsequent price increase on the tablet formulations of the drug. One year later, when Patel first began planning for "round 2" of Teva's price increases, Etodolac and Etodolac ER were not slated for increases. For example, when she circulated a long list of potential "round 2" increases on July 11, 2013, neither of those drugs were on the list.

1136.   Around that time, Sandoz began identifying a list of drugs where it believed it could increase price by the end of July. Etodolac was on the list, primarily because Sandoz would be able to implement a substantial increase without incurring significant price protection penalties from its customers.

1137.   On July 16, 2013, CW-3, then a senior executive at Sandoz, reached out to Defendant Aprahamian at Taro and they spoke for sixteen (16) minutes. Defendant Aprahamian called CW-3 back the next day and the two spoke again for eight (8) minutes. After hanging up the phone with CW-3, Defendant Aprahamian immediately called Defendant Patel. They exchanged voicemails until they were able to connect later in the day for nearly fourteen (14) minutes. On July 18, 2013, Defendant Patel called CW-1 at Sandoz and the two spoke for more than ten (10) minutes.

1138.   During this flurry of phone calls, Defendants Sandoz, Taro and Teva agreed to raise prices for both Etodolac and Etodolac ER.

1139.   On July 22, 2013, before any price increases took effect or were made public, Defendant Patel added both Etodolac and Etodolac ER to her price increase spreadsheet for the first time.

1140.   Based on her conversations with CW-1 and Defendant Aprahamian, Defendant

Patel understood that Sandoz planned to increase its price on Etodolac, and that Taro would follow suit and raise its price for Etodolac ER. During those conversations, Teva agreed to follow both price increases.

1141. That same day, Sandoz sent out a calendar notice to certain sales and pricing employees for a conference call scheduled for July 23, 2013 to discuss planned price increases, including for Etodolac. Prior to the conference call on July 23, CW-1 called Defendant Patel at Teva. After exchanging voice mails, the two were able to connect for more than fourteen (14) minutes that day. During that call, CW-1 confirmed the details of the Sandoz price increase on Etodolac. Similarly, CW-3 of Sandoz called Defendant Aprahamian at Taro that same day and the two spoke for more than three (3) minutes.

1142. The Sandoz price increase for Etodolac became effective on July 26, 2013. That same day, Taro received a request from a customer for a one-time buy on Etodolac 400mg Tablets. After learning of the request, Aprahamian responded swiftly internally: "Not so fast. Why the request? Market just changed on this and not apt to undercut."

1143. When Taro received another request on July 30 from a large wholesale customer for a bid due to the Sandoz price increase, Aprahamian's internal response was equally short:

| Message | |
|---|---|
| From: | ara.aprahamian@taro.com [ara.aprahamian@taro.com] |
| Sent: | 7/30/2013 11:14:49 PM |
| To: | |
| CC: | |
| Subject: | Re: Fw: Bid Request - Etodolac |
| Attachments: | _.gif; _; _ |

recent market changes, not taking on additional share...

263

1144.    Also on July 26, Defendant Patel sent an e-mail to others at Teva – including her supervisor K.G., Defendant Rekenthaler and others – informing them of the Sandoz increase on Etodolac IR (immediate release). She instructed them to "[p]lease watch ordering activity for both, IR and ER. The intent is that we will follow in the near future, but a date has not been determined."

1145.    Defendant Patel continued to coordinate with both Sandoz and Taro regarding the Etodolac and Etodolac ER price increases (among other things). Between July 29 and August 2, 2013, for example, Defendant Patel engaged in the following series of calls with CW-1 of Sandoz and Defendant Aprahamian at Taro:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 7/29/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 8:44:23 | 0:09:08 |
| 7/30/2013 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 13:05:11 | 0:09:51 |
| 7/31/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 13:17:12 | 0:03:33 |
| 8/1/2013 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 11:01:31 | 0:09:05 |
| 8/1/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 14:35:17 | 0:03:24 |
| 8/1/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 16:41:05 | 0:14:34 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 8:59:51 | 0:05:23 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 10:15:46 | 0:08:27 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 10:59:57 | 0:00:28 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 17:33:12 | 0:00:00 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 17:34:43 | 0:00:55 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 17:35:47 | 0:00:02 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 17:36:12 | 0:05:40 |

Defendant Aprahamian was also speaking to his contact at Sandoz -CW-3 -during this time, including the following calls:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 7/30/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 7:56:00 | 0:01:00 |
| 8/1/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 12:43:00 | 0:14:00 |
| 8/2/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 13:26:00 | 0:06:00 |

1146.    On August 1, 2013, shortly after speaking with Defendant Patel, Defendant Aprahamian instructed a colleague at Taro to begin implementing a price increase on Etodolac

and Etodolac ER. Defendant Aprahamian stated "[w]e need to get these out next week." Not wanting to provide the details in writing, Defendant Aprahamian concluded: "Will come over and discuss with you."

1147.   By August 5, 2013, it was well known internally at Teva that Taro would soon be raising prices on both Etodolac and Etodolac ER. The minutes from a Teva "Marketing Ops" meeting on August 5, 2013 - which Defendant Patel attended-reflect the following:

> 4.   Etodolac – Sandoz did take price increase on IR, Taro taking a price increase on IR and ER this week.  CIM still monitoring to 100% forecast for all customers.

1148.   When Defendant Patel sent the "Price Increase Overview" spreadsheet to her supervisor K.G. on August 7, 2013, summarizing Teva's upcoming August 9 price increases, she again made it clear that the reason Teva was increasing its prices for Etodolac and Etodolac ER was because Teva senior executives knew that Taro would be raising its prices on both drugs "this week." K.G. quickly instructed Defendant Patel to delete those entries, but never instructed her to stop communicating with the company's competitors, including Taro.

1149.   Teva and Taro raised prices for Etodolac and Etodolac ER simultaneously, with the price increases effective on August 9, 2013. Both their AWP and their WAC prices were increased to the exact same price points. The increases were substantial. For Etodolac, Teva's average increase was 414%; for Etodolac ER, the average increase was 198%.

1150.   This substantial price increase resulted in Zydus entering the market for Etodolac ER, which should have led to price competition. Instead, Teva and Taro willingly gave up customers to Zydus so that it could get its "Fair Share" of the market. For example, Nisha Patel, Ara Aprahamian on information and belief, and Kevin Green, discussed a plan to cede a

265

large wholesale client to Zydus in May 2014, and Teva then ceded a second customer to Zydus a few months later. Some of these conversations are reflected in the chart below:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 5/6/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:08:00 |
| 5/6/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:00:12 |
| 5/7/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:05:36 |
| 5/7/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:00:00 |
| 5/7/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:00:03 |
| 5/7/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:09:21 |
| 5/8/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | Patel, Nisha (Teva) | 0:01:00 |
| 5/8/2014 | Text | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 0:00:00 |
| 5/8/2014 | Text | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 0:00:00 |
| 5/8/2014 | Text | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 0:00:00 |
| 5/8/2014 | Text | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 0:00:00 |
| 5/8/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 0:00:00 |
| 5/8/2014 | Text | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 0:00:00 |
| 5/8/2014 | Text | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 0:00:00 |
| 5/8/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 0:16:45 |
| 5/8/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:37:49 |
| 5/11/2014 | Voice | Green, Kevin (Zydus) | Outgoing | Patel, Nisha (Teva) | 0:01:00 |
| 5/11/2014 | Voice | Green, Kevin (Zydus) | Incoming | Patel, Nisha (Teva) | 0:13:00 |
| 5/11/2014 | Voice | Green, Kevin (Zydus) | Outgoing | Patel, Nisha (Teva) | 0:07:00 |

1151.    Defendants continued to allocate the market. On May 14, 2014, Anda, a wholesaler customer of Teva, notified Teva that Zydus had submitted a bid for its Etodolac ER business. That same day, Patel exchanged eight (8) text messages and had a four (4) minute call with Aprahamian. The next day, on May 15, 2014 Green called Patel and they spoke for twenty (20) minutes.

1152.    On May 20, 2014, Defendant Green called Defendant Patel and they spoke for four (4) minutes. That same day, K.R., a senior sales executive at Zydus, also exchanged two (2) text messages and had a 39-second call with Defendant Maureen Cavanaugh of Teva. The next day - May 21, 2014 - Defendant Green called Defendant Patel again and they spoke for twenty-eight (28) minutes. That same day, K.R. of Zydus and Defendant Cavanaugh of Teva exchanged four (4) text messages.

1153.    The next day, on May 22, 2014, T.S., Senior Analyst, Strategic Support at Teva,

sent an internal e-mail to certain Teva employees, including Defendant Patel, stating: "I have proposed we concede Anda as they are a small percent of market share and we will have to give up some share with a new market entrant. Anda is looking for a response today." Patel responded: "agree with concede."

1154. Similarly, on June 27, 2014, Econdisc, a Teva GPO customer, notified Teva that it had received a competitive offer for its Etodolac ER business. Later that day, Patel spoke with Defendant Aprahamian at Taro for fourteen (14) minutes.

1155. On July 2, 2014, Patel called Green and left a four-second voicemail. The next day, on July 3, 2014, Patel sent an internal e-mail advising that "We will concede." Later that day, Teva told Econdisc that it was unable to lower its pricing to retain the business.

1156. When Patel's supervisor, K.G., learned that Teva had lost the Econdisc business, he sent an internal e-mail asking "Did we choose not to match this?" Patel responded, "Yes. New market entrant – Zydus." K.G. replied, "Okay good. Thank you."

### 64. Exemestane

1157. Exemestane is used to treat certain types of breast cancer. It is available in Tablet form and has been available in the United States for many years as a generic medication.

1158. The market for Exemestane is mature. At all relevant times, there have been multiple manufacturers of Exemestane.

1159. Defendants Greenstone and West-Ward dominate sales of Exemestane Tablets.

1160. Plaintiff alleges that as part of Defendants' Fair Share Agreement, they conspired to fix, raise, maintain or stabilize the prices of Exemestane beginning at least as early as the Winter of 2013.

1161. Under the Fair Share Agreement, Defendants did not attempt to undercut

267

competitors' prices in order to gain additional market share.

1162.   The ability of Greenstone and West-Ward to reach agreements on Exemestane was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. See Exhibit 1 (Chart of Defendants' Trade Association Meetings Attendance).

1163.   No non-collusive market factors (e.g., product shortages) can explain the artificially inflated prices.

1164.   The agreement between Defendants Greenstone and West-Ward was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Exemestane Tablets (25 mg).

### 65. Fenofibrate

1165.   Fenofibrate—also known by brand names such as Tricor—is a medication used to treat cholesterol conditions by lowering "bad" cholesterol and fats (such as LDL and triglycerides) and raising "good" cholesterol (HDL) in the blood.

1166.   As of the end of 2012, Teva and Lupin were the only major suppliers of generic Fenofibrate 48mg and 145mg tablets, with Teva having approximately 65% market share and Lupin having approximately 35% market share.

1167.   Based on the Fair Share agreement between late 2012 and March 2014, three new competitors entered the Fenofibrate market- Mylan, Perrigo, and Zydus. Consistent with their conspiracy, when each competitor entered, the existing manufacturers coordinated to cede market share to the new entrant.

1168.   On February 27, 2013, K.G., a senior marketing executive at Teva, e-mailed multiple Teva colleagues asking them to provide "any noise you may be hearing in the market

268

relative to additional competition on Fenofibrate 48mg and 145mg." Specifically, K.G. was seeking "Competitive Intelligence" on Mylan's potential entry to the market. In order to get this information, Defendant Green called Defendant Nesta. Over the course of that day, Green and Nesta spoke at least four (4) different times. That same day, Green reported back to K.G. and other Teva colleagues what he had learned: Mylan planned to launch Fenofibrate 48mg and 145mg sometime around November 2013.

1169.   A few months later, however, Teva learned that Mylan was moving up its launch date for Fenofibrate. In advance of this launch, Teva, Lupin, and Mylan conspired to allocate the market for Fenofibrate. On May 8, 2013, Defendant Green e-mailed his colleagues at Teva that "Mylan is entering [the market for Fenofibrate] very soon." To assist in Teva's efforts to allocate the Fenofibrate market, Green asked a colleague for the "typical data on Fenofibrate." This request for information was reiterated – and its purpose made clear – the following day when KG sent an internal e-mail stating that Mylan expected to launch Fenofibrate 48mg and 145mg tablets "on or around May 14" and that he needed Teva's Fenofibrate sales and profitability information "to determine who we want to keep and who we want to concede" to Mylan.

1170.   Up to this point, executives from Teva, Mylan, and Lupin had all been in regular contact by phone. These calls include at least those listed below. On these calls, Teva, Mylan, and Lupin executives shared information about Mylan's Fenofibrate launch and the plan to allocate the market share to Mylan:

269

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 5/6/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:32 |
| 5/6/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:22:02 |
| 5/6/2013 | Voice | Green, Kevin (Teva) | Outgoing | Berthold, David (Lupin) | 0:01:00 |
| 5/7/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:10:31 |
| 5/7/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:00:06 |
| 5/7/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:00:18 |
| 5/7/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:11:12 |
| 5/7/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Berthold, David (Lupin) | 0:02:53 |
| 5/8/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Berthold, David (Lupin) | 0:00:05 |
| 5/8/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Berthold, David (Lupin) | 0:08:55 |
| 5/8/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:00:20 |
| 5/8/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:00:05 |
| 5/8/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:00:05 |
| 5/8/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:03:46 |
| 5/9/2013 | Voice | Green, Kevin (Teva) | Outgoing | Berthold, David (Lupin) | 0:01:00 |
| 5/9/2013 | Voice | Green, Kevin (Teva) | Incoming | Berthold, David (Lupin) | 0:12:00 |
| 5/9/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:04:05 |

1171.  In one example of the coordination between the three companies, Defendant Nesta called Defendant Green at 2:42pm on May 7 and they spoke for more than eleven (11) minutes. Immediately after hanging up the phone – at 2:54 p.m. – Nesta called Defendant Berthold and spoke for nearly three (3) minutes.

1172.  On May 10, 2013, K.G. received the Teva sales and profitability information he requested. After having the information for barely a half hour, and before there was even a formal price challenge by Mylan at any of Teva's customers, K.G. concluded that "it is best to concede Econdisc [to Mylan] and try to maintain the balance of our customers . . . ." By conceding Econdisc to Mylan, Teva would walk away from its single biggest customer (in terms of gross profit) for the 48mg tablets and the third largest out of six customers (in terms of gross profit) for the 145mg tablets. Defendant Patel, who had been at Teva for only two weeks at that point, said she "want[ed] to understand the logic you [K.G.] use for determining this." The logic, of course, was to allocate a customer of sufficient size to Mylan so that Mylan would be comfortable with its "fair share" and not need to compete on price to acquire market share.

270

1173.   Teva executives immediately reached out to executives at Mylan and Lupin through a series of phone calls. These calls include at least those listed below. On these calls, executives of Teva, Mylan, and Lupin confirmed the market allocation scheme.

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 5/10/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:00:28 |
| 5/10/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:10:46 |
| 5/10/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:02:19 |
| 5/10/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Patel, Nisha (Teva) | 0:05:25 |
| 5/10/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:17 |
| 5/10/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:07:26 |
| 5/10/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:17:28 |

1174.   Teva made good on its agreement to concede Econdisc to Mylan. On May 15, 2013, Econdisc informed Teva that a new market entrant had submitted a competitive offer for Fenofibrate 48mg and 145mg tablets and asked Teva for a counteroffer to retain Econdisc's business. Less than an hour after receiving the notice of the price challenge, Defendant Green recommended conceding Econdisc based on "prior conversations." K.G. later agreed: "this is the customer we should concede on Fenofibrate."

1175.   Following Teva's internal confirmation of the market allocation scheme, Teva executives spoke with executives at Mylan and Lupin numerous times. These calls include at least those listed below. On these calls, executives of Teva, Mylan, and Lupin confirmed that Teva was sticking to the market allocation scheme by conceding Econdisc to Mylan.

271

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:36 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:02:07 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:00:07 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:03:12 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:00:04 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:05:29 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:34 |
| 5/17/2013 | Voice | Berthold, David (Lupin) | Outgoing | Nesta, Jim (Mylan) | 0:02:21 |
| 5/17/2013 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Teva) | 0:10:06 |
| 5/17/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:00:04 |
| 5/17/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:11:50 |
| 5/17/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:02:23 |
| 5/17/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:09 |
| 5/17/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:00:21 |
| 5/17/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:11:12 |
| 5/17/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:04:25 |
| 5/17/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:00:05 |
| 5/17/2013 | Text | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 0:00:00 |
| 5/17/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 0:16:02 |

1176.   As set forth above, Defendant Teva colluded with Defendants Mylan and Lupin to allocate the Fenofibrate market upon Mylan's entry in May 2013, and to effectuate that agreement, Defendant Green of Teva was in frequent contact with Defendant Nesta of Mylan and Defendant Berthold of Lupin.

1177.   Defendant Green left Teva in November 2013 and took a position as an Associate Vice President of National Accounts at manufacturer Defendant Zydus. Once at Zydus, Green took advantage of his relationships with his former Teva colleagues to collude with Teva and other competitors on several Teva/Zydus overlap drugs, including Fenofibrate.

1178.   In February 2014, Zydus was preparing to launch into the Fenofibrate market. Defendant Green, now at Zydus, colluded with Defendants Patel, Rekenthaler, Nesta, and Berthold to share pricing information and allocate market share to his new employer, Zydus.

1179.   On February 21, 2014, Teva's Patel sent a calendar invite to Rekenthaler and to her supervisor, K.G., Senior Director, Marketing Operations, for a meeting to discuss "Post

272

Launch Strategy (Multiple Products)" on February 24, 2014. One discussion item was Zydus's anticipated entry into the Fenofibrate market. Notably, Defendant Zydus did not enter the Fenofibrate market until a few weeks later on March 7, 2014.

1180.   In the days leading up to the meeting, between February 19 and February 24, Patel and Green spoke by phone at least 17 times – including two calls on February 20 lasting twenty-seven (27) minutes and nearly nine (9) minutes, respectively; one call on February 21 lasting twenty-five (25) minutes; and a call on February 24 lasting nearly eight (8) minutes.

1181.   On or about March 7, 2014, Defendant Zydus entered the Fenofibrate market at WAC pricing that matched Defendants Teva, Mylan, and Lupin. In the days leading up to the launch, Defendants from all four competitors were in regular contact with each other to discuss pricing and allocating market share to Zydus. Indeed, between March 3 and March 7, these competitors exchanged at least 26 calls with each other. These calls are detailed in the table below:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 3/3/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Green, Kevin (Zydus) | 0:20:00 |
| 3/3/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Nesta, Jim (Mylan) | 0:14:00 |
| 3/3/2014 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Zydus) | 0:00:03 |
| 3/3/2014 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Zydus) | 0:00:05 |
| 3/3/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:00:04 |
| 3/3/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:19:43 |
| 3/3/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:00:04 |
| 3/3/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:00:00 |
| 3/3/2014 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Zydus) | 0:00:04 |
| 3/3/2014 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Zydus) | 0:00:03 |
| 3/3/2014 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Zydus) | 0:00:05 |
| 3/3/2014 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Zydus) | 0:00:04 |
| 3/3/2014 | Voice | Nesta, Jim (Mylan) | Outgoing | Rekenthaler, David (Teva) | 0:13:30 |
| 3/3/2014 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Zydus) | 0:00:07 |
| 3/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:00:04 |
| 3/4/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:00:00 |
| 3/4/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:00:04 |
| 3/4/2014 | Voice | Berthold, David (Lupin) | Outgoing | Green, Kevin (Zydus) | 0:13:26 |
| 3/5/2014 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Zydus) | 0:08:15 |
| 3/6/2014 | Voice | Green, Kevin (Zydus) | Outgoing | M.A. (Mylan) | 0:01:00 |
| 3/6/2014 | Voice | Green, Kevin (Zydus) | Outgoing | M.A. (Mylan) | 0:01:00 |
| 3/6/2014 | Voice | Green, Kevin (Zydus) | Outgoing | M.A. (Mylan) | 0:03:00 |
| 3/6/2014 | Voice | Green, Kevin (Zydus) | Incoming | M.A. (Mylan) | 0:17:00 |
| 3/6/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:07:20 |
| 3/6/2014 | Voice | Green, Kevin (Zydus) | Outgoing | M.A. (Mylan) | 0:01:00 |
| 3/6/2014 | Voice | Green, Kevin (Zydus) | Incoming | M.A. (Mylan) | 0:12:00 |

1182. During the morning of March 17, 2014, Defendants Patel and Green had two more phone calls, lasting nearly six (6) minutes and just over five (5) minutes. During those calls they were discussing how to divvy up the market for several products where Zydus was entering the market. A half an hour after the second call, Patel e-mailed her supervisor, K.G., identifying "LOE Targets to Keep" for several products on which Teva overlapped with Defendant Zydus - including Fenofibrate. With respect to Fenofibrate, Patel recommended ''Defend all large customers." Later that same day, Patel called Green again and they spoke for more than eleven minutes.

1183. In the months that followed, Teva "strategically conceded" several customers to Zydus in accordance with the agreement they had reached.

1184. For example, on Friday March 21, 2014, J.P., a Director of National Accounts at Teva, sent an internal e-mail to certain Teva employees, including Defendants Patel and Rekenthaler, notifying them that Zydus had submitted an unsolicited bid to a Teva customer, OptiSource. Patel responded that Teva was "Challenged at Humana as well."

1185. That morning, Patel sent a calendar invite to Rekenthaler and to K.G. scheduling a meeting to discuss "Open Challenges-Retain/Concede Plan." One item on the agenda was "Fenofibrate (Zydus at Opti and Humana-propose to concede)."

1186. The following Monday – March 24, 2014 – Patel sent internal e-mails directing that Teva "concede" OptiSource and Humana to Zydus. Patel further stated that Teva provided a "courtesy reduction" to a third customer, NC Mutual, but stated that Teva should "concede if additional reduction is requested." That same day, Patel called Green and they spoke for more than fourteen (14) minutes. She also spoke with Defendant Berthold of Lupin for nearly twelve minutes.

1187. In the meantime, Zydus bid at another Teva customer, Ahold. On March 25,

274

2014, Patel e-mailed Rekenthaler stating "Need to discuss. NC pending, and new request for Ahold. We may not be aligned." Patel then sent an internal e-mail directing that Teva "concede" the Ahold business. Later that day, Patel called Green. He returned the call and they spoke for nearly eight (8) minutes. Patel also called Defendant Berthold of Lupin and they spoke for five (5) minutes.

1188.    On May 13, 2014, Zydus bid on Fenofibrate at Walgreens, which was also Teva's customer. The next day, on May 14, 2014, Patel forwarded the bid to her supervisor, K.G., and explained "if we concede, we will still be majority share, but only by a few share points. On the other hand, if Zydus is seeking share, they're challenging the right supplier, but the size of the customer is large. What are you[r] thoughts on asking them to divide the volume 25% Zydus and 75% Teva? This way, we've matched, retained majority and will hopefully have satisfied Zydus, and minimize them going elsewhere."

1189.    K.G. agreed with the approach and on May 15, 2014, Patel sent an internal e-mail directing that Teva reduce its price to Walgreens, but explained that "we will retain 75% of the award. The remainder will go to Zydus. Hopefully, this will satisfy their share targets." Patel emphasized that we "need to be responsible so that Zydus doesn't keep challenging Teva in the market." Later that day, Green called Patel and they spoke for twenty (20) minutes.

1190.    On June 2, 2014, Green called Patel and they spoke for nearly six (6) minutes. He also called Rekenthaler, and they spoke for two (2) minutes. Two days later, on June 4, 2014, Zydus submitted an unsolicited bid for Fenofibrate at Anda, a Teva customer.

1191.    On June 10, 2014, T.S., Senior Analyst, Strategic Support at Teva e-mailed J.P., Director of National Accounts, stating "We are going to concede this business to Zydus per upper management." T.S. forwarded the e-mail to K.G., copying Defendants Patel and Rekenthaler, asking to "revisit the decision to concede ANDA" because "[w]e need to send

275

Zydus a message to cease going after all of our business." Rekenthaler responded, "At Anda I would suggest you try to keep our product on their formulary in a secondary position and we'll continue to get sales Zydus has little market share on Fenofibrate that I can tell and they'll continue to chip away at us until they get what they are looking for." A few hours later, J.P. responded that Anda would maintain Teva on secondary and award the primary position to Zydus. Anda was fully aware that Teva was conceding Anda's business to Zydus because it was a new entrant.

1192. The next day, on June 11, 2014, Defendant Green called Defendant Rekenthaler and they spoke for eight (8) minutes. Later that day, Patel called Green. He returned the call and they spoke for nearly fifteen (15) minutes.

### 66. Fluconazole

1193. Fluconazole, which is also discussed in additional detail in Sections XIII. A. and B. below, is a commonly prescribed antifungal medication that has been available in the United States for decades. The World Health Organization includes Fluconazole on its List of Essential Medicines, i.e., one of the most effective and safe medicines needed in a health system. Fluconazole is available in the United States in several dosage strengths, including 50, 100, 150, and 200 mg Tablets.

1194. The market for Fluconazole is mature. At all relevant times, there have been multiple manufacturers of Fluconazole. Defendants Citron, Dr. Reddy's, Glenmark, Greenstone, and Teva dominated sales of Fluconazole in the relevant period.

1195. The GAO found that all four dosage strengths had "extraordinary price increases" in 2013-2014. Documentary evidence confirms that these parallel price increases were the result of collusion among generic drug manufacturers including Citron, Dr. Reddy's, Glenmark, Greenstone, and Teva.

276

1196. Defendants Citron, Dr. Reddy's, Glenmark, Greenstone, and Teva became aware of the potential for coordinating price increases on Fluconazole in early 2013. As explained above Glenmark was one of Teva's highest-ranked competitors by "quality." Teva also viewed Greenstone as a "high quality" competitor.

1197. As discussed in more detail below, Teva's Patel went to great lengths to coordinate Teva's price increases with competitors before sending the list to K.G. on May 24, 2013. She saw potential when Glenmark prepares to increase the price of a large number of drugs, and Teva also sold a number of them.

1198. In an email to Patel on May 1, 2013, K.G. identified as Teva's "Main priority" price increases for other drugs, namely "Methotrexate, Nadolol, and Fluocinonides. We need to try to get these done within the next 2-3 weeks if we can get approval." Anticipating Glenmark's price increases (which were not made public before May 16, 2013), Patel responded: "I also expect to have some high priority items to add to this list. I should have them shortly." Fluconazole is one of several drugs Patel identified for price increases. And indeed, she had numerous conversations with various sales and marketing executives at Glenmark over the next five days to discuss raising the price of Fluconazole and other drugs, including:

May 2, 2013: four calls with a senior executive at Glenmark

May 3, 2013: two calls and one text with a senior executive at Glenmark

May 6, 2013: three calls with J.C.

May 7, 2013 three calls with J.C.

1199. Consistent with the Fair Share Agreement, as the Glenmark price increases were approaching, Patel took steps to make sure that Teva did not undermine its competitor's action.

277

1200.   For example, on the morning of May 15, 2013, in anticipation of the Glenmark price increases that had not yet been implemented or made public, Patel instructed her Teva colleagues to alert her of any requests by customers for pricing relating to eight different Glenmark drugs, including Fluconazole. Teva planned to "discuss where to price" these drugs "based on market intelligence she has collected." In the interests of coordinating prices, Teva wanted to be careful to avoid obtaining any market share from Glenmark after the price increases.

1201.   Patel also spoke to a senior executive at Glenmark for nearly six minutes the next day, May 16, 2013 - the day of the Glenmark price increases. Effective that day, Glenmark increased price on numerous drugs where there was an overlap with Teva, including Fluconazole. Patel also spoke to a senior executive and J.C. at Glenmark multiple times on May 17, 2013. After Glenmark's price increases and before Teva had the opportunity to institute them, Teva was approached by several customers looking for a lower price. Teva refused to bid on most of these solicitations in order to maintain market stability. When it did bid, Teva intentionally bid high so that it would not win the business. As Patel stated to a Teva colleague when a large wholesaler approached Teva about bidding on several drugs for which Glenmark had increased its prices: "IF we bid, we need to bid high, or we will disturb the market."

1202.   But Patel did not immediately push to increase Teva's prices on all of the overlapping drugs that Glenmark increased, such as Fluconazole. Instead, Teva waited until July 3, 2013. Teva hesitated because certain overlapping drugs also involved competitors that Patel did not consider at that time to be of the highest "quality." For these drugs, Patel anticipated that a little more work (and communication) was required before she would feel comfortable moving forward with a price increase.

278

1203. As of Friday, May 17, 2013, Patel had not yet decided whether Teva should institute the Glenmark price increase on Fluconazole, fearing that Greenstone might not be responsive to price coordination. In an internal email that day, Patel indicated to colleagues - including her supervisor, K.G. - that she was "[g]athering some revised intel'' about Fluconazole in order to determine next steps.

1204. The following Monday, May 20, Patel called R.H., a director of national accounts at Greenstone but was unable to connect. Patel was ultimately not able to communicate with R.H. by phone until May 28, 2013 when the two had a twenty-one-minute call. The next day after speaking to R.H. - May 29, 2013 -Patel promptly added Fluconazole to the Teva price increase list.

1205. While it was still deciding whether to institute Glenmark's price increases, Teva declined to capitalize on its competitor's price increase to gain market share. For example, in a May 17, 2013 email about Fluconazole, Teva's B.B. expressed concern to his colleagues about the prospect of taking McKesson's business, which represented all of Greenstone's or Glenmark's customers. Patel agreed and advised the group to decline to bid because she had heard that Greenstone was also increasing its price and because Teva already had 80% share and the lowest price in the market. In another internal Teva email, dated May 22, 2013, a Teva employee reports that Teva declined to bid at One Stop on Fluconazole after a Glenmark price increase and asks "to confirm that we want to follow the same [no-bid] strategy for Rite Aid?"

1206. Likewise, when Walgreens asked for a bid on Fluconazole and other items, Teva's Green forwarded the request to Patel on May 30, 2013, and wondered whether Glenmark's price increase prompted the inquiry. Anticipating that Teva would join the others and increase its prices shortly, she responded: "We are in a great inventory position, but not

279

sure I want to steal it on an increase  GS has very little share and no significant customers." Teva's patience and persistence was rewarded when each of the Defendants increased their prices on Fluconazole tablets in coordinated fashion.

1207.   Defendants coordinated prices each step of the way and avoided bidding on business that would disrupt the Fair Share Agreement. Like its competitors, Teva increased its prices significantly. Teva's WAC prices for Fluconazole, which it announced on July 3, 2013, resulted in a tripling and quadrupling of its former prices. And just as they had done, when Glenmark increased its prices, Patel spoke to R.H. and a senior executive at Glenmark for nearly 16 minutes and almost five minutes, respectively.

1208.   No non-collusive market factors (e.g., product shortages) can explain the artificially inflated prices.

1209.   The agreement between Defendants Citron, Dr. Reddy's Glenmark, Greenstone, and Teva was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Fluconazole Tablets.

### 67. Fluocinolone Acetonide

1210.   Fluocinolone Acetonide is a commonly prescribed corticosteroid primarily used in dermatology to reduce skin inflammation and relieve itching. It has been on the market for decades and is available in several forms, including Fluocinolone Acetonide Ointment (0.025%), Cream (0.01% and 0.025%), and Solution (0.01%).

1211.   The market for Fluocinolone Acetonide is mature. At all relevant times, there have been multiple manufacturers. Defendants G&W, Sandoz, Taro, and Teligent dominated sales of these Fluocinolone Acetonide products in the relevant period.

1212.   The GAO reported that Fluocinolone Acetonide experienced "an extraordinary

price increase" in 2012-2013.

1213. Plaintiff alleges that as part of Defendants' Fair Share Agreement, they conspired to fix, raise, maintain or stabilize the prices of Fluocinolone Acetonide beginning at least as early as 2012.

1214. Under the Fair Share Agreement, Defendants did not attempt to undercut competitors' prices in order to gain additional market share.

1215. There were no reported shortages of these products in the relevant period. Yet, rather than lowering its prices in anticipation of competition from G&W and Teligent, Defendant Sandoz tripled its WAC prices on December 21, 2011. And instead of competing on price, both G&W and Teligent entered the market with similar, supracompetitive prices. Teligent preceded its entry with the announcement of WACs that matched or slightly exceeded Sandoz's prices.

1216. Pursuant to Defendants' agreement, their price increases did not result in significant market share losses in the relevant period.

1217. Documentary evidence confirms that these parallel price increases were the result of collusion among generic drug manufacturers, including G&W, Sandoz, Taro, and Teligent. Co-Defendant Teva considered Sandoz to be a "quality competitor," with whom it was easy to facilitate price coordination.

1218. The ability of G&W, Sandoz, Taro, and Teligent to reach agreement regarding Fluocinolone Acetonide was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. See Exhibit 1 (Chart of Defendants' Trade Association Meetings Attendance).

1219. The agreement between Defendants G&W, Sandoz, Taro and Teligent was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise

281

prices, rig bids, and engage in market and customer allocation for generic drugs, including Fluocinolone Acetonide Ointment (0.025%), Cream (0.01% and 0.025%), and Solution (0.01%).

### 68. Fluocinonide

1220. The market for Fluocinonide is mature, as the drug has been available in the United States for more than 40 years. Fluocinonide, also known by the brand name Lidex, is a topical corticosteroid used for the treatment of a variety of skin conditions, including eczema, dermatitis, psoriasis, and vitiligo. It is one of the most widely prescribed dermatological drugs in the United States.

1221. There are several different formulations of Fluocinonide including, among others: Fluocinonide 0.05% cream, Fluocinonide 0.05% emollient-based cream, Fluocinonide 0.05% gel and Fluocinonide 0.05% ointment. As of June 2014, Teva, Taro and Sandoz were the only three manufacturers actively selling any of the four Fluocinonide formulations mentioned above.

1187. On June 11, 2014, Teva identified the market-share breakdown for each of the different formulations of those drugs as follows:

| Product Description | Teva Market Share | Market Data |
| --- | --- | --- |
| FLUOCINONIDE CREAM 0.05% 15GM | 12.7% | Taro 87.2% |
| FLUOCINONIDE CREAM 0.05% 30GM | 12.7% | Taro 87.2% |
| FLUOCINONIDE CREAM 0.05% 60GM | 12.7% | Taro 87.2% |
| FLUOCINONIDE CREAM-E 0.05% 15GM | 29.2% | Taro 69.5%; Sandoz 1.3% |
| FLUOCINONIDE CREAM-E 0.05% 30GM | 29.2% | Taro 69.5%; Sandoz 1.3% |
| FLUOCINONIDE CREAM-E 0.05% 60GM | 29.2% | Taro 69.5%; Sandoz 1.3% |
| FLUOCINONIDE GEL 0.05% 60GM | 26.0% | Taro 61.7% |
| FLUOCINONIDE OINTMENT 0.05% 15GM | 53.8% | Taro 37.7%; Sandoz 8.5% |
| FLUOCINONIDE OINTMENT 0.05% 30GM | 53.8% | Taro 37.7%; Sandoz 8.5% |
| FLUOCINONIDE OINTMENT 0.05% 60GM | 53.8% | Taro 37.7%; Sandoz 8.5% |

1222.   Teva coordinated with Taro and Sandoz to increase the price of all four of those formulations of Fluocinonide in July 2013, based in part on discussions that started between Defendants Patel and Aprahamian even before Defendant Patel started her employment at Teva. The increases to the WAC prices in 2013 were a modest 10-17%, depending on the formulation.

1223.   The second coordinated increase of Fluocinonide was much more significant. Taro raised its prices for all four Fluocinonide formulations effective June 3, 2014. For each, the increases to Taro's WAC policies are set forth below:

| Formulation | Percentage Increase to WAC |
|---|---|
| Fluocinonide 0.05% Cream | 206 – 754% |
| Fluocinonide 0.05% Gel | 155 – 255% |
| Fluocinonide 0.05% Ointment | 206 – 483% |
| Fluocinonide Emollient-Based 0.05% Cream | 160 – 430% |

1224.   Taro notified its customers of the increases the day before they became effective - June 2, 2014. 1190.  Defendant Patel knew of these (and other) Taro increases well in advance and was prepared so that Teva would be able to quickly follow the price increases. Defendant Patel was already preparing for the next round of Teva price increases in June 2014; many of which would ultimately be implemented by Teva in August.

1225.   On May 14, 2014, Defendants Patel and Aprahamian exchanged eight (8) text messages, and had one phone conversation lasting more than four (4) minutes.

1226.   Subsequent to the May 14 communications, Defendant Patel directed a colleague to create a list of future price increase candidates, based on a set of instructions and data she had given him. On May 28, 2014, that colleague sent her a list titled "2014 Future Price Increase Candidate Analysis." The list included several drugs sold by Taro –including the four formulations of Fluocinonide (plus Carbamazepine and Clotrimazole) – with the

283

notation "Follow/Urgent" listed as the reason for the increase, even though Taro had not yet increased its price on those drugs or notified its customers that it would be doing so. The relevant portions of that spreadsheet are set forth below:

| Item Description | Product Family | BUCKET |
|---|---|---|
| CARBAMAZEPINE TABLETS 200MG 100 | CARBAMAZEPINE TABLETS | Follow/Urgent |
| CARBAMAZEPINE TABLETS 200MG 1000 | CARBAMAZEPINE TABLETS | Follow/Urgent |
| CLOTRIMAZOLE TOPICAL SOLUTION 1% 10ML | CLOTRIMAZOLE TOPICAL SOLUTION | Follow/Urgent |
| CLOTRIMAZOLE TOPICAL SOLUTION 1% 30ML | CLOTRIMAZOLE TOPICAL SOLUTION | Follow/Urgent |
| FLUOCINONIDE CREAM 0.05% 15GM | FLUOCINONIDE CREAM | Follow/Urgent |
| FLUOCINONIDE CREAM 0.05% 30GM | FLUOCINONIDE CREAM | Follow/Urgent |
| FLUOCINONIDE CREAM 0.05% 60GM | FLUOCINONIDE CREAM | Follow/Urgent |
| FLUOCINONIDE CREAM-E 0.05% 15GM | FLUOCINONIDE E CREAM | Follow/Urgent |
| FLUOCINONIDE CREAM-E 0.05% 30GM | FLUOCINONIDE E CREAM | Follow/Urgent |
| FLUOCINONIDE CREAM-E 0.05% 60GM | FLUOCINONIDE E CREAM | Follow/Urgent |
| FLUOCINONIDE GEL 0.05% 60GM | FLUOCINONIDE TOPICAL GEL | Follow/Urgent |
| FLUOCINONIDE OINTMENT 0.05% 15GM | FLUOCINONIDE OINTMENT | Follow/Urgent |
| FLUOCINONIDE OINTMENT 0.05% 30GM | FLUOCINONIDE OINTMENT | Follow/Urgent |
| FLUOCINONIDE OINTMENT 0.05% 60GM | FLUOCINONIDE OINTMENT | Follow/Urgent |

1227.   On June 3, 2014 – the date the Taro increases on Fluocinonide became effective – CVS reached out to T.C., a senior sales executive at Teva, indicating that it had an "immediate opportunity" on Fluocinonide 0.05% Cream and Fluocinonide 0.05% Emollient Cream, but did not give a reason for providing that opportunity to Teva. The CVS representative offered to move a significant amount of business from Taro to Teva, stating: "Opportunity knocks." The e- mail was forwarded to Defendant Patel, who responded:

284

**From:** Nisha Patel02
**Sent:** Tuesday, June 03, 2014 12:46 PM
**To:** ▉▉▉▉▉
**Subject:** Re: Fluocinonide Cream

I suspect a price increase...and we would likely follow.

Sent from my iPhone

1228.    Of course Defendant Patel already knew the bid request was due to a price increase, because she had spoken to Defendant Aprahamian in May and included Fluocinonide on her list of price increases with a notation to "Follow/Urgent." But she still needed to determine the specific price points so that Teva could follow quickly.

1229.    T.C. stated that she had not heard about a price increase from anyone else, but indicated that she would "snoop around." Defendant Patel stated: "OK. Thanks. I'll do the same."

1230.    Defendant Patel immediately began snooping around by exchanging five (5) text messages with Defendant Aprahamian at Taro. Later that afternoon, she reported that she had "[c]onfirmed that Taro increased," but that she was "still working on intel." K.G. at Teva suggested that it might be a good opportunity to take some share from Taro – the market share leader on several of the Fluocinonide formulations. He asked Defendant Patel to provide "guidance" by the next day. Patel responded at 4:23pm, making it clear that she had been talking to Defendant Aprahamian not only about Fluocinonide, but other drugs as well:

> I expect to provide guidance at some point in the morning. I'm also hearing Warfarin, Carbamazepine as well. I'll be looking at shares and intel tomorrow and will provide commentary. (Taro is a high quality competitor. It's just a matter of who

285

the others are.)

Shortly after sending that e-mail Patel called Defendant Aprahamian and they spoke for nearly seven (7) minutes. As discussed more fully below, Taro had also increased its prices for Warfarin and Carbamazepine on June 3. Teva followed those substantial Taro price increases with equally substantial increases of its own in August.

1231.    First thing the next morning – June 4, 2014 – Defendant Patel exchanged two (2) more text messages with Defendant Aprahamian, and then the two spoke on the phone for more than twenty-five (25) minutes. Within minutes after hanging up the phone with Defendant Aprahamian, Defendant Patel sent the following e-mail to K.G., making it clear that she had obtained additional "intel" that she did not want to put in writing:

| | |
|---|---|
| From: | Nisha Patel02 |
| Sent: | Wed 6/04/2014 10:44 AM (GMT-05:00) |
| To: | ████████████████ |
| Cc: | |
| Bcc: | |
| Subject: | Fluo Crm and E Crm Info |
| Attachments: | Analysource_Report_20140604113534(1).xlsx |

████,

Per your request, I have added in the plain cream. I know you're working on a lot, so just let me know if you'd like to discuss further. I have additional intel (I can discuss with you) that will be useful.

We should probably discuss how we want to handle all Taro increase items. Taro is a high quality competitor--I think we need to be responsible where we have adequate market share.

Thanks,

Nisha

1232.    That same day, Teva received a bid request from another large customer, Walmart. Shortly after that e-mail was forwarded to her, Defendant Patel responded by making it clear that Teva would play nice in the sandbox with Taro:

From:    Nisha Patel02
Sent:    Wed 6/04/2014 2:09 PM (GMT-05:00)
To:      ███████████████
Cc:
Bcc:
Subject: RE: Item Questions

████████████

(Please consider the Taro items alert items.) Based on quality of competitor, the intention of being responsible in the market, and market share, below is my commentary:

1. Gel: WAC issue. I estimate that WM nets are right around our WAC. Recommend bidding right below WAC, assuming we can supply.
2. Ointment: Should not pursue. We have reasonable share.
3. Cream: Since we are pursuing CVS, and assuming it works out, we should probably not pursue.

After further deliberation, Teva decided not to bid on any of the Walmart business.

1233. On June 23, 2014, as Teva was planning to implement a price increase on Fluocinonide to follow the Taro increase, Defendant Patel forwarded a spreadsheet to a subordinate with "intel" she had obtained directly from Defendant Aprahamian. That spreadsheet contained specific Taro customer price points for the different formulations of Fluocinonide for each of the various classes of trade (i.e., wholesalers, chain drug stores, mail order and GPO). Prior to sending that "intel," Defendant Patel had spoken to Aprahamian on June 17 for fifteen (15) minutes, and June 19 for nearly fourteen (14) minutes. The contract price points obtained by Defendant Patel were not otherwise publicly available.

1234. Sandoz was also a competitor on two formulations of Fluocinonide – Fluocinonide ointment and Fluocinonide gel – but was only actively marketing the gel. Not coincidentally, Defendant Aprahamian was having similar communications with his contact at Sandoz, CW-3, during this time period. At least some of those calls are set forth below:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 6/17/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:01:00 |
| 6/18/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:01:00 |
| 6/18/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:01:00 |
| 6/19/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:01:00 |
| 6/20/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:02:00 |
| 6/20/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:04:00 |
| 6/20/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:10:00 |

During one of the calls on June 20 referenced above, Defendant Aprahamian dictated to CW-3 over the telephone specific Taro contract price points for each of the same classes of trade that he had provided to Defendant Patel, for Fluocinonide ointment, Fluocinonide gel, and various other drugs that Taro had increased that overlapped with Sandoz. CW-3 took very detailed notes of the pricing information Defendant Aprahamian provided, which again were not publicly available. Based on a history and pattern of practice between CW-3 and Defendant Aprahamian, it was understood that Sandoz would follow the Taro price increase.

1235.    On June 26, 2014, Teva sent out a calendar notice to a number of sales and pricing employees - including Defendants Patel and Rekenthaler - for a 3pm conference call that day. The notice stated: "We will discuss the upcoming price increase for all Fluocinonide products: Fluocinonide Cream, Fluocinonide E-Cream, Fluocinonide Gel, Fluocinonide Ointment. We are targeting an announcement date of Monday, June 30th for an effective date of July 1st." The next morning, at 9:57 a.m., Defendants Patel and Aprahamian spoke again for nearly thirteen (13) minutes.

1236.    The Teva price increases on Fluocinonide became effective on July 1, 2014. Teva increased its WAC pricing to match Taro's pricing almost exactly. That same day, Defendant Patel spoke to her contact at Sandoz, CW-1, several times, including at least those calls set forth below:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 7/1/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 7:54:45 | 0:00:03 |
| 7/1/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 9:59:38 | 0:01:34 |
| 7/1/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 15:05:31 | 0:00:03 |
| 7/1/2014 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 15:10:28 | 0:00:11 |
| 7/1/2014 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 15:13:36 | 0:01:59 |
| 7/1/2014 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 15:21:17 | 0:07:14 |
| 7/1/2014 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 17:58:19 | 0:19:46 |

During those calls, Defendant Patel informed CW-1 of the Teva price increase and provided specific price points to CW-1 so that Sandoz would be able to follow the price increase.

1237.    Taro and Teva set identical WAC prices within a month of each other in the Summer of 2014, reflecting increases of more than 200%:

| Product CRM .05% | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 15 gm | Taro | 51672125301 | $0.79 | $2.43 | 3-June-14 | 206% |
| 30gm | Taro | 51672125302 | $0.56 | $2.43 | 3-June-14 | 337% |
| 60gm | Taro | 51672125303 | $0.39 | $2.43 | 3-June-14 | 524% |
| 15 gm | Teva | 00093026215 | $0.79 | $2.43 | 1-July-14 | 206% |
| 30gm | Teva | 00093026230 | $0.56 | $2.43 | 1–July-14 | 337% |
| 60gm | Teva | 00093026292 | $0.39 | $2.43 | 1-July-14 | 524% |

1238.    Sandoz was in the process of exiting the market for Fluocinonide ointment (it had ceased its sales by September 2014), but followed the increase on the gel three months later, on October 10, 2014. Sandoz increased its WAC pricing on the gel by 491%. That same day, Defendant Patel spoke to CW-1 at Sandoz by phone for more than three (3) minutes.

1239.    During this time period, Actavis had also started to re-enter the market for Fluocinonide 0.05% cream, but had not yet gained any significant market share due to supply

289

problems. Nonetheless, Actavis still followed the Taro and Teva price increases in December 2014 by raising its prices to the exact WAC prices as Teva and Taro. The Actavis price increase on Fluocinonide cream was effective December 19, 2014. Not surprisingly, in the days and weeks leading up to the Actavis price increase, the co-conspirators at Actavis, Taro and Teva were all communicating frequently. At least some of those communications are set forth below:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 12/3/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:01:39 |
| 12/3/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:00:00 |
| 12/3/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:00:06 |
| 12/3/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:00:16 |
| 12/3/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:00:00 |
| 12/5/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.D. (Actavis) | 0:01:00 |
| 12/5/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.D. (Actavis) | 0:01:00 |
| 12/9/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:00:00 |
| 12/9/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:00:22 |
| 12/9/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:00:19 |
| 12/10/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:00:07 |
| 12/10/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:07:59 |
| 12/10/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:02:37 |
| 12/11/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.D. (Actavis) | 0:02:00 |
| 12/11/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | Patel, Nisha (Teva) | 0:16:00 |
| 12/17/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:02:35 |
| 12/17/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:08:00 |
| 12/18/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:02:40 |

1240.     As a result of these communications, Defendants Sandoz, Taro, Teva, and Actavis sold Fluocinonide to A&P and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

### 69. Fluoxetine HCL

1241.     Fluoxetine HCL is a medication used to treat depression. It is available in a Tablet formulation.

1242.     It has been available in the United States in a generic form for many years.

1243.     The market for Fluoxetine HCL is mature. At all relevant times, there have been multiple manufacturers of Fluoxetine HCL.

290

1244.   During the relevant time frame, Defendants Mylan, Par, and Teva were the primary manufacturers of Fluoxetine HCL.

1245.   In late June 2014, Mylan imposed large price increases on Fluoxetine HCL. Around the time of the increases, Mylan, Teva and Par directly communicated via phone to coordinate.

1246.   For example, on June 18, 2014, less than a week before Mylan announced its Fluoxetine HCL price increases, a National Account Manager at Mylan spoke to the Vice President of National Accounts at Par.

1247.   On June 24, the day after Mylan announced its price increases, Mylan 's Nesta spoke to Teva's Rekenthaler.

1248.   Two days later, on June 26, Teva's Patel exchanged a series of text messages with the Chief Commercial Officer at Par.

1249.   In January 2015, Teva followed Mylan's price increases for Fluoxetine HCL Tablets. Again, the manufacturers of Fluoxetine were in communication to coordinate.

1250.   On January 5, 14 and 20, Teva's Rekenthaler spoke with Mylan's Nesta.

1251.   On January 26, Rekenthaler spoke with a Vice President of National Accounts at Par for 14 minutes, and on January 28, he spoke with Par's Vice President of Sales.

1252.   The ability of Mylan, Par, and Teva to reach agreements on Fluoxetine HCL was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. See Exhibit 1 (Chart of Defendants' Trade Association Meetings Attendance).

1253.   The coordination by Mylan, Par, and Teva is consistent with the Fair Share Agreement.

1254.   The agreement between Defendants Mylan, Par, and Teva was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Fluoxetine HCL Tablets.

291

### 70. Fluticasone Propionate

1255.   Fluticasone Propionate is a steroid medication used for the long-term management of asthma and chronic obstructive pulmonary disease. It is available as a 50cg Nasal Spray and has been available in the United States for many years in a generic form.

1256.   The market for Fluticasone Propionate is mature. At all relevant times, there have been multiple manufacturers.

1257.   Defendants Akorn, West-Ward and Co-Conspirator Apotex dominate sales of Fluticasone Propionate.

1258.   Plaintiff alleges that as part of Defendants' Fair Share Agreement, they conspired to fix, raise, maintain or stabilize the prices of Fluticasone Propionate beginning at least as early as 2009.

1259.   Under the Fair Share Agreement, Defendants did not attempt to undercut competitors' prices in order to gain additional market share.

1260.   The ability of Akorn, Apotex, and West-Ward to reach agreements on Fluticasone Propionate was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. See Exhibit 1 (Chart of Defendants' Trade Association Meetings Attendance).

1261.   No non-collusive market factors (e.g., product shortages) can explain the artificially inflated prices.

1262.   The agreement between Defendants Akorn, West-Ward and Co-Conspirator Apotex were part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Fluticasone Propionate Nasal Spray.

### 71. Fosinopril HCTZ

1263.   Fosinopril HCTZ is the generic version of Monopril HCT, a drug developed by

Bristol Meyers Squibb in 1994 to treat hypertension. The market for Fosinopril HCTZ is mature. The primary marketers of Fosinopril HCTZ are Aurobindo, Citron, Glenmark, Heritage, and Sandoz, and each sold Fosinopril HCTZ to A&P and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

1264.    During an April 22, 2014 internal call at Heritage, Malek informed the sales team that he wanted Heritage to take a price increase on Fosinopril HCTZ. Both Malek and Glazer pushed the Heritage sales team members to communicate with their competitors to obtain agreements to raise prices.

1265.    In early May 2014, sales executives with pricing authority for Fosinopril HCTZ from Heritage, Glenmark, and Aurobindo began to discuss a collusive price increase for the  drug.

1266.    For example, on May 2, 2014, a Heritage sales executive, reached out to his counterpart at Glenmark, the Executive Vice President of Generics. On May 8, 2014, the Fosinopril HCTZ sales executives from each of the three companies spoke several times by telephone in order to discuss and coordinate the price increase.

1267.    On May 14, 2014, at the MMCAP conference, executives from Sandoz, Aurobindo, and Heritage met in person to discuss raising prices on Fosinopril HCTZ. Discussions were also held with CW-3, a National Accounts Executive at Sandoz. The next day, a sales executive from Aurobindo and Sandoz's CW-3 communicated by text messages about the price increase.

1268.    Also on May 15, 2014, Heritage agreed to walk away from a large pharmacy account, so that it could concede this business to Aurobindo. This act against Heritage's self-interest was done to ensure that Aurobindo participated in the price increase.

1269.    On May 21, 2014, an executive from Heritage exchanged texts with Sandoz's

293

CW-3 to confirm that each had the other's mobile phone numbers.

1270. On June 3, 2014, following an HDMA conference held that day, a Heritage sales executive met for drinks with her counterpart at either Sandoz or Aurobindo (or both). During the week that followed this conference, the sales executives from Aurobindo, Sandoz, and Glenmark spoke by phone at least nine times and also exchanged numerous text messages about the Fosinopril HCTZ price increase.

1271. On June 16, 2014, a different Glenmark employee called a different Aurobindo employee and they spoke for twenty-two minutes. Again, these discussions were presumably about the pricing of various Drugs at Issue, including Fosinopril HCTZ.

1272. On June 25, 2014, sales executives from Heritage and Aurobindo spoke by phone for approximately 18 minutes. Upon information and belief, during that call, Heritage informed the Aurobindo executive that Heritage would increase Fosinopril HCTZ prices by approximately 200% beginning the next day, and the Aurobindo executive ensured Heritage that each of Aurobindo, Glenmark, and Sandoz would follow Heritage's price increase.

1273. That same day, Glenmark's sales executive spoke with the sales executive at Citron with responsibility for both Glyburide and Fosinopril HCTZ. Upon information and belief, during the discussion, Citron informed Glenmark that Citron would be entering the Fosinopril HCTZ market, and Glenmark informed Citron about the agreement between Glenmark, Heritage, Aurobindo, and Sandoz to follow Heritage's forthcoming price increase.

1274. Beginning on June 26, 2014, Heritage began to implement the 200% price increase on Fosinopril HCTZ with its customers.

1275. On June 27, 2014, executives from Aurobindo and Glenmark discussed the price increase on Fosinopril HCTZ. Upon information and belief, each confirmed to the other that the two companies would follow Heritage's price increase.

294

1276.    On July 1, 2014, the Citron employee that had discussed the price increase with Glenmark reached out to Heritage to discuss the price increases of both Glyburide and Fosinopril HCTZ. The Citron and Heritage employees also discussed that communications should not be done through e-mail (this would leave evidence of the conspiracy), and instead, Heritage should communicate only by phone with a specific Citron executive.

1277.    On July 2, 2014, a Heritage executive spoke with the specified Citron representative, for approximately 22 minutes. Upon information and belief, during that call, Citron agreed to follow Heritage's price increases on both Fosinopril HCTZ and Glyburide. The two executives continued to speak frequently about both drugs for the rest of July 2014.

1278.    By July 9, 2014, Heritage had fully implemented the price increase of 200% on Fosinopril HCTZ. That same day, Citron executives spoke internally about their intention to follow through on their agreement to increase prices of Fosinopril HCTZ, as well as other drugs (including Glyburide).

1279.    A few days later, on July 14, 2014, a Citron employee spoke with a Glenmark employee on the phone for about 20 minutes.

1280.    The next day, July 15, 2014, Citron began announcing to customers its pricing of Fosinopril HCTZ (which was in line with the increased prices announced by Heritage).

1281.    The Defendants continued to communicate in mid- and late-July 2014 regarding the Fosinopril HCTZ price increase. For example, a Heritage employee spoke with her Glenmark counterpart for about 23 minutes on July 18 and for approximately 5 minutes on July 30, and executives from Aurobindo and Citron spoke for about 24 minutes on July 28. Upon information and belief, Defendants communicated to each other during these calls their commitment to the agreement to follow Heritage's increased prices.

1282.    By January 2015, each of the Defendants fully implemented the increased

295

pricing on Fosinopril HCTZ.

1283.    As alleged above, the price increases regarding Fosinopril HCTZ were the result of collusive agreements between and among Defendants and co-conspirators to increase pricing and restrain competition for the sale of Fosinopril HCTZ to A&P and others in the United States. These collusive agreements were furthered, at least in part, by the communications between and among Defendants and co-conspirators alleged above.

### 72. Gabapentin Tablets

1284.    Gabapentin, also known by the brand name Neurontin, is part of a class of drugs called anticonvulsants. The medication is used to treat epilepsy and neuropathic pain. Glenmark entered the market for Gabapentin 800mg and 600mg tablets on April I, 2006.

1285.    On October 13 and 14, 2014, Defendant Patel attended the Annual Meeting of the Pharmaceutical Care Management Association ("PCMA") in Rancho Palos Verdes, California along with a number of Teva's competitors. The PCMA described its Annual Meeting as "the ideal venue for senior executives from PBMs, specialty pharmacy, payer organizations and pharmaceutical manufacturers to network, conduct business and learn about the most current strategic issues impacting the industry."

1286.    Shortly after returning from that meeting, during the morning of October 15, 2014, Defendant Patel informed colleagues at Teva that Glenmark would be taking a price increase on Gabapentin, and suggested that this would be a great opportunity to pick up some market share. The Glenmark increase had not yet been made public, and would not be effective until November 13, 2014. Nonetheless, Patel informed her colleagues in an e-mail that same day that there would be a WAC increase by Glenmark effective November 13, and that she had already been able to obtain certain contract price points that Glenmark would be charging to distributors. At around the time she sent the e-mail, Defendant Patel exchanged two (2) text messages with Defendant Brown

of Glenmark.

1287. Having relatively little market share for Gabapentin, Teva discussed whether it should use the Glenmark price increase as an opportunity to pick up some market share. Over the next several weeks, Teva did pick up "a bit of share" to be more in line with fair share principles, but cautioned internally that it did not "want to disrupt Glenmark's business too much."

1288. These communications reflect that, even in instances when competitors took share from each other, it was fully in line with the conspiracy's Fair Share principles. Indeed, the fact that these high-level conspirators were actively communicating about confidential pricing information while also taking market share from each other demonstrates that Teva's act of taking market share from Glenmark was the conspiracy functioning on a business as usual basis.

### 73. Glimepiride

1289. Glimepiride, which is also discussed in additional detail in Section XIII. G. below, is a medication used to treat diabetes. It is available in a Tablet formulation.

1290. It has been available in the United States in a generic form for many years.

1291. The market for Glimepiride is mature. At all relevant times, there have been multiple manufacturers of Glimepiride.

1292. During the relevant time frame, Defendants Dr. Reddy's and Teva were the primary manufacturers of Glimepiride.

1293. On August 28, 2014, Dr. Reddy's significantly increased its Glimepiride pricing. The increases were significant-with the Glimepiride WAC going up by approximately 300% across dosage strengths. Dr. Reddy's price increases for Glimepiride were preceded by frequent calls between a Vice President of Sales at Dr. Reddy's, and Teva's Patel. They also exchanged text messages on August 25, 2014, three days before the price increase. The Dr. Reddy's VP and Patel continued to communicate after the price increase as well.

1294. Although Teva did not initially follow Dr. Reddy's price increases for Glimepiride, the Dr. Reddy's VP and Patel continued to communicate, and they exchanged four text messages on October 10, 2014.

1295. Several months later, on January 25, 2015, Teva raised prices on a number of different drugs, including Glimepiride. Teva raised its list (WAC) prices to match Dr. Reddy's list prices exactly.

1296. No non-collusive market factors (e.g., product shortages) can explain the artificially inflated prices.

1297. The ability of Dr. Reddy's and Teva to reach agreements on Glimepiride was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. See Exhibit 1 (Chart of Defendants' Trade Association Meetings Attendance).

1298. The coordination by Dr. Reddy's and Teva is consistent with the Fair Share Agreement.

1299. The agreement between Defendants Dr. Reddy's and Teva was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Glimepiride Tablets.

### 74. Glipizide-Metformin

1300. The market for Glipizide is mature, as the drug has been available in generic form since 2005. During the relevant time period, Heritage, Teva, and Mylan sold Glipizide to A&P and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

1301. During the same April 15, 2014 phone call between Malek and Teva's Patel referenced above that resulted in an agreement between the two companies to increase prices on

Doxy Mono, Malek informed Teva's Patel that Heritage wanted to raise prices on Glipizide. Teva agreed that it would either match Heritage's price increase or commit to not bidding against Heritage's business.

1302. Around the same time, a second Heritage employee, who was tasked with coordinating price increases with Mylan, discussed the Glipizide price increase with his Mylan contact. On April 23, 2014, a Mylan employee e-mailed Malek to confirm to him that Mylan agreed to the Glipizide price increase as well. (They also agreed to raise prices on Doxy Mono and Verapamil in the same communication).

1303. Pursuant to the agreement with Teva and Mylan, Heritage began informing customers of the price increase in late June, and had fully implemented the price increase by July 9, 2014.

1304. In furtherance of the agreement, Teva and Mylan did not bid for any of Heritage's Glipizide business. Additionally, in those instances where Heritage's customers sought out bids from Teva, Teva responded with pricing that it knew was higher than Heritage's pricing.

1305. As alleged above, the price increases regarding Glipizide were the result of collusive agreements between and among Defendants and co-conspirators to increase pricing and restrain competition for the sale of Glipizide to A&P and others in the United States. These collusive agreements were furthered, at least in part, by the communications between and among Defendants and co-conspirators alleged above.

### 75. Glyburide

1306. The market for Glyburide is mature, as Glyburide has been available in the United States for decades and has been available in generic form in the United States for more than 20 years. Prior to September 2015, the primary manufacturers were Heritage, Teva, Citron, and Aurobindo (Citron entered the market in 2014 through a manufacturing partnership with

Aurobindo), and each sold Glyburide to A&P and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

1307.    Glazer's plea agreement with DOJ, which provided the factual basis for his felony conviction imposed by Judge Surrick, states that: "[i]n furtherance of the conspiracy, [Glazer] and his co-conspirators at [Heritage], including individuals the defendant supervised, engaged in discussions and attended meetings with co-conspirators involved in the production and sale of Glyburide. During such discussions and meetings, agreements were reached to allocate customers and fix and maintain the prices of Glyburide sold in the United States."

1308.    Similarly, Malek's plea agreement with DOJ, which provided the factual basis for his felony conviction imposed by Judge Surrick, states that: "[i]n furtherance of the conspiracy, [Malek] and his co-conspirators at [Heritage], including individuals the defendant supervised, engaged in discussions and attended meetings with co-conspirators involved in the production and sale of Glyburide. During such discussions and meetings, agreements were reached to allocate customers and fix and maintain the prices of Glyburide sold in the United States."

1309.    On or about April 22, 2014, Heritage held an internal teleconference during which Malek identified drugs that could be targeted for price increases. Glyburide was one of the drugs on Malek's list. During the call or shortly thereafter, Malek instructed Heritage sales executives to contact their counterparts at Teva and Aurobindo and to reach an agreement to raise prices on Glyburide.

1310.    Malek himself spoke to a senior executive at Teva, Patel, about Glyburide and several other drugs on his list, including an 18 minute call on April 15, 2014 (one week before and after the April 22 conference call). During Malek's communications with the Teva's Patel, an agreement was reached that both companies would raise their prices on Glyburide sold to A&P and others in the United States.

1311. After successfully reaching an agreement with Teva in late April, Malek and Glazer pressured their sales executives to reach agreement with Aurobindo as well in order to allow the collusive Glyburide price increase to succeed.

1312. While Malek was responsible for communicating with Teva (among other Defendants), another Heritage employee was assigned to communicate with Aurobindo. Malek and Glazer asked this other Heritage employee for updates about his communications with Aurobindo on April 28, 29, and 30. The Heritage employee assigned to communicate with Aurobindo eventually connected with his contact at Aurobindo on May 8, 2014, when the two spoke for sixteen minutes. During this call, they agreed to raise the price of a number of drugs, including Glyburide.

1313. On May 9, 2014, Heritage's sales team had another internal call to share the results of their conversations with competitors and further discuss the contemplated price increases for other generic drugs, including Glyburide.

1314. At the MMCAP conference in Bloomington, Minnesota, between May 12-15, 2014, Heritage's attendee met with a number of competitors and held collusive discussions on a number of generic drugs. Among her conspiratorial meetings, Sather met with an executive from Aurobindo, who also attended the conference and confirmed that each of the three generic manufacturers of Glyburide (Aurobindo, Heritage and Teva) would increase prices on Glyburide sold in the United States. Sather confirmed that Aurobindo was committed to the agreement in an e-mail to Malek on May 15, 2014.

1315. But the Defendants were not done. On June 23, 2014, Heritage held another teleconference during which the company determined that the price of Glyburide could be raised by 200%, notwithstanding the fact that Citron was planning to enter the market through its partnership with Aurobindo. (As noted earlier, the FDA has documented that, with each new

301

competitor that enters a market for a generic drug, the price of the drug typically declines substantially.)

1316.    In June and July 2014, executives from Heritage communicated with executives from Citron via text message, phone, and e-mail in order to ensure that Citron would abide by the collusive agreement already in place between the three existing manufacturers of generic Glyburide. Citron agreed to increase prices on Glyburide, but Citron's representative requested that there be no communication to Citron via e-mail in order to prevent the unlawful agreement from being exposed. Citron requested that the collusive communications be conveyed by telephone and directed to a specific individual within the company.

1317.    By early July 2014, with Citron, Heritage, Aurobindo, and Teva all committed to the collusive price increase, these four Defendants had successfully implemented the collusive price increase and were able to raise their prices for Glyburide to A&P and others in the United States to supracompetitive levels.

1318.    Thereafter, Citron, Heritage, Aurobindo, and Teva adhered to the collusive agreement. In July 2014, a purchaser of Glyburide sought a request for proposal from Teva on Glyburide, in response to Heritage's price increase. Teva sales executives declined to bid based on their agreement with Defendants, and referenced the agreements on both Glyburide and another drug as the basis for refusing to issue a competitive bid to the potential customer. Defendants also engaged in discussions about how Citron could acquire market share without disrupting the collusive conspiracy agreement.

1319.    Through their continued collusion, Citron, Heritage, Aurobindo, and Teva were able to maintain their collusive pricing on Glyburide until at least December 2015. This conspiratorial agreement continues to impact prices that A&P and others in the United States pay for Glyburide.

302

1320.    As alleged above, the price increases regarding Glyburide were the result of collusive agreements between and among Defendants and co-conspirators to increase pricing and restrain competition for the sale of Glyburide to A&P and others in the United States. These collusive agreements were furthered, at least in part, by the communications between and among Defendants and co-conspirators alleged above, and at trade association events and conferences.

### 76. Glyburide-Metformin

1321.    The market for Glyburide-Metformin is mature, as the drug has been available in generic form since 2004. During the relevant time period, Heritage, Teva, Aurobindo, Actavis, and Citron sold Glyburide-Metformin to A&P and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

1322.    During the same April 15, 2014 phone call alleged above when they discussed a number of other collusive price increases, Malek and the senior Teva sales executive, Patel, agreed to increase prices on Glyburide-Metformin.

1323.    On April 22, 2014, Heritage held an internal teleconference during which Malek identified a large number of drugs that Heritage targeted for price increases, including Glyburide-Metformin. After the call, Malek assigned Heritage sales executives to contact their counterparts at Aurobindo about Glyburide-Metformin, and at Actavis to discuss Glyburide- Metformin.

1324.    After the internal conference call, Heritage's Sather spoke with a senior executive at Actavis on April 22, 2014 about the Glyburide-Metformin price increase. Upon information and belief, during this call, the executives from Heritage and Actavis agreed to increase prices on both Glyburide-Metformin and another drug (Verapamil). As with all collusive communications identified in this Complaint involving Actavis, the Actavis representative acted on behalf of and reached an agreement that was followed by all Actavis entities identified in this Complaint.

1325. On May 8, 2014, a Heritage executive spoke with an Aurobindo executive about the Glyburide-Metformin price increase. Heritage and Aurobindo executives followed up this phone call with an in-person meeting, during which – upon information and belief – the Glyburide-Metformin price increase was discussed (along with price increases on other drugs).

1326. Executives from the four companies continued to communicate regarding the price increase for the next month. For example, the Actavis executive spoke with Teva by phone on May 1 and May 6, and the two exchanged at least 30 text messages about pricing agreements on Glyburide-Metformin and other drugs. The same Actavis executive also spoke with Aurobindo's CEO regarding the pricing agreement.

1327. Heritage also communicated the terms of the agreement to Citron and Sun. Because Citron had agreed to increase prices of Glyburide, Heritage sought to ensure that Citron (which had authority to market Glyburide-Metformin, but did not actively manufacture the drug at that time) did not take any steps that would undermine or reveal the collusion on Glyburide-Metformin. Accordingly, a Heritage sales executive discussed the Glyburide-Metformin price agreement by text. Additionally, to facilitate collusion on other drugs, Heritage informed Sun through a chain of text messages sent in August 2014 about the successful price increases on Glyburide-Metformin and Verapamil.

1328. In Summer 2014, Aurobindo, Actavis, Heritage, and Teva increased their WAC pricing on Glyburide-Metformin.

1329. In August 2014, a Heritage executive texted a Sun employee regarding agreements Heritage had reached with Actavis to increase the prices of both Glyburide- Metformin and Verpamil. Such a communication highlights the overarching nature of the conspiracy; Sun was kept apprised of agreements (in this case between Actavis and Heritage) relating to drugs that it did not market or sell.

304

1330.    By September 2014, Citron had mobilized to enter the Glyburide-Metformin market. Instead of undercutting the prices of Actavis, Aurobindo, Heritage, and Teva in an effort to gain market share, Citron announced list prices higher than all of them.

1331.    As alleged above, the price increases regarding Glyburide-Metformin were the result of collusive agreements between and among Defendants and co-conspirators to increase pricing and restrain competition for the sale of Glyburide-Metformin to A&P and others in the United States. These collusive agreements were furthered, at least in part, by the communications between and among Defendants and co-conspirators alleged above.

### 77. Griseofulvin

1332.    Griseofulvin, which is also discussed in additional detail in Section XIII. G. below, is a medication used to treat fungal infections. It is available in a suspension formulation.

1333.    It has been available in the United States in a generic form for many years.

1334.    The market for Griseofulvin is mature. At all relevant times, there have been multiple manufacturers of Griseofulvin.

1335.    During the relevant time frame, Defendants Actavis and Teva were the primary manufacturers of Griseofulvin.

1336.    On September 9, 2014, Actavis notified its customers of a price increase on Griseofulvin Suspension (Micro). From September, through the day of the price increase Patel and Rekenthaler communicated with Falkin and Rogerson of Actavis to coordinate the increase over the course of at least ten telephone calls.

1337.    Teva added Griseofulvin to its own price increase list, with the notation "Follow Competitor - Actavis" as the reason for the price increase, and followed the Actavis increase for Griseofulvin during its next price increase event on January 28, 2015.

1338.    As with the Actavis price increase in September, in the days leading up to the

January 2015 price increase, Rekenthaler of Teva and Falkin of Actavis coordinated frequently.

1339.    Teva's price increase for Griseofulvin matched Actavis's list (WAC) pricing exactly.

1340.    No non-collusive market factors (e.g., product shortages) can explain the artificially inflated prices.

1341.    The ability of Actavis and Teva to reach agreements on Griseofulvin was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. See Exhibit 1 (Chart of Defendants' Trade Association Meetings Attendance).

1342.    he coordination by Actavis and Teva is consistent with the Fair Share Agreement.

1343.    The agreement between Defendants Actavis and Teva was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Griseofulvin Suspension (Micro).

### 78. Halobetasol Propionate

1344.    Halobetasol Propionate is a corticosteroid used to treat a variety of skin conditions such as eczema, dermatitis, psoriasis, and rash. It has been available in the United States for decades in a generic form.

1345.    The market for Halobetasol Propionate is mature. At all relevant times, there have been multiple manufacturers of Halobetasol Propionate.

1346.    Defendants G&W, Perrigo, Sandoz, and Taro dominate sales of Halobetasol Propionate. During much of the relevant time period, G&W and Perrigo had a roughly 40/60 split of the markets for both Ointment (0.05%) and Cream (0.05%). Defendant Sandoz rejoined the market for Cream in early 2014, growing to a smaller but still sizeable share of the cream.

Defendant Taro rejoined the market for Cream and Ointment in summer 2014 and had small shares of both.

1347.    For years the prices of Halobetasol Propionate cream and ointment were relatively low and stable. In late 2012, Perrigo and G&W were the dominant manufacturers. Perrigo and G&W each implemented enormous price increases in lock step in the spring of 2013.

1348.    As Sandoz (late 2013) and Taro (spring 2014) joined the market, they announced list prices identical to Perrigo and G&W.

1349.    Thus, the GAO noted that the Halobetasol Propionate 0.05% Ointment and 0.05% Cream had "extraordinary price increases" in the years 2013-2014.

1350.    Under the Fair Share Agreement, Sandoz and Taro did not attempt to undercut competitors' prices in order to gain additional market share. When reentering the market and gaining share, Sandoz and Taro targeted the competitor with the higher market share in order to maintain market share at what they considered to be "fair share." For example, in December 2013, when Sandoz was planning its relaunch of the 0.05% Cream, Arpad Szechenyi of Sandoz noted in internal Sandoz emails that G&W had 63% of the market and Perrigo had 36% and that Sandoz would ·seek to "[t]ake most of the share from G&W and one smaller account from Perrigo."

1351.    The ability of G&W, Perrigo, Sandoz, and Taro to reach agreement regarding Halobetasol Propionate was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. *See* Exhibit 1 (Chart of Defendants' Trade Association Meetings Attendance).

1352.    The Defendants also communicated directly with one another. For example, D.B., Perrigo EVP and General Manager, and K.O, G&W President, spoke twice by phone on March 19, 2013, texted on March 25 and spoke for approximately six minutes on March 26. Perrigo announced list (WAC) price increases for Halobetasol Propionate the next day.

307

1353.    K.O. at G&W also was communicating with M.P., Taro Chief Commercial Officer during the same window of time. K.O. tried to connect with M.P. on March 19, 2013 (the same day he had spoken to D.B. at Perrigo) but did not get through. The two did connect, however, on March 21. They also text messaged on March 25 (the same day that K.O. texted with D.B. at Perrigo), and had two relatively long conversations (15 and 20 minutes) on March 28, 2012, the day after Perrigo increased its list (WAC) prices.

1354.    K.O. (G&W) and M.P. (Taro) continued to communicate by text message in late March and early April 2013, including on April 11, 2013 the day that G&W announced list (WAC) price increases for Halobetasol Propionate. The next day, the two executives spoke by phone for approximately 28 minutes.

1355.    Meanwhile, Perrigo's T.P., Director of National Accounts, was communicating with C.B., Sandoz's Director of National Accounts. The two spoke on April 10, 2012, the day before G&W announced its price increase. The two also spoke on December 18, 2012, just a few days after Sandoz announced list (WAC) price increases for Halobetasol Priopionate. K.O (G&W) and D.B. (Perrigo) also spoke again after the Sandoz price increase (December 20, 2013) for approximately 10 minutes.

1356.    Another series of communications occurred when Taro raised its list (WAC) prices on May 13, 2014. In April 2014, before the Taro price increase was announced, M.P. (Taro) and K.O (G&W) again spoke by phone. On May 6, K.O again spoke to D.B (Perrigo) and two days later, Perrigo's T.P. spoke again with C.B at Sandoz. On May 16, shortly after Taro's list price increase became official, E.G., Taro Director of Corporate Accounts, spoke to A.F., Perrigo National Account Director. That same day, K.O. (G&W) re-connected with D.B. (Perrigo).

1357.    No non-collusive market factors (e.g., product shortages) can explain the artificially inflated prices.

308

1358. The agreement between Defendants G&W, Perrigo, Sandoz, and Taro was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Halobetasol Propionate Ointment (0.05%) and Cream (0.05%).

### 79. Haloperidol

1359. Haloperidol is an antipsychotic used to treat disorders such as schizophrenia and Tourette syndrome. It has been available in the United States for many years in a generic form.

1360. The market for Haloperidol is mature. At all relevant times, there have been multiple manufacturers.

1361. During the relevant time frame, Defendants Mylan, Sandoz, and Zydus were the primary manufacturers of Haloperidol Tablets.

1362. For years, the prices for Haloperidol tablets were relatively low and stable. In the summer of 2013, however, the manufacturers of Haloperidol determined to collusively raise prices. In the second half of 2013, they did so. For example, on the 5 mg dosage, Mylan first announced a list (WAC) price increase that more than tripled its prices. Sandoz followed the increase, announcing similar list (WAC) prices in January 2014. And Zydus, which entered the market in the fall of 2014, offered virtually identical prices as Mylan and Sandoz instead of trying to win customers through price competition.

1363. Throughout this period, Mylan, Sandoz and Zydus met at trade conferences and communicated directly with each other in furtherance of their price fixing agreement on Haloperidol and of their Fair Share agreement.

1364. For example, in July 2013, Sandoz executives were carefully monitoring the generic market in order to ensure that they adhered to the Fair Share agreement. Sandoz did not want to accidentally poach customers from its co-conspirators. As part of this effort, D.L., a

Sandoz Director of National Accounts, called her contact at Mylan, Jim Nesta, and obtained a list of drugs for which Mylan had increased prices, including Haloperidol, so that Sandoz could follow with its own price increase.

1365.    Not long after, Nesta twice called this Director of National Accounts at Sandoz on August 6, a few days before Mylan imposed price increases on Haloperidol. On August 9, 2013, Mylan implemented significant list price increases on Haloperidol.

1366.    Nesta also kept Zydus in the loop. On August 15, Nesta and K.R., a Vice President of Sales at Zydus, exchanged text messages, and the next day the two spoke by phone.

1367.    After the Mylan price increase, Sandoz and Zydus were careful not to take business and instead endeavored to maintain high prices, as contemplated by their price-fixing agreement and Fair Share agreement.

1368.    For example, on October 2, 2013, M.V., the Associate Director of Pricing at Sandoz, advised a colleague to decline to bid on Haloperidol and Trifluoperazine: "We have been running up against Mylan a lot lately (Nadolol, BenazJHctz), and fear blowback if we take on any more products at this moment. Trying to be responsible in the sandbox." M.V. went to suggest that a pretextual excuse be offered to the customer: "I recommend you blame supply." Of course, the real reason for turning down the competitive opportunity was Sandoz's adherence to the Fair Share Agreement.

1369.    On October 3, 2013, the day after this internal discussion at Sandoz in which it reaffirmed its commitment to "be responsible in the sandbox," D.L. (Sandoz Director of National Accounts) and Nesta of Mylan spoke by phone. The two spoke again on October 4 and 14, 2013. Nesta also exchanged text messages with the VP of Sales at Zydus on October 9, 2013. Not long after, Sandoz increased its pricing on Haloperidol.

1370.    In November and December of 2013, as well as in January, February, March,

310

April, June, July, August, September and October of 2014, Nesta (Mylan) and Kevin Green (who by then had left Teva and had begun working at Zydus) communicated by phone numerous times. Zydus also joined the Haloperidol price increases during this period.

1371. No non-collusive market factors *(e.g.,* product shortages) can explain the artificially inflated prices.

1372. The agreement between Defendants Mylan, Sandoz, and Zydus was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Haloperidol Tablets (0.5, I, 2, 5, 10, 20 mg).

### 80. Hydralazine

1373. Hydralazine HCL is a drug used to treat high blood pressure. It is also known by the brand names Apresoline and Dralzine.

1374. During the relevant time period, Teva, Par, Heritage, Strides, Camber, and Glenmark dominated the market for Hydralazine tablets.

1375. In approximately August 2014, Defendants applied the "fair share" understanding to the market for Hydralazine in order to prevent any price erosion for the drug.

1376. As of August 2014, Defendant Strides was in the process of ramping back up its domestic operations, following its 2013 sale of its specialty injectables business to Defendant Mylan. As a result of this ramp up, Strides sought to obtain its "fair share" of the Hydralazine market, consistent with the principles of Defendants' fair share agreement. As a company with more share for Hydralazine than the market allocation scheme allowed, it was up to Heritage to concede business to Strides.

1377. Defendant Heritage hired a new VP of Marketing on August 1, 2014. One of his first acts of business for Heritage was to facilitate an agreement to allow Defendant Strides to

311

obtain market share for Hydralazine.

1378. In early August 2014, an executive working for co-conspirator TruPharma, relayed the message that Strides would submit an unsolicited bid to Morris & Dickson, a wholesaler, for its Hydralazine business. Strides requested that Heritage concede the business.

1379. On August 20, 2014, Malek was informed that Strides wanted Morris & Dickson's Hydralazine business. Malek was told that Heritage should concede this business to Strides. Malek also looped in the Heritage employee who was responsible for the Morris & Dickson account.

1380. On September 5, Morris & Dickson informed Heritage that it had received a competing bid for its Hydralazine business and asked for Heritage to provide a better price for Hydralazine.

1381. Consistent with the fair share understanding, Heritage declined to match Strides' bid and instead conceded the Morris & Dickson business to Strides.

1382. Upon information and belief, Heritage's decision to concede this business to Strides was communicated to Teva, Par, Camber, and Glenmark, so that each of these Defendants would know that Heritage was complying with the fair share agreement for the benefit of each Defendant.

1383. As a result of the overarching fair share agreement, Defendants have been able to maintain the market allocation agreement for Hydralazine tablets since at least August 2014, which has allowed them to sell Hydralazine at supracompetitive prices to A&P and other.

### 81. Hydrocodone Acetaminophen

1384. Hydrocodone Acetaminophen is a pain reliever and is available in tablet form in multiple strengths, including 5-325 mg and 10-325 mg Tablets. It has been available in the United States for over a decade in a generic form.

312

1385.     The market for Hydrocodone Acetaminophen 5-325 mg and 10-325 mg Tablets is mature. At all relevant times, there have been multiple manufacturers.

1386.     Amneal, Mallinckrodt, Par, and Teva dominated the sales of Hydrocodone Acetaminophen 5-325 mg and 10-325 mg Tablets in the relevant period with Mallinckrodt, Par, and Teva having roughly equal shares of the 5-325 mg Tablet market, and Amneal having a smaller share. On the 10-325 mg Tablets, Mallinckrodt and Par had large shares of the market, Teva had a smaller but still significant share, and Amneal had a relatively small share of the market.

1387.     Plaintiff alleges that as part of Defendants' Fair Share Agreement, they conspired to fix, raise, maintain or stabilize the prices of Hydrocodone Acetaminophen beginning at least as early as 2014.

1388.     Under the Fair Share Agreement, Defendants did not attempt to undercut competitors' prices in order to gain additional market share.

1389.     The ability of Amneal, Mallinckrodt, Par, and Teva to reach agreements on Hydrocodone Acetaminophen was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. See Exhibit 1 (Chart of Defendants' Trade Association Meetings Attendance).

1390.     No non-collusive market factors (e.g., product shortages) can explain the artificially inflated prices.

1391.     The agreement between Defendants Amneal, Mallinckrodt, Par, and Teva was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Hydrocodone Acetaminophen Tablets (5-325, 10-325 mg).

### 82. Hydrocortisone Valerate

1392.     Hydrocortisone Valerate is a corticosteroid used to treat a variety of skin

conditions such as eczema, dermatitis, psoriasis, and rash. It has been available in the United States for decades in a generic form.

1393.    The market for Hydrocortisone Valerate is mature. At all relevant times, there have been multiple manufacturers of Hydrocortisone Valerate including Defendants G&W, Perrigo, and Taro who dominate sales of Hydrocortisone Valerate Cream (0.2%).

1394.    As part of the overarching fair share agreement Taro, Perrigo, and G&W conspired to fix, raise, maintain or stabilize the prices of Hydrocortisone Valerate cream at least as early as October 2010.

1395.    The GAO noted that the Hydrocortisone Valerate 0.2% Cream had an "extraordinary price increase" in the years 2013-2014.

1396.    The following chart presents list prices (i.e., WAC) for Hydrocortisone Valerate. The cart shows that when G&W entered the Hydrocortisone Valerate market, rather than offer lower prices to win customers, G&W offered prices equal to the incumbent manufacturers.



1340.    Under the Fair Share Agreement, Defendants did not attempt to undercut

314

competitors' prices in order to gain additional market share.

1341.    Throughout this period, G&W, Perrigo, and Taro also met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements, including on Hydrocortisone Valerate and their fair share agreement.

1342.    In March 2013, when Taro and Perrigo began to raise prices to customers for Hydrocortisone Valerate cream, the two companies were communicating. D.S., the AVP of National Accounts at Taro, and A.F., Perrigo National Account Director, communicated by phone on March 13, 2013.

1343.    When G&W was preparing to enter the Hydrocortisone Valerate cream market in early 2015, T.P, Director of National Accounts at Perrigo, spoke a number of times to E.V., a VP of Sales at Marketing at G&W, between January and March 2015. When G&W entered the market, it matched the prices of Perrigo and Taro.

1344.    The ability of G&W, Perrigo, and Taro to reach agreement regarding Hydrocortisone Valerate was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. *See* Exhibit 1 (Chart of Defendants' Trade Association Meetings Attendance).

1345.    No non-collusive market factors *(e.g.,* product shortages) can explain the artificially inflated prices.

1346.    The agreement between Defendants G& W, Perrigo, and Taro was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Hydrocortisone Valerate Cream (0.2%).

### 83. Irbesartan

1347.    Irbesartan is a drug used in the treatment of hypertension. It prevents the

narrowing of blood vessels, thus lowering the patient's blood pressure. Irbesartan is also known by the brand name Avapro®.

1348. Teva received approval to manufacture generic Irbesartan in March 2012.

1349. On March 6, 2012, Teva's K.G. polled the Teva sales team seeking information about competitors that were also making offers to supply Irbesartan.

1350. At 11:27 am, J.P., an account manager at Teva responded: "Lupin is promising offers today." Less than twenty minutes later, Defendant Green (still at Teva at the time) placed a call to Defendant Berthold at Lupin. They talked for seventeen (17) minutes. Shortly after hanging up the phone, Green e-mailed his colleagues with the information he obtained:

From: Kevin Green
Sent: Tue 3/06/2012 12:26 PM (GMT-05:00)
To: ███████████████████; Dave Rekenthaler; ████████████████████
Cc: ███████████; Maureen Cavanaugh
Bcc:
Subject: RE: Irbesartan

Lupin is looking for a 15% share. They already have ABC. Confirmed Zydus is out. I assume Winthrop id the AG

1351. That same day, Defendant Rekenthaler informed the group that he still had not received "a call from any other manufacturer on Irbesartan." He received an immediate response from a senior commercial operations executive at Teva, expressing his displeasure:

From: ████████████
Sent: Tue 3/06/2012 3:08 PM (GMT-05:00)
To: Dave Rekenthaler; ███████████████████████; Kevin Green; ████████████████
Cc: ███████████, Maureen Cavanaugh
Bcc:
Subject: RE: Irbesartan

Then work harder....

1352. At 10:54 a.m. the next day, Green called Berthold again. They spoke for nearly

316

seven (7) minutes. At 12:20 pm, Teva shared with the sales team the competitively sensitive information Green had obtained from Berthold. Included were the details Berthold had shared with Green about which competitors were launching/not launching the drug, and the identity of the customers that received offers. K.G. stated that Teva was in a position to take up to a 40% market share if Lupin was only looking for 15% when it launched Irbesartan on March 30, 2012.

### 84. Isosorbide Dinitrate

1353.    Isosorbide Dinitrate is a commonly prescribed medication used to prevent chest pain (angina) in patients with coronary artery disease. It has been on the market for decades and is available in several dosages, including 5 mg,10 mg, 20 mg, and 30 mg Tablets.

1354.    The market for Isosorbide Dinitrate is mature. At all relevant times, there have been multiple manufacturers. Defendants Sandoz, Par, and West-Ward dominated sales of Isosorbide Dinitrate in the relevant period. Sandoz and West-Ward roughly split the market at the time of the price increase on the 5 mg, 10 mg, and 20 mg Tablets. Par re-entered the market later and regained a roughly equal share. On the 30 mg Tablets, Par had approximately 90% of the market share, and West-Ward had approximately 10% of the market share during the relevant time period.

1355.    For years, the prices of Isosorbide Dinitrate tablets were relatively low and stable. For example, before the spring of 2012, Sandoz and West-Ward had list prices for 10 mg tablet of less than 10 cents.  Par, which had a negligible presence in the market during that time period, offered similarly low prices.

1356.    A supply disruption between March and July 2012 prompted Sandoz and West-Ward to impose enormous price increases on all tablets. Although the supply disruption was mostly resolved within months, thereafter Sandoz and West-Ward relied on their Fair Share agreement to keep prices more than 10 times higher than they had been only months before.

1357.    In the spring of 2013, Par made a push into the Isosorbide Dinitrate market.

1358.    Rather than offer lower prices to customers in order to build market share, Par announced list prices that matched Sandoz (and which were higher than West-Ward).

1359.    Pursuant to Defendants' agreement, their price increases had no significant impact of their respective market shares.

1360.    Documentary evidence confirms that these parallel price increases were the result of collusion among generic drug manufacturers including Par, Sandoz, and West-Ward. Teva identified both Par and Sandoz as competitors willing to coordinate price increases under the Fair Share Agreement. Defendants' coordination included raising Isosorbide Dinitrate prices.

1361.    The ability of Par, Sandoz, and West-Ward to reach agreement regarding Isosorbide Dinitrate was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. See Exhibit 1 (Chart of Defendants' Trade Association Meetings Attendance).

1362.    The Defendants also communicated by phone with one another.  For example, On June 6, 2012, Sandoz's C.B, Director of National Accounts, spoke for approximately 25 minutes to M.R., West-Ward's Director of National Accounts. The next week, on June 15, Sandoz announced its large list (WAC) price increases on Isosorbide. The two executives next spoke, for approximately 21 minutes, on October 11. The next day, West-Ward announced its Isosorbide list (WAC) price increases.

1363.    Par announced its list (WAC) price increases on March 11, 2013. Not long after, on March 26, K.O, VP of National Accounts at Par, spoke to M.V., Associate Director of Pricing at Sandoz for approximately 25 minutes.

1364.    The agreement between Defendants Par, Sandoz, and West-Ward was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Isosorbide

318

Dinitrate Tablets (5, 10, 20, 30 mg).

### 85. Ketoconazole (Cream and Tablets)

1365. Ketoconazole, which is also discussed in additional detail in Section XIII. E. below, is a commonly prescribed antifungal medication that has been available in the United States for decades as a generic. It is available as a Tablet to treat certain serious fungal infections in the body and as a Cream to treat fungal infections of the skin.

1366. The market for Ketoconazole is mature. At all relevant times, there have been multiple manufacturers of both Ketoconazole Tablets and Cream. Defendants G&W, Sandoz, Taro, and Teva dominated sales of Ketoconazole Cream in the relevant period. Defendants Mylan, Taro, and Teva dominated sales of Ketoconazole Tablets in the relevant period.

1367. The GAO noted that it had "extraordinary price increases" for Ketoconazole in 2014-2015.

1368. Documentary evidence confirms that these parallel price increases were the result of collusion among generic drug manufacturers including G&W, Mylan, Sandoz, Teva, and Taro.

1369. When Defendant Teva increased prices for Ketoconazole on April 4, 2014, it made sure to coordinate with all of its competitors in doing so. Teva's price increases doubled its WAC price for Ketoconazole Cream and tripled its WAC price for 200 mg Tablets, which would leave it vulnerable to challenges unless it coordinated the price increases with its competitors. In a practice that had now become routine at Teva, leading up to the price increase Patel and Rekenthaler both were communicating frequently with competitors, including in this case, Taro, and Sandoz. For example, Patel called Taro's Aprahamian twice on March 10, 2014, before he returned her call at 10:46 am, at which time they spoke for five minutes. On March 17, 2014, she returned a call he had made two minutes earlier and they spoke for nine minutes. Patel also spoke

with Sandoz's M.V. on March 31, 2014, when they spoke for fifteen minutes. On April 4, 2014- the day of the Ketoconazole increases -Patel spoke separately with both Aprahamian of Taro and M.V. of Sandoz. During each call, she let them know that Teva was increasing the price of its Ketoconazole products. Patel's call with M.V. lasted over twenty-five minutes. Rekenthaler relayed the same message when he spoke to Nesta of Mylan that same day for six minutes.

1370.    M.V. at Sandoz immediately told his colleagues not to bid on any new opportunities for the drugs, and instead put the products on "strict allocation" until Sandoz determined how to proceed. That same day, Aprahamian sent a similar internal email to his colleagues at Taro.

1371.    Co-conspirators at Taro and Sandoz also communicated directly with each other to coordinate the price increases. On April 4, 2014, for example, Aprahamian spoke to C.B. at Sandoz for nineteen minutes. They discussed Teva's 2% cream price increase and the fact that Taro would match. C.B. then sent an email internally at Sandoz, alerting colleagues of the price increase and conveying information about Taro's price increase plans.

1372.    Four days after Teva increased its Ketoconazole products, on April 8, 2014, Aprahamian called Patel and the two spoke for more than nineteen minutes. Later that same day, Aprahamian initiated a price increase for all of Taro's customers on Ketoconazole. Aprahamian directed that notice letters be sent to customers on April 16, 2014, with an effective date of April 17, 2014. Like Teva, Taro's WAC prices doubled for Ketoconazole Cream and tripled for Tablets.

1373.    Previously, in anticipation of its own price increase, on April 7, 2014, Taro turned down an opportunity to bid on 200 mg Tablets. After reviewing the request, a Taro sales executive sent an internal email stating: "we are not going to bid this product.  Taro has 27% share in a 4-player market." In a follow-up email, E.G., a Director of Corporate Accounts at Taro, confirmed that Taro would decline to bid, but indicated that Taro would need to lie about the

320

reason: "Yes, we are declining, but we need to advise its [sic] due to supply."

1374.   Teva upheld its end of the deal on multiple occasions by not encroaching on its competitors' market share. For example, on May 14, 2014, Patel directed Teva to decline to bid for Ketoconazole at AmerisourceBergen, citing the same logic Taro used: "unable to bid (strategic reasons, for internal purposes)." Again on August 8, 2014, Teva turned down a Ketoconazole bid request from McKesson, reasoning in an internal email: "we just implemented the increase and we have very high share so whomever is challenging will continue to look elsewhere until they find their piece of the pie." And again on April 14, 2014, in another internal email, it noted simply: "Ketoconazole. Decline to adjust. We have lead share."

1375.   Although Sandoz immediately understood that it would match Teva and Taro's price increases for Ketoconazole Cream, it could not implement the price increase until October. Sandoz's contracts with certain customers contained price protection terms, which would impose substantial penalties if Sandoz increased its prices at that time - and those penalties would have caused Sandoz to miss certain financial targets during the months after April 2014. At Sandoz, senior management held monthly budget meetings where they analyzed whether it made financial sense to implement a particular price increase. In the case of Ketoconazole, the ramifications of the price protection terms did not make sense for Sandoz to follow until October 2014. When Sandoz ultimately matched the Teva and Taro increases for Ketoconazole Cream on October 10, 2014, Patel and M.V. at Sandoz spoke for more than three minutes. Sandoz's WACs matched Teva and Taro's and doubled its prior price.

1376.   The agreement between Defendants G&W, Mylan, Sandoz, Taro, and Teva was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Ketoconazole Cream and Tablets.

321

### 86. Ketoprofen

1377. Ketoprofen, which is also discussed in additional detail in Sections XIII. D. and G. below, is also known by the brand name Dolobid, and is a nonsteroidal *anti-inflammatory* drug (NSAID) used to treat mild to moderate pain, and to relieve symptoms of arthritis, such as inflammation, swelling, stiffness, and joint pain. It has been available in the United States in a generic form for many years.

1378. The market for Ketoprofen Capsules was mature and at all relevant times had multiple manufacturers.

1379. During the relevant time frame, Defendants Teva and Mylan were the primary manufacturers of Ketoprofen capsules.

1380. Plaintiff alleges that as part of Defendants' Fair Share Agreement, they conspired to fix, raise, maintain or stabilize the prices of Ketoprofen beginning at least as early as September 2012.

1381. In the summer of 2013, Patel said she had heard "rumors of activity," i.e., a price increase, on Ketoprofen. "Rumors" was a term consistently used by Patel in emails to as a euphemism for communicating with competitors about future price increases.

1382. On June 28, 2013, Teva's Green and Mylan's Nesta spoke on the phone. Shortly thereafter, Patel sent an email internally at Teva stating that Mylan was announcing price increases that day, including for Ketoprofen. In actuality, Mylan did not announce the price increases until July 1, 2013, with an effective date of July 2, 2013. Teva followed on August 9, 2013.

1383. As Teva prepared to follow the Mylan increase, the companies were in frequent contact. For example, on July 10, 2013, Green and Nesta spoke twice, and the next day, Nesta

and Green exchanged several more calls. In addition, Green spoke to Nesta on August 1 (two calls), 2, 6 (three calls), and 8 (three calls), 2013.

1384.   The day before Teva officially followed Mylan's price increase - August 8, 2013 - Patel spoke directly to Nesta.

1385.   On January 28, 2015, Teva again raised its price on Ketoprofen capsules. Again, Teva's Patel and Rekenthaler communicated with Mylan before doing so. For example, Rekenthaler spoke to Nesta of Mylan on January 14 (2 calls) and January 20, 2015.

1386.   The ability of Teva and Mylan to reach agreements on Ketoprofen capsules was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. *See* Exhibit 1 (Chart of Defendants' Trade Association Meetings Attendance).

1387.   The coordination by Teva and Mylan is consistent with the Fair Share Agreement.

1388.   The agreement between Defendants Teva and Mylan was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Ketoprofen Capsules.

### 87. Ketorolac Tromethamine

1389.   Ketorolac Tromethamine, which is also discussed in additional detail in Sections XIII. D. and G. below, is a medication used to treat pain. It is available in a Tablet formulation.

1390.   It has been available in the United States in a generic form for many years.

1391.   The market for Ketorolac Tromethamine is mature. At all relevant times, there have been multiple manufacturers of Ketorolac Tromethamine.

1392.   During the relevant time frame, Defendants Mylan and Teva were the primary

manufacturers of Ketorolac Tromethamine.

1393.  For years, the prices of Ketorolac Tromethamine tablets were relatively low and stable. As with numerous other drugs during manufactured by Teva and Mylan, things changed in mid-2012, when those manufacturers began to implement coordinated and sustained price increases.

1394.  Over the course of their conspiratorial price increases, Teva and Mylan prices skyrocketed. List (WAC) prices for Ketorolac Tromethamine tablets more than doubled. These extraordinary price increases were only possible because of Teva and Mylan's agreement to fix prices and to abide by the Fair Share agreement.

1395.  No non-collusive market factors (e.g., product shortages) can explain the artificially inflated prices.

1396.  The ability of Mylan and Teva to reach agreements on Ketorolac Tromethamine was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. See Exhibit 1 (Chart of Defendants' Trade Association Meetings Attendance).

1397.  Throughout 2012, 2013 and 2014, Teva and Mylan were also in regular communication for the purposes of fixing the prices of generic drugs, including Ketorolac Tromethamine. For example, Teva's Green and Mylan's Nesta spoke many times by phone in 2012 and 2013. In 2014, Teva's Rekenthaler stepped in for Green and communicated directly with Nesta to work out pricing and Fair Share for Ketorolac Tromethamine and other drugs.

1398.  The coordination by Mylan and Teva is consistent with the Fair Share Agreement.

1399.  The agreement between Defendants Mylan and Teva was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids,

324

and engage in market and customer allocation for generic drugs, including Ketorolac Tromethamine.

### 88. Labetalol

1400.   Labetalol, also known by brand names such as Normodyne and Trandate, is a medication used to treat high blood pressure. Labetalol, like Nadolol, is in a class of drugs called beta blockers, and it works by relaxing blood vessels and slowing heart rate to improve blood flow and decrease blood pressure.

1401.   Labetolol was one of eight drugs that Teva targeted for a price increase effective July 31, 2012. Prior to implementing the price increase for these drugs, Green and Rekentheler spoke with their competitors for each targeted drug to ensure that the understanding to increase prices would hold, including Mylan, Actavis, Breckenridge, and Alvogen. For example, in July 2012, Green spoke by phone with Nesta of Mylan, CW-2 of Sandoz, and William Hill, a senior sales and marketing executive at Alvogen. On July 31, Green and Nesta spoke five times, and immediately following some of these calls Green called Hill. Also, Rekentheler spoke with his counterparts at Actavis and Breckenridge. These communications solidified the agreement between the Defendants that each would adhere to the price increase for the drug that each manufactured.

1402.   After Teva increased its pricing on Labetalol on July 31, 2012, it continued to coordinate with its competitors to maintain that supra-competitive pricing for that drug. For example, In October 2012, Teva learned that Sandoz was "no longer having supply issues" but that "Watson is on allocation" (i.e., did not have enough supply to meet all of its demand).  In an internal e-mail sent on October 16, 2012, J. L., a senior analyst at Teva, questioned whether Teva should consider lowering "strategic customer pricing" in order to retain its market share.

1403.     That same day, Defendant Green spoke to CW-2 of Sandoz two (2) times.

After those calls with CW-2, Green responded to the analyst's question:

> Sandoz is back in good supply. They took a 500% price increase several months back, and they are holding firm with their prices.
>
> Stay the course and maintain our higher price

T. C. of Teva agreed: "We need to stay the TEVA course."

1404.    Defendant Rekenthaler was not satisfied, however. In order to confirm that Watson was also still committed to maintain high pricing on Labetalol, Defendant Rekenthaler called and spoke to A.S., a senior sales executive at Watson, four (4) times on October 18, 2012.

### 89. Lamivudine/Zidovudine (Generic Combivir)

1405.    Lamivudine/Zidovudine, also known by the brand name Combivir, is a combination of medications used in the treatment of human immunodeficiency virus (HIV) infection. This combination of drugs is often prescribed to decrease the chances that an HIV- positive patient will develop acquired immunodeficiency syndrome (AIDS) or other related illnesses.

1406.    Teva launched its generic Combivir product in December 2011.

1407.    In mid-May 2012, two competitors – Lupin and Aurobindo – received FDA approval for generic Combivir and were preparing to enter the market.

1408.    Even before those two companies obtained FDA approval, Teva was communicating with both about how to share the market with the new entrants. Defendant Rekenthaler was speaking to R.C., a senior-most executive at Aurobindo, while Defendant Green was speaking to Defendant Berthold of Lupin and Defendant Grauso of Aurobindo.

1409.    For example, on April 24, 2012, T.C. of Teva asked her co-workers whether they had heard about any new entrants to the market for generic Combivir. Defendant Rekenthaler

responded immediately that Aurobindo was entering. When T.C. questioned that information based on her understanding of how quickly the FDA typically approved new product applications, Rekenthaler assured her that the information was coming from a reputable source:

**From:** Dave Rekenthaler
**Sent:** Tuesday, April 24, 2012 11:17 AM
**To:** ▮▮▮▮▮▮▮
**Subject:** RE: what r you guys hearing on generic combivir?

It was brought up to me last week by our good friend so I'm assuming it's accurate.

1410. That "good friend" was Aurobindo's R.C., who had previously worked with both T.C. and Rekenthaler while at Teva. Rekenthaler was reluctant to identify R.C. in writing as it would evidence conspiratorial communications between the two competitors. To confirm this information, Defendant Green also called and spoke to Defendant Grauso of Aurobindo that same day for twelve (12) minutes and Defendant Berthold of Lupin for four (4) minutes.

1411. After speaking with Berthold, Defendant Green responded separately to T.C., providing specific information regarding Lupin's entry plans, including commercially sensitive intelligence about Lupin's anticipated bid at a large wholesaler. Green and Berthold then spoke again the next day, April 25, 2012, for seven (7) minutes.

1412. In early May, with the Lupin and Aurobindo launches just days away, communications among all three competitors accelerated noticeably. Over the four-day period from May 7 to May 10, for example, the three companies spoke at least 32 times, as set forth in the table below:



| Date | Call Typ | Target Name | Direction | Contact Name | Durati |
|---|---|---|---|---|---|
| 5/7/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:01:10 |
| 5/7/2012 | Text | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:00:00 |
| 5/7/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:00:04 |
| 5/7/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:00:40 |
| 5/7/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:00:41 |
| 5/7/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:00:03 |
| 5/7/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:03:40 |
| 5/7/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:01:36 |
| 5/7/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:00:04 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:02:32 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:00:17 |
| 5/8/2012 | Voice | Green, Kevin (Teva) | Outgoing | Grauso, Jim (Aurobindo) | 0:01:00 |
| 5/8/2012 | Voice | Green, Kevin (Teva) | Outgoing | Grauso, Jim (Aurobindo) | 0:02:00 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Teva) | 0:04:47 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Teva) | 0:04:31 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:00:04 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Teva) | 0:02:29 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:01:23 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Teva) | 0:04:23 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Outgoing | Green, Kevin (Teva) | 0:00:24 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Teva) | 0:07:57 |
| 5/8/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:00:02 |
| 5/9/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Green, Kevin (Teva) | 0:13:00 |
| 5/9/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:06:07 |
| 5/9/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:01:01 |
| 5/9/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:01:39 |
| 5/9/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:07:27 |
| 5/9/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:03:10 |
| 5/10/2012 | Voice | Berthold, David (Lupin) | Incoming | Grauso, Jim (Aurobindo) | 0:10:15 |
| 5/10/2012 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Teva) | 0:05:52 |
| 5/10/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:00:03 |
| 5/10/2012 | Voice | Berthold, David (Lupin) | Outgoing | Grauso, Jim (Aurobindo) | 0:13:29 |

1413.    During this four-day period, the three individuals were negotiating and discussing the specific customers that Teva would concede and retain in order to make Lupin and Aurobindo's entry into the generic Combivir market as seamless as possible.  The phone records demonstrate several instances during this 4-day period where two of the individuals referenced above (Green, Berthold and/or Grauso) would speak, followed by a phone call by one of those two individuals to the individual that was not part of the original conversation.

1414.    On May 10, 2012, at the conclusion of this four-day period of intensive communications, K.G. of Teva informed his colleagues of the results. He confirmed that "'Lupin and Aurobindo anticipate approval and launch." Importantly, he went on to list the specific accounts that Teva had negotiated to retain in order to hold on to a 40% market share in generic Combivir. K.G. also identified the specific accounts that Teva would concede to its

competitors Aurobindo and Lupin.

1415.    Even before the negotiations with Aurobindo and Lupin were finalized, K.G. made it clear to the sales team that Teva would be cooperating with its competitors to provide them with their fair share of the generic Combivir market. On May 9, 2012, when a major customer was pressing Teva for a bid, K.G. instructed T.C. that Teva did not plan to keep that customer. When T.C. asked if she should provide any bid at all, K.G. directed her to provide a sham bid, saying:

From:
Sent:    Wed 5/09/2012 2:54 PM (GMT-05:00)
To:
Cc:
Bcc:
Subject: RE: Combivir - Multisource Strategy

We can send them a proposal that will not work.

1416.    Three days later, when preparing the bid for that customer, T.C. pushed back on K.G.'s directive on price, asking: "Can we send something that at least looks like we are trying?" But K.G. refused, responding that they could not go any lower or else Teva might risk actually winning the business. He concluded: "We really need to concede this business with the accounts we have kept."

1417.    In a separate e-mail exchange with T.C. on that same day, May 11, 2012, K.G. told T.C. that another of her major customers was not on the list for Teva to retain with respect to generic Combivir. He reminded her of the goal of the overarching conspiracy, stating that Teva should concede that customer ". . . in order to preserve market pricing as much as possible." K.G. pointed out that such a move would give Teva its fair share as the first entrant: "40-45% market share in a three player market." T.C. then informed that customer that Teva

329

would not compete for its business because "we need to concede some share."

1418.    Lupin was able to enter the market for generic Combivir and obtain more than a 30% market share without significantly eroding the price due to the understanding with Teva and Aurobindo that each was entitled to its fair share of the market.

### 90. Latanoprost

1419.    Latanoprost is used to treat glaucoma and high pressure in the eyes. It has been available in the United States for many years in a generic form.

1420.    The market for Latanoprost Opthalmic Liquid Eye (0.005%) is mature. At all relevant times, there have been multiple manufacturers.

1421.    Plaintiff alleges that as part of Defendants' Fair Share Agreement, they conspired to fix, raise, maintain or stabilize the prices of Latanoprost beginning at least as early as 2011.

1422.    Under the Fair Share Agreement, Defendants did not attempt to undercut competitors' prices in order to gain additional market share.The ability of Akorn, Bausch, Greenstone, and Sandoz to reach agreements on Latanoprost was aided by the prevalence of trade association meetings and conferences where  the parties were able to meet in person. *See* Exhibit 1 (Chart of Defendants' Trade Association Meetings Attendance).

1423.    No non-collusive market factors *(e.g.,* product shortages) can explain the artificially inflated prices.

1424.    The agreement between Defendants Akorn, Bausch, Greenstone, and Sandoz was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Latanoprost Opthalmic Liquid Eye (0.005%).

330

### 91. Leflunomide

1425.   The market for Leflunomide is mature, as the drug has been available in generic form since 2005. During the relevant time period, Defendants Heritage, Teva and Co-Conspirator Apotex sold Leflunomide to A&P and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

1426.   During their April 15, 2014 phone call alleged above, Malek and the Teva's Patel also discussed Leflunomide and targeted it for a price increase.

1427.   During the first week of May 2014, executives from Teva, Heritage and Apotex spoke several times by telephone. During these phone calls, all three companies agreed to increase prices on Leflunomide and to refrain from submitting competitive bids to each other's customers. These conversations also resulted in an agreement that Apotex would lead the price increase, which it did on May 9, 2014.

1428.   Pursuant to the agreement between the three companies, Heritage began to announce the price increase in June, and had fully implemented the price increase on all its major Leflunomide accounts by early July.

1429.   In early July, after the price increase on Leflunomide was implemented, Teva exited the market for the drug. Because the price increase was successful, this action was against Teva's self interest. Upon information and belief, Heritage induced Teva's exit by agreeing to concede market share to Teva on other drugs.

1430.   As alleged above, the price increases regarding Leflunomide were the result of collusive agreements between and among Defendants and co-conspirators to increase pricing and restrain competition for the sale of Leflunomide to A&P and others in the United States. These collusive agreements were furthered, at least in part, by the communications between and

among Defendants and co-conspirators alleged above.

### 92. Levothyroxine

1431.    Levothyroxine is a synthetic form of the thyroid hormone thyroxine used to treat hypothyroidism, goiter, thyroid cancer, and cretinism.

1432.    The market for Levothyroxine is mature, as Levothyroxine has been available in the United States for over 50 years. Levothyroxine is on the WHO's list of essential medicines. Levothyroxine is often featured on lists of the top ten most prescribed generic drugs and, as of June 2015, it was the most prescribed generic drug in the United States and constituted 2.7% of the entire generic drug market by number of prescriptions. Over 120 million prescriptions are written annually for Levothyroxine in the United States, treating 15% of the population over the age of 55.

1433.    Since approximately December 2010, Defendants Mylan, Sandoz, and Lannett have dominated the generic Levothyroxine market.

1434.    In the years 2013 and 2014, the three competitors coordinated to significantly raise the price of Levothyroxine. Defendant Nesta of Mylan spearheaded the discussions by speaking with K.S., a senior sales executive at Lannett, and with CW-4 of Sandoz. In addition to communicating directly with CW-4 on this drug, Defendant Nesta also communicated indirectly with Sandoz through a mutual contact at a competitor company – Defendant Green of Teva. Notably, Levothyroxine was not a drug that Teva sold.

1435.    As detailed above, Mylan increased prices on a number of drugs on January 4, 2013, including Levothyroxine. The day before the Mylan increase, on January 3, 2013, Defendant Nesta of Mylan and Defendant Green of Teva spoke at least four times by phone. The next morning – the day of the Mylan price increases – Defendant Green spoke twice

with Defendant Kellum, including a six (6) minute call at 9:34am.

1436.   Shortly after hanging up the phone with Defendant Green, Defendant Kellum sent an internal e-mail stating, among other things, that he "[j]ust heard from a customer that . . .Mylan took a significant price increase on Levothyroxine" and Defendant Kellum advised his team to "please be cautious" on this product. As the phone records demonstrate, Defendant Kellum's source for the information was not "a customer," but rather Defendant Green of Teva.

1437.   That same morning, K.S. of Lannett called Defendant Nesta of Mylan. The phone call lasted 44 seconds. Then, on January 10, 2013, Defendant Nesta called K.S. back and they spoke for more than six (6) minutes. That same day, McKesson e-mailed Sandoz and requested a price reduction on Levothyroxine. Kellum responded internally, "This is a no. We just learned that Mylan look a large price increase."

1438.   The following Monday – January 14, 2013 – Lannett raised its pricing for Levothyroxine to match Mylan. Notably, after these phone calls, Defendant Nesta would not speak again with K.S. of Lannett until August 6, 2013 – three days before Mylan increased its prices for Levothyroxine a second time.

1439.   On July 16, 2013 – as detailed above – CW-4 spoke with Defendant Nesta and sent the July 2013 E-mail identifying the Mylan price increases. The price list included Levothyroxine and noted that Lannett had followed.

1440.   On August 6, 2013, Defendant Nesta called CW-4 two times. Both calls lasted less than a minute. A few minutes after the second call, Defendant Nesta called K.S. at Lannett. The call lasted 24 seconds (likely a voicemail). Three days later, on August 9, 2013, Mylan increased WAC pricing on Levothyroxine for a second time.

1441.   On August 10, 2013, S.G., a national account executive at Sandoz, sent an

333

internal e-mail that stated: "Mylan took a 300% price increase on Levothyroxine!!! Based on my intelligence (we will need to confirm), please lock down inventory (strict allocation per AK) and no new product offers until we can clarify the situation." CW-4 replied to S.G.'s e-mail stating, "This is correct based on my info as well."

1442.    Pursuant to their ongoing understanding, Lannett followed quickly and matched Mylan's WAC pricing on August 14, 2013.

1443.    On August 14, 2013, S.G. sent an e-mail to Defendant Kellum, copying CW-1, regarding "Levothyroxine Mylan" and asked "[w]e taking the pricing up?" CW-1 responded: "[w]orking on it." In response, S.G. replied: "Thx. I believe Lannett rationalized the market earlier this week." CW-1 answered "We just noticed that as well."

1444.    On September 5, 2013, Cigna – a Mylan customer – contacted Lannett and requested a bid on Levothyroxine. J.M., a national account manager at Lannett, forwarded the request to K.S. stating "due to Mylan's across the board price increases on a number of products, they are looking for new suppliers wherever there is crossover." J.M. explained that "[t]he volume isn't gigantic on the 1000s so it wouldn't attract much attention from Mylan if it went to us …." Nonetheless, on September 12, 2013, Lannett declined the opportunity and blamed supply issues stating "[a]s much as we'd love to take on the business, we are not in a position to do so at this time."

1445.    During a September 10, 2013 earnings call, Lannett's CEO, A.B., was asked for his reaction to Mylan's Levothyroxine price increase. A.B. responded, "You mean after I sent them a thank you note? I'm just kidding. I'm always grateful to see responsible generic drug companies realize that our cost of doing business is going up as well. So whenever people start acting responsibly and raise prices as opposed to the typical spiral down of generic drug prices, I'm grateful."

334

1446.    On September 13, 2013, Sandoz did indeed act "responsibly" and, consistent with the understanding it had with its competitors, raised WAC pricing to match Mylan and Lannett.

1447.    By way of example, Defendants set matching WAC prices on their 0.05 mg tablet in quick succession in August and September of 2013:

| Product .05 m2 Tab | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 1000 ct | Mylan | 00378180310 | $0.18 | $0.27 | 9-Aug-13 | 45% |
| 100 ct | Lannett | 00527134201 | $0.18 | $0.27 | 14-Aug-13 | 46% |
| 1000 ct | Lannett | 00527134210 | $0.18 | $0.27 | 14-Aug-13 | 46% |
| 90 ct | Sandoz | 00781518192 | $0.12 | $0.27 | 13-Sep-13 | 120% |
| 1000 ct | Sandoz | 00781518110 | $0.12 | $0.27 | 13-Sep-13 | 120% |

1448.    The three competitors – Defendants Mylan, Lannett, and Sandoz – did not stop there. They coordinated again to raise price on Levothyroxine in April/May 2014.

1449.    Consistent with the 2013 increases, Mylan was the first to raise its WAC pricing on Levothyroxine on April 25, 2014.  In the two days leading up to the increase, Defendant Nesta and K.S. of Lannett spoke by phone several times. These calls are listed below. Notably, these calls are the last documented telephone calls between these two executives.

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 4/23/2014 | Voice | Nesta, Jim (Mylan) | Outgoing | K.S. (Lannett) | 18:31:26 | 0:00:03 |
| 4/23/2014 | Voice | Nesta, Jim (Mylan) | Incoming | K.S. (Lannett) | 18:59:53 | 0:00:34 |
| 4/23/2014 | Voice | Nesta, Jim (Mylan) | Outgoing | K.S. (Lannett) | 19:57:39 | 0:00:50 |
| 4/23/2014 | Voice | Nesta, Jim (Mylan) | Incoming | K.S. (Lannett) | 21:04:47 | 0:05:07 |

1450.    On April 25, 2014 – the day that Mylan increased its pricing for Levothyroxine – P.C., a sourcing manager at Cardinal Health, sent a text message to Defendant Sullivan of

Lannett stating: "[n]ot sure if you knew already … Mylan increasing levos." Defendant Sullivan responded: "Thanks for the heads up … We heard 55% on contract price, can you confirm?" P.C. replied, "[y]es ~ 50-55%." Defendant Sullivan had "heard" about the Mylan increase from her supervisor, K.S., who had communicated with Defendant Nesta only days prior.

1451.    Lannett quickly followed with a price increase of its own – raising its WAC pricing to match Mylan on April 28, 2014. In accordance with their ongoing agreement, and consistent with past practice, Sandoz followed shortly thereafter on May 23, 2014 and matched the WAC pricing of its competitors.

1452.    The following chart reflects Defendants' price increases on .05 mg tablets:

| Product .05 mg tab | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 1000 ct | Mylan | 00378180310 | $0.27 | $0.41 | 25-Apr-14 | 54% |
| 100 ct | Lannett | 00527134201 | $0.27 | $0.41 | 28-Apr-14 | 55% |
| 1000 ct | Lannett | 00527134210 | $0.27 | $0.41 | 28-Apr-14 | 54% |
| 90 ct | Sandoz | 00781518192 | $0.27 | $0.41 | 23-May-14 | 54% |
| 1000 ct | Sandoz | 00781518110 | $0.27 | $0.41 | 23-May-14 | 54% |

1453.    As a result of the overarching "fair share" understanding and these collusive communications, Defendants Lannett, Mylan, and Sandoz all sold Levothyroxine to A&P and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

1454.    Mylan, Sandoz, and Lannett have maintained their prices at these supracompetitive levels and, as a result, A&P have been forced to pay supracompetitive prices for generic Levothyroxine since January 2013.

### 93. Lidocaine-Prilocaine

1455.    The market for Lidocaine-Prilocaine is mature, as Lidocaine-prilocaine has been

available in the United States for decades. It is marketed in the United States under the brand name EMLA. Defendants Akorn, Hi-Tech, Impax, Sandoz, and Fougera have all sold Lidocaine-Prilocaine throughout the United States.

1456.    At all times relevant to this lawsuit there has been more than one manufacturer of Lidocaine-prilocaine on the market. Defendants Akorn, Hi-Tech, Impax, Sandoz, and Fougera sold Lidocaine-prilocaine to A&P and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

1457.    For more than two years prior to the conspiracy period, Defendants' average price in the U.S. for Lidocaine-prilocaine was remarkably stable. Beginning in mid-2014, Defendants increased their prices abruptly and, for the most part, in unison.

1458.    Upon information and belief, Akorn, Hi-Tech, Impax, Sandoz, and Fougera reached an agreement to increase prices for Lidocaine-Prilocaine in the United States from an average of 47 cents per dose in April 2014 to an average price of $1.20 by January 2015.

1459.    These extraordinary price increases were not the result of supply shortages, demand spikes, or other competitive market conditions. There were no relevant labeling changes or reported drug shortages that might have led to price increases. Nor was there a spike in demand that could explain the price hikes.

1460.    Upon information and belief, this agreement to increase prices on Lidocaine-Prilocaine was the result of collusive communications between and among Defendants that were initiated by Sandoz and Fougera to increase pricing and restrain competition for the sale of Lidocaine-Prilocaine in the United States, and this agreement to increase prices was facilitated because each Defendant adhered to the overarching market allocation agreement in the generic drug industry. The collusive agreement to increase prices on Lidocaine-Prilocaine was furthered, at least in part, through in-person discussions conducted at meetings and industry events hosted

337

by GPhA and HDMA as well as other meetings and communications such as those described below.

1461.    For example, on October 1-3, 2012, representatives from Fougera, Impax, and Sandoz attended the GPhA Annual Meeting in Orlando, Florida. See Ex. 1.

1462.    On February 20-22, 2013, GPhA held its Annual Meeting in Orlando, Florida that was attended by Akorn, Impax, and Sandoz. See Ex. 1.

1463.    On June 2-5, 2013, HDMA held its 2013 BLC in Orlando, Florida, which was attended by Akorn, Impax, and Sandoz. See Ex. 1.

1464.    On June 4-5, 2013, GPhA held a meeting in Bethesda, Maryland that was attended by Fougera, Hi-Tech, Impax, and Sandoz. See Ex. 1.

1465.    On August 10-13, 2013, NACDS held its 2013 Total Store Expo in Las Vegas. This event was attended by representatives from Akorn, Hi-Tech, Impax, and Sandoz. See Ex. 1. 1489.

1466.    On October 28-30, 2013, GPhA held a meeting in Maryland that was attended by Akorn, Fougera, Hi-Tech, Impax, and Sandoz representatives. See Ex. 1.

1467.    On February 28-30, 2013, GPhA held its Annual Meeting in Orlando, Florida that was attended by representatives from Hi-Tech, Impax, and Sandoz. See Ex. 1.

1468.    On June 1-4, 2014, HDMA held a BLC in the Marriott in Phoenix, Arizona.Representatives from Akorn, Sandoz, and Impax attended. See Ex. 1.

1469.    On June 3-4, 2014, GPhA held a meeting in Maryland that was attended by representatives from Hi-Tech, Fougera, Impax, and Sandoz. See Ex. 1.

1470.    On August 23-26, 2014, NACDS held its 2014 Total Store Expo in Boston. Representatives from Akorn, Impax, and Sandoz attended. See Ex. 1.

1471.    On October 27-29, 2014, GPhA held its Fall Conference in Bethesda,

338

Maryland. Representatives from Impax, Fougera, and Sandoz attended. See Ex. 1.

1472. Akorn, Hi-Tech, Impax, Sandoz, and Fougera continued to attend trade association events in 2015 and 2016.

1473. The Defendants also spoke to one another directly by phone. For example, as Akorn was preparing to enter the market in March 2012, it communicated directly with Taro. M.B., a VP of Marketing at Taro, spoke to E.B., Akorn's VP of Sales and Marketing, on February 24, 28 and March 14 and 29.

1474. Meanwhile, the incumbent suppliers—Taro and Sandoz—were in touch as well. On March 7, 8 and 17, 2012, K.K., a Sandoz Senior National Account Executive, communicated by phone with Taro's D.S., AVP of National Accounts at Taro.

## 94. Loperamide HCL Capsules

1475. Loperamide HCL, which is also discussed in further detail in Section XIII. F. below, is known by the brand name Imodium, among others, and is a medication used to treat diarrhea.

1476. Mylan and Teva dominate the market for Loperamide HCL capsules.

1477. Loperamide HCL was one of eight drugs that Teva targeted for a price increase effective July 31, 2012. Prior to implementing the price increase for these drugs, Green and Rekentheler spoke with their competitors for each targeted drug to ensure that the understanding to increase prices would hold, including Mylan, Actavis, Breckenridge, and Alvogen. For example, in July 2012, Green spoke by phone with Nesta of Mylan, CW-2 of Sandoz, and William Hill, a senior sales and marketing executive at Alvogen. On July 31, Green and Nesta spoke five times, and immediately following some of these calls Green called Hill. Also, Rekentheler spoke with his counterparts at Actavis and Breckenridge. These communications solidified the agreement between the Defendants that each would adhere to the price increase

for the drug that each manufactured.

1478.    As a result of these collusive communications, Mylan and Teva were able to increase prices on Loperamide HCL. By adhering to the Fair Share agreement and through the numerous other examples of collusion between Teva and Mylan, Defendants have been able to maintain prices for Loperamide HCL at supracompetitive levels since July 2012.

### 95. Meprobamate

1479.    The market for Meprobamate is mature, as the drug has been available in the United States since 1955. Heritage and Dr. Reddy's sold Meprobamate to A&P and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

1480.    On March 21, 2013, Heritage's Malek instructed a Heritage employee to contact Dr. Reddy's about a possible increase in Meprobamate prices.

1481.    On March 22, 2013, on information and belief, Heritage contacted Dr. Reddy's to propose that both companies increase their prices for Meprobamate in the United States.

1482.    On March 22, 2013, a Heritage executive contacted a Dr. Reddy's executive and spoke by phone for about nine minutes. Upon information and belief, during the phone call, the two companies agreed to increase prices on Meprobamate in the United States. The terms of the agreement were further confirmed in e-mails exchanged between March 22 and March 25, 2013.

1483.    \On March 27, 2013, on information and belief, Malek forwarded an RFP to Dr. Reddy's that Heritage had received from a prospective purchaser of Meprobamate. Through e-mails that followed and through about a four minute phone call on March 29, 2013, Heritage and Dr. Reddy's took steps to ensure that neither submitted bids that undercut the other's pricing for Meprobamate.

1484.    In April 2013, Dr. Reddy's requested that Heritage allow Dr. Reddy's to increase

its market share for Meprobamate. Dr. Reddy's wanted to achieve this by reaching an agreement that Heritage would walk away from its existing Meprobamate business with a national pharmacy chain. Heritage quickly agreed to give this business to Dr. Reddy's, and by April 2013, Heritage took steps to give up this business so that Dr. Reddy's could take it.

1485.    Malek and other employees continued to e-mail and speak by phone throughout May 2013 to ensure that the market for Meprobamate in the United States was allocated to the liking of both Dr. Reddy's and Heritage.

1486.    As a result of this anticompetitive conduct, Heritage and Dr. Reddy's increased the prices for Meprobamate sold to A&P and others in the United States to supracompetitive levels. This market allocation and price-fixing agreement and the ensuing supracompetitive pricing continued in either force or effect (or both) until at least the end of 2016.

### 96. Metformin ER

1487.    Metformin ER, the generic version of Fortamet, is prescribed to treat adult-onset diabetes.

1488.    During the time period relevant to this Complaint, Actavis, Amneal, Lupin, Sun, and Teva dominated the market for Metformin ER tablets.

1489.    Lupin led the price increase in August 2015, by raising prices by approximately 200%. Between August 2015 and January 2016, Actavis, Amneal, Sun, and Teva all supported Lupin's price increase by following it themselves and by refraining from adding market share beyond each Defendant's "fair share" of the market.

1490.    Senior sales executives from each Defendant were in active contact with each other during the period in which they implemented the price increase, both by telephone and at trade shows and industry events.

1491.    For example, and as detailed in the phone records tables described throughout

341

this Complaint, between July 2015 and February 2016, David Berthold of Lupin was in frequent contact with S.R.(2) of Amneal and Mark Falkin and A.G/ of Actavis.  Similarly, during this same time period, Ara Aprahamian (on behalf of Taro's corporate parent, Sun) was in frequent contact with S.R.(1) of Amneal; Rick Rogerson, Mark Falkin, and M.D. of Actavis; and Nisha Patel of Teva.

1492.    As a result of these collusive communications, Defendants have been able to maintain prices at supracompetitive levels on Metformin ER tablets since July 2015.

### 97. Methadone HCL

1493.    Methadone HCL is an opioid analgesic used to treat addiction to opioids. It is available in Injectable, Tablet, and Oral Liquid formulations. It has been available in the United States for decades in a generic form. Due to, among other things, its clinical efficacy and safety, Methadone HCL has been designated as a model essential medicine by the World Health Organization.

1494.    The market for Methadone HCL is mature. At all relevant times, there have been multiple manufacturers of Methadone HCL, including Defendants Mallinckrodt and West-Ward. 1518.    The GAO noted that the Methadone HCL 5 mg Tablets had an "extraordinary price increase" in the years 2014-2015.

1495.    Plaintiff alleges that as part of Defendants' Fair Share Agreement, they conspired to fix, raise, maintain or stabilize the prices of Methadone HCL beginning at least as early as 2014.

1496.    Under the Fair Share Agreement, Defendants did not attempt to undercut competitors' prices in order to gain additional market share.

1497.    The ability of Mallinckrodt and West-Ward to reach agreement regarding Methadone HCL was aided by the prevalence of trade association meetings and conferences

where the parties were able to meet in person. See Exhibit 1 (Chart of Defendants' Trade Association Meetings Attendance).

1498.    No non-collusive market factors (e.g., product shortages) can explain the artificially inflated prices.

1499.    The agreement between Defendants Mallinckrodt and West-Ward was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Methadone HCL Tablets (5, 10 mg).

### 98. Methylphenidate

1500.    Methylphenidate – the generic version of the branded drug Ritalin – is a central nervous system stimulant prescribed to treat attention deficit disorder.

1501.    During the time period relevant to this Complaint, Actavis, Impax, Mallinckrodt, Par, Sandoz, and Sun dominated the market for Methylphenidate.

1502.    In early March 2013, Mallinckrodt announced that it would have a temporary supply disruption. Whether Mallincrkodt truly had a supply disruption or not remains unclear; what is clear though, is that immediately after this announcement, Sandoz and Mallincrkodt began coordinating to exploit this purported supply disruption to raise prices.

1503.    Between March 1, 2013, and March 8, 2013, CW-3 (a senior sales executive at Sandoz) and a Vice President of Mallinckrodt spoke by phone four times. Following their fourth call of the week on March 8, 2013, Sandoz announced that it was raising its prices on Methylphenidate by 400%.

1504.    Following Sandoz's announcement, a Director of National Accounts at Watson (a predecessor to Actavis) spoke with the VP of Generic Sales of Sandoz for more than 20 minutes on April 21, 2013 and upon information and belief, confirmed that Actavis would follow

Sandoz's price increase.

1505. Two days after the above call a Sun employee reported to her superior that Actavis/Watson would raise price effective May 25 (even though Actavis had not yet announced a price increase) and that Mallinckrodt would follow this price increase when it resolved its supply issue.

1506. Sure enough, on April 25, 2013, Actavis/Watson announced that it was matching Sandoz's 400% price increase.

1507. Less than a week later, Mallinckrodt sought to re-enter the market and regain the share that it had forfeited during the period of its claimed supply disruption – which lasted just two months. Despite selling the product at competitive levels in February 2013, Mallinckrodt reentered the market at the elevated price set by Sandoz and Actavis.

1508. The day after Mallinckrodt announced that its supply disruption had been resolved, a national accounts director at Mallinckrodt – spoke by phone with CW-3, his former colleague from Sandoz. Upon information and believe, the purpose of this call was to determine which customers that Sandoz would concede to Mallinckrodt so that it could regain its market share.

1509. And that is just what happened. In August 2013, CW-2 and Armando Kellum – both of Sandoz – acknowledged conceding a large customer.

1510. In late 2014, Sun's market share was well below what it determined would be its fair share of 17% in what was then a five-manufacturer market. Sun then coordinated with the other Defendants to arrange for Sun to increase its market share on Methylphenidate.

1511. In 2014 and 2015, Impax and Par entered the Methylphenidate market at the elevated prices set by Sandoz, Actavis, and Mallinckrodt. Consistent with the overarching Fair Share agreement, Impax and Par communicated with the existing manufacturers to arrange for

344

the seamless transfer of a "fair share" of the market without disrupting the price. On information and believe one or more of Par competitors contacted senior sales executives at Par to coordinate Par's entry into the market and arrange for Par to receive Fair Share in mid-2015.

1512.   As a result of these collusive communications, Defendants have been able to maintain prices for Methylphenidate at supracompetitive levels since March 2013.

### 99. Methylprednisolone

1513.   Methylprednisolone, the generic version of the branded drug Medrol manufactured by Defendant Pfizer, is a corticosteroid that is prescribed to reduce inflammation and treat a wide range of conditions including arthritis, ulcerative colitis, psoriasis, and endocrine disorders. Methylprednisolone is most typically sold in 4 mg tablets, but is also occasionally sold in higher- dose tablets ranging from 8 mg to 32 mg.

1514.   The market for Methylprednisolone is mature, as the drug has been available in the United States for more than 60 years.

1515.   During the time period relevant to this Complaint, Breckenridge, Cadista, Greenstone, Par, and Sandoz dominated the market for Methylprednisolone.

1516.   In early 2011, Methylprednisolone cost just a few cents per tablet. For example, Cadista sold packages of 21 4 mg tablets for 85 cents each. Between March and June 2011, however, Defendants colluded to implement a massive price increase.

1517.   Cadista and Sandoz both raised their prices by more than 2000%. For example, the same 21 tablet package that Cadista sold for 85 cents in March cost more than $19.00 by June. Sandoz concurrently imposed the same price increase as Cadista.

1518.   Par – which was obligated by contractual price protections to maintain its current prices for large customers – complied with the fair share agreement by declining to supply Cadista's and Sandoz's customers. As Par's contractual price obligations for

345

Methylprednisolone phased out, Par also raised its prices in accordance with Sandoz and Cadista.

1519.    Between October 2011 and October 2012, Greenstone and Breckenridge entered the market for Methylprednisolone. Consistent with the Fair Share agreement, Greenstone and Breckenridge communicated with the other Defendants and confirmed their intentions to enter the market at the elevated price. For example, an executive from Breckenridge communicated with Par's Vice President for Generic Sales prior to Breckenridge's entry into the market. In return, Cadista, Par, and Sandoz conceded market share to the new entrants so that they could receive their "fair share."

1520.    In response to this price increase, customers pushed back on the Defendants to lower their pricing on Methylprednisolone. For example, Walgreens – who was supplied by Cadista – solicited Sandoz to submit a bid in December 2012. Upon learning that Walgreens was soliciting bids, on information and belief the Vice President of Sales & Marketing at Sandoz, instructed his sales associate that took action to not obtain the business. Armando Kellum of Sandoz confirmed this instruction.

1521.    Walgreens continued to seek a lower price on Methylprednisolone in 2013. In September 2013, Kellum of Sandoz intervened again to prevent a sales associate from bidding on the large account, which still belonged to Cadista.

1522.    As a result of these collusive communications and each Defendants' adherence to the fair share agreement, the price increase on Methylprednisolone stuck, and Defendants have been able to sell the drug at supracompetitive levels ever since.

### 100.    Metronidazole

1523.    The market for Metronidazole is mature, as the drug has been available in the United States since the 1970s. Defendants G&W, Impax, Sandoz, Teva, and Valeant sold Metronidazole to A&P and others in the United States at supracompetitive prices inflated by the

346

unlawful and anticompetitive agreements alleged in this Complaint. There are several formulations of Metronidazole including cream, jelly, lotion, and vaginal formulations.

### a)  Metronidazole Cream

1524.    Defendants G&W, Sandoz, and Teva were the primary manufacturers of the cream formulation in 2011. Beginning around June 2011, G&W, Sandoz, and Teva engaged in price increases on Metronidazole Cream of more than 400%. Prices have remained at artificially high levels since 2011.

1525.    The GAO Report listed Metronidazole Cream as having experienced an "extraordinary price increase."

1526.    These price increases were not the result of supply shortages, demand spikes, increased input costs, or other competitive market conditions. There were no reported drug shortages nor was there a spike in demand that could explain the price hikes.

### b)  Metronidazole Jelly

1527.    Defendants G&W, Sandoz, Taro, and Teva were the primary manufacturers of the jelly formulation in 2011. Impax entered the market in 2012.

1528.    Beginning around June 2011, G&W, Sandoz, Taro, and Teva collusively engaged in price increases of Metronidazole Jelly of more than 400%. When Impax entered the market in 2012, it did not disturb the artificially inflated pricing.

1529.    The GAO Report listed Metronidazole Jelly as having experienced an "extraordinary price increase."

1530.    These price increases were not the result of supply shortages, demand spikes, increased input costs, or other competitive market conditions. There were no reported drug shortages nor was there a spike in demand that could explain the price hikes.

### c) Metronidazole Lotion

1531. Defendants Sandoz and Teva were the primary generic manufacturers of Metronidazole Lotion in 2011.

1532. Beginning in June 2011, Defendants Sandoz and Teva collusively engaged in a multifold coordinated price increase of Metronidazole Lotion of more than 400%.

1533. The GAO Report listed Metronidazole Lotion as having experienced an "extraordinary price increase."

1534. These price increases were not the result of supply shortages, demand spikes, increased input costs, or other competitive market conditions. There were no reported drug shortages nor was there a spike in demand that could explain the price hikes.

### d) Metronidazole Vaginal

1535. Defendants Sandoz and Valeant were the primary generic manufacturers of generic Metronidazole Vaginal in 2015.

1536. Prior to January 2015, prices for Metronidazole Vaginal remained stable for years.

1537. Beginning in around February 2015, Defendants Sandoz and Valeant collusively engaged in price increases of more than 300%.

1538. Notably, the price increase on Metronidazole Vaginal occurred around the same time that news sources reported that Valeant was dramatically increasing prices on other drugs.

1539. These price increases were not the result of supply shortages, demand spikes, increased input costs, or other competitive market conditions. There were no reported drug shortages nor was there a spike in demand that could explain the price hikes.

1540. Upon information and belief, the agreement to increase prices on all formulations of Metronidazole was the result of collusive communications between and among Defendants, and this agreement to increase prices was facilitated because each Defendant adhered

348

to the overarching market allocation agreement in the generic drug industry. The collusive agreement to increase prices on Metronidazole was furthered, at least in part, through in-person discussions conducted at meetings and industry events hosted by GPhA and HDMA as well as other meetings and communications such as those described below.

1541.    For example, on August 30-31, 2010, representatives from G&W, Sandoz, and Teva attended the NACDS Pharmacy and Technology Conference in San Diego, California. See Ex. 1.

1542.    On August 27-30, 2011, NACDS held a Pharmacy and Technology Conference in Boston. Representatives from G&W, Sandoz, and Teva attended. See Ex. 1.

1543.    On April 24-27, 2012, NACDS held its Annual Meeting. Representatives from G&W, Impax, Sandoz, and Teva attended. See Ex. 1.

1544.    On February 20-22, 2013, GPhA held its annual meeting in Orlando, Florida. Representatives from G&W, Impax, Sandoz, and Teva attended. See Ex. 1.

1545.    December 3, 2014, NACDS held its Foundation and Reception Dinner in New York City. Representatives from Sandoz, Valeant, and Teva attended. See Ex. 1.

1546.    On April 25-28, 2015, NACDS held its annual meeting in Florida. Representatives from G&W, Impax, Sandoz, Teva, and Valeant attended. See Ex. 1.

### 101.    Moexipril Hydrochloride Tablets

1547.    Moexipril Hydrochloride ("Moexipril"), also known by the brand name Univasc, is part of a class of drugs called angiotensin-converting enzyme (ACE) inhibitors. It is used to treat high blood pressure by reducing the tightening of blood vessels, allowing blood to flow more readily and the heart to pump more efficiently. Glenmark entered the market for the 7.5mg and 15mg tablets of Moexipril on December 31, 2010.

1548.    As discussed more fully below, Glenmark and Teva coordinated with each other

to raise pricing on two different formulations of Moexipril between May and July, 2013. When Defendant Patel colluded with CW-5, a senior-most executive at Glenmark, to raise prices on Moexipril, one of the fundamental tenets of that agreement was that they would not try to poach each other's customers after the increase and the competitors would each maintain their "fair share."

1549.   On August 5, 2013, Teva learned that it had been underbid by Glenmark at one of its largest wholesaler customers, ABC. Upon hearing this news, Defendant Rekenthaler, the Vice President of Sales at Teva, forwarded an e-mail discussing the Glenmark challenge to Defendant Patel, expressing his confusion over why Glenmark would be challenging Teva's business:

**From:** Dave Rekenthaler
**Sent:** Monday, August 05, 2013 7:05 PM
**To:** Nisha Patel02
**Subject:** Fwd: ABC - Loss business on Moexipril

???

Sent from my iPhone

1550.   Defendant Rekenthaler forwarded the e-mail only to Defendant Patel because he was aware that she had been the person at Teva who had been colluding with Glenmark.

1551.   Five (5) minutes after receiving the e-mail from Defendant Rekenthaler, Defendant Patel responded:

```
From:     Nisha Patel02
Sent:     Mon 8/05/2013 7:10 PM (GMT-05:00)
To:       Dave Rekenthaler
Cc:
Bcc:
Subject: RE: ABC - Loss business on Moexipril


I know…made the call already
```

1552.    The call that Defendant Patel had made earlier that day was to Defendant CW-5, a senior executive at Glenmark, to find out why Glenmark sought to underbid Teva at ABC.

1553.    Defendant Patel spoke to CW-5 three times that day. The following day – August 6, 2013 – Defendant Jim Brown, the Vice President of Sales at Glenmark, called Defendant Patel at 9:45am but did not reach her. Patel returned Brown's call at 10:08am and the two spoke for approximately thirteen (13) minutes. Later that day, at 1:11pm, the two spoke again for approximately fifteen (15) minutes. During these calls, Defendant Patel reminded Brown and CW-5 of their prior agreement not to poach each other's customers after a price increase.

1554.    As a result of these communications, Glenmark decided to withdraw its offer to ABC and honor the agreement it had reached with Teva not to compete on Moexipril. Later that same day – August 6, 2013 – T.S. of Teva informed colleagues that "[t]oday is a new day and today…. ABC has now informed me that they will NOT be moving the Moexipril business to Glenmark."

### 102.    Nadolol

1555.    As early as 2012, Teva was speaking to competitors about the drug Nadolol.

1556.    Nadolol, also known by the brand name Corgard, is a "beta blocker'' which is used to treat high blood pressure, reducing the risk of stroke and heart attack. It can also be used to treat chest pain (angina).

351

1557. In 2012 and 2013, Teva's only competitors for Nadolol were Mylan and Sandoz. All three companies experienced supply problems of some sort during that time period, but they were in continuous communication to coordinate pricing and market allocation in order to maintain market stability. Nadolol was a high volume drug and one of the most profitable drugs where Teva, Mylan and Sandoz overlapped, so it was very important that they maintain their coordination.

1558. Teva's relationships with Mylan and Sandoz are discussed above, but by 2012 an anticompetitive understanding among those companies was firmly entrenched.

1559. Teva raised its price on Nadolol on July 31, 2012. In the days leading up to that increase – following a pattern that would become routine and systematic over the following years – Defendant Green, at the time in the sales department at Teva, was in frequent communication with executives at both Sandoz and Mylan. Green spoke to CW-2 from Sandoz twice on July 29, 2012, and again on the day of the price increase, July 31, 2012. Similarly, Defendant Green was communicating with Defendant Nesta of Mylan often in the days leading up to the increase, including five (5) calls on the day of the price increase.

1560. Sandoz followed with its own increase on August 27, 2012. The increases were staggering – varying from 736% to 798% depending on the formulation. The day before the Sandoz increase, Defendant Armando Kellum, then the Senior Director of Pricing and Contracts at Sandoz, called Defendant Green. They had also spoken once earlier in the month, shortly after the Teva increase.  CW-2 also called Green twice on August 21, 2012 – the same day that Sandoz requested approval from its Pricing Committee to raise the Nadolol price. The day after the Sandoz increase, Defendant Green – acting as the conduit of information between Sandoz  and Mylan – called Nesta of Mylan twice, with one call lasting fourteen (14) minutes.

1561. Mylan, which returned to the market after a brief supply disruption, followed the

Teva and Sandoz increases on January 4, 2013. In what had become a routine component of the scheme, the day before the Mylan increase Nesta spoke to Green four (4) times. The next day, Defendant Green conveyed the information he had learned from Defendant Nesta directly to his counterpart at Sandoz. On January 4, 2013 – the day of the Mylan increase – Defendant Green called Defendant Kellum twice in the morning, including a six (6) minute call at 9:43am. Shortly after hanging up with Green, Kellum reported internally on what he had learned – but concealing the true source of the information – a convention that was frequently employed by many Sandoz executives to avoid documentation of their covert communications with competitors:

From: Kellum, Armando
Sent: Friday, January 04, 2013 11:28 AM
To: ███████████████████████████████████████████████
███████████████
Subject: Levothryoxine and nadolol

Just heard from a customer that

- Teva and Mylan raised have now raised price on Nadolol to our levels

and

Mylan took a significant price increase on Levothryoxine

Let's please be cautious on both of these products.

Thanks

Being "cautious" on those products meant that Sandoz did not want to steal business away from its competitors by offering a lower price and taking their market share.

1562.    Defendant Kellum's phone records demonstrate that he did not speak with any customers during the morning of January 4, 2013. At 11:50am the same morning, Defendant Green also called CW-2 at Sandoz and they spoke for fifteen (15) minutes.

1563.    Significantly, Defendant Green was not speaking with his Sandoz contacts solely about Nadolol, the common drug between Teva and Sandoz, but was also conveying information to Sandoz about a Mylan price increase on another drug that Teva did not even sell – Levothyroxine. Such conversations further demonstrate the broad, longstanding agreement among

353

each of these competitors to share market intelligence in order to facilitate the scheme.

1564.    In 2014, Greenstone entered the market for Nadolol and abided by the overarching "Fair Share" agreement in the process. Greenstone was in frequent contact with Kellum of Sandoz, Nesta of Mylan, and Patel of Teva around the time that Greenstone entered the market. Through these conversations, the competitors arranged for Greenstone to obtain its "Fair Share" of the Nadolol market, and Greenstone agreed to enter the market at the existing supracompetitive price.

1565.    To put the Nadolol price increases into context, the Connecticut Attorney General's Office received a complaint from a Connecticut resident who has been prescribed Nadolol for approximately the last 15 years. In or about 2004, that individual paid between $10 and $20 in out-of-pocket costs for a 90-day supply of Nadolol. Today, that same 90-day supply of Nadolol would cost the complainant more than $500.

1566.    As discussed more fully below, Teva continued to conspire with Mylan and Sandoz about Nadolol and many other drugs throughout 2013 and into the future.

### 103.    Naproxen Sodium

1567.    Naproxen Sodium is a nonsteroidal anti-inflammatory drug used to relieve pain from various conditions.  It has been available in the United States for decades in a generic form.

1568.    The market for Naproxen Sodium is mature. At all relevant times, there have been multiple manufacturers of Naproxen Sodium.

1569.    Defendants Amneal and Glenmark dominate sales of Naproxen Sodium Tablets (275 mg and 550 mg).

1570.    For years, the prices for Naproxen Sodium tablets were relatively low and stable. In 2015, Teva prepared to and eventually did exit the market, leaving Glenmark and Amneal as the dominant suppliers. Rather than compete against each other to pick up Teva's market share,

354

Glenmark and Amneal imposed very large and nearly simultaneous price increases.

1571.    In close succession, Glenmark and Amneal increased list (WAC) prices more than ten-fold.

1572.    On information and belief, Amneal and Glenmark reached an agreement to fix the price of Naproxen Sodium by rigging bids and allocating customers in furtherance of the overarching conspiracy.

1573.    Plaintiff alleges that as part of Defendants' Fair Share Agreement, they conspired to fix, raise, maintain or stabilize the prices of Naproxen Sodium beginning at least as early as 2014.

1574.    Under the Fair Share Agreement, Defendants did not attempt to undercut competitors' prices in order to gain additional market share.

1575.    The ability of Amneal and Glenmark to reach agreement regarding Naproxen Sodium was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. See Exhibit 1 (Chart of Defendants' Trade Association Meetings Attendance).

1576.    The Defendants also regularly communicated by phone.  For example, Jim Brown, VP of Sales at Glenmark, and S.R., Senior Director of Sales at Amneal, frequently communicated during the period when Glenmark and Amneal raised and maintained the prices of Naproxen Sodium. The two executives communicated by phone multiple times per month in every month of 2015.

1577.    No non-collusive market factors (e.g., product shortages) can explain the artificially inflated prices.

1578.    The agreement between Defendants Amneal and Glenmark was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig

355

bids, and engage in market and customer allocation for generic drugs, including Naproxen Sodium Tablets (275, 550 mg).

### 104.    Neomycin Polymyxin Hydrocortisone

1579.    Neomycin Polymyxin Hydrocortisone is a topical antibiotic used to treat outer ear infections caused by bacteria. It is available in several forms, including a Solution and has been available in the United States for over a decade in a generic form.

1580.    The market for Neomycin  Polymyxin Hydrocortisone Solution (3.5mg-10MU 1%) is mature. At all relevant times, there have been multiple manufacturers.

1581.    Defendants Bausch and Sandoz dominate sales of Neomycin Polymyxin Hydrocortisone.

1582.    On information and belief, Bausch and Sandoz reached an agreement to fix the price of Neomycin Polymyxin Hydrocortisone by rigging bids and allocating customers in furtherance of the overarching conspiracy.

1583.    Plaintiff alleges that as part of Defendants' Fair Share Agreement, they conspired to fix, raise, maintain or stabilize the prices of Neomycin Polymyxin Hydrocortisone beginning  at least as early as 2010.

1584.    Under the Fair Share Agreement, Defendants did not attempt to undercut competitors' prices in order to gain additional market share.

1585.    The ability of Bausch and Sandoz to reach agreements on Neomycin Polymyxin Hydrocortisone was aided by the prevalence of trade association meetings and conferences  where the parties were able to meet in person. See Exhibit 1 (Chart of Defendants' Trade Association Meetings Attendance).

1586.    No non-collusive market factors (e.g., product shortages) can explain the artificially inflated prices.

1587.    The agreement between Defendants Bausch and Sandoz was part of an

overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Neomycin Polymyxin Hydrocortisone Solution (3.5mg-10MU 1%).

### 105. Niacin ER

1588. Niacin Extended Release ("ER"), also known by the brand name Niaspan Extended Release, is a medication used to treat high cholesterol.

1589. Defendant Teva entered the Niacin ER market on September 20, 2013 as the first to-file generic manufacturer and was awarded 180 days of exclusivity. Teva's exclusivity was set to expire on March 20, 2014.

1590. Teva had advance knowledge that Defendant Lupin planned to enter on March 20, 2014 and that Lupin would have 100 days or until June 28, 2014 before a third generic manufacturer would be allowed to enter. Teva also knew that Defendant Zydus planned to enter on June 28, 2014.

1591. Armed with that knowledge, Teva increased price on Niacin ER on March 7, 2014 in advance of the competitors' entry. In the days leading up to the price increase, all three competitors exchanged several calls during which they discussed, among other things, the price increase on Niacin ER and the allocation of customers to the new entrants, Zydus and Lupin. The communications between Green and Patel and Rekenthaler of Teva, and Berthold of Lupin are detailed in the chart below.

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 3/3/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Green, Kevin (Zydus) | 0:20:00 |
| 3/3/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:00:04 |
| 3/3/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:19:43 |
| 3/3/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:00:04 |
| 3/3/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:00:00 |
| 3/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:00:04 |
| 3/4/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:00:00 |
| 3/4/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:00:04 |
| 3/4/2014 | Voice | Berthold, David (Lupin) | Outgoing | Green, Kevin (Zydus) | 0:13:26 |

1592.    Similarly, in the days leading up to the Lupin launch on March 20, 2014, all three competitors spoke again to discuss their plans for Niacin ER. The communications between Green and Rekenthaler and Patel of Teva, and Berthold of Lupin, are detailed in the chart below.



| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 3/17/2014 | Voice | Green, Kevin (Zydus) | Outgoing | Rekenthaler, David (Teva) | 0:01:00 |
| 3/17/2014 | Voice | Green, Kevin (Zydus) | Outgoing | Rekenthaler, David (Teva) | 0:03:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:05:53 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:05:04 |
| 3/17/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:06:16 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:11:13 |
| 3/18/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:06:26 |
| 3/18/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:04:12 |
| 3/18/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:07:00 |
| 3/18/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:12:39 |
| 3/20/2014 | Voice | Green, Kevin (Zydus) | Outgoing | Berthold, David (Lupin) | 0:01:00 |
| 3/20/2014 | Voice | Green, Kevin (Zydus) | Incoming | Berthold, David (Lupin) | 0:26:00 |

1593.    In May 2014, Zydus began readying to enter the Niacin ER market. On May 5, 2014, Zydus bid on the Niacin ER business at ABC- a Teva customer. The next day, on May 6, 2014, Defendant Green called Defendant Rekenthaler and they spoke for three (3) minutes. Less than an hour later, Green called Defendant Patel and they spoke for eight (8) minutes. A few minutes later, Green called Patel again and left a twelve-second voicemail. Later that evening, Defendant Patel e-mailed K.G. reporting what Teva had learned on those calls:

----Original Message----
From: Nisha Patel02
Sent: Tuesday, May 06, 2014 4:26 PM
To: ████████
Subject: RE: LIFO-niacin er
Importance: High

I have the share info and LOE tracker ready...I was getting mixed messages on the plan of action, so I did not send out or set up a meeting to discuss. Here's what I have picked up:

--Zydus responded in accordance with ABC's bid request. Offer is in writing.
--Zydus shipping either 6/18 or 6/28
--Zydus is the AG
--We are considering retaining ABC. My thought is that we need to concede due to the amount of erosion, but...
--Christine has indicated that we have direction to retain any and all share at any cost
  --This may be unrealistic
  --Several competitors entering
  --Should we agree that we will need to concede share, and determine retention/concession targets, I think we should consider conceding ABC --I have asked Liz to calculate the financials, including WAG and CVS exposure --LIFO buy in play
  --ABC needs commitment on a price, even though not yet valid.
  --LIFO is significant impact that is visible at ALL levels within ABC
  --There were talks of Teva providing a response with caveats (that ABC is open to), that I would like to review/suggest, since I am familiar with the triggers as well as LIFO

K.G. responded that Patel should schedule an internal meeting to discuss their strategy for Niacin ER and include Rekenthaler.

1594. Over the next several days, Patel and Rekenthaler exchanged several calls with Green. Green also exchanged several calls with Defendant Berthold of Lupin. These calls are listed below.

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 5/7/2014 | Voice | Green, Kevin (Zydus) | Outgoing | Berthold, David (Lupin) | 0:01:00 |
| 5/7/2014 | Voice | Green, Kevin (Zydus) | Incoming | Berthold, David (Lupin) | 0:08:00 |
| 5/7/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:05:37 |
| 5/7/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:00:00 |
| 5/7/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 0:00:03 |
| 5/7/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:09:21 |
| 5/8/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 0:37:49 |
| 5/9/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:00:00 |
| 5/9/2014 | Voice | Berthold, David (Lupin) | Incoming | Green, Kevin (Zydus) | 0:00:05 |
| 5/9/2014 | Voice | Berthold, David (Lupin) | Outgoing | Green, Kevin (Zydus) | 0:11:15 |

1595. Ultimately, the competitors agreed that Teva would retain ABC and concede McKesson, another large wholesaler, to Zydus.

1596. On May 29, 2014, C.D., an Associate Director of National Accounts at Teva,

359

sent an internal e-mail to certain Teva employees, including Defendants Patel and Rekenthaler, stating: "A customer is reporting that Zydus is soliciting usage for Niacin with an anticipated launch of June 24." After receiving the e-mail, Rekenthaler called Green. The call lasted two (2) minutes. Green returned the call a few minutes later and they spoke for twenty-eight (28) minutes. Later that day, Patel called Green and they spoke for nearly twenty-one (21) minutes.

1597.    On June 2, 2014, J.P., a Director of National Accounts at Teva, sent an internal e- mail stating "I received a ROFR from McKesson due to Zydus entering the market. They apparently did not secure ABC. They are launching 6/28, but are sending offers early due to Sun entering as well." Patel replied, "Please be sure to consult with [K.G.] on this one. Thanks." Later that morning, Green called Rekenthaler. The call lasted two (2) minutes. Green then called Patel and they spoke for nearly six (6) minutes.

1598.    On June 5, 2014, J.P. sent an internal e-mail regarding "McKesson Niacin" stating "Per Dave [Rekenthaler], Maureen [Cavanaugh] has agreed to concede this item." J.P. also entered the loss in Teva's internal database – Delphi – and noted that the reason for the concession was "Strategic New Market Entrant."

1599.    On June 28, 2014, Zydus formally launched Niacin ER and published WAC pricing that matched the per-unit cost for both Teva and Lupin.

### 106.    Nimodipine

1600.    The market for Nimodipine is mature, as the drug has been available in the United States in generic form for more than 10 years. Heritage, Sun (through Caraco), and Teva sold Nimodipine in the United States to A&P and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

1601.    In June 2012, Malek instructed a Heritage employee, Sather, to reach out to a sales executive at Caraco to discuss an agreement to raise prices and confirm the market allocation that the two companies would abide by in the U.S. market for Nimodipine. The ensuing

communications between Heritage and Caraco resulted in an agreement to increase prices on Nimodipine.

1602. In furtherance of this agreement to increase prices, Heritage agreed to submit a sham bid to an RFP from Cardinal, with Heritage intentionally quoting a price to Cardinal that Heritage knew was higher than the price that Caraco was quoting.

1603. In late 2012, the FDA issued a recall on the Nimodipine that Caraco was selling in the United States, which required Caraco to briefly exit the market.

1604. In late April or early May 2013, Malek learned that Caraco would seek to re-enter the Nimodipine market by July 2013. Malek initiated discussions with Caraco that resulted in an agreement that both companies would continue charging elevated prices on Nimodipine, and Heritage would allow Caraco to retake a certain percentage of the market.

1605. Caraco ultimately reentered the Nimodipine market in November 2013 and implemented the agreement with Heritage by charging the agreed-upon prices. Upon information and belief, Heritage reciprocated by allowing Sun and Caraco to retake the agreed-upon percentage of the Nimodipine market.

1606. These anticompetitive agreements by Heritage and Sun (through Caraco) resulted in supracompetitive prices for Nimodipine in the United States that have persisted since June 2012.

1607. As alleged above, the price increases regarding Nimodipine were the result of collusive agreements between and among Defendants and co-conspirators to increase pricing and restrain competition for the sale of Nimodipine to A&P and others in the United States. These collusive agreements were furthered, at least in part, by the communications between and among Defendants and co-conspirators alleged above.

### 107.    Nitrofurantoin Macrocrystal Capsules

1608.    Nitrofurantoin Macrocrystal, also known by the brand name Macrodantin, is a medication used to treat certain urinary tract infections.

1609.    In 2012, Mylan and Teva dominated the market for Nitrofurantoin Macrocrystal capsules, and Alvogen also maintained approximately 10% market share.

1610.    Nitrofurantoin Macrocrystal was one of eight drugs that Teva targeted for a price increase effective July 31, 2012. Prior to implementing the price increase for these drugs, Green and Rekentheler spoke with their competitors for each targeted drug to ensure that the understanding to increase prices would hold, including Mylan, Actavis, Breckenridge, and Alvogen. For example, in July 2012, Green spoke by phone with Nesta of Mylan, CW-2 of Sandoz, and William Hill, a senior sales and marketing executive at Alvogen. On July 31, Green and Nesta spoke five times, and immediately following some of these calls Green called Hill. Also, Rekentheler spoke with his competitors including his counterparts at Actavis and Breckenridge. These communications solidified the agreement between the Defendants that each would adhere to the price increase for the drug that each manufactured.

1611.    Teva's July 31, 2012 price increase on Nitrofurantoin Macrocrystal was between 90-95% depending on the dosage and formulation. After that increase, Teva continued to coordinate with Mylan and Alvogen to maintain those high prices.

1612.    For example, on October 10, 2012, a distributor customer approached Teva requesting a lower price for Nitrofurantoin MAC because it was having difficulty competing with the prices being charged by the distributor's competitors (i.e., other distributors). At 9:49am on October 10, 2012, K.G. of Teva sent an internal e-mail to the Teva sales team, including Defendants Green and Rekenthaler, among others, saying:

Sales Team,

We adjusted our pricing on Nitrofurantoin based on market pricing we had received in the past. Please confirm current market pricing.

1613.     Immediately after receiving that e-mail, Defendant Green reached out to both Defendant Nesta at Mylan and B.H., his counterpart at Alvogen. At 10:01am, Green called Nesta and the two spoke for ten (10) minutes. After hanging up – at 10:11am – Green called B.H. at Alvogen for the first of three (3) calls that day, including one call lasting fourteen (14) minutes. To close the loop, Defendant Nesta also separately spoke to B.H. two times that same day, including a call lasting almost ten (10) minutes. Teva did not lower its price.

### 108.    Norethindrone Acetate

1614.     Norethindrone Acetate, also known by the brand name Primolut-Nor among others, is a female hormone used to treat endometriosis, uterine bleeding caused by abnormal hormone levels, and secondary amenorrhea.

1615.     On September 9, 2014, a customer approached Teva asking if Teva would lower its pricing on certain drugs, including Norethindrone Acetate. One of Teva's competitors for Norethindrone Acetate was Defendant Amneal. That same day, Defendant Patel received phone calls from two different Amneal employees – S.R.(2), a senior sales executive (call lasting more than three (3) minutes), and S.R.(1), a senior sales and finance executive (almost twenty-five (25) minutes). These were the first calls Defendant Patel had with either S.R.(1) or S.R.(2) since she joined Teva in April 2013. That same day, S.R.(1) also spoke several times with Defendant Jim Brown, Vice President of Sales at Glenmark – the only other competitor in the market for Norethindrone Acetate.

363

1616. After speaking with the two Amneal executives, Teva refused to significantly reduce its price to the customer; instead providing only a nominal reduction so as not to disrupt the market. At that time, market share was almost evenly split between the three competitors. When discussing it later, Defendant Patel acknowledged internally that Teva had "bid high" at the customer based on its understanding "that it would be an increase candidate for Amneal. They increased shortly after." By bidding high and not taking the business from Amneal, in anticipation of a future price increase, Teva reinforced the fair share understanding among the competitors in the market.

### 109. Norethindrone/Ethinyl Estradiol (Balziva®)

1617. Norethindrone/ethinyl estradiol, also known by the brand name Ovcon®35, is a combination of medications used as an oral contraceptive. Teva markets its generic version of this combination medication under the name Balziva®.

1618. On January 23, 2014, a customer informed Teva that a new market entrant was seeking a share of its business. Teva employees surmised that the entrant was Lupin, as it had recently obtained approval to begin marketing its generic of Ovcon®35.

1619. Teva employees discussed internally how to make room for this new player in the market, with one expressing concern that "[w]e would lose our current market lead if we were to concede this business."

1620. The discussions about how to share the market with the recent entrant were not limited to internal communications, however. On January 24, 2014, Defendant Patel spoke to Defendant Berthold at Lupin twice by phone.

1621. Five days later, on January 29, Patel informed Defendant Rekenthaler of her recommendation based on her communications with Defendant Berthold, to take a cooperative stance towards this competitor, saying: "Kevin and I are in agreement that we should concede part

of the business to be responsible in the market."

1622. On February 4, Patel received the profitability analysis she requested in order to determine how much of the customer's business to hand over to Lupin. That same day, she spoke to Berthold two more times to further coordinate Lupin's seamless entry into the market.

### 110. Nortriptyline Hydrochloride

1623. Nortriptyline Hydrochloride ("Nortriptyline"), also known by the brand name Pamelor, is a drug used to treat depression.

1624. While Taro was approved in May 2000 to market generic Nortriptyline, it subsequently withdrew from the market. As of early 2013, the market was shared by only two players – Teva with a 55% share, and Actavis with the remaining 45%.

1625. By February 2013, Taro personnel had come to believe that they should reclaim a portion of this market, one opining that "…Nortriptyline capsules should be seriously considered for re-launch as soon as possible."

1626. In early November, Taro was formulating re-launch plans, including a "Target Market share goal" for Nortriptyline of 25% that would leave Teva with 42.45% and Actavis with 31.02%.

1627. On November 6, 2013, Defendant Aprahamian pressed his team to "…get some offers on Nortrip[tyline] out . . .." He emphasized the need to find out who currently supplied two particular large customers so that Taro could "determine our course (Cardinal or MCK)".

1628. Two days later, on November 8, Aprahamian received confirmation that McKesson was a Teva customer.

1629. Several days of conversations ensued among the affected competitors in an effort to sort out how Teva and Actavis would make room for Taro in this market. For example, Defendant Rekenthaler of Teva and Defendant Falkin of Actavis spoke twice by phone on

November 10, 2013.

1630.    Then, on November 12, 2013, Taro's Aprahamian called Defendant Patel at Teva. Their conversation lasted almost eleven (11) minutes. That same day, Defendant Aprahamian announced to his colleagues that Taro would not be pursuing Teva's business with McKesson, saying simply: "Will pass on MCK on Nortrip." Accordingly, he instructed a subordinate to put together an offer for Cardinal instead.

1631.    The discussions of how to accommodate Taro into the Nortriptyline market were far from over, however. Defendants Falkin of Actavis and Rekenthaler of Teva spoke on November 14, 15 and 18. Falkin also exchanged two text messages with Defendant Maureen Cavanaugh of Teva on November 17, and one on November 18, 2014.

1632.    Immediately following this series of discussions, Aprahamian began delivering a new message to his team: Taro had enough offers out on Teva customers – it needed to take the rest of its share from Actavis. On November 19, 2013 when a colleague presented an opportunity to gain business from Teva customer HD Smith, Aprahamian flatly rejected the idea, saying: "Looking for Actavis.. [sic] We have outstanding Teva offers out .. [sic]".

1633.    The next day, November 20, 2013, another Taro employee succeeded in finding an Actavis customer that Taro might pursue. Armed with this new information, Defendant Aprahamian wasted no time in seeking Actavis's permission, placing a call to M.D., a senior national account executive at Actavis, less than four hours later. They ultimately spoke on November 22, 2013 for more than eleven (11) minutes.

1634.    Meanwhile, Teva employees finalized plans to cede Cardinal to Taro as discussed in the negotiations with Actavis and Taro. On November 21, 2013, Teva informed its customer that "[w]e are going to concede the business with Cardinal."

1635.    The competitors continued consulting with each other over the coming months

366

on Nortriptyline. On December 6, 2013, for example, Defendant Aprahamian called M.D. at Actavis and the two spoke for over thirteen (13) minutes. On December 10, 2013, a Taro colleague informed Aprahamian that a large customer, HEB, was with Actavis for all but one of the Nortriptyline SKUs, and that HEB was interested in moving the business to Taro.

1636.   Having already cleared the move with Actavis during his December 6 call with M.D., Aprahamian put the wheels in motion the next day for Taro to make an offer to HEB.

1637.   Defendant Aprahamian also continued to coordinate with Teva. He called Defendant Patel on January 28, 2014, but she did not pick up. The dialogue continued on February 4, 2014 when Patel called Aprahamian back. The two talked for nearly twenty-four (24) minutes.

1638.   Two days later, on February 6, a potential customer solicited Taro to bid on its business. When a colleague informed Defendant Aprahamian of that fact and asked if he wanted to pursue the opportunity, Aprahamian responded firmly that Teva had already done enough to help Taro with its re-launch and thus only Actavis accounts should be pursued:



From: Ara Aprahamian/US/TARO
To: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
Cc: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
Date: 02/06/2014 06:03 PM
Subject: Re: Fw: Omnicare - Nortriptyline

No, need Actavis...

Teva gave up Cardinal and Opti, enough with thenm

1639.   Over the first ten days of March, executives at Teva, Taro and Actavis called and texted each other frequently in their continuing effort is to work out the details of Taro's re-entry. These calls include at least those listed below:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 3/4/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:00:19 |
| 3/4/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:01:03 |
| 3/4/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:11:56 |
| 3/5/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:00:00 |
| 3/5/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:10:37 |
| 3/5/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:00:02 |
| 3/6/2014 | Voice | M.D. (Actavis) | Outgoing | Taro Pharmaceuticals | 0:21:10 |
| 3/7/2014 | Voice | Falkin, Marc (Actavis) | Incoming | Rekenthaler, David (Teva) | 0:15:10 |
| 3/7/2014 | Voice | Falkin, Marc (Actavis) | Outgoing | Rekenthaler, David (Teva) | 0:09:42 |
| 3/10/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 0:00:02 |
| 3/10/2014 | Text | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 0:00:00 |
| 3/10/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 0:05:08 |

1640.    At the end of this flurry of communications, Teva documented its internal game plan for Nortriptyline. Prior to this time – particularly in early 2014 - Nortriptyline had been listed by Teva as a potential candidate for a price increase. On March 10, 2014, however, as Patel was revising that list of price increase candidates (and the same day she spoke to Defendant Aprahamian for more than five (5) minutes), she removed Nortriptyline from contention in order to accommodate Taro's entry. The spreadsheet that she sent to a colleague on that date expressly took into account the negotiations over Taro's entry that had occurred over the past few weeks. With respect to a possible Nortriptyline price increase, it stated: "Delay – Taro (new) seeking share." As discussed more fully below in Section XIII. G., Teva subsequently raised the price of Nortriptyline on January 28, 2015 – in coordination with both Taro and Actavis.

1641.    Green left Teva in November 2013 and moved to Zydus where he took a position as an Associate Vice President of National Accounts. Once at Zydus, Green capitalized on the relationships he had forged with his former Teva colleagues to collude with Teva (and other competitors) on several Teva/Zydus overlap drugs.

1642.    In the spring/early summer of 2014 in particular, Zydus was entering four different product markets that overlapped with Teva. During that time period, Green was in

frequent contact with Patel and Rekenthaler, and others, to discuss pricing and the allocation of customers to his new employer, Zydus. Indeed, given the close timing of entry on these four products, Green, Patel, and Rekenthaler were often discussing multiple products at any given time.

### 111. Nystatin

1643.    Developed in the 1950s, Nystatin is an antifungal drug sold in various dosage formulations including creams, ointments, and tablets. The market for Nystatin is mature, as the drug has been available in the United States since 1950.  The drug is considered an essential medicine by the World Health Organization. Actavis, Par, Perrigo, Sandoz, Taro, Teva, Heritage, and Sun (through Mutual) sold Nystatin to A&P and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

1644.    During the relevant period, Defendants Actavis, Par, Perrigo, Sandoz, and Taro were the primary manufacturers of Nystatin external cream.

1645.    During the relevant period, Defendants Actavis, Perrigo, and Sandoz were the primary manufacturers of Nystatin ointment.

1646.    During the relevant period, Defendants Teva, Heritage, and Sun (through Mutual) were the primary manufacturers of Nystatin tablets.

### a) *Nystatin Cream*

1647.    In late 2011, Taro, Perrigo, Par, and Actavis all raised the list prices of Nystatin cream. Taro and Perrigo increased their prices in very close succession in late 2011. Par followed the price increase in August and Actavis joined in November 2011. Sandoz joined the price increase when it re-entered the market in 2013.

1648.    In June 2011, Taro announced a dramatic price increase of more than 600%. Rather than compete on price in order to gain market share, Perrigo followed Taro's increase and

raised its own prices to almost identical levels. Perrigo increased production and managed to gain some market share from 2011-2013, but, consistent with the overarching market allocation (or "fair share") agreement, market prices remained relatively stable.

1649. In August 2011, Par, which only had about 1% of the market, followed the Taro and Perrigo price increase. Rather than competing on price in order to gain market share, Par followed this price increase. Over the next few years Par grew its market share, but it did so without competing on price, just as the fair share agreement intended.

1650. In November, Actavis ramped up production of Nystatin cream and re-joined the market. It, too, immediately elevated its prices to match that of Taro, Perrigo and Par, also choosing to forgo price competition and the prospect of winning a larger share of the market. Even a fourth entrant into the Nystatin cream market did not cause prices to erode. Defendants' agreement was working.

1651. Sandoz's share of the Nystatin cream market was close to 0% until the fall of 2013, at which point it ramped up production for re-entry into the market. Like Perrigo, Par and Actavis before it, rather than compete on price in order to regain lost market share, Sandoz priced its Nystatin cream at the same inflated level as its co-conspirators. Prices remained stable and elevated even with a fifth seller in the market.

1652. Upon information and belief, the price increases on Nystatin cream were the result of collusive agreements between and among Defendants to increase pricing and restrain competition for the sale of Nystatin in the United States. These collusive agreements were furthered at least in part, through in-person discussions conducted at meetings and industry events hosted by GPhA and HDMA as well as other meetings and communications described in Ex. 1.

#### b) *Nystatin Ointment*

1653. In June 2011, after Sandoz and Actavis had ceded the Nystatin ointment market,

Perrigo implemented a more than 300% increase.

1654.    In early 2012, Actavis increased production of Nystatin ointment. Rather than compete on price and try to steal market share from Perrigo, Actavis increased its list prices to high levels to match Perrigo.

1655.    This pattern repeatsed in the Summer of 2012. Sandoz increased its production. Rather than compete on price to gain market share, Sandoz raised its list price to identical levels as Perrigo and Actavis.

1656.    These actions by Actavis and Sandoz reflected the "fair share" agreement understanding.

1657.    Upon information and belief, the price increases on Nystatin ointment were the result of collusive agreements between and among Defendants to increase pricing and restrain competition for the sale of Nystatin in the United States. These collusive agreements were furthered at least in part, through in-person discussions conducted at meetings and industry events hosted by GPhA and HDMA as well as other meetings and communications described in Ex. 1.

### c)  *Nystatin Tablets*

1658.    As part of the overarching fair share conspiracy, Cardinal coordinated with Heritage, Sun/Mutual, Mylan, and Teva to allocate market share and increase prices for Nystatin Tablets.

1659.    On information and belief, Cardinal hosted a meeting with Heritage to discuss a plan to increase the price of Nystatin Tablets.

1660.    Ultimately Heritage agreed to join Cardinal's plan to increase prices.

1661.    Cardinal employees coordinated these price increases at an in-person meeting and a record exists only because the Heritage employee typed notes of the meeting. The notes also include other anticompetitive coordination by Cardinal on behalf of the manufacturer conspirators.

371

1662. Beginning in approximately April 2013, Sun (along with its subsidiary, Mutual) sought to increase the prices of Nystatin. A senior executive from Sun, discussed the price increase with Heritage on April 16, 2013, during a phone call that lasted approximately 40 minutes. However, the newly hired senior executive at Teva responsible for pricing of Nystatin (Nisha Patel) was initially leery about joining Sun's price increase.

1663. Defendant Cardinal helped build this relationship by confirming that Teva would follow a Heritage price increase for Nystatin.

1664. Malek sought to get Teva on board with the price increase. Malek spoke with Teva's Patel by telephone regarding a possible price increase on Nystatin several times in July 2013, including for about 21 minutes on July 9, 10 minutes on July 23 and for more than approximately 20 minutes on July 30. Heritage also discussed with Sun the conversations Heritage was having with Teva.

1665. The discussions between the three companies were put on hold for a period of time in late 2013, while Teva's Patel went on maternity leave. Shortly after her return to work, she spoke with Malek about finally implementing the Nystatin price increase during a February 4, 2014 telephone conversation. Malek and Teva's Patel spoke several additional times about the Nystatin price increase in February and March in order to confirm the agreement.

1666. On April 4, 2014, Teva announced an increase of approximately 100% on its Nystatin pricing. Around the same time, Malek renewed discussions with Sun to confirm the timing of Sun's and Heritage's price increases. As it was Sun that began the collusive discussions on Nystatin roughly one year prior, Sun quickly agreed to implement the price increase.

1667. Beginning in late June 2014, Heritage began announcing to its customers an increase on its Nystatin prices of almost 100%. Heritage confirmed to Sun the details of its pricing announcements in a detailed text message sent on June 25, 2014. By July 9, 2014, Heritage had

fully implemented the Nystatin price increase.

1668. After Heritage implemented its price increase on Nystatin, a large pharmacy sent an RFP to Teva seeking a competitive bid on Nystatin pricing. Teva forwarded the RFP to Heritage, confirming that Teva was following the conspiracy pricing.

1669. In August 2014, as it had discussed with Teva and Heritage, Sun (and Mutual) announced and implemented the increased pricing on Nystatin.

1670. As a result of this collusive agreement on Nystatin pricing, Teva, Heritage, and Sun (including Mutual) were able to roughly double the prices for generic Nystatin tablets that they sold to A&P and others in the United States. This collusive agreement remained in force or effect (or both) from April 2014 until the present.

### 112. Nystatin Triamcinolone

1671. Nystatin Triamcinolone is a steroid medication used to treat fungal infections. It comes in a Cream and Ointment formulation, among others.

1672. It has been available in the United States in a generic form for several years.

1673. During the relevant time frame, Defendants Taro, Sandoz, and Teva were the primary manufacturers of Nystatin Triamcinolone.

1674. Prior to certain Defendants launching Nystatin Triamcinolone, Defendants Taro, Sandoz, and Teva engaged in conversations about their launch. These conversations involved discussions of market and customer allocations.

1675. The ability of Taro, Sandoz, and Teva to reach agreements on Nystatin Triamcinolone was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. *See* Exhibit 1 (Chart of Defendants' Trade Association Meetings Attendance).

1676. The coordination by Taro, Sandoz, and Teva is consistent with the Fair Share

Agreement.

1677.    The agreement between Defendants Taro, Sandoz and Teva was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Nystatin Triamcinolone Cream and Ointment.

### 113.    Omega-3-Acid Ethyl Esters

1678.    Omega-3-Acid Ethyl Esters, also known by the brand name Lovaza, is a lipid-regulating agent used to lower levels of triglycerides.

1679.    Teva launched Omega-3-Acid Ethyl Esters on April 8, 2014. During this time period, manufacturers of the drug were all experiencing various supply problems, affecting how much market share each would be able to take on.

1680.    On the morning of June 26, 2014, Defendant Patel e-mailed C.B., a senior operations executive at Teva, to inform C.B. that Par had recently received FDA approval for Omega-3-Acid Ethyl Esters. C.B. responded by asking if Par had started shipping that product. Patel replied at 10:24am that she had not heard anything yet, but promised to "snoop around."

1681.    Patel had indeed already started "snooping around." At 9:46am, she had sent a message to T.P., a senior-most executive at Par, through the website LinkedIn, stating:

374



T.P. at Par did not respond through LinkedIn, but texted Patel on her cell phone later that same day, initiating a flurry of ten (10) text messages between them in the late afternoon and early evening of June 26, 2014.

1682.    That same night, Patel followed up with C.B., informing her that the only thing Patel knew at that point was that Par was limited on supply, but that she was "working on getting more …"

1683.    The next morning, on June 27, 2014, T.P. called Patel and they spoke for nearly thirty (30) minutes. That appears to be the first and only voice call ever between the two according to the phone records. That same morning, Patel informed C.B. that she now had "some more color" on Par's launch of Omega-3-Acid Ethyl Esters and would "fill you in when we speak." Patel also communicated this information to Defendant Rekenthaler. At 11:27am that same morning, Rekenthaler sent an e-mail to T.C., a Teva sales executive, with a veiled – but clear – understanding about Par's bidding and pricing plans:

> You're aware PAR receive [sic] an approval. I would imagine that CVS is

going to receive a one time buy offer from PAR. I'm also assuming the price would be above ours so there should not be a price request (which we would not review anyway). My point in the email is to ensure that you are aware of all of this . . . .

1684.    Par launched Omega-3-Acid Ethyl Esters Capsules the following Monday, June 30, 2014.

1685.    After the discussions between Patel and T.P. at Par, Teva proceeded to concede business to Par to ensure Par's smooth entry into the market. As of July 11, 2014, Teva's share of the market for new generic prescriptions had dropped 15.9 points to 84.1% and its share of the total generic market (new prescriptions and refills) had dropped 16.3 points to 83.7%.

1686.    As new competitors entered the market, Teva coordinated with them to avoid competition and keep prices high. For example, in an internal e-mail on October 2, 2014, Teva's K.G. stated that "[w]e heard that Apotex may be launching with limited supply and at a high price." Defendant Rekenthaler had obtained this information through phone calls with J.H., a senior sales executive at Apotex, on September 25 and 27, 2014 – and then conveyed the information internally at Teva.

1687.    Because of supply limitations, Par was not able to meaningfully enter the market until late November 2014. On November 10, 2014, Patel and T.P. exchanged five (5) text messages. On December 1, 2014, Teva was notified by a customer that it had received a price challenge on Omega-3-Acid Ethyl Esters. T.C. at Teva speculated that the challenge was from Apotex, but Rekenthaler knew better, stating "I'm confident it's Par." Rekenthaler informed T.C. that Teva would not reduce its price to retain the business – thus conceding the business to Par.

1688.    By mid-February 2015, Teva had conceded several large customers to Par to smooth Par's entry into the market and maintain high pricing. During this time, Defendant Rekenthaler was speaking frequently with M.B., a senior national account executive at Par, to coordinate.

1689.    By April 2015, Apotex had officially entered the market, and consistent with the "fair share" understanding, Teva's market share continued to drop. By April 25, Teva's share of the market for new generic prescriptions for Omega-3-Acid Ethyl Esters had dropped to 68.3% and its share of the total generic market (new prescriptions and refills) had dropped to 66.8%. Defendant Rekenthaler was speaking frequently with J.H. at Apotex to coordinate during the time period of Apotex's entry in the market.

### 114.    Oxaprozin Tablets

1690.    Oxaprozin, also known by the brand name Daypro, is a nonsteroidal anti-inflammatory drug (NSAID). It is used to treat rheumatoid arthritis, osteoarthritis, and juvenile rheumatoid arthritis.

1691.    Prior to July 2012, Teva and Dr. Reddy's dominated the Oxaprozin market. However, between July 2012 and March 2013, two additional competitors entered the market, yet the price of the drug went up more than 500% in the process.

1692.    First, Sandoz entered the market in July 2012. Prior to Sandoz's entry into the market, Teva raised its prices by approximately 500%.

1693.    This price increase was made possible by the Fair Share agreement, as Teva knew that it would not lose market share by raising prices, even with Sandoz's pending entry into the market. Indeed, when Sandoz did enter the market in July 2012, it matched Teva's higher prices and was still able to gain its "Fair Share" of the market.

1694.    Greenstone entered the market for Oxaprozin 600mg Tablets on March 27, 2013. It entered with the exact same WAC pricing as Teva. In the days and weeks leading up to Greenstone's entry into the market, Defendant Green of Teva and Defendant Hatosy, an account executive at Greenstone, were in frequent communication by phone and text to coordinate the entry as set forth in more detail below:

377

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 3/6/2013 | Voice | Hatosy, Robin (Greenstone) | Incoming | Green, Kevin (Teva) | 8:47:46 | 0:10:57 |
| 3/11/2013 | Voice | Hatosy, Robin (Greenstone) | Incoming | Green, Kevin (Teva) | 15:24:26 | 0:01:30 |
| 3/11/2013 | Voice | Hatosy, Robin (Greenstone) | Incoming | Green, Kevin (Teva) | 19:25:44 | 0:02:38 |
| 3/18/2013 | Voice | Hatosy, Robin (Greenstone) | Outgoing | Green, Kevin (Teva) | 18:03:08 | 0:00:36 |
| 3/18/2013 | Voice | Hatosy, Robin (Greenstone) | Incoming | Green, Kevin (Teva) | 18:44:27 | 0:04:51 |
| 3/20/2013 | Voice | Hatosy, Robin (Greenstone) | Incoming | Green, Kevin (Teva) | 7:59:16 | 0:02:22 |
| 3/21/2013 | Voice | Hatosy, Robin (Greenstone) | Incoming | Green, Kevin (Teva) | 16:31:40 | 0:00:00 |
| 3/21/2013 | Voice | Hatosy, Robin (Greenstone) | Outgoing | Green, Kevin (Teva) | 16:42:27 | 0:00:27 |
| 3/21/2013 | Voice | Hatosy, Robin (Greenstone) | Incoming | Green, Kevin (Teva) | 16:43:56 | 0:04:04 |
| 3/22/2013 | Voice | Hatosy, Robin (Greenstone) | Incoming | Green, Kevin (Teva) | 10:20:36 | 0:00:00 |
| 3/22/2013 | Voice | Hatosy, Robin (Greenstone) | Outgoing | Green, Kevin (Teva) | 10:45:41 | 0:00:10 |
| 3/22/2013 | Text | Hatosy, Robin (Greenstone) | Outgoing | Green, Kevin (Teva) | 10:51:04 | 0:00:00 |
| 3/22/2013 | Voice | Hatosy, Robin (Greenstone) | Incoming | Green, Kevin (Teva) | 10:56:51 | 0:02:13 |
| 3/27/2013 | Voice | Hatosy, Robin (Greenstone) | Incoming | Green, Kevin (Teva) | 17:26:41 | 0:00:00 |

1695. During these communications, Teva agreed to concede specific customers to Greenstone in order to avoid competition and price erosion resulting from Greenstone's entry.

1696. Part of the understanding between the companies was that Teva would concede at least two large customers - CVS and Cardinal - to Greenstone, and that Teva would retain Walmart as a customer. On March 27, 2013, however, Teva learned that Greenstone had either misunderstood the deal or was trying to cheat on the agreement by approaching Walmart.

1697. On March 27, 2013, T.C. of Teva forwarded an e-mail that T.C. had received from Walmart to Defendants Green and Rekenthaler. The e-mail from Walmart, sent the same day, requested that Teva provide a more competitive price on Oxaprozin 600mg tablets because Walmart had received a new bid from a competitor (Greenstone).

1698. Defendant Rekenthaler's immediate reaction to T.C.'s e-mail was "GreatMore idiots in the market... ."  In subsequent e-mails between T.C. and Rekenthaler, T.C. reminded Rekenthaler that, pursuant to the agreement with Greenstone, "[w]e just conceded at cardinal ... remember[?]" Teva had conceded both Cardinal and CVS to Greenstone. Rekenthaler remarked that "[t]hey should not have gone to Walmart. Poor

strategy on their part for sure..." In her reply, T.C. made it clear that there was an understanding between Teva and Greenstone:

```
From:        ▮▮▮▮▮▮▮▮▮
Sent:        Wed 3/27/2013 4:36 PM (GMT-05:00)
To:          Dave Rekenthaler; Kevin Green
Cc:
Bcc:
Subject:     RE: Oxaprozin 600mg Tab

I thought they said they were done after cardainl.. I am pissed.
```

1699.    Teva took immediate steps to address the situation. That same day – March 27, 2013 – Defendant Green called Defendant Hatosy at Greenstone at 5:25pm but she did not answer. The next morning, at 8:06am, T.C. sent an email to Walmart stating: "Addressing this morning…". Less than a half hour later, T.C. sent an email to Defendant Green, stating: "CALL ME IN MY OFFICE when you get a chance."

1700.    After Green spoke to T.C., he immediately called Hatosy at Greenstone. Defendant Hatosy relayed the information from Defendant Green to her boss, Defendant Nailor, in a series of conversations and text messages over the course of that morning, and later in the day, as set forth below:

379

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 3/28/2013 | Voice | Hatosy, Robin (Greenstone) | Incoming | Green, Kevin (Teva) | 8:57:21 | 0:00:00 |
| 3/28/2013 | Voice | Hatosy, Robin (Greenstone) | Outgoing | Green, Kevin (Teva) | 11:09:50 | 0:04:52 |
| 3/28/2013 | Voice | Hatosy, Robin (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 11:15:18 | 0:00:00 |
| 3/28/2013 | Voice | Hatosy, Robin (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 11:15:39 | 0:01:23 |
| 3/28/2013 | Voice | Hatosy, Robin (Greenstone) | Outgoing | Green, Kevin (Teva) | 11:22:04 | 0:00:45 |
| 3/28/2013 | Voice | Hatosy, Robin (Greenstone) | Incoming | Green, Kevin (Teva) | 12:15:08 | 0:00:00 |
| 3/28/2013 | Voice | Hatosy, Robin (Greenstone) | Outgoing | Green, Kevin (Teva) | 12:18:28 | 0:04:45 |
| 3/28/2013 | Voice | Hatosy, Robin (Greenstone) | Outgoing | Green, Kevin (Teva) | 13:38:50 | 0:03:15 |
| 3/28/2013 | Text | Hatosy, Robin (Greenstone) | Incoming | Nailor, Jill (Greenstone) | 18:52:14 | 0:00:00 |
| 3/28/2013 | Text | Hatosy, Robin (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 18:59:45 | 0:00:00 |
| 3/28/2013 | Text | Hatosy, Robin (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 18:59:47 | 0:00:00 |
| 3/28/2013 | Text | Hatosy, Robin (Greenstone) | Incoming | Nailor, Jill (Greenstone) | 19:00:29 | 0:00:00 |
| 3/28/2013 | Text | Hatosy, Robin (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 19:07:29 | 0:00:00 |
| 3/28/2013 | Text | Hatosy, Robin (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 19:07:31 | 0:00:00 |
| 3/28/2013 | Text | Hatosy, Robin (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 21:15:51 | 0:00:00 |
| 3/28/2013 | Text | Hatosy, Robin (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 21:15:53 | 0:00:00 |
| 3/28/2013 | Text | Hatosy, Robin (Greenstone) | Incoming | Nailor, Jill (Greenstone) | 23:23:53 | 0:00:00 |

1701.   During those conversations, Greenstone agreed to withdraw the offer to Walmart and honor the agreement with Teva.

1702.   At 1:22 p.m. that day, after several of the communications outlined above, Walmart sent an e-mail to T.C. at Teva confirming that Greenstone had in fact withdrawn its offer: "FYI – I just received word from Greenstone that they have met their market share and the proposal has expired. Please see what you can do with pricing." T.C. forwarded the e-mail to Defendant Green, with a one-word response making it clear that Teva would not be reducing its price for Oxaprozin: "FUNNY."

1703.   Pursuant to the agreement between Greenstone and Teva, there was very little price erosion as a result of Greenstone's entry. A couple of months later, as Defendant Dr. Reddy's was preparing to enter the market for Oxaprozin (discussed more fully below), a Dr. Reddy's representative commented positively that "[p]ricing [is] still high" on Oxaprozin. That same representative had also talked to wholesaler Cardinal about the drug, and conveyed that "Cardinal switched to Greenstone. Teva was 'fine' with it!"

1704.   In early 2013, Dr. Reddy's began having internal discussions about re-launching

380

Oxaprozin in June of that year. In March 2013 – when Teva was still the sole generic in the market – the plan was to target one large chain and one large wholesaler in order to obtain at least 30% market share. Two months later, in May 2013, Dr. Reddy's adjusted its market share expectations down to 20% after Greenstone and Sandoz both re-launched Oxaprozin.

1705.    On June 13, 2013, members of the Dr. Reddy's sales force met for an "Oxaprozin Launch Targets Discussion" to "discuss launch targets based on the market intelligence gained by the sales team."

1706.    Dr. Reddy's re-launched Oxaprozin on June 27, 2013 with the same WAC price as Teva. At the time, Teva had 60% market share. Dr. Reddy's almost immediately got the Oxaprozin business at two customers, Keysource and Premier. Dr. Reddy's also challenged for Teva's business at McKesson, but Teva reduced its price to retain that significant customer.

1707.    Eager to obtain a large customer, Dr. Reddy's turned its sights to Walgreens. At a July 1, 2013 sales and marketing meeting, there was an internal discussion among Dr. Reddy's employees about "asking to see if Teva would walk away from the business" at Walgreens. Within a week, Dr. Reddy's employees had learned that Teva would defend the Walgreens business and recognized that they would have to "bid aggressively" to obtain that customer.

1708.    Dr. Reddy's did bid aggressively at Walgreens. On or around July 14, 2013, Walgreens informed Defendant Green, then a National Account Director at Teva, that Dr. Reddy's had made an unsolicited bid for the Oxaprozin business, at a price of roughly half of Teva's current price. Per Defendant Green, Walgreens did not "want to move but obviously want[s] the price."

1709.    While the Dr. Reddy's offer to Walgreens was still pending – on July 23, 2013 –J.A. of Dr. Reddy's called Defendant Green. That phone call – the only one ever between the two individuals that is identified in the phone records – lasted for nearly five (5) minutes.

1710.    Two days later, Defendant Green noted that "[i]f we give D[r. Reddy's] this

business, they may be satisfied. I will see if I can find this out." Green also warned, however, that if Teva decided to defend and keep Walgreens' business, Dr. Reddy's will "just go elsewhere" – meaning Dr. Reddy's would continue to offer unsolicited bids to Teva customers and drive prices down.

1711. While deciding whether to match the Dr. Reddy's offer at Walgreens or concede the business to Dr. Reddy's, Teva engaged in internal discussions about strategy. On July 29, 2013, K.G. at Teva suggested the possibility of keeping the Walgreens business, but conceding Teva's next largest customer for Oxaprozin – Econdisc – to Dr. Reddy's. Eager to avoid any further price erosion from the Dr. Reddy's entry, Defendant Rekenthaler immediately asked Defendant Patel to "look at our business on Oxaprozin in order to accommodate Dr. Reddy's entry." Rekenthaler's goal was to identify customers other than Walgreens that Teva could concede to Dr. Reddy's in order to satisfy its market share goals.

1712. At 12:33pm that day, Defendant Patel asked a colleague to "run the customer volume and profitability analysis for Oxaprozin." It was typical at Teva to run this type of report before negotiating market share with a competitor. At 2:20pm, that colleague provided the information to Defendant Patel, copying Defendant Rekenthaler and K.G. With this information in hand, less than an hour later Defendant Rekenthaler placed a call to T.W., a Senior Director of National Accounts at Dr. Reddy's. The call lasted two (2) minutes, and was their only telephone conversation in 2013.

1713. After having this conversation with T.W., Teva decided to maintain the Walgreens business, but concede the Econdisc business to Dr. Reddy's. Teva conceded the Econdisc business on August 7, 2013. Defendant Green listed "Strategic Market Conditions" in Teva's Delphi database as the reason for conceding the business to Dr. Reddy's.

1714. By September 10, 2013, Dr. Reddy's had achieved its goal of obtaining 20%

share of the Oxaprozin market. At that time, its customers included Econdisc, Keysource, and Premier.

1715.    As a result of this collusion, Defendants have been able to maintain pricing for Oxaprozin at supracompetitive levels since July 2012.

### 115.    Oxybutynin Chloride

1716.    Oxybutynin Chloride, which is also discussed in additional detail in Section XIII. B. below, is a commonly prescribed antispasmodic and anticholinergic agent used to treat symptoms of overactive bladder. It has been in the United States market for years and is available in Tablets.

1717.    The GAO observed "extraordinary price increases" for Oxybutynin Chloride in 2013-14. Documentary evidence confirms that these parallel price increases were the result of collusion among generic drug manufacturers including Par, Teva, and Upsher-Smith.

1718.    In 2013, Teva, Par and Upsher-Smith coordinated their pricing actions. For example, Teva's Patel spoke to B.L. at Upsher-Smith on April 29, 2013 for nearly twenty (20) minutes reached an understanding that Teva and Upsher-Smith would follow each other's price increases. On June 15, 2013, after Teva, Upsher-Smith and Par had begun to radically raise prices, Patel exchanged six (6) text messages with B.L. Also in June, K.O, VP of National Accounts at Par, spoke multiple times to B.P., National Account Manager at Upsher-Smith.

1719.    No non-colusive market factors (e.g., product shortages) can explain the artificially-inflated prices.

1720.    The agreement between Defendants Par, Teva, and Upsher-Smith was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Oxybutynin Chloride Tablets.

### 116.   Oxycodone/Acetaminophen

1721.   Oxycodone/Acetaminophen, which is the generic version of Percocet and is sometimes abbreviated as "Oxy/Apap" is prescribed to treat chronic or severe pain.

1722.   During the time period relevant to this Complaint, Actavis, Alvogen, Amneal, Aurobindo, Mallinckrodt, Mayne, Par, and Teva dominated the market for Oxy/Apap. Given the large number of competitors that entered the market for the drug between 2011 and 2015, pricing for Oxy/Apap should have fallen substantially over time. Instead, the opposite occurred. For example, by December 2013, Mallinckrodt, Actavis, Alvogen, Amneal and Par all sold 100- tablet bottles of 10/325 mg pills that had cost roughly $18 per bottle throughout 2011 and 2012 for more than $80.

1723.   Although the Defendants did not increase prices on the drug until late 2013, Defendants ensured that the fair share agreement applied as new competitors entered the market. For example, Alvogen received approval to launch Oxy/Apap in July 2012. Upon learning that Alvogen was entering the market for Oxy/Apap, Dr. Reddy's – which did not manufacture the drug – reached out to William Hill, Alvogen's EVP of US Commercial Sales, to congratulate him on the approval. Hill responded that Alvogen's entry "should be a fun ride. We're just trying to find the right spots to fill some holes in the market." In other words, Hill confirmed to a Defendant that did not manufacture the drug that Alvogen was complying with the overarching agreement by not seeking any more than its "fair share" of the market.

1724.   Between July and December 2013, Defendants coordinated to more than quadruple their prices on Oxy/Apap. Mallinckrodt led the price increase, and Actavis, Alvogen, Amneal, and Par quickly followed. Upon information and belief, the campaign to increase prices on the drug was spearheaded by Actavis and Mallinckrodt. Between July 2013 and December 2013, Marc Falkin of Actavis spoke with William Hill, Alvogen's EVP of US Commercial Sales;

the VP of Sales at Amneal; Robert Cunnard, the CEO of Aurobindo; the Vice President and General Manager at Mallinckrodt; and Par's VP of Sales. Amneal also coordinated with Aurobindo and Actavis, respectively, during this timeframe.

1725.    On November 19, 2013, Par received an inquiry from Econdisc to bid for Oxy/Apap. Upon learning that the RFP was requested due to a price increase from the incumbent supplier, upon information and belief, Par declined to bid for this business based on its discussions and in furtherance of the agreement reached with the other Defendants.

1726.    A Teva sales executive reported internally in a November 26, 2013 e-mail to Kevin Green David Rekenthaler, Nisha Patel, and others regarding a price increase by Actavis. This information proved accurate, as Actavis followed Mallinckrodt's price increase just a few days later.

1727.    Mayne entered the market for Oxy/Apap in late 2014 and on information and belief, after coordinating with other defendants received its "fair share" as the eighth entrant into the market without any disruption to price, in accordance with the overarching conspiracy.

1728.    As a result of these collusive communications, Defendants have been able to maintain Oxy/Apap at supracompetitive levels since July 2012.

### 117.    Oxycodone HCL

1729.    Oxycodone HCL is an opioid agonist indicated for the management of moderate to severe acute and chronic pain where the use of an opioid analgesic is appropriate. It is available in several forms, including Tablet and Oral Solution, and has been available in the United States for over a decade in generic form.

1730.    The market for Oxycodone HCL is mature. At all relevant times, there have been multiple manufacturers of Oxycodone HCL.

1731.    The GAO noted that Oxycodone HCL had "extraordinary price increases" in the

years 2010-2011.

1732.    Plaintiff alleges that as part of Defendants' Fair Share Agreement, they conspired to fix, raise, maintain or stabilize the prices of Oxycodone HCL beginning at least as early as 2010.

1733.    Under the Fair Share Agreement, Defendants did not attempt to undercut competitors' prices in order to gain additional market share.

1734.    The ability of Glenmark and Lannett to reach agreements on Oxycodone HCL was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. *See* Exhibit 1 (Chart of Defendants' Trade Association Meetings Attendance).

1735.    No non-collusive market factors (e.g., product shortages) can explain the artificially inflated prices.

1736.    The agreement between Defendants Glenmark and Lannett was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Oxycodone HCL Oral Solution (20mg/ml).

1737.    The ability of Mallinckrodt, Par and Teva to reach agreements on Oxycodone HCL Tablets was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. *See* Exhibit 1 (Chart of Defendants' Trade Association Meetings Attendance).

1738.    No non-collusive market factors (e.g., product shortages) can explain the artificially inflated prices.

1739.    The agreement between Defendants Mallinckrodt, Par, and Teva was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig

386

bids, and engage in market and customer allocation for generic drugs, including Oxycodone HCL Tablets (15 mg and 30 mg).

### 118.    Paricalcitol

1740.    Paricalcitol, also known by the brand name Zemplar, is used to treat and prevent high levels of parathyroid hormone in patients with long-term kidney disease.  As part of the overarching fair share conspiracy, Dr. Reddy's, Teva and Zydus sought to allocate market share for the drug.

1741.    Defendant Teva entered the market on Paricalcitol on September 30, 2013. As the first generic to enter the market, it was entitled to 180 days of exclusivity.

1742.    In March 2014, with the end of the exclusivity period approaching, Teva began planning which customers it would need to concede. Teva had advance knowledge that Defendant Zydus and another generic manufacturer not named as a Defendant in this case planned to enter the market on day 181, which was March 29, 2014.

1743.    In the month leading up to the Zydus launch, Defendants Patel and Rekenthaler spoke with Defendant Green and discussed, among other things, which Paricalcitol customers Teva would retain and which customers it would allocate to the new market entrant.

1744.    On February 28, 2014, T.S., a Director of National Accounts at Teva, sent an internal e-mail to certain Teva employees, including Defendants Patel and Rekenthaler, advising that ABC was requesting bids on two Zydus overlap drugs – Paricalcitol and Niacin ER. After receiving that e-mail, Rekenthaler called Green. The call lasted less than one (1) minute (likely a voicemail). The next business day, on March 3, 2014, Rekenthaler called Green again and they spoke for twenty (20) minutes.  Later that afternoon, Patel also called Green.  The two exchanged four calls that day, including one that lasted nearly twenty (20) minutes. On March 4, Patel called Green again and left a voicemail.

1745.    On March 12, 2014, T.S. e-mailed Defendants Patel and Rekenthaler stating that Zydus had bid on Paricalcitol at ABC. That same day, Patel sent an internal e-mail asking for a loss of exclusivity report for Paricalcitol, listing out Teva's customers and the percentage of Teva's business they represented. This was typically done by Teva employees before calling a competitor to discuss how to divvy up customers in a market.

1746.    On March 13, 2014, Patel directed that Teva retain ABC and match the Zydus pricing. The next day, on March 14, 2014, Patel called Green to update him on Teva's decision to play fair. A few minutes later, Green returned the call and they spoke for nineteen (19) minutes. Rekenthaler then called Patel and they spoke for eleven (11) minutes.

1747.    During the morning of March 17, 2014, Defendants Patel and Green had two more phone calls, lasting nearly six (6) minutes and just over five (5) minutes. During those calls they were discussing how to divvy up the market for several products where Zydus was entering the market. A half an hour after the second call, Patel e-mailed her supervisor, K.G., identifying "LOE Targets to Keep" for several products on which Teva overlapped with Defendant Zydus – including Paricalcitol. With respect to Paricalcitol, Patel recommended that Teva "Keep Walgreens, ABC, One Stop, WalMart, Rite Aid, Omnicare." Later that same day, Patel called Green again and they spoke for more than eleven (11) minutes.

1748.    Over the next several weeks, Defendant Teva would "strategically" concede several customers to the new entrant Zydus.

1749.    For example, on March 27, 2014, Green called Patel. Defendant Patel returned the call and they spoke for nearly nine (9) minutes. The next day, on March 28, 2014, OptiSource, one of Teva's GPO customers, notified J.P., a Director of National Accounts at Teva, that it had received a competing offer from Zydus for its Paricalcitol business. J.P. forwarded the OptiSource e-mail to Patel. Within minutes, Patel responded "[w]e should concede." Patel's answer was

immediate because of her call with Green the day before during which Green had advised her of the incoming bid and Patel had agreed to play fair.

1750. That same day, Defendant Teva was notified by another customer, Publix, that Zydus had submitted a proposal for its Paricalcitol business. On April 1, 2014, Defendant Teva conceded the customer to Zydus and noted in Delphi that the reason for the concession was "Strategic New Market Entrant."

1751. On April 1, 2014, Defendant Zydus bid for the Parcalcitol business at NC Mutual, another Teva customer. That same day, Patel called Green and left a 22-second voicemail. The next day, on April 2, 2014, Patel tried Green twice more and they connected on the second call and spoke for nearly ten (10) minutes. Later that evening L.R., an Associate Manager, Customer Marketing at Teva, sent an internal e-mail to T.S., the Teva Director of National Accounts assigned to NC Mutual, copying Patel, asking: "May we please have an extension for this request until tomorrow?" Patel responded, "I apologize for the delay! We should concede."

1752. On April 15, 2014, Walmart received a competitive bid for its Paricalcitol business and provided Teva with the opportunity to retain. Two days later, on April 17, 2014, K.G. responded that he thought it might be Zydus. Patel replied, "We have conceded a reasonable amount of business (as planned) to Zydus. I would be surprised if they were going after a customer this big after they've picked up business recently." Later that day, Green called Patel. She returned his call and they spoke for nearly twelve (12) minutes. Later that day, after her discussion with Defendant Green, Patel sent an internal e-mail stating "After further review, I believe this is [a company not identified as a Defendant in this case]." On April 22, 2014, Patel sent an internal e-mail regarding Walmart directing, "Need to retain. Please send an offer. Thanks.''

1753. By May 2014, Dr. Reddy's started preparing to enter the Paricalcitol market. WBAD coordinated Dr. Reddy's entry into the market by serving as a liaison between Dr Reddy's

and its competitors even though they were also in direct communication with one another. Dr. Reddy's was targeting a 20% market share. At the time, Teva's share was 73%.

1754. On May 1, 2014, T.W. of Dr. Reddy's spoke with Defendant Rekenthaler of Teva for nearly eleven (11) minutes.

1755. At a May 20 sales and marketing team meeting, the Dr. Reddy's sales force was instructed to find out which customers were currently purchasing Paricalcitol from which manufacturers, and their prices. Dr. Reddy's was targeting a 20% market share. At the time, Teva's share was 73%.

1756. On June 10, 2014 – as Dr. Reddy's was starting to approach certain customers – including a large retail pharmacy customer, WBDA, – Defendant Patel spoke with Victor Borelli, the Vice President of Sales for North American Generics at Dr. Reddy's, several times. At 8:50am, Patel called Victor Borelli and left a voicemail. Borelli returned the call at 9:18am, and the two spoke for more than ten (10) minutes. Later that day, at 2:46pm, Dr. Reddy's provided WBDA with a market share report for Paricalcitol indicating that Teva was the market leader at 60% share. A representative of WBDA responded that it "[l]ooks like Teva is the right target." Shortly after this e-mail exchange, at 3:21pm, Borelli called Defendant Patel again and the two spoke for nearly nine (9) minutes.

1757. By June 19, 2014, Dr. Reddy's had made offers to Omnicare, Cardinal, ABC, and WBDA. The internal plan was that if WBDA, declined, then Dr. Reddy's would make an offer to CVS. That same day, Teva agreed to concede its Paricalcitol business at Omnicare, dropping its market share by 3%.

1758. Teva also strategically conceded what remained of its Cardinal business (it had previously conceded some of that business to Zydus). After receiving Dr. Reddy's bid, Cardinal approached Teva and asked whether Teva would bid to retain the four mcg portion of the business.

Defendant Patel recommended to her boss, K.G., that Teva concede the business: "We have ~70 share and it is ideal to concede here because of the incomplete family." K.G. agreed. Defendant Patel then instructed S.B., a customer analyst at Teva, to concede "due to [T]eva's high share." S.B. subsequently e-mailed T.C., Teva's Senior Director of Sales & Trade Relations: "Due to the fact that we have high share and already conceded on the other strengths, we are going to concede on this strength as well." T.C. relayed this statement, word-for-word, to Cardinal.

1759. Dr. Reddy's formally launched Paricalcitol on June 24, 2014. On or around that date, it sent offers to, inter alia, Winn-Dixie, Giant Eagle, and Schnucks. On June 26, 2014, Teva's K.G. told Defendant Patel that he was "willing to concede 10-15% share total on Paricalcitol" to Dr. Reddy's. Teva then conceded several accounts to Dr. Reddy's, following the plan confirmed by WBAD.

1760. Winn-Dixie informed Teva that it had received a competing offer for Paricalcitol from Dr. Reddy's. Defendant Patel recommended that Teva concede the business. Teva did, and Winn-Dixie informed Dr. Reddy's that it had won its Paricalcitol business on July 9, 2014.

1761. Giant Eagle informed Teva that it had received a competing offer on Paricalcitol on July 10, 2014. That same day, Victor Borelli of Dr. Reddy's called Defendant Patel and the two spoke for more than twelve (12) minutes. Shortly after getting off the phone with Borelli, Patel responded to a question from a colleague regarding an RFP to another supermarket chain. One of the potential bid items was Paricalcitrol. Patel directed her colleague to "bid a little high on Paricalcitol. We should not be aggressive since we are in the process of conceding share due to additional entrants." Her colleague responded: "I will bid higher" on Paricalcitol.

1762. The next day, Teva conceded the Giant Eagle business to Dr. Reddy's. S.B., a Teva Strategic Customer Analyst, wrote in an internal e-mail, "Due to DRL recent launch and pressure to give up share, we are going to concede." Giant Eagle accepted Dr. Reddy's proposal

the next day.

1763.    After receiving an offer from Dr. Reddy's, Schnucks also asked Teva for reduced pricing in order to retain the business. Teva decided internally to concede Paricalcitol at Schnucks "[d]ue to new entrants and having to give up some share." In order to create the appearance of competition with this customer, Teva engaged in what Defendant Patel referred to as "fluff pricing," by which it offered Schnucks an inflated price (cover bid) for Paricalcitol to ensure that Teva did not win the business. Indeed, Schnucks was "so insulted" by Teva's price that it moved to Dr. Reddy's the same day it received Teva's offer. When Defendant Patel learned of this, she remarked to a Teva salesperson (who she had been discussing "fluff pricing" with recently):

From:    Nisha Patel02
Sent:    Thu 7/17/2014 11:36 AM (GMT-05:00)
To:      ████████████
Cc:
Bcc:
Subject: RE: Schnucks Paricalcitol CPC (#12201)

Sorry! Had to laugh.  In regards to our recent conversation….this is what we see when we provide fluff pricing.
Can't win!

Schnucks accepted Dr. Reddy's Paricalcitol proposal on June 30, 2014.

1764.    On July 16, 2014, McKesson informed Teva that it had received a competing bid for Paricalcitol, and that Teva would need to submit its best bid in order to retain the business. Teva initially decided to concede the One Stop portion of McKesson's business only, while retaining another portion (RiteAid a/k/a McRAD). Defendant Patel wrote internally to her team that "[t]his decision is based on the number of competitors, DRL's potential share target and our current/conceded share. (Dr. Reddy's should be done with challenging our business on this product.)" Patel further added that Teva had been "looking to give up One Stop to be responsible with share" and that "[t]he responsible thing to do is concede some share to DRL but not all."

392

1765. On July 18, 2014 – a Friday – Defendant Patel called Borelli at Dr. Reddy's at 4:20pm and left a message. Borelli returned the call on Monday morning, and the two spoke for more than four (4) minutes. They spoke again the next morning, July 22, 2014, for more than six (6) minutes. During these calls, Defendant Patel and Borelli agreed that Dr. Reddy's would surrender its bid for Teva's Paricalcitol business at Wal-Mart and would stop competing for additional market share (and driving price down further) if Teva conceded all of its McKesson business (One Stop and Rite Aid) to Dr. Reddy's. Indeed, Dr. Reddy's confirmed to McKesson (that same day) that it "would be done after this" – meaning it would not compete for additional business because it had attained its fair share. McKesson passed this information along to Teva on July 22.

1766. The next day, July 23, 2014, Teva carried out its agreement to concede its entire McKesson business – both RiteAid and One Stop – to Dr. Reddy's and to retain Wal-Mart. In making this decision, Defendant Patel noted: "NOW, DRL should be done." In its Delphi database, Teva noted that the McKesson Paricalcitol business had been conceded to a "Strategic New Market Entrant."

1767. By early August 2014, Dr. Reddy's had attained 15-16% of the total Paricalcitol market, which it decided – pursuant to its understanding with Teva – it would "maintain for now."

### 119. Paromomycin

1768. The market for Paromomycin is mature, as the drug has been available in the United States since 1960. The drug is considered an essential medicine by the World Health Organization. Heritage and Sun sold Paromomycin to A&P and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

1769. Until April 2014, pursuant to the conspiracy's overarching agreement on market allocation, Heritage maintained approximately a 65% market share for Paromomycin and Sun

393

maintained approximately a 35% market share.

1770.    During a lengthy phone call on April 22, 2014, representative from Heritage and Sun discussed an agreement to raise prices on Paromomycin. Ultimately, it was agreed between the two companies that Sun would exit the market for Paromomycin. Upon information and belief, Heritage agreed to concede market share to Sun on another generic drug in exchange for Sun's agreement to stop manufacturing Paromomycin.

1771.    In May 2014, Sun stopped its production of Paromomycin (although it continued to sell its surplus inventory of the drug until approximately January 2015).

1772.    Knowing that it would have a complete monopoly for the manufacture of generic Paromomycin in the United States, Heritage decided to raise prices, and on June 26, 2014, Heritage notified its customers that its prices for Paromomycin would double going forward. Upon information and belief, Heritage raised its prices by approximately 100%.

1773.    As a result of this unlawful agreement between Heritage and Sun, Defendants have charged supracompetitive prices on generic Paromomycin sold to A&P and others in  the United States since at least April 2014.

### 120.    Permethrin

1774.    Permethrin is a medication used to treat scabies. It has been available in the United States for decades in a generic form. Due to, among other things, its clinical efficacy and safety, Permethrin has been designated as a model essential medicine by the World Health Organization.

1775.    The market for Permethrin is mature. At all relevant times, there have been multiple manufacturers of Permethrin.

1776.    Defendants Actavis and Perrigo dominate sales of Permethrin 5% Cream.

1777.    The GAO noted that the Permethrin 5% Cream had an "extraordinary price

increase" in the years 2011-2012.

1778. Plaintiff alleges that as part of Defendants' Fair Share Agreement, they conspired to fix, raise, maintain or stabilize the prices of Permethrin beginning at least as early as 2011.

1779. Under the Fair Share Agreement, Defendants did not attempt to undercut competitors' prices in order to gain additional market share.

1780. The ability of Actavis, Mylan, and Perrigo to reach agreement regarding Permethrin was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. See Exhibit 1 (Chart of Defendants' Trade Association Meetings Attendance).

1781. No non-collusive market factors (e.g., product shortages) can explain the artificially inflated prices.

1782. The agreement between Defendants Actavis, Mylan, and Perrigo was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Permethrin Cream (5%).

### 121.  Perphenazine

1783. Perphenazine is a psychiatric medication used to treat mental or mood disorders such as schizophrenia. It has been available in the United States for decades in a generic form.

1784. The market for Perphenazine is mature. At all relevant times, there have been multiple manufacturers of Perphenazine.

1785. Defendants Par and Sandoz dominate sales of Perphenazine 2 mg, 4 mg, 8 mg, and 16 mg tablets. Beginning as early as the summer of 2009, Par and Sandoz divided the

market for Perphenazine Tablets in a roughly 10/90 split. Over the course of the time period, the market share grew closer to a 30/70 split.

1786.    The ability of Par and Sandoz to reach agreement regarding Perphenazine was aided by the prevalence of trade association meetings and conferences where the pai1ies were able to meet in person. *See* Exhibit 1 (Chart of Defendants' Trade Association Meetings Attendance).

1787.    No non-collusive market factors (e.g., product shortages) can explain the artificially inflated prices.

1788.    The agreement between Defendants Par and Sandoz was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Perphenazine Tablets (2, 4, 8, and 16 mg).

### 122.    Phenytoin Sodium

1789.    Phenytoin Sodium is an antiepileptic drug used to prevent and treat seizures. It has been available in the United States for decades in a generic form. Due to, among other things, its clinical efficacy and safety, Phenytoin Sodium has been designated as an essential medicine by the World Health Organization.

1790.    The market for Phenytoin Sodium is mature. At all relevant times, there have been multiple manufacturers of Phenytoin Sodium.

1791.    Defendants Amneal, Mylan, Sun, and Taro dominate sales of Phenytoin Sodium 100 mg Capsules.[41] During the relevant time period, Taro held about 50% of the market share, while Amneal, Mylan, and Sun split the rest of the market.

1792.    The GAO noted that Phenytoin Sodium 100 mg Capsules had an "extraordinary

---

[41] Although Phenytoin Sodium extended release is also sold in dosage strengths of 200 mg and 300 mg, only Sun sells those dosage strengths.

price increase" in 2014-2015.

1793.    Documentary evidence confirms that these parallel price increases were the result of collusion among Amneal, Mylan, Sun, and Taro.

1794.    By early-2014, Amneal, Mylan, Sun, and Taro became aware of the potential for price increases on Phenytoin Sodium. For example, on April 21, 2014, R.C. of Sun sent an internal email to colleagues asking about multiple drugs including Phenytoin Sodium stating, "I am starting to hear some rumblings in the marketplace about potential price increases on Phenytoin 100mg caps .... Could you please let me know what you are hearing on these products?" W.F. of Sun responded, "No price increase yet on Phenytoin but I have heard one might be coming."

1795.    By mid-summer of 2014, prices on Phenytoin Sodium had begun to rise.

1796.     On July 11, 2014, C.W. of Mylan wrote to her Mylan colleagues, "Walmart has submitted an opportunity for Ext Phenytoin due to a price increase from their incumbent. This is a future price increase item. Taro increased in June, Amneal increase is rumored but not confirmed, and Upsher Smith posted pricing 6/26/14. Walgreens and CVS both approached us for a bid last month and we did not pursue   P&C is suggested NOT to give Walmart an offer but need management's weigh in." C.W.'s email also included relative market share for each of the manufacturers on Phenytoin Sodium and a spreadsheet attachment noting that it was an upcoming price increase product for Mylan. Based on the foregoing, Mylan declined to bid for the Walmart business as to not disrupt the Phenytoin Sodium pricing and market shares that were in place.

1797.    After Mylan's refusal, Walmart turned to Taro for a bid. Taro also refused to bid due to their high market share, in consideration of the existing market shares and elevated pricing that was being put in place among the manufacturers. On August 4,

2014, T.I. of Taro wrote to colleagues, "Base[d] on current market share, not sure this is something we want." A.L. of Taro agreed, saying, "While we would be happy to give them a one time buy to get them to full stock level we are not currently in position to pick up additional share."

1798. Because of the ongoing understanding of the Fair Share Agreement between the companies, they did not worry about their ostensible competitors cutting prices to gain market share. They also did not attempt to undercut their ostensible competitors' prices in order to gain additional market share. For example, in July 2015, roughly one year after the dramatic price increases, D.S. of Taro reported to colleagues about a response to a request for a bid from Meijer. D.S. stated, "I chose not to bid on Extended Phenytoin Sodium Capsules, USP 100 mg 100, due to Taro having enough market share ... 64% in 5 player market." Similarly, by way of another example, on August 6, 2015, M.L. of Taro wrote to colleague A.L., "Spoke to Lisa yesterday and she is still looking for an offer to be sent to R&S for the phenytoin 1000's. When we first took a look at this product we said no since we had enough Market Share." A.L. responded, "The answer on Phenytoin is still the same, we have our share. We don't need anymore."

1799. The ability of Amneal, Mylan, Sun, and Taro to reach agreement regarding Phenytoin Sodium was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. See Exhibit 1 (Chart of Defendants' Trade Association Meetings Attendance).

1800. No non-collusive market factors (e.g., product shortages) can explain the artificially inflated prices.

1801. The agreement between Defendants Amneal, Mylan, Sun, and Taro was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and

raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Phenytoin Sodium Capsules (100 mg).

### 123.   Pilocarpine HCL

1802.   Pilocarpine HCL is a drug used to reduce pressure inside the eye and treat dry mouth. It is available in Tablet and Oral Liquid formulations. It has been available in the United States for over a decade in a generic form.

1803.   The market for Pilocarpine HCL is mature. At all relevant times, there have been multiple manufacturers of Pilocarpine HCL.

1804.   Defendants Actavis, Impax, and Lannett dominate sales of Pilocarpine HCL Tablets (5 mg). During much of the relevant time period, Lannett held approximately 80% of the market share and Actavis held most of the remaining 20%. Impax had a relatively small market share.

1805.   Plaintiff alleges that as part of Defendants' Fair Share Agreement, they conspired to fix, raise, maintain or stabilize the prices of Pilocarpine HCL beginning at least as early as 2010.

1806.   Under the Fair Share Agreement, Defendants did not attempt to undercut competitors' prices in order to gain additional market share.

1807.   The ability of Actavis, Impax, and Lannett to reach agreement regarding Pilocarpine HCL was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. See Exhibit 1 (Chart of Defendants' Trade Association Meetings Attendance).

1808.   The Defendants also communicated by phone.  For example, in late 2013 and early 2014—the time of the Pilocarpine price increases—Actavis's Falkin and Lannett's K.S. communicated multiple times by phone. Falkin (Actavis) also

399

communicated by phone on November 15, 2013 with M.G., Senior National Account Manager at Impax. Lannett's K.S. also communicated by phone with Impax during this same window of time; on January 15, 2014, he spoke to D.D., Impax National Accounts Manager.

1809. No non-collusive market factors (e.g., product shortages) can explain the artificially inflated prices.

1810. The agreement between Defendants Actavis, Impax, and Lannett was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Pilocarpine HCL Tablets (5 mg).

### 124. Piroxicam

1811. Piroxicam, also known by the brand name Feldene, is a nonsteroidal anti-inflammatory drug (NSAID). Piroxicam is used to treat rheumatoid arthritis, osteoarthritis, and juvenile rheumatoid arthritis.

1812. On March 3, 2014, Greenstone received FDA approval to market Piroxicam Capsules. It entered the market with the exact same WAC pricing as Teva for both the 10mg and 20mg capsules.

1813. Greenstone immediately began seeking potential customers. At 10:07 a.m. on March 5, 2014, J.L. of Teva sent an e-mail to Defendant Patel informing her that Greenstone had just received Piroxicam approval and was challenging Teva on several accounts. J.L. asked Patel: "Do we have any strategy in place for Piroxicam?"

1814. Before responding to that e-mail, Defendant Patel sought to negotiate strategy with Greenstone. Patel called Defendant Hatosy at Greenstone at 10:55 a.m. and they spoke briefly. Shortly after that call, Patel also called Defendant Hatosy's boss,

Defendant Nailor. At 2:14 p.m. that afternoon, Defendants Patel and Nailor spoke briefly.

1815. Immediately after hanging up with Defendant Nailor, Patel responded to J.L.'s e-mail:



From: Nisha Patel02
Sent: Wed 3/05/2014 2:17 PM (GMT-05:00)
To:
Cc:
Bcc:
Subject: RE: Piroxicam CPCs in house

█████,

We will need to concede, but either way, will need to understand the value involved. This will help us to determine the share we want to retain v. concede and in order of customers. Please create the concede analysis and customer profitability analysis (the type that █████ did yesterday for Amphetamine IR).

1816. Teva immediately began preparing a strategy to deal with Greenstone's entry into the Piroxicam market. On March 6, 2014, Defendant Patel requested a customer profitability and share analysis. During these negotiations with competitors regarding market entry, it was typical for Teva employees to request a "customer profitability and share analysis" (as Patel did here) so they could easily determine which customers to concede when talking to competitors about dividing the market.

1817. That same day, Defendant Patel had multiple calls with Defendants Nailor and Hatosy at Greenstone to discuss their plans for dividing the Piroxicam market. At least some of those calls are set forth in the table below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 3/6/2014 | Voice | Hatosy, Robin (Greenstone) | Outgoing | Patel, Nisha (Teva) | 10:00:22 | 0:00:29 |
| 3/6/2014 | Voice | Hatosy, Robin (Greenstone) | Incoming | Patel, Nisha (Teva) | 10:29:29 | 0:03:23 |
| 3/6/2014 | Voice | Hatosy, Robin (Greenstone) | Outgoing | Patel, Nisha (Teva) | 12:14:29 | 0:00:00 |
| 3/6/2014 | Voice | Hatosy, Robin (Greenstone) | Outgoing | Patel, Nisha (Teva) | 12:14:52 | 0:00:03 |
| 3/6/2014 | Voice | Hatosy, Robin (Greenstone) | Incoming | Patel, Nisha (Teva) | 12:33:08 | 0:01:10 |
| 3/6/2014 | Voice | Hatosy, Robin (Greenstone) | Incoming | Patel, Nisha (Teva) | 15:07:50 | 0:05:10 |
| 3/6/2014 | Voice | Hatosy, Robin (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 15:20:18 | 0:00:00 |
| 3/6/2014 | Voice | Hatosy, Robin (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 15:20:29 | 0:00:43 |
| 3/6/2014 | Voice | Patel, Nisha (Teva) | Incoming | Nailor, Jill (Greenstone) | 17:32:25 | 0:00:00 |
| 3/6/2014 | Voice | Patel, Nisha (Teva) | Incoming | Nailor, Jill (Greenstone) | 17:32:48 | 0:01:02 |

1818.    The next day-March 7, 2014 - after the flurry of phone calls detailed above, Defendant Patel sent an e-mail to L.R., a customer marketing manager at Teva, identifying specific customers to concede to Greenstone. Based on her several conversations with Greenstone, and her understanding of the concept of fair share, Patel also noted: "I'm guessing that Greenstone will not stop here since we are the share leader, but for the customers listed below, we should concede. We will review additional challenges as they come, if they come."

1819.    Additional challenges did come. On March 12, 2014, Defendant Patel learned that Greenstone was challenging Teva at CVS – Teva's largest account for Piroxicam. Teva refused to concede CVS to Greenstone because CVS represented 26.1% of Teva's total market share for that drug. Teva lowered its price by 20%, and the next morning CVS notified Teva that it would retain the account. The same day, after hearing that Teva was not going to back down on the CVS challenge, Defendant Hatosy of Greenstone called Defendant Patel at 1:41pm and they spoke briefly.

1820.    Additional challenges did come. On March 12, 2014, Defendant Patel learned that Greenstone was challenging Teva at CVS - Teva's largest account for Piroxicam. Teva refused to concede CVS to Greenstone because CVS represented 26.1% of Teva's total market share for that during. Teva lowered its price by 20%, and the next morning CVS notified Teva that it would retain the account. The same day, after hearing that Teva was not going to back down on the CVS challenge, Defendant Hatosy of Greenstone called Defendant Patel at 1:41pm and they spoke briefly.

1821.    Teva and Greenstone continued to coordinate their allocation over the coming days and weeks. On March 17, 2014, Defendant Patel called Defendant Hatosy and they spoke briefly. Hatosy called Patel back at 11:35 p.m. that same day and they

402

spoke for fifteen (15) minutes. Immediately after speaking to Patel, Defendant Hatosy called Defendant Nailor and they spoke for ten (10) minutes. Teva retained the CVS account but conceded other customers (representing less market share) to Greenstone through March and April.

1822. For example, on March 25, 2014 Teva learned of a challenge from Greenstone at Anda, a wholesaler distributor. Following an analysis of its market share, Teva determined that it still had more than its fair share of the market. Pursuant to the understanding among generic manufacturers alleged above, Teva determined that it would be prudent to concede the Anda business to Greenstone on Piroxicam, in order to alleviate any future challenges from Greenstone. Defendant Patel agreed with the decision to concede on April 1, 2014.

### 125. Potassium Chloride

1823. Potassium Chloride is prescribed to treat hypokalemia, a condition occurring when a patient's blood levels have insufficient potassium.

1824. During the time period relevant to this Complaint, Actavis, Mylan, Sandoz, Upsher- Smith, and Zydus dominated the market for Potassium Chloride tablets and capsules.

1825. In August 2010, Actavis, Sandoz, and Upsher-Smith each implemented abrupt and substantial parallel price increases on Potassium Chloride. For example, bottles of 100 tablets of 8 MEQ dosage strength that sold for less than $7.00 at the end of July 2010 increased to more than $42.00 by mid-August.

1826. Upon information and belief, this price increase was agreed upon during telephone calls between the three companies. Additionally, representatives of each of the three companies met at trade shows and other industry events throughout

Summer 2010.

1827. In mid-2011, Zydus entered the market at the elevated prices established by Actavis, Sandoz, and Upsher-Smith.

1828. Prior to Zydus' entry, the company's Associate Vice President of National Accounts – communicated frequently with CW-4 of Sandoz. The purpose of these communications was to determine which accounts Zydus would add in order for the company to receive its "fair share" of the market. In exchange for Zydus' support of the supracompetitive conspiracy pricing for Potassium Chloride, Actavis, Sandoz, and Upsher- Smith each conceded market share to Zydus.

1829. In late 2014, Mylan also entered the market for Potassium Chloride. Consistent with the Fair Share agreement, Jim Nesta of Mylan reached out to Marc Falkin of Actavis in September 2014 to coordinate Mylan's receipt of its "fair share" of the market. Like Zydus, Mylan agreed to support the pricing as already fixed by Actavis, Sandoz, and Upsher-Smith, and in return, the existing manufacturers of Potassium Chloride conceded market share to Mylan.

1830. Internal Upsher-Smith documents prepared in late 2014 confirmed that the Fair Share agreement was followed by all competitors.

1831. As a result of these collusive communications, Defendants have been able to maintain supracompetitive pricing for Potassium Chloride tablets and capsules since August 2010.

### 126.    Pravastatin

1832. Pravastatin, also known by the brand name Pravachol, is a medication belonging to a class of drugs called "statins," and is used to treat high cholesterol and triglyceride levels.

1833.	As early as May 2, 2013, Defendant Patel engaged in discussions regarding a price increase for Pravastatin with CW-5, a senior executive at Glenmark. Early in the morning of May 2, as she was in the process of formulating her list of "high quality" competitors and the list of price increase candidates, Defendant Patel informed a colleague that she expected to have some "priority items" to add to the price increase list "shortly." Within minutes, she received a call from CW-5 and they discussed price increases for a number of different drugs, including Pravastatin. Shortly after that call, Defendant Patel sent an e-mail to her Teva colleague directing him to add Pravastatin, and several other Glenmark drugs, to the price increase list. In all, Defendant Patel spoke to CW-5 four (4) times throughout the day on May 2, 2013, as set forth below:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-5 (Glenmark) | 7:02:23 | 0:05:02 |
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 7:56:12 | 0:00:06 |
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-5 (Glenmark) | 10:00:09 | 0:07:18 |
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 18:40:29 | 0:11:39 |

1834.	As of May 2013, the market for Pravastatin included five competitors: Glenmark, Teva, Lupin, Zydus and Apotex. The number of competitors made it more difficult to coordinate a price increase. This difficulty stemmed in part because two of those competitors - Zydus and Apotex - were also the two lowest quality competitors in Defendant Patel's quality of competition rankings, and any price increase for that drug would require significant coordination and communication before Teva could feel comfortable raising its own price.

1835.	Teva was able to achieve a sufficient level of comfort and substantially raise prices for Pravastatin by systematically communicating and reaching agreement with each and every competitor on that drug over the next several

months.

1836.    On May 3, 2013, Defendant Green called M.K., a senior executive at Zydus twice with one call lasting four (4) minutes. Over the next several weeks, Defendant Green communicated numerous times with both M.K. and K.R., a senior sales executive at Zydus, to coordinate a Zydus price increase on Pravastatin.

1837.    On May 6 and 7, 2013, Patel communicated with her contacts at Lupin (Defendant Berthold) and Glenmark (J.C., a national account executive) multiple times. Those calls are detailed below:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 5/6/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:32 |
| 5/6/2013 | Voice | Patel, Nisha (Teva) | Incoming | J.C. (Glenmark) | 0:06:45 |
| 5/6/2013 | Voice | Patel, Nisha (Teva) | Incoming | J.C. (Glenmark) | 0:20:44 |
| 5/6/2013 | Voice | Patel, Nisha (Teva) | Incoming | J.C. (Glenmark) | 0:08:39 |
| 5/6/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:22:02 |
| 5/7/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:10:31 |
| 5/7/2013 | Voice | Patel, Nisha (Teva) | Outgoing | J.C. (Glenmark) | 0:08:00 |
| 5/7/2013 | Voice | Patel, Nisha (Teva) | Incoming | J.C. (Glenmark) | 0:01:03 |

1838.    During one or more of her calls with J.C. and/or CW-5 of Glenmark in early May 2013, Defendant Patel obtained specific price points from Glenmark for its Pravastatin (and other) price increases - well before the Glenmark increases became public - and documented those price points in her price increase spreadsheet.

1839.    By May 8, 2013, Teva executives clearly understood that Glenmark would be leading the Pravastatin price increase, and were comfortable enough with the situation that one marketing executive at Teva indicated in an e-mail to Defendant Patel that he was hoping to raise price on Pravastatin "if/when Glenmark does."

1840.    As the Glenmark increase for Pravastatin was approaching, Defendant Patel began preparing. On May 15, 2013 - the day before Glenmark's increase would become effective - a Teva executive sent an e-mail out to the pricing

team stating that "Nisha would like to be made aware of any requests (including in-house RFPs) that include" several of the Glenmark product families, including Pravastatin. The Teva executive concluded: "[i]n the event you are reviewing these products for any request, please make her aware and as a group we can discuss where to price based on market intelligence she has collected."

1841. That same day, Glenmark notified its customers that it would substantially raise the price of Pravastatin, effective May 16, 2013.

1842. As was now the practice among co-conspirators, the day before and the day of the Glenmark increase brought a flurry of phone calls among several of the competitors, including Teva executives. At least some of those calls are set forth below:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 5/15/2013 | Voice | Green, Kevin (Teva) | Outgoing | M.F. (Zydus) | 0:05:00 |
| 5/15/2013 | Voice | Green, Kevin (Teva) | Incoming | M.K. (Zydus) | 0:03:00 |
| 5/15/2013 | Voice | Green, Kevin (Teva) | Outgoing | K.R. (Zydus) | 0:16:00 |
| 5/16/2013 | Voice | Green, Kevin (Teva) | Outgoing | M.K. (Zydus) | 0:04:00 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 0:05:57 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:00 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:36 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:02:07 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:00:07 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:03:12 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:00:04 |
| 5/16/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:05:29 |

1843. As of May 16, 2013, Defendant Patel was still considering whether Teva should increase its price for Pravastatin, because she was concerned about whether Zydus would act responsibly and follow a price increase. At that time, Defendant Patel did not view Zydus as a quality competitor. Defendant Patel stated: "I have asked to get Zydus' ability to supply on this. If it's not so great, I would like to add back to the increase list." Patel later indicated that "[t]he only threat was Zydus.

Just waiting to hear on their ability to supply."

1844.    Defendant Green was responsible for coordinating with Zydus. As seen in the table above, on May 15, 2013, Defendant Green spoke with three Zydus employees, including a call with K.R. of Zydus lasting sixteen (16) minutes. The next day, on May 16, Green spoke with M.K. for 4 minutes. Later that day, K.R. called M.K. and the two Zydus executives spoke for more than seventeen (17) minutes. Defendant Green also spoke to Defendants Rekenthaler and Patel the same day, conveying what he had learned from his communications with the Zydus executives.

1845.    Also on May 16, Defendant Patel's supervisor, K.G., sent an internal e-mail to several colleagues, including Defendants Patel and Rekenthaler, stating "I think we need to understand additional competitor ability to take on additional share and pricing actions. The volume is huge for us. It would be nice to try to increase our price, but we do not really want to lose a lot of share on this product." In response, Defendant Rekenthaler indicated that he was now comfortable with the price increase, but he did not want to put his reasoning in writing:



1846.    The next day – May 17, 2013 – Defendant Patel continued to coordinate the price increase with executives at both Glenmark and Lupin. For example, at 12:08 p.m., Defendant Patel called Defendant Berthold at Lupin for an eleven (11) minute call. While she was on the phone with Berthold, CW-5 of Glenmark called Patel (at 12:09 p.m.) and left a 23-second voice mail. Immediately after she

hung up the phone with Defendant Berthold, Defendant Patel returned the call to CW-5; they ultimately connected for nearly eight (8) minutes.

1847.    As of this point, Teva executives had spoken to all of their competitors about Pravastatin except Apotex. From May 20-24, Defendant Patel had the following series of phone calls with B.H., a senior sales executive at Apotex, during which Apotex agreed to raise its price for Pravastatin:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 5/20/2013 | Voice | Patel, Nisha (Teva) | Incoming | B.H. (Apotex) | 0:21:56 |
| 5/21/2013 | Voice | Patel, Nisha (Teva) | Incoming | B.H. (Apotex) | 0:11:28 |
| 5/23/2013 | Voice | Patel, Nisha (Teva) | Incoming | B.H. (Apotex) | 0:06:13 |
| 5/24/2013 | Voice | Patel, Nisha (Teva) | Incoming | B.H. (Apotex) | 0:00:39 |
| 5/24/2013 | Voice | Patel, Nisha (Teva) | Outgoing | B.H. (Apotex) | 0:12:07 |

These were the first documented phone calls between Defendant Patel and B.H. since Patel had joined Teva.

1848.    But even with this agreement in hand, Defendant Patel was still hesitant to add Pravastatin to the price increase list until Apotex actually increased its price. For example, when she sent the "Immediate PI" spreadsheet to her supervisor K.G. on May 24, 2013, Pravastatin was still not on the list.

1849.    That would change shortly. On May 28, 2013, Apotex raised its price for Pravastatin. That same day, Defendant Green also exchanged six (6) text messages with K.R. at Zydus. The next day, after a conversation with Defendant Maureen Cavanaugh, Defendant Patel added Pravastatin to the Teva price increase list.

1850.    The day after the Apotex increase, Defendant Green spoke to K.R. at Zydus two more times, and exchanged four (4) more text messages. Zydus then quickly followed with a price increase of its own on June 14, 2013.

409

1851. Following the normal pattern, Defendant Green spoke to K.R. and M.K. at Zydus several times in the days leading up to the Zydus increase, including at least the following calls and text messages:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 6/11/2013 | Voice | Green, Kevin (Teva) | Outgoing | K.R. (Zydus) | 0:01:00 |
| 6/11/2013 | Voice | Green, Kevin (Teva) | Outgoing | M.K. (Zydus) | 0:26:00 |
| 6/11/2013 | Voice | Green, Kevin (Teva) | Outgoing | M.K. (Zydus) | 0:03:00 |
| 6/11/2013 | Text | K.R. (Zydus) | Outgoing | Green, Kevin (Teva) | 0:00:00 |
| 6/11/2013 | Text | K.R. (Zydus) | Incoming | Green, Kevin (Teva) | 0:00:00 |
| 6/11/2013 | Text | K.R. (Zydus) | Outgoing | Green, Kevin (Teva) | 0:00:00 |
| 6/12/2013 | Voice | Green, Kevin (Teva) | Incoming | K.R. (Zydus) | 0:22:00 |
| 6/12/2013 | Voice | Green, Kevin (Teva) | Incoming | K.R. (Zydus) | 0:14:00 |
| 6/12/2013 | Voice | Green, Kevin (Teva) | Incoming | K.R. (Zydus) | 0:01:00 |
| 6/13/2013 | Voice | Green, Kevin (Teva) | Outgoing | M.F. (Zydus) | 0:16:00 |
| 6/13/2013 | Voice | K.R. (Zydus) | Outgoing | Green, Kevin (Teva) | 0:07:11 |

1852. Teva ultimately followed Glenmark, Apotex and Zydus with a significant (653%) price increase of its own on August 9, 2013. As described in more detail above, in the days and weeks leading up to August 9, Defendants Patel and Green were communicating with all of Teva's competitors for Pravastatin to coordinate the increase.

1853. When Defendant Patel sent the "Price Increase Overview" to her supervisor, K.G., on August 7, 2009, two days in advance of Teva's price increase, she included one piece of very telling information about the agreement she had in place with Defendants Berthold and Lupin: specifically, that Lupin was "waiting on Teva" before implementing its own increase. Based on this representation from Lupin, and Lupin's status as a high-quality competitor, Teva executives felt comfortable implementing the significant price increase.

1854. A couple of days after Teva implemented its increase, a colleague at Teva asked Defendant Patel when Zydus and Apotex implemented their price increases. In her response, Patel confirmed that it was Defendant Kevin Green ("KG'')

410

who had indeed coordinated the Pravastatin price increase with Zydus:

> Assuming we're talking Prava. Glenmark dud theirs 5/15. Zydus followed right before/after hdma i think. apotex i think was early to mid june? KGn got the Zydus intel...he might know off the top if his head.

1855.    Pursuant to that agreement, shortly after Teva's increase – on August 28, 2013 – Lupin raised its price to follow competitors Glenmark, Apotex, Zydus and Teva.

1856.    The extra work required to implement the Pravastatin price increase was well worth it to Teva. On August 8, 2013 – the day before the Teva increase – Patel sent her supervisor K.G. an estimate of the "net upside" to Teva as a result of certain price increases. She estimated that, for Pravastatin alone, the "net upside after credits" to Teva was $674,670,548 per quarter.

1857.    Between July 2013 and October 2013, Apotex, Glenmark, Teva, Lupin, Zydus, and Mylan each increased their prices for generic Pravastatin sold to A&P and others in the United States. The Defendants continued to further raise prices throughout the remainder of 2013.

1858.    By way of example, with respect to WAC pricing, Defendants reported nearly identical WACs for their 10 mg products, reflecting increases of more than 100%:

| Product 10 mg | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 90 ct | Apotex | 60505016809 | $0.26 | $0.56 | 28-May-13 | 119% |
| 500 ct | Apotex | 60505016805 | $0.26 | $0.56 | 28-May-13 | 119% |
| 90 ct | Zydus | 68382007016 | $0.17 | $0.48 | 14-Jun-13 | 189% |
| 500 ct | Zydus | 68382007005 | $0.15 | $0.48 | 14-Jun-13 | 222% |
| 90 ct | Teva | 00093077198 | $0.17 | $0.48 | 9-Aug-13 | 189% |
| 1000 ct | Teva | 00093077110 | $0.15 | $0.48 | 9-Aug-13 | 221% |
| 90 ct | Lupin | 68180048509 | $0.17 | $0.48 | 28-Aug-13 | 190% |
| 500 ct | Lupin | 68180048502 | $0.15 | $0.48 | 28-Aug-13 | 222% |

1859. These price increases were not the result of supply shortages, demand spikes, increased input costs, or other competitive market conditions. There were no reported drug shortages nor was there a spike in demand that could explain the price hikes.

1860. Although prices for Pravastatin have receded somewhat from the peak in early 2014, Defendants continue to charge supracompetitive prices for Pravastatin to A&P and others in the United States. The conspiracy overcharge remains embedded in the price of Pravastatin that Defendants charge A&P and others.

### 127. Prazosin HCL

1861. Prazosin HCL, which is also discussed in additional detail in Sections XIII. B. and F. below, is a widely prescribed medication to treat high blood pressure and prostate enlargement. It has been available in the United States for decades. It is available in the United States in 1 mg, 2 mg, and 5 mg Capsules.

1862. The market for Prazosin HCL Capsules is mature. At all relevant times, there have been multiple manufacturers.

1863. Documentary evidence confirms that these parallel price increases were the result of collusion among generic drug manufacturers, including Mylan, and Teva.

1864. Effective July 3, 2013, Teva increased pricing on a number of drugs, including roughly doubling its WAC prices for Prazosin HCL. The day before the price

412

increases, Patel scheduled an internal conference call to discuss those increases with members of Teva's sales and pricing departments.

1865. In the days and weeks leading up to its announced price increases, Teva privately spoke with every important competitor to coordinate its increases and reiterate the understanding already in place with those competitors. To coordinate the prices of Prazosin HCL and other drugs that overlapped with Mylan, Teva's Green and Mylan's Nesta spoke on the June 26, 2013 for one hour, and again on June 27, 2013, when they had one-minute and four-minute calls. After the second call, Green immediately called his colleague Patel and spoke with her for eight minutes. In furtherance of the conspiracy, on June 28, 2013, Green again attempted to reach Nesta, who returned his call on July 3, the day of the price increase, when they spoke for fourteen minutes.

1866. Consistent with their Fair Share Agreement, Defendants' agreed market share limited their willingness to compete for customers. For example, in July 31, 2013, when Teva received a request from Walgreens to bid on drugs that Mylan and others supplied, Teva circulated "the most recent market share reports for each [drug] family." Within that list, Patel identified Prazosin HCL as a market that Teva "shared with Mylan," but Teva could bid on it because "[we] do not have our fair share.

1867. Mylan matched Teva by roughly doubling its own WACs for Prazosin HCL and raising prices on many other drugs. Mylan's increase lead to slightly higher WAC prices for Prazosin HCL than Teva's. Rather than competing for market share, Teva quickly determined to adjust its WAC.

1868. In furtherance of Defendants' price coordination scheme, T.S., Patel's colleague at Teva, sent her spreadsheets, which Mylan personnel had created, that listed all the price increases Mylan had taken. After reviewing the spreadsheets, Patel forwarded

413

the list to the Teva sales team, informing them: "Our intention is to follow Mylan on this increase. Below, you will see the list of increase items where Teva overlaps with Mylan. Please share any pricing intelligence you are able to obtain. Thank you in advance!" The list included Prazosin HCL.

1869.    Within days, Teva began receiving requests from potential customers for bids due to the Mylan price increases. On April 24, 2014, Patel began to formulate a "Mylan Increase Strategy" in order to respond to those requests, but noted that Teva was "still awaiting intel" about the Mylan customer contract price points, which were not publicly available. The delay in Teva's collection of "intel," i.e., its active coordination with Mylan, placed pressure on Teva, which was trying to gain market share for Prazosin HCL-within the Defendants' agreed limits.

1870.    Patel continued to push Teva employees for specific contract price points from Mylan. For example, on April 28, 2014, she emailed the Teva sales team: "To date, we have no intel on Mylan's recent increases. I realize there is a lot of travel going on, but whatever you can gather and share would be greatly appreciated." And again on May 9, 2014, she reiterated: "Sorry to be so persistent, but we has not received any Mylan price increase intelligence yet. In fact, I cannot see Teva being able to follow in the next round of mass price changes (without any price points) at this point. Of course we can always follow by guessing, but it could cause needless price disruption in the market." In other words, to eliminate uncertainty, Teva wanted direct coordination with other manufacturers before raising its prices. After receiving Patel's email – at 11:15 am that morning - Rekenthaler immediately called Nesta at Mylan and left a message. Nesta returned the call moments later at 11:23 am, and the two spoke for nearly eight minutes.

1871.    Separately, and before Rekenthaler was able to convey any information

414

he had obtained, Patel forwarded a bid request from AmerisourceBergen to a Teva accounts manager and again requested intel on Mylan's contract prices:

> I am in a really tough spot on these. Please help! There are several requests open for offers, but I have ZERO intel. A little frustrating/discouraging, as we are bound to hear complaints on how long it took to close the Delphi request. Is there anything you are able to get to help when you are back? (I know you 're in the process of transitioning accounts, but l figured l would give it a shot. At some point, I know I'll have to find another source of magic:).

1872. Teva ultimately matched Mylan's WAC increases on Prazosin HCL on August 28, 2014, when it raised prices on Prazosin HCL and numerous other overlapping drugs.

1873. Following the normal pattern, Teva's Rekenthaler and Mylan's Nesta had numerous calls leading up to and in furtherance of coordinating the August 28, 2014 increases: three calls on August 11, two calls on August 18, 2014 and a final call on August 21, 2014.

1874. On March 4, 2015, Mylan again increased Prazosin HCL WAC prices in coordination with Teva, who would match its WACs a few months later. Again, Nesta and Rekenthaler engaged in multiple phone calls to coordinate the increase of Prazosin HCL capsules prices-along with other drugs that overlapped with Teva's: two calls on February 18, 2015 and one call on February 19, 2015.

1875. In furtherance of the scheme, Teva matched Mylan's WAC prices in July 2015. In the interim, Teva "strategically concede[d]" an "opportunity in April" 2015 to bid on a contract to supply Walgreens with Prazosin HCL capsules and other drugs "because we were waiting to follow[] a Mylan price increase." Although Teva initially planned to announce price increases in the fall of 2015, Teva fast-tracked its WAC price increases for Prazosin HCL capsules because its supply contracts closely tracked its existing WAC prices and "[i]t might" have been "a challenge to follow Mylan's price

increase without implementing a price increase on [Teva's] end."

1876.    No non-collusive market factors (e.g., product shortages) can explain the artificially inflated prices.

1877.    The agreement between Defendants Mylan and Teva was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Prazosin HCL Capsules (1, 2, 5 mg).

### 128.    Prednisolone Acetate

1878.    Prednisolone Acetate is a corticosteroid used to treat certain eye conditions due to inflammation or injury. It has been available in the United States for decades in a generic form. It is available in an Ophthalmic Solution and in Opthalmic Liquid Eye formulations. Due to, among other things, its clinical efficacy and safety, Prednisolone has been designated as an essential medicine by the World Health Organization.

1879.    The market for Prednisolone Acetate Opthalmic Liquid Eye is mature. At all relevant times, there have been multiple manufacturers of Prednisolone Acetate Opthalmic Liquid Eye.

1880.    Defendants Greenstone and Sandoz dominate sales of Prednisolone Acetate Opthalmic Liquid Eye (1%). For much of the relevant time period, Sandoz had approximately two thirds of the market, and Greenstone had approximately one third of the market.

1881.    The GAO noted that Prednisolone Acetate Opthalmic Liquid Eye had "extraordinary price increases" in the years 2013-2014.

1882.    Documentary evidence confirms that these parallel price increases were

the result of collusion among Greenstone and Sandoz.

1883.    Because of the ongoing understanding of the Fair Share Agreement between the companies, they did not worry about their ostensible competitors cutting prices to gain market share. They also did not attempt to undercut their ostensible competitors' prices in order to gain additional market share. For example, in January 2014, several months after the dramatic price increase, C.B. of Sandoz reported to colleagues that OptiSource was looking for a bid on Prednisolone Acetate. Kellum of Sandoz responded, "Why are they asking??? I think we should leave this alone as Pacific raised price etc ... to match ours." D.H. of Sandoz wrote back, "I have a suspicion that Pacific cannot supply or at least cannot supply consistently. Also, Pacific has likely raised contract pricing in-line with Sandoz contract pricing; so [OptiSource] is likely seeking a better deal. I could be wrong, but based on market intelligence & knowing Rick [Meehan, President of OptiSource] this is likely the situation." Kellum confirmed, "Agree- I don't want to bid right now and I think we just blame supply for now." By way of another example, a Sandoz November 2015 "Key Customers Monthly Business Review" states that Sandoz "lost" $29,000,000 worth of sales of Prednisolone Acetate because Sandoz "[r]elinquish[ed] [it] to Pacific."

1884.    The ability of Greenstone and Sandoz to reach agreement regarding Prednisolone Acetate was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. See Exhibit 1 (Chart of Defendants' Trade Association Meetings Attendance).

1885.    No non-collusive market factors (e.g., product shortages) can explain the artificially inflated prices.

1886.    The agreement between Defendants Greenstone and Sandoz was part of

417

an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Prednisolone Acetate Opthalmic Liquid Eye (1%).

### 129.   Prednisone

1887.   Prednisone is a corticosteroid used to treat conditions such as arthritis, blood disorders, breathing problems, and immune system disorders. It is available in Tablet and Oral Solution formulations. It has been available in the United States for over a decade in a generic form.

1888.   The market for Prednisone is mature. At all relevant times, there have been multiple manufacturers of Prednisone.

1889.   Defendants Actavis, Cadista, Par, and West-Ward dominate sales of Prednisone Tablets.

1890.   For years the prices of Prednisone tablets were relatively low and stable. There were limited supply disruptions in 2012 and early 2013, but market supply recovered and, for some dosages, increased in 2014. Nonetheless, in the spring of 2013, all manufacturers shifted their prices significantly higher. By the end of 2013, Prednisone tablet prices were more than triple the prices that they were at the beginning of the year, and prices have remained higher than former levels through the present.

1891.   The GAO noted that Prednisone had "extraordinary price increases" in the years 2013-2014.

1892.   Plaintiff alleges that as part of Defendants' Fair Share Agreement, they conspired to fix, raise, maintain or stabilize the prices of Prednisone beginning at least as early as 2013.

1893.   Under the Fair Share Agreement, Defendants did not attempt to undercut competitors' prices in order to gain additional market share.

1894. The ability of Actavis, Cadista, Par, and West-Ward to reach agreements on Prednisone was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. See Exhibit 1 (Chart of Defendants' Trade Association Meetings Attendance).

1895. The Defendants also communicated directly with one another. For example, Cadista, which had exited the market but then re-entered in late 2013 at the elevated prices already imposed by West-Ward and Actavis, communicated with its competitors around the time of its re-entry. Shortly before re-entering the market, Cadista's M.D., VP of Sales, spoke with Falkin (Actavis) on July 31, 2013 for six minutes. Shortly after re-joining the market, on November 1, 2013, M.D. at Cadista spoke for nearly 40 minutes with S.G, VP of Sales and Marketing at West-Ward.

1896. D.S., who began as Head of Sales at West-Ward in January 2014 after leaving Taro, called K.O., VP of National Accounts at Par, during his first weeks on the job. The two had communicated when D.S. was at Taro, and the practice continued when D.S. moved to West- Ward. D.S. communicated by phone with K.O. throughout 2014. They communicated in  January, February, April, May, June, July, October, November and December. Prices for Prednisone remained high throughout this time.

1897. J.H., Par Regional VP of Sales at Par, began communicating with Falkin shortly after Falkin joined Actavis. The two communicated by phone in September 2013, then throughout 2014, including (at least) in February, March, April, May, June, July, August and October.

1898. No non-collusive market factors (e.g., product shortages) can explain the artificially inflated prices.

1899. The agreement between Defendants Actavis, Cadista, Par, and West-

419

Ward was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Prednisone Tablets (1, 2.5, 5, 10, 20 mg).

### 130. Propranolol

1900. The market for Propranolol is mature, as Propranolol has been available in the United States for decades. Propranolol, also known by various brand names including Inderal LA, Inderal XL, Hemangeol and InnoPran XL, is a beta-blocker used to treat high blood pressure, irregular heartbeats, shaking (tremors), and other conditions. The drug is considered an essential medicine by the World Health Organization, and is used by millions of patients in the United States. The price for Propranolol had fallen steadily since its introduction in the 1960s, and as recently as early 2013, a monthly prescription for Propranolol cost as little as $8.00.

1901. Actavis, Breckenridge, and Upsher-Smith each manufacture Propranolol in capsule form, while Actavis, Mylan, Teva, Pliva, UDL, Par, and Heritage manufacture Propranolol in tablet form. Each sold either Propranolol capsules or tablets (or both) to A&P and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

#### a) *Propranolol Capsules*

1902. Actavis, Breckenridge, and Upsher-Smith implemented a collusive price increase beginning in November 2013 on Propranolol capsules. Breckenridge, which had previously had lower prices for Propranolol capsules, increased its prices for all dosages by 88% to 140%. Upsher-Smith followed in December with a corresponding price increase on all dosages of Propranolol capsules that ranged from 49% to 79%, depending on the dosage strength. In February 2014, Actavis increased prices for all dosages of

Propranolol capsules by 64% to 81%, depending on the dosage strength. Although prices fell slightly from their peak in 2014, Actavis, Breckenridge, and Upsher-Smith still continue to price Propranolol capsules at supracompetitive levels.

1903. Upon information and belief, the price increases on Propranolol capsules were the result of collusive agreements between and among Defendants that were initiated by Actavis to increase pricing and restrain competition for the sale of Propranolol capsules to A&P and others in the United States. These collusive agreements were furthered, at least in part, through in-person discussions conducted at meetings and industry events hosted by GPhA and HDMA as well as other meetings and communications as described in Ex. 1.

### b) *Propranolol Tablets*

1904. Although the conspiring Defendants increased prices on Propranolol capsules by early 2014, Defendants' prices for Propranolol tablets remained stable throughout 2014.

1905. Beginning in January 2015, however, Actavis, Mylan, Teva, Pliva, UDL, Par, and Heritage colluded to increase prices on Propranolol tablets as well.

1906. On January 15, 2015, Actavis sent a notice to its customers informing them of a significant increase to its WAC and Suggested Wholesale Prices (SWP) for Propranolol. The increases would not become effective (and thus publicly visible to the rest of the market) until February 17, 2015.

1907. In the days before Actavis sent this notice to its customers, Falkin of Actavis and Rekenthaler of Teva spoke frequently. For example:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 1/8/2015 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 7:18:00 | 0:10:00 |
| 1/13/2015 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 15:39:00 | 0:01:00 |
| 1/14/2015 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 3:10:00 | 0:01:00 |
| 1/14/2015 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 6:29:00 | 0:03:00 |

1908.    Indeed, the day before Actavis sent the price increase notice to its customers, Rekenthaler coordinated the price increase with Falkin and Nesta of Mylan - the other quality competitor in the market for Propranolol. The timing and duration of those phone calls are set forth in the table below:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 1/14/2015 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 3:10:00 | 0:01:00 |
| 1/14/2015 | Voice | Rekenthaler, David (Teva) | Outgoing | Nesta, Jim (Mylan) | 3:12:00 | 0:01:00 |
| 1/14/2015 | Voice | Rekenthaler, David (Teva) | Outgoing | Nesta, Jim (Mylan) | 5:39:00 | 0:09:00 |
| 1/14/2015 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 6:29:00 | 0:03:00 |

1909.    On January 16, 2015 – more than a month before the Actavis price increase for Propranolol was disclosed to the public – Rekenthaler forwarded Teva's price increase list to Patel. Propranolol was on the list, with the following explanations about pricing strategy and reasons for the price increase:

| Product Description | Price Increase Strategy | Reason for Increase |
|---|---|---|
| PROPRANOLOL HCL TABLETS 10MG 100 | Market Intelligence | Follow Competitor - Actavis |
| PROPRANOLOL HCL TABLETS 10MG 1000 | Market Intelligence | Follow Competitor - Actavis |
| PROPRANOLOL HCL TABLETS 20MG 100 | Market Intelligence | Follow Competitor - Actavis |
| PROPRANOLOL HCL TABLETS 20MG 1000 | Market Intelligence | Follow Competitor - Actavis |
| PROPRANOLOL HCL TABLETS 40MG 100 | Market Intelligence | Follow Competitor - Actavis |
| PROPRANOLOL HCL TABLETS 40MG 1000 | Market Intelligence | Follow Competitor - Actavis |
| PROPRANOLOL HCL TABLETS 60MG 100 | Market Intelligence | Follow Competitor - Actavis |
| PROPRANOLOL HCL TABLETS 80MG 100 | Market Intelligence | Follow Competitor - Actavis |
| PROPRANOLOL HCL TABLETS 80MG 500 | Market Intelligence | Follow Competitor - Actavis |

1910.    Teva raised its pricing for Propranolol on January 28, 2015 – before the Actavis price increase even became effective. As discussed above, Rekenthaler was in constant communication with Falkin of Actavis and Nesta of Mylan in the days leading up

422

to Teva's price increase.

1911. When the Actavis price increase on Propranolol did become effective – on February 17, 2015 – Rekenthaler and Falkin continued to discuss pricing. For example, the day before those price increases became visible to the public – February 16, 2015 – Rekenthaler and Falkin spoke two times, including one call lasting nearly twenty- three (23) minutes. Rekenthaler then spoke to Nesta twice on February 18, 2015 and again on February 19, 2015.

1912. Heritage increased effective prices by 102%-151% in January 2015, and, a few weeks later, Teva, Pliva, and Actavis increased their own prices in March 2015 by 566%-898% and 395%-638%, respectively. Mylan and Par began increasing their prices soon after, by amounts ranging from 55%-607% and 52%-216%, respectively. Actavis, Mylan, Teva, Pliva, Par, and Heritage continued to increase prices throughout 2015, and by January 2016, Defendants had increased their prices for some strengths of Propranolol tablets by more than 1700%.

1913. With respect to both the capsule and the tablet price increases, even in those instances in which the Defendants did not increase prices in perfect unison, they still managed to align their pricing on a bi-monthly or quarterly basis, which is consistent with an illegal agreement.

1914. Defendants continue to charge supracompetitive prices for Propranolol tablets as of the filing of this Complaint.

### 131.    Raloxifene HCL

1915. Raloxifene HCL, also known by the brand name Evista, is a medication used to combat the effects of osteoporosis in postmenopausal women.

1916. During the relevant time frame, Defendants Teva and Camber were the

primary manufacturers of Raloxifene HCL Tablets.

1917. In March 2014, Teva began marketing Raloxifene HCL. Actavis had received approval to begin marketing Raloxifene HCL in 2014 as well, but, by September 2014, had not entered the market. Camber entered the market in September 2014.

1918. With anticipated product launches approaching, the market entrants discussed an allocation scheme in September 2014: On September 9, 2014, Teva's Rekenthaler had a twenty six (26) minute phone call with the Senior Vice President of U.S. Sales at Actavis, and, over the course of the following week, Rekenthaler spoke with multiple Actavis employees, including the SVP of U.S. Sales again, on September 16, 2014, for over half an hour.

1919. On September 17, 2014, Camber sent an offer for Raloxifene HCL to a large Teva customer. That day, Rekenthaler shared internally the information he had gathered from other manufacturers, including that Actavis would be "late" to the market, and that he would learn more about Camber's plan following an upcoming trip.

1920. Rekenthaler and Kon Ostaficiuk, the President of Camber Pharmaceuticals, spent the next three days playing golf during the day and socializing at night at an industry outing in Kentucky. On September 21 and 22, 2014, Ostaficiuk had a series of five phone calls with Rekenthaler. After those calls, Camber sent a revised offer to a potential customer that same afternoon, containing modified prices for Raloxifene HCL.

1921. On September 24, Patel discussed a Raloxifene HCL market strategy with her Teva colleagues in light of Camber's offer to the large Teva customer. Later that morning, Rekenthaler called Ostaficiuk and the two spoke for 2 minutes. They spoke two more times that day.

424

1922. On September 25, after discussing with his colleagues which customers Teva should concede to give Camber its Fair Share of the Raloxifene HCL market, and armed with the information Rekenthaler had gathered from Ostaficiuk, Teva decided to concede certain additional, smaller customers. Rekenthaler and Ostaficiuk spoke again twice that day.

1923. On Friday, September 26, 2014, Camber announced that it was launching Raloxifene HCL. Rekenthaler called Ostaficiuk that day to convey that Teva did not want Camber taking any more of its Raloxifene HCL customers. Camber agreed, and on September 29, 2014, Ostaficiuk sent an email to colleagues at Camber warning them not to "offer anything to any Teva customers ... Not even a 'bad price'! Please acknowledge .... We do not want to upset them more!" The Director of Sales and Operations at Camber, replied, "We has not made any offers to any Teva Raloxifene accounts    Both Sales and Contracts are aware, & requesting incumbent detail for all offers, if Teva, no offer."

1924. About a week later, on October 7, 2014, McKesson informed a Teva sales representative that Camber had made an unsolicited bid for its Raloxifene HCL business. A Director of National Accounts at Teva sent an internal email at Teva, expressing surprise given the agreement that Teva had previously reached with Camber: "I thought they were done after securing [our large customer] Econdisk?" Senior Director of Sales & Trade Relations Teri Coward expressed her frustration at a competitor not playing fair, commenting "this is ridiculous" and calling Camber "total idiots." Rekenthaler thought there had to be a miscommunication and doubted that Camber made an offer to another Teva customer, stating, "You're positive they sent them an offer?"

1925. Since it seemed that Camber was not sticking to the deal, Teva decided that they needed McKesson to give Camber a "message" that the "market should be stable

425

at this point," meaning that McKesson would tell Camber it was not supposed to be competing for further business. The Teva Director of National Accounts "relayed 'the message' re market should be stable" to an individual at McKesson who said he would confirm "Camber intentions and why they said they would send an offer."

1926.    After further discussion with McKesson, Teva learned that it was a misunderstanding. Camber never actually made the offer; and had instead complied with the Fair Share agreement with Teva.

1927.    No non-collusive market factors (e.g., product shortages) can explain the artificially inflated prices.

1928.    The ability of Teva, Camber, and Actavis to reach agreements on Raloxifene HCL was also aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. See Exhibit 1 (Chart of Defendants' Trade Association Meetings Attendance).

1929.    The coordination by Teva, Camber and Actavis is consistent with the Fair Share Agreement.

1930.    The agreement between Defendants Teva, Camber, and Actavis was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Raloxifene HCL Tablets.

### 132.    Ranitidine HCL

1931.    Ranitidine HCL, which is also discussed in further detail in Sections XIII. A. and B. below, is a commonly prescribed medication used to prevent and treat heartburn and other symptoms caused by too much acid in the stomach. It has been designated as an essential medicine by the World Health Organization and has been

426

available in the United States for decades. Ranitidine HCL comes in many forms, including 75 mg, 150 mg, 300 mg Tablets, and 150 mg and 300 mg Capsules.

1932.    The market for Ranitidine HCL Capsules and Tablets is mature. At all relevant times, there have been multiple manufacturers. Defendants Dr. Reddy's and Sandoz dominated the sales of Ranitidine HCL Capsules and Defendants Amneal, Glenmark, Par, and Teva dominated the sales of Ranitidine HCL Tablets in the relevant period.

1933.    The GAO reported that 300 mg Ranitidine HCL Capsules experienced "an extraordinary price increase" in 2012-2013.

1934.    WAC pricing also rose in a coordinated fashion. Sandoz substantially raised its WAC prices for Ranitidine HCL on January 13, 2012, a decision it would not have made unless it had pre-existing knowledge that Dr. Reddy's would quickly match its prices, as it did on February I, 2012. Glenmark introduced WAC prices on May 16, 2013, which approximately doubled existing prices, a decision it would not have made unless it had pre-existing knowledge that Teva would quickly match its prices, as it did on July 3, 2013, even though it doubled its prior WAC prices. Defendants Amneal and Par benefited from these increases.

1935.    Pursuant to Defendants' agreement, their price increases did not result in significant market share losses in the relevant period.

1936.    Documentary evidence confirms that these parallel price increases were the result of collusion among generic drug manufacturers, including Amneal, Glenmark, Par, Teva, Dr. Reddy's and Sandoz. Teva considered all of these companies to be "quality competitors," with whom it was easy to facilitate price coordination.

1937.    For example, in a June 7, 2013 email, Dr. Reddy's internally discussed

427

its strategy of supporting Sandoz's price increase and not exploiting Sandoz's temporary absence to gain market share: "Sandoz did a price adjustment (Jan' 12) and we followed. Then they went on  back order. As a result, we picked up their business temporarily (May' 12 - July' 12 qtr) from them since we did not want to upset the market post this price adjustment."

1938.    Teva and Glenmark's coordination is also well documented. As soon as she  arrived at Teva, Patel began identifying price increase candidates, including drugs, where it ostensibly competed with Glenmark. On May 2, 2013, in a 6:49 am email, Patel informed a colleague that she expected to have some new drugs to add to the price increase list imminently. Not fifteen minutes later, she received a call from a senior executive at Glenmark, with whom she spoke for five minutes. At 7:44 am that day, Patel sent a follow-up email to her subordinate, directing him to add six different "high priority" Glenmark drugs to the price increase list, including Ranitidine HCL. Glenmark increased its WAC prices on all of these drugs two weeks later, on May 16, 2013, and Teva initiated price increases in July, when Teva and Glenmark exchanged six more telephone calls or texts to coordinate Teva's price increases. Although Glenmark increased its prices first, on May 6, 2013, Teva internally considered itself to be the leader on the Defendants' price increase.

1939.    The ability of Amneal, Glenmark, Par, Teva, Dr. Reddy's and Sandoz to reach agreement regarding Ranitidine HCL was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. See Exhibit 1 (Chart of Defendants' Trade Association Meetings Attendance).

1940.    The agreement between Defendants Amneal, Glenmark, Par, Teva, Dr. Reddy's and Sandoz was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and

428

customer allocation for generic drugs, including for Ranitidine HCL Capsules and Tablets.

### 133.    Silver Sulfadiazine

1941.    Silver Sulfadiazine is an antibiotic used to treat second and third-degree burns. It has been available in the United States for many years in a generic form. It is available in a Cream formulation.

1942.    The market for Silver Sulfadiazine 1% Cream is mature. At all relevant times there have been multiple manufacturers.

1943.    Defendants Ascend and Teva dominate sales of Silver Sulfadiazine Cream (1%). 1968.  Plaintiff alleges that as part of Defendants' Fair Share Agreement, they conspired to fix, raise, maintain or stabilize the prices of Silver Sulfadiazine Cream beginning at least as early as 2012.

1944.    Under the Fair Share Agreement, Defendants did not attempt to undercut competitors' prices in order to gain additional market share.

1945.    The ability of Ascend and Teva to reach agreements on Silver Sulfadiazine was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. See Exhibit 1 (Chart of Defendants' Trade Association Meetings Attendance).

1946.    No non-collusive market factors (e.g., product shortages) can explain the artificially inflated prices.

1947.    The agreement between Defendants Ascend and Teva was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Silver Sulfadiazine Cream (1%).

### 134.    Spironolactone HCTZ

429

1948. Spironolactone Hydrochlorothiazide (HCTZ) is a commonly prescribed medication used to treat high blood pressure. It has been on the market for decades and is available in 25-25mg Tablets.

1949. The market for Spironolactone HCTZ Tablets is mature. At all relevant times, there have been multiple manufacturers. Defendants Greenstone, Mylan, and Sun dominated sales of for 25-25mg Spironolactone HCTZ Tablets in the relevant period.

1950. The GAO reported that 25-25mg Spironolactone HCTZ Tablets experienced "an extraordinary price increase" in 2013-2014. There were no reported shortages of these products in the relevant period.

1951. WAC pricing also rose in a coordinated fashion. Mylan raised its prices on March 6, 2013, roughly five times its prior WAC price, a decision it would not have made unless it had pre-existing knowledge that the others would quickly match, as they did. Greenstone and Sun essentially matched Mylan's price on April 2, 2013 and April 15, 2013 respectively, causing a more than fourfold increase of their prior WAC prices.

1952. Pursuant to Defendants' agreement, their price increases did not result in significant market share losses in the relevant period. Mylan held the dominant share, while Greenstone and Sun maintained small, but steady market shares.

1953. Documentary evidence confirms that these parallel price increases were the result of collusion among generic drug manufacturers, including Greenstone, Mylan, and Sun. Defendant Teva considered Mylan and Greenstone to be "quality competitors," with whom it was easy to facilitate price coordination. Greenstone's R.H. and Mylan's Nesta exchanged 2,310 telephone calls or texts from 2011 through 2015, through which their companies facilitated price coordination on many products, including Spironolactone HCTZ. Nesta also exchanged 40 phone calls or texts with Greenstone's Nailor between

December 2012 and November 2015 to coordinate prices.

1954. The ability of Greenstone, Mylan, and Sun to reach agreement regarding for Spironolactone HCTZ was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. See Exhibit 1 (Chart of Defendants' Trade Association Meetings Attendance).

1955. The agreement between Defendants Greenstone, Mylan, and Sun was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including for Spironolactone HCTZ Tablets (25-25mg).

### 135. Tamoxifen Citrate

1956. Tamoxifen Citrate Tablets, which are also discussed in additional detail in Section XIII. E. below, are commonly prescribed to treat breast cancer and have been available in the United States for decades. The World Health Organization includes Tamoxifen on its List of Essential Medicines. It is available in the United States in 10 mg and 20 mg Tablets.

1957. The market for Tamoxifen Citrate Tablets is mature. At all relevant times, there have been multiple manufacturers. Defendants Actavis, Mylan, and Teva dominated sales of Tamoxifen Citrate 10 mg and 20 mg Tablets in the relevant period.

1958. Documentary evidence confirms that these parallel price increases were the result of collusion among generic drug manufacturers, including Actavis, Mylan, and Teva.

1959. Effective July 31, 2012, Teva increased pricing on a number of drugs, including Tamoxifen Citrate, where it had the dominant share, followed by "Mylan (22.2%); Watson [Actavis] (10.3%)." Teva coordinated each of these price increases with

other manufacturers through numerous calls in July 2012 in the days and weeks leading up to the price increase. For example, Teva's Green spoke to Mylan's Nesta on July 23, 2012 (seven minutes); July 24, 2012 (four minute and eight minute calls), July 25 (four minutes); July 26 (four minutes); July 30 (two calls, one for eight minutes); and July 31 ( six minute, two minute, four minute, seven minute  and two minute calls). Meanwhile, Teva's Rekenthaler spoke to A.S. at Actavis on July 11, 2012 (one minute and nine minute calls).

1960.    Defendants orchestrated a second price increase in April 2014. The plan originated with Teva's advance knowledge that Actavis would increase its price, an increase ultimately implemented on April 15, 2014. Following a now very familiar pattern, at 9:54 am on March 14, 2014 Actavis's Rogerson called Patel and left a message. Patel called Rogerson back at 10:31 am, and the two spoke for more than twelve minutes. Within minutes after hanging up with Rogerson, Patel informed others at Teva about the Actavis increase. Within half an hour of sending that email, Patel instructed colleagues to add the Actavis drugs to the Teva price increase list. She added: "We intend to follow where we can." Less than two hours later, at 12:37 pm, Patel called Rogerson again. They spoke for more than five minutes. Shortly after hanging up the phone, at 12:51 pm, Patel wrote another email to her colleagues at Teva, stating: "Actavis took an increase. We will follow. We need to review price per my alert list. Let's wait to see what  intel we can get and discuss Monday."

1961.    That Monday, March 17, 2014, Patel forwarded the "PI Candidates" list to K.G. at Teva. The list included both Tamoxifen Citrate. Later that morning, Patel called Actavis's Rogerson. After quickly exchanging voicemails, they spoke for more than nineteen minutes. Rekenthaler of Teva and Falkin of Actavis also exchanged four text messages that day and had one call lasting more than six minutes.

432

1962. In the days leading up to Teva's price increase for Tamoxifen Citrate, Rekenthaler asked Patel for a list of drugs and competitors associated with each of the increase items so that he could confirm that Teva had successfully coordinated increases with everyone. On April 1, 2014, Patel responded by providing a list of only those drugs where Teva was leading the price increase- i.e., the drugs with the most risk if Teva did not secure an agreement beforehand with other manufacturers before raising its own price. Again, on April 4, 2014, the day of Teva's price increase, Patel and Rogerson spoke twice by phone and Rekenthaler and Falkin also spoke by phone that day. Satisfied that Patel and Rekenthaler had confirmed agreement with all the appropriate competitors, Teva announced the price in increase on Tamoxifen Citrate and other drugs. Because Teva was able to institute Actavis's planned price increase so quickly, Teva's increase became effective even before Actavis implemented its increases.

1963. After their price increases became effective, Teva took consistent steps not to disrupt the market or steal market share from Actavis. For example, on May 14, Patel declined to bid at AmerisourceBergen on both Tamoxifen Citrate and Estazolam, stating: "unable to bid (strategic reasons, for internal purposes)." When Patel and her other conspirators at Teva used the term "strategic" in this context, it was code for the fact that there was an understanding in place with a supposed competitor.

1964. Similarly, on May 21, 2014, Teva received a request from Wal-Mart for a bid on Tamoxifen Citrate. As of that date, Teva had 58.4% of the market, and Actavis had 40.7%. A Teva analyst forwarded the request to Patel and others, recommending (pursuant to the fair share understanding in the industry) that Teva not bid "as we are first in a two-player market with good share already." Patel responded: "Agree. We should decline to bid."

1965.    Meanwhile Mylan's internal emails show that it temporarily discontinued Tamoxifen Citrate sales on October 15, 2013 due to "technical issues" and that it planned to relaunch in June 2014. Mylan listed its target market share as 25%. Under the Fair Share Agreement, Defendants willingly conceded market share to Mylan in order to maintain supracompetitive prices for Tamoxifen Citrate. For example, on June 6, 2014, a Teva employee emailed Patel and K.G.: "Since Mylan is coming into the market and we will need to give up some share, I propose conceding Cardinal." K.G. countered that Teva had considered giving up CVS instead in order to keep Cardinal Health and Econdisc: "Let's match Cardinal for now. Hopefully they go to CVS.'' In another email, Teva employees considered holding off on bidding on Walmart because Mylan was reentering the market: "My assumption is that we will not want to pick up Wal-Mart, as we will most likely have to concede some of our current business with Mylan re-entering."

1966.    No non-collusive market factors (e.g., product shortages) can explain the artificially inflated prices.

1967.    The agreement between Defendants Actavis, Mylan, and Teva was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Tamoxifen Citrate Tablets.

### 136.    Temozolomide

1968.    Temozolomide, also known by the brand name Temodar, is used to treat glioblastoma multiforme and refractory anaplastic astrocytoma, both cancers of the brain.

1969.    The patent on Temodar was set to expire in early 2014, but both Teva and Sandoz had independently obtained the right to launch in August 2013 – six months prior to the patent expiration. Leading up to the launch of the generic, Teva coordinated

with Sandoz to divide up the market.

1970. On July 18, 2013, a large retail pharmacy customer ("The Pharmacy") submitted an RFP to Sandoz for Temozolomide. Playing by the rules of the road, Sandoz waited to see what Teva was going to do before submitting their own bid. That same day, CW-1 received a telephone call from Defendant Patel. Patel sought information on Sandoz's current customers and discussed options to allocate customers for Temozolomide. Nothing was agreed to on that call.

1971. On July 22, 2013, P.G., a senior Sandoz executive, instructed his team to find out Teva's plans with regard to The Pharmacy: "Please find out if Teva is submitting an offer to them." The next morning, S.G., a national accounts executive at Sandoz, spoke with The Pharmacy and asked The Pharmacy to find out Teva's plans. S.G. summarized his call with The Pharmacy to his team: "I just spoke to [The Pharmacy] regarding Temozolomide. [The Pharmacy] has not yet received an offer from Teva on the product. At this time, [The Pharmacy] is reaching out to Teva to understand their supply and launch status. [The Pharmacy] will be circling back and I will share the feedback we receive with everyone on this email trail."

1972. At the same time, CW-1 was reaching out to Teva directly to get more information. CW-1 called Defendant Patel at approximately 1:45 p.m. on July 23, 2013. After exchanging voicemails, they spoke for over fourteen (14) minutes that same afternoon.

435

1973.    Also on the afternoon of July 23, The Pharmacy replied to Sandoz and cryptically delivered Teva's message regarding its plans for Temozolomide:

> **From:** ██████████████████████████████
> **Sent:** Tuesday, July 23, 2013 3:26 PM
> **To:** Greenstein, Steven
> **Subject:**
>
> 8/11 launch
>
> Looking to play nice in 2 player market
>
> Have supply for that share.
>
> What are your plans?

1974.    Thus, Teva was able to communicate to Sandoz (a) when it was prepared to  launch Temozolomide, (b) that it was not planning to compete aggressively or pursue more than its fair share, (c) that it had sufficient stock of Temozolomide to sustain around a 50% market share, and (d) an inquiry regarding Sandoz's plans for Temozolomide. Sandoz understood the implications of the communication, and understood that "Teva is seeking a ~45-50% share." One Sandoz executive responded internally and exclaimed that this was "[g]reat news . . . !"

1975.    On July 30, 2013, another customer, CVS Caremark, contacted Teva asking for an offer on Temozolomide. T.C., a senior sales executive at Teva, discussed the matter internally and asked her boss, Defendant Rekenthaler, "[i]s the strategy to target CVS[?]" Rekenthaler responded by alluding to the deal that had already been struck with Sandoz: "We'll send offers out to everyone. My instincts tell me Sandoz will end up with them as we'll probably be more focused on [The Pharmacy] on this one. Again, we'll send them out an offer same time as everyone else and respond from there." Rekenthaler most likely got his information from Defendant Patel. Just one day earlier, on July 29, 2013, Patel had called CW-1 at Sandoz and spoke for nine (9) minutes, where the two discussed

436

how to carve up the market for the drug.

1976.    Teva and Sandoz were also coordinating through other channels. After receiving the RFP from The Pharmacy, S.G. of Sandoz coordinated with T.S., a senior account executive  at Teva, on a seven (7) minute call on July 29, 2013 followed by an eleven (11) minute call on July 31, 2013. After those calls, S.G. suggested in an internal e-mail on July 31 that Sandoz cede the business and instead submit a cover bid: "[The Pharmacy] has received an offer from Teva  on Temozolomide. They are asking for an offer from Sandoz. Even if we decide not to take this business, I would recommend that we submit an offer."

1977.    Similarly, on July 29, 2013, Defendant Green spoke to CW-2 of Sandoz two (2) times. The two spoke again on July 31, 2013 for six (6) minutes. During those calls,

| | |
|---|---|
| From: | ████████ [/O=MMS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=█████ ███B108848C-2032-4369-BDD7-5742A8329215] |
| Sent: | 8/1/2013 11:52:29 AM |
| To: | Kellum, Armando [/O=MMS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Kellum, Armando3a1dd060-78e9-4d1c-904b-da70bd48a7c5] |
| CC: | ████████████[/O=MMS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=██████████554612fa-c83d-4cef-8dde-6baf08aeaa0f] |
| Subject: | Teva temzol |

AK:

████ just got some intel from a reputable source:

Teva plans to launch on Monday (Aug 12)
Teva sending offers to all customers today
Teva wants ████

Regards,
████

Green told CW-2 about Teva's launch plans and that Teva wanted the The Pharmacy's business. The next day, August 1, 2013, D.P., another Sandoz executive, e-mailed Defendant Kellum, conveying the message from Green:

1978.    Teva and Sandoz communicated their future plans with each other for other accounts in addition to The Pharmacy and CVS. On July 31, 2013, D.P. of Sandoz

437

e-mailed an update on Temozolomide to his coworker, stating: "Teva has sent offers to ABC and [The Pharmacy] and **is planning to send to Econdisc tomorrow**[.]"

1979.    Going forward, Sandoz and Teva continued to coordinate with respect to Temozolomide. On August 12, 2013, the same day as Teva's launch, CW-2 met in person with Defendant Rekenthaler at the Grand Lux Café in Las Vegas during the NACDS Total Store Expo conference. There, Rekenthaler discussed, among other things, Temozolomide and informed CW-2 that Teva had officially launched and shipped all formulations of the drug.

1980.    Although Teva initially obtained the CVS account in August 2013 due to Sandoz's inability to supply the 250mg strength of Temozolomide, the companies had agreed that the account would revert back to Sandoz once Sandoz could supply that dosage strength. In an internal e-mail dated August 16, 2013, a Teva employee confirmed the plan: "This is perfect  I spoke to [a CVS representative] and as soon as Sandoz is available to launch the 250mg we kill the contract."

1981.    CW-1 spoke to Defendant Patel both before and after Sandoz sent out any offers regarding Temozolomide in an effort to develop and ensure the appropriate fair share balance between the two competitors.

### 137.    Theophylline ER

1982.    The market for Theophylline ER is mature, as Theophylline has been used to treat various conditions since approximately 1900. Heritage and Teva sold Theophylline ER to A&P and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

1983.    In February 2014, Teva's Patel spoke with Heritage's Malek for more than an  hour regarding a number of potential drugs on which prices could be increased. Upon information and belief, during that conversation, Heritage and Teva agreed that they

438

would increase prices for Theophylline ER.

1984.    Teva agreed that it would lead the price increase for Theophylline ER. By late April 2014, Teva fully implemented a price increase on the drug of approximately 150%.

1985.    During an internal company meeting on April 22, 2014, Malek informed sales employees at Heritage that Heritage would follow Teva's price increase and raise prices for Theophylline ER by approximately 150%.

1986.    Heritage began announcing the price increase to customers in late June 2014, and by July 9, 2014, it had fully implemented the collusive 150% price increase of Theophylline ER.

1987.    As a result of the unlawful agreement on Theophylline ER between Teva and Heritage, prices for the drug still remain at supracompetitive levels.

### 138.    Timolol Maleate

1988.    Timolol Maleate is a beta blocker drug, which is used to treat, for example, high pressure inside the eye due to glaucoma or other eye diseases. It has been available in the United States for decades in a generic form. It is available in Opthalmic Gel, Opthalmic Liquid Eye, and Tablet formulations. Due to, among other things, its clinical efficacy and safety, it has been designated as an essential medicine by the World Health Organization.

1989.    The market for Timolol Maleate is mature. At all relevant times, there have been multiple manufacturers of Timolol Maleate.

1990.    Defendants Bausch and Sandoz dominate sales of Timolol Maleate Opthalmic Gel, which is available in dosage strengths of 0.25% and 0.5%. For much of the relevant time period, Bausch and Sandoz divided the market for Timolol Maleate

Opthalmic Gel in close to a 50/50 split.

1991. Documentary evidence confirms that parallel pricing was the result of collusion among Bausch and Sandoz.

1992. A product sales and market share performance spreadsheet from Sandoz from May 2013 asks, "Do we want more share on this product?" for Timolol Maleate Opthalmic Gel. The spreadsheet indicates that the response is "No" because "Sandoz has fair share." Several months after this spreadsheet was circulated, Sandoz and Bausch engaged in a parallel price increase on Timolol Maleate.

1993. The GAO noted that Timolol Maleate Ophthalmic Gel had an "extraordinary price increase" in the years 2014-15.

1994. Bausch's and Sandoz's Timolol Maleate Opthalmic Gel prices remained elevated and parallel.

1995. The ability of Bausch and Sandoz to reach agreement regarding Timolol Maleate was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. See Exhibit 1 (Chart of Defendants' Trade Association Meetings Attendance).

1996. No non-collusive market factors (e.g., product shortages) can explain the artificially inflated prices.

1997. The agreement between Defendants Bausch and Sandoz was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Timolol Maleate Ophthalmic Gel (0.25%, 0.5%).

### 139. Tobramycin

1998. Distributors Cardinal, ABC and WBAD each participated in the

scheme to allocate manufacturer market share for Tobramycin inhalation solution (also known as Tobi). Although these distributor Defendants often initiated discussions about balancing share or increasing price in order to foment agreement, in this case they worked to finalize the agreement.

1999.   Tobramycin, also known by the brand name Tobi, is an eye drop used to treat bacterial infections.

2000.   Tobramycin inhalation is prescribed to people with cystic fibrosis who are suffering from bacterial infections in their lungs. The drug is sold in packs of 56 ampules because patients must inhale two ampules of Tobramycin per day for 28 days. At the time, the 56-pack of ampules cost Teva around $48.69 to produce. As a result of the conspiracy, Teva was able to sell each 56-pack of Tobramycin for over $4,000.

2001.   Beginning in October 2013, prior to the first generic launch of Tobramycin (for which Teva would have 180-day generic exclusivity), Sandoz began making plans for its entry after Teva's exclusivity period. These plans included going after Sandoz's "fair share," but depended on Teva being "rational." A.S., a Sandoz executive responsible for product launches, wrote in an internal e-mail in October 2013: "[w]e will aim to go for our fair share of the market, and exact goals will depend on how Teva goes into the market on day 1, and how rational they behave on day 181." "Rational" behavior is a term of art in the fair share conspiracy indicating that a competitor will play fair and cede share to avoid competition.

2002.   As expected, Teva was "rational" when it came time to give up share to Sandoz. Nearing Teva's loss of exclusivity and Sandoz's entry, on July 1, 2014, Teva and Sandoz began sharing information and coordinating to divide up the market for Tobramycin. Defendant Patel exchanged seven (7) calls with CW-1 on July 1, during

which they discussed Sandoz's launch plans and how to divide up the market for Tobramycin. Defendant Patel conveyed some of this information in an internal Teva e-mail the same day, writing, "[A]s a heads up, I heard that Sandoz plans to ship Tobi [Tobraymycin] prior to Akorn. Hearing they are ready to ship once they secure business, and we have been challenged." The next day, Teva made the decision to concede two different accounts for Tobramycin to Sandoz.

2003.    On July 7, 2014, Patel and CW-1 spoke five more times, including one call lasting eleven (11) minutes. On these calls, CW-1 and Patel discussed how to divide up the market for Tobramycin, including specific accounts that each would maintain or concede to the other. Patel then memorialized the agreement in an e-mail two days later. The result: Teva would take Walgreens, McKesson, Econdisc, ABC, and Omnicare; while Sandoz would take CVS, Cigna, Prime Therapeutics, Kinney Drugs, and OptumRx. Teva also planned to concede the Cardinal business to Sandoz.

2004.    Patel told CW-1 specifically that Teva would not even submit a bid to CVS. This was significant because Tobramycin was a very expensive product, and Sandoz was able to acquire the CVS business by offering only a nominal reduction to the extremely high Teva price.

2005.    According to plan, Teva conceded the CVS business to Sandoz after CVS contacted Teva and requested that Teva submit a lower price to retain the business. Defendant Rekenthaler wrote in an internal e-mail, "I notified CVS that we would be conceding their business. [T.C.], never a pleasant call so I figured I'd simply handle it myself." Teva also went through with its plan to concede Cardinal to Sandoz.

2006.    CW-1, in turn, told Defendant Patel that Sandoz would not pursue business from ABC and Walgreens. CW-1 spoke with Defendant Kellum about his

442

conversations with Defendant Patel and the agreement to stay away from Walgreens and ABC, and Kellum agreed with the plan. Pursuant to that agreement, Sandoz made no effort to contact those two large customers when it entered the market.

2007.    CW-1 and Patel also discussed Sandoz's target market share. CW-1 informed  Patel that Sandoz was seeking a 50% share, but Patel thought that was "unrealistic due to  Akorn's expected entry." After discussing Sandoz's share goal with Defendant Rekenthaler,  Patel went back to CW-1 and informed him "that a 25% share was reasonable."   Sandoz appeared to comply with that, as Patel observed that Sandoz "appear[s] to be taking a responsible approach."

2008.    On July 9, 2014, one of the above allocated customers, Kinney Drugs, approached Teva asking for a lower price on Tobramycin. A Teva analyst stated in an internal e-mail, "[w]e are strategically going to decline to bid on this request per Nisha." A Teva national accounts director was confused by this decision and responded, "Really? Do you have a little more detail? It is such a small qty." The analyst responded and said, "[w]e were given direction from Nisha not to pursue this opportunity. My understanding of this is there is a new market entrant, (Sandoz) and we are trying to keep our current customers instead of picking up new business." Defendant Patel's direction had come after she had called CW-1 at Sandoz twice on July 9, 2014 and left him a voicemail. CW-1 then returned her call the same day and the two spoke for four (4) minutes.

2009.    The following week, on July 17, 2014, Red Oak / Cardinal's was concerned that the manufacturers' allocation agreement was not being executed quickly enough. He called T. C. (Teva) to discuss his concerns.  That same week, Walgreens also coordinated with Sandoz and Teva to allocate the market for Tobramycin. On July 16, 2014, Teva spoke with (Walgreens/WBA), who had spoken with Sandoz that same

443

day to discuss the launch of Tobramycin.

2010.    When Tobramycin came up for re-bid in July 2015, Teva continued with the agreed plan to concede to challengers in order to avoid or limit price erosion.

### 140.    Tobramycin Dexamethasone

2011.    Tobramycin Dexamethasone, is an antibiotic used to treat bacterial eye infections. It has been available in the United States for over a decade in a generic form. The market for Tobramycin Dexamethasone is mature. At all relevant times, there have been multiple manufacturers.

2012.    Defendants Bausch and Sandoz dominate sales of Tobramycin Dexamethasone Ophthalmic Liquid (0.3-0.1%).

2013.    Plaintiff alleges that as part of Defendants' Fair Share Agreement, they conspired to fix, raise, maintain or stabilize the prices of Tobramycin Dexamethasone beginning at least as early as 2012.

2014.    Under the Fair Share Agreement, Defendants did not attempt to undercut competitors' prices in order to gain additional market share.

2015.    The ability of Bausch and Sandoz to reach agreements on Tobramycin Dexamethasone was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. See Exhibit 1 (Chart of Defendants' Trade Association Meetings Attendance).

2016.    No non-collusive market factors (e.g., product shortages) can explain the artificially inflated prices.

2017.    The agreement between Defendants Bausch and Sandoz was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including

444

Tobramycin Dexamethasone Ophthalmic Liquid (0.3-0.1%).

### 141.    Tolmetin Sodium

2018.    Tolmetin Sodium, which is also discussed in additional detail in Section XIII. D. below, is also known by the brand name Tolectin, and is a medication used to reduce pain, swelling, and joint stiffness from rheumatoid arthritis and osteoarthritis.

2019.    It has been available in the United States in a generic form for many years.

2020.    The market for Tolmetin Sodium is mature. At all relevant times, there have been multiple manufacturers of Tolmetin Sodium.

2021.    During the relevant time frame, Defendants Teva and Mylan were the primary manufacturers of Tolmetin Sodium Capsules.

2022.    On August 9, 2013, Teva raised prices on a number of drugs, including Tolmetin Sodium. Leading up to these price increases, Teva coordinated via direct communication with other drug manufacturers, including Mylan.

2023.    For example, on July 10, 2013, Teva's Green and Mylan's Nesta spoke twice. The next day, July 11, Nesta and Green exchanged several more calls.

2024.    On August 1, 2013, Green again spoke to Nesta (Mylan) 2 times; shortly after the second call, Green called Patel to update her. On August 2, 2013, Patel called Green, after which Green immediately called Nesta. Green spoke to Nesta three more times on August 6 and three times on August 8, 2013. Patel also spoke to Nesta twice on August 8, 2013.

2025.    The day before the price increase went into effect - August 8, 2013 -Patel and Nesta spoke again. Price increases followed the next day.

2026.    No non-collusive market factors (e.g., product shortages) can explain the

artificially inflated prices.

2027.    The ability of Teva and Mylan to reach agreements on Tolmetin Sodium was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. See Exhibit 1 (Chart of Defendants' Trade Association Meetings Attendance).

2028.    The coordination by Teva and Mylan is consistent with the Fair Share Agreement.

2029.    The agreement between Defendants Teva and Mylan was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Tolmetin Sodium Capsules.

### 142.    Tolterodine

2030.    Tolterodine Tartrate, also known by the brand name Detrol, is in the antispasmodics class of medications and is prescribed to treat an overactive bladder. Tolterodine Extended Release ("Tolterodine ER") – also known by the brand name Detrol LA – is an extended release version of the drug used for the same purpose.

### a)    Tolterodine ER

2031.    Pfizer is the branded drug manufacturer for Detrol LA. To resolve patent infringement claims against Teva by Pfizer related to Detrol LA, Teva and Pfizer entered into a settlement agreement under which Teva would distribute an authorized generic of Tolterodine ER. To resolve similar claims, Mylan entered into its own settlement agreement with Pfizer, which allowed Mylan to launch its generic version Tolterodine ER. On October 31, 2013, Mylan's ANDA for Tolterodine ER was approved. Under their respective settlement agreements with Pfizer, this triggering event allowed Teva and

Mylan to launch their respective generics on January 2, 2014.

2032.    Teva planned to launch on January 2, 2014. During the first half of December 2013, Teva was under the impression—based on conversations with potential customers—that Mylan was not in a position to launch until 30 to 60 days after Teva launched.  Nonetheless, Teva was considering how to allocate the market with Mylan when it did eventually launch. On December 3, 2013, J.K., a marketing executive at Teva, sent an e-mail to Defendant Rekenthaler, K.G., and several other Teva colleagues stating "we prepared for 50-60 share… I am looking  into the numbers as far as what this means." To prepare offers and figure out the allocation of customers that would bring Teva its desired 50% to 60% market share, Teva executives were instructed to gather usage from potential customers.

2033.    Through the first half of December 2013, as Teva was soliciting usage amounts from potential customers, customers were asking Teva to send in pricing offers before the  launch. Teva resisted sending out those offers and instead did not plan to do so until the January 2, 2014 launch date. Teva's delay in putting together pricing for potential customers was part of  a plan to drive up the amount it could charge for Tolterodine ER. Specifically, Teva expected  that on January 1, 2014, Pfizer would raise the price of branded Detrol LA. This would allow Teva to peg its price to the now inflated price of the branded drug and thereby command a higher price for Tolterodine ER on the January 2, 2014 generic launch date.

2034.    At the end of the day on Friday December 20, 2013, Dale Hill (Cardinal) called T.C. (Teva) and delivered the message that Mylan would launch its Tolterodine ER in two weeks. Cardinal also provided Mylan's future pricing for Tolterodine ER, and conveyed that Mylan was "looking for a 40% market share." Cardinal

447

knew this was sufficient for Teva and Mylan to determine whether their customers added up to fair share and said that Teva "can figure the rest out."

2035. T.C. informed her Teva colleagues of Mylan's plans. K.G. of Teva then worked over the weekend to turn this information into initial pricing for all of Teva's potential customers and then shared it internally. In a telling admission that Teva had no intention to bid competitively for all accounts, K.G. noted that the next step was "to pick who should receive" bids. The goal in "pick[ing] who should receive" bids was to ensure that both Mylan and Teva received their previously stated market share goals: Teva wanted "50-60 [%] share" while Mylan was only "looking for a 40% market share."

2036. With the market allocation and pricing details provided by Cardinal, the manufacturer conspirators were all set. T.C. circulated the message from Cardinal to her Teva colleagues, including Kevin Galownia, and asked to have a call "first thing Monday morning to discuss what we want to do" in terms of preparing a "target strategy." Galownia then spent the weekend working up a strategy so that Teva could "pick who should receive bids." The unbidded customers would be conceded to Mylan as per the agreement communicated and confirmed via Cardinal.

2037. On Monday, December 23, 2013, Rekenthaler, Patel, K.G., T.C., and several others at Teva had a telephone conference scheduled from 8:00am to 9:00am to discuss the Tolterodine ER launch strategy. Just minutes before the meeting was to start, Rekenthaler tried calling Defendant Nesta at Mylan. Nesta returned Rekenthaler's call at 8:15am, which was during Teva's scheduled Tolterodine ER phone conference. Rekenthaler nonetheless answered Nesta's call on his cell phone and the pair spoke for 1 minute, 26 seconds. Immediately after Teva's scheduled Tolterodine ER phone conference, Rekenthaler tried calling Nesta two more times. At 10:22am, Nesta returned Rekenthaler's

calls and the pair spoke for an additional 12 minutes, 2 seconds. During these calls, Defendants Rekenthaler and Nesta exchanged the details about their offers to various customers, including the specific contractual language used in their offers.

2038.    For example, at 10:33 am—while Rekenthaler was still on the phone with Nesta, K.G. sent an e-mail to Rekenthaler and others asking about the appropriate contractual language to use in offers about the potential for price increases. Minutes after Rekenthaler finished his call with Nesta, he replied with the exact language, in quotes, that Mylan was using

> From:    Dave Rekenthaler
> Sent:    Mon 12/23/2013 10:41 AM (GMT-05:00)
> To:      ███████████; Maureen Cavanaugh
> Cc:      Nisha Patel02
> Bcc:
> Subject: RE: Proposed Price Increase Language
>
> Mylans language is vague. "Pricing subject to change at Mylan's sole discretion."

Most importantly though, during these calls between Defendants Nesta and Rekenthaler, Teva and Mylan reached an agreement to allocate the Tolterodine ER market on launch day so that Teva and Mylan could reach their target share without eroding pricing.

2039.    At 12:12 p.m. on December 23, 2013, K.G. circulated a revised version of Teva's pricing plan for the Tolterodine ER launch. This new version incorporated Teva and Mylan's plan to allocate the market, including the submission of cover bids and abstention from bidding. Notably, the revised pricing plan included the following chart identifying the major customers (and their associated market share percentage) that Teva would receive to get close to its desired 60% market share while Mylan would get its desired 40% share:

449

| | |
|---|---|
| CVS | 18 |
| Wal-Mart | 5 |
| Cardinal | 8 |
| Omnicare | 1 |
| Anda | 2 |
| Rite Aid | 4 |
| Econdisc | 15 |
| McKesson | 6 |
| | 59 |

2040.    In exchange for Mylan either submitting cover bids or abstaining from bidding on these customers, Teva reciprocated by submitting cover bids and/or refusing to submit bids to customers that Mylan targeted. This is demonstrated by the fact that Teva's newly revised pricing plan now included considerably higher direct invoice prices for major customers allocated to Mylan; namely Walgreens, Cigna, Humana, Optum RX, Prime Therapeutics, and Kaiser. The table below includes a comparison of Teva's pricing plan for these Mylan customers before and after Defendant Rekenthaler spoke with Defendant Nesta on December 23, 2013:

450

| Dosages | Initial Pricing Plan | Price after Dave Rekenthaler Speaks with Jim Nesta |
|---|---|---|

**WALGREEN**

| Product Description | Indirect Contract | Direct Invoice | Indirect Contract | Direct Invoice |
|---|---|---|---|---|
| TOLTERODINE TARTRATE ER CAPSULES 2MG 30 | 114.30 | 83.03 | 114.30 | 107.93 |
| TOLTERODINE TARTRATE ER CAPSULES 2MG 90 | 342.90 | 249.08 | 342.90 | 323.80 |
| TOLTERODINE TARTRATE ER CAPSULES 2MG 500 | 1,866.90 | 1,383.78 | 1,866.90 | 1,798.91 |
| TOLTERODINE TARTRATE ER CAPSULES 4MG 30 | 114.30 | 83.03 | 114.30 | 107.93 |
| TOLTERODINE TARTRATE ER CAPSULES 4MG 90 | 342.90 | 249.08 | 342.90 | 323.80 |
| TOLTERODINE TARTRATE ER CAPSULES 4MG 500 | 1,866.90 | 1,383.78 | 1,866.90 | 1,798.91 |

**CIGNA**

| Product Description | Indirect Contract | Direct Invoice | Indirect Contract | Direct Invoice |
|---|---|---|---|---|
| TOLTERODINE TARTRATE ER CAPSULES 2MG 30 | 114.30 | 88.05 | 114.30 | 108.00 |
| TOLTERODINE TARTRATE ER CAPSULES 2MG 90 | 342.90 | 264.15 | 342.90 | 324.00 |
| TOLTERODINE TARTRATE ER CAPSULES 2MG 500 | 1,866.90 | 1,467.50 | 1,866.90 | 1,800.00 |
| TOLTERODINE TARTRATE ER CAPSULES 4MG 30 | 114.30 | 88.05 | 114.30 | 108.00 |
| TOLTERODINE TARTRATE ER CAPSULES 4MG 90 | 342.90 | 264.15 | 342.90 | 324.00 |
| TOLTERODINE TARTRATE ER CAPSULES 4MG 500 | 1,866.90 | 1,467.50 | 1,866.90 | 1,800.00 |

**HUMANA**

| Product Description | Direct Invoice | Direct Invoice |
|---|---|---|
| TOLTERODINE TARTRATE ER CAPSULES 2MG 30 | 88.05 | 108.00 |
| TOLTERODINE TARTRATE ER CAPSULES 2MG 90 | 264.15 | 324.00 |
| TOLTERODINE TARTRATE ER CAPSULES 2MG 500 | 1,467.50 | 1,800.00 |
| TOLTERODINE TARTRATE ER CAPSULES 4MG 30 | 88.05 | 108.00 |
| TOLTERODINE TARTRATE ER CAPSULES 4MG 90 | 264.15 | 324.00 |
| TOLTERODINE TARTRATE ER CAPSULES 4MG 500 | 1,467.50 | 1,800.00 |

**OPTUM RX**

| Product Description | Indirect Contract | Direct Invoice | Indirect Contract | Direct Invoice |
|---|---|---|---|---|
| TOLTERODINE TARTRATE ER CAPSULES 2MG 30 | 114.30 | 88.05 | 114.30 | 108.00 |
| TOLTERODINE TARTRATE ER CAPSULES 2MG 90 | 342.90 | 264.15 | 342.90 | 324.00 |
| TOLTERODINE TARTRATE ER CAPSULES 2MG 500 | 1,866.90 | 1,467.50 | 1,866.90 | 1,800.00 |
| TOLTERODINE TARTRATE ER CAPSULES 4MG 30 | 114.30 | 88.05 | 114.30 | 108.00 |
| TOLTERODINE TARTRATE ER CAPSULES 4MG 90 | 342.90 | 264.15 | 342.90 | 324.00 |
| TOLTERODINE TARTRATE ER CAPSULES 4MG 500 | 1,866.90 | 1,467.50 | 1,866.90 | 1,800.00 |

**PRIME THERAPEUTICS**

| Product Description | Indirect Contract | Direct Invoice | Indirect Contract | Direct Invoice |
|---|---|---|---|---|
| TOLTERODINE TARTRATE ER CAPSULES 2MG 30 | 114.30 | 88.05 | 114.30 | 108.00 |
| TOLTERODINE TARTRATE ER CAPSULES 2MG 90 | 342.90 | 264.15 | 342.90 | 324.00 |
| TOLTERODINE TARTRATE ER CAPSULES 2MG 500 | 1,866.90 | 1,467.50 | 1,866.90 | 1,800.00 |
| TOLTERODINE TARTRATE ER CAPSULES 4MG 30 | 114.30 | 88.05 | 114.30 | 108.00 |
| TOLTERODINE TARTRATE ER CAPSULES 4MG 90 | 342.90 | 264.15 | 342.90 | 324.00 |
| TOLTERODINE TARTRATE ER CAPSULES 4MG 500 | 1,866.90 | 1,467.50 | 1,866.90 | 1,800.00 |

| Product Description | KAISER | | | KAISER | | |
|---|---|---|---|---|---|---|
| | Indirect Contract | Rebate To | Direct Invoice | Indirect Contract | Rebate To | Direct Invoice |
| TOLTERODINE TARTRATE ER CAPSULES 2MG 30 | 114.30 | 98.20 | 91.85 | 114.30 | 102.72 | 96.00 |
| TOLTERODINE TARTRATE ER CAPSULES 2MG 90 | 342.90 | 294.84 | 275.55 | 342.90 | 308.16 | 288.00 |
| TOLTERODINE TARTRATE ER CAPSULES 2MG 500 | 1,866.90 | 1,637.99 | 1,530.83 | 1,866.90 | 1,712.00 | 1,600.00 |
| TOLTERODINE TARTRATE ER CAPSULES 4MG 30 | 114.30 | 98.20 | 91.85 | 114.30 | 102.72 | 96.00 |
| TOLTERODINE TARTRATE ER CAPSULES 4MG 90 | 342.90 | 294.84 | 275.50 | 342.90 | 308.16 | 288.00 |
| TOLTERODINE TARTRATE ER CAPSULES 4MG 500 | 1,866.90 | 1,637.99 | 1,530.83 | 1,866.90 | 1,712.00 | 1,600.00 |

2041.    In addition to submitting inflated bids for Walgreens, Cigna, Humana, Optum RX, Prime Therapuetics, and Kaiser, Teva agreed to refrain from bidding for certain customers, such as Publix, Ahold, Hannaford, and PVA Health.

2042.    The following day, on December 24, 2013, Defendants Rekenthaler and Nesta had two more calls to confirm and refine Teva and Mylan's market allocation agreement. Those calls lasted for nine (9) minutes and eight (8) minutes, respectively.

### b) Tolterodine Tartrate

2043.    Tolterodine Tartrate, also known by the brand name Detrol, is in the antispasmodics class of medications. It is used to treat overactive bladder by improving the ability to control urination.

2044.    Greenstone entered the market for Tolterodine Tartrate 1mg and 2mg Tablets ("Tolterodine") on January 23, 2014 with the exact same WAC prices as Teva for all formulations. In the days leading up to Greenstone's entry, Defendants Hatosy and Nailor of Greenstone were speaking frequently to Defendants Patel and Rekenthaler of Teva to coordinate Greenstone's entry into the market. Those calls and text messages include at least those set forth below:



| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 1/21/2014 | Voice | Patel, Nisha (Teva) | Incoming | Nailor, Jill (Greenstone) | 14:40:25 | 0:00:00 |
| 1/21/2014 | Voice | Patel, Nisha (Teva) | Incoming | Nailor, Jill (Greenstone) | 14:40:48 | 0:00:12 |
| 1/21/2014 | Text | Patel, Nisha (Teva) | Outgoing | Hatosy, Robin (Greenstone) | 16:38:41 | 0:00:00 |
| 1/21/2014 | Voice | Hatosy, Robin (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 17:11:38 | 0:00:28 |
| 1/21/2014 | Voice | Hatosy, Robin (Greenstone) | Incoming | Nailor, Jill (Greenstone) | 17:33:42 | 0:03:12 |
| 1/21/2014 | Voice | Patel, Nisha (Teva) | Incoming | Hatosy, Robin (Greenstone) | 17:37:55 | 0:18:09 |
| 1/21/2014 | Voice | Hatosy, Robin (Greenstone) | Outgoing | Nailor, Jill (Greenstone) | 17:57:37 | 0:00:00 |
| 1/21/2014 | Voice | Nailor, Jill (Greenstone) | Outgoing | Rekenthaler, David (Teva) | 18:23:09 | 0:00:00 |
| 1/21/2014 | Voice | Nailor, Jill (Greenstone) | Outgoing | Rekenthaler, David (Teva) | 18:26:58 | 0:00:46 |
| 1/22/2014 | Text | Nailor, Jill (Greenstone) | Incoming | Rekenthaler, David (Teva) | 9:47:36 | 0:00:00 |
| 1/22/2014 | Voice | Nailor, Jill (Greenstone) | Incoming | Teva Pharmaceuticals | 11:25:37 | 0:09:53 |
| 1/22/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Nailor, Jill (Greenstone) | 15:33:20 | 0:00:00 |
| 1/22/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Nailor, Jill (Greenstone) | 15:33:26 | 0:00:04 |
| 1/22/2014 | Text | Patel, Nisha (Teva) | Outgoing | Nailor, Jill (Greenstone) | 15:33:47 | 0:00:00 |
| 1/22/2014 | Text | Patel, Nisha (Teva) | Outgoing | Nailor, Jill (Greenstone) | 15:33:49 | 0:00:00 |
| 1/22/2014 | Text | Patel, Nisha (Teva) | Incoming | Nailor, Jill (Greenstone) | 16:00:44 | 0:00:00 |
| 1/22/2014 | Text | Patel, Nisha (Teva) | Incoming | Nailor, Jill (Greenstone) | 16:00:46 | 0:00:00 |
| 1/22/2014 | Text | Patel, Nisha (Teva) | Outgoing | Nailor, Jill (Greenstone) | 16:00:59 | 0:00:00 |
| 1/22/2014 | Text | Patel, Nisha (Teva) | Outgoing | Nailor, Jill (Greenstone) | 16:01:01 | 0:00:00 |
| 1/22/2014 | Voice | Patel, Nisha (Teva) | Incoming | Nailor, Jill (Greenstone) | 16:26:26 | 0:11:09 |

2045.    During these calls and text messages, Teva and Greenstone agreed that Teva would concede business to Greenstone in order to avoid significant price erosion in the market.

2046.    The day after Greenstone's entry, January 24, 2014, in a message to Teva national account managers about how important it was for them to determine and document which competitor was challenging Teva for business in a particular situation (because it would help Teva determine whether to concede or not) Defendant Patel stated: "As we've heard, Greenstone is entering the market for Tolterodine. I'm sure we will have to concede somewhere."

2047.    On January 28, 2014, Teva was informed by CVS that it had received a competitive price challenge on Tolterodine. K.G. of Teva immediately asked: "do we know who this could be?" Defendant Rekenthaler responded that it was Greenstone, but did not want to put the details into writing:

453

> From:    Dave Rekenthaler
> Sent:    Tue 1/28/2014 4:02 PM (GMT-05:00)
> To:      ███████████████████
> Cc:      Maureen Cavanaugh; Nisha Patel02
> Bcc:
> Subject: RE: price challenge delphi 10707 cvs tolterdine
>
>
> It's Greenstone, new to market. We can discuss.

The next day, Defendant Patel and Defendant Hatosy of Greenstone tried to reach each other several times, and were ultimately able to speak once, for more than two (2) minutes.

2048.    On Monday, February 3, 2014, Defendant Patel instructed a colleague at Teva to concede the business at CVS by providing a small price reduction that she knew would not be sufficient to retain the business. T.C. of Teva, who had the customer relationship with CVS, challenged the decision to concede the business. Defendant Rekenthaler responded – again not wanting to put the details into writing:

> On Feb 3, 2014, at 11:29 AM, "Dave Rekenthaler" <Dave.Rekenthaler@tevapharm.com> wrote:
>
> ████ I'll discuss the details of this with you later. There was a strategy here and you weren't in the office Thursday or Friday so we proceeded. Again, it will make sense after I discuss with you.

The next day, Defendant Patel called Defendant Hatosy at Greenstone and the two spoke for nearly sixteen (16) minutes.

2049.    After some internal discussions at Teva regarding the CVS business, Teva confirmed its decision to concede CVS to Greenstone. CVS represented more than 20% of Teva's business on Tolterodine.

### 143.    Trazodone HCL

2050.    Trazodone HCL is a serotonin uptake inhibitor that is used to treat depression. It is available in tablet form in several strengths, including 100 mg Tablets. It has been available in the United States for over a decade in a generic form.

2051.    The market for Trazodone HCL is mature. At all relevant times, there have been multiple manufacturers of Trazodone HCL. Defendants Teva and Par dominated the market for Trazodone HCL 100mg Tablets, with Teva holding about 70% of the market and Par holding about 15% within that timeframe. Apotex and Sun each held smaller shares.

2052.    Plaintiff alleges that as part of Defendants' Fair Share Agreement, they conspired to fix, raise, maintain or stabilize the prices of Trazodone HCL beginning at least as early as 2014.

2053.    Under the Fair Share Agreement, Defendants did not attempt to undercut competitors' prices in order to gain additional market share.

2054.    The ability of Apotex, Par, Sun, and Teva to reach agreements on Trazodone HCL was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. See Exhibit 1 (Chart of Defendants' Trade Association Meetings Attendance).

2055.    No non-collusive market factors (e.g., product shortages) can explain the artificially inflated prices.

2056.    The agreement between Defendants Par, Sun, Teva and Co-Conspirator Apotex was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including 100 mg Trazodone HCL Tablets (100 mg).

### 144.   Triamcinolone Acetonide

2057.    Triamcinolone Acetonide is a corticosteroid used to treat a variety of skin conditions such as eczema, dermatitis, allergies, and rashes. It has been available in the United States for decades in a generic form. It is available in, for example, Cream and Ointment. The market for Triamcinolone Acetonide is mature. At all relevant times, there have been multiple manufacturers of Triamcinolone Acetonide.

2058.    Defendants Ascend, Par, Perrigo, Sandoz, and Taro dominate sales of Triamcinolone Acetonide Cream and Ointment. For much of the relevant period, Sandoz and Perrigo held most of the market share for the 0.025% Ointment, 0.025% Cream, 0.5% Cream, 0.1 % Cream, 0.1 % Ointment, and 0.5% Ointment with other defendants (Ascend, Par, and Taro) having a small share at certain times.

2059.    The GAO noted that Triamcinolone Acetonide 0.023% Cream, 0.025% Cream, 0.1 % Ointment, 0.1 % Cream, and 0.5% Cream had "extraordinary price increases" in the years 2010-2011.

2060.    Documentary evidence confirms that these parallel price increases were the result of collusion among Ascend, Par, Perrigo, Sandoz, and Taro.

2061.    Under the Fair Share Agreement, they expected that their ostensible competitors would not undercut their prices in order to gain additional market share. When ostensible competitors did seek additional market share, defendants showed surprise and dismay that one would not expect in a competitive market. For instance, in September 2012, Sandoz received a rebid request from Rite Aid on Triamcinolone Acetonide 0.1% Lotion due to a bid from a competitor. R.T. of Sandoz asked colleague D.L. to find out if this was Par (Qualitest) or another competitor. D.L. confirmed that it was Par. R.T. asked, "Why in the heck would they be coming after our share?" C.B. of Sandoz responded, "Low

IQ and a lack of understanding the market."

2062.    The ability of Ascend, Par, Perrigo, Sandoz, and Taro to reach agreement regarding Triamcinolone Acetonide was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. See Exhibit 1 (Chart of Defendants' Trade Association Meetings Attendance).

2063.    No non-collusive market factors (e.g., product shortages) can explain the artificially inflated prices.

2064.    The agreement between Defendants Ascend, Par, Perrigo, Sandoz, and Taro, was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Triamcinolone Acetonide Cream and Ointment.

### 145.    Triamterene HCTZ

2065.    Triamterene HCTZ is a commonly prescribed medication used to treat fluid retention and high blood pressure. It has been on the market for decades and is available in multiple forms and dosages, including Capsules (37.5-25 mg) and Tablets (37.5-25 mg and 75- 50 mg).

2066.    The market for Triamterene HCTZ 37.5-25mg Capsules and 37.5-25 mg and 75-50 mg Tablets is mature. At all relevant times, there have been multiple manufacturers: Defendants Lannett, Mylan, and Sandoz dominated the sales of 37.5-25 mg Capsules and Defendants Actavis, Mylan, Sandoz and Co-Conspirator Apotex dominated the sales of 37.5-25 mg and 75- 50mg Tablets.

2067.    For many years the price of Triamterene HCTZ remained stable. However, prices began to rise dramatically beginning in at least 2011.

2068.    For example, the GAO reported that Triamterene HCTZ 50-75 mg

Tablets experienced "an extraordinary price increase" in 2013-2014.

2069.    WAC pricing also rose in a coordinated fashion in the Tablets market. Mylan substantially raised its WAC prices on November 18, 2011, a decision it would not have made unless it had pre-existing knowledge that the others would soon match, as they did. Sandoz matched Mylan's WAC prices on January 13, 2012, even though it meant increasing its prior WAC prices sevenfold. Actavis and Apotex also matched Mylan and Sandoz's prices on March 9, 2012 and August 28, 2012 respectively, thereby significantly increasing their prior WAC prices.

2070.    Documentary evidence confirms that these parallel price increases were the result of collusion among generic drug manufacturers, including Actavis, Apotex, Lannett, Mylan, and Sandoz. Co-Defendant Teva considered all four to be "quality competitors," with whom it was easy to facilitate price coordination.

2071.    The ability of Actavis, Apotex, Lannett, Mylan, and Sandoz to reach agreements regarding Triamterene HCTZ prices was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. See Exhibit 1 (Chart of Defendants' Trade Association Meetings Attendance).

2072.    The agreement between Defendants Actavis, Lannett, Mylan, Sandoz Co-Conspirator Apotex were part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including for Triamterene HCTZ Capsules (37.5-25 mg) and Tablets (37.5-25 mg and 75-50 mg).

### 146.    Trifluoperazine HCL

2073.    Trifluoperazine HCL, which is also discussed in additional detail in Section XIII. C. below, is also known by the brand name Stelazine, and is a medication used to treat disorders such as schizophrenia and Tourette syndrome. It has been available

in the United States in a generic form for many years.

2074. The market for Trifluoperazine HCL was mature and at all relevant times had multiple manufacturers.

2075. During the relevant time frame, Defendants Mylan and Sandoz were the primary manufacturers of Trifluoperazine HCL Tablets. Defendant Upsher-Smith joined the conspiracy in March 2015.

2076. Plaintiff alleges that as part of Defendants' Fair Share Agreement, they conspired to fix, raise, maintain or stabilize the prices of Trifluoperazine HCL tablets (1, 2, 5 and 10 mg) beginning at least as early as July, 2013.

2077. For years, the prices for Trifluoperazine HCL tablets were relatively low and stable. In the summer of 2013, Mylan and Sandoz coordinated large price increases for their Trifluoperazine tablets. Within a small window of time, Mylan and Sandoz approximately doubled their list (WAC) prices to identical levels.

2078. When Upsher-Smith joined the market in spring of 2015, rather than offer better pricing to win customers, it announced identical list (WAC) prices to Mylan and Sandoz.

2079. Throughout this period, Mylan, Sandoz and Upsher-Smith met at trade conferences and communicated directly with each other in furtherance of their price fixing agreement on Trifluoperazine HCL tablets and of the Fair Share agreement.

2080. For example, on August 6, 2013-just a few days prior to Mylan's price increases- Nesta (Mylan) was in phone contact with a Sandoz Director of National Accounts.

2081. Once the Mylan price increases were imposed, Sandoz was careful not to take Mylan's customers and to maintain Fair Shares.

459

2082.    Sandoz and Mylan were in contact by phone on numerous occasions in October, and on October 25, 2013, Sandoz announced identical list (WAC) prices to Mylan. In January, February and March of 2015, Sandoz's Kellum was in phone contact with S.H., Senior VP of Global Sales, and J.H., Senior Director of Marketing, at Upsher-Smith. In February 2015, M.A., National Account Director at Mylan, communicated by text message with D.Z., National Accounts Senior Director at Upsher-Smith. On March 17, Upsher-Smith announced identical list prices to Sandoz and Mylan.

2083.    No non-collusive market factors (e.g., product shortages) can explain the artificially inflated prices.

2084.    The ability of Mylan, Sandoz and Upsher-Smith to reach agreements on Trifluoperazine tablets was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. See Exhibit 1 (Chart of Defendants' Trade Association Meetings Attendance). The coordination by Mylan, Sandoz, and Upsher- Smith is consistent with the Fair Share Agreement.

2085.    The agreement between Defendants Mylan, Sandoz and Upsher-Smith was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Trifluoperazine Tablets.

### 147.    Ursodiol

2086.    The market for Ursodiol is mature, as generic versions of Ursodiol have been available in the United States since 2000. Defendants Actavis, Lannett, and Epic sold Ursodiol to A&P and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

2087.    At all times relevant to this lawsuit there has been more than one

manufacturer of Ursodiol on the market. Defendants Actavis, Larmett, and Epic dominate the market for Ursodiol.

2088. In the years prior to the conspiracy period, Defendants' average price in the U.S. for Ursodiol were remarkably stable. Beginning in or around May 2014, Defendants increased their prices for Ursodiol abruptly and, for the most part, in unison.

2089. For example, beginning in May 2014, Defendants selling generic Ursodiol set their WACs in near lockstep, reflecting increases from previous WACs on the 300 mg capsule of more than 560%:

| Product Cap | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 300 mg | Lannett | 00527132601 | * | $5.11 | 1-May-14 | * |
| 300 mg | Epic | 42806050301 | $0.45 | $5.10 | 6-May-14 | 1034% |
| 300 mg | Actavis | 00591315901 | $0.77 | $5.11 | 24-Jun-14 | 562% |

2090. Ursodiol was one of the drugs identified in the GAO Report as having experienced an "extraordinary price increase".

2091. Furthermore, there are no legitimate reasons or explanations for the unprecedented and dramatic price increases of Ursodiol. Demand for Ursodiol has not materially changed in the last few years, nor does any change in input costs explain these price increases. Furthermore, at the time Ursodiol prices were increased in Summer 2014, there were no known raw material shortages that would have constrained Defendants' ability to supply the market.

2092. Upon information and belief, the price increases on Ursodiol were the result of collusive agreements between and among Defendants that were initiated by Actavis to increase pricing and restrain competition for the sale of Ursodiol in the United States. These collusive agreements were furthered, at least in part, through in-person

discussions conducted at meetings and industry events hosted by GPhA and HDMA as well as other meetings and communications, some of which are highlighted below.

2093. For example, on October 1-3, 2012, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from Actavis and Lannett. See Ex. 1.

2094. On June 4-5, 2013, the GPhA held a meeting in Bethesda, Maryland that was attended by representatives from Actavis and Lannett. See Ex. 1.

2095. On June 2-5, 2013, HDMA held its 2013 BLC in Florida. Representatives from Actavis and Lannett attended the event. See Ex. 1.

2096. On August 10-13, 2013, NACDS held its 2013 Total Store Expo in Las Vegas. Representatives from Actavis and Lannett attended. See Ex. 1.

2097. On October 28-30, 2013, GPhA held a meeting in Maryland that was attended by representatives from Actavis and Lannett. See Ex. 1.

2098. On May 12-15, 2014, MMCAP held its National Member Conference which was attended by representatives from Actavis and Lannett. See Ex. 1.

2099. On June 1-4, 2014, HDMA held its BLC at the JW Marriott in Arizona. This event was attended by representatives from Actavis and Lannett. See Ex. 1.

2100. On June 3-4, 2014, GPhA held a meeting in Maryland that was attended by representatives from Actavis and Lannett. See Ex. 1.

2101. On August 23-26, 2014, NACDS held its 2014 TSE in Boston. Representatives from Actavis, Epic, and Lannett attended. See Ex. 1.

2102. On October 27-29, 2014, GPhA held a meeting in Maryland that attended by Actavis and Lannett. See Ex. 1.

### 148. Valsartan HCTZ

2103. Valsartan HCTZ works to lower blood pressure and relax blood vessels so that blood can flow more easily, in order to prevent strokes, heart attacks, and kidney

problems. Mylan and Sandoz dominate the market for Valsartan HCTZ.

2104.    In September 2012, CW-4 was concerned about her job security at Sandoz and sought to network with executives at competing companies in the hope of obtaining new employment. CW-4 contacted Nesta because she was interested in potentially working at Mylan. CW-4 obtained Nesta's phone number from a mutual contact and called to introduce herself. During that phone call, Nesta immediately started talking about competitively-sensitive information. Although CW-4 was surprised that Nesta was being so blatant, she did not stop him. 2131.    In the year that followed, between September 2012 and October 2013, CW-4 and Nesta developed an ongoing understanding that they would not poach each other's customers and would follow each other's price increases. Notably, CW-4 and Nesta were not friends and communicated almost exclusively by phone. Examples of their coordination with respect to specific drugs are discussed in more detail below.

2105.    The first drug that CW-4 and Defendant Nesta coordinated about was Valsartan HCTZ. Valsartan HCTZ, also known by the brand name Diovan, is used to treat high blood pressure.

2106.    Diovan was a large volume drug that had sales in the United States of approximately $1.6 billion for the 12 months ending June 30, 2012.

2107.    Mylan was the first to file an abbreviated new drug application (ANDA) to market the generic version – Valsartan HCTZ – which, if approved, would give Mylan 180 days of generic exclusivity. Sandoz manufactured the authorized generic. This meant that Sandoz and Mylan would be the only two manufacturers of the generic version of the drug for six months.

2108.    Mylan and Sandoz launched Valsartan HCTZ on the same day –

September 21, 2012. In the days leading up to the launch, CW-4 and Defendant Nesta spoke at least twenty-one (21) times by phone during which they discussed, among other things, allocating market share for this product. These calls are detailed in the table below:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 9/6/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:20:01 |
| 9/6/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:00:11 |
| 9/6/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:00:05 |
| 9/6/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:01:18 |
| 9/6/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:05:22 |
| 9/7/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:00:43 |
| 9/7/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:11:35 |
| 9/7/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:01:03 |
| 9/12/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:22:22 |
| 9/12/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:01:35 |
| 9/12/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:00:06 |
| 9/13/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:11:26 |
| 9/13/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:00:19 |
| 9/13/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:00:57 |
| 9/13/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:05:22 |
| 9/13/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:03:30 |
| 9/14/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:07:36 |
| 9/17/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:00:09 |
| 9/17/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:03:32 |
| 9/19/2012 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:02:40 |
| 9/19/2012 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:00:51 |

2109.    During these phone calls, Sandoz and Mylan – through CW-4 and Defendant Nesta – agreed to divvy up the market so that each competitor obtained roughly a 50% market share.

2110.    Throughout this time, CW-4 also kept Defendant Kellum (her supervisor) regularly informed of her discussion with Defendant Nesta and met with Kellum in person to discuss her customer accounts, including a meeting on September 14, 2012.

2111.    On September 21, 2012 – the date of the Valsartan HCTZ launch – R.T., a senior sales and marketing executive at Sandoz, sent an internal e-mail stating "[a]s a

464

cross functional team, we have optimized this launch successfully securing – 52% market share vs. a formidable competitor like Mulan. … you should be very proud!"

2112.    That same day, Mylan issued a press release announcing that it had received final FDA approval to market generic Valsartan HCTZ. In an internal series of e-mails reacting to this news, a Sandoz employee remarked: "Fyi, good news, Mylan has 180 days as expected." H.F., a senior-most executive of Sandoz Germany responded, "…sometimes a little help from our competition is welcome as well." D.D., a senior-most executive of Sandoz North America, replied:

> I guess this is what they call "co-opetition".

2113.    Defendant Kellum forwarded Mylan's press release announcing the Valsartan launch to the Sandoz pricing and sales teams. S.G., a national account executive at Sandoz, replied "Hallelulah!!!!!!!!!!!!!!! (sic)."

2114.    On September 25, 2012 – only four days after the launch – ABC contacted Sandoz seeking a price reduction on Valsartan HCTZ. S.G. forwarded the request to CW-1 and Defendant Kellum stating "ABC has provided additional information regarding the market pricing on Valsartan HCTZ (specifically to McK [a Mylan customer]). Please review and advise if Sandoz will continue to let the market settle or move in a different direction. Defendant Kellum replied, "[n]o price change."

2115.    On November 16, 2012, Sandoz executives met to discuss increasing sales for Valsartan HCTZ. R.T. sent an internal e-mail in advance of the meeting asking "Are there opportunities with non-Sandoz customers that we should evaluate?" After a colleague responded with a list of potential Mylan customers, Kellum responded, "I'm concerned we are going to disrupt the market. I understand the need for additional sales but we need to be thoughtful here." R.T. then informed the Sandoz team "Do not approach

465

new customers, with[out] me or Armando [Kellum]'s consent."

### 149.    Verapamil

2116.    The market for Verapamil is mature, as the drug has been available in the United States since 1981. The drug is considered an essential medicine by the World Health Organization. Actavis, Heritage, and Mylan sold Verapamil to A&P and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

2117.    During phone calls with senior sales executives from Mylan and Actavis on April 22 and April 23, 2014, Heritage, Mylan, and Actavis agreed to raise prices on Verapamil in the United States.

2118.    Heritage began announcing the price increase to its customers in late June 2014, and had fully implemented the Verapamil price increase by July 9, 2014.

2119.    During the Summer of 2014, Mylan and Actavis also implemented the collusive price increase on Verapamil, as agreed by the three Defendants. As a result of this agreement, prices for Verapamil sold to A&P and others in the United States still remain at supracompetitive levels.

### 150.    Zoledronic Acid

2120.    The market for Zoledronic Acid is mature, as the drug has been available in generic form since 2013. The drug is considered an essential medicine by the World Health Organization. Heritage and Dr. Reddy's sold Zoledronic Acid to A&P and others in the United States at supracompetitive prices inflated by the unlawful and anticompetitive agreements alleged in this Complaint.

2121.    In early 2013, Heritage received approval to market Zoledronic Acid in the United States. On January 21, 2013, Malek instructed members of his sales team to

reach out to Dr. Reddy's – which at the time was the exclusive manufacturer of generic Zoledronic Acid in the United States – to reach an agreement on the price that the two companies would charge and a "fair share" market allocation that each would follow once Heritage entered the market.

2122.   Through a number of phone calls in late January 2013 between Heritage and Dr. Reddy's an agreement was reached that Heritage would be entitled to a 40% market share and Dr. Reddy's could keep the remaining 60% of the market. The two Defendants also agreed not to compete on pricing for Zoledronic Acid.

2123.   Conversations between the two companies in furtherance of the agreement continued in early March 2013, in preparation for Heritage's entry into the market on March 13, 2013. For example, Heritage employees, at Malek's direction, e-mailed and spoke by telephone with Dr. Reddy's employees on March 1, March 4, March 6, and March 12, 2013. Heritage employees also exchanged a number of texts with their contacts at Dr. Reddy's on March 12, 2013.

2124.   When Heritage began shipping Zoledronic Acid on March 13, 2013, Malek confirmed this to Dr. Reddy's, and he also confirmed the exact prices that Heritage was charging.

2125.   On April 19, 2013, in order to conceal the conspiracy, Malek instructed his sales team not to reduce to writing any collusive discussions or agreements relating to Zoledronic Acid or other drugs.

2126.   In order to ensure that the market allocation agreement (and the resulting supracompetitive pricing) remained in place, Malek and his counterparts at Dr. Reddy's discussed their bids to potential customers. For example, in November 2013, Malek e-mailed Dr. Reddy's to discuss an instance in which Dr. Reddy's responded to an RFP with

quoted prices below what Heritage was charging.

2127.    As a result of these anticompetitive agreements and collusive communications, prices for Zoledronic Acid sold to A&P and others in the United States remain at supracompetitive levels as of the filing of this Complaint.

### XIII.   **THE CONSPIRATORS INCREASE PRICES IN BUNCHES**

2128.    As discussed in detail above, the overarching "fair share" agreement allowed the conspirators to maintain supracompetitive prices on numerous drugs, and implement massive price increases on many others. In this Section, Plaintiff explains how the overarching "fair share" agreement also allowed competitors to begin increasing prices on drugs in bunches. As detailed below – including by tying in examples of price-fixing agreement discussed above – as the rules of the conspiracy became more established and the relationships within the industry developed, Defendants ramped up their price increase activity substantially.

**A.   Nisha Patel's First List of Increase Candidates: Adapalene Gel; Nabumetone; Fluconazole Tablets; Ranitidine; Moexipril; Moexipril HCTZ; Pravastatin; and Onadansetron**

2129.    As noted above, Patel's first task at Teva was to identify drugs for which Teva could increase prices by colluding with its competitors. Through her communications with her competitors, Patel learned more about their planned price increases and entered into agreements for Teva to follow them. On May 2, 2013, Patel spoke to her contacts at Glenmark, Actavis and Sandoz several times:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-5 (Glenmark) | 0:05:02 |
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 0:00:06 |
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 0:00:03 |
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-5 (Glenmark) | 0:07:18 |
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 0:15:48 |
| 5/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 0:11:39 |

2130. Defendant Patel completed and sent her first formal list of recommended price increases to her supervisor, K.G., on May 24, 2013. She sent the list via e-mail, with an attached spreadsheet entitled "Immediate PI File." The attached list included twelve (12) different drugs where Defendant Patel recommended that Teva follow a "high quality" competitor's price increase as soon as possible.

2131. The spreadsheet also revealed competitively sensitive information about future pricing and bidding practices of several of Teva's high quality competitors – information that Defendant Patel could have only learned through her discussions with those competitors. The relevant columns from that spreadsheet are set forth below:

| Product Category | Competitors | Reason for Increase |
|---|---|---|
| NABUMETONE TABLETS Total | Watson 26, Glenmark 25, Sandoz 5 | Follow 10% below Glenmark. Sandoz also bidding high. |
| RANITIDINE HCL TABLETS Total | Glenmark 1, Amneal 35, Wockhardt 10? | Follow Glenmark and Amneal increase. 3% below Glenmark. |
| MOEXIPRIL HCL TABLETS Total | Glenmark 18, Paddock 16 | Follow Glenmark increase. 5% lower |
| MOEXIPRIL HCL/HCTZ TABLETS Total | Glenmark 78, Paddock 2 | Follow Glenmark increase. 5% lower |
| ADAPALENE GEL Total | Glenmark 13, Taro 45 | Follow Glenmark increase. 5% lower. Rumors of Taro increase |
| CEFDINIR ORAL SUSPENSION Total | Lupin 35, Northstar 5, Sandoz 3 | Follow Lupin. 8-10% lower |
| CEFPROZIL TABLETS Total | Lupin 42, Northstar 10, Sandoz 18 | Follow Lupin. 8-10% lower |
| CEFDINIR CAPSULES Total | Lupin 49, Sandoz 16, Northstar 7 | Follow Lupin. 8-10% lower |
| FLUOCINONIDE OINTMENT Total | Taro 44, Sandoz 1 | Raise to follow Taro |
| FLUOCINONIDE CREAM E Total | Taro 62, Sandoz 10 | Raise to follow Taro |
| FLUOCINONIDE GEL Total | Taro 63, Sandoz 9 | Raise to follow Taro |
| FLUOCINONIDE CREAM Total | Taro 68, Sandoz 1 | Raise to follow Taro |
| CEFACLOR ER TABLETS Total | Teva Exclusive | Teva Exclusive |
| CEPHALEXIN TABLETS Total | Teva Exclusive | Teva Exclusive |
| CEFADROXIL TABLETS Total | Westward 41 | EXCLUDE; ERROR IN SOURCE DATA |

2132. For every one of the relevant drugs on the list, Defendant Patel or another executive at Teva spoke frequently with Teva's competitors in the days and weeks leading up to May 24, 2013. During these communications, Teva and its competitors agreed to fix prices and avoid competing with each other in the markets for the identified drugs. For some of these drugs including the four different formulations of Fluocinonide – Defendant Patel knew before she even began her employment at Teva that she would be identifying those drugs as price increase candidates because of communications she had

already had with Defendant Aprahamian of Taro.

2133.    The following graphic summarizes some of the calls related to each of the respective competitors leading up to May 24, 2013:



2134.    The "Immediate PI File," including the competitively sensitive information Defendant Patel had obtained from competitors, was sent by Patel's supervisor K.G. to Defendant Maureen Cavanaugh – at that time the Senior Vice President of Sales and Marketing at Teva – on May 27, 2013. Defendant Cavanaugh adopted and approved Defendant Patel's price increase recommendations on May 28, 2013.

2135.    The Teva price increases for the drugs identified in Defendant Patel's May 24, 2013 "Immediate PI File" went into effect on July 3, 2013. Defendant Patel went to great lengths to coordinate these price increases with competitors prior to sending the list to K.G. on May 24, 2013. Some illustrative examples of that coordination are set forth below.

### 1. Glenmark

2136.    A number of the drugs identified in the "Immediate PI File" were targeted because of a recent Glenmark price increase on May 16, 2013. As soon as Defendant Patel started at Teva, she began to identify price increase candidates through her conversations with various sales and marketing executives at Glenmark, including:

      i.    **CW-5:** 4 calls on 5/2/13 (5:02; 0:06; 7:18 and 11:39), 2 calls on 5/3/13 (1:53 and **0:06**); 1 text message on 5/3/13;

      ii.    **J.C.:**  3 calls on 5/6/13 (6:45; 20:44; 8:39); 2 calls on 5/7/13 (7:59 and 1:03); For example, early in the morning on May 2, 2013, Defendant Patel informed a colleague that she expected to have some new drugs to add to the price increase list imminently:

From:    Nisha Patel02
Sent:    Thu 5/02/2013 6:49 AM (GMT-05:00)
To:    ███████████
Cc:
Bcc:
Subject: RE: Price Increases — will you be scheduling time next week to discuss?

When you get in, let's touch base on the high priority items below. Please gather/calculate the shelf stock and any other financial exposure involved. If possible, use an assumption of a 30% increase for now with a variable formula where the percentages can be changed for different scenarios. I also expect to have some high priority items to add to this list. I should have them shortly.

Less than fifteen minutes later, Defendant Patel received a call from CW-5 of Glenmark and the two spoke for just over five (5) minutes.  Shortly after that call, at 7:44am, Defendant Patel sent a follow-up e-mail where she identified six different "high priority" Glenmark drugs to add to the price increase list, including: Adapalene Gel; Nabumetone; Pravastatin; Ranitidine; Moexipril; and Moexipril HCTZ. Glenmark had not yet increased price on any of those drugs, nor had it sent any notices to customers indicating that it would be doing so (and would not send such notices until May 15, 2013).

2137.    As the Glenmark price increases were approaching, Defendant Patel took steps to make sure that Teva did not undermine its competitor's action. During the morning on May 15, 2013, in anticipation of the Glenmark price increases that had not yet been

implemented or made public, Defendant Patel instructed her Teva colleagues to alert her of any requests by customers for pricing relating to eight different Glenmark drugs:

From:
Sent:       Wed 5/15/2013 7:40 AM (GMT-05:00)
To:
Cc:         Nisha Patel02
Bcc:
Subject: Various Product Family Requests / RFP

Nisha would like to be made aware of any requests (including in-house RFPs) that include the following product families:

Adapalene

Nabumetone

Fluconazole Tabs

Ranitidine

Moexipril

Moexipril HCTZ

Pravastatin

Ondansetron

In the event you are reviewing these products for any request, please make her aware and as a group we can discuss where to price based on market intelligence she has collected.

2138.    In accordance with the fair share understanding outlined above, Defendant Patel wanted to be careful to avoid obtaining any market share from Glenmark after the price increases.

2139.    Following the normal pattern, Defendant Patel also spoke to CW-5 of Glenmark for nearly six (6) minutes the next day, May 16, 2013 – the day of the Glenmark price increases. Effective that day, Glenmark increased price on the following drugs where there was an overlap with Teva: Adapalene Gel; Nabumetone; Fluconazole Tablets; Ranitidine; Moexipril; Moexipril HCTZ; Pravastatin; and Ondansetron. Patel also spoke to CW-5 and J.C. at Glenmark multiple times on May 17, 2013.

2140.    After the implementation of the Glenmark price increases on May 16,

472

2013, and before Teva had the opportunity to follow those increases, Teva was approached by several customers looking for a lower price. Teva refused to bid on most of these solicitations in order to maintain market stability. When it did provide a customer with a bid, Teva intentionally bid high so that it would not win the business. As Defendant Patel stated to a Teva colleague when a large wholesaler approached Teva about bidding on several Glenmark increase drugs: "IF we bid, we need to bid high, or we will disturb the market."

2141. Defendant Patel did not immediately include all of the Glenmark price increase drugs on Teva's price increase list, however, because certain drugs involved competitors that were not of the highest "quality." For these drugs, a little more work (and communication) was required before Patel would feel comfortable moving forward with a price increase.

2142. For example, the market for Fluconazole Tablets included Defendant Greenstone as a competitor (albeit with relatively low market share) in addition to Teva and Glenmark. As of Friday May 17, 2013, Defendant Patel had not yet decided whether Teva should follow the Glenmark price increase on Fluconazole, fearing that Greenstone might not be a responsible competitor. In an internal e-mail that day, Patel indicated to colleagues – including her supervisor, K.G. – that she was "[g]athering some revised intel" about Fluconazole in order to determine next steps. The following Monday, May 20, Patel called Defendant Hatosy, a national account manager at Greenstone but was unable to connect. Patel was ultimately not able to communicate with Hatosy by phone until May 28, 2013 when the two had a twenty-one (21) minute call. The next day after speaking to Defendant Hatosy – May 29, 2013 – Defendant Patel promptly added Fluconazole to the Teva price increase list.

2143.    As discussed more fully below, Teva followed the Glenmark price increase for Fluconazole Tablets on July 3, 2013. That same day, Defendant Patel spoke to Defendant Hatosy for nearly sixteen (16) minutes; she also spoke to CW-5 at Glenmark for almost five (5) minutes. The Teva price increases were a staggering 875% - 1,570%, depending on the dosage strength. Greenstone then followed with an increase of its own on August 16, 2013. Defendant Patel coordinated those increases with both Glenmark and Greenstone.

2144.    The price increase on Fluconazole Tablets is also reflective of how the overarching conspiracy operated. The massive price increase on Fluconazole Tablets led to two additional market entrants: Citron and Dr. Reddy's. When both of these competitors entered the market for Fluconazole Tablets, they spoke with the existing entrants to arrange for their "Fair Share" and to prevent competition for the drug.

### 2.  Sandoz

2145.    In her May 24 "Immediate PI File," Defendant Patel included competitively sensitive information about the drug Nabumetone, indicating that she was confident following Glenmark's increase because Sandoz was "bidding high" on that drug. In other words, Sandoz would provide cover bids that were too high to be successful, so that Sandoz would not take its competitors' market share even if it did not take its own price increase. Defendant Patel had spoken to CW-1 for nearly twenty-five (25) minutes on May 15, 2013, and again for more than eighteen (18) minutes on May 20, 2013, during which time she learned this information.

2146.    At the same time, Sandoz was internally discussing its "bidding high" strategy for Nabumetone. Two days before Defendant Patel sent the "Immediate PI File" to her supervisor, a Sandoz pricing analyst sent the following e-mail to Defendant Kellum

and CW-1 confirming the strategy:

From:
Sent:                    Wednesday, May 22, 2013 4:14 PM
To:                      Kellum, Armando;
Subject:                 Target RFP Question

AK,

I know we agreed not to bid on potential price increase items, but we bid Nabumetone at a high price.  Are you okay with us bidding on this one?  McKesson does not purchase this product from us.

2147.    Patel continued to coordinate with CW-1 and other competitors about increasing prices for drugs on the list even after she sent it to K.G. on May 24, 2013. For example, at 8:15am on May 30, 2013, Defendant Patel spoke to CW-5 at Glenmark for nearly twelve (12) minutes. Immediately after hanging up the phone, Patel called CW-1 at Sandoz to discuss Glenmark's increase on the drug Ranitidine and Teva's plans to follow that increase (Sandoz was also in the market for Ranitidine). She left CW-1 a voicemail, and he called her back promptly. Patel and CW-1 then had several substantive telephone calls over the next half hour.

2148.    The communication between Defendant Patel and CW-1 about competitively sensitive information was constant and unrelenting during this period. For example, in June 2013 Teva was "attempting to understand how [its] pricing for Isoniazid compares to the rest of the market." On June 11, 2013, L.R., a Teva marketing representative, asked Defendant Patel whether she was "aware of any competitive market intel for this family?" According to the marketing representative, Sandoz was also in the market for Isoniazid and had "drastically increased their pricing" in January 2013. Defendant Patel responded: "I will try to get the scoop on Sandoz pricing tomorrow. When do you need this by?"

2149.    The next day - June 12, 2013 - Patel exchanged at least five (5) calls with CW-1  at Sandoz, including those listed below:

475

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 6/12/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 0:19:04 |
| 6/12/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 0:03:20 |
| 6/12/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 0:00:00 |
| 6/12/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 0:00:23 |
| 6/12/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 0:09:21 |
| 6/12/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 0:03:25 |

2150.    Later that day, at 3:21pm, Defendant Patel passed along additional information with specific price points she had received from CW-1 at Sandoz:



From: Nisha Patel02
Sent: Wed 6/12/2013 3:21 PM (GMT-05:00)
To: ███████████████
Cc:
Bcc:
Subject: RE: Isoniazid market pricing

██,

Wholesaler nets for Sandoz product are around $100 for the 300mg 100s and $80 for 100mg 100s. Our WACs are very low. Let me know if you need anything else.

2151.    As discussed more fully below, Teva ultimately increased price on Isoniazid on January 28, 2015 – in coordination with Sandoz. Defendant Patel spoke to CW-1 for more than sixteen (16) minutes shortly before the increase, on January 22, 2015.

### 3.  Taro

2152.    Defendant Patel noted in her May 24, 2013 "Immediate PI File" that for the drug Adapalene Gel, she was confident in following the Glenmark price increase because there were also "[r]umors of a Taro increase" on that drug. In addition to Teva and Glenmark, Taro was the only other competitor in the market for Adapalene Gel at that time. Defendant Patel had heard the "rumors" about a Taro increase directly from Defendant Ara Aprahamian, the Vice President of Sales and Marketing at Taro. During a nearly eleven (11) minute phone conversation between the two on May 22, 2013, the competitors agreed to follow the Glenmark increase. This was the first call between

476

Defendants Patel and Aprahamian since Patel joined Teva.

2153.    Shortly after the phone call with Defendant Patel, Defendant Aprahamian made  an internal request for a report with specific information about Adapalene Gel in order to  evaluate a potential Taro increase on the drug, including volume and pricing. Defendant Aprahamian indicated that the reason for his request was that the "[r]umor mill has some price changes in the market."

2154.    The next day, May 23, 2013, Defendant Aprahamian directed a Taro employee to implement a price increase on Adapalene Gel:



Exactly one week after the call between Defendants Patel and Aprahamian, on May 29, 2013, Taro increased its price on Adapalene Gel. As discussed below, Teva followed with its own price increase on July 3, 2013, which was coordinated with both Glenmark and Taro.

**B.**  **Teva/Patel's July 3, 2013 Price Increases: Adapalene Gel, Cefaclor ER Tablets, Cefadroxil Tablets, Cefdinir Capsules and Oral Suspension, Cefprozil Tablets. Cimetidine Tablets, Fluconazole Tablets, Floucinonide Cream, Gel, and Ointment, Methotrexate Tablets, Moexipril HCL Tablets, Moexipril HCL/HCZT Tablets, Nabumetone Tablets, Nadolol Tablets, Oxybutynin Chloride Tablets, Prazosin HCL Capsules, Ranitidine HCL Tablets**

2155.    Teva implemented its first formal set of price increases using Patel's

high-quality competitor formula on July 3, 2013, relating to twenty-one (21) different generic drugs. Many of the drugs slated for price increases were from the May 24, 2013 "Immediate PI File," but several others had been added in the interim. Patel scheduled a conference call for the day before the price increases to discuss those increases with members of Teva's sales and pricing departments:

| | Price Increase -- Agenda | | | |
|---|---|---|---|---|
| Date and Location | Tuesday, July 02, 2013 11:00 AM - 11:30 AM, Call In Number Below/Dave's Office | | | |
| Attendees | Nisha Patel02; Kevin Green; Dave Rekenthaler; ███████████████████ | | | |
| Message | We are currently preparing to announce a price increase effective Wednesday, 7/3/13. The list includes several items. I wanted to take some time to do a quick review of the item list and answer any questions you may have.<br><br>Dial In: 866-225-0660<br>Access Code: 4075453 | | | |

1) Price increase effective Wednesday, 7/3/2013

2) List of items affected:

| Product Family | Customers Affected | SWP Change | WAC Change | % ASP Increase (not actual inc) |
|---|---|---|---|---|
| ADAPALENE GEL Total | All | yes | | 95% |
| CEFACLOR ER TABLETS Total | All | yes | | 25% |
| CEFADROXIL TABLETS Total | All | | | 25% |
| CEFDINIR CAPSULES Total | All | | | 122% |
| CEFDINIR ORAL SUSPENSION Tot | All | | | 520-620% |
| CEFPROZIL TABLETS Total | All | | | 55-95% |
| CEPHALEXIN TABLETS Total | All | yes | yes | 95% |
| CIMETIDINE TABLETS Total | All | yes | yes | 200-800% |
| FLUCONAZOLE TABLETS Total | All | | yes | 875-1570% |
| FLUOCINONIDE CREAM E Total | All | | yes | 10% |
| FLUOCINONIDE CREAM Total | All | | yes | 15% |
| FLUOCINONIDE GEL Total | All | | yes | 15% |
| FLUOCINONIDE OINTMENT Total | All | | yes | 17% |
| METHOTREXATE TABLETS Total | All | | yes | 500-1800% |
| MOEXIPRIL HCL TABLETS Total | All | | yes | 300-560% |
| MOEXIPRIL HCL/HCTZ TABLETS | All | | yes | 70-175% |
| NABUMETONE TABLETS Total | All | | yes | 140-160% |
| NADOLOL TABLETS Total | All less Econdisc | yes | yes | 1200-1400% |
| OXYBUTYNIN CHLORIDE TABLETS | All | | yes | 1100-1500% |
| PRAZOSIN HCL CAPSULES Total | All | | yes | 30% |
| RANITIDINE HCL TABLETS Total | All | yes | yes | 330-900% |

Following the now-established pattern, Defendants Patel and/or Green spoke to every important competitor in the days and weeks leading up to the July 3, 2013 Teva price increase to coordinate the increases and reiterate the understanding already in place with those competitors.

2156.    The following graphic details some of the calls between Teva representatives and Teva's competitors in the days and weeks leading up to the July 3, 2013 price increase; color coded to show the calls with specific competitors relating to each drug:



The only drugs that Defendants Patel or Green did not coordinate with Teva's competitors (those not highlighted in the graphic above) were drugs where Teva was exclusive – i.e., had no competitors.

2157.    Defendant Patel – and other executives at Teva – went to great efforts to coordinate these price increases with competitors prior to July 3, 2013. Some illustrative examples of generic drugs that were added to the list after May 24, 2013 are set forth in more detail below.

479

1. **Upsher-Smith**

2158.    On June 13, 2013, as Defendant Patel was in the process of finalizing the Teva price increase list, she learned that Defendant Upsher-Smith had increased its listed WAC prices for the drug Oxybutynin Chloride Tablets.

2159.    Oxybutynin Chloride, also known by the brand name Ditropan XL, is a medication used to treat certain bladder and urinary conditions. Belonging to a class of drugs called antispasmodics, Oxybutynin Chloride relaxes the muscles in the bladder to help decrease problems of urgency and frequent urination.

2160.    On June 13, 2013, K.G. of Teva sent an e-mail to several Teva employees, including Defendant Patel, asking them to "share any competitive intelligence you may have or receive" regarding Oxybutynin Chloride. At that time, Teva had been considering whether to delete the drug from its inventory, due to low supply and profitability. One factor that could potentially change that calculus for Teva was the ability to implement a significant price increase. On June 14, 2013, while considering whether to change Teva's plan to delete the drug, a Teva employee asked Defendant Patel whether she could "provide an estimate of the pricing we might secure business at?"

2161.    On June 15, 2013, Defendant Patel exchanged six (6) text messages with B.L., a senior national account executive at Upsher-Smith.

2162.    Defendant Patel deemed Upsher-Smith a highly-ranked competitor (+2) in large part because of her relationship and understanding with B.L. In the week before she began her employment at Teva (after leaving her previous employment), Defendant Patel and B.L. exchanged several text messages. During her first week on the job, as she was beginning to identify price increase candidates and high quality competitors, Patel spoke to B.L. on April 29, 2013 for nearly twenty (20) minutes. During these initial

480

communications, the two competitors reached an understanding that Teva and Upsher-Smith would follow each other's price increases. This understanding resulted in Upsher-Smith receiving a +2 "quality competitor" ranking from Defendant Patel.

2163.    On June 19, 2013, Teva learned that the other competitor in the market for Oxybutynin Chloride, also increased its price for that drug. As a result, a national account executive at Teva sent an e-mail to Defendant Patel stating "Did you know about the Oxybutynin? We have small share, but huge increase there!" Patel responded: "Yes, heard late last week. The train is moving so fast, I'm worried we won't get on!" That same day, Patel instructed a colleague to add Oxybutynin Chloride to the Teva price increase list and began taking steps to implement the increase.

2164.    On July 3, 2013, Teva implemented a price increase ranging between 1,100 – 1,500% on Oxybutynin Chloride, depending on the dosage strength. Like the other drugs on the list, Teva would not have increased its price without first obtaining agreement from competitors that they would not compete with Teva or steal market share after the increase.

### 2.  Mylan

2165.    Immediately after she began at Teva, Defendant Patel began to investigate Mylan drugs as a potential source for coordinated price increases. For example, on May 6, 2013, as she was creating the list of "Immediate PI" candidates, Defendant Patel sent Defendant Green an e- mail with an attached spreadsheet titled "Price Increase Candidate Competitive Landscape." Defendant Patel asked Defendant Green to "gather as much market intelligence as possible" for certain, specific items that she had highlighted in blue, including nine (9) Mylan drugs: Tolmetin Sodium Capsules; Doxazosin Mesylate Tablets; Methotrexate Tablets; Diltiazem HCL Tablets; Flurbiprofen Tablets; Nadolol Tablets; Amiloride HCL/HCTZ Tablets; Cimetidine Tablets; and Estradiol Tablets.

2166.    The next day, May 7, 2013, Defendant Green spoke to Defendant Nesta at Mylan three times, including one call lasting more than eleven (11) minutes. Defendant Green also called Defendant Patel twice that day to report on what he had learned. Defendants Green and Nesta also spoke a number of times over the next several days, including on May 8 (3:46), May 9 (4:05) and May 10, 2013 (0:28; 10:46 and 2:19).

2167.    On May 14, 2013, Defendant Patel asked several Teva national account managers, including Defendant Green, to obtain "price points" on certain Mylan drugs including  Cimetidine and Nadolol in preparation for a potential price increase. She indicated internally to another Teva colleague that she was expecting ''additional Mylan intel" and that she was expecting Mylan "to take an additional increase" on those items. On May 17, 2013 , Defendant Green spoke to Defendant Nesta six (6) times, including calls lasting 11:50, 2:23, 4:25 and  16:02.

2168.    On May 29, 2013, after a discussion with Defendant Cavanaugh, Defendant Patel added four Mylan drugs to the Teva price increase list: Nadolol, Cimetidine, Prazosin and Methotrexate.

2169.    For Methotrexate, Par had already increased its prices in February 2013  and West-Ward followed this price increase on May 15, 2013. Consistent with the "Fair Share" agreement, Par knew it could lead this price increase without losing market share, and West- Ward knew that it could follow Par's increase without losing share to Mylan or Teva as well.

2170.    Discussions between Defendants Green and Nesta about specific drugs continued into June, as Mylan was also preparing for its own major price increase on a number of drugs. From June 24 through June 28, 2013, for example, Defendants Green and Nesta had at least the following telephone calls:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 6/24/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 13:25:29 | 0:00:06 |
| 6/24/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 13:32:25 | 0:10:13 |
| 6/25/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 13:43:27 | 0:00:06 |
| 6/25/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 16:02:58 | 0:00:32 |
| 6/25/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 16:51:43 | 0:00:03 |
| 6/26/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 9:55:29 | 1:00:25 |
| 6/27/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 10:47:23 | 0:00:06 |
| 6/27/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 11:04:04 | 0:01:03 |
| 6/27/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 15:42:07 | 0:04:20 |
| 6/28/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 10:59:56 | 0:03:53 |

2171.    On June 26, 2013, in the midst of this flurry of communications between Teva and Mylan (and the same day that Defendants Green and Nesta had a one-hour phone call), one of Defendant Patel's colleagues sent her a suggestion with the following list of potential drugs to add to the price increase list:

| Product | Competitors (Mkt Share) |
|---------|-------------------------|
| Disopyramide Phosphate Capsules | Actavis (61%) |
| Ketorolac Tablets | Mylan (32%) |
| Ketoprofen Capsules | Mylan (63%) |
| Hydorxyzine Pamoate Capsules | Sandoz (39%); Actavis (9%) |
| Nystatin Tablets | Heritage (35%); Mutual (32%) |

In response, Defendant Patel's supervisor, K.G. of Teva, commented that "Ketoprofen would have a high likelihood of success." Patel also responded favorably with regard to some of the drugs, alluding to the fact that she had inside information about at least Ketoprofen:

From: Nisha Patel02
Sent: Wednesday, June 26, 2013 1:41 PM
To: ▆▆▆▆▆▆▆▆▆▆▆
Subject: RE: India Transfer Review - Price Increase List Question

▆▆▆▆

I definitely agree on Ketoprofen since there are rumors of activity on this one...From a "quality of competitor" standpoint, I definitely think all, but Nystatin, are strong candidates. We'll gather intel on the rest and factor into the potential items for later. Is there a time constraint and a need for actual numbers, or is this just an inquiry to see if they would be possible in the near future? Sorry for the basic questions. I'm just trying to understand how to look at possible deletions v. any other candidate item.

At that time, Nystatin was not considered a strong candidate for a price increase because of the quality of the competitors in the market. As discussed herein, those dynamics would

later change after Defendant Patel struck up a collusive relationship with a high-level executive at Heritage.

2172.    Not surprisingly given the "rumors," Mylan raised its price for both Ketorolac and Ketoprofen (the two Mylan drugs on the list above) six days later, on July 2, 2013. Teva then quickly followed with its own price increase for both drugs (and others) on August 9, 2013. As discussed more fully below, those price increases were closely coordinated and agreed to by Teva and Mylan.

2173.    At the end of the flurry of phone communications between Teva and Mylan described above – on June 28, 2013 – Defendant Green and Defendant Nesta had a four (4) minute call starting at 10:59 a.m. Within minutes after that call, Defendant Patel sent the following e-mail internally at Teva:

> From:    Nisha Patel02
> Sent:    Fri 6/28/2013 11:22 AM (GMT-05:00)
> To:      ████████████████████████
> Cc:      ████████████████
> Bcc:
> Subject: Competitor Increase Items
>
> All,
>
> It is my understanding that Mylan is announcing a long list of price increases today, for a Monday effective date. As we confirm the items and overlap with Teva, we should add the items to the CM alert list and determine what our plan of response is based on various factors (WAC limitation, no WAC limitation, supply, etc).
>
> ████████,
>
> Hearing that Ketoprofen is on the list.

Defendant Patel obtained this information directly from Defendant Green, but got one significant point wrong (which confirms that she had advance notice of the Mylan increase). In actuality, Mylan did not announce the price increases until the following Monday, July 1, 2013 – with an effective date of July 2, 2013.

2174.    "Rumors" was a term consistently used by Defendant Patel in e-mails to

camouflage the fact that she and her co-conspirators within Teva were communicating with competitors about future price increases. She used the term when discussing Taro in the May 24, 2013 "Immediate PI" spreadsheet, after speaking with Defendant Aprahamian and before Taro raised its price on Adapalene Gel. She used it again on June 26, 2013 – after Defendants Green and Nesta spoke several times in advance of Mylan's price increase on Ketoprofen.

2175.    Similarly, on July 2, 2013 – the day before Teva's price increases (including for the drug Methotrexate) went into effect, a colleague asked Defendant Patel how Teva's competitors' pricing compared with regard to Methotrexate. Defendant Patel responded that Mylan's pricing was a little low on that drug, "but we are hearing rumors of them taking another increase," so Teva felt comfortable increasing the price of that drug on July 3, 2013. These "rumors" – which were based on the direct communications between Defendants Green and Nesta noted above – again turned out to be accurate: Mylan increased its price of Methotrexate, pursuant to its agreement with Teva, on November 15, 2013.

### 3. Sandoz

2203.  After the large Teva and Mylan price increases on July 2 and 3, 2013, Sandoz sought to obtain a "comprehensive list of items" increased so that it would "not respond to something adversely" by inappropriately competing for market share on any of those drugs. Sandoz executives had previously conveyed to their counterparts at both Mylan and Teva that Sandoz would follow their price increases and not steal their customers after an increase. Obtaining the comprehensive list of price increase drugs was an effort by Sandoz to ensure it was aware of every increase taken by both competitors so it could live up to its end of the bargain.

2204. On July 9, 2013, CW-1 stated in an internal Sandoz e-mail that he would "call around

485

to the [Sandoz directors of national accounts] to try and gather a comprehensive list of items."

2205. Pursuant to that direction, on July 15, 2013 CW-2 of Sandoz called Defendant Rekenthaler at Teva and left a message. Defendant Rekenthaler called CW-2 back immediately and the two had a three (3) minute conversation during which CW-2 asked Rekenthaler to provide him with a full, comprehensive list of all the Teva price increase drugs – not just those drugs where Teva overlapped with Sandoz. Defendant Rekenthaler complied. Understanding that it was improper to share competitively sensitive pricing information with a competitor, and in an effort to conceal such conduct, Defendant Rekenthaler first sent the Teva price increase list from his Teva work e-mail account to a personal e-mail account, and then forwarded the list from his personal e-mail account to CW-2's personal e-mail account:

**From:** David Rekenthaler [daverek@verizon.net]
**Sent:** Monday, July 15, 2013 5:02 PM
**To:** ████████@icloud.com
**Subject:** Fwd:

Sent from my iPhone

Begin forwarded message:

> **From:** Dave Rekenthaler <Dave.Rekenthaler@tevapharm.com>
> **Date:** July 15, 2013, 4:59:27 PM EDT
> **To:** "daverek@verizon.net" <daverek@verizon.net>

| Product Family | Customers Affected | SWP Change | WAC Change | % ASP Increase [best actual inc] |
|---|---|---|---|---|
| ADAPALENE GEL Total | All | yes | | 95% |
| CEFACLOR ER TABLETS Total | All | yes | | 25% |
| CEFADROXIL TABLETS Total | All | | | 25% |
| CEFDINIR CAPSULES Total | All | | | 122% |
| CEFDINIR ORAL SUSPENSION Tot | All | | | 520-620% |
| CEFPROZIL TABLETS Total | All | | | 55-95% |
| CEPHALEXIN TABLETS Total | All | yes | yes | 95% |
| CIMETIDINE TABLETS Total | All | yes | yes | 200-800% |
| FLUCONAZOLE TABLETS Total | All | | yes | 875-1570% |
| FLUOCINONIDE CREAM E Total | All | | yes | 10% |
| FLUOCINONIDE CREAM Total | All | | yes | 15% |
| FLUOCINONIDE GEL Total | All | | yes | 15% |
| FLUOCINONIDE OINTMENT Total | All | | yes | 17% |
| METHOTREXATE TABLETS Total | All | | yes | 500-1800% |
| MOEXIPRIL HCL TABLETS Total | All | | yes | 300-560% |
| MOEXIPRIL HCL/HCTZ TABLETS | All | | yes | 70-175% |
| NABUMETONE TABLETS Total | All | | yes | 140-160% |
| NADOLOL TABLETS Total | All less Econdisc | yes | yes | 1200-1400% |
| OXYBUTYNIN CHLORIDE TABLET: | All | | yes | 1100-1500% |
| PRAZOSIN HCL CAPSULES Total | All | | yes | 30% |
| RANITIDINE HCL TABLETS Total | All | yes | yes | 330-900% |

Best regards,

486

CW-2 later called CW-1 and conveyed the information orally to CW-1, who transcribed the information into a spreadsheet.

2176. One of the drugs that both Teva and Mylan increased the price of in early July 2013 was Nadolol. Sandoz was the only other competitor in that market. Shortly after the Teva increase, CW-1 sent Defendant Patel a congratulatory message regarding the increase.

C. **Price Increases – Summer 2013: Sandoz and Mylan Coordinate to Orchestrate Price Increases on Diltiazem HCL, Haloperidol, Clomipramine, Tizanidine, Levothyroxin, and Nadolol**

2177. Patel's efforts to coordinate the July 2013 increases also helped facilitate additional collusion between Mylan and Sandoz. After Mylan and Teva implemented significant price increases in early July 2013, Sandoz executives sought to obtain a "comprehensive list" of those Teva and Mylan price increases. Sandoz sought this information because it did not want to accidentally compete for market share on any of the Teva or Mylan drugs that overlapped with Sandoz.

2178. To that end, on July 15, 2013, Sandoz executives held an internal meeting during which CW-1 instructed members of the Sandoz sales team, including CW-2 and CW-4, "to investigate [the] list of Mylan and Teva increase items."

2179. That same day, as detailed above, CW-2 contacted his counterpart at Teva, Defendant Rekenthaler, and obtained the list of drugs that Teva increased on July 3, 2013, along with the percentage increases for each. Similarly, on July 16, 2013, CW-4 called her contact at Mylan, Defendant Nesta. The call lasted two-and-a-half (2.5) minutes. A half hour later, Defendant Nesta returned the call and they spoke for nearly nineteen (19) minutes.

2180. During those two calls, CW-4 asked Defendant Nesta to identify the

drugs Mylan had increased prices on so that Sandoz could follow with its own price increase. Defendant Nesta provided CW-4 with a list of drugs, highlighting that the Nadolol price increase would be large. Defendant Nesta also emphasized that Mylan did not appreciate having its prices challenged and that prices should be kept high. After the phone call ended, CW-4 sent the following e-mail to her superiors (the "July 2013 E-mail"):

From: █████████
Sent: Tuesday, July 16, 2013 6:31 PM
To: █████████ Kellum, Armando; █████████
Subject: Price increases

Here are some of the pricing increases from Mylan I was able to garner. These are reportedly to be BIG increases,
Bupropion HCL
Diltiazem HCL
Haloperidol
Clomipramine
Sotalol
Tizanidine
Peprhenazine
Levothyroxine (Lanette followed)
Nadolol

There were others but ones we don't have. There may be others we have, but this is all I was able to get. Pretty well anything we get from a customer that isn't supply obviously is due to pricing increase.

If a specific product is questionable, let me know and I'll find out about it.

█████████

1

2181.    For at least one drug on the list – Haloperidol – Mylan had yet to raise price at the time of the July 2013 E-mail. Indeed, Mylan would not raise price on this product until August 9, 2013. On that date, Mylan also raised the price on Levothyroxine – a drug on the list that was also increased by Mylan in January 2013 – and at least two other Sandoz overlap drugs not on the list – Trifluoperazine HCL and Benazepril HCTZ.

2182.    Over the next several months, and consistent with their understanding, Sandoz declined to bid and take business from Mylan customers (except in one instance where Mylan had more than its fair share) and raised prices to match Mylan on a number of products. Some examples of this conduct are detailed below.

488

### 1.  Haloperidol and Trifluoperazine HCL

2183.    Haloperidol, also known by the brand name Haldol, and Trifluoperazine HCL,  also known by the brand name Stelazine, are antipsychotic drugs that are used to treat disorders such as schizophrenia and Tourette syndrome.

2184.    On August 6, 2013, Defendant Nesta of Mylan called CW-4 at Sandoz twice.  Both calls were less than a minute long. Three days later, on August 9, 2013, Mylan implemented significant price increases on both Haloperidol and Trifluoperazine HCL. For Haloperidol, Mylan increased the WAC price by 250% on several formulations. For Trifluoperazine HCL, Mylan increased the WAC price by 80% on all formulations.

2185.    On August 19, 2013, S.G., a national account executive at Sandoz, sent  an internal e-mail stating that Mylan increased its prices on Haloperidol and Trifluoperazine and  that Sandoz needed to "rationalize the market."

2186.    On August 22, 2013, CW-2 e-mailed Defendant Kellum stating that CVS "wanted to know if we will be raising price on Haloperidol and Trifluoperazine. Mylan took substantial increases." Kellum forwarded the request to CW-1 and F.R., a pricing manager at Sandoz. F.R. responded, "I believe the answer is yes?? We bid at current price in RFP and did not go after this business. I would answer yes. Thoughts?" CW-1 replied that he would obtain the pricing data, "but I would imagine we will be fast followers."

2187.    On September 18, 2013, CW-1 e-mailed Defendant Kellum with his price increase analyses for Haloperidol and Trifluoperazine HCL. For Haloperidol, CW-1 indicated that Mylan had 72% market share, Sandoz had 15%, and Zydus had 10%. For Trifluoperazine HCL, CW-1 stated that "Mylan has 73% and we have 24%. This is a no brainer."

2188.    On September 25, 2013, Walgreens – a Mylan customer – e-mailed

Sandoz asking for bids on Haloperidol and Trifluoperazine HCL. CW-1 sent an internal e-mail explaining that "Mylan took a price increase on this product. That's why he is asking. We are currently evaluating tak[ing] one ourselves."

2189.    On October 2, 2013, CW-1 emailed S.G., the Sandoz national account executive assigned to Walgreens, directing S.G. to not only decline to bid at Walgreens, but also lie about the reason for doing so:

| | |
|---|---|
| **From:** | ▇▇▇▇▇▇▇ |
| **Sent:** | Wednesday, October 02, 2013 6:45 PM |
| **To:** | ▇▇▇▇▇▇▇ |
| **Cc:** | Kellum, Armando |
| **Subject:** | Haloperidol and Trifluoperazine - WAGS |

Steve,

We discussed internally and decided not to pursue WAGS on these at this point. We have been running up against Mylan a lot lately(Nadolol, Benaz/Hctz), and fear blowback if we take on any more products at this moment.

Trying to be responsible in the sandbox.

I recommend you blame supply.

▇▇▇▇▇

2190.    Over the next several days, CW-4 Defendant Nesta spoke by phone several times. These communications are detailed in the table below. Prior to these calls, CW-4 and Nesta had not communicated by phone since August 6, 2013.

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 10/3/2013 | Voice | Nesta, Jim (Nesta) | Outgoing | CW-4 (Sandoz) | 0:00:00 |
| 10/3/2013 | Voice | Nesta, Jim (Nesta) | Outgoing | CW-4 (Sandoz) | 0:02:09 |
| 10/4/2013 | Voice | Nesta, Jim (Nesta) | Incoming | CW-4 (Sandoz) | 0:00:00 |
| 10/4/2013 | Voice | Nesta, Jim (Nesta) | Incoming | CW-4 (Sandoz) | 0:10:56 |
| 10/4/2013 | Voice | Nesta, Jim (Nesta) | Outgoing | CW-4 (Sandoz) | 0:00:24 |
| 10/4/2013 | Voice | Nesta, Jim (Nesta) | Outgoing | CW-4 (Sandoz) | 0:00:05 |
| 10/4/2013 | Voice | Nesta, Jim (Nesta) | Outgoing | CW-4 (Sandoz) | 0:00:00 |
| 10/14/2013 | Voice | Nesta, Jim (Nesta) | Incoming | CW-4 (Sandoz) | 0:11:19 |

2191.    On October 15, 2013 (the day after the last of the phone calls noted above), CW-1 e-mailed the Sandoz Pricing Committee recommending that Sandoz increase pricing on Haloperidol and Trifluoperazine HCl. After reviewing the e-mail, O.K.,

490

a senior executive responsible for business planning at Sandoz, recommended approval of the Haloperidol price increase, but advised that Sandoz wait to increase the price of Trifluoperazine HCL until January 2014 because of price protection penalties that would be triggered if Sandoz increased in October.

2192.    As O.K. explained, "I understand that both price increases have been taken by Mylan in August and we are the followers. We might be sending the wrong signal to Mylan by not following promptly however 1.6m top/bottom-line hit with no upside is too big to swallow."

2193.    Ultimately, Sandoz followed O.K.'s recommendation and increased its WAC pricing on Haloperidol to match Mylan's pricing on October 25, 2013, but waited to follow on Trifluoperazine HCL until January 31, 2014.

### 2.  Tizanidine

2194.    Tizanidine, also known by the brand name Zanaflex, is used to treat muscle spasticity due to spinal cord injury or multiple sclerosis.

2195.    As of May 2013, Defendants Sandoz, Mylan, and Dr. Reddy's were in the market for Tizanidine. Dr. Reddy's led the increase on this product on May 13, 2013, increasing its WAC price and raising contract pricing tenfold. At that time, Dr. Reddy's was the market leader with 59% market share, while Mylan had 24%, and Sandoz had 17%.

2196.    Tizanidine was a drug that had been on the market for many years and whose price had eroded as many competitors entered and exited the market depending on the profitability of the drug. As Dr. Reddy's explained in an internal presentation, "Price needs to be adjusted to incentivize current manufacturers to stay in this product" and stated that Dr. Reddy's assumes "Mylan and Sandoz are responsible players, and they may not

be able to pick up the large volumes we currently service."

2197.    On May 10, 2013, Sandoz learned that Reddy's had increased prices tenfold, which gave Sandoz and Mylan room to obtain their fair share at significantly higher prices.

2198.    In fact, Sandoz was thrilled when it learned that Dr. Reddy's had increased its price on Tizanidine. For example, on May 10, 2013, S.G., a national account executive at Sandoz, sent an internal e-mail stating that "Giant Eagle just let me know that Dr. Reddy just took a price increase on Tizanidine!  Pricing on the 2 & 4mg 150ct went from $4.50 to $45.00. We should secure confirmation but if this is true it would be very positive …." Defendant Kellum responded, "Wow! Thank you." Kellum then quickly sent out a directive to the team to "[p]lease put the product on strict allocation to forecast. Pricing Team – no new offers."

2199.    On May 13, 2013, Dr. Reddy's made it price increases public when it published its new WAC pricing for Tizanidine. That same day, Defendant Nesta of Mylan called CW-4 at Sandoz and they spoke for 4 minutes. Two days later, CW-1 of Sandoz sent an internal e-mail to Defendant.

2200.    On May 24, 2013, Sandoz followed and matched Dr. Reddy's WAC pricing on several formulations, and even exceeded Dr. Reddy's pricing on one formulation. Sandoz's  WAC increases were significant – ranging from 248% to 344%, depending on the formulation. In the three days leading up to the Sandoz increase, Defendant Nesta of Mylan exchanged phone calls with both CW-4 of Sandoz and J.A., a national account executive at Dr. Reddy's, to coordinate the price increase regarding Tizanidine. At least some of those calls are set forth in the table below:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 5/20/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:00:06 |
| 5/21/2013 | Voice | Nesta, Jim (Mylan) | Incoming | J.A. (Dr. Reddy's) | 0:00:00 |
| 5/21/2013 | Voice | Nesta, Jim (Mylan) | Incoming | J.A. (Dr. Reddy's) | 0:00:42 |
| 5/23/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:00:37 |
| 5/23/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:01:25 |
| 5/23/2013 | Text | Nesta, Jim (Mylan) | Outgoing | J.A. (Dr. Reddy's) | 0:00:00 |
| 5/23/2013 | Text | Nesta, Jim (Mylan) | Outgoing | J.A. (Dr. Reddy's) | 0:00:00 |
| 5/24/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | J.A. (Dr. Reddy's) | 0:00:20 |

2201. Notably, after this, Defendant Nesta would not speak with J.A. again until three months later in August 2013.

2202. On May 29, 2013, customer Omnicare e-mailed Sandoz and asked whether it wanted to submit a bid for Tizanidine. CW-3 of Sandoz forwarded the request internally to CW- 1 and Defendant Kellum asking "[a]re we considering additional Tizanidine market share? I'm assuming are [sic] intent is not to be disruptive at this time." A few minutes later, Defendant Nesta called CW-4 at Sandoz and they spoke for nearly thirteen (13) minutes. Later that day, CW-1 replied to CW-3's e-mail stating, "[w]e will sit tight for now." CW-3 then responded to Omnicare, stating that "[a]lthough we are not in a back order situation we cannot assume additional usage at this time. If this were to change I will let you know."

2203. On June 14, 2013, Anda, a wholesale customer, e-mailed J.A. of Dr. Reddy's asking "[d]id mylan follow your increase?" J.A. responded, "We've heard they did." J.A. had learned of Mylan's intent to follow the price increase through his prior communications with Defendant Nesta. However, Mylan had not actually raised its price on Tizanidine at the time of the inquiry, and would not do so until July 2, 2013.

2204. On June 26, 2013, Meijer, a supermarket chain customer, e-mailed Dr. Reddy's requesting a bid for Tizanidine. J.A. forwarded the request to N.M., a marketing executive at Dr. Reddy's, stating: "I'm assuming they got a price increase." N.M.

responded: "I think, given the market situation and us leading the price adjustment, I think, we should not go behind additional market share since it will erode the market even further." J.A. replied, "[y]eah, I was just sending it as an FYI, no intention to bid." A few weeks later, Meijer forwarded the same request to Sandoz and Sandoz gave the pre-textual response that: "[w]e cannot supply unfortunately."

2205. On July 26, 2013 a Sandoz executive identified Mylan, Teva, and Apotex as the source of a "tremendous number of price increases" and said Sandoz "will be next."

### 3. Enalapril Maleate

2206. Immediately after the July 3, 2013 price increases, Patel began preparing for what she called "Round 2" – another large set of Teva price increases. In the interim, however, Teva was presented with an opportunity to coordinate a price increase with competitors on a single drug – Enalapril Maleate Tablets.

2207. Enalapril Maleate ("Enalapril"), also known by the brand name Vasotec, is a drug belonging to the class called ACE inhibitors, and is used to treat high blood pressure.

2208. Mylan previously increased its price for Enalapril effective July 2, 2013. At that time, there were only three manufacturers in the market: Mylan, Teva and Wockhardt. Enalapril was on the list of drugs slated for a price increase that Teva had received from Mylan in June 2013, before those price increases were put into effect.

2209. Shortly after the Mylan price increase, on July 10, 2013, Teva received a request from a customer for a lower price on Enalapril. Interestingly, the customer indicated that the request was due to Wockhardt having supply problems, not because of the Mylan increase. K.G. of Teva confirmed that Enalapril "was on the Mylan increase communicated last week. They took a ~75% increase to WAC."

2210.    The comment from the customer sparked some confusion at Teva, which Teva quickly sought to clarify. That same day, Defendants Green and Nesta had two phone calls, including one lasting almost sixteen (16) minutes. The next day, July 11, 2013, Defendants Green and Nesta spoke two more times. During these conversations, Nesta explained to Green that Wockhardt had agreed to follow the Mylan price increase on Enalapril. This information sparked the following e-mail exchange between Defendants Green and Patel (starting from the bottom):

---

**From:** Kevin Green
**Sent:** Friday, July 12, 2013 1:12 AM
**To:** Nisha Patel02
**Subject:** Re: Enalapril / Wockhardt Supply Constraint

Wockhardt followed Mylan. They are not having supply issues. Just allocating based on the Mylan increase. They make their own API

Sent from my iPhone

On Jul 11, 2013, at 9:54 PM, "Nisha Patel02" <Nisha.Patel02@tevapharm.com> wrote:

> Wockhardt took an increase before Mylan? Then had their supply issue? I thought it was their supply issue plus Mylan increase.
>
> Nisha Patel
>
> Teva Pharmaceuticals USA
>
> Director, Strategic Customer Marketing
>
> On Jul 11, 2013, at 10:25 PM, "Kevin Green" <Kevin.Green@tevapharm.com> wrote:
>
>> This is all a result of a wockhardt price increase following a Mylan increase
>>
>> Sent from my iPhone

---

As it turned out, there must have been a miscommunication between Defendants Green and Nesta because although Wockhardt did in fact plan to follow Mylan's price increase, it had not yet had the opportunity to do so as of July 11, 2013.

2211.    On Friday, July 12, 2013, J.P., a national account executive at Teva, asked Defendant Patel whether Teva was "planning on increasing [its price for Enalapril]?" Defendant Patel responded: "I hope to increase, but we're gathering all the facts before

making a determination." J.P. then inquired whether Teva would make an offer to the customer, and Defendant Patel responded: "Not sure yet. Need some time. We're exploring the possibility of an increase just on this item . . . in the near future. Maybe next week."

2212.    That same day, Defendants Patel and Green each started "exploring the possibility" and "gathering the facts" by reaching out to Teva's two competitors for Enalapril. Defendant Patel called Defendant Nesta of Mylan directly and they spoke three times, including calls lasting six (6) and five (5) minutes. Defendant Patel likely called Defendant Nesta directly in this instance because Defendant Green was attending the PBA Health[42] Conference at the Sheraton Overland Park, Overland Park, Kansas, where he was participating in a golf outing. Upon information and belief, K.K. – a senior national account executive at Wockhardt – attended the same conference, and likely spoke directly to Defendant Green either at the golf outing during the day or the trade show at night, because at 12:40 a.m. that evening (now the morning  of July 13, 2013) K.K. created a contact on his cell phone with Defendant Green's cell phone number in it.

2213.    On Sunday, July 14, 2013, after Defendant Green returned home from the conference, Defendants Green and Patel spoke three times, including one call lasting twenty-one (21) minutes. During these calls, Defendant Green conveyed to Defendant Patel what he had learned from K.K.: that Wockhardt planned to follow the Mylan price increase.

2214.    First thing the next morning, on Monday, July 15, 2013, Defendant Patel sent an e-mail to a Teva executive stating "new developments…heard that Wockhardt is taking an increase today or tomorrow." At the same time, Wockhardt began planning to raise the price of Enalapril and sought to confirm specific price points for the increase. Internally,

---

[42] PBA Health is a pharmacy services organization that serves independent community pharmacies with group purchasing and other services.

Wockhardt employees understood that K.K. would try to obtain price points from a competitor. That morning, K.K. of Wockhardt called Defendant Green for a one (1) minute call; shortly thereafter, Defendant Green returned the call and they spoke for two (2) more minutes. At 9:57 a.m. that morning, K.K. reported internally the specific price ranges that he had obtained from Defendant Green.

2215.   Armed with this competitively sensitive information, and the understanding that Wockhardt intended to follow the Mylan increase, Teva began to plan its own price increase. On Tuesday, July 16, 2013, Defendant Patel sent the following internal e-mail to her supervisor K.G., again using the term "rumors" to obfuscate the true source of her information:

From: Nisha Patel02
Sent: Tue 7/16/2013 11:08 AM (GMT-05:00)
To:
Cc:
Bcc:
Subject: Enalapril Increase Overview

As you are aware, we are currently preparing the information to hopefully be able to implement a price increase on Enalapril.

This is a 3-player market that we share with Mylan and Wockhardt. Mylan announced a price increase last week. We are hearing rumors that Wockhardt will follow or exceed Mylan sometime this week. It would be ideal if we could follow very soon at a slightly more competitive price, with the intent of picking up some additional share in the market. Current share make up is as follows:

1. Mylan: 44%
2. Wockhardt: 43%
3. Teva: 13%

At this time, we are holding off on responding to a couple of bids in-house since a WAC increase would be required to follow the market. It would be a great opportunity to win this share and hopefully additional business as customers request bids going forward. (I think it would be ideal to capture an additional 10%.)

That same day, Defendant Nesta called Defendant Patel and left a voice mail.

2216.   Defendant Patel's July 16, 2013 e-mail referred to above was forwarded to Defendant Cavanaugh, who promptly approved the price increase. That same day, July

497

16, 2013, Defendant Patel then scheduled a "Price Increase Discussion" with members of Teva's sales and pricing teams, and sent the following agenda:

| Subject | Price Increase Discussion |
| --- | --- |
| Date and Location | Wednesday, July 17, 2013 10:30 AM - 11:00 AM, Dial In Below/Dave's Office |
| Attendees | Nisha Patel02; ████████████████████████ Dave Rekenthaler ████████████████████████ ████████████; Kevin Green; ████████████████████████ ████████████ |
| Message | Sorry for the re-schedules!<br><br>We are planning to announce an increase on Enalapril Tablets effective Friday. I would like to do a quick review of the changes and answer any questions you may have. A summary will be sent prior to the meeting.<br><br>Dial In: 866-225-0660<br>Access Code: 4075453 |

**Notes**

1) Price increase effective 7/19/2013

2) List of items affected:

| NDC | Generic Name | Strength | Form | Package Size |
| --- | --- | --- | --- | --- |
| 00093-0026-01 | ENALAPRIL MALEATE | 2.5 mg | TABLET | 100 |
| 00093-0026-10 | ENALAPRIL MALEATE | 2.5 mg | TABLET | 1000 |
| 00093-0027-01 | ENALAPRIL MALEATE | 5 mg | TABLET | 100 |
| 00093-0027-50 | ENALAPRIL MALEATE | 5 mg | TABLET | 5000 |
| 00093-0028-01 | ENALAPRIL MALEATE | 10 mg | TABLET | 100 |
| 00093-0028-10 | ENALAPRIL MALEATE | 10 mg | TABLET | 1000 |
| 00093-0028-50 | ENALAPRIL MALEATE | 10 mg | TABLET | 5000 |
| 00093-0029-01 | ENALAPRIL MALEATE | 20 mg | TABLET | 100 |
| 00093-0029-10 | ENALAPRIL MALEATE | 20 mg | TABLET | 1000 |
| 00093-0029-50 | ENALAPRIL MALEATE | 20 mg | TABLET | 5000 |

- Pricing Overview
  - 400-650% increase in invoice/contract pricing
  - 350-450% increase in WAC
  - 10% increase in SWP

- All customers are affected (Top Customers: CVS, Rite Aid and Medco)

- Expecting Wockhardt to increase. Please pass on any intelligence you are able to get.

- Additional share target of 10%

2217.    Teva and Wockhardt simultaneously implemented price increases on July 19, 2013. Although the timing of the price increase was coordinated among the competitors, Defendant Patel nevertheless described the simultaneous increase as a coincidence in an internal e-mail that same day:

From:    Nisha Patel02
Sent:    Fri 7/19/2013 8:10 AM (GMT-05:00)
To:      ██████████████████████████████████████████████
                                              Dave Rekenthaler; ████████████

Cc:
Bcc:
Subject: RE: Enalapril Competitive Customer Volume

FYI, I heard that Wockhardt announced a price increase yesterday morning (probably effective today). Coincidentally, Teva's increase was announced yesterday afternoon with an effective date of today.

I will pass on any supply information I receive.

2218.    Within a few days after the increases, a customer complained to K.K. at Wockhardt, asking: "What is going on in the market that justifies your price increases?" K.K.'s response to the customer was direct: "Mylan took up first we are just following." Similarly, in early August, a different customer asked Wockhardt to reconsider its increase, suggesting that Wockhardt's competitors were offering a lower price point. Knowing this to be untrue, K.K. replied again "we followed Mylan and Teva for the increase."

**D. August 9, 2013 Price Increases ("Patel's Round 2"): Amiloride HCL/HCTZ Tablets, Clemastine Fumarate Oral Liquid and Tablets, Diclofenac Tablets, Diltiazem HCL Tablets, Etodolac ER Tablets, Ketoprofen Capsules, Ketorolac Tablets, Pravastatin Tablets, Tolmetin Sodium Capsules**

2219.    On August 9, 2013, Teva raised prices on twelve (12) different drugs. These increases were again coordinated with a number of Teva's competitors, including Defendants Mylan, Sandoz, Taro, Lupin, Glenmark, Zydus and Co-Conspirator Apotex.

2220.    Defendant Patel began planning for the increase shortly after the July 3 increases were implemented. On July 11, 2013, Defendant Patel sent a preliminary draft list of price increase candidates to a colleague for what she referred to as "Round 2." For the drugs on the preliminary list, Defendant Patel stated that "this does not guarantee that [they] will end up getting an increase, but at the very least, it will be put through the review process."

2221.    The list included a number of drugs involving the following competitors, primarily: Actavis, Aurobindo, Glenmark, Heritage, Lupin, Mylan and Sandoz. In the days leading up to July 11, 2013, Defendant Patel was communicating directly with executives at nearly all of those competitors, including the following:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 7/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 0:11:24 |
| 7/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:08:34 |
| 7/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Grauso, Jim (Aurobindo) | 0:08:34 |
| 7/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 0:00:08 |
| 7/9/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Malek, Jason (Heritage) | 0:21:08 |
| 7/9/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 0:00:05 |
| 7/9/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 0:00:07 |
| 7/9/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-1 (Sandoz) | 0:16:16 |
| 7/10/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 0:00:04 |
| 7/10/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:04:26 |
| 7/10/2013 | Text | Patel, Nisha (Teva) | Incoming | CW-5 (Glenmark) | 0:00:00 |
| 7/11/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:54 |
| 7/11/2013 | Voice | Patel, Nisha (Teva) | Incoming | CW-5 (Glenmark) | 0:07:29 |

2222.    Defendant Patel was also communicating indirectly with Mylan through Defendant Kevin Green. For example, on July 10, 2013 - the day before Defendant Patel sent the preliminaly "Round 2" increase list -Defendants Green and Nesta spoke twice. Shortly after the second call, Defendant Green called Defendant Patel and the two spoke for just over seven (7) minutes. The next day, on July 11, Defendants Nesta and Green exchanged several more calls. The timing of those calls is set forth below:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 7/10/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 15:29:50 | 0:15:38 |
| 7/10/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 15:46:55 | 0:02:18 |
| 7/10/2013 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Teva) | 15:59:38 | 0:07:05 |
| 7/11/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 12:11:34 | 0:00:08 |
| 7/11/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 12:12:47 | 0:00:17 |
| 7/11/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 12:38:48 | 0:04:03 |
| 7/11/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 12:43:51 | 0:00:00 |
| 7/11/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 13:20:15 | 0:01:52 |

2223.    Defendant Patel and other Teva executives continued to coordinate with competitors over the next several weeks, refining the list and preparing for the next large

500

Teva increase. By August 7, 2013, Defendant Patel had finalized the list. That day she sent an e- mail to her supervisor, K.G., with a "Price Increase Overview" spreadsheet which she had prepared for Defendant Maureen Cavanaugh, summarizing the increases. As shown below, the spreadsheet included competitively sensitive information about certain competitors' plans regarding future price increases that Defendants Patel and/or Green could have only learned from directly colluding with those competitors:

Price Increase Overview—Effective August 9, 2013

| Product Category | Average % Increase | Reason for Increase | Competitors |
|---|---|---|---|
| AMILORIDE HCL/HCTZ TABLETS | 53% | Follow Mylan | Mylan, 95.7% |
| CLEMASTINE FUMARATE ORAL LIQUIDS | 7% | Teva Exclusive; Lead | |
| CLEMASTINE FUMARATE TABLETS | 76% | Lead | Sandoz/Fougera, 10.8% |
| DICLOFENAC TABLETS | 302% | Follow Mylan; Teva share leader | Mylan, 19.4% - Sandoz/Fougera, 19.4% - Apotex, 0.1% |
| DILTIAZEM HCL TABLETS | 90% | Follow Mylan | Mylan, 61.3% |
| DOXAZOSIN MESYLATE TABLETS | 1031% | Follow Mylan and Apotex; Teva share leader | Mylan, 28.1% - Apotex, 2.2% - Dava, 0.4% |
| ETODOLAC ER TABLETS | 198% | Follow Taro (likely to be this week with IR) | Taro, 56.9% |
| ETODOLAC TABLETS | 414% | Follow Sandoz; Taro likely to follow this week | Taro, 56.6% - Sandoz/Fougera, 20.8% - Watson/Actavis, 0.5% - Apotex, 0.2% |
| KETOPROFEN CAPSULES | 146% | Follow Mylan | Mylan, 63.4% |
| KETOROLAC TABLETS | 268% | Follow Mylan | Mylan, 31.7% |
| PRAVASTATIN TABLETS | 653% | Follow Glenmark, Zydus and Apotex. Lupin waiting on Teva. | Glenmark, 23.2% - Apotex, 7.1% - Zydus, 4.8% - Lup'n, 4.8% - Dr Reddy, 0.9% |
| TOLMETIN SODIUM CAPSULES | 80% | Follow Mylan; Teva almost exclusive | Mylan, 6.5% |

2224.    K.G. immediately recognized that having such explicit evidence of a competitor's price increase plans in writing would be problematic for Teva. In response to the e-mail, K.G. politely asked Defendant Patel to remove some of the incriminating information:

From:
Sent:    Wed 8/07/2013 11:00 AM (GMT-05:00)
To:      Nisha Patel02
Cc:
Bcc:
Subject: RE: PI Overview-MC

Nisha,

Please add Teva share to the competitors commentary and change header to Market Share.

Under reasons, I would change to the following:

1. Etodolac ER : Follow Taro
2. Etodolac : Follow Sandoz; Taro increase anticipated.
3. Pravastatin : Follow Glenmark, Zydus, and Apotex. Lupin increase anticipated.

501

In accordance with the executive's request, Patel deleted the information.

2225.    Following the now common and systematic pattern, Defendants Patel and Green coordinated the increases with every important competitor in the days and weeks leading up to the increase. The following graphic details some of the calls with competitors in the days and weeks leading up to the increases:



2226.    The only drug on the list that Defendants Patel and/or Green were not coordinating with competitors on in advance (Clemastine Fumarate Oral Liquids) was a drug where Teva was exclusive and thus had no competitors. Interestingly, that drug was slated for the lowest increase of all drugs on the list (7%).

2227.    The day before the price increase went into effect – August 8, 2013 – Defendant Patel was particularly busy, spending most of her morning reaching out and communicating with several key competitors:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 8/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 7:27:26 | 0:00:33 |
| 8/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 7:34:46 | 0:11:41 |
| 8/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 7:59:48 | 0:00:01 |
| 8/8/2013 | Text | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 8:01:07 | 0:00:00 |
| 8/8/2013 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 8:04:04 | 0:12:15 |
| 8/8/2013 | Voice | Patel, Nisha (Teva) | Incoming | Nesta, Jim (Mylan) | 9:08:05 | 0:00:00 |
| 8/8/2013 | Voice | Patel, Nisha (Teva) | Incoming | Nesta, Jim (Mylan) | 9:08:28 | 0:00:07 |
| 8/8/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Nesta, Jim (Mylan) | 9:27:19 | 0:00:37 |

2228.     As it turned out, Mylan was also in the process of implementing its own price increases on August 9, 2013 on several drugs (including several sold by Teva), and it is likely that Defendant Nesta reached out to Defendant Patel to coordinate those increases.

### 1.  Mylan

2229.     Teva and Mylan were coordinating price increases consistently during this period, including the time leading up to the August 9, 2013 increases. During each step in the process, Teva and Mylan executives kept their co-conspirators apprised of their decisions. The communications were typically initiated by Defendant Patel, who asked Defendant Green to communicate with Defendant Nesta of Mylan and obtain what she referred to as "intel" on many different drugs. But at times, Defendant Patel communicated directly with Defendant Nesta.

2230.     For example, on July 22, 2013, Defendant Patel sent Defendant Green an e-mail with an attached spreadsheet of "Round 2" increase items. She indicated that she was "seeking intel" for a group of drugs in the attached spreadsheet with a highlighted yellow "x" and included in a column titled "Follow Mylan/Other:"

503

| Product Family | Initial Comments | PM Related | Follow Mylan/Other |
|---|---|---|---|
| Amiloride | Mylan increase; Teva only has HCTZ | | x |
| Diclofenac Tab | Mylan increase; On historical PI list | x | x |
| Doxazosin Mesylate Tabs | Mylan increase; On historical PI list | | x |
| Enalapril Tab | Mylan increase; On historical PI list--COMPLETED | | x |
| Ketoprofen | Follow Mylan; Deletion candidate; PM related | x | x |
| Ketorolac | Follow Mylan; Deletion candidate; PM related | x | x |
| Metoprolol | Mylan increase (Teva does not have 25mg but small sku) | | x |
| Nystatin | Heritage involved follow Mutual deletion candidate PM related | x | x |
| Pravastatin | Carried over from round 1 | | x |
| Sotalol | Mylan increase; On historical PI list | | x |
| Tolmetin Tab | Mylan increase; Teva has 94 share; On historical PI list | | x |
| Verapamil (Isoptin SR) | Mylan increase (lost Kroger and OneStop--to who?) | | x |

A large majority were Mylan drugs.

2231.    The next day – July 23, 2013 – at 4:30pm, Defendants Green and Nesta spoke for more than six (6) minutes. Immediately after hanging up the phone, Defendant Green called Defendant Patel to convey the intel he had obtained from Mylan. The call lasted more than three (3) minutes.

2232.    On July 29, 2013, Defendant Green at Teva was approached by a large retail pharmacy asking for bids on several of the drugs that Mylan had increased prices on in early July. Defendant Green's first step was to request market share information for those drugs so that Teva could make a decision on how to respond to the customer's inquiry based on the generally accepted understanding regarding fair share:

**From:** Kevin Green
**Sent:** Monday, July 29, 2013 9:49 AM
**To:**
**Cc:**
**Subject:** Walgreens: Items for discussion

From the list of items below, can you pull in current market share. These are new opportunities at Walgreens, and I want to see what the current market looks like.

2233.    The next day, July 30, 2013, Defendant Patel sent Defendant Green the "latest" price increase file as an attachment, saying that she "[f]igured it would help since I've changed a few things on you." Defendant Patel asked Defendant Green to obtain additional "market intel" for a group of seven Mylan drugs, some of which varied slightly from the prior spreadsheet.

2234.    Following the same consistent pattern, Defendants Green and Nesta spoke six (6) times over the next two days. After hanging up from the last call between the two on August 1, 2013, Defendant Green called Defendant Patel and conveyed the results of his conversations. This series of phone calls is detailed below:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 7/31/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 14:10:33 | 0:04:52 |
| 7/31/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 14:50:57 | 0:01:09 |
| 7/31/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 14:54:39 | 0:03:21 |
| 7/31/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 14:59:57 | 0:06:53 |
| 7/31/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 16:46:59 | 0:01:27 |
| 8/1/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 11:23:47 | 0:05:48 |
| 8/1/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 12:21:43 | 0:00:59 |
| 8/1/2013 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Teva) | 12:29:55 | 0:02:36 |

2235.    In the midst of the phone calls between Defendants Green and Nesta on July 31 2013, Defendant Patel sent the following e-mail with "commentary" about the customer request, with a particular focus on balancing Teva's desire to increase prices against its commitment to adhere to the fair share agreement and how that may affect its market share for certain products sold by Mylan:

505

From:     Nisha Patel02
Sent:     Wed 7/31/2013 3:23 PM (GMT-05:00)
To:       Kevin Green; ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Dave Rekenthaler
Cc:
Bcc:
Subject: RE: DELPHI 9429 Walgreens: Items for discussion

My initial commentary…

If we can take on the supply, we can bid on items we have already taken our increase on (bold).

**Enalapril: seeking share**

**Cimetidine: shared with Mylan, but do not have our fair share**

**Prazosin: shared with Mylan, but do not have our fair share**

**Nadolol: can pursue additional share (Mylan) for 3-player market**

Loperamide: consider it added to the PI candidates list

Fluoxetine: no plans to follow Mylan increase, but have high share in a 7 player market

Diltiazem IR: consider it added to the PI candidates list

There are plans to follow Mylan on the rest. Need to determine how we want to respond on these if we haven't implemented an increase by the time we respond. From what I understand, we have some time.

2236.    Based on all of these communications between Teva and Mylan (and at times other competitors), Teva was able to successfully increase price on seven different Mylan drugs on August 9, 2013, as set forth above.

## 2. Etodolac and Etodolac ER

2237.    Etodolac, also known by the brand name Lodine, is a medication known as a non- steroidal anti-inflammatory drug (NSAID). It is used to reduce pain, swelling and joint stiffness from arthritis.  It works by blocking the body's production of certain natural substances that cause inflammation. An extended release version of Etodolac – Etodolac ER –also known by the brand name Lodine XL, is also available.

2238.    Apotex, Taro, Teva and Sandoz dominated the market for Etodolac tablets; Teva, Taro, and Zydus dominated the market for Etodolac ER tablets; and Apotex,

Teva, and Taro dominated the market for Etodolac capsules.

2239.    In early 2012, Apotex (which had received an ANDA to market Etodolac capsules in 2000) was planning to re-enter the market for the drug while Teva was planning to exit the market. Although the number of competitors in the market would remain the same, Apotex and Taro were able to coordinate a large price increase due to the overarching Fair Share Agreement. 2269. As a result of this coordination, Taro was able to lead a price increase that more than tripled its previous price for Etodolac capsules from early 2012, while Apotex was able to enter the market at the higher price and gain its "Fair Share." As a result, between May and August of 2012, Taro and Apotex were able to coordinate to increase prices by more 200%.

2240.    This coordination paved the way for a subsequent price increase on the tablet formulations of the drug. One year later, when Defendant Patel first began planning for "Round 2" of Teva's price increases, Etodolac and Etodolac ER were not slated for increases. For example, when she circulated a long list of potential "Round 2" increases on July 11, 2013 (that would later be cut down substantially) – neither of those drugs was on the list.

2241.    Around that time, Sandoz began identifying a list of drugs where it believed it could increase price by the end of July. Etodolac was on the list, primarily because Sandoz would be able to implement a substantial increase without incurring significant price protection penalties from its customers.

2242.    On July 16, 2013, CW-3, then a senior executive at Sandoz, reached out to Defendant Aprahamian at Taro and they spoke for sixteen (16) minutes. Defendant Aprahamian called CW-3 back the next day and the two spoke again for eight (8) minutes. After hanging up the phone with CW-3, Defendant Aprahamian immediately called

507

Defendant Patel. They exchanged voicemails until they were able to connect later in the day for nearly fourteen (14) minutes. On July 18, 2013, Defendant Patel called CW-1 at Sandoz and the two spoke for more than ten (10) minutes.

2243. During this flurry of phone calls, Defendants Sandoz, Taro and Teva agreed to raise prices for both Etodolac and Etodolac ER.

2244. On July 22, 2013 – before any price increases took effect or were made public – Defendant Patel added both Etodolac and Etodolac ER to her price increase spreadsheet for the first time, with the following notations:

| Etodolac | Sandoz* (All strong competitors) |
| Etodolac ER | Could follow IR (Shared with Taro) |

Based on her conversations with CW-1 and Defendant Aprahamian, Defendant Patel understood that Sandoz planned to increase its price on Etodolac, and that Taro would follow suit and raise its price for Etodolac ER. During those conversations, Teva agreed to follow both price increases.

2245. That same day, Sandoz sent out a calendar notice to certain sales and pricing employees for a conference call scheduled for July 23, 2013 to discuss planned price increases, including for Etodolac. Prior to the conference call on July 23, CW-1 called Defendant Patel at Teva. After exchanging voice mails, the two were able to connect for more than fourteen (14) minutes that day. During that call, CW-1 confirmed the details of the Sandoz price increase on Etodolac. Similarly, CW-3 of Sandoz called Defendant Aprahamian at Taro that same day and the two spoke for more than three (3) minutes.

2246. The Sandoz price increase for Etodolac became effective on July 26, 2013. That same day, Taro received a request from a customer for a one-time buy on Etodolac 400mg Tablets. After learning of the request, Aprahamian responded swiftly internally: "Not so fast. Why the request? Market just changed on this and not apt to

undercut."

2247.    When Taro received another request on July 30 from a large wholesale customer for a bid due to the Sandoz price increase, Aprahamian's internal response was equally short:

| Message | |
|---|---|
| **From:** | ara.aprahamian@taro.com [ara.aprahamian@taro.com] |
| **Sent:** | 7/30/2013 11:14:49 PM |
| **To:** | ███████████████████████████████ |
| **CC:** | |
| **Subject:** | Re: Fw: Bid Request - Etodolac |
| **Attachments:** | _.gif; _; _ |

recent market changes, not taking on additional share...

2248.    Also on July 26, Defendant Patel sent an e-mail to others at Teva – including her supervisor K.G., Defendant Rekenthaler and others – informing them of the Sandoz increase on Etodolac IR (immediate release). She instructed them to "[p]lease watch ordering activity for both, IR and ER. The intent is that we will follow in the near future, but a date has not been determined."

2249.    Defendant Patel continued to coordinate with both Sandoz and Taro regarding the Etodolac and Etodolac ER price increases (among other things). Between July 29 and August 2, 2013, for example, Defendant Patel engaged in the following series of calls with CW-1 of Sandoz and Defendant Aprahamian at Taro:



| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 7/29/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 8:44:23 | 0:09:08 |
| 7/30/2013 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 13:05:11 | 0:09:51 |
| 7/31/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 13:17:12 | 0:03:33 |
| 8/1/2013 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 11:01:31 | 0:09:05 |
| 8/1/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 14:35:17 | 0:03:24 |
| 8/1/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 16:41:05 | 0:14:34 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 8:59:51 | 0:05:23 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 10:15:46 | 0:08:27 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 10:59:57 | 0:00:28 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 17:33:12 | 0:00:00 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 17:34:43 | 0:00:55 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 17:35:47 | 0:00:02 |
| 8/2/2013 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 17:36:12 | 0:05:40 |

Defendant Aprahamian was also speaking to his contact at Sandoz -CW-3 -during this time, including the following calls:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 7/30/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 7:56:00 | 0:01:00 |
| 8/1/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 12:43:00 | 0:14:00 |
| 8/2/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 13:26:00 | 0:06:00 |

2250.    On August 1, 2013 - shortly after speaking with Defendant Patel-Defendant Aprahamian instructed a colleague at Taro to begin implementing a price increase on Etodolac and Etodolac ER. Defendant Aprahamian stated "[w]e need to get these out next week" Not wanting to provide the details in writing, Defendant Aprahamian concluded: "Will come over and discuss with you."

2251.    By August 5, 2013, it was well known internally at Teva that Taro would soon be raising prices on both Etodolac and Etodolac ER. The minutes from a Teva "Marketing Ops" meeting on August 5, 2013 - which Defendant Patel attended-reflect the following:

510

4. Etodolac – Sandoz did take price increase on IR, Taro taking a price increase on IR and ER this week.  CIM still monitoring to 100% forecast for all customers.

2252.    When Defendant Patel sent the "Price Increase Overview" spreadsheet to her supervisor K.G. on August 7, 2013, summarizing Teva's upcoming August 9 price increases, she again made it clear that the reason Teva was increasing its prices for Etodolac and Etodolac ER was because Teva senior executives knew that Taro would be raising its prices on both drugs "this week." K.G. quickly instructed Defendant Patel to delete those entries, but never instructed her to stop communicating with the company's competitors, including Taro.

2253.    Teva and Taro raised prices for Etodolac and Etodolac ER simultaneously, with the price increases effective on August 9, 2013. Both their AWP and their WAC prices were increased to the exact same price points. The increases were substantial. For Etodolac, Teva's average increase was 414%; for Etodolac ER, the average increase was 198%.

2254.    Once again, this substantial price increase resulted in Zydus entering the market for Etodolac ER in early, which should have led to price competition. Instead, Teva and Taro willingly gave up customers to Zydus so that it could get its "Fair Share" of the market. For example, Nisha Patel, Ara Aprahamian, and Kevin Green discussed a plan to cede a large wholesale client to Zydus in May 2014, and Teva then ceded a second customer to Zydus a few months later.

### 3.    Impact of Price Increases

2255.    As she was preparing to implement Teva's August 9, 2013 price increases, Defendant Patel also calculated the quarterly increase in sales revenues resulting from the price increase taken by Teva on July 3, 2013. The analysis also included the

511

financial impact of the recent Pravastatin increase. The results were staggering.

2256.    According to her analysis the total net upside as a result of the July 3 price increase, plus Pravaststin and one other drug was nearly $1 Billion per quarter to Teva, as shown below:

| Price Increase Category | Incremental Sales Value (Est ASPs) | Total Credit Estimate | CVS Credit Estimate | Credit Estimate (Less CVS) | Total Net Upside after Credits | Total Net Upside (CVS credits deferred) |
|---|---|---|---|---|---|---|
| Grand Total | $973,184,165 | ($36,105,086) | ($10,188,095) | ($25,916,991) | $937,079,079 | $962,996,070 |
| IHI Total | $850,711,025 | ($31,676,647) | ($7,898,091) | ($23,778,555) | $819,034,379 | $842,812,934 |
| ILI Total | $34,078,176 | ($1,489,058) | ($594,035) | ($895,023) | $32,589,117 | $33,484,141 |
| UR Total | $88,394,964 | ($2,939,381) | ($1,695,968) | ($1,243,413) | $85,455,583 | $86,698,996 |

2257.    Patel was rewarded handsomely by Teva for effectuating these price increases. In March 2014, less than a year after starting at Teva, Patel was rewarded with a $37,734 cash bonus, as well as an allocation of 9,500 Teva stock options.

### 4.  Price Increase Hiatus

2258.    Shortly after the August 9, 2013 price increase went into effect, Defendant Patel left the office for several months while on maternity leave.

2259.    This slowed down Teva's plans for its next round of price increases. During the time period while Patel was out on maternity leave, Teva did not implement or plan any additional price increases, instead waiting for Defendant Patel to return and continue her work. Defendant Patel began to return to the office on a part-time basis beginning in November 2013.

2260.    During this time period, Defendant Kevin Green left Teva to join Defendant Zydus as the Associate Vice President of National Accounts. His last day of employment at Teva was October 23, 2013. This prompted Defendant Rekenthaler to assume the role of communicating with specific competitors, including Mylan. Defendant Rekenthaler also identified and began communicating on a more frequent basis with co-conspirators at different companies to facilitate the price increase process for Teva.

512

2261.    As discussed more fully below, although Defendant Patel's absence slowed Teva in its plans for price increases on additional drugs, it did not stop certain competitors – in particular Lupin and Greenstone – from attempting to coordinate with Teva regarding their own price increases. In Defendant Patel's absence, they simply communicated through different channels. These communications were conveyed to Defendant Patel upon her return and she included the information in her efforts to identify new price increase candidates.

2262.    As discussed more fully below, by early 2014 Defendant Patel had picked up right where she left off planning for the next round of Teva increases.

### 5.  March 7, 2014: Niacin ER

2263.    Niacin Extended Release (ER), also known by the brand name Niaspan Extended Release, is a medication used to treat high cholesterol.

2264.    On September 20, 2013, Teva entered the market for Niacin ER as the first-to-file generic manufacturer. As the first-to-file, Teva was awarded 180 days of exclusivity to sell the generic drug before other generic manufacturers could enter the market.

2265.    Teva's period of exclusivity for Niacin ER was scheduled to expire on March 20, 2014. As that date approached, Teva began to plan for loss of its exclusivity. By at least as early as February, Teva learned that Defendant Lupin would be the only competitor entering the market on March 20.

2266.    The first thing Teva sought to do – knowing that a high-quality competitor would be the only new entrant – was to raise its price. On February 28, 2014, Defendant Maureen Cavanaugh instructed K.G. and others at Teva that "[w]e need to do the Niacin ER price increase before Lupin comes to market and sends offers out." K.G.

513

immediately forwarded the e-mail to Defendant Patel with the instruction: "Please see comment on Niacin ER. Please make sure you include in your price increase." Later that day, Defendant Patel called Defendant Berthold at Lupin and the two spoke for nearly seven (7) minutes.

2267.    Within a week, Teva was ready to implement the price increase. On March 5, 2014, Defendant Patel sent an e-mail to the Teva pricing group stating "[p]lease prepare for a price increase on Niacin ER, to be communicated [to customers] this Friday for an effective date of Monday.'' The next day, March 6, Teva notified its customers that it would be implementing  a price increase on Niacin ER effective March 7, 2014. The increase was for 10% across the board, on all formulations.

2268.    Once Teva coordinated the price increase it next began taking the necessary steps to divvy up the Niacin ER market with new entrant Lupin so as to avoid competition that would erode Teva's high pricing. Defendant Patel scheduled a meeting with Defendant Rekenthaler for March 6, 2014 to discuss an "LOE Plan" for Niacin ER. "LOE Plan," in Teva parlance, is a plan detailing which customers Teva would concede and which customers it would retain upon  Teva's "loss of exclusivity" in a particular generic drug market. Teva's LOE plans were often secretly negotiated directly with competitors as they were entering the market, consistent with  the industry understanding of fair share discussed above.

2269.    This situation was no different. During the morning of March 6, 2014, Defendant Patel called Defendant Berthold and they spoke for more than seven (7) minutes. During this and several subsequent calls, discussed in more detail below, Teva and Lupin agreed on which specific customers Teva would concede to Lupin when it entered the market on March 20, 2014. Teva agreed that it would concede 40% of the market to Lupin

upon entry.

2270.    When Lupin entered the market for Niacin ER on March 20, 2014, it entered at the same WAC per u and Berthold were in frequent communication to coordinate the entry , as set forth below:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:07:44 |
| 3/18/2014 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:12:19 |
| 3/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:06:20 |
| 3/20/2014 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:12:34 |

2271.    In addition, Lupin entered with customer pricing only 10% below Teva's recently increased pricing - so it was expected that pricing would remain at least at Teva's pre-increase exclusive pricing levels. In other words, there was little or no price erosion as a result of Lupin's anticompetitive entry into the market for Niacin ER.

2272.    Over the next several days, Defendants Patel and Berthold continued to coordinate to make sure Lupin obtained the agreed-upon customers. For example, on March 24, 2014, a Teva executive received an e-mail from Cardinal indicating that Cardinal had received "a competitive offer for the Niacin ER family." Cardinal was one of the customers that Teva had already agreed to concede to Lupin. The Teva executive forwarded the e-mail to several people internally at Teva, including Defendants Patel, Rekenthaler and Cavanaugh, confirming the plan:

From: ▮▮▮▮
Sent: Monday, March 24, 2014 2:10 PM
To: ▮▮▮▮ Dave Rekenthaler
Cc: Maureen Cavanaugh; Nisha Patel02; ▮▮▮▮
Subject: FW: Niacin ER

I want to make sure our strategy has not changed>  we are conceding correct ?

515

That same day, Defendant Patel spoke to Defendant Berthold at Lupin three times, as shown below:



| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 3/24/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:05:14 |
| 3/24/2014 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:04:55 |
| 3/24/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:11:49 |

Defendant Patel responded:

From: Nisha Patel02
Sent: Mon 3/24/2014 1:13 PM (GMT-05:00)
To: ▬▬▬
Cc: Maureen Cavanaugh; ▬▬▬ Dave Rekenthaler
Bcc:
Subject: RE: Niacin ER

Yes. The plan is to concede. This was re-confirmed earlier today, unless something has changed.

2273.    The next day – March 25, 2014 – K.G. of Teva summarized the status of Teva's LOE Plan and the company's agreement with Lupin on Niacin ER: "With the four concessions (CVS, Cardinal, Optum and Humana), we would be giving up right around 40% share as Dave noted (I calculated 39%) We need to keep everybody else."

**E. April 4, 2014 Price Increases: Azithromycin Suspension and Oral Suspension, Bumetanide Tablets, Cephalexin Suspension, Clarithromycin ER Tablets, Cyproheptadine HCL Tablets, Dicloxacillin Sodium Capsules, Diflunisal Tablets, Estazolam Tablets, Ethosuximide Capsules and Oral Suspension, Hydroxyzine Pamoate Capsules, Ketoconazole (Cream and Tablets), Medroxyprogesterone Tablets, Estradiol/Norethindrone Acetate Tablets, Nystatin Oral Tablets, Pentoxifylline Tablets, Tamoxifen Citrate Tablets, Theophylline ER Tablets**

2274.    On April 4, 2014, Teva raised prices on twenty-two (22) different generic drugs. Again, nearly all of these increases were coordinated with a number of Teva's high-quality competitors who by now were familiar co-conspirators, including Defendants Sandoz, Taro, Actavis, Mylan, Lupin and Greenstone. But for this price increase, Teva also began coordinating with some of what it regarded as "lesser-quality" competitors – such

516

as Defendant Breckenridge, Heritage, Versapharm, Inc. ("Versapharm") and Rising Pharmaceuticals, Inc. ("Rising") – as new sources for anticompetitive agreements. For this price increase, Teva also decided to lead many more price increases – which was riskier for Teva and required even greater coordination with competitors.

2275.    Leading more price increases was part of a strategy that Defendant Patel memorialized in writing in January of 2014, documenting in many respects the successful strategy that she had implemented in 2013, focused on leveraging Teva's collusive relationships with high-quality competitors. This strategy was well known, understood and authorized by individuals at much higher levels at Teva, including Defendants Cavanaugh and Rekenthaler, and Patel's direct supervisor K.G. For example, on January 16, 2014, Patel sent a document to K.G. titled "2014 Pricing Strategy Brainstorm," where she outlined her plan for implementing price increases:

**2014 Pricing Strategy Brainstorm**

- Lead more increases
- Candidate Identification:
  - Exclusive items
  - Number of competitors; Target 2-4 total players, where quality of competitor is high
  - Teva has majority share and quality of competitors is high - lead
  - Competitors with long term supply issues
  - Competitors exiting market
  - Low or limited financial exposure
  - Adjust pricing in accordance with volume (secondary, dual, etc)
- Follow market pricing promptly
  - Delayed reactions erode pricing
  - Teva is the market leader. Ability to react to market changes should be reflective of reputation.

2276.    Defendant Patel began planning for the next round of Teva price increases in early January 2014, shortly after returning to full-time status from maternity leave. On January 14, 2014, Patel sent K.G. a preliminary draft list of price "Increase Potentials Q1 2014." She stated: "Attached is my list of potential items. Note that they still need to go through the review process."

517

2277.    The initial list contained drugs sold by Actavis, Lupin and Greenstone, among others. Not surprisingly, Defendant Patel was communicating frequently with each of those competitors throughout December 2013 and into early January 2014.

2278.    On February 7, 2014, Patel created a formal list of "PI Candidates'' in a spreadsheet In the days leading up to February 7, Patel was feverishly coordinating by phone with a number of different competitors to identify price increase candidates, including at least the following:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 0:23:21 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 0:00:00 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-5 (Glenmark) | 0:00:10 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Hatosy, Robin (Greenstone) | 0:15:53 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 0:00:22 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 0:10:04 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Malek, Jason (Heritage) | 0:00:00 |
| 2/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Malek, Jason (Heritage) | 0:00:29 |
| 2/5/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 0:00:11 |
| 2/5/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 0:00:04 |
| 2/5/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Hatosy, Robin (Greenstone) | 0:00:04 |
| 2/5/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 0:30:28 |
| 2/5/2014 | Voice | Patel, Nisha (Teva) | Incoming | Malek, Jason (Heritage) | 1:02:06 |
| 2/6/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 0:00:05 |
| 2/6/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 0:00:00 |
| 2/6/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 0:00:03 |
| 2/7/2014 | Voice | Patel, Nisha (Teva) | Outgoing | S.C. (Breckenridge) | 0:01:20 |
| 2/7/2014 | Voice | Patel, Nisha (Teva) | Incoming | S.C. (Breckenridge) | 0:04:53 |

2279.    Those efforts were successful. By February 26, 2014, Defendant Patel had a more refined list of "PI Candidates," which she forwarded to another colleague for his review. That list included the following drugs and notes about each drug:



| Family | Market Notes | Pricing Notes |
|---|---|---|
| Clarithromycin ER | Zydus exiting | Raise non-Cardinal customers in accordance with new Cardinal price |
| OCs | Secondary at ABC | Raise to non-primary pricing/within 10% of primary market sell-refer to Anda intel |
| Cephalexin OS | | Follow Lupin - price points - WS net $14.70, 23.52, 16.75, 25.13 |
| Azith Susp | | Follow GS - price points - WS net $12.50 on all sku's |
| Medroxypro Tabs | | Follow GS - price points - WS net 8.50, 9.50, 10.50 on 100s |
| Nadolol (Econdisc only) | | Raise to originally planned increase price |
| Ethosuxamide Liquid | Shared only with Versa; test quality of competitor | |
| Ethosuxamide Caps | Shared only with Versa; test quality of competitor; UNPROFITABLE | |
| Cyproheptadine | Shared only with Breckenridge | Follow Breckenridge - price points - WS contract 55.10 |
| Mimvey | Shared only with Breckenridge | Follow Breckenridge - price points - WS contract 96.30 |
| BUDESONIDE | Exclusive | PER PRICING INFORMATION FROM DECEMEBER |
| NIACIN ER | Exclusive but Lupin entering | PER PRICING INFORMATION FROM DECEMEBER |
| Bumetanide | Teva exiting  CHECK SALES FOR % INCREASE | Lead market with potential share loss in mind |
| Divalproex ER | UNPROFITABLE  several competitors | |
| Diflunisal | Shared only with Rising | |
| Ketoconazole Cream | Shared with Taro and Sandoz | |
| Ketoconazole Tab | Shared with Taro, Myl and Apo | |
| Mupirocin Ointment | Shared with Perrigo, GM, Taro, Sandoz | |
| Theophylline Tab | Shared with Heritage, Major and Inwood | |
| Nystatin Tab | Shared with Heritage and Mutual/Caraco | |
| Hydroxyzine Pamoate | Shared with Sandoz and Actavis | |
| Pentoxi ER | Shared with Apo and Mylan | |

2280.    Patel continued to refine the list over the next several weeks.

2281.    On March 17, 2014, Defendant Patel sent a near final version of the "PI Candidates" spreadsheet to K.G. with the statement: "Once you verify these are acceptable, we can finalize for the increase." In a practice that had now become routine at Teva, Defendants Patel and Rekenthaler both were communicating frequently with competitors – in this case Taro, Lupin, Actavis, Greenstone, Zydus, Heritage, and Rising – to coordinate the price increases in the week before Patel sent the price increase list to K.G. At least some of those communications are reflected in the table below:



| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 3/10/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | S.G. (Zydus) | 7:46:00 | 0:02:00 |
| 3/10/2014 | Voice | Rekenthaler, David (Teva) | Incoming | S.G. (Zydus) | 8:23:00 | 0:16:00 |
| 3/10/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 7:59:46 | 0:00:02 |
| 3/10/2014 | Text | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 8:00:03 | 0:00:00 |
| 3/10/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 10:46:30 | 0:05:08 |
| 3/10/2014 | Voice | Patel, Nisha (Teva) | Incoming | Malek, Jason (Heritage) | 17:48:05 | 0:00:00 |
| 3/10/2014 | Voice | Patel, Nisha (Teva) | Incoming | Malek, Jason (Heritage) | 17:48:28 | 0:00:30 |
| 3/11/2014 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 9:25:06 | 0:06:25 |
| 3/11/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 15:25:00 | 0:01:00 |
| 3/12/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 12:36:00 | 0:03:00 |
| 3/12/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 12:40:00 | 0:01:00 |
| 3/13/2014 | Voice | Patel, Nisha (Teva) | Incoming | R.H. (Greenstone) | 13:41:03 | 0:00:00 |
| 3/13/2014 | Voice | Patel, Nisha (Teva) | Incoming | R.H. (Greenstone) | 13:41:24 | 0:00:21 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 8:05:47 | 0:00:00 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 8:07:44 | 0:20:38 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 8:35:27 | 0:00:00 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 8:41:11 | 0:19:00 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rekenthaler, David (Teva) | 9:00:43 | 0:10:43 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Berthold, David (Lupin) | 9:11:50 | 0:07:54 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 9:53:49 | 0:00:00 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 9:54:11 | 0:00:22 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 10:31:09 | 0:12:37 |
| 3/14/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 12:36:59 | 0:05:31 |
| 3/14/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 16:11:00 | 0:01:00 |
| 3/15/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 10:27:00 | 0:11:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 8:57:19 | 0:05:53 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 9:06:23 | 0:05:04 |
| 3/17/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 10:23:00 | 0:07:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | Berthold, David (Lupin) | 10:26:51 | 0:07:44 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | R.H. (Greenstone) | 10:40:04 | 0:00:05 |
| 3/17/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | CW-2 (Rising) | 10:44:00 | 0:05:00 |
| 3/17/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | CW-2 (Rising) | 10:56:00 | 0:03:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 11:07:35 | 0:00:01 |
| 3/17/2014 | Text | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 11:08:08 | 0:00:00 |
| 3/17/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Green, Kevin (Zydus) | 11:17:00 | 0:20:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | R.H. (Greenstone) | 11:35:28 | 0:15:25 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 11:53:08 | 0:00:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 11:53:31 | 0:00:05 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 12:17:50 | 0:00:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 12:18:13 | 0:00:22 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 12:19:10 | 0:19:13 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 12:36:50 | 0:00:00 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 12:38:42 | 0:09:51 |
| 3/17/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 16:46:25 | 0:11:13 |

Defendant Rekenthaler had also previously spoken with his contact at Versapharm - J.J., a senior national accounts executive- on January 22, 2014 (a five (5) minute call) and March 7, 2014 (a three (3) minute call) to secure Versapharm's agreement to follow the Teva increase on two drugs.. Those were the only two identified telephone calls between Rekenthaler and J.J. since 2012. As discussed more fully below, Versapharm followed with its own price increase shortly after the Teva increase.

2282.    In the days leading up to the price increase, Defendant Rekenthaler asked Defendant Patel for a list of drugs and competitors associated with each of the increase

520

items so that he could confirm that Teva had successfully coordinated increases with everyone. On April 1, 2014, Defendant Patel responded by providing a list of only those drugs where Teva was leading the price increase – i.e., the drugs with the most risk if Teva did not secure an agreement beforehand with a competitor before raising its own price.

2283.    Satisfied that Defendants Patel and Rekenthaler had confirmed agreement with all the appropriate competitors, on April 4, 2014 Teva increased pricing on various dosage strengths of the following drugs:

| Product Description | Lead/Follow | Competitors |
|---|---|---|
| AZITHROMYCIN ORAL SUSPENSION | Follow | Greenstone |
| AZITHROMYCIN SUSPENSION | Follow | Greenstone |
| BUMETANIDE TABLETS | Lead | Sandoz |
| CEPHALEXIN SUSPENSION | Follow | Lupin |
| CLARITHROMYCIN ER TABLETS | Follow | Actavis; Zydus |
| CYPROHEPTADINE HCL TABLETS 4MG 100 | Follow | Breckenridge |
| DICLOXACILLIN SODIUM CAPSULES | Lead | Sandoz |
| DIFLUNISAL TABLETS | Lead | Rising |
| ESTAZOLAM TABLETS | Follow | Actavis |
| ETHOSUXIMIDE CAPSULES | Lead | Versapharm |
| ETHOSUXIMIDE ORAL SOLUTION | Lead | Versapharm |
| HYDROXYZINE PAMOATE CAPSULES | Lead | Sandoz; Actavis |
| KETOCONAZOLE CREAM 2% | Lead | Taro; Sandoz |
| KETOCONAZOLE TABLETS | Lead | Taro; Mylan |
| MEDROXYPROGESTERONE TABLETS | Follow | Greenstone |
| MIMVEY (ESTRADIOL/NORETH) TAB | Follow | Breckenridge |
| NYSTATIN ORAL TABLETS | Lead | Heritage; Mutual |
| PENTOXIFYLLINE TABLETS | Lead | Apotex; Mylan |
| TAMOXIFEN CITRATE TABLETS | Follow | Actavis |
| THEOPHYLLINE ER TABLETS 100MG 100 | Lead | Heritage |

2284.    These price increases were all coordinated and agreed to between Teva and its competitors. As was now their standard procedure, Defendants Patel and/or Rekenthaler communicated directly with all of their key competitors in the days and weeks leading up to the increase. Many of those communications are set forth in the graphic below:

521



2285.    Defendant Patel and others at Teva again went to great efforts to coordinate these price increases with competitors prior to April 4, 2014 – including during the time that Defendant Patel was out on maternity leave. Some illustrative examples of those efforts are set forth below.

### 1. Lupin (Cephalexin Oral Suspension)

2286.    Throughout 2013, Defendant David Berthold of Lupin colluded with two different individuals at Teva: Defendants Patel and Green. As discussed above, at times Defendants Patel and Green would even coordinate with each other regarding who would communicate with Defendant Berthold, and take turns doing so.

2287.    As of late October, 2013, however, neither of those options was available to Defendant Berthold. Defendant Patel was out of the office on maternity leave, and Defendant Green had left Teva to join Zydus as of October 23, 2013.

522

2288.    This did not deter Defendant Berthold; he merely went further down the Teva organizational chart to find a Teva executive to communicate with. The ongoing understanding between Teva and Lupin was institutional, not dependent upon a relationship between specific individuals. So in October 2013, when Lupin decided to raise price on Cephalexin Oral Suspension – a drug where Teva was the only other competitor in the market – Defendant Berthold already knew that Teva would follow the increase.

2289.    On October 14, 2013, Defendant Berthold called Defendant Rekenthaler at Teva. They ultimately spoke for sixteen (16) minutes that day. Communication was rare between those two executives. Prior to October 14, 2013, the last (and only) time they had spoken by phone was November 21, 2011 according to the phone records produced.

2290.    On October 31, 2013 – the day before Lupin was scheduled to increase its price on Cephalexin Oral Suspension – Defendant Berthold also called T.S., a national account executive at Teva, to notify Teva of the price increase. He called T.S. at 9:18am that morning and left a message. T.S. returned the call at 9:57am, and the two spoke for nearly five (5) minutes.

2291.    Within minutes after hanging up the phone with Defendant Berthold, T.S. notified others internally at Teva about the substantial increase Lupin was about to take:

From: ████████████
Sent: Thursday, October 31, 2013 10:08 AM
To: ████████    Dave Rekenthaler
Cc: ███████████████████████████████████ Nisha Patel02; ███████████████████
Subject: LUPIN PRICE INCREASE - Cephalexin Oral Suspension

I have heard the Lupin is implementing a price increase today on Cephalexin Oral Suspension (4-6 x's current price)

Teva has 59% market share; Lupin has 37% market share.

523

The Lupin increase on Cephalexin Oral Suspension actually became effective the next day, November 1, 2013 – demonstrating that T.S. had advance knowledge of the increase. Shortly thereafter, T.S. followed up her own e-mail with specific price points that Lupin would be charging for Cephalexin.

2292. K.G. of Teva responded later that day, asking: "Did Lupin increase the Caps as well?" Defendant Rekenthaler answered immediately, with information he had learned from Defendant Berthold in mid-October: "Lupin did not increase the caps, only the susp[ension]."

2293. On November 22, 2013, a large customer requested a bid from Teva on Cephalexin due to the Lupin price increase. T.S. forwarded the e-mail from the customer to Defendant Rekenthaler and others with the suggestion that, because Teva already had the majority share, it should not bid for the business. K.G. agreed, and simultaneously forwarded the e-mail to Defendant Patel stating: "Nisha, let's add this to our list to discuss." Defendant Patel called Defendant Berthold the same day and left a message.

2294. When Patel drafted her initial list of possible price increase candidates and forwarded it to K.G. in January 2014, Cephalexin Oral Suspension was on the list. Defendant Patel coordinated the increase consistently with Defendant Berthold throughout the period.

2295. On April 4, 2014, Teva raised its WAC prices on Cephalexin Oral Suspension to match Lupin's prices exactly. The increases to the WAC price ranged from 90% - 185%, depending on the formulation.

### 2. Greenstone (Azithromycin Oral Suspension, Azithromycin Suspension, and Medroxyprogesterone Tablets)

2296. In November 2013, Defendant Greenstone began planning to increase prices on several drugs, including some that overlapped with Teva: Azithromycin Oral

Suspension, Azithromycin Suspension and Medroxyprogesterone Tablets. Defendant Patel and Defendant Hatosy, a national account executive at Greenstone, were communicating frequently during that time, including exchanging six (6) text messages on November 16, 2013 and a phone call on November 23, 2013. Because Greenstone was a high-quality competitor, and because the companies had successfully conspired to raise prices previously, it was understood between the two that if Greenstone raised prices Teva would follow and would not seek to poach Greenstone's customers after the increase.

2297.    Defendant Pfizer was directly involved in the approval process for these price increases. On November 18, 2013 – only two days after Defendants Patel and Hatosy exchanged six (6) text messages – a senior pricing executive at Greenstone sent an e-mail to Greenstone's General Manager seeking approval to implement the price increases. The General Manager approved of the price increases the next day, but indicated that he had sent a message to a senior Pfizer executive for sign off, and wanted "to socialize this with him" and let him know that the price increases that Greenstone was seeking to take were consistent with the other price increases currently happening with great frequency in the U.S. generic industry. Part of that socialization process included explaining the strategy behind the price increases. Pfizer approved the price increases on November 22, 2013. The next day, Defendant Patel spoke to Defendant Hatosy at Greenstone for nearly one (1) minute.

2298.    On December 2, 2013 - the same day that Greenstone was slated to send out notices of the price increases to its customers - Defendant Patel spoke to Defendant Hatosy at Greenstone three times within a span of twenty (20) minutes, as set forth below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 12/2/2013 | Voice | Patel, Nisha (Teva) | Outgoing | Hatosy, Robin (Greenstone) | 14:02:54 | 0:00:05 |
| 12/2/2013 | Voice | Patel, Nisha (Teva) | Incoming | Hatosy, Robin (Greenstone) | 14:10:13 | 0:06:09 |
| 12/2/2013 | Voice | Patel, Nisha (Teva) | Incoming | Hatosy, Robin (Greenstone) | 14:18:50 | 0:01:37 |

2299.    After the last of those three calls, Defendant Patel sent an e-mail to several colleagues at Teva notifying them of an impending Greenstone price increase - one that would not be effective for another month:

```
From:    Nisha Patel02
Sent:    Mon 12/02/2013 2:23 PM (GMT-05:00)
To:      ███████████████████████████████
Cc:      █████████████  ; Dave Rekenthaler
Bcc:
Subject: Azithro OS Price Increase

FYI, I'm hearing that Greenstone just announced an increase on Azithromycin Oral Suspensions, effective
January 1st. Please take this into consideration for bid requests we may receive.
```

2300.    On December 5, 2013, Defendant Patel continued to communicate with Defendant Hatosy about the Greenstone increases, and how Teva would react to unsolicited customer requests for bids - trading two voicemails. The next day, Patel sent another e-mail to K.G. about Azithromycin Suspension:

```
From:    Nisha Patel02
Sent:    Fri 12/06/2013 11:33 AM (GMT-05:00)
To:      ██████████████
Cc:
Bcc:
Subject: Azithro Susp Question

██████████

I mentioned earlier in the week that Greenstone took an increase that is effective January 1st. (As a reminder, I
intend to add these items to my list of potential price increases for Q1 2014.)

Since the new pricing requires a WAC increase, I am inclined to decline to bid at this time. Further, in a 2
player market, we have 54% share and this includes a gain of ~4% in June.

Do you agree with the "decline to bid at this time"
approach?
```

K.G. agreed with Patel's recommendation. Later that day, J.L. of Teva sent the following notice to several Teva colleagues:

526

From:
Sent: Friday, December 06, 2013 2:27 PM
To:
Cc:                              Nisha Patel02
Subject: RE: Giant Eagle Cephalexin Offer


We've been informed that we will not be pursuing any business at this time on the Azithromycin OS.


As Greenstone recently took a price increase that will not be visible to the market until January, it's been decided to hold off until that time.  Once the information is available, we will consider a price increase and then attempt to revisit the opportunities.


The request was left open to see if we could supply for internal purposes only.


Please inform the customer that we are unable to provide an offer at this time.

That same day, Teva declined to bid on Azithromycin at multiple customers.

2301.    Over the next several months – during the period of time before Teva followed Greenstone's price increases – Teva continued to refuse to bid (and avoid taking Greenstone's market share) when requested by customers, for both Azithromycin formulations and Medroxyprogesterone Tablets. For example, on January 27, 2014, Teva was approached by a large wholesaler asking for bids on both Azithromycin Suspension and Medroxyprogesterone  due to a "Change in Market Dynamics." After speaking with Defendant Hatosy of Greenstone  for more than five (5) minutes that same day, Defendant Patel agreed with the recommendation not to provide a bid to that customer.

2302.    Similarly, on March 17, 2014 – which was the same day that Defendant Patel sent a nearly final price increase list to K.G. – Teva was approached by another wholesaler requesting a lower price for Azithromycin Oral Suspension. A national account executive at Teva asked Defendant Patel: "Can we provide any better pricing than Greenstone? . . . I know we have picked up our target share." Defendant Patel had spoken with Defendant Hatosy of Greenstone twice earlier that day, including one call lasting more

527

than fifteen (15) minutes. Patel's response to the national account executive was: "Let's talk tomorrow."

2303.    Consistent with the understanding between the two companies, Teva followed Greenstone's price increases for Azithromycin Oral Suspension, Azithromycin Suspension and Medroxyprogesterone Tablets on April 4, 2014. Defendant Patel spoke twice with Defendant Hatosy from Greenstone that same day.

### 3.    Actavis (Clarithromycin ER Tablets, Tamoxifen Citrate and Estazolam)

2304.    Teva and Actavis were coordinating about several drugs increased by Teva on April 4, 2014. One of them was Clarithromycin ER Tablets. As of December 2013, Teva, Actavis and Zydus were the only three generic manufacturers actively selling Clarithromycin ER.

2305.    On December 30, 2013, however, Cardinal approached Teva looking for a bid on Clarithromycin ER because Zydus was exiting the market. Teva informed Cardinal that it would not have adequate supply to be able to take on this additional market share until April 2014, but if Cardinal could wait until then for Teva to supply, Teva would make an offer. Cardinal agreed.

2306.    The Cardinal bid request was forwarded to Defendant Patel on the morning of January 2, 2014. At 9:37am that morning, L.R., a customer marketing manager at Teva, suggested providing an offer to Cardinal at "10% under market intel pricing for [the] Watson/Actavis product." L.R. also stated: "[i]f Cardinal is willing to wait until April, I suspect that Actavis isn't interested in picking up a lot of additional share."

2307.    Immediately after receiving that e-mail, at 9:40am, Defendant Patel called Defendant Rogerson at Actavis and the two spoke for more than seventeen (17) minutes. Shortly after hanging up the phone with Defendant Rogerson, at 10:12am,

528

Defendant Patel responded to the e-mail, saying: "I think we have an opportunity to go higher. Let's aim for around $148 net and request feedback."

2308. On January 9, 2014, Teva learned that Cardinal had accepted Teva's bid at the higher price. At 9:19am that morning, Defendant Patel called Defendant Rogerson at Actavis and they spoke for more than six (6) minutes. Shortly after that call, at 9:45am, Patel sent an e- mail internally at Teva stating: "It looks like Cardinal accepted our bid at the higher price. We may have an opportunity to take some increases."

2309. When Defendant Patel sent her supervisor the initial list of "Increase Potentials  Q1 2014" on January 14, 2014, Clarithromycin ER was on the list.

2310. Similarly, in March, 2014, Actavis implemented its own price increase on several other drugs, including some that overlapped with Teva. Consistent with the ongoing understanding between these high-quality competitors, Actavis understood that Teva would follow the increases or, at a minimum, would not poach Actavis customers after the increase.

2311. Following a now very familiar pattern, at 9:54am on March 14, 2014 Defendant Rogerson called Defendant Patel and left a message. Patel called Rogerson back at 10:31am, and the two spoke for more than twelve (12) minutes. Within minutes after hanging up with Rogerson, Patel informed others at Teva about the Actavis increase:

From: Nisha Patel02
Sent: Friday, March 14, 2014 10:47 AM
To: ███████████████████████████████████
Cc: Dave Rekenthaler; ███████████████████
Subject: Market Increases


NAMs,


I'm hearing that Actavis announced a bunch of price increases yesterday. Please share any intel you gather. I believe some of the products, that overlap with Teva, are as follows (not sure if there are any more):


Tamoxifen

Mirtazipine

Estazolam

In actuality, these increases would not become effective until April 15, 2014, again demonstrating that Teva knew in advance of its competitors' price increase plans.

2312.    Within half an hour of sending that e-mail, Defendant Patel instructed colleagues to add the Actavis drugs to the Teva price increase list. She added: "We intend to follow where we can."

2313.    Less than two hours later, at 12:37pm, Defendant Patel called Defendant Rogerson again. They spoke for more than five (5) minutes. Shortly after hanging up the phone, at 12:51pm, Patel wrote another e-mail to certain colleagues at Teva, stating: "Actavis took an increase. We will follow. We need to review price per my alert list. Let's wait to see what intel we can get and discuss Monday."

2314.    First thing the next business day – which was the following Monday, March 17, 2014 – Defendant Patel forwarded the "PI Candidates" list to K.G. at Teva. The list included both Tamoxifen Citrate and Estazolam. Later that morning, Defendant Patel called Defendant Rogerson. After quickly exchanging voicemails, they spoke for more than nineteen (19) minutes. Defendants Rekenthaler of Teva and Falkin of Actavis also

530

exchanged four (4) text messages that day, and had one call lasting more than six (6) minutes.

2315.     Teva followed the Actavis price increases on Tamoxifen Citrate and Estazolam less than three weeks later, on April 4, 2014. Defendants Patel and Rogerson spoke twice by phone that day. Defendants Rekenthaler and Falkin also spoke by phone that day. Because Teva was able to follow the price increase so quickly, Teva's increase became effective even before the Actavis price increase for those drugs.

2316.     After the price increases became effective, Teva took consistent steps not to disrupt the market or steal market share from Actavis. For example, on May 14, Defendant Patel declined to bid at ABC on both Tamoxifen Citrate and Estazolam, stating: "unable to bid (strategic reasons, for internal purposes)." When Defendant Patel and her other conspirators at Teva used the term "strategic" in this context, it was code for the fact that there was an understanding in place with a competitor.

2317.     Similarly, on May 21, 2014, Teva received a request from a large customer for a bid on Tamoxifen Citrate. As of that date, Teva had 58.4% of the market, and Actavis had 40.7%. A Teva analyst forwarded the request to Defendant Patel and others, recommending (pursuant to the fair share understanding in the industry) that Teva not bid "as we are first in a two-player market with good share already." Defendant Patel responded: "Agree. We should decline to bid."

### 4.  Multiple Manufacturers (Ketoconazole Cream and Tablets)

2318.     Defendant Patel identified Ketoconazole Cream  and Ketoconazole Tablets as  price increase candidates sometime in February 2014. They were not listed on her original "Increase Potentials" list that she sent to K.G. on January 14, 2014, but they were on the list of "PI Candidates" that she sent to a colleague on February 26, 2014, with

531

the following notes  about each:

| Ketoconazole  Cream | Shared with Taro and Sandoz |
|---|---|
| Ketoconazole  Tab | Shared with Taro, Mylan and Apotex |

2319.    Taro was a common competitor on both drugs, but there were different sets of competitors for each formulation. For Ketoconazole Cream, Teva's competitors were Taro and Sandoz. For Ketoconazole Tablets, Teva's competitors were Taro, Mylan and Apotex.

2320.    Teva led the price increases for both drugs, but made sure to coordinate with all of its competitors before (and as it was) doing so. On April 4, 2014 – the day of the increases – Patel spoke separately with both Defendant Aprahamian of Taro and CW-1 of Sandoz. During each call, she let them know that Teva was increasing the price of Ketoconazole. The same day, Defendant Rekenthaler spoke to Defendant Nesta of Mylan; he had previously communicated with J.H., a senior sales executive at Apotex, on March 20 and 25, 2014.

2321.    On Ketoconazole Cream, co-conspirators at Taro and Sandoz were also communicating directly with each other. On April 4, 2014, for example, Defendant Aprahamian spoke to CW-3 at Sandoz for nineteen (19) minutes. They discussed the Teva increase and the fact that Taro would follow. CW-3 then sent an e-mail internally at Sandoz, alerting colleagues  of the price increase and conveying information about Taro's price increase plans:

From: ▮▮▮▮▮▮▮
Sent: Friday, April 04, 2014 3:01 PM
To: ▮▮▮▮▮; Kellum, Armando; ▮▮▮▮▮▮▮▮▮▮▮▮▮
▮
Subject: Ketoconazole Cream Price Increase

As an FYI, Teva increased contract price and WAC on Keto Cream yesterday (tripled).  Taro will more than likely follow shortly.  We should determine if Teva had additional increases yesterday as well.

CW-1 at Sandoz immediately told his colleagues not to bid on any new opportunities for

the drugs, and instead put the products on "strict allocation" until Sandoz determined how to proceed.

2322. That same day, Defendant Aprahamian sent a similar e-mail internally to his colleagues at Taro.

2323. The following Monday, April 7, 2014, Taro received a request from a customer – the Minnesota Multistate Contracting Alliance for Pharmacy ("MMCAP"), a group purchasing organization acting on behalf of a number of States – seeking a competitive bid on Ketoconazole Tablets due to the Teva price increase. After reviewing the request, a Taro sales executive sent an internal e-mail stating: "we are not going to bid this product Taro has 27% share in a 4-player market." In a follow-up e-mail, E.G., a Director of Corporate Accounts at Taro, confirmed that Taro would decline to bid, but indicated that Taro would need to lie about the reason: "Yes, we are declining, but we need to advise its [sic.] due to supply."

2324. Four days after the Teva increase, on April 8, 2014, Defendant Aprahamian called Defendant Patel and the two spoke for more than nineteen (19) minutes. Later that same day, he initiated a price increase for all of Taro's customers on both the Ketoconazole Cream and the Tablets. Defendant Aprahamian directed that the notice letters be sent to customers on April 16, 2014, with an effective date of April 17, 2014.

2325. Although Sandoz immediately understood that it would follow these price increases, it was not able to implement them until October. The delay was due to the fact that Sandoz had contracts with certain customers that contained price protection terms which would impose substantial penalties on Sandoz if it increased its prices at that time – and those penalties would have caused Sandoz to miss certain financial targets during the months after April 2014. At Sandoz, senior management held monthly budget meetings

where they analyzed whether it made financial sense to implement a particular price increase. In this case, the ramifications of the price protection terms did not make sense for Sandoz to follow until October 2014.

2326.    In the months after the Teva and Taro increases, Teva held up its end of the agreement not to poach its competitors' customers. For example, on May 14, 2014, Teva was approached by Cardinal requesting a bid due to the Taro increase. The e-mail from Cardinal was forwarded to Defendant Patel, who responded immediately:

From:    Nisha Patel02
Sent:    Wed 5/14/2014 10:05 AM (GMT-05:00)
To:
Cc:
Bcc:
Subject: RE: Cardinal Ketoconazole CR NBO # 11796

Unable to bid at this time. For internal purposes, it is for strategic reasons.

Shortly before sending the e-mail, Defendant Patel exchanged several text messages with Defendant Aprahamian at Taro. She would ultimately exchange eight (8) text messages and had one phone call lasting more than four (4) minutes with Aprahamian on that day.

2327.    Later that same day, Defendant Patel also directed that Teva decline to bid for Ketoconazole at ABC, citing the same logic: "unable to bid (strategic reasons, for internal purposes)."

2328.    Sandoz ultimately followed the Teva and Taro increases for Ketoconazole Cream on October 10, 2014. That same day, Defendant Patel and CW-1 at Sandoz spoke for more than three (3) minutes.

2329.    The Teva increases on Ketoconazole were significant. For the cream, Teva, Taro and Sandoz all increased the WAC price by approximately 110%. For the tablets, Teva's WAC increases were approximately 250%, but its customer price increases were substantially larger – averaging 528%.

534

2330.    Following this first successful price increase, Defendants were able to increase prices again on Ketoconazole Cream when G&W entered the market. Consistent with the overarching Fair Share agreement, G&W entered the market at prices that were substantially higher than those charged by the existing manufacturers. Notwithstanding the fact that it was a new market entrant with a higher price, G&W was able to gain market share as Taro, Sandoz,  and Teva ceded market share to G&W. Further, Taro quickly matched G&W's price increase. Upon information and belief, this collusion was facilitated by communications between Aprahamian of Taro and high level executives at G&W.

### 5.  New Relationships Emerge

2331.    By early 2014, the generic drug industry was in the midst of a price increase explosion. In an internal Teva presentation given shortly after the April 2014 price increases – titled "2014 US Pricing Strategy" – Teva reflected on the current state of the industry, noting that the "[c]ompetitive landscape is supportive of price increases." In commenting on the future implications for Teva's pricing strategy, the company stated: "Mature competitors participate in price appreciation; immature competitors are starting to follow."

2332.    Understanding that many more competitors were enthusiastic about conspiring to raise prices, Teva began to develop new and additional relationships with certain competitors when implementing its April 4, 2014 price increases. Some illustrative examples are set forth below.

#### a)  *Breckenridge*

2333.    One of those new co-conspirators was Defendant Breckenridge. Defendant Patel already had a relationship with S.C., a senior sales executive at Breckenridge, and Defendant Rekenthaler had a relationship with D.N., another senior

sales executive at Breckenridge, so Breckenridge was a prime candidate to coordinate pricing.

2334.    On November 14, 2013, Breckenridge increased its pricing on both Estradiol/Norethindrone Acetate Tablets ("Mimvey") and Cyproheptadine HCL Tablets.[43] For Cyproheptadine, Breckenridge increased its WAC pricing by as high as 150%, and raised its customer contract pricing even higher – 400%. The increases to Mimvey were a more modest 20-27% for both the WAC and customer pricing.[44]

2335.    In the weeks leading up to those increases – when Defendant Patel was still out on maternity leave – Defendant Rekenthaler had several phone calls with D.N. at Breckenridge to coordinate the price increases. The two spoke twice on October 14, 2013 and had a twenty-six (26) minute call on October 24, 2013. After those calls, they did not speak again until mid- January 2014, when Teva began preparing to implement its increase.

2336.    Over the next several months – during the period of time before Teva was able to follow the Breckenridge price increases – Teva followed the "fair share" understanding to the letter.

2337.    With respect to Cyproheptadine HCL, Teva had approximately 54% market share in a two-player market. For that drug, Teva consistently refused to bid or take on any additional market share after the Breckenridge increase. For example, on February 7, 2014, a customer gave Teva an opportunity to pick up new business on Cyproheptadine. When she learned the news, Defendant Patel called S.C. at Breckenridge. They ended up speaking twice that day – the first and only phone calls ever between them. After speaking

---

[43] Breckenridge had acquired the ANDA for Cyproheptadine HCL Tablets in September 2013 from another manufacturer, and immediately sought to raise the prices previously charged by the prior manufacturer as it began to sell the product under its own label.

[44] As discussed above, Defendants Teva and Breckenridge had previously coordinated with regard to a price increase on Mimvey on July 31, 2012.

536

to S.C., Defendant Patel sent the following e-mail regarding the customer's request:

> From:    Nisha Patel02
> Sent:    Fri 2/07/2014 2:46 PM (GMT-05:00)
> To:      ▆▆▆▆▆▆▆▆▆
> Cc:
> Bcc:
> Subject: RE: Possible Indirect Additions - Safeway # 10769, 70, 71 & 72
>
> Let's hold off on providing a bid. We can provide a bid when we are in a position to do so (post increase).

2338.    With regard to Mimvey, however, Teva only had 19% market share in a two- player market. For that drug, Teva sought to pick a few customers to level the playing field – before raising its own prices to follow Breckenridge.

2339.    On April 4, 2014, Teva followed the Breckenridge price increases with substantial increases of Mimvey (contract increases of as much as 393%) and Cyproheptadine HCL Tablets (contract increases of as much as 526%). In addition, Teva increased the WAC price on Mimvey (Estradiol/Norethindrone Acetate Tablets) by 26% and the WAC price on Cyproheptadine HCL Tablets by as much as 95% — to exactly match Breckenridge's WAC price on both products.

### b)  *Rising*

2340.    Rising became a more appealing potential co-conspirator when CW-2, who had formerly been employed at Sandoz, left to join Rising in August 2013. Rekenthaler had known CW-2 for many years, going back to when they both worked together at Teva several years prior.

2341.    Of the drugs on the Teva April 4, 2014 price increase list, Rising was a competitor on Diflunisal. For that drug, Rising had 21% market share in a two-player market with Teva as of March 2014.

2342.    Defendant Rekenthaler spoke to CW-2 of Rising on December 5, 2013 for  fourteen (14) minutes. When Defendant Patel sent her initial list of "Increase

537

Potentials" to K.G. on January 14, 2014, Diflunisal was on the list, with Teva expecting to lead the increase.

2343.    Teva and Rising continued to coordinate the increase over the next several  months. For example, when Defendant Patel sent a nearly final list of "PI Candidates" to her supervisor K.G. on March 17, 2014, she included the following notation about Diflunisal:

| Diflunisal | Shared only with Rising |
|---|---|

That same day, Defendant Rekenthaler spoke with CW-2 twice. During those calls, CW-2 informed Defendant Rekenthaler that Rising was having supply problems for Diflunisal and might be exiting the market at some point in the future. CW-2 confirmed that it would be a good opportunity for Teva to take a price increase.

2344.    Defendant Rekenthaler and CW-2 spoke once again on March 31, 2014, shortly before the Teva price increase for Diflunisal. On April 4, 2014, Teva increased is WAC pricing on Diflunisal by as much as 30%, and its contract pricing by as much as 182% for certain customers.

2345.    Rising ultimately exited the Diflunisal market for a short period of time starting in mid-July 2014. When Rising decided to exit the market, CW-2 called Defendant Rekenthaler to let him know. Four months later – when Rising's supply problems were cured – Rising re- entered the market for Diflunisal. Consistent with the fair share principles and industry code of conduct among generic drug manufacturers discussed more fully above, CW-2 and Defendant Rekenthaler spoke by phone on several occasions in advance of Rising's re-entry to identify specific customers that Rising would obtain and, most importantly, to retain the high pricing that Teva had established through its price increase on April 4, 2014. On December 3, 2014, Rising re-entered the market for

Diflunisal Tablets. Its new pricing exactly matched Teva's WAC price increase from April 2014.

### c) *Versapharm*

2346.    On the April 4, 2014 Teva price increase list, Versapharm was a competitor on  two different drugs: Ethosuximide Capsules and Ethosuximide Oral Solution.

2347.    When Defendant Patel began creating the price increase list, neither of these drugs was considered a candidate for an increase. For example, when Defendant Patel sent her initial "Increase Potentials" list to K.G. in mid-January 2014, neither drug was on the list.

2348.    Versapharm was not considered a high-quality competitor. When Defendant Patel created the quality competitor rankings in May 2013, Versapharm was given a -2 score in the rankings. That did not stop Defendant Rekenthaler, however, from calling J.J., a senior national account executive at Versapharm, and speaking for five (5) minutes on January 22, 2014. When Defendant Patel sent the next "PI Candidate" list to a colleague on February 26, 2014 – Ethosuximide Capsules and Oral Solution were both on the list, with the following notation:

| Ethosuxamide Liquid | Shared only with Versa; test quality of competitor |
| Ethosuxamide Caps | Shared only with Versa; test quality of competitor; UNPROFITABLE |

2349.    Defendant Rekenthaler called again and spoke with J.J. at Versapharm on March 7, 2014. Teva then raised prices on both drugs on April 4, 2014. For Ethosuximide Capsules, Teva raised is WAC price by 87%, and its contract prices by up to 322%. For Ethosuximide Oral Solution, Teva raised its WAC price by 20% and its contract prices by up to 81%.

2350.    If Versapharm was being tested by Defendants Patel and Teva, it passed

with flying colors. On April 9, 2014 – only five days after the Teva increase – Versapharm increased its pricing on both Ethosuximide Capsules and Oral Solution to a nearly identical price to Teva.

2351.    Following their agreement on those two drugs, and with no reason to speak  further, Rekenthaler and J.J. of Versapharm never spoke by phone again.

### 6. Impact

2352.    A few weeks after Teva's April 4, 2014 price increases went into effect, Defendant Patel calculated the impact to Teva's net sales as a result of the April 4 increase. Based on her analysis, she found that the April 4, 2014 price increases resulted in a net increase in sales to Teva of $214,214,338 per year.

F. **August 28, 2014 Price Increases: Amiloride HCL/HCTZ Tablets, Amoxicillin/Clavulanate Chewable Tablets, Carbamazepine Chewable Tablets, Carbamazepine Tablets, Clemastine Fumarate Tablets, Clotrimazole Topical Solution, Desmopressin Acetate Tablets, Diclofenac Potassium Tablets, Disopyramide Phosphate Capsules, Enalapril Maleate Tablets, Epitol Tablets, Flurbiprofen Tablets, Flutamide Capsules, Fluvastatin Sodium Capsules, Hydroxyurea Capsules, Loperamide HCL Capsules, Penicillin VK Tablets, Prazosin HCL Capsules, Prochlorperazine Tablets, Topiramate Sprinkle Capsules, Warfarin Sodium Tablets**

2353.    On August 28, 2014, Teva raised prices on a number of different drugs, including those set forth below:

| Product Description | Competitors | % WAC Increase |
|---|---|---|
| AMILORIDE HCL/HCTZ TABLETS | Mylan (88%) | 50% |
| AMOXICILLIN/CLAV CHEW TABLETS | Sandoz (34%) | 25% |
| CARBAMAZEPINE CHEWABLE TABLETS | Taro (59%); Torrent (24.9%) | 270% |
| CARBAMAZEPINE TABLETS | Taro (52%); Torrent (3.2%); Apotex (3%) | 1538% |
| CIMETIDINE TABLETS | Mylan (58%); Apotex (0.4%) | 25% |
| CLEMASTINE FUMARATE TABLETS | Sandoz (13%) | 45% |
| CLOTRIMAZOLE TOPICAL SOLUTION | Taro (54%) | 208% |
| DESMOPRESSIN ACETATE TABLETS | Actavis (43%) | 75% |
| DICLOFENAC POTASSIUM TABLETS | Mylan (37%); Sandoz (13.5%) | 50% |
| DISOPYRAMIDE PHOSPHATE CAPSULES | Actavis (47%) | 100% |
| ENALAPRIL MALEATE TABLETS | Mylan (30%); Wockhardt (22.5%) | 230% |
| EPITOL TABLETS | Taro (52%); Torrent (3.4%); Apotex (3%) | 1538% |
| FLURBIPROFEN TABLETS | Mylan (41%) | 75% |
| FLUTAMIDE CAPSULES | Par (33%); Actavis (26.8%) | 140% |
| FLUVASTATIN SODIUM CAPSULES | Mylan (82%) | 32% |
| HYDROXYUREA CAPSULES | Par (64%) | 37% |
| LOPERAMIDE HCL CAPSULES | Mylan (56%) | 25% |
| PENICILLIN VK TABLETS | Sandoz (26%); Northstar (5.3%); Dava (4%); Aurobindo (3.6%); Greenstone (2%) | 100% |
| PRAZOSIN HCL CAPSULES | Mylan (71%); Mylan Inst. (0.5%) | 21% |
| PROCHLORPERAZINE TABLETS | Mylan (35%); Cadista (30.3%); Sandoz (11%); Mylan Inst. (0.3%) | 0% |
| TOPIRAMATE SPRINKLE CAPSULES | Zydus (81%); Actavis (3.5%) | 0% |
| WARFARIN SODIUM TABLETS 10MG 100 | Taro (57%); Zydus (16.2%); Upsher-Smith (5%); Amneal (0.4%); | 5% |

2354.    Following the normal pattern in the days and weeks leading up to the price increase, Defendants Patel and Rekenthaler were communicating with every high-quality competitor on those drugs to coordinate the increases in advance. At least some of those communications are set forth in the graphic below:



2355.   The day before the increase became effective – August 27, 2014 – Defendant Patel spent most of her morning discussing the price increases with her contacts at Sandoz, Actavis, Taro, Zydus and Glenmark:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 7:11:03 | 0:11:13 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 8:02:19 | 0:00:00 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 8:02:42 | 0:00:03 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 8:27:27 | 0:02:25 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 8:31:03 | 0:00:33 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 8:32:42 | 0:20:31 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 8:41:01 | 0:00:00 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 8:41:06 | 0:00:25 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 8:58:01 | 0:16:23 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 9:23:26 | 0:18:34 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Brown, Jim (Glenmark) | 10:34:34 | 0:00:06 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Incoming | Brown, Jim (Glenmark) | 16:29:08 | 0:07:52 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 17:09:15 | 0:00:06 |

2356.   In addition to those phone communications noted above, representatives

542

from Teva and every other defendant met in Boston, Massachusetts shortly before the increase, from August 23-26, 2014, for the NACDS annual event, which was the largest pharmaceutical industry meeting of the year. Defendants Cavanaugh, Rekenthaler and Patel, along with many other Teva executives, as well as executives from every other corporate Defendant, attended.

2357.    For those few drugs where the phone records do not identify direct communications between Teva executives and their competitors, these executives, at a minimum, communicated through other competitors.

2358.    For example, with regard to Enalapril, Defendant Patel was speaking to Defendant Aprahamian at Taro as shown above. Defendant Aprahamian, in turn spoke to M.C., the Vice President of Sales and Marketing at Wockhardt, on August 8, 2014 for thirteen (13) minutes, and again twice on August 14, 2014, including one call lasting eight (8) minutes.

2359.    Similarly, with regard to the drug Prochlorperazine, Defendant Rekenthaler communicated with Defendant Nesta at Mylan on August 7 and August 11, as shown above. Defendant Nesta, in turn, communicated with M.D., a senior sales executive at non-Defendant Cadista Pharmaceuticals, on the same days that he had been communicating with Defendant Rekenthaler.

2360.    A large number of the drugs on Teva's August 28, 2014 price increase list were selected because Teva was following a "high quality" competitor. The coordination between Teva and certain co-conspirators regarding those drugs is discussed more fully below.

### 1. Mylan

2361.    Effective April 17, 2014, Mylan increased its WAC pricing on a number

of different drugs, including several that overlapped with Teva. Mylan also increased its contract prices, but at least some of those price increases would not become effective until mid-May 2014.

2362.    Pursuant to the established understanding between the two companies, Teva immediately decided that it would follow the Mylan increases. On April 21, 2014, T.S., a national account executive at Teva, forwarded to Defendant Patel two spreadsheets with WAC and AWP pricing information for the price increases taken by Mylan. The spreadsheets were created by Mylan personnel.

2363.    Defendant Patel, in turn, forwarded the e-mail to the Teva sales team and stated: "Our intention is to follow Mylan on this increase. Below, you will see the list of increase items where Teva overlaps with Mylan. Please share any pricing intelligence you are able to obtain. Thank you in advance!" The list that Defendant Patel referred to included the following products, several of which had been the subject of coordinated price increases in 2013 as well: Amiloride HCL/HCTZ Tablets; Cimetidine Tablets; Enalapril Maleate Tablets; Fluvastatin Sodium Capsules; Loperamide HCL Capsules; Prazosin HCL Capsules; and Sotalol Hydrochloride Tablets.

2364.    Within days, Teva began receiving requests from its customers for bids due to the Mylan price increases. On April 24, 2014, Defendant Patel began to formulate a "Mylan Increase Strategy" in order to respond to those requests, but noted that Teva was "still awaiting intel" about the Mylan customer contract price points, which were not publicly available. Previously, Defendant Patel had relied on Defendant Kevin Green to obtain specific Mylan customer price points (referred to as "intel") through his communications with Defendant Nesta of Mylan, which she used to follow Mylan's pricing. The next day, in a follow-up e-mail about the Mylan strategy, Defendant Patel

544

noted that one of her Mylan increase strategies would not have been appropriate for this situation, and concluded that: "Plus, we really need some intel" about the Mylan contract price points.

2365.    Defendant Patel continued to push for specific contract price points from Mylan. On April 28, 2014, Patel sent an e-mail to the Teva sales team, stating: "To date, we have no intel on Mylan's recent increases. I realize there is a lot of travel going on, but whatever you can gather and share would be greatly appreciated."

2366.    On May 9, 2014, Defendant Patel sent another e-mail:

> From: Nisha Patel02
> Sent: Fri 5/09/2014 9:55 AM (GMT-05:00)
> To:
> Cc: Dave Rekenthaler;
> Bcc:
> Subject: Mylan Increase Intel
>
> NAMs,
>
> Sorry to be so persistent, but we have not received any Mylan price increase intelligence yet. Whatever you can gather and provide would be greatly appreciated. Our intention is to become better, quicker followers, but without intel, we are unable to do so.
>
> In fact, I cannot see Teva being able to follow in the next round of mass price changes (without any price points) at this point. Of course we can always follow by guessing, but it could cause needless price disruption in the market.
>
> Please send any intel to me and Tom.

Shortly after receiving that e-mail – at 11:15 a.m. that morning – Defendant Rekenthaler called Defendant Nesta at Mylan and left a message. Nesta returned the call at 11:23 a.m., and the two spoke for nearly eight (8) minutes.

2367.    Separately, and before Defendant Rekenthaler was able to convey any information he had obtained, Defendant Patel forwarded a customer request from ABC (relating to the Mylan increase items) directly to T.S. at Teva, lamenting the absence

545

of Defendant Green to obtain the Mylan intel:

I am in a really tough spot on these. Please help! There are several requests open for offers, but I have ZERO intel. A little frustrating/discouraging, as we are bound to hear complaints on how long it took to close the Delphi request. Is there anything you are able to get to help when you are back? . . . At some point, I know I'll have to find another source of magic :))

2368.    The next day, T.S. sent Defendant Patel an e-mail with an attached spreadsheet listing the Mylan contract price points for all of the recent increases:

```
From:           ██████████████████
Sent:           Tue 5/13/2014 1:34 PM (GMT-05:00)
To:             Nisha Patel02
Cc:
Bcc:
Subject:        FW: Dirt
Attachments:    Mylan-Price List A.xlsx


FYI
```

The e-mail was unclear on where T.S. had obtained this "dirt," but the spreadsheet attached to her e-mail was created by a Mylan employee.

2369.    Defendants Rekenthaler and Nesta spoke again on May 20, 2014. Armed with this new source of "intel," Defendant Patel was more confident that Teva could follow the Mylan price increases exactly, without disrupting the market. That same day, as Defendant Patel began to create a new list of Teva price increase candidates, she instructed a colleague to include the Mylan increase drugs – with specific price points – as its own separate tab in the spreadsheet, called "follow." Her colleague provided the list, as requested, on May 21.

2370.    On May 27, 2014, Defendants Rekenthaler and Nesta spoke twice, including one call lasting nearly four (4) minutes. By May 28, Teva had a much more comprehensive list of price increase items. On that list, seven of the Mylan items were prominently listed with a "Follow Urgent" notation listed next to each:

546

| Item Description | BUCKET | Comments |
|---|---|---|
| AMILORIDE HCL/HCTZ TABLETS 5/50MG 100 | Follow/Urgent | Follow Mylan Increase |
| AMILORIDE HCL/HCTZ TABLETS 5/50MG 1000 | Follow/Urgent | Follow Mylan Increase |
| CIMETIDINE TABLETS 300MG 100 | Follow/Urgent | Follow Mylan Increase |
| CIMETIDINE TABLETS 300MG 500 | Follow/Urgent | Follow Mylan Increase |
| CIMETIDINE TABLETS 400MG 100 | Follow/Urgent | Follow Mylan Increase |
| CIMETIDINE TABLETS 400MG 500 | Follow/Urgent | Follow Mylan Increase |
| CIMETIDINE TABLETS 800MG 100 | Follow/Urgent | Follow Mylan Increase |
| ENALAPRIL MALEATE TABLETS 2.5MG 100 | Follow/Urgent | Follow Mylan Increase |
| ENALAPRIL MALEATE TABLETS 2.5MG 1000 | Follow/Urgent | Follow Mylan Increase |
| ENALAPRIL MALEATE TABLETS 5MG 100 | Follow/Urgent | Follow Mylan Increase |
| ENALAPRIL MALEATE TABLETS 5MG 5000 | Follow/Urgent | Follow Mylan Increase |
| ENALAPRIL MALEATE TABLETS 10MG 100 | Follow/Urgent | Follow Mylan Increase |
| ENALAPRIL MALEATE TABLETS 10MG 1000 | Follow/Urgent | Follow Mylan Increase |
| ENALAPRIL MALEATE TABLETS 20MG 100 | Follow/Urgent | Follow Mylan Increase |
| ENALAPRIL MALEATE TABLETS 20MG 1000 | Follow/Urgent | Follow Mylan Increase |
| FLUVASTATIN SODIUM CAPSULES 20MG 30 | Follow/Urgent | Follow Mylan Increase |
| FLUVASTATIN SODIUM CAPSULES 20MG 100 | Follow/Urgent | Follow Mylan Increase |
| FLUVASTATIN SODIUM CAPSULES 40MG 30 | Follow/Urgent | Follow Mylan Increase |
| FLUVASTATIN SODIUM CAPSULES 40MG 100 | Follow/Urgent | Follow Mylan Increase |
| LOPERAMIDE HCL CAPSULES 2MG 100 | Follow/Urgent | Follow Mylan Increase |
| LOPERAMIDE HCL CAPSULES 2MG 500 | Follow/Urgent | Follow Mylan Increase |
| PRAZOSIN HCL CAPSULES 1MG 100 | Follow/Urgent | Follow Mylan Increase |
| PRAZOSIN HCL CAPSULES 1MG 1000 | Follow/Urgent | Follow Mylan Increase |
| PRAZOSIN HCL CAPSULES 2MG 100 | Follow/Urgent | Follow Mylan Increase / Exceed Hypothetical BWAC |
| PRAZOSIN HCL CAPSULES 2MG 1000 | Follow/Urgent | Follow Mylan Increase / Exceed Hypothetical BWAC |
| PRAZOSIN HCL CAPSULES 5MG 100 | Follow/Urgent | Follow Mylan Increase |
| PRAZOSIN HCL CAPSULES 5MG 250 | Follow/Urgent | Follow Mylan Increase |
| PRAZOSIN HCL CAPSULES 5MG 500 | Follow/Urgent | Follow Mylan Increase |
| SOTALOL HYDROCHLORIDE TABLETS 80MG 100 | Follow/Urgent | Follow Mylan Increase |
| SOTALOL HYDROCHLORIDE TABLETS 120MG 100 | Follow/Urgent | Follow Mylan Increase |
| SOTALOL HYDROCHLORIDE TABLETS 160MG 100 | Follow/Urgent | Follow Mylan Increase |
| SOTALOL HYDROCHLORIDE TABLETS 240MG 100 | Follow/Urgent | Follow Mylan Increase |

Also on the list were three additional Mylan drugs for which Teva would be leading the price increase: Diclofenac Potassium Tablets; Flurbiprofen Tablets; and Prochlorperazine Tablets.

2371.    With the list firmly squared away at the end of May, Defendants Rekenthaler and Nesta had no need to speak again until August, when Teva was preparing to implement the price increases. In the weeks leading up to the August 28, 2014 Teva price increases, Defendants Rekenthaler and Nesta spoke several times to coordinate, including at least the calls set forth below:

547

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 8/4/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Nesta, Jim (Mylan) | 0:01:00 |
| 8/4/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Nesta, Jim (Mylan) | 0:06:00 |
| 8/7/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Nesta, Jim (Mylan) | 0:14:00 |
| 8/11/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Nesta, Jim (Mylan) | 0:02:00 |
| 8/11/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Nesta, Jim (Mylan) | 0:06:00 |
| 8/18/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Nesta, Jim (Mylan) | 0:01:00 |
| 8/18/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Nesta, Jim (Mylan) | 0:13:00 |
| 8/21/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Nesta, Jim (Mylan) | 0:06:00 |

## 2. Taro

2372.    As discussed above, Taro implemented a substantial price increase on various formulations of Fluocinonide on June 3, 2014. In addition to Fluocinonide, Taro also significantly raised its prices on the following additional drugs, which overlapped with Teva: Carbamazepine Chewable Tablets, Carbamazepine Tablets, Clotrimazole Topical Solution and Warfarin Sodium Tablets.

2373.    Defendant Patel learned of the price increases for certain of these drugs in advance, based on her conversations with Defendant Aprahamian. It was understood that Teva would follow the Taro price increases based on these and prior conversations. In fact, Teva agreed and made plans to follow them before Taro had even put them into effect.

2374.    Specifically, on May 28, 2014, T.S. of Teva sent Defendant Patel the then-current version of her "Future Price Increase Candidate" spreadsheet.  That list included the following Taro drugs, which had not yet been increased by Taro:

| Item Description | BUCKET |
|------------------|--------|
| CARBAMAZEPINE TABLETS 200MG 100 | Follow/Urgent |
| CARBAMAZEPINE TABLETS 200MG 1000 | Follow/Urgent |
| CLOTRIMAZOLE TOPICAL SOLUTION 1% 10ML | Follow/Urgent |
| CLOTRIMAZOLE TOPICAL SOLUTION 1% 30ML | Follow/Urgent |

Defendant Patel likely obtained this information from Defendant Aprahamian on May 14, 2014, when the two exchanged eight (8) text messages and spoke for more than four (4)

548

minutes by phone.

2375. On June 3, 2014 – the date of the Taro price increases on Fluocinonide, Carbamazepine, Clotrimazole, Warfarin and other drugs – Defendants Patel and Aprahamian exchanged five (5) text messages. After exchanging those text messages, Defendant Patel confirmed to her supervisor K.G. and another Teva representative that Taro had in fact raised its pricing on Fluocinonide. Defendant Patel then added: "I expect to provide guidance at some point in the morning. I'm also hearing Warfarin, Carbamazepine as well. I'll be looking at shares and intel tomorrow and will provide commentary. (Taro is a high-quality competitor. It's just a matter of who the others are.)" At 5:08pm that evening, Defendant Patel called Defendant Aprahamian and the two spoke for nearly seven (7) minutes.

2376. First thing the next morning, Defendants Patel and Aprahamian exchanged two text messages. Then, at 9:56am, the two spoke again for almost twenty-six (26) minutes. Shortly after hanging up the phone with Defendant Aprahamian, Defendant Patel sent an e-mail to K.G. making it clear that she had obtained additional "intel" regarding the Taro price increases that she did not want to put into writing, stating: "I have additional intel (I can discuss with you) that will be useful."

2377. On June 12, 2014, Teva internally discussed future projections regarding Carbamazepine – including the fact that its API supplier might run out of supply sometime in 2015. One of the options discussed was a price increase. K.G. – aware that Defendant Patel had been in discussions with Defendant Aprahamian and had "intel" regarding the Taro price increase on Carbamazepine (and other drugs) – stated: "Nisha [Patel] would be able to provide guidance relative to [the Carbamazepine] price increase for the analysis being put together." In fact, Defendant Patel had communicated with Defendant

Aprahamian earlier that same day for more than nine (9) minutes.

2378.    One of the drugs that Taro increased on June 3, 2014 was Warfarin Sodium Tablets ("Warfarin"). Also known by the brand name Coumadin, Warfarin is a blood thinner medication used to treat and prevent blood clots.

2379.    As of June 2014, there were three competitors in the market for Warfarin: Teva, Taro and Zydus. Ten days after Taro increased its price, Zydus quickly followed with a price increase of its own on June 13, 2014. In the days between the Taro and Zydus price increases for Warfarin, Teva, Taro and Zydus coordinated through various phone communications with each other, including at least the following:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 6/4/2014 | Text | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 9:11:28 | 0:00:00 |
| 6/4/2014 | Text | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 9:16:52 | 0:00:00 |
| 6/4/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 9:56:52 | 0:25:57 |
| 6/11/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Green, Kevin (Zydus) | 4:37:00 | 0:08:00 |
| 6/11/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 15:36:37 | 0:00:07 |
| 6/11/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 15:42:26 | 0:14:31 |
| 6/12/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 7:57:50 | 0:09:18 |
| 6/13/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 8:13:10 | 0:16:38 |

2380.    On June 13, 2014 - the date of the Zydus increase on Warfarin- Teva was presented with an offer from a customer for a one-time buy on that drug. Defendant Patel responded that "[w]e will review, but note that we intend to follow [the] Taro and Zydus increase price." Later that same day, Defendant Patel sent an internal e-mail alerting her group, including her supervisor K.G., about a list of drugs on which Teva planned to raise prices. A number of them - including Carbamazepine Chewable Tablets, Carbamazepine Tablets, Clotrimazole Topical Solution, Fluocinonide Cream, Emollient Cream, Gel and Ointment, and Warfarin Sodium Tablets - included the notation "Follow/Urgent - Taro" as the reason for the increase. For that list of drugs, Defendant Patel directed that "we should not provide any decreases on these products." Defendant

Patel's directive meant that Teva would not seek to compete for market share against Taro or Zydus when approached by customers due to those competitors' price increases.

2381.     On June 18, 2014, Defendant Patel sent that same list to the entire sales team at Teva, informing them of the status of Teva's next price increase. She noted that Teva had already been "receiving multiple requests on several items that are prioritized as increase candidates." Defendant Patel continued: "While we do not have an exact date of increase, we are taking our increase plans into consideration and are bidding on new business at the planned increase price where our WAC allows." Finally, Patel stated:

> This is all in consideration of market factors, quality of competitors, current market share (including McK RFP results) and intelligence we have been able to gather. As you know, each situation is unique, but this should provide a high level overview.

Some of the "intelligence" referred to by Defendant Patel was gathered during a phone conversation she had with Defendant Aprahamian of Taro the day before, on June 17, 2014, which lasted more than fifteen (15) minutes.

2382.     The next day, Defendant Patel continued to gather "intelligence" and made concerted efforts to simultaneously coordinate with both Defendant Aprahamian and Defendant Green at Zydus. The timing and duration of those phone calls is set forth below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 8:38:09 | 0:00:01 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 8:41:07 | 0:00:04 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 13:56:47 | 0:00:00 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 14:08:53 | 0:00:00 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 14:24:45 | 0:00:09 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 14:25:32 | 0:00:04 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 15:40:08 | 0:00:00 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Incoming | Aprahamian, Ara (Taro) | 16:01:31 | 0:13:35 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 16:23:36 | 0:00:05 |
| 6/19/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 17:24:07 | 0:13:15 |

2383.     On August 28, 2014, Teva followed the Taro price increases on Carbamazepine Chewable Tablets, Clotrimazole Tablets, Clotrimazole Topical Solution,

and Warfarin Sodium Tablets. As discussed more fully above, Teva coordinated those increases with Taro (and Zydus) through direct communications with those competitors in the days leading up to the increase.

### 3. Zydus

2384. In addition to their agreement on Warfarin, Teva also agreed with Zydus to raise the price of Topiramate Sprinkle Capsules.

2385. Topiramate Sprinkle Capsules also known by the brand name Topamax, is a medication used to treat seizures caused by epilepsy, and also to treat migraine headaches. As of June 2014, Zydus and Teva had a large majority of the market share for Topiramate, while Actavis had just 3% of the market.

2386. In April 2014, Zydus raised its price for Topiramate Sprinkle Capsules. Defendant Patel was in frequent communication with Defendant Green at the time of the Zydus price increase.

2387. In the days leading up to the June 13 Zydus price increase on Warfarin, which is discussed more fully above, Defendant Kevin Green coordinated with both Defendant Patel and Defendant Rekenthaler at Teva, as set forth in the table below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 6/2/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Green, Kevin (Zydus) | 9:33:00 | 0:02:00 |
| 6/2/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 11:25:26 | 0:05:48 |
| 6/11/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Green, Kevin (Zydus) | 4:37:00 | 0:08:00 |
| 6/11/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 15:36:37 | 0:00:07 |
| 6/11/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 15:42:26 | 0:14:31 |
| 6/13/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 8:13:10 | 0:16:38 |

2388. Defendant Green was likely speaking to Defendants Patel and Rekenthaler about both Warfarin and Topiramate Sparkle Capsules during those calls because on June 13 – the same day the Zydus price increase on Warfarin became effective, and after the conversations noted above – Defendant Patel added Topiramate Sprinkle Capsules to Teva's price increase list, with a notation: "Follow/Urgent – Zydus." Two days

before that – the same day that Defendant Green had extensive phone calls with both Defendants Rekenthaler and Patel – Rekenthaler also spoke twice with Defendant Falkin of Actavis, the only other competitor in the market for Topiramate Sprinkle Capsules.

2389.    Teva followed the Zydus price increase for Topiramate Sprinkle Capsules on August 28, 2014. As noted above, Teva coordinated that increase with both Zydus and Actavis in the days and weeks before it.

### 4.  Competitors Follow Teva

2390.    For those drugs where Teva was leading the price increases on August 28, 2014, several of Teva's competitors followed in short order and those price increases were also coordinated.

2391.    For example, on October 10, 2014 Sandoz followed Teva's price increases on three drugs: (1) Amoxicillin/Potassium Clavulanate Chewable Tablets; (2) Diclofenac Potassium Tablets; and (3) Penicillin V Potassium Tablets. Following the normal pattern, Defendant Patel of Teva spoke to CW-1 of Sandoz on the day of the Sandoz price increases for more than three minutes.

2392.    Then, on December 19, 2014, Actavis followed the Teva price increase on Desmopressin Acetate Tablets. Defendants Rekenthaler of Teva and Falkin of Actavis spoke frequently in the days and weeks leading up to the Actavis price increase, including calls on November 18, November 21 and November 25, 2014.

2393.    Indeed, even before Actavis followed the Teva price increase, Teva knew that Actavis planned to increase. For example, on October 15, 2014 – approximately six weeks  before Actavis raised its price – Teva received a request from a customer asking Teva to reduce its pricing on Desmopressin Acetate because it was no longer offering competitive prices. Defendant Patel's initial response to the customer was "[w]e believe

the market is still settling on this product. Can you please review in a few days and advise of more current pricing intelligence?" In a subsequent internal discussion, Defendant Patel expressed how difficult it was to actually keep track of all of Teva's different collusive agreements, saying: "I can't quite recall if Actavis followed us or we followed them….but they definitely did not change their WACs recently."

2394. Similarly, on March 4, 2015, Mylan followed the Teva and Sandoz price increases on Diclofenac Potassium Tablets. Defendant Rekenthaler coordinated that price increase with Defendant Nesta of Mylan during two phone calls on February 18 and one call on February 19, 2015.

**G. January 28, 2015 Price Increases: Bethanechol Chloride Tablets, Ciprofloxacin HCL Tablets, Diltiazem HCL Tablets, Estradiol Tablets, Fluoxetine HCL Tablets, Glimepiride Tablets, Griseofulvin Suspension, Isoniazid, Ketoprofen Capsules, Ketorolac Tromethamine Tablets, Nortriptyline HCL Capsules, Propranolol**

2395. Shortly after the August 28, 2014 Teva price increases, Defendant Patel accepted a new position at Teva. She left her position in the pricing department to take on the role of Director of National Accounts at Teva. Her new position meant new responsibilities, necessitating more frequent travel to customer conferences and trade shows, giving her a greater opportunity to meet and collude face-to-face with competitors instead of over the telephone.

2396. When Defendant Patel left the pricing department at Teva her position was not re- filled. K.G., Patel's former supervisor, assumed her role and became the executive responsible for identifying price increase candidates and implementing price increases.

2397. On January 28, 2015, Teva raised prices on a number of different drugs. Teva's price increase spreadsheet – now maintained by K.G. at Teva – identified the

following drugs, among others, along with the price increase strategy and reasons for the increase:

| Product Description | Price Increase Strategy | Reason for Increase | Competitors |
|---|---|---|---|
| BETHANECHOL CHLORIDE TABLETS | Market Intel | Follow Competitor – Amneal | Amneal (65%); Wockhardt (14.9%); Rising (1.7%) |
| CIPROFLOXACIN TABLETS | 193% Increase | Follow Competitor – DRL & Actavis | Actavis (37%); Dr. Reddy's (23.3); Westward (11.2%); Northstar (5.6%); Pack (5.2%) |
| DILTIAZEM HCL TABLETS | 90% Increase | Lead – Semi-Exclusive | Mylan (41.8%) |
| ESTRADIOL TABLETS | 90% Increase | Lead – Semi-Exclusive | Actavis (12.3%); Mylan (3.1%) |
| FLUOXETINE HCL TABLETS | 612% Increase | Mylan (New Market Entrant) (6/23/2014) | Par (45.1%); Mylan (7.3%) |
| GLIMEPIRIDE TABLETS | 300% Increase | Follow Competitor – DRL | Dr. Reddy's (34%); Accord (17%); INT Labs (15.3%); Virtus (3.6%); BluePoint (2%) |
| GRISEOFULVIN SUSPENSION | 50% Increase | Follow Competitor – Actavis | Actavis (47.2%); Qualitest (14.1%); Perrigo (3.9%) |
| ISONIAZID TABLETS | 50% Increase | Lead – Limited Competition | Sandoz (21.2%); Lannett (3.4%) |
| KETOPROFEN CAPSULES | 90% Increase | Lead – Semi-Exclusive | Mylan (42.2%) |
| KETOROLAC TROMETHAMINE TABLETS | 90% Increase | Lead – Semi-Exclusive (Mylan Supply Issues) | Mylan (40%) |
| NORTRIPTYLINE HCL CAPSULES | 90% Increase | Lead – Cost of Goods Increased | Actavis (29.4%); Taro (4.8%) |
| PROPRANOLOL HCL TABLETS | Market Intel | Follow Competitor – Actavis | Heritage (28.5%); Actavis (21.2%); Qualitest (12.8%); Northstar (7.5%); Mylan (2.6%) |

2398. Consistent with their normal pattern, Defendants Patel and Rekenthaler communicated with a number of Teva's significant competitors about these drugs in the days and weeks leading up to January 28, 2015. The relevant phone communications between Teva and several of its competitors related to these drugs are set forth below:

Par:
Rekenthaler speaks to M.B. (Par) on 1/26 (14 minutes); Rekenthaler speaks to J.H. (VP of Sales at Par) on 1/28 (2 calls)

Amneal:
Patel speaks to S.R.(1) on 1/6 (51 minute call)

Taro:
Patel speaks to Aprahamian two times on 1/9/15

Dr. Reddy's:
Patel speaks to V.B. in June through October 2014 when Dr. Reddy's increases prices (see below)

| Product Description | Competitors |
|---|---|
| BETHANECHOL CHLORIDE TABLETS | Amneal (65%); Wockhardt (14.9%); Rising (1.7%) |
| CIPROFLOXACIN TABLETS | Actavis (37%); Dr. Reddy's (23.3); Westward (11.2%); Northstar (5.6%); Pack (5.2%) |
| DILTIAZEM HCL TABLETS | Mylan (41.8%) |
| ESTRADIOL TABLETS | Actavis (12.3%); Mylan (3.1%) |
| FLUOXETINE HCL TABLETS | Par (45.1%); Mylan (7.3%) |
| GLIMEPIRIDE TABLETS | Dr. Reddy's (34%); Accord (17%); INT Labs (15.3%); Virtus (3.6%); BluePoint (2%) |
| GRISEOFULVIN SUSPENSION | Actavis (47.2%); Qualitest (14.1%); Perrigo (3.9%) |
| ISONIAZID TABLETS | Sandoz (21.2%); Lannett (3.4%) |
| KETOPROFEN CAPSULES | Mylan (42.2%) |
| KETOROLAC TROMETHAMINE TABLETS | Mylan (40%) |
| NORTRIPTYLINE HCL CAPSULES | Actavis (29.4%); Taro (4.8%) |
| PROPRANOLOL HCL TABLETS | Heritage (28.5%); Actavis (21.2%); Qualitest (12.8%); Northstar (7.5%); Mylan (2.6%) |

Actavis:
Rekenthaler speaks to M. Falkin on 1/13, 1/14 (2 calls) and 1/16

Sandoz:
Patel speaks to CW-1 (Sandoz) on 1/22 (12 minute call)

Mylan:
Rekenthaler speaks to J. Nesta on 1/14 (2 calls) and 1/20

555

2399.    Upon information and belief, Defendant Patel also spoke in-person with many of these competitors. For example, in her new role as a Director of National Accounts, Defendant Patel personally attended the following trade association events and customer conferences in the fall of 2014 and winter of 2014-15: NACDS, Boston, MA (August 23-26, 2014); Econdisc Bidders Meeting, St. Louis , MO (September 17-19, 2014); PCMA Annual Meeting in Rancho Palos Verdes, CA (October 13-14, 2014); Anda Strategy Meeting, Miami, FL (October 26-29 , 2014); and the HOMA Round Table, Washington, DC (January 8, 2015). These industry events were all well-attended by Teva's competitors.

2400.    Some specific examples of Teva's coordination with competitors about its January 28, 2015 price increases are set forth below.

### 1.    Ciprofloxacin HCL and Glimepiride

2401.    Ciprofloxacin HCL Tablets, also known by various brand names including Cetraxal, Otiprio and Ciloxan, is an antibiotic that fights bacteria in the body. It is used to treat different types of bacterial infections, including skin infections, bone and joint infections, respiratory or sinus infections, urinary tract infections, and certain types of diabetes.

2402.    Glimepiride Tablets, also known by the brand name Amaryl, is a medication used to control high blood sugar in people with type 2 diabetes.

2403.    Dr. Reddy's significantly increased its pricing on both Ciprofloxacin HCL and Glimepiride on August 18, 2014. The increase to the Ciprofloxacin HCL WAC were 201%- 533% depending on the dosage strength. The increases to the Glimepiride WAC were approximately 300% for all dosage strengths.

2404.    In the days and weeks leading up to the Dr. Reddy's price increase for

Ciprofloxacin HCL and Glimepiride, V.B., a senior sales executive at Dr. Reddy's spoke frequently with Defendant Patel about the planned price increases. At least some of those phone communications are set forth below:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 7/10/2014 | Voice | Patel, Nisha (Teva) | Incoming | V.B. (Dr. Reddy's) | 13:28:12 | 0:12:14 |
| 7/18/2014 | Voice | Patel, Nisha (Teva) | Outgoing | V.B. (Dr. Reddy's) | 16:20:45 | 0:00:10 |
| 7/21/2014 | Voice | Patel, Nisha (Teva) | Incoming | V.B. (Dr. Reddy's) | 9:51:53 | 0:04:14 |
| 7/22/2014 | Voice | Patel, Nisha (Teva) | Incoming | V.B. (Dr. Reddy's) | 9:19:44 | 0:06:33 |
| 7/24/2014 | Voice | Patel, Nisha (Teva) | Outgoing | V.B. (Dr. Reddy's) | 10:31:30 | 0:00:04 |
| 7/24/2014 | Voice | Patel, Nisha (Teva) | Incoming | V.B. (Dr. Reddy's) | 10:40:28 | 0:04:03 |

2405. V.B. continued to communicate with Defendant Patel after the Dr. Reddy's price increases became effective, in the hope that Teva would quickly follow with its own price increases. The two exchanged four (4) text messages on August 25, 2014 – only three days before Teva's substantial price increase on August 28, 2014 (discussed above).

2406. Despite Dr. Reddy's best efforts, Teva was unable to add Ciprofloxacin HCL or Glimepiride to its August 28 price increase. On the same day that Teva sent its price increase notices out to its customers, T.W., a senior account executive at Dr. Reddy's, obtained a complete list of Teva's price increases (including a number of drugs not sold by Dr. Reddy's).

2407. Although unclear how T.W. obtained this information, the subject line of the e-mail clearly identified the information as "Confidential Teva increases." In her message to several other Dr. Reddy's colleagues, T.W. stated:

On Aug 28, 2014, at 4:11 PM, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮> wrote:

Hi All,
Teva had price increases today. No glimepiride though!
See products below.
Thanks,
▮▮▮▮

2408.    J.M., a senior marketing executive at Dr. Reddy's, replied: Thanks for sending. This was shown in the pricing compendium today. I was a little disappointed. However, some of the price increase[s] were led by other companies more than a month ago. So I am still hopeful they may follow." Dr. Reddy's anticipated that Teva would follow its price increases based on the understanding that had been reached between V.B. and Defendant Patel during their various conversations.

2409.    In fact, Teva did follow the Dr. Reddy's price increases – on both Ciprofloxacin HCL and Glimepiride – during its next round of price increases on January 28, 2015. In the interim, V.B. and Defendant Patel continued to communicate, exchanging four (4) text messages on October 10, 2014.

2410.    Actavis – the only other quality competitor in the market for Ciprofloxacin HCL – increased its pricing for that drug on December 19, 2014 to exactly match Dr. Reddy's WAC pricing. In the days leading up to the Actavis price increase, Defendant Rekenthaler of Teva spoke to Defendant Falkin of Actavis several times to coordinate the increase, including twice on December 17 (including one call lasting nearly nine (9) minutes) and once on December 18, 2014.

2411.    When Teva did follow the Dr. Reddy's (and Actavis) price increases on Ciprofloxacin HCL and Glimepiride, on January 28, 2015, Teva raised its WAC pricing to match Dr. Reddy's WAC prices exactly. That same day, Dr. Reddy's was (again) able to obtain a full copy of Teva's price increase list. That list included many drugs that Dr. Reddy's did not market.

### 2.    Griseofulvin

2412.    Griseofulvin Microsize Oral Suspension, also known by the brand name Griseofulvin V, is a medication used to treat fungal infections of the skin, hair

and nails that do not respond to creams or lotions. The medication works by stopping the growth of fungi.

2413.    On September 9, 2014, Actavis notified its customers of a price increase on Griseofulvin Microsize Oral Suspension. In the days leading up to September 9, 2014, Defendants Patel and Rekenthaler of Teva communicated with Defendants Falkin and Rogerson of Actavis to coordinate the increase. Some of those calls are detailed below:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 9/3/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 0:02:00 |
| 9/3/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 0:01:00 |
| 9/4/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Falkin, Marc (Actavis) | 0:01:00 |
| 9/4/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 0:01:00 |
| 9/4/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Falkin, Marc (Actavis) | 0:15:00 |
| 9/8/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 0:02:00 |
| 9/8/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 0:01:00 |
| 9/8/2014 | Voice | Rekenthaler, David (Teva) | Incoming | Falkin, Marc (Actavis) | 0:21:00 |
| 9/8/2014 | Voice | Rekenthaler, David (Teva) | Outgoing | Falkin, Marc (Actavis) | 0:05:00 |
| 9/9/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 0:04:32 |

2414.    The Actavis price increase for Griseofulvin became effective on October 6, 2014.

2415.    Teva promptly added Griseofulvin to its own price increase list, with the notation "Follow Competitor – Actavis" as the reason for the price increase.

2416.    Teva followed the Actavis increase for Griseofulvin during its next price increase event on January 28, 2015. As discussed above, in the days leading up to that price increase Defendants Rekenthale1· of Teva and Falkin of Actavis coordinated frequently. Teva's price increase for Griseofulvin Microsize Oral Suspension matched Actavis's WAC pricing exactly.

## XIV.    AFTER SUCCESSFULLY COLLUDING, DEFENDANTS' QUALITY RANKINGS IMPROVE

2417.    A little more than a year after she first circulated her Quality of Competitor List, Defendant Patel finalized an updated list on May 9, 2014. This updated list reflected changes in Teva' s conspiratorial relationships.

2418.    Although certain competitors retained a high-quality ranking throughout the entire relevant time period-like Defendants Mylan, Sandoz, Actavis and Taro - other competitors saw their ranking increase (sometimes dramatically) after successfully colluding with Defendant Patel or others at Teva on one or more drugs during the prior twelve-month period. These changes demonstrate that Teva's quality competitor rankings were, in reality a list of co- conspirators that Teva could trust to adhere to the illegal agreements.

### A. Apotex

2419.    Apotex, for instance, was one of Teva's two lowest-ranked competitors in May 2013 with a ranking of -3. When Defendant Patel updated her Quality Competitor rankings in May 2014, however, Apotex was rated +2 – an increase in five points over that twelve-month period.

2420.    Apotex made this jump in Teva's quality competitor rankings in large part due to Defendant Patel's relationship with B.H., a sales executive at Apotex, and the successful coordination between Apotex and Teva in 2013 on Pravastatin and Doxazosin Mesylate, discussed above.

2421.    As noted above, Defendant Patel revised her May 2013 price increase list on May 29, 2013 to add, inter alia, Pravastatin. The day before – May 28 – Apotex increased its price on Pravastatin by over 100%. Apotex's new, higher prices for Pravastatin exactly matched Glenmark's May 16, 2013 price increase.

2422.    In the days leading up to Defendant Patel's decision to add Pravastatin

to her list of price increase candidates – and Apotex actually increasing its prices – Defendant Patel communicated frequently with B.H. at Apotex. Between May 20 and May 24, 2013, the two spoke five (5) times.

2423.    Teva ultimately raised its prices on Pravastatin – to follow Glenmark, Apotex and Zydus – on August 9, 2013. In the days leading up to the Teva price increase, Defendant Patel spoke to B.H. at Apotex three (3) times to coordinate.

2424.    At the same time that Teva raised its prices on Pravastatin in August 2013, it also increased its pricing on Doxazosin Mesylate. Teva's new, increased price (a 1,053% increase) matched Apotex's (and Mylan's) recent price increases. Apotex itself had increased the price of this drug on July 23, 2013. B.H. of Apotex and Defendant Patel of Teva had one conversation the week before Apotex took the increase, in addition to coordinating before Teva followed on August 9, 2013.

2425.    Apotex soared dramatically in the quality competitor rankings for one additional reason: in April 2013, Apotex hired J.H. as a senior executive. Defendant Rekenthaler of Teva and J.H. began communicating regularly after J.H. was hired by Apotex. There is no record that they had ever communicated by phone before that.

2426.    That relationship continued through 2014. On April 4, 2014, Teva increased the price on Pentoxifylline by as much as 69%. Despite the fact that Apotex was the market leader at that time, Teva chose to lead the price increase on Pentoxifylline. In the weeks leading up to Teva's price increase, Defendant Rekenthaler of Teva engaged in numerous communications with J.H. at Apotex. The two spoke twice on March 7, 2014, for two (2) and three (3) minutes, respectively. They spoke again on March 20 for four (4) minutes, and again on March 25 for two (2) minutes. A week after Teva increased its price – on April 11, 2014 – they spoke again for five (5) minutes. During these calls, Defendant

561

Rekenthaler gathered Apotex's pricing plans and conveyed them to Defendant Patel.

2427.    As a result of Defendant Patel and Defendant Rekenthaler's successful coordination with Apotex executives, Defendant Patel dramatically increased Apotex's quality competitor ranking in May 2014.

### B. Zydus

2428.    Zydus – like Apotex – had been one of Teva's two lowest-ranked competitors in May 2013 with a ranking of -3. But, when Defendant Patel updated her quality competitor rankings in May 2014, Zydus was rated +2, an increase in five points over a twelve-month period. While Apotex's increase in the ranking was due to Teva's successful collusion with Apotex on several price increases in 2013 and 2014, Zydus's increase was more personnel- oriented: Defendant Kevin Green, who had himself conspired with a number of competitors while at Teva (at the direction of and in coordination with Defendants Patel and Rekenthaler at Teva, among others) moved from Teva to Zydus in November 2013. With Defendant Green firmly installed at Zydus, Defendant Patel was emboldened to more fully include Zydus in the conspiracy.

2429.    Defendant Patel's confidence was well-founded.  In the  year after Defendant  Green joined Zydus, the two companies successfully conspired to divide markets and allocate customers relating to Zydus's entry into the market for multiple drugs, including: Fenofibrate (February – March 2014), Paricalcitol (March – April 2014), Niacin (May – June 2014), and Etodolac ER (May – July 2014). These agreements are discussed more fully above.

2430.    Teva and Zydus also agreed to increase prices on Topiramate Sprinkles and Warfarin Sodium tablets. Zydus increased the price for both of those drugs on June 13, 2014. Teva followed with an increase on both drugs on August 28, 2014. With respect

to the Topiramate Sprinkles, Teva was explicit in its internal communications that its increase was to "follow competitor," namely Zydus.

2431.    In the days leading up to both companies' price increases, Defendants Green and Patel communicated frequently to coordinate the price increases. On June 19, 2014 – four days before Zydus increased its prices – Defendants Green and Patel spoke four (4) times. And on August 27, 2014 – the day before Teva raised its prices – Green and Patel spoke three (3) times.

2432.    Defendant Green was also communicating frequently with Defendant Rekenthaler of Teva around the time of the price increases on Topiramate Sprinkles and Warfarin Sodium tablets. On June 11, 2014, the two men spoke for eight (8) minutes. On August 20, the two exchanged an additional pair of phone calls.

2433.    Defendants Patel and Rekenthaler did not communicate with Defendant Green in isolation. The two Teva executives made sure to keep each other apprised of their conversations with competitors, including Green. In early 2014, Defendants Patel and Rekenthaler both worked largely out of Teva's home office. After either one of them engaged in a phone call with a competitor, he or she would be sure to provide an in-person debrief of the communication so as to avoid putting such information in writing.

2434.    Even before Defendant Green joined Zydus in November 2013, Teva had some success in coordinating price increases with Zydus.  As discussed above, Defendant Patel decided to add Pravastatin to her price increase list only after determining that Zydus agreed to the increase. In the week leading up to Defendant Patel's decision to revise her price increase list to include Pravastatin, Defendant Green (still at Teva) spoke to K.R. and M.K., both senior executives at Zydus.

2435.    Just two weeks later, on June 14, 2013, Zydus increased its price on

563

Pravastatin by over 150%. Defendant Green similarly had numerous conversations with Zydus executives in the week prior to that company's Pravastatin increase, as shown in the table below:

| Date | Call Typ | Target Name | Direction | Contact Name | Duration |
|------|----------|-------------|-----------|--------------|----------|
| 6/9/2013 | Voice | Green, Kevin (Teva) | Outgoing | M.F. (Zydus) | 0:12:00 |
| 6/10/2013 | Voice | Green, Kevin (Teva) | Outgoing | M.K. (Zydus) | 0:02:00 |
| 6/11/2013 | Voice | Green, Kevin (Teva) | Outgoing | K.R. (Zydus) | 0:01:00 |
| 6/11/2013 | Voice | Green, Kevin (Teva) | Outgoing | M.K. (Zydus) | 0:26:00 |
| 6/11/2013 | Voice | Green, Kevin (Teva) | Outgoing | M.K. (Zydus) | 0:03:00 |
| 6/12/2013 | Voice | Green, Kevin (Teva) | Incoming | K.R. (Zydus) | 0:22:00 |
| 6/12/2013 | Voice | Green, Kevin (Teva) | Incoming | K.R. (Zydus) | 0:14:00 |
| 6/12/2013 | Voice | Green, Kevin (Teva) | Incoming | K.R. (Zydus) | 0:01:00 |
| 6/13/2013 | Voice | Green, Kevin (Teva) | Outgoing | M.F. (Zydus) | 0:16:00 |

2436.    As noted above, Teva ultimately raised its prices on Pravastatin on August 9, 2013. At that time, Defendant Patel recommended that Teva follow the competitors that had already raised their prices - including Zydus. Prior to Teva raising its prices on August 9, 2013, Defendant Green spoke to K.R. at Zydus three times-twice on August 4, 2013 and once on August 5.

### C. Heritage

2437.    Heritage, like Apotex and Zydus, was not a highly-ranked competitor when Defendant Patel first created the quality of competitor ranking list in May 2013. Initially Defendant Patel gave Heritage a ranking of "0." However, when Patel updated her quality competitor rankings in May 2014, Heritage received the highest possible ranking of +3.

2438.    The reason for Heritage' s significant improvement in Defendant Patel's quality competitor rankings was the relationship that Defendant Patel established with the Vice President of Heritage, Jason Malek. After moving to Teva, Defendant Patel began communicating with Malek by phone as early as July 9, 2013. From that date until July 25, 2014, the two spoke by phone at least 37 times.

564

2439.    Heritage's successful effort to coordinate price increases with Teva on seven drugs - Acetazolamide, Glipizide-Metformin Glyburide, Glyburide-Metformin, Leflunomide, Nystatin and Theophylline - is described in the State AGs' Consolidated Amended Complaint dated June 15, 2018, MDL No. 2724, 2:17-cv-03768 (E.D. Pa.), which is incorporated herein by reference.

### D. Lupin

2440.    In Defendant Patel's initial May 2013 quality competitor ranking list, Defendant Lupin was given a ranking of +2. When Defendant Patel updated her quality competitor rankings a year later, Lupin received the highest possible rating of +3.

2441.    Defendant Lupin was awarded the highest score in the quality competitor ranking in 2014 because Defendant Berthold of Lupin earned Defendant Patel's trust by consistently agreeing to her price increase plans. From May 2013 through April 2014, for example, Defendants Patel and Berthold spoke at least 76 times by phone. Defendant Green, while still at Teva, also had a very strong relationship with Defendant Berthold. As discussed above, at times Defendants Patel and Green would even coordinate with each other regarding which one of them should coordinate a price increase or customer allocation agreement with Defendant Berthold.

2442.    As discussed more fully above, in 2013 – after Defendant Patel joined Teva – Teva and Lupin conspired to fix and raise prices on at least the following four drugs: Cefdinir Oral Suspension, Cefdinir Capsules, Cefprozil Tablets and Pravastatin. Then in early 2014, executives at the two companies coordinated Lupin's entrance into the market for Balziva.

2443.    The relationship was so strong between Teva and Lupin that even when Defendant Green left Teva, and Defendant Patel was out of the office on

565

maternity leave, Defendant Berthold still found other executives at Teva to communicate with regarding a price increase for the drug Cephalexin Oral Suspension. As discussed above, in October 2013 Defendant Berthold called Defendant Rekenthaler and T.S., a national account executive at Teva, to coordinate Lupin's November 1, 2013 price increase for Cephalexin Oral Suspension. When Defendant Patel returned from maternity leave and began planning the next round of Teva price increases, she continued these communications with Defendant Berthold until Teva followed Lupin's price increase on April 4, 2014.

2444.    Defendants Patel and Berthold also coordinated a price increase and market allocation scheme with regard to the drug Niacin ER, as Lupin was entering the market in March 2014. Given the successful track record between the two competitor companies, Lupin warranted a +3 in the quality competitor rankings when Defendant Patel updated them in May 2014.

### E. Par

2445.    In Defendant Patel's initial May 2013 quality competitor ranking list, Defendant Par was given a ranking of +1. When Patel updated her quality competitor rankings a year later, Par improved to a ranking of +2.

2446.    Defendant Par rose in the rankings largely because of several strong relationships between executives at the two companies. For example, T.S., a national sales executive at Teva, had a strong relationship with R.K., a senior sales executive at Par. The two began communicating by telephone in September 2013. Between September 2013 and May 2014, the two spoke at least twenty-seven (27) times by phone.

2447.    Similarly, Defendant Rekenthaler at Teva had a very strong relationship with another senior executive at Par, M.B. Rekenthaler spoke with M.B. frequently

throughout 2013 and 2014. From the beginning of 2013 through May 2014, Defendant Rekenthaler spoke to M.B. at Par at least thirty-two (32) times by phone.

2448.    Defendant Patel was well aware of these strong relationships, and relied on the information that T.S. and Defendant Rekenthaler obtained from their communications with senior Par executives in order to make pricing or bidding decisions for Teva's drugs. One such example occurred on Friday, February 7, 2014 when Teva received notice from a customer that it had received a competitive challenge from Par on the drug Labetalol HCL Tablets. Defendant Patel forwarded the e-mail to T.S. with three question marks:  "???"  T.S. responded immediately: "left message." The message that T.S. had left was for R.K. at Par, and the two executives spoke five (5) times that same day. After these calls with R.K., T.S. responded back  to Defendant Patel saying "[l]et's speak on Monday. Just received call back with more information."

2449.    The following Monday, Defendant Patel also forwarded the original e-mail (discussing the competitive challenge from Par on Labetalol) to Defendant Rekenthaler, saying "[n]eed to make a decision quickly." One (1) minute after receiving that e-mail, Defendant Rekenthaler called M.B. at Par and the two spoke for eighteen (18) minutes. Shortly after hanging up the phone with M.B., Defendant Rekenthaler sent another e-mail to Defendant Patel, stating: "[h]old off on this until I get back with you." Defendant Rekenthaler spoke to M.B.  again later that afternoon for three (3) minutes.

2450.    After these discussions between Teva and Par executives, Teva ultimately offered only a nominal price reduction to that customer – knowing that this would likely concede the business to Par.

2451.    As discussed more fully above, Teva continued to conspire with Defendant Par on various market allocation and price fixing schemes throughout the

remainder of 2014 and into 2015.

### F. Greenstone

2452.    Greenstone was not a highly-ranked competitor when Defendant Patel first created the quality competitor ranking list in May 2013. Defendant Patel had, at that time, given Greenstone a ranking of "0." However, when Defendant Patel updated her quality competitor rankings in May 2014, Greenstone improved to a +1 ranking.

2453.    One of the reasons for Greenstone's improvement in the rankings was Defendant Patel's developing relationship with Defendant Robin Hatosy, a national account executive at Greenstone. Defendants Patel and Hatosy were former co-workers at ABC, and had a longstanding relationship. From the time Defendant Patel started her employment at Teva in April 2013, through the time that she updated the quality competitor rankings in May 2014, Defendants Patel and Hatosy communicated by phone or text at least 66 times. Defendant Patel also spoke to Defendant Hatosy's supervisor, Defendant Jill Nailor of Greenstone, numerous times in early 2014 to coordinate Greenstone and Teva price increases and customer allocation agreements.

2454.    Defendant Patel and Defendant Hatosy of Greenstone spoke consistently at or around the time of every price increase effectuated by either company on drugs where they overlapped, including for example: July 3, 2013 – the day of Teva's price increase on Fluconazole; December 2, 2013 – the day that Greenstone sent notices to customers of its price increases on Azithromycin Suspension, Azithromycin Oral Suspension and Medroxyprogesterone; and April 4, 2014 – the day that Teva followed Greenstone's price increases on Azithromycin Suspension, Azithromycin Oral Suspension and Medroxyprogesterone.

2455.    Given the willingness of Greenstone's executives to coordinate price

568

increases with Teva, Defendant Patel increased Greenstone's quality competitor ranking in May 2014.

G. **Amneal**

2456.    In Defendant Patel's initial May 2013 quality of competitor ranking list, Defendant Amneal was given a ranking of +1. When Defendant Patel updated her quality competitor rankings a year later, Amneal improved to a ranking of +2.

2457.    One of the reasons why Defendant Amneal rose in the rankings was because of several strong relationships between executives at the two companies. For example, Defendant Rekenthaler of Teva had a strong relationship with S.R.(2), a senior sales executive at Amneal. From May 2013 to May 2014, they spoke eight (8) times by phone, and attended many trade association meetings and customer conferences together as well. Rekenthaler and S.R.(2) were regular participants in an annual golf outing hosted by a packaging contractor in Kentucky,  where – as discussed above – the generic drug manufacturer participants (competitors) played golf by day and gathered socially by night, referring to each other as "friends" and "fraternity brothers." (Defendants Green and Ostaficiuk were also participants.).

2458.    Similarly, Defendant Patel also developed strong relationships with two Amneal executives: S.R.(1), a senior sales and finance executive at Amneal, and S.R.(2). As discussed above, Defendant Patel and S.R.(1) coordinated price increases for the drugs Norethindrone Acetate (September 2014) and Bethanechol Chloride (January 2015).

2459.    Defendant Patel also spoke to S.R.(2) regarding Norethindrone Acetate in September 2014, and continued to communicate with S.R.(2) into at least 2015 – sometimes using alternative forms of communication. In addition to their cell phones, the two executives also used Facebook Messenger to coordinate anticompetitive conduct. In

the message exchange below, S.R.(2) informs Defendant Patel that Amneal will concede one customer – Econdisc ("E") – so long as Amneal is able to retain another large customer, Red Oak Sourcing ("RO"):



On the day of this message exchange, Defendant Patel and S.R.(2) also spoke by phone for nearly five (5) minutes.

### H. **Rising**

2460.    In Patel's initial May 2013 quality competitor ranking list, Rising was given a ranking of +1. When Defendant Patel updated her quality competitor rankings a year later, Rising improved to a ranking of +2.

2461.    Rising improved in the quality competitor rankings because of the relationship between Defendant Rekenthaler and CW-2. In 2013, CW-2 left Sandoz to join Rising. At that time, Rising was already preparing to enter the market for a drug called Hydroxyzine Pamoate. Teva was one of the competitors already in that market. During

several calls in early October 2013, CW-2 coordinated with Defendants Green and Rekenthaler of Teva to acquire a large customer and facilitate Rising's entry into the Hydroxyzine Pamoate market.

2462.    Later, in March 2014, CW-2 sought to return the favor. At that time, Rising experienced supply problems for the drug Diflunisal Tablets – a two-player market involving only Teva and Rising. In an effort to "play nice in the sandbox," and to further the ongoing understanding between the two competitors, CW-2 contacted Defendant Rekenthaler of Teva and informed him of Rising's supply problems and the fact that Rising may have to leave the market at some point in the future.  The purpose for the call was to alert Defendant Rekenthaler that Teva would have the opportunity to take a price increase, as Rising would not be in a position to take on any additional market share.

2463.    On April 4, 2014, Teva increased the price on Diflunisal Tablets (by as much as 182%), as well as Hydroxyzine Pamoate (by as much as 165%). In the weeks leading up to those price increases, Defendant Rekenthaler communicated several times with CW-2 at Rising to coordinate the increases. The two spoke by phone twice on March 17, 2014 and once on March 31.

2464.    When Rising decided to leave the Diflunisal market in mid-July 2014, CW-2 called Rekenthaler to let him know. Four months later – after Rising remedied its supply problems – Rising re-entered the market for Diflunisal. Consistent with the fair share understanding discussed above, and the rules of engagement that were generally followed in the industry, CW-2 and Defendant Rekenthaler communicated in advance of Rising's re-entry to identify specific customers that Rising would obtain and, most importantly, to ensure the retention of the high prices that Teva had established through its price increase in April 2014. On December 3, 2014, Rising re-entered the market for

571

Diflunisal Tablets. Its new pricing matched Teva's WAC price increase from April 2014.

2465.     Defendant Rekenthaler's successful efforts to coordinate price increases and customer allocation agreements with CW-2 of Rising led Defendant Patel to increase Rising's quality competitor ranking in May 2014.

## I.  Breckenridge

2466.     In Defendant Patel's initial May 2013 quality competitor ranking list, she gave Breckenridge a ranking of +1. When Defendant Patel updated her quality competitor rankings a year later, Breckenridge improved to a ranking of +2.

2467.     Breckenridge improved in the quality competitor rankings largely because of the strong relationship established between Defendants Patel and Rekenthaler and certain executives at Breckenridge, which led to several successful price increases.

2468.     For example, on November 14, 2013, Breckenridge increased the WAC pricing of both Mimvey and Cyproheptadine HCL Tablets. In the weeks leading up to those Breckenridge price increases, Defendant Rekenthaler communicated by phone several times with D.N., a sales executive at Breckenridge. The two spoke twice on October 14, 2013 and once on October 24, 2013. The call on October 24 lasted twenty-six (26) minutes.

2469.     On April 4, 2014, Teva followed the Breckenridge price increases on Mimvey Tablets (increasing the WAC pricing by over 100%) and Cyproheptadine HCL Tablets (increasing the WAC pricing by over 90%), to match Breckenridge's WAC pricing on both products. Teva raised prices even higher on its customer contracts. Teva increased the contract pricing of Mimvey by as much as 393%, and the contract pricing of Cyproheptadine HCL Tablets by as much as 526%, depending on the dosage strength.

2470.     As Defendant Patel planned for Teva's April 4, 2014 price increases, both she and Defendant Rekenthaler continued to communicate with their counterparts at

Breckenridge. Defendant Rekenthaler spoke to D.N. at Breckenridge on January 15, 2014 – the day after Defendant Patel sent her first list of "Increase Potentials Q1 2014" to K.G. – for nineteen (19) minutes. Similarly, Defendant Patel spoke with S.C. – a sales executive at Breckenridge – two times on February 7, 2014, as she was determining whether Teva should provide a bid to a customer. After her discussions with S.C., Teva declined to bid for the business in order to avoid taking market share away from Breckenridge as a result of the price increases.

2471.    As a result of the successful coordination of these price increases between Teva and Breckenridge, Defendant Patel increased Breckenridge's quality competitor ranking in May 2014.

### J.  Glenmark

2472.    Not every Teva competitor saw its quality competitor ranking increase between 2013 and 2014. Defendant Glenmark, for example, declined slightly in the rankings. In Defendant Patel's initial May 2013 quality competitor ranking list, Glenmark was given a ranking of +3. When Defendant Patel updated her quality competitor rankings a year later, Glenmark was given a ranking of +2.

2473.    The reason that Defendant Glenmark declined in the rankings was because Defendant Patel lost her most valuable relationship at that company – CW-5. CW-5 left Glenmark in April 2014. In the eleven-month period between Defendant Patel joining Teva in late April 2013 and CW-5 leaving Glenmark in April 2014, the two competitors communicated by phone or text message 121 times. They also communicated frequently using an encrypted messaging application, WhatsApp. As discussed more fully above, starting in early May 2013 Teva and Glenmark conspired to fix and raise prices on a number of drugs, including:  Adapalene, Nabumetone, Fluconazole Tablets, Ranitidine,

Moexipril, Moexipril HCTZ and Pravastatin.

2474.    In addition to CW-5, Defendant Patel also had other contacts at Glenmark – which is why Glenmark did not fall dramatically in the quality competitor rankings when CW-5 left the company. For instance, Patel exchanged 44 phone calls or text messages with J.C., a sales and marketing executive at Glenmark, between May 2013 and July 2015. Similarly, Defendant Patel exchanged 36 calls with Defendant Jim Brown, the Vice President of Sales at Glenmark, between August 2013 and October 2014. As discussed more fully above, Defendant Patel continued to coordinate with J.C. and Defendant Brown throughout 2014 on several drugs, including Kariva and Gabapentin Tablets – demonstrating that Glenmark remained a quality competitor even after CW-5 left the company.

### K. A Commitment To The Overcharging Conspiracy Was Instrumental To The Success Of The Price Fixing Agreements

2475.    As detailed above, the overall understanding among the co-conspirators required a commitment that each competitor was entitled to its "fair share" of a given market. When a competitor was satisfied that it had its "fair share" of a particular drug market, competition waned and prices rose. These "fair share" principles were the foundation upon which the price increases were built. So long as each competitor had its "fair share," no competitor was incentivized to compete for business when another competitor increased price. In short, competition resulted in lower prices; and as far as Defendants were concerned, nobody won in that scenario. Indeed, it was generally understood that when a competition increased price, the other competition in the same drug market would either decline to bid for the business or would bid high so as not to punish the party that took the price increase. Often, the competitor would then follow with a comparable price increase of its own.

574

2476.    There are numerous examples throughout this Amended Complaint of competitors refusing to compete in the face of a price increase so as not to "punish" the leader or "steal" market share. As just one example, when Defendant Teva was approached by a large retail customer in May 2013 to bid on a drug for which Defendant Greenstone had increased prices, Defendant Green expressed caution stating, "not sure I want to steal it on an increase." Teva later declined to bid on the business.

2477.    The concept of "fair share" and price increases went hand in hand.  For example, as discussed above the ongoing understanding between Defendants Teva and Sandoz that they would follow each other's price increases was predicated on the agreement that the follower would not poach the leader's customers after the increase. The same was true for the understanding between Sandoz and Mylan. As discussed above, Defendant Nesta specifically cautioned CW-4 that Mylan did not appreciate having its prices challenged after an increase – i.e., Mylan did not want Sandoz to steal its business by underbidding its customers. Similarly, Defendant Aprahamian of Taro often spoke with CW-3 of Sandoz about coordinating price increases between the two companies.[45] Almost invariably, he would conclude the conversations with phrases like "don't take my fucking customers," "don't take my business" or "don't be stupid."

2478.    Further, because of this "fair share" understanding, it was not essential for the competitors to communicate with each other in advance of every price increase, although they often did so anyway. So long as the competitor knew before it was approached by customers that the reason for the solicitation was due to a price increase by the incumbent supplier, the competitor knew not to compete for the business. Similarly,

___

[45] Although there are some examples of communications between Defendant Aprahamian and CW-3 discussed in this Complaint, as they relate to Teva drugs, many other collusive communications over a period of time, and the drugs they relate to, will be the subject of a subsequent complaint.

the competitor knew it would have the opportunity, which it often took, to follow the increase with a comparable price increase of its own.

### L. "Quality Competitor" Rankings Relate To Price Increases, But Even "Low Quality" Competitors Comply With The Overarching Conspiracy

2479.    As a further demonstration that the fair share understanding was universally accepted and understood in the generic pharmaceutical industry, even companies that Defendant Patel and Teva referred to as "low quality competitors" – because they were not viewed as strong leaders or followers for price increases – consistently complied with

#### 1.    Camber Pharmaceuticals, Inc. (and its President, Defendant Ostaficiuk) and Teva fix prices on Ranitidine HCL

2480.    When Defendant Patel first created the quality of competitor rankings in early May 2013, she gave Camber Pharmaceuticals a ranking of -2. When Defendant Patel revised those rankings one year later in May 2014, Camber's ranking did not change. It remained one of the lowest ranked of all of Teva's competitors.

2481.    Nonetheless, Camber adhered to the fair share understanding, and consistently applied those rules in dealing with its competitors.

2482.    This was evident when, in September 2014, Camber entered the market for two different drugs that overlapped with Teva.

2483.    One of those drugs was Raloxifene Hydrochloride Tablets ("Raloxifene"), also known by the brand name Evista – a drug used in the treatment of osteoporosis in postmenopausal women.

2484.    Teva had begun marketing Raloxifene in March of that year. Actavis had received approval to begin marketing Raloxifene in 2014 as well, but had not yet entered by September 2014.

576

2485. The other drug was a generic form of Lamivudine/Zidovudine – a combination medication also known by the brand name Combivir. Generic Combivir is used in the treatment of human immunodeficiency virus (HIV). Camber had received approval to market a generic form of Combivir in February 2014, but as of September 2014 was still in the process of entering the market. Already in the market were competitors Teva, Aurobindo and Lupin. As discussed more fully above, Defendants Teva, Lupin and Aurobindo agreed to divvy up the generic Combivir market in 2012 when Teva was losing exclusivity on that drug.

2486. As the anticipated product launches for Raloxifene approached, the new entrants discussed an allocation strategy with Teva to ensure they each received their fair share of the market. On September 9, 2014, Defendant Rekenthaler had a twenty-six (26) minute phone call with A.B., a senior sales and marketing executive at Actavis. A short time later, a Teva executive told colleagues that she had "just heard Camber and Actavis expect to launch 9/24."

2487. Teva's discussions with Actavis escalated over the coming week. On September 10, Defendant Rekenthaler exchanged two calls with Defendant Falkin of Actavis lasting fifteen (15) minutes and one (1) minute, respectively. On September 11, the men talked for ten (10) more minutes. On September 16, Defendant Rekenthaler spoke by phone a total of six (6) times with different Actavis personnel, including one call with A.B. lasting thirty-four (34) minutes.

2488. The following morning, in response to an inquiry regarding whether Teva intended to retain a major customer's Raloxifene business, K.G. of Teva replied in the affirmative. Defendant Rekenthaler then shared the information he had gathered through his communications with competitors: "I know Actavis will be late.  Camber is

talking but their [sic] being somewhat unclear as well. I'll know more about them after my trip this week." That same day, on September 17, 2014, Camber sent an offer for Raloxifene to a large Teva customer, Econdisc.

2489.    Defendant Rekenthaler and Defendant Kon Ostaficiuk, the President of Camber Pharmaceuticals, spent the next three days – September 17 through September 19 – playing golf during the day and socializing at night at an industry outing in Kentucky sponsored by a packaging vendor.

2490.    On September 21, 2014, Defendant Ostaficiuk called Defendant Rekenthaler and the two spoke for two (2) minutes. The next day, Rekenthaler initiated a series of four (4) phone calls with Defendant Ostaficiuk. The two spoke for a total of thirty (30) minutes that day. Notably, these are the first identified phone calls ever between the two competitors. As a result, Camber sent a revised offer to its potential customer that same afternoon, containing modified prices for Raloxifene.

2491.    On September 24, Defendant Patel discussed a Raloxifene allocation strategy with her Teva colleagues in light of Camber's offer to the large Teva customer, Econdisc. She emphasized Camber's expressed commitment to the overarching conspiracy among the competitors – and conveyed information she obtained from Defendant Rekenthaler during his conversations with Ostaficiuk – stating:  "Camber indicated that they are targeting Econdisc and a small retailer … and then they would be 'done.'"

2492.    As a part of this discussion, K.G. considered whether Teva should just concede Econdisc to Camber, and seek to recover that market share with another customer. At 9:07am that morning, Patel informed her supervisor K.G. and numerous others at Teva that Defendant Rekenthaler planned to discuss the matter with Camber:



From: Nisha Patel02
Sent: Wed 9/24/2014 9:07 AM (GMT-05:00)
To:
Cc: Dave Rekenthaler;
Bcc:
Subject: Re: Econdisc Raloxifene Intel

FYI, Dave is working on verifying the Camber price. Stand by.

Sent from my iPhone

2493. Indeed, at 9:28am that morning, Defendant Rekenthaler called Defendant Ostaficiuk and the two spoke for two (2) minutes. They spoke two more times that day, including one call that had lasted eight (8) minutes.

2494. Some of these calls also related to Camber's entry into the market for generic Combivir. Teva and Lupin were already in the market for generic Combivir, and Defendant Ostaficiuk was engaging in contemporaneous communications with Defendants Rekenthaler of Teva and Berthold of Lupin to negotiate Camber's entry into that market. At least some of those calls on September 24, 2014 are set forth below:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 9/24/2014 | Voice | Ostaficiuk, Kon (Camber) | Incoming | Rekenthaler, David (Teva) | 5:28:00 | 0:02:00 |
| 9/24/2014 | Voice | Ostaficiuk, Kon (Camber) | Outgoing | Rekenthaler, David (Teva) | 8:19:00 | 0:02:00 |
| 9/24/2014 | Voice | Ostaficiuk, Kon (Camber) | Outgoing | Berthold, David (Lupin) | 8:21:00 | 0:02:00 |
| 9/24/2014 | Voice | Ostaficiuk, Kon (Camber) | Incoming | Berthold, David (Lupin) | 8:23:00 | 0:10:00 |
| 9/24/2014 | Voice | Ostaficiuk, Kon (Camber) | Incoming | Rekenthaler, David (Teva) | 10:35:00 | 0:07:00 |

2495. On that same day, Defendant Berthold also spoke with P.M., a senior operations executive at Aurobindo, for more than eighteen (18) minutes, to close the loop on the generic Combivir communications.

2496. On September 25, after discussing with his colleagues which customers Teva should concede in order to give Camber its fair share of the Raloxifene market, and armed with information Defendant Rekenthaler had gathered from Camber's President, K.G. concluded: "Okay, we will concede additional smaller customer challenges (particularly distributors) since they are not going to target One Stop." Defendants Rekenthaler and Ostaficiuk spoke again twice that day.

579

2497.    That evening, a Camber executive instructed a colleague to gather market intelligence on possible additional customers for Camber's new Raloxifene product, but stressed that the company would not bid on any additional Teva accounts "until we know how we do with Econ[disc]."

2498.    On Friday, September 26, 2014, Camber publicly announced that it was launching Raloxifene, the generic version of Evista. Defendant Rekenthaler called Defendant Ostaficiuk that day, for a short one (1) minute call.

2499.    From those telephone calls, Defendant Rekenthaler expressed to Defendant Ostaficiuk that Teva did not want Camber challenging for any more of its customers, on Raloxifene or generic Combivir. As a result of this communication, on Monday September 29, 2014 Defendant Ostaficiuk sent the following e-mail to his colleagues at Camber:

| Message | |
| --- | --- |
| From: | Kon Ostaficiuk [/o=Camber Pharma/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=Kon Ostaficiuk] |
| on behalf of | Kon Ostaficiuk |
| Sent: | 9/29/2014 5:27:43 PM |
| To: | ▇▇▇▇▇▇▇ [/o=Camber Pharma/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=▇▇▇▇▇▇▇ [/o=Camber Pharma/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=▇ |
| CC: | ▇▇▇▇ [/o=Camber Pharma/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=▇▇ |
| Subject: | RE: McKesson -- dead net prices for OS w/ Riteaid |

Hi Gang,
We do not offer anything to any Teva customers...

Not even a "bad price"!

Please acknowledge...We do not want to upset them more!

Thank you,
Kon

2500.    A.R., a senior sales executive at Camber, replied: "We has not made any offers to any Teva Raloxifene accounts since we received the Econ award. Both Sales and Contracts are aware, & requesting incumbent detail for all offers, if Teva, no offer." A.R. also added that "We are also not seeking any Lupin business on Lamo/Zidovudine [aka

generic Combivir].” Defendant Ostaficiuk replied: “Thank you. We don't want to antagonize either of them and start a war…”

2501. About a week later, on October 7, 2014, McKesson, who was a Teva customer informed a Teva sales representative that Camber had made an unsolicited bid for its Raloxifene business. J.P., a Director of National Accounts at Teva, sent an e-mail to certain employees at Teva, including Defendant Rekenthaler, notifying them of her conversation with McKesson, and expressing surprise given the agreement Teva had previously reached with Camber: “I thought they were done after securing Econdisc?” Based on his prior conversations with Defendant Ostaficiuk, Defendant Rekenthaler doubted that Camber made an offer to another Teva customer, stating: “You're positive they sent them an offer?”

2502. Since it seemed that Camber was not sticking to the deal, Teva decided that they needed McKesson to give Camber a “message” that the “market should be stable at this point,” meaning that McKesson would tell Camber it was not supposed to be competing for further business. J.P. the Teva Director of National Accounts “relayed 'the message' re market should be stable” to an individual at McKesson, who said he would confirm “Camber intentions and why they said they would send an offer.”

2503. After further discussion with the customer, Teva staff learned that it was a misunderstanding. Camber never actually made the offer, but had instead complied with its agreement with Teva.

2504. The fair share agreement continued to govern as usual until mid-December 2014, when Camber learned of supply problems at Teva on Raloxifene. A Camber employee described the prospect of Teva being on backorder for this drug as a “Game changer.” Expressing her understanding of the rules of the conspiracy, she pointed

out: "Fair share only applies when there is not supply constraints." Defendant Ostaficiuk responded optimistically, but cautiously: "Good luck guys but go fishing and gather information before we commit."

## XV.    CONCIOUSNESS OF GUILT – DEFENDANTS AND THEIR EXECUTIVES KNOWINGLY VIOLATED THE ANTITRUST LAWS

2505.    The Defendants were aware that their conduct was illegal.  They all made consistent efforts to avoid communicating in writing, or to delete written electronic communications after they were made.  There are numerous examples, discussed throughout this Complaint, where Teva employees indicated they could not talk by e-mail, but had additional information that they could only convey personally.  This was part of a consistent effort by these individuals, as well as individuals at other corporate Defendants, to avoid putting incriminating information in writing, in order to evade detection.

2506.    Teva was aware of the antitrust laws, and paid them lip service in its Corporate Code of Conduct. For example, Teva's Code of Conduct from the summer of 2013 states specifically:



582

2507.    But high-level executives at Teva were aware that those laws were being violated systematically and egregiously, and never instructed Teva employees to stop or to rescind the agreements that Teva had reached with its competitors.

2508.    For example, when Defendant Patel started at Teva in late-April 2013, she immediately began ranking Teva's competitors by their "quality." "Quality" was nothing more than a euphemism for "good co-conspirator," and it was well known internally at Teva that Patel was identifying price increase candidates based on who Teva's competitors were for those drugs, and whether she or others at Teva had an understanding in place. Indeed, Patel already had a short list of price increase candidates in place on the day she started at Teva, which was based at least in part on conversations she had already been having with Teva's competitors before she started, including Defendant Ara Aprahamian at Taro.

2509.    As Defendant Patel was starting to create her ranking of quality competitors and identify candidates for price increases, she sent her very first iteration of the quality competitor ranking to her supervisor, K.G. – a senior marketing executive at Teva – on May 1, 2013. That ranking included, within the category of "Strong Leader/Follower," the following competitors: Mylan, Actavis, Sandoz, Glenmark, Taro and Lupin. The preliminary list of price increase candidates also included the formula that Defendant Patel would use to identify price increase candidates using the quality of competitor scores.

2510.    With K.G.'s approval of her methodology for identifying price increase candidates, Defendant Patel continued communicating with competitors and agreeing to price increases. She also routinely provided K.G. with intelligence that she had received from her communications with competitors. For example, when Patel sent her very first

formal "PI Candidates" spreadsheet to K.G. on May 24, 2013, she identified, for example, that the drug Nabumetone was a price increase candidate because, among other things, "Sandoz [was] also bidding high." For the drug Adapalene Gel, Patel noted that there were "[r]umors of a Taro increase" – even though Taro had not yet increased its prices for Adapalene Gel. Patel had obtained this competitively sensitive information directly from her communications with competitors.

2511.   K.G. immediately forwarded that information to Defendant Maureen Cavanaugh, the Senior Vice President of Sales at Teva, who approved of the price increases based on the reasoning that Defendant Patel provided for each drug. As discussed more fully above, Teva raised prices on those drugs (and others) on July 3, 2013.

2512.   Defendant Cavanaugh was well aware that Patel was communicating with competitors about price increases, and making recommendations based on those communications, because Patel told her so directly. For example, during a 2013 meeting of Teva sales and pricing personnel where Defendant Cavanaugh was present, Defendant Patel was discussing her communications with certain competitors about price increases when Defendant Cavanaugh smiled, put her hands over her ears, and pretended that she could not hear what was being said. Not once, however, did Cavanaugh ever tell Defendant Patel or anyone else at Teva  to stop conspiring with Teva's competitors or rescind the agreements that had been reached.

2513.   Patel continued to send intelligence that she had obtained from competitors to her supervisor, K.G. On August 7, 2013, Defendant Patel sent to K.G. a summary list of drugs slated for a price increase on August 9, 2013. In the "Reasons for Increase" column, Patel again included specific information that could only have come

from her communications with competitors, including:

| Product Category¤ | Reason for Increase¤ | |
|---|---|---|
| ETODOLAC ER TABLETS¤ | Follow Taro (likely to be this week with IR)¤ | |
| ETODOLAC TABLETS¤ | Follow Sandoz; Taro likely to follow this week¤ | |
| PRAVASTA TIN TABLETS¤ | Follow Glenmark, Zydus and Apotex. Lupin waiting on Teva.¤ | |

2514.   This time, K.G. – recognizing that it was inappropriate for Teva to have this information in writing – asked Defendant Patel to change those references above, to remove the offending language:

Under reasons, I would change to the following:

1. Etodolac ER : Follow Taro
2. Etodolac : Follow Sandoz; Taro increase anticipated.
3. Pravastatin : Follow Glenmark, Zydus, and Apotex. Lupin increase anticipated.

2515.   As discussed more fully above, Teva increased prices on those three drugs two days later. Not once did K.G. ever tell Defendant Patel to stop communicating with competitors, or to rescind any of the agreements she had reached on behalf of Teva.

2516.   Defendant Patel also spoke regularly to both Defendant Rekenthaler and Defendant Green about each others' communications with competitors. Patel was aware that both Rekenthaler and Green were communicating with competitors, sometimes at her direction. Defendants Green and Rekenthaler, in turn, were also both aware that Patel was communicating with competitors and implementing price increases based on those communications.

2517.   Defendant Rekenthaler – the Vice President of Sales at Teva – was aware that communicating with competitors about pricing and market allocation was illegal, and took steps to avoid any evidence of his wrongdoing. For example, as discussed more fully above, on July 15, 2013 CW-2 of Sandoz called Defendant Rekenthaler at Teva and left a

585

message. Rekenthaler called CW-2 back immediately and they had a three (3) minute conversation during which CW-2 asked Rekenthaler to provide him with a full, comprehensive list of all drugs that Teva had recently increased pricing on – not just those drugs where Teva overlapped with Sandoz. Rekenthaler complied. Understanding, however, that it was improper to share competitively sensitive pricing information with a competitor, and in an effort to conceal such conduct, Rekenthaler first sent the Teva price increase list from his work e-mail account to a personal e- mail account, then forwarded the list from his personal e-mail account to CW-2's personal e-mail account.

2518.    As another example, when Kevin Green wanted to speak with a particular competitor, he would routinely send a text message to that competitor, saying only "call me." Again, this was done to avoid putting any potentially incriminating communications in writing. Defendant Patel learned this technique from Defendant Green, shortly after starting at Teva, and adopted a similar strategy for communicating with competitors.

2519.    Armando Kellum of Sandoz was also aware that what he and others at Sandoz were doing was illegal. Kellum had received antitrust training, and knew that conspiring with competitors to fix or raise prices, or to allocate customers or markets, was a violation of the antitrust laws. Kellum would routinely admonish Sandoz employees for putting anything incriminating into e-mails, and voiced concern that the conduct they were engaging in – if discovered – could result in significant liability. As a result of Kellum's admonishments, Sandoz employees (including Kellum himself) routinely lied in e-mails about the sources of their information to camouflage their conduct, claiming they learned the information from a customer instead of a competitor.

2520.    Similarly, Jill Nailor of Greenstone instructed her subordinates to avoid

586

putting any sensitive market intelligence in writing.

**XVI.      THE GENERIC DRUG INDUSTRY WAS SUSCEPTIBLE TO COLLUSION**

2521.      Defendants' anticompetitive conduct alleged in the Complaint constitutes a conspiracy to fix prices and engage in market customer allocation, which is a per se violation of Section 1 of the Sherman Act. Therefore, Plaintiff need not define a relevant market. There are, however, features of the industry relevant to this case that show both (i) that the industry is susceptible to collusion, and (ii) that the price increases were in fact the result of collusion and not the result of mere parallel prices.

2522.      Indeed, the U.S. market for each of the Price-Fixed Generic Drugs has been characterized by numerous factors that facilitated Defendants' conspiracy, including: (i) industry concentration; (ii) sufficient numbers to drive competition; (iii) substantial barriers to entry; (iv) demand inelasticity; (v) lack of substitutes; (vi) interchangeability; (vii) absence of non- conspiring competitors; (viii) opportunities for contact and an extremely high level of inter-firm communications; (ix) the magnitude of the price increases; and (x) the reimbursement of generic drugs purchases by third parties.

2523.      Since 2005, consolidation has reduced the number of competitors in the generic drug industry, which has rendered the market ripe for collusion. For example: Teva acquired Ivax Corporation in 2006, Barr Laboratories in 2008 (including Defendant Pliva), Ratiopharm (Germany's second largest generic drug producer) in 2010, and Allergan's generics business (including Actavis) in 2016; Watson Pharmaceuticals acquired Andrx Corporation in 2006; Endo acquired Qualitest in 2010; Perrigo acquired Paddock Laboratories, Inc. in 2011; and Sandoz acquired Fougera in 2012. As a result of the industry-wide consolidation, for each of the Price- Fixed Generic Drugs, there were between two and ten manufacturers of the generic drugs for sale in the United States during

the time period relevant to Plaintiff's claims, thus rendering the market for each drug concentrated.

2524. Barriers to entry increase a market's susceptibility to a coordinated effort to maintain supracompetitive prices because it is difficult for new suppliers to enter the market and destabilize coordinated supracompetitive prices. Costs of manufacture, intellectual property, and expenses related to regulatory oversight create substantial barriers to entry in the generic pharmaceutical industry.

2525. Each of the Price-Fixed Generic Drugs is medically necessary to the health and well-being of the patient for whom it is prescribed. For that reason, each demonstrates substantial demand inelasticity. Indeed, notwithstanding the substantial price increases alleged in this Complaint, demand for each of the Price-Fixed Generic Drugs dropped very little following the increase in price.

2526. There are a lack of available substitute products for each of the Price-Fixed Generic Drugs, because patients face substantial barriers to switching to other drugs, and because patients often face little incentive to switch.

2527. Because a generic drug must be the therapeutic equivalent of its branded counterpart, each generic drug that is approved for sale in the United States is interchangeable with each other generic drug of the same dosage strength. For example, a 40 mg tablet of Pravastatin manufactured by Glenmark is interchangeable with a 40 mg tablet of Pravastatin manufactured by Teva. Accordingly, each of the Price-Fixed Generic Drugs is highly interchangeable from Defendant to Defendant, and the only way that a Defendant can gain market share is by competing on price.

2528. The Defendants control the markets for each of the Price-Fixed Generic Drugs, which enables them to increase prices without losing market share to non-

conspirators.

2529.    As alleged throughout this Complaint, there was a high level of interfirm communications within the generic pharmaceutical industry, and numerous opportunities for such communications through various trade association and similar meetings. The magnitude of the price increases involved in this case further differentiates them from parallel price increases.

2530.    As noted above, there are unique features of the generic drug industry, including the fact that reimbursement for generic drugs to retail pharmacies is limited by MAC pricing, which is based on the lowest acquisition cost for each generic pharmaceutical paid by retail pharmacies purchasing from a wholesaler for each of the a pharmaceutical's generic equivalent versions. There is therefore, in the absence of collusion, an enhanced incentive to compete on price within this reimbursement system.

## XVII.    DEFENDANTS' CONSPIRACY WAS EFFECTIVE AND IS STILL ONGOING

2531.    As a proximate result of this conspiracy, and during the time period relevant to Plaintiff's claims, Defendants and co-conspirators charged A&P and others in the United States supracompetitive prices (*i.e.*, prices above a competitive level) for each of the Price-Fixed Generic Drugs.

2532.    Defendants and co-conspirators' conspiracy alleged in this Complaint overcharged A&P on the Price-Fixed Generic Drugs that A&P directly and indirectly purchased from one or more Defendants and co-conspirators. Even in those instances in which a were able to negotiate Defendants down from the full overcharge agreed to by conspirators, Defendants' agreements still impacted and artificially elevated the prices paid by A&P, because each Defendant knew that A&P would not be able to obtain a competitive price from the Defendant's competitors for each Price-Fixed Generic Drug. Defendants

589

also knew that any new entrants to the market would also follow the conspiracy pricing (or even seek to  increase it further) based on the conspiracy's overarching market allocation agreement.

2533.     As further evidence that the price increases discussed above were not the result of normal market factors, the massive price spikes that were occurring in the industry in 2013 and 2014 slowed dramatically after the State of Connecticut commenced its antitrust  investigation  in  July  2014.  This  was  not  a  coincidence.  Generic  drug manufacturers in the industry – including the Defendants in this case – understood that they were under scrutiny and did not want to draw further attention to themselves.

2534.     In January 2015, Sandoz conducted an analysis of the price increases in the  generic drug industry in 2013 and 2014, with an early look toward 2015. In its report, Sandoz found that "[g]eneric drug price increases in 2013 and 2014 were very common." Specifically, the report stated: "For the years 2013 and 2014, there were 1,487 SKU 'large price increases' (WAC increase greater than 100%)[;] of this 12% (178 SKUs) were increased by more than 1000%."

2535.     The  report  went  on  to  state  that  "[t]he  number  and  level  of  price increases  declined noticeably in 4Q 2014." The following graphic, which was included in  the  Sandoz report, actually demonstrates that the number of price increases started to decline dramatically after the second quarter of 2014 – the same time that the State AGs commenced their investigation:

590



2536.    The massive price spikes in the industry may have declined, but the already-high prices for most of these drugs did not go down. To date, prices for many of these drugs remain at significantly inflated, anti-competitive levels.

2537.    As alleged in this Complaint, during the conspiracy, Defendants and co-conspirators applied the "fair share" overarching agreement to each of the Price-Fixed Generic Drugs. They were successful in achieving price increases on numerous drugs and on allocating markets for all Price-Fixed Generic Drugs, which enabled them to impose supracompetitive prices on A&P and others. Defendants' coordinated price increases and market allocation agreements provided them with a higher, unified starting point negotiating prices with A&P and others for each Price-Fixed Generic Drug than would have resulted if each Defendant had independently and unilaterally set its own price increases for each Price-Fixed Generic Drug.

2538.    The conspiracy alleged in this Complaint remains in either force of effect (or  both) as of the date Plaintiff filed this Complaint and Defendants continue to charge supracompetitive prices for each Price-Fixed Generic Drug as a result of the conspiracy alleged in this Complaint.

## XVIII.    THE STATUTE OF LIMITATIONS DOES NOT BAR PLAINTIFF'S CLAIMS.

### A.  The Statutes of Limitation Did Not Begin to Run Because Plaintiff Did Not and Could Not Discover Defendants' Unlawful Conspiracy

2539.    Plaintiff had no knowledge of the combination or conspiracy alleged herein, or  of facts sufficient to place them on inquiry notice of the claims set forth herein, until (at the earliest) Defendants' disclosures of the existence of the government investigations and subpoenas. Prior to that time, no information in the public domain or available to Plaintiff suggested that any Defendant was involved in a criminal conspiracy to fix prices for generic drugs.

2540.    Plaintiff had no knowledge of the combination or conspiracy alleged herein, or  of facts sufficient to place them on inquiry notice of the claims set forth against these  Defendants, until (at the earliest) the filing of the States' May 10, 2019 Complaint.

2541.    No information evidencing antitrust violations was available in the public domain prior to the public announcements of the government investigations that revealed sufficient information to suggest that any of the Defendants was involved in a criminal conspiracy to fix prices for generic drugs.

### A.  The Statute of Limitations Was Tolled on Numerous Grounds.

2542.    The statute of limitations as to Defendants and their co-conspirators' continuing antitrust violations alleged in this Complaint were tolled because of one or more of the following events:

2543.    The pendency of one or more Class Action Complaints, and any Amendments, against Defendants and their co-conspirators for conspiring to fix prices of each of the Price- Fixed Generic Drugs tolled the running of the statute of limitations on Plaintiff's claims.

2544.    On December 12, 2016, the DOJ filed an Information charging Glazer with the criminal offense of violating the U.S. antitrust laws by participating in a conspiracy to fix, raise and maintain the prices of generic Doxycycline and Glyburide sold in the United States. The Glazer criminal proceedings, and the Malek criminal proceedings that were filed one day later, toll the running of the statutes of limitation on Plaintiff's claims during the criminal proceedings and for one year thereafter by operation of federal statute, under 15 U.S.C. § 16(i).  The above Information charging Glazer was just the beginning of the DOJ Investigation, as the DOJ stated publicly at the time, and that Investigation is still ongoing.  Based on the Glazer Information, the statute of limitations has been tolled since December 12, 2016, allowing Plaintiff to pursue damages back to at least December 12, 2012.  However, the DOJ Investigation and the Investigation by the State Attorneys General commenced in 2014, which allows Plaintiff to pursue damages back to 2010.

2545.    Defendants' affirmative and fraudulent concealment of the conspiracy prevented Plaintiff from having notice of their claims more than four years before filing this Complaint, and tolled the statute of limitations on Plaintiff's claims.

2546.    Each of the overt acts in furtherance of the conspiracy alleged in this Complaint was done for the purpose of concealing the conspiracy and preventing Plaintiff and other purchasers of generic drugs from learning about the conspiracy's existence. Accordingly, Plaintiff did not know or reasonably suspect the existence of their claims

more than four years before filing this Complaint, nor were they aware of any facts more than four years before filing this Complaint that would have put them on reasonable notice of their claims. More than four years before Plaintiff filed this Complaint, Defendants and their co-conspirators fraudulently concealed the existence of Plaintiff's antitrust claim so that Plaintiff, acting as a reasonable person, did not know of the existence of its claim at the time.

2547.    During the time period relevant to Plaintiff's claims, including the time period more than four years before Plaintiff filed this Complaint, Defendants and their co-conspirators concealed the existence of Plaintiff's antitrust claims from A&P as a result of the self- concealing nature of the conspiracy; and/or because Defendants and their co-conspirators engaged in affirmative and deceptive acts of concealment as described below. As a result, Plaintiff did not know, and through the exercise of due diligence (which they exercised) could not have known, about the existence of its antitrust claims more than four years before filing this Complaint.

2548.    Defendants communicated with each other and within their organizations to actively conceal the conspiracy, by, among other actions, avoiding putting incriminating information in writing. For examples, Defendants undertook the following communications:

• Nailor of Greenstone instructing subordinates to avoid putting sensitive market intelligence in writing;

• Kellum of Sandoz routinely admonishing colleagues for putting incriminating information in e-mails and voicing concern that the conduct they were engaging in could lead to significant legal exposure;

• Teva's Green and Patel sending text messages to competitors saying "call me";

• Teva's K.G. instructing Patel to remove from an August 2013 e-mail information obtained from competitors about their price increase plans;

• Taro's Aprahamian instructing colleagues in May 2014 to avoid discussing fair share by e-mail and to discuss by phone instead;

594

• Citron instructing Heritage to communicate by phone and not through e-mail; and

• Sandoz avoiding "fair share" language in an internal presentation in May 2017.

2549.  During the time period relevant to Plaintiff's claims, A&P exercised diligence in an effort to ensure that the prices that it was paying Defendants for each generic drug that is the subject of claims in this Complaint were competitive. For example, A&P frequently submitted requests for competitive bids on each of the Price-Fixed Generic Drugs to Defendants. Unbeknownst to A&P, Defendants shared these requests for quotations and took steps to coordinate with their conspirators to ensure that the bids they provided in response to these requests were rigged and were not competitive.

2550.  Notwithstanding the self-concealing nature of their conspiracy, during the time period relevant to Plaintiff's claims, including more than four years before Plaintiff filed this Complaint, Defendants and their co-conspirators affirmatively misled A&P by wrongfully and affirmatively concealing the existence of Plaintiff's antitrust claims from A&P. In addition to the many overt acts alleged above that were undertaken for the purpose of concealing the conspiracy, Defendants took additional steps to conceal their illegal conduct from A&P and others. For example:

(a)  During the conspiracy alleged in this Complaint, and as alleged above,  Defendants and co-conspirators spoke and met in secret to affirmatively conceal the existence of the conspiracy from Plaintiff and others. For each of the numerous meetings between Defendants alleged in this Complaint, Defendants took steps to either conceal the existence of the meeting from Plaintiff or others, or to create a pretextual explanation for why the meeting occurred.

(b)  During the conspiracy alleged in this Complaint, Defendants made false and pretextual statements about the bids they provided to Plaintiff and others in response to requests from Plaintiff and others for competitive bids. For example, upon information and belief, when Cardinal requested that Heritage provide a competitive bid for Nimodipine in June 2012, Heritage made representations to Cardinal that the sham bid that Heritage submitted in response (and that Heritage had coordinated with Sun and Caraco in advance) was the lowest price that Heritage could provide. In reality, Heritage could have manufactured and sold the drug for substantially less than it quoted to Cardinal, but Heritage had agreed in advance with Sun and Caraco that Heritage would not submit a competitive price in response

595

to Cardinal's request. Accordingly, Heritage's false statements to Cardinal were intended to conceal from all purchasers of Nimodipine (and all other generic drugs) the existence of the conspiracy.

(c)    During the conspiracy alleged in this Complaint, Defendants took steps to ensure that their communications in furtherance of the conspiracy were not recorded in writing. For example, on April 19, 2013, Malek instructed his employees at Heritage not to keep in writing any evidence of the agreements that Heritage was negotiating (and that it would soon reach) with other Defendants relating to the Zoledronic Acid (and other drugs). Similarly, during the July 1, 2014 telephone conversation in which a senior sales executive at Heritage discussed the collusive price increases of Glyburide and Fosinopril HCTZ with a senior sales executive at Citron, the Citron representative told the Heritage representative not to communicate with Citron through e- mail.

(d)    During the conspiracy alleged in this Complaint, Defendants took steps to confine knowledge of the conspiracy to a small group of senior executives for the purpose (and with the effect) of concealing the conspiracy's existence. For example, during the same July 1, 2014 telephone conversation between Heritage and Citron, the Citron representative told the Heritage representative to communicate with a specifically designated employee of Citron that was fully briefed on the conspiracy.

2551.    Furthermore, Defendants lied to customers about why they increased prices or declined to submit bids. Examples include:

• In an April 2013 e-mail, Kellum of Sandoz told CW-4 that Sandoz could "blame supply" when declining to bid for Publix's business;

• In June of 2015, a Sandoz national account representative told a customer that Sandoz was declining to bid based on limited supply, when in fact the reason was the fair share agreement with competitors;

• Taro blamed supply for its decision not to submit a bid to MMCAP in April 2014, when in fact the reason the fair share agreement; and

• K.K. told a customer in July 2013 that Wockhardt was simply following a Mylan price increase, when in fact Wockhardt had coordinated with Mylan.

2552.    Defendants also lied to the public. For example, in December 2013, Sandoz received an inquiry from a Bloomberg reporter who questioned the propriety of Sandoz's recent price increases. Sandoz responded that it just "followed Mylan and Taro" and learned about their increases from "pricing services we subscribe to." In reality, Sandoz had coordinated the increases with Taro and Mylan in advance. In addition, Sandoz

closely coordinated with Novartis's media relations personnel to formulate responses to media inquiries in response to the dramatic price increases on generic drugs in 2014 and 2015 at issue in this case, which had the effect of concealing the fact that these increases were caused by Defendants' unlawful and anticompetitive activities.

2553.    During the conspiracy alleged in this Complaint, Defendants discussed and coordinated the timing of their price increase announcements for the purpose of making each price increase seem like it was each Defendant's independent decision to raise prices even though, in reality, it was not. For example, Sandoz and Mylan coordinated their price increases on Amitriptyline and Levothyroxine. For Levothyroxine, Mylan increased its prices on April 25, 2014, and Sandoz issued its matching price increase on May 23, 2014. Also on May 23, 2014, Sandoz increased its price for Amitriptyline, an increase that Mylan matched on July 16, 2014.  By staggering the announcement of these price increases, Sandoz and Mylan intended to convince generic drug purchasers such as Plaintiff and others that the latter price increase was the independent response to the initial price increase. As the allegations in this Complaint make clear though, Defendants actively discussed, coordinated, and agreed to these price increases in secret, in order to conceal the existence of the conspiracy.

2554.    During the conspiracy, including more than four years before Plaintiff filed this Complaint, Defendants and their co-conspirators' affirmative acts of concealment were intended by them to conceal the existence of their unlawful actions from Plaintiff; and Plaintiff was unaware, and had no reasonable basis to be aware, of Defendants and their co-conspirators' acts of concealment.

2555.    As a direct result of Defendants and their co-conspirators' affirmative and fraudulent acts of concealment alleged above, each Plaintiff did not have actual or

constructive knowledge of its antitrust claim, or the facts that might reasonably have led any Plaintiff (or a reasonable purchaser in Plaintiff's position) to discover or suspect that it had the antitrust claim against Defendants and their co-conspirators alleged in this Complaint, more than four years before Plaintiff filed this Complaint. Before then, Plaintiff was not aware of the facts that would have alerted it (or would have alerted a reasonably diligent purchaser in Plaintiff's position) of the need to investigate whether it had the antitrust claim alleged in this Complaint.

### B.  Spoliation of Evidence

2556.    Many of the individual Defendants, and others employees of the various corporate Defendants, took active steps to delete their conspiratorial communications with competitors, and destroy evidence of their illegal behavior.

2557.    For example, Defendant Nisha Patel produced text messages – in response to the State AGs' subpoena – going back as far as early 2014. Prior to producing those text messages, however, Patel had deleted all of her text communications with competitors from the same time period, including many text messages with individual Defendants Aprahamian, Brown, Cavanaugh, Grauso, Green, Nailor, Rekenthaler and Sullivan; and many other text messages with employees of corporate Defendants Dr. Reddy's, Glenmark (including CW-5), Greenstone (including Defendant Hatosy), Par, Sandoz, Upsher-Smith and Zydus.

2558.    Patel deleted these text messages after a conversation with Defendant Rekenthaler in early 2015, when Rekenthaler warned Patel to be careful about communicating with competitors.    Rekenthaler was aware of the government investigations that had been commenced, and told Patel that the government was showing up on people's doorsteps. Sometime after that, Patel deleted her text messages with

competitors.

2559.    Apotex also destroyed an entire custodial file for one of its key employees (B.H., a senior sales executive), after the State AGs requested it through an investigatory subpoena in July 2017. As discussed above, B.H. was involved in coordinating two significant price increases with Defendant Patel of Teva in 2013, which resulted in Apotex soaring in the quality competitor rankings. After the State AGs' subpoena was issued, Apotex destroyed B.H.'s custodial file – and did not inform the State AGs that it had done so for over a year.

## C. Obstruction of Justice

2560.    Many of the Defendants have been coordinating consistently to obstruct the ongoing government investigations and to limit any potential response. This coordination goes back at least as far as October 2014, when Congress first started investigating price increases in the generic drug industry.

2561.    For example, in early October 2014, Heritage received a letter from Representative Cummings and Senator Sanders as part of their inquiry into generic drug pricing. Heritage's outside counsel immediately set out to coordinate a response with counsel for Defendants Teva and Mylan, to provide what he referred to as "polite f-u" letters to Congress:

From:
To:          Jeff Glazer
CC:
BCC:
Subject:     RE: Letter to Mr. Glazer, President and Chief Executive Officer Heritage Pharmaceuticals Inc.
Sent:        10/3/2014 03:22:12 PM -0400 (EDT)
Attachments:
_____
Spoke with my colleague _____ in DC, who is doing the response letter for Mylan. Her husband works for _____ and he is doing the response for Teva.
They have both been in contact with GPhA on coordinating a response - and the consensus at this point is that the responses will be "polite f-u" letters.
She told me that Teva authorized _____ to schedule a conference call to coordinate the response and make sure everyone is on the same page.
She said the response can either be a ghost written letter on HPI letterhead or a letter from outside counsel. Just depends on your preference.
I'll keep you updated.

2562.    The coordination did not stop there. When the federal government executed a search warrant against Defendant Patel at her home on June 21, 2017, she immediately called Defendant Rekenthaler (from another phone because her phone had been seized) even though Rekenthaler was no longer employed at Teva and was by that point the Vice President of Sales at Apotex. Rekenthaler then immediately called Defendant Cavanaugh and C.B., another senior Teva executive. Rekenthaler spoke several times to Defendant Cavanaugh before then calling his own attorney and speaking twice. Later that day, Patel called Rekenthaler two more times to coordinate her response to the government.

2563.    Other Defendants took similar action in response to events in the State AGs' investigation. Several were speaking frequently at or around the time a subpoena was issued, or when the State AGs were engaging in substantive discussions with their counsel. As just one example, on July 17, 2018 the State AGs sent a subpoena to Defendant Grauso, through his counsel. That same day, Grauso spoke to Defendant Aprahamian for more than twelve (12) minutes. The State AGs then set up a conference call with Defendant Grauso's counsel for July 25, 2018. The day before that call – July 24, 2018 – Defendant Aprahamian spoke to his lawyer, and then shortly thereafter called Defendant Grauso. The next day, shortly after a conversation between the State AGs and counsel for Defendant Grauso, Defendants Aprahamian and Grauso spoke again, this time for nearly seven (7) minutes.

2564.    Accordingly, Defendants and their co-conspirators' fraudulent concealment of their unlawful conduct tolled the statute of limitations for each of Plaintiff's claims.

2565.    Plaintiff's claims have been brought within the applicable statute of

limitations period.

## XIX.    MARKET EFFECTS

2566.    The acts and practices of Defendants have had the purpose or effect, or the tendency or capacity, of unreasonably restraining competition and injuring competition by preventing competition for the numerous generic pharmaceutical drugs identified herein, and have directly resulted in an increase in consumer prices for those drugs.

2567.    By unreasonably and illegally restraining competition for the generic pharmaceutical drugs identified herein, Defendants have deprived A&P of the benefits of competition that the federal and state antitrust laws, consumer protection laws and/or unfair competition statutes and related state laws are designed to promote, preserve and protect.

2568.    As a direct and proximate result of the unlawful conduct alleged above, A&P was not and are not able to purchase the various generic pharmaceutical drugs identified herein at prices determined by a market unhindered by the impact of Defendants' anticompetitive behavior. Instead, they have been and continue to be forced to pay artificially high prices. Consequently, they have suffered substantial injury in their business and property in that, inter alia, they have paid more and continue to pay more for the various generic pharmaceutical drugs identified herein than they would have paid in an otherwise competitive market.

2569.    As a direct and proximate cause of the unlawful conduct alleged above, A&P has sustained injury.

2570.    Plaintiff does not have an adequate remedy at law. All conditions precedent necessary to the filing of this action have been fulfilled, waived or excused.

601

## XX.    ANTITRUST INJURY

2571.    Defendants' anticompetitive conduct had the following effects, among others:

A.    Price competition has been restrained or eliminated with respect to the generic drugs;

B.    The prices of generic drugs have been fixed, raised, stabilized, or maintained at artificially inflated levels;

C.    Plaintiff has been deprived of free and open competition; and

D.    Plaintiff has paid artificially inflated prices.

2572.    The purpose of the conspiratorial conduct of the Defendants and their co-conspirators was to raise, fix, or maintain the price of generic drugs. As a direct and foreseeable result, Plaintiff paid supra-competitive prices for generic drugs during the relevant period.

2573.    By reason of the alleged violations of the antitrust laws, Plaintiff has sustained injury to their businesses or property, having paid higher prices for generic drugs than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy and as a result have suffered damages.

2574.    This is an antitrust injury of the type that the antitrust laws were meant to prohibit.

## XXI.    ANTITRUST VIOLATIONS

A.    **Count 1 – Overarching Conspiracy On All Price-Fixed Generic Drugs For Direct Purchases under Section 1 of the Sherman Act Against Teva, Actavis, Akorn, Alvogen, Amneal, Aurobindo, Dr. Reddy's, Lannett, Lupin, Mylan, Par, Upsher-Smith, Wockhardt, Zydus, Aprahamian, Cavanaugh, Berthold, Falkin, Grauso, Green, Nesta, Ostaficiuk, Patel, Reckenthaler and Rogerson[46]**

---

[46] For purposes of this Count, Defendants Breckenridge, Greenstone, Emcure, Heritage, Pfizer, Sandoz, Fougera, Novartis, Sun, Taro, Glenmark, Jim Brown, Jill Nailor, Armando Kellum, and Robin Hatosy, should be included in the conduct alleged against Defendants but should be treated an unnamed Co-Conspirators for purposes of the relief sought under this Count.

2575. Plaintiff repeats and re-alleges paragraphs 1-2603 as if fully set forth herein.

2576. By no later than 2009, as alleged above, the market for manufacture, pricing and sale of Price- Fixed Generic Drugs had become conducive to cartelization. The Defendants' efforts to manipulate the pricing and sale of some Price-Fixed Generic Drugs as alleged above infected and over time spread to the pricing and sale of all Price-Fixed Generic Drugs as alleged above. Beginning at a time yet to be determined, but no later than 2009 and continuing in force or effect, or both, through the date of filing of this Complaint, the Defendants engaged in a continuing agreement, understanding and conspiracy not to compete on the sale of the Price- Fixed Generic Drugs in the United States in unreasonable restraint of trade and commerce in in violation of Section 1 of the Sherman Act.

2577. Each Defendant consciously committed to a common scheme, the ultimate objective of which was to cartelize the Price-Fixed Generic Drugs in order to achieve substantial supracompetitive profits. This objective was a common goal among all the Defendants. In furtherance of the scheme, each Defendant consciously committed to an overarching market allocation agreement that governed each of their respective market shares for the Price-Fixed Generic Drugs.

2578. Each Defendant had knowledge of the conspiracy to increase prices, allocate markets, rig bids, agree not to compete and decrease production for each of the Price-Fixed Generic Drugs, and each Defendant knowingly participated in the conspiracy's common goal of cartelizing the Price-Fixed Generic Drugs in order to achieve supracompetitive profits. Each Defendant's knowledge of the overarching conspiracy is demonstrated by the fact that the numerous collusive agreements reached in furtherance of the conspiracy were discussed at the same meetings and social gatherings, including the

industry meetings alleged in Exhibit 1. Further, this overarching conspiracy contemplated a continuous result that would not continue without the continuous cooperation of all Defendants.

2579. Every Defendant intended to join the all-Price-Fixed Generic Drugs conspiracy. The Core Conspirators, consisting of Actavis, Heritage, Mylan/UDL, Par, Sun, Taro, Teva/Pliva, and the Sandoz Defendants, engaged in the conduct alleged in this Complaint and directed the implementation of the all Price-Fixed Generic Drugs conspiracy. Each of these Core Conspirators played a prominent role in the overarching all-Price-Fixed Generic Drugs conspiracy. However, all Defendants named in this Complaint engaged in the conduct alleged in this Complaint and were active participants in the overarching conspiracy, despite the fact that some Defendants sold fewer Price-Fixed Generic Drugs than the Core Conspirators, and some only sold one Price-Fixed Generic Drug. However, the participation of all Defendants in the all- Price Fixed Generic Drugs conspiracy was necessary to increase the prices of the generic drugs that they manufactured. Absent the participation of all other Defendants, the Core Conspirators' efforts to increase the prices would have been thwarted because it would have been in the independent interests of their competitors to increase their market share by refusing to follow the price increases of the Core Conspirators. A single overarching market allocation agreement facilitated all of the collusive agreements alleged in this Complaint, and this overarching agreement was negotiated and policed through the industry meetings attended by all Defendants. In this way, and for the reasons explained below in ¶¶ 2611-2618, there was substantial overlap between all Defendants in the overarching conspiracy.

2580. By joining the all-Price-Fixed Generic Drugs conspiracy, the Defendants became interdependent upon one another, in that their respective benefit depended on the

success of the all-Price-Fixed Generic Drugs Conspiracy. Indeed, each of the conspiratorial price increases and price-fixing agreements alleged in this Complaint were interdependent for at least six reasons.

2581.    First, every agreement on each of the Price-Fixed Generics was interdependent because every agreement was the byproduct of the same overlapping overarching market allocation agreement. Indeed, the interdependent nature of these agreements was what allowed the Defendants to enforce and police every agreement reached in furtherance of the all-Price- Fixed Generics Conspiracy. For example, Defendants with a proportionately smaller market share of certain drugs agreed not to compete for additional market share in return for an agreement that their competitors would not compete for additional market share of other drugs for which they enjoyed a proportionately larger market share. Further, because each Defendant knew that its market share was safe from competition, market share itself became a fungible commodity that could be traded. For example, as alleged in ¶ 980, Mylan agreed to concede market share for Doxycycline to Heritage in consideration for Heritage conceding market share to Mylan for a second generic drug.

2582.    The overarching all-Price-Fixed Generics conspiracy also benefitted Defendants that manufactured just a few, or even just one of the Price-Fixed Generics. For example, as alleged in ¶¶ 1341-1346 when Strides sought to reenter the market for Hydralazine in 2014, it knew to approach Heritage and arrange to receive market share. Because Strides knew that Heritage – a Core Conspirator – would concede a customer to Strides, Strides was able to put in a bid to that customers at a supracompetitive price, comfortable in the knowledge that Heritage would concede the account and the inflated bid would be accepted. Similarly, when Mayne entered the Doxy DR market that had been

cartelized by Core Conspirators Heritage and Mylan, the overarching conspiracy allowed Defendants to reach an agreement that allocated to Mayne a percentage of the market and prevented price competition that would have disturbed the prevailing supracompetitive prices on Doxy DR. The portion of Doxy DR sales allocated to Mayne by agreement with Heritage and Mylan yielded profits sufficient to compensate Mayne for not competing on price to gain sales of Doxy DR at the supracompetitive price level.

2583.    In this manner, the existence of the overarching conspiracy permitted the Core Conspirators to induce the collusive agreements of all Defendants as needed to raise prices on each of the Price Fixed Generic Drugs. In other words, the Core Conspirators allocated sufficient sales to all other Defendants to incentivize and compensate them for adhering to the collusive scheme. Absent such compensation, non-conspiring manufacturers would have acted in their unilateral self interests by lowering their prices to gain profitable sales. For example, the existence of the overarching conspiracy allowed Core Conspirator Actavis to persuade Defendant Breckenridge to lead a series of collusive price increases on Propranolol capsules and to persuade Defendant Epic to raise its prices by more than 1000% on Ursodiol, notwithstanding the fact that the actions taken by Breckenridge and Epic were against their respective self-interests and would not have been taken absent collusion. Similarly, the existence of the overarching conspiracy facilitated the ability of Defendants, including Core Conspirators Actavis, Mylan, and Teva, to reach an agreement with Defendant Lupin to triple its prices on Pravastatin. In addition, the overarching conspiracy facilitated the collusive agreement of Defendants Morton Grove and Wockhardt to raise prices on Clobetasol, and Defendant Teligent's collusive agreement to raise prices on Econazole. Finally, although the Core Conspirators were the primary facilitators of the collusive conduct alleged in this Complaint, the success of the

606

overarching conspiracy was also dependent on the agreement (or understanding) that the other Defendants would participate in the overarching conspiracy as well. For example, Breckenridge's participation in the conspiracy was dependent on its knowledge – gained in part from attending the many industry events alleged in Section IX, supra – that each of the Defendants would follow the conspiracy's supracompetitive pricing and market allocation agreements in the event that any entered the market for Propranolol.

2584.    Second, the success of each conspiratorial price increase, each rigged bid, and/or each individual market allocation agreement was interdependent, because pursuant to the overarching conspiracy, a given Defendant's commitment to one price increase helped solidify and protect other conspiracy price increases that were implemented. For example, as alleged in ¶ 1283, Teva declined to offer a competitive bid to a customer that sought Glyburide based not only on its agreement with Heritage on Glyburide, but also based on its collusion with Heritage on other drugs discussed in this Complaint. In other words, Teva knew that undercutting the conspiratorial price increase on Glyburide would impact not only Glyburide, but also the conspiratorial price increases on other drugs. Because most Defendants manufactured multiple Price-Fixed Generic Drugs, a manufacturer who cheated on the conspiracy as to one Price-Fixed Generic Drug would be subject or susceptible to punishment by the cartel with respect to accounts for that drug, along with each of the other Price-Fixed Generic Drugs that the cheater manufactured. Thus, the overarching conspiracy enhanced Defendants' ability to enforce the conspiracy, both for conspirators that manufactured many Price-Fixed Generic Drugs, and for those that manufactured just one. For example, Mayne (which manufactured only Doxycycline) knew that Mylan and Heritage had an added incentive to follow through on the unlawful agreements on Doxycycline, which helped to ensure that Mayne also

607

committed to the conspiracy. Indeed, Mylan and Heritage shared a strong incentive to reward Mayne for its adherence to the overarching conspiracy.

2585.    Third, and along the same lines, the coordination of price increases and market allocation agreements across multiple Price-Fixed Generic Drugs allowed Defendants to police individual conspiratorial agreements and better conceal the conspiracy from Plaintiff and others. For example, Sandoz and Mylan coordinated their price increases on Amitriptyline and Levothyroxine. For Levothyroxine, Mylan increased its prices on April 25, 2014, and Sandoz increased its matching price increase on May 23, 2014. That same day, Sandoz increased its price for Amitriptyline, an increase that Mylan matched on July 16, 2014. By staggering these price increases in a "my turn, your turn" fashion, Sandoz and Mylan were able to ensure that each would follow through with its promise to increase prices (as they had unlawfully agreed), while avoiding announcing price increases on the same day or extremely close in time. And for the same reasons explained in ¶¶ 2611-2614 the ability of Core Conspirators such as Sandoz and Mylan to compel each other's compliance with the unlawful agreement helped to ensure that other Defendants, some of whom manufactured just one of the drugs subject to staggered price increases – such as Lannett (Levothyroxine) or Par (Amitriptyline) – would also commit to the unlawful agreement, because they were promised a sufficient volume of profitable sales to compensate for their forbearance.

2586.    Fourth, each successful conspiratorial price fixing agreement helped the Defendants by reducing the quantity produced of the drug, which in turn reduced demand for the raw materials required to manufacture that drug. Because all of the drugs involved in the conspiracy shared common inputs such as binding agents, the reduction in supply of Propranolol (for example) helped to reduce the demand for these inputs, which reduced the

cost to produce not only Propranolol, but also each of the other Price-Fixed Generic Drug that also used the same binding agents.

2587. Fifth, with each successful price increase, Defendants were able to commit a portion of their production capacity to a drug priced substantially above marginal cost. However, successful price increases also incentivized other manufacturers to substitute capacity towards the high margin drugs. Accordingly, it was necessary for Defendants to implement the numerous conspiratorial price increases and price-fixing agreements alleged in this Complaint, so that each member of the conspiracy could enjoy supracompetitive profits. Further, in the instances, if any, that Defendants determined that excess capacity was devoted to a particular drug, one conspirator would agree to discontinue production of that drug. For example, Fougera stopped production of Fluocinonide in January 2015, after the collusive price increase had been implemented on the drug. Similarly, Teva discontinued production of Doxy Hyclate in May 2013, after the collusive price increase had been implemented on the drug.

2588. Sixth, certain of the Price-Fixed Generic Drugs are subject to a degree of long-run demand-side substitution. For example, the topical corticosteroids – Fluocinonide, Desonide, and Clobetasol – are all used for similar purposes. The same is true of the oral diabetes drugs (Glipizide, Glyburide, Glyburide-Metformin, and Metformin ER). Accordingly, the success of certain of the conspiratorial price increases for the Price-Fixed Generic Drugs were relevant to the long-term success of other of the conspiratorial price increases.

2589. The contract, combination and conspiracy among Defendants consisted of a continuing course, pattern, and practice of conduct regarding the production, pricing, marketing, and/or sale of generic drugs in violation of Section 1 of the Sherman Act.

609

2590.	The course, pattern and practice of conduct described above included, among other things, a continuing agreement, understanding, and concert of action among Defendants, the substantial terms and purpose of which were one or more of the following:

a.	To fix, stabilize, maintain, and/or raise prices of the Price-Fixed Generic Drugs sold to A&P and others in the United States;

b.	To allocate customers, the volume of sales, and/or market shares of the Price-Fixed Generic Drugs sold to A&P and others in the United States;

c.	To control the production and/or sale of the Price-Fixed Generic Drugs to A&P and others in the United States; and/or

d.	To earn supracompetitive profits on the price of the Price-Fixed Generic Drugs sold to A&P and others in the United States that resulted from the collusion alleged in this Complaint.

2591.	In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants engaged in one or more of the following overt acts (including those overt acts alleged above in this Complaint):

a.	They agreed to exchange, and did exchange, current and future price information about the Price-Fixed Generic Drugs sold in the United States, including the prices quoted or charged to A&P for the sale of the Price- Fixed Generic Drugs;

b.	They agreed to coordinate, and did coordinate, price levels, price terms, and/or price movements for sale of the Price-Fixed Generic Drugs sold in the United States;

c.	They agreed on prices, price levels, and/or production levels of the Price-Fixed Generic Drugs in the United States; and/or

d.	They agreed not to compete for certain customers or sales on certain products, and/or in certain regions of the United States.

2592.	Defendants entered into and refined their illegal combination and conspiracy through, among other things, the overt acts described above, including, without limitation, participating in conversations and meetings to discuss the prices of the Price-Fixed Generic Drugs to be sold to A&P and/or others in the United States; participating in

610

conversations and attending meetings concerning implementation of and adherence to their conspiracy; issuing price announcements and/or price quotations in accordance with the conspiracy; and/or exchanging confidential information on the pricing and/or sale of the Price-Fixed Generic Drugs to A&P and/or others in the United States.

2593. As a result of this conspiracy in violation of Section 1 of the Sherman Act. and during the time period relevant to Plaintiff's claims:

a. Price competition in the sale of the Price-Fixed Generic Drugs among Defendants to A&P and others in the United States has been restrained, suppressed, and eliminated;

b. Prices for the Price-Fixed Generic Drugs sold by Defendants to A&P and others have been raised, fixed, maintained and/or stabilized at artificially high and supracompetitive levels throughout the United States; and

c. A&P and other direct purchasers of the Price-Fixed Generic Drugs produced and sold by Defendants have been deprived of the benefit of free and open competition.

2594. A&P was injured in its business or property by reason of the Defendants' antitrust violations in amounts not yet ascertained. A&P's injury as a direct purchaser of the Price-Fixed Generic Drugs is an injury of the type the antitrust laws were designed to prevent and flows from that which makes the Defendants' conduct unlawful.

**B. Count 2 – Overarching Conspiracy On All Price-Fixed Generic Drugs For Indirect Purchases under Certain State Antitrust and Consumer Protection Statutes Against All Defendants**

2595. Plaintiff repeats and re-alleges paragraphs 1-2603 as if fully set forth herein.

2596. By no later than 2009, as alleged above, the market for manufacture, pricing and sale of Price- Fixed Generic Drugs had become conducive to cartelization. The Defendants' efforts to manipulate the pricing and sale of some Price-Fixed Generic Drugs

611

as alleged above infected and over time spread to the pricing and sale of all Price-Fixed Generic Drugs as alleged above. Beginning at a time yet to be determined, but no later than 2009 and continuing in force or effect, or both, through the date of filing of this Complaint, the Defendants engaged in a continuing agreement, understanding and conspiracy not to compete on the sale of the Price- Fixed Generic Drugs in the United States in unreasonable restraint of trade and commerce in violation of the following state antitrust and consumer protection statutes:  Conn. Gen. Stat. §35-26 and §35-28; District of Columbia Code §28-4501; Md. Code Com. Law §11-204(a)(1); N.J. Statutes §56:8-1, et seq. and §56:8-107; New York General Business Law §340 et seq. and §349(h); 6 Del. Code §2511 et seq. (herein after referred to as "Certain State Antitrust and Consumer Protection Statutes").

2597.    Each Defendant consciously committed to a common scheme, the ultimate objective of which was to cartelize the Price-Fixed Generic Drugs in order to achieve substantial supracompetitive profits. This objective was a common goal among all the Defendants. In furtherance of the scheme, each Defendant consciously committed to an overarching market allocation agreement that governed each of their respective market shares for the Price-Fixed Generic Drugs.

2598.    Each Defendant had knowledge of the conspiracy to increase prices, allocate markets, rig bids, agree not to compete and decrease production for each of the Price-Fixed Generic Drugs, and each Defendant knowingly participated in the conspiracy's common goal of cartelizing the Price-Fixed Generic Drugs in order to achieve supracompetitive profits. Each Defendant's knowledge of the overarching conspiracy is demonstrated by the fact that the numerous collusive agreements reached in furtherance of the conspiracy were discussed at the same meetings and social gatherings, including the industry meetings alleged in Exhibit 1. Further, this overarching conspiracy

contemplated a continuous result that would not continue without the continuous cooperation of all Defendants.

2599.    Every Defendant intended to join the all-Price-Fixed Generic Drugs conspiracy. The Core Conspirators, consisting of Actavis, Heritage, Mylan/UDL, Par, Sun, Taro, Teva/Pliva, and the Sandoz Defendants, engaged in the conduct alleged in this Complaint and directed the implementation of the all Price-Fixed Generic Drugs conspiracy. Each of these Core Conspirators played a prominent role in the overarching all-Price-Fixed Generic Drugs conspiracy.  However, all Defendants named in this Complaint engaged in the conduct alleged in this Complaint and were active participants in the overarching conspiracy, despite the fact that some Defendants sold fewer Price-Fixed Generic Drugs than the Core Conspirators, and some only sold one Price-Fixed Generic Drug. However, the participation of all Defendants in the all- Price Fixed Generic Drugs conspiracy was necessary to increase the prices of the generic drugs that they manufactured. Absent the participation of all other Defendants, the Core Conspirators' efforts to increase the prices would have been thwarted because it would have been in the independent interests of their competitors to increase their market share by refusing to follow the price increases of the Core Conspirators. A single overarching market allocation agreement facilitated all of the collusive agreements alleged in this Complaint, and this overarching agreement was negotiated and policed through the industry meetings attended by all Defendants. In this way, and for the reasons explained below in ¶¶ 2611-2618, there was substantial overlap between all Defendants in the overarching conspiracy.

2600.    By joining the all-Price-Fixed Generic Drugs conspiracy, the Defendants became interdependent upon one another, in that their respective benefit depended on the success of the all-Price-Fixed Generic Drugs Conspiracy. Indeed, each of the conspiratorial

613

price increases and price-fixing agreements alleged in this Complaint were interdependent for at least six reasons.

2601.    First, every agreement on each of the Price-Fixed Generics was interdependent because every agreement was the byproduct of the same overlapping overarching market allocation agreement. Indeed, the interdependent nature of these agreements was what allowed the Defendants to enforce and police every agreement reached in furtherance of the all-Price- Fixed Generics Conspiracy. For example, Defendants with a proportionately smaller market share of certain drugs agreed not to compete for additional market share in return for an agreement that their competitors would not compete for additional market share of other drugs for which they enjoyed a proportionately larger market share. Further, because each Defendant knew that its market share was safe from competition, market share itself became a fungible commodity that could be traded. For example, as alleged in ¶ 980, Mylan agreed to concede market share for Doxycycline to Heritage in consideration for Heritage conceding market share to Mylan for a second generic drug.

2602.    The overarching all-Price-Fixed Generics conspiracy also benefitted Defendants that manufactured just a few, or even just one of the Price-Fixed Generics. For example, as alleged in ¶¶ 1341-1346 when Strides sought to reenter the market for Hydralazine in 2014, it knew to approach Heritage and arrange to receive market share. Because Strides knew that Heritage – a Core Conspirator – would concede a customer to Strides, Strides was able to put in a bid to that customers at a supracompetitive price, comfortable in the knowledge that Heritage would concede the account and the inflated bid would be accepted. Similarly, when Mayne entered the Doxy DR market that had been cartelized by Core Conspirators Heritage and Mylan, the overarching conspiracy allowed

Defendants to reach an agreement that allocated to Mayne a percentage of the market and prevented price competition that would have disturbed the prevailing supracompetitive prices on Doxy DR. The portion of Doxy DR sales allocated to Mayne by agreement with Heritage and Mylan yielded profits sufficient to compensate Mayne for not competing on price to gain sales of Doxy DR at the supracompetitive price level.

2603. In this manner, the existence of the overarching conspiracy permitted the Core Conspirators to induce the collusive agreements of all Defendants as needed to raise prices on each of the Price Fixed Generic Drugs. In other words, the Core Conspirators allocated sufficient sales to all other Defendants to incentivize and compensate them for adhering to the collusive scheme. Absent such compensation, non-conspiring manufacturers would have acted in their unilateral self interests by lowering their prices to gain profitable sales. For example, the existence of the overarching conspiracy allowed Core Conspirator Actavis to persuade Defendant Breckenridge to lead a series of collusive price increases on Propranolol capsules and to persuade Defendant Epic to raise its prices by more than 1000% on Ursodiol, notwithstanding the fact that the actions taken by Breckenridge and Epic were against their respective self- interests and would not have been taken absent collusion. Similarly, the existence of the overarching conspiracy facilitated the ability of Defendants, including Core Conspirators Actavis, Mylan, and Teva, to reach an agreement with Defendant Lupin to triple its prices on Pravastatin. In addition, the overarching conspiracy facilitated the collusive agreement of Defendants Morton Grove and Wockhardt to raise prices on Clobetasol, and Defendant Teligent's collusive agreement to raise prices on Econazole. Finally, although the Core Conspirators were the primary facilitators of the collusive conduct alleged in this Complaint, the success of the overarching conspiracy was also dependent on the agreement (or understanding) that the

615

other Defendants would participate in the overarching conspiracy as well. For example, Breckenridge's participation in the conspiracy was dependent on its knowledge – gained in part from attending the many industry events alleged in Section IX, supra – that each of the Defendants would follow the conspiracy's supracompetitive pricing and market allocation agreements in the event that any entered the market for Propranolol.

2604.     Second, the success of each conspiratorial price increase, each rigged bid, and/or each individual market allocation agreement was interdependent, because pursuant to the overarching conspiracy, a given Defendant's commitment to one price increase helped solidify and protect other conspiracy price increases that were implemented. For example, as alleged in ¶ 1283, Teva declined to offer a competitive bid to a customer that sought Glyburide based not only on its agreement with Heritage on Glyburide, but also based on its collusion with Heritage on other drugs discussed in this Complaint. In other words, Teva knew that undercutting the conspiratorial price increase on Glyburide would impact not only Glyburide, but also the conspiratorial price increases on other drugs. Because most Defendants manufactured multiple Price-Fixed Generic Drugs, a manufacturer who cheated on the conspiracy as to one Price-Fixed Generic Drug would be subject or susceptible to punishment by the cartel with respect to accounts for that drug, along with each of the other Price-Fixed Generic Drugs that the cheater manufactured. Thus, the overarching conspiracy enhanced Defendants' ability to enforce the conspiracy, both for conspirators that manufactured many Price-Fixed Generic Drugs, and for those that manufactured just one. For example, Mayne (which manufactured only Doxycycline) knew that Mylan and Heritage had an added incentive to follow through on the unlawful agreements on Doxycycline, which helped to ensure that Mayne also committed to the conspiracy. Indeed, Mylan and Heritage shared a strong incentive to

616

reward Mayne for its adherence to the overarching conspiracy.

2605.    Third, and along the same lines, the coordination of price increases and market allocation agreements across multiple Price-Fixed Generic Drugs allowed Defendants to police individual conspiratorial agreements and better conceal the conspiracy from Plaintiff and others. For example, Sandoz and Mylan coordinated their price increases on Amitriptyline and Levothyroxine. For Levothyroxine, Mylan increased its prices on April 25, 2014, and Sandoz increased its matching price increase on May 23, 2014. That same day, Sandoz increased its price for Amitriptyline, an increase that Mylan matched on July 16, 2014. By staggering these price increases in a "my turn, your turn" fashion, Sandoz and Mylan were able to ensure that each would follow through with its promise to increase prices (as they had unlawfully agreed), while avoiding announcing price increases on the same day or extremely close in time. And for the same reasons explained in ¶¶ 2611-2614 the ability of Core Conspirators such as Sandoz and Mylan to compel each other's compliance with the unlawful agreement helped to ensure that other Defendants, some of whom manufactured just one of the drugs subject to staggered price increases – such as Lannett (Levothyroxine) or Par (Amitriptyline) – would also commit to the unlawful agreement, because they were promised a sufficient volume of profitable sales to compensate for their forbearance.

2606.    Fourth, each successful conspiratorial price fixing agreement helped the Defendants by reducing the quantity produced of the drug, which in turn reduced demand for the raw materials required to manufacture that drug. Because all of the drugs involved in the conspiracy shared common inputs such as binding agents, the reduction in supply of Propranolol (for example) helped to reduce the demand for these inputs, which reduced the cost to produce not only Propranolol, but also each of the other Price-Fixed Generic Drug

617

that also used the same binding agents.

2607.    Fifth, with each successful price increase, Defendants were able to commit a portion of their production capacity to a drug priced substantially above marginal cost. However, successful price increases also incentivized other manufacturers to substitute capacity towards the high margin drugs. Accordingly, it was necessary for Defendants to implement the numerous conspiratorial price increases and price-fixing agreements alleged in this Complaint, so that each member of the conspiracy could enjoy supracompetitive profits. Further, in the instances, if any, that Defendants determined that excess capacity was devoted to a particular drug, one conspirator would agree to discontinue production of that drug. For example, Fougera stopped production of Fluocinonide in January 2015, after the collusive price increase had been implemented on the drug. Similarly, Teva discontinued production of Doxy Hyclate in May 2013, after the collusive price increase had been implemented on the drug.

2608.    Sixth, certain of the Price-Fixed Generic Drugs are subject to a degree of long-run demand-side substitution. For example, the topical corticosteroids – Fluocinonide, Desonide, and Clobetasol – are all used for similar purposes. The same is true of the oral diabetes drugs (Glipizide, Glyburide, Glyburide-Metformin, and Metformin ER). Accordingly, the success of certain of the conspiratorial price increases for the Price-Fixed Generic Drugs were relevant to the long-term success of other of the conspiratorial price increases.

2609.    The contract, combination and conspiracy among Defendants consisted of a continuing course, pattern, and practice of conduct regarding the production, pricing, marketing, and/or sale of generic drugs in violation of the State Antitrust and Consumer Protection Statutes.

618

2610.    The course, pattern and practice of conduct described above included, among other things, a continuing agreement, understanding, and concert of action among Defendants, the substantial terms and purpose of which were one or more of the following:

e.  To fix, stabilize, maintain, and/or raise prices of the Price-Fixed Generic Drugs sold to A&P and others in the United States;

f.  To allocate customers, the volume of sales, and/or market shares of the Price-Fixed Generic Drugs sold to A&P and others in the United States;

g.  To control the production and/or sale of the Price-Fixed Generic Drugs to A&P and others in the United States; and/or

h.  To earn supracompetitive profits on the price of the Price-Fixed Generic Drugs sold to A&P and others in the United States that resulted from the collusion alleged in this Complaint.

2611.    In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants engaged in one or more of the following overt acts (including those overt acts alleged above in this Complaint):

e.  They agreed to exchange, and did exchange, current and future price information about the Price-Fixed Generic Drugs sold in the United States, including the prices quoted or charged to A&P for the sale of the Price- Fixed Generic Drugs;

f.  They agreed to coordinate, and did coordinate, price levels, price terms, and/or price movements for sale of the Price-Fixed Generic Drugs sold in the United States;

g.  They agreed on prices, price levels, and/or production levels of the Price-Fixed Generic Drugs in the United States; and/or

h.  They agreed not to compete for certain customers or sales on certain products, and/or in certain regions of the United States.

2612.    Defendants entered into and refined their illegal combination and conspiracy through, among other things, the overt acts described above, including, without limitation, participating in conversations and meetings to discuss the prices of the Price-Fixed Generic Drugs to be sold to A&P and/or others in the United States; participating in

619

conversations and attending meetings concerning implementation of and adherence to their conspiracy; issuing price announcements and/or price quotations in accordance with the conspiracy; and/or exchanging confidential information on the pricing and/or sale of the Price-Fixed Generic Drugs to A&P and/or others in the United States.

2613.    As a result of this conspiracy in violation of the State Antitrust and Consumer Protection Statutes and during the time period relevant to Plaintiff's claims:

   d. Price competition in the sale of the Price-Fixed Generic Drugs among Defendants to A&P and others in the United States has been restrained, suppressed, and eliminated;

   e. Prices for the Price-Fixed Generic Drugs sold by Defendants to A&P and others have been raised, fixed, maintained and/or stabilized at artificially high and supracompetitive levels throughout the United States; and

   f. A&P and other direct purchasers of the Price-Fixed Generic Drugs produced and sold by Defendants have been deprived of the benefit of free and open competition.

2614.    A&P was injured in its business or property by reason of the Defendants' antitrust violations in amounts not yet ascertained. A&P's injury as an indirect purchaser of the Price-Fixed Generic Drugs is an injury of the type the antitrust laws were designed to prevent and flows from that which makes the Defendants' conduct unlawful.

   C. **Count 3 (Pled In The Alternative To Count 1) For Direct Purchases Under Section 1 of the Sherman Act Against Teva, Actavis, Amneal, Aurobindo, Dr. Reddy's, Lannett, Lupin, Mylan, Par, Upsher-Smith, Wockhardt, Zydus, Aprahamian, Cavanaugh, Berthold, Falkin, Grauso, Green, Nesta, Ostaficiuk, Patel, Reckenthaler and Rogerson[47]**

2615.    Plaintiff repeats and re-alleges paragraphs 1-2603 as if fully set forth

---

[47] For purposes of this Count, Defendants Breckenridge, Greenstone, Emcure, Heritage, Pfizer, Sandoz, Fougera, Novartis, Sun, Taro, Glenmark, Jim Brown, Jill Nailor, Armando Kellum, and Robin Hatosy, should be included in the conduct alleged against Defendants but should be treated an unnamed Co-Conspirators for purposes of the relief sought under this Count.

herein.

2616.    For the purposes of this Count, the term "Specified Price-Fixed Generic Drugs" means:

| 1. | Adapalene Gel |
|---|---|
| 2. | Amiloride HCL/HCTZ Tablets |
| 3. | Amoxicillin/Clavulanate Chewable Tablets |
| 4. | Amphetamine/ Dextroamphetamine ER (aka Mixed Amphetamine Salts) |
| 5. | Amphetamine/ Dextroamphetamine IR |
| 6. | Azithromycin Oral Suspension |
| 7. | Azithromycin Suspension |
| 8. | Baclofen Tablets |
| 9. | Benazepril HCTZ |
| 10. | Bethanechol Chloride Tablets |
| 11. | Budesonide DR Capsules |
| 12. | Budesonide Inhalation |
| 13. | Bumetanide Tablets |
| 14. | Buspirone Hydrochloride Tablets |
| 15. | Cabergoline |
| 16. | Capecitabine |
| 17. | Carbamazepine Chewable Tablets |
| 18. | Carbamazepine Tablets |
| 19. | Cefdinir Capsules |
| 20. | Cefdinir Oral Suspension |
| 21. | Cefprozil Tablets |
| 22. | Celocoxib |
| 23. | Cephalexin Suspension |
| 24. | Cimetidine Tablets |
| 25. | Ciprofloxacin HCL Tablets |
| 26. | Clarithromycin ER Tablets |
| 27. | Clemastine Fumarate Tablets |
| 28. | Clomipramine |
| 29. | Clonidine TTS Patch |
| 30. | Clotrimazole Topical Solution |
| 31. | Cyproheptadine HCL Tablets |
| 32. | Desmopressin Acetate Tablets |
| 33. | Desogestrel/Ethinyl Estradiol Tablets (Kariva) |
| 34. | Dexmethylphenidate HCL ER Capsules |
| 35. | Dextroamphetamine Sulfate ER |
| 36. | Diclofenac Potassium Tablets |
| 37. | Dicloxacillin Sodium Capsules |
| 38. | Diflunisal Tablets |
| 39. | Diltiazem HCL Tablets |

| 40. | Disopyramide Phosphate Capsules |
| 41. | Doxazosin Mesylate Tablets |
| 42. | Drospirenone and ethinyl estradiol (Ocella) |
| 43. | Enalapril Maleate Tablets |
| 44. | Entecavir |
| 45. | Epitol Tablets |
| 46. | Estazolam Tablets |
| 47. | Estradiol Tablets |
| 48. | Ethinyl estradiol and levonorgestrel (Portia and Jolessa) |
| 49. | Ethosuximide Capsules |
| 50. | Ethosuximide Oral Solution |
| 51. | Etodolac ER Tablets |
| 52. | Etodolac Tablets |
| 53. | Fenofibrate |
| 54. | Fluconazole Tablets |
| 55. | Fluocinonide Cream |
| 56. | Fluocinonide Emollient Cream |
| 57. | Fluocinonide Gel |
| 58. | Fluocinonide Ointment |
| 59. | Fluoxetine HCL Tablets |
| 60. | Flurbiprofen Tablets |
| 61. | Flutamide Capsules |
| 62. | Fluvastatin Sodium Capsules |
| 63. | Gabapentin Tablets |
| 64. | Glimepiride Tablets |
| 65. | Griseofulvin Suspension |
| 66. | Haloperidol |
| 67. | Hydroxyurea Capsules |
| 68. | Hydroxyzine Pamoate Capsules |
| 69. | Irbesartan |
| 70. | Isoniazid |
| 71. | Ketoconazole Cream |
| 72. | Ketoconazole Tablets |
| 73. | Ketoprofen Capsules |
| 74. | Ketorolac Tromethamine Tablets |
| 75. | Labetalol HCL Tablets |
| 76. | Lamivudine/Zidovudine (generic Combivir) |
| 77. | Levothyroxine |
| 78. | Loperamide HCL Capsules |
| 79. | Medroxyprogesterone Tablets |
| 80. | Methotrexate Tablets |
| 81. | Mimvey (Estradiol/Norethindrone Acetate) Tablets |
| 82. | Moexipril HCL Tablets |
| 83. | Moexipril HCL/HCTZ Tablets |
| 84. | Nabumetone Tablets |
| 85. | Nadolol Tablets |
| 86. | Niacin ER Tablets |

| 87. | Nitrofurantoin MAC Capsules |
|---|---|
| 88. | Norethindrone/ethinyl estradiol (Balziva) |
| 89. | Norethindrone Acetate |
| 90. | Nortriptyline Hydrochloride Capsules |
| 91. | Omega-3-Acid Ethyl Esters |
| 92. | Oxaprozin Tablets |
| 93. | Oxybutynin Chloride Tablets |
| 94. | Paricalcitol |
| 95. | Penicillin VK Tablets |
| 96. | Pentoxifylline Tablets |
| 97. | Piroxicam |
| 98. | Pravastatin Sodium Tablets |
| 99. | Prazosin HCL Capsules |
| 100. | Prochlorperazine Tablets |
| 101. | Propranolol HCL Tablets |
| 102. | Raloxifene HCL Tablets |
| 103. | Ranitidine HCL Tablets |
| 104. | Tamoxifen Citrate Tablets |
| 105. | Temozolomide |
| 106. | Tizanidine |
| 107. | Tobramycin |
| 108. | Tolmetin Sodium Capsules |
| 109. | Tolterodine ER |
| 110. | Tolterodine Tartrate |
| 111. | Topiramate Sprinkle Capsules |
| 112. | Trifluoperazine HCL |
| 113. | Valsartan HCTZ |
| 114. | Warfarin Sodium Tablets |

2617. For the purposes of this Count, the term "Defendants and Co-Conspirators" means Teva, Actavis, Amneal, Apotex, Aurobindo, Breckenridge, Dr. Reddy's, Glenmark, Greenstone, Lannett, Lupin, Mylan, Par, Pfizer, Sandoz, Taro, Upsher-Smith, Wockhardt, Zydus.

2618. The market for manufacture, pricing and sale of the Specified Price-Fixed Generic Drugs was conducive to cartelization. Beginning no later than 2012, and continuing in force or effect, or both, through the date of filing of this Complaint, the Defendants and Co-Conspirators engaged in a continuing agreement, understanding and conspiracy not to compete on the sale of the Specified Price-Fixed Generic Drugs in the

623

United States in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act.

2619. Each Defendant and Co-Conspirator consciously committed to a common scheme, the ultimate objective of which was to cartelize the Specified Price-Fixed Generic Drugs in order to achieve substantial supracompetitive profits. This objective was a common goal among all the Defendants. In furtherance of the scheme, each Defendant and Co-Conspirator consciously committed to an overarching market allocation agreement that governed each of their respective market shares for the Specified Price-Fixed Generic Drugs.

2620. Each Defendant and Co-Conspirator had knowledge of the conspiracy to increase prices, allocate markets, rig bids, and decrease production for each of the Specified Price-Fixed Generic Drugs, and each Defendant and Co-Conspirator knowingly participated in the conspiracy's common goal of cartelizing the Specified Price-Fixed Generic Drugs in order to achieve supracompetitive profits. Each Defendant's and Co-Conspirator's knowledge of the overarching conspiracy is demonstrated by the fact that the numerous collusive agreements reached in furtherance of the conspiracy were discussed at the same meetings and social gatherings, including the industry meetings alleged in Exhibit 1. Further, this overarching conspiracy contemplated a continuous result that would not continue without the continuous cooperation of all Defendants and Co-Conspirators.

2621. Every Defendant and Co-Conspirator intended to join the conspiracy to fix the prices of the Specified Price-Fixed Generic Drugs.

2622. Teva engaged in the conduct alleged in this Complaint and was a central catalyst for the implementation of the conspiracy. However, all Defendants and Co-

624

Conspirators engaged in the conduct alleged in this Complaint and were active participants in the overarching conspiracy, despite the fact that some Defendants and Co-Conspirators sold fewer Price-Fixed Generic Drugs than Teva. However, the participation of all Defendants and Co-Conspirators in the all-Price Fixed Generic Drugs conspiracy was necessary to increase the prices of the generic drugs that they manufactured.

2623.    By joining the conspiracy to fix the prices of the Specified Price-Fixed Generic Drugs conspiracy, the Defendants and Co-Conspirators became interdependent upon one another, in that their respective benefit depended on the success of overarching conspiracy. Indeed, each of the conspiratorial price increases and price-fixing agreements alleged in this Complaint with respect to the Specified Price-Fixed Generic Drugs were interdependent for the reasons explained above in Count One.

2624.    The contract, combination and conspiracy among Defendants and Co-Conspirators consisted of a continuing course, pattern, and practice of conduct regarding the production, pricing, marketing, and/or sale of generic drugs in violation of Section 1 of the Sherman Act.

2625.    The course, pattern and practice of conduct described above included, among other things, a continuing agreement, understanding, and concert of action among Defendants and Co-Conspirators, the substantial terms and purpose of which were one or more of the following:

   a. To fix, stabilize, maintain, and/or raise prices of the Specified Price-Fixed Generic Drugs sold to A&P and others in the United States;

   b. To allocate customers, the volume of sales, and/or market shares of the Specified Price-Fixed Generic Drugs sold to A&P and others in the United States;

   c. To control the production and/or sale of the Specified Price-Fixed Generic Drugs to A&P and others in the United States; and/or

   d. To earn supra-competitive profits on the price of the Specified Price-Fixed Generic

625

Drugs sold to A&P and others in the United States that resulted from the collusion alleged in this Complaint.

2626.     In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants and Co-Conspirators engaged in one or more of the following overt acts (including those overt acts alleged above in this Complaint):

a.      They agreed to exchange, and did exchange, current and future price information about the Specified Price-Fixed Generic Drugs sold in the United States, including the prices quoted or charged to A&P for the sale of the Specified Price-Fixed Generic Drugs;

b.      They agreed to coordinate, and did coordinate, price levels, price terms, and/or price movements for sale of the Specified Price-Fixed Generic Drugs sold in the United States;

c.      They agreed on prices, price levels, and/or production levels of the Specified Price-Fixed Generic Drugs in the United States; and/or

d.      They agreed not to compete for certain customers or sales on certain products, and/or in certain regions of the United States.

2627.     Defendants and Co-Conspirators entered into and refined their illegal combination and conspiracy through, among other things, the overt acts described above, including, without limitation, participating in conversations and meetings to discuss the prices of the Specified Price-Fixed Generic Drugs to be sold to A&P and/or others in the United States; participating in conversations and attending meetings concerning implementation of and adherence to their conspiracy; issuing price announcements and/or price quotations in accordance with the conspiracy; and/or exchanging confidential information on the pricing and/or sale of the Specified Price-Fixed Generic Drugs to A&P and/or others in the United States.

2628.     As a result of this conspiracy in violation of Section 1 of the Sherman Act and during the time period relevant to Plaintiff's claims:

a.      Price competition in the sale of the Specified Price-Fixed Generic Drugs among Defendants and Co-Conspirators to A&P has been restrained suppressed, and eliminated;

626

b.      Prices for the Specified Price-Fixed Generic Drugs sold by Defendants and Co-Conspirators to A&P directly have been raised, fixed, maintained and/or stabilized at artificially high and supracompetitive levels throughout the United States; and

c.      A&P was deprived of the benefit of free and open competition.

2629.    A&P was injured in its business or property by reason of the Defendants' and their Co-Conspirators' antitrust violations in amounts not yet ascertained. A&P's injury as a direct purchaser of the Specified Price-Fixed Generic Drugs is an injury of the type the antitrust laws were designed to prevent and flows from that which makes the Defendants' and their Co-Conspirators' conduct unlawful.

**D.  Count 4 (Pled In The Alternative To Count 2) For Indirect Purchases Under the Certain State Antitrust and Consumer Protection Statutes Against Teva, Actavis, Amneal, Aurobindo, Breckenridge, Dr. Reddy's, Fougera, Glenmark, Greenstone, Lannett, Lupin, Mylan, Novartis, Par, Pfizer, Sandoz, Taro, Upsher-Smith, Wockhardt, Zydus, Aprahamian, Brown, Cavanaugh, Berthold, Falkin, Grauso, Green, Hatosy, Kellum, Nailor, Nesta, Ostaficiuk, Patel, Reckenthaler and Rogerson**

2630.    Plaintiff repeats and re-alleges paragraphs 1-2603 as if fully set forth herein.

2631.    For the purposes of this Count, the term "Specified Price-Fixed Generic Drugs" means:

| 1. | Adapalene Gel |
|---|---|
| 2. | Amiloride HCL/HCTZ Tablets |
| 3. | Amoxicillin/Clavulanate Chewable Tablets |
| 4. | Amphetamine/ Dextroamphetamine ER (aka Mixed Amphetamine Salts) |
| 5. | Amphetamine/ Dextroamphetamine IR |
| 6. | Azithromycin Oral Suspension |
| 7. | Azithromycin Suspension |
| 8. | Baclofen Tablets |
| 9. | Benazepril HCTZ |
| 10. | Bethanechol Chloride Tablets |
| 11. | Budesonide DR Capsules |

627

| 12. | Budesonide Inhalation |
|---|---|
| 13. | Bumetanide Tablets |
| 14. | Buspirone Hydrochloride Tablets |
| 15. | Cabergoline |
| 16. | Capecitabine |
| 17. | Carbamazepine Chewable Tablets |
| 18. | Carbamazepine Tablets |
| 19. | Cefdinir Capsules |
| 20. | Cefdinir Oral Suspension |
| 21. | Cefprozil Tablets |
| 22. | Celocoxib |
| 23. | Cephalexin Suspension |
| 24. | Cimetidine Tablets |
| 25. | Ciprofloxacin HCL Tablets |
| 26. | Clarithromycin ER Tablets |
| 27. | Clemastine Fumarate Tablets |
| 28. | Clomipramine |
| 29. | Clonidine TTS Patch |
| 30. | Clotrimazole Topical Solution |
| 31. | Cyproheptadine HCL Tablets |
| 32. | Desmopressin Acetate Tablets |
| 33. | Desogestrel/Ethinyl Estradiol Tablets (Kariva) |
| 34. | Dexmethylphenidate HCL ER Capsules |
| 35. | Dextroamphetamine Sulfate ER |
| 36. | Diclofenac Potassium Tablets |
| 37. | Dicloxacillin Sodium Capsules |
| 38. | Diflunisal Tablets |
| 39. | Diltiazem HCL Tablets |
| 40. | Disopyramide Phosphate Capsules |
| 41. | Doxazosin Mesylate Tablets |
| 42. | Drospirenone and ethinyl estradiol (Ocella) |
| 43. | Enalapril Maleate Tablets |
| 44. | Entecavir |
| 45. | Epitol Tablets |
| 46. | Estazolam Tablets |
| 47. | Estradiol Tablets |
| 48. | Ethinyl estradiol and levonorgestrel (Portia and Jolessa) |
| 49. | Ethosuximide Capsules |
| 50. | Ethosuximide Oral Solution |
| 51. | Etodolac ER Tablets |
| 52. | Etodolac Tablets |
| 53. | Fenofibrate |
| 54. | Fluconazole Tablets |
| 55. | Fluocinonide Cream |
| 56. | Fluocinonide Emollient Cream |
| 57. | Fluocinonide Gel |
| 58. | Fluocinonide Ointment |

| 59. | Fluoxetine HCL Tablets |
|---|---|
| 60. | Flurbiprofen Tablets |
| 61. | Flutamide Capsules |
| 62. | Fluvastatin Sodium Capsules |
| 63. | Gabapentin Tablets |
| 64. | Glimepiride Tablets |
| 65. | Griseofulvin Suspension |
| 66. | Haloperidol |
| 67. | Hydroxyurea Capsules |
| 68. | Hydroxyzine Pamoate Capsules |
| 69. | Irbesartan |
| 70. | Isoniazid |
| 71. | Ketoconazole Cream |
| 72. | Ketoconazole Tablets |
| 73. | Ketoprofen Capsules |
| 74. | Ketorolac Tromethamine Tablets |
| 75. | Labetalol HCL Tablets |
| 76. | Lamivudine/Zidovudine (generic Combivir) |
| 77. | Levothyroxine |
| 78. | Loperamide HCL Capsules |
| 79. | Medroxyprogesterone Tablets |
| 80. | Methotrexate Tablets |
| 81. | Mimvey (Estradiol/Norethindrone Acetate) Tablets |
| 82. | Moexipril HCL Tablets |
| 83. | Moexipril HCL/HCTZ Tablets |
| 84. | Nabumetone Tablets |
| 85. | Nadolol Tablets |
| 86. | Niacin ER Tablets |
| 87. | Nitrofurantoin MAC Capsules |
| 88. | Norethindrone/ethinyl estradiol (Balziva) |
| 89. | Norethindrone Acetate |
| 90. | Nortriptyline Hydrochloride Capsules |
| 91. | Omega-3-Acid Ethyl Esters |
| 92. | Oxaprozin Tablets |
| 93. | Oxybutynin Chloride Tablets |
| 94. | Paricalcitol |
| 95. | Penicillin VK Tablets |
| 96. | Pentoxifylline Tablets |
| 97. | Piroxicam |
| 98. | Pravastatin Sodium Tablets |
| 99. | Prazosin HCL Capsules |
| 100. | Prochlorperazine Tablets |
| 101. | Propranolol HCL Tablets |
| 102. | Raloxifene HCL Tablets |
| 103. | Ranitidine HCL Tablets |
| 104. | Tamoxifen Citrate Tablets |
| 105. | Temozolomide |

| 106. | Tizanidine |
|------|------------|
| 107. | Tobramycin |
| 108. | Tolmetin Sodium Capsules |
| 109. | Tolterodine ER |
| 110. | Tolterodine Tartrate |
| 111. | Topiramate Sprinkle Capsules |
| 112. | Trifluoperazine HCL |
| 113. | Valsartan HCTZ |
| 114. | Warfarin Sodium Tablets |

2632. For the purposes of this Count, the term "Defendants and Co-Conspirators" means Teva, Actavis, Amneal, Apotex, Aurobindo, Breckenridge, Dr. Reddy's, Glenmark, Greenstone, Lannett, Lupin, Mylan, Par, Pfizer, Sandoz, Taro, Upsher-Smith, Wockhardt, Zydus.

2633. The market for manufacture, pricing and sale of the Specified Price-Fixed Generic Drugs was conducive to cartelization. Beginning no later than 2012, and continuing in force or effect, or both, through the date of filing of this Complaint, the Defendants and Co-Conspirators engaged in a continuing agreement, understanding and conspiracy not to compete on the sale of the Specified Price-Fixed Generic Drugs in the United States in unreasonable restraint of trade and commerce in violation of the Certain State Antitrust and Consumer Protection Statutes.

2634. Each Defendant and Co-Conspirator consciously committed to a common scheme, the ultimate objective of which was to cartelize the Specified Price-Fixed Generic Drugs in order to achieve substantial supracompetitive profits. This objective was a common goal among all the Defendants. In furtherance of the scheme, each Defendant and Co-Conspirator consciously committed to an overarching market allocation agreement that governed each of their respective market shares for the Specified Price-Fixed Generic Drugs.

2635. Each Defendant and Co-Conspirator had knowledge of the conspiracy to

630

increase prices, allocate markets, rig bids, and decrease production for each of the Specified Price-Fixed Generic Drugs, and each Defendant and Co-Conspirator knowingly participated in the conspiracy's common goal of cartelizing the Specified Price-Fixed Generic Drugs in order to achieve supracompetitive profits. Each Defendant's and Co-Conspirator's knowledge of the overarching conspiracy is demonstrated by the fact that the numerous collusive agreements reached in furtherance of the conspiracy were discussed at the same meetings and social gatherings, including the industry meetings alleged in Exhibit 1. Further, this overarching conspiracy contemplated a continuous result that would not continue without the continuous cooperation of all Defendants and Co-Conspirators.

2636.    Every Defendant and Co-Conspirator intended to join the conspiracy to fix the prices of the Specified Price-Fixed Generic Drugs.

2637.    Teva engaged in the conduct alleged in this Complaint and was a central catalyst for the implementation of the conspiracy. However, all Defendants and Co-Conspirators engaged in the conduct alleged in this Complaint and were active participants in the overarching conspiracy, despite the fact that some Defendants and Co-Conspirators sold fewer Price-Fixed Generic Drugs than Teva. However, the participation of all Defendants and Co-Conspirators in the all-Price Fixed Generic Drugs conspiracy was necessary to increase the prices of the generic drugs that they manufactured.

2638.    By joining the conspiracy to fix the prices of the Specified Price-Fixed Generic Drugs conspiracy, the Defendants and Co-Conspirators became interdependent upon one another, in that their respective benefit depended on the success of overarching conspiracy. Indeed, each of the conspiratorial price increases and price-fixing agreements alleged in this Complaint with respect to the Specified Price-Fixed

631

Generic Drugs were interdependent for the reasons explained above in Count One.

2639.    The contract, combination and conspiracy among Defendants and Co-Conspirators consisted of a continuing course, pattern, and practice of conduct regarding the production, pricing, marketing, and/or sale of generic drugs in violation of the State Antitrust and Consumer Protection Statutes.

2640.    The course, pattern and practice of conduct described above included, among other things, a continuing agreement, understanding, and concert of action among Defendants and Co-Conspirators, the substantial terms and purpose of which were one or more of the following:

e.    To fix, stabilize, maintain, and/or raise prices of the Specified Price-Fixed Generic Drugs sold to A&P and others in the United States;

f.    To allocate customers, the volume of sales, and/or market shares of the Specified Price-Fixed Generic Drugs sold to A&P and others in the United States;

g.    To control the production and/or sale of the Specified Price-Fixed Generic Drugs to A&P and others in the United States; and/or

h.    To earn supra-competitive profits on the price of the Specified Price-Fixed Generic Drugs sold to A&P and others in the United States that resulted from the collusion alleged in this Complaint.

2641.    In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants and Co-Conspirators engaged in one or more of the following overt acts (including those overt acts alleged above in this Complaint):

e.    They agreed to exchange, and did exchange, current and future price information about the Specified Price-Fixed Generic Drugs sold in the United States, including the prices quoted or charged to A&P for the sale of the Specified Price-Fixed Generic Drugs;

f.    They agreed to coordinate, and did coordinate, price levels, price terms, and/or price movements for sale of the Specified Price-Fixed Generic Drugs sold in the United States;

g.    They agreed on prices, price levels, and/or production levels of the Specified Price-Fixed Generic Drugs in the United States; and/or

632

h. They agreed not to compete for certain customers or sales on certain products, and/or in certain regions of the United States.

2642. Defendants and Co-Conspirators entered into and refined their illegal combination and conspiracy through, among other things, the overt acts described above, including, without limitation, participating in conversations and meetings to discuss the prices of the Specified Price-Fixed Generic Drugs to be sold to A&P and/or others in the United States; participating in conversations and attending meetings concerning implementation of and adherence to their conspiracy; issuing price announcements and/or price quotations in accordance with the conspiracy; and/or exchanging confidential information on the pricing and/or sale of the Specified Price-Fixed Generic Drugs to A&P and/or others in the United States.

2643. As a result of this conspiracy in violation of Section 1 of the Sherman Act and during the time period relevant to Plaintiff's claims:

d. Price competition in the sale of the Specified Price-Fixed Generic Drugs among Defendants and Co-Conspirators to A&P has been restrained suppressed, and eliminated;

e. Prices for the Specified Price-Fixed Generic Drugs sold by Defendants and Co-Conspirators to A&P indirectly have been raised, fixed, maintained and/or stabilized at artificially high and supracompetitive levels throughout the United States; and

f. A&P was deprived of the benefit of free and open competition.

2644. A&P was injured in its business or property by reason of the Defendants' and their Co-Conspirators' antitrust violations in amounts not yet ascertained. A&P's injury as an indirect purchaser of the Specified Price-Fixed Generic Drugs is an injury of the type the antitrust laws were designed to prevent and flows from that which makes the Defendants' and their Co-Conspirators' conduct unlawful.

**E. Counts 5 Through 209 (Individual Conspiracies) For Direct Purchases Under Section 1 of the Sherman Act Against Teva, Actavis, Akorn, Alvogen, Amneal, Aurobindo, Dr. Reddy's, Lannett, Lupin, Mylan, Par, Upsher-Smith, Wockhardt, Zydus, Aprahamian, Cavanaugh, Berthold, Falkin, Grauso, Green, Nesta, Ostaficiuk, Patel, Reckenthaler and Rogerson**

2645. Plaintiff repeats and re-alleges paragraphs 1-2603 as if fully set forth herein.

2646. The individual product conspiracies alleged in Counts 5 through 209 (each plead in the alternative) involve only the respective specified individual generic drug and the specified Defendants as indicated on the table below. For the purposes of Counts 5 through 209, the term "Defendants" and "Co-Conspirators" refers to only those companies identified in each individual Count.

| Count | Drug | Defendants and Co-Conspirators | Time Period (Beginning at least as early as:) |
|---|---|---|---|
| 5. | Acetazolamide Capsules | Heritage, Teva, Zydus | April 2014 to the present |
| 6. | Acetazolamide Tablets | Lannett, Taro | 2012 to the Present |
| 7. | Adapalene Gel | Glenmark, Taro, Teva | May 2013 to Present |
| 8. | Albuterol | Mylan, Sun | March 2013 to present |
| 9. | Allopurinol Injection | Actavis, Dr. Reddy's, Mylan, Par | 2014 to Present |
| 10. | Allopurinol Tablet | Actavis, Dr. Reddy's, Mylan, Par | 2014 to Present |
| 11. | Amantadine HCL/HCTZ | Lannett, Sandoz, Upsher-Smith | December 2011 to Present |
| 12. | Amiloride HCL/HCTZ Tablets | Mylan, Teva | May 2013 to Present |
| 13. | Amitriptyline | Mylan, Par, Sandoz | May 2014 to Present |

634

| 14. | Amoxicillin/Clavulanate Chewable Tablets | Sandoz, Teva | August 2014 to present |
|---|---|---|---|
| 15. | Amphetamine/Dextroamphetamine ER (Aka Mixed Amphetamine Salts) | Actavis, Impax, Teva | June 2012 to Present |
| 16. | Amphetamine/Dextroamphetamine IR (Aka Mixed Amphetamine Salts) | Actavis, Aurobindo, Mallinckrodt, Sandoz, Teva | June 2012 to Present |
| 17. | Atenolol Chlortholidone | Actavis,  Mylan | 2014 to the Present |
| 18. | Atropine Sulfate | Bausch, Sandoz | 2010 to Present |
| 19. | Azithromycin Oral Suspension | Greenstone, Teva | November 2013 to present |
| 20. | Azithromycin Suspension | Greenstone, Teva | November 2013 to present |
| 21. | Baclofen | Lannett, Par, Teva, Upsher-Smith | February 2014 to present |
| 22. | Balsalazide Disodium | Apotex, West-Ward | Fall of 2013 to present |
| 23. | Benazepril HCTZ | Mylan, Sandoz, Rising | August 2013 to present |
| 24. | Betamethasone Dipropionate | Actavis, Perrigo, Sandoz, Taro | 2011 to Present |
| 25. | Betamethasone Dipropionate Clotrimazole | Actavis, Sandoz, Taro | 2011 to present |
| 26. | Betamethasone Valerate | Actavis, Sandoz, Taro | 2011 to Present |
| 27. | Bethanechol Chloride Tablets | Amneal, Teva, Upsher-Smith | January 2015 to present |
| 28. | Bromocriptine Mesylate | Mylan, Perrigo, Sandoz | Winter 2012-2013 to present |
| 29. | Budesonide DR Capsules | Mylan, Par, Teva | April 2014 to present |

| 30. | Budesonide Inhalation | Actavis, Teva | February 2015 to present |
| 31. | Bumetanide Tablets | Sandoz, Teva | April 2014 to the present |
| 32. | Buspirone Hydrochloride Tablets | Actavis, Mylan, Teva | July 2012 to the present |
| 33. | Butorphanol Tartrate | Apotex, Mylan, West-Ward | 2014 to Present |
| 34. | Cabergoline | Greenstone, Par, Teva | December 2014 to present |
| 35. | Capecitabine | Teva, Mylan | Winter 2013-2014 to present |
| 36. | Captopril | Mylan, West-Ward, Wockhardt | 2014 to Present |
| 37. | Carbamazepine Chewable Tablets | Apotex, Sandoz, Taro, Teva | May 2013 to present |
| 38. | Carbamazepine Extended Release Tablets | Apotex, Sandoz, Taro, Teva | May 2013 to Present |
| 39. | Carbamazepine Tablets | Apotex, Sandoz, Taro and Teva | May 2013 to Present |
| 40. | Carisoprodol | Par, Teva | 2013 to Present |
| 41. | Cefdinir Capsules | Lupin, Sandoz, Teva | May 2013 to present |
| 42. | Cefdinir Oral Suspension | Lupin, Sandoz, Teva | May 2013 to Present |
| 43. | Cefprozil Tablets | Lupin, Sandoz, Teva | May 2013 to present |
| 44. | Cefuroxime Axetil | Aurobindo, Citron, Lupin | May 2014 to present |
| 45. | Celecoxib | Actavis, Teva | November 2014 to present |
| 46. | Cephalexin (Cefalexin) | Lupin, Teva | October 2013 to the present |
| 47. | Chlorpromazine HCL | Sandoz, Upsher-Smith | 2013 to Present |

| 48. | Cholestyramine | Par, Sandoz, Upsher-Smith | June 7, 2013 to present |
| 49. | Ciclopirox | Akorn, G&W, Perrigo | May 9, 2013 to present |
| 50. | Cimetidine Tablets | Mylan, Teva | May 2013 to present |
| 51. | Ciprofloxacin HCL Tablets | Actavis, Dr. Reddy's, Teva | August 2014 to present |
| 52. | Clarithromycin | Actavis, Teva, Zydus | April 2014 to present |
| 53. | Clemastine Fumarate Tablets | Sandoz, Teva | August 2013 to present |
| 54. | Clindamycin Phosphate | Actavis, Greenstone, Perrigo, Sandoz, and Taro | 2012 to present |
| 55. | Clobetasol | Actavis, Akorn, Fougera, Hi-Tech, Morton Grove, Perrigo, Sandoz, Taro, Wockhardt | June 2014 to present |
| 56. | Clomipramine HCL | Mylan, Sandoz, Taro | May 2013 to the present |
| 57. | Clonidine TTS Patch | Actavis, Mylan, Teva | October 2012 to present |
| 58. | Clotrimazole Tablets | Taro, Teva | May 2014 to Present |
| 59. | Clotrimazole Topical Solution | Taro, Teva | May 2014 to Present |
| 60. | Cyproheptadine HCL Tablets | Breckenridge, Teva | November 2013 to Present |
| 61. | Desmopressin Acetate | Actavis, Teva | August 2014 to present |
| 62. | Desogestrel/Ethinyl Estradiol Tablets (Kariva) | Glenmark, Teva | May 2014 to present |
| 63. | Desonide | Actavis, Fougera Perrigo, Sandoz, Taro | May 2013 to the present |
| 64. | Dexmethylphenidate HCL ER Capsules | Par, Sandoz, Teva | February 2014 to the Present |
| 65. | Dextroamphetamine Sulfate ER | Actavis, Mallinckrodt Teva | June 2014 to present |

637

| 66. | Diclofenac Potassium Tablets | Mylan, Sandoz, Teva | August 2013 to present |
| 67. | Dicloxacillin Sodium Capsules | Sandoz, Teva | April 2014 to the Present |
| 68. | Diflunisal Tablets | Teva, Rising | April 2014 to Present |
| 69. | Digoxin | Impax, Lannett, Mylan, Par, West-Ward | October 2013 to the present |
| 70. | Diltiazem HCL Tablets | Mylan, Teva | May 2013 to present |
| 71. | Diphenoxylate Atropine HCL | Greenstone, Mylan | 2014 to Present |
| 72. | Disopyramide Phosphate Capsules | Actavis, Teva | July 2013 to present |
| 73. | Divalproex ER | Dr. Reddy's, Mylan, Par, Zydus | June 2013 to present |
| 74. | Doxazosin Mesylate Tablets | Apotex, Mylan, Teva | May 2013 to Present |
| 75. | Doxycycline | Actavis, Heritage, Lannett, Mayne, Mylan Par, Sun, West-Ward | October 2012 to present |
| 76. | Doxy DR | Emcure, Heritage, Mylan, Mayne | May 2013 to Present |
| 77. | Doxy Hyclate | Actavis, Endo, Mylan Par, Sun, Teva, West-Ward | November 2012 |
| 78. | Doxy Mono | Heritage, Lannett, Mylan Par | February 2013 |
| 79. | Drospirenone And Ethinyl Estradiol (Ocella)) | Actavis, Lupin,Teva | May 2013 to Present |
| 80. | Econazole | Fougera, Perrigo, Taro, Teligent | June 2014 to Present |
| 81. | Enalapril Maleate Tablets | Mylan, Taro, Teva, Wockhardt | July 2013 to Present |
| 82. | Entecavir | Par, Teva | September 2014 to Present |
| 83. | Epitol Tablets | Apotex, Taro, Teva | August 2014 to present |
| 84. | Estazolam Tablets | Actavis, Teva | April 2014 to Present |
| 85. | Estradiol Tablets | Actavis, Mylan, Teva | May 2013 to Present |

638

| 86. | Ethinyl Estradiol And Levonorgestrel (Portia And Jolessa) | Sandoz, Teva | May 2012 to the Present |
|---|---|---|---|
| 87. | Ethosuximide Capsules | Teva, Versapharm | April 2014 to Present |
| 88. | Ethosuximide Oral Solution | Teva, Versapharm | April 2014 to Present |
| 89. | Etodolac | Apotex, Taro, Teva, Sandoz, Zydus | 2012 to Present |
| 90. | Etodolac ER | Taro, Teva, Zydus | Summer 2013 to present |
| 91. | Exemestane | Greenstone, West-Ward | Winter 2013-2014 to present |
| 92. | Fenofibrate | Lupin, Mylan, Perrigo, Teva, Zydus | February 2013 to Present |
| 93. | Fluconazole Tablets | Citron, Dr. Reddy's Glenmark, Greenstone, Teva | May 2013 to present |
| 94. | Fluocinolone Acetonide | G&W, Sandoz, Taro, Teligent | 2012 to Present |
| 95. | Fluocinonide | Actavis, Sandoz, Taro, Teva | July 2013 to present |
| 96. | Fluocinonide Cream | Actavis, Sandoz, Taro, Teva | July 2013 to Present |
| 97. | Fluocinonide Gel | Actavis, Sandoz, Taro, Teva | July 2013 to Present |
| 98. | Fluocinonide Ointment | Actavis, Sandoz, Taro, Teva | July 2013 to Present |
| 99. | Fluoxetine HCL Tablets | Mylan, Par, Teva | January 2015 to present |
| 100. | Flurbiprofen Tablets | Mylan, Teva | May 2013 to present |
| 101. | Flutamide Capsules | Actavis, Par, Teva | August 2014 to present |
| 102. | Fluticasone Propionate | Akorn, Apotex, West-Ward | Winter 2009-2010 to present |
| 103. | Fluvastatin Sodium Capsules | Mylan, Teva | April 2014 to present |
| 104. | Fosinopril HCTZ | Aurobindo, Citron, Glenmark, Heritage, | April 2014 to present |

| | | Sandoz | |
|---|---|---|---|
| 105. | Gabapentin Tablets | Aurobindo, Glenmark, Teva | October 2014 to present |
| 106. | Glimepiride Tablets | Dr. Reddy's, Teva | August 2014 to present |
| 107. | Glipizide Metformin | Heritage, Mylan, Teva | April 2014 to Present |
| 108. | Glyburide | Aurobindo, Citron, Heritage, Teva | April 2014 to present |
| 109. | Glyburide-Metformin | Actavis, Aurobindo, Citron, Heritage, Teva | April 2014 to Present |
| 110. | Griseofulvin Suspension | Actavis, Teva | September 2014 to present |
| 111. | Halobetasol Propionate | G&W, Perrigo, Sandoz, Taro | 2013 to Present |
| 112. | Haloperidol | Mylan, Sandoz, Zydus | August 2013 to present |
| 113. | Hydralazine | Camber, Glenmark, Heritage, Par, Strides, Teva | August 2014 to present |
| 114. | Hydrocodone Acetaminophen | Amneal, Mallinckrodt, Par, Teva | 2014 to Present |
| 115. | Hydrocortisone Valerate | G&W, Perrigo, Taro | 2013 to Present |
| 116. | Hydroxyurea Capsules | Par, Teva | August 2014 to present |
| 117. | Hydroxyzine Pamoate Capsules | Actavis, Rising, Sandoz, Teva | October 2013 to present |
| 118. | Irbesartan | Lupin, Teva | March 2012 to present |
| 119. | Isoniazid | Sandoz, Teva | June 2013 to present |
| 120. | Isosorbide Dinitrate | Par, Sandoz, West-Ward | Spring 2012 to the present |
| 121. | Ketoconazole Cream | G&W, Sandoz, Taro, Teva | February 2014 to Present |
| 122. | Ketoconazole Tablets | Apotex, Mylan, Taro, Teva | February 2014 to Present |
| 123. | Ketoprofen Capsules | Mylan, Teva | July 2013 to Present |

| | | | |
|---|---|---|---|
| 124. | Ketorolac Tromethamine Tablets | Mylan, Teva | July 2013 to present |
| 125. | Labetalol HCL Tablets | Actavis, Alvogen, Par, Sandoz, Teva | July 2012 to present |
| 126. | Lamivudine/Zidovudine (Generic Combivir) | Aurobindo, Camber, Lupin, Teva | May 2012 to Present |
| 127. | Latanoprost | Akorn, Bausch, Greenstone, Sandoz | Fall 2011 to Present |
| 128. | Leflunomide | Apotex, Heritage, Teva | April 2014 to present |
| 129. | Levothyroxine | Lannett, Mylan, Sandoz | August 2013 to present |
| 130. | Lidocaine-Prilocaine | Akorn, Fougera, Hi-Tech,  Impax, Sandoz | March 2014 to present |
| 131. | Loperamide HCL Capsules | Mylan, Teva | April 2014 to the present |
| 132. | Medroxyprogesterone Tablets | Greenstone, Teva | November 2013 to Present |
| 133. | Meprobamate | Dr. Reddy s, Heritage | March 2013 to present |
| 134. | Metformin ER | Actavis, Amneal, Lupin, Sun, Teva | July 2015 to Present |
| 135. | Methadone HCL | Mallinckrodt, West-Ward | 2014 to Present |
| 136. | Methotrexate Tablets | Mylan, Par, Teva, West-Ward | February 2013 to Present |
| 137. | Methylphenidate | Actavis, Impax, Mallinckrodt, Par, Sandoz, Sun | February 2013 to Present |
| 138. | Methylprednisolone | Breckenridge, Cadista, Greenstone, Par, Sandoz | February 2011 to Present |
| 139. | Metronidazole | G&W, Impax, Sandoz, Taro, Teva, Valeant | Summer 2011 to present |
| 140. | Metronidazole Cream | G&W, Sandoz, Teva | Summer 2011 to present |
| 141. | Metronidazole Jelly | G&W, Impax, Sandoz, Taro, Teva | June 2011 to Present |
| 142. | Metronidazole Lotion | Sandoz, Teva | June 2011 to Present |

641

| 143. | Metronidazole Vaginal | Sandoz, Valeant | February 2015 to Present |
| 144. | Mimvey (Estradiol/Norethindrone Acetate) Tablets | Breckenridge, Teva | July 2012 to present |
| 145. | Moexipril Hydrochloride Tablets | Glenmark, Teva | May 2013 to present |
| 146. | Nabumetone Tablets | Actavis, Glenmark Sandoz, Teva | May2013 to present |
| 147. | Nadolol Tablets | Greenstone, Mylan Sandoz, Teva | May 2013 to present |
| 148. | Naproxen Sodium | Amneal, Glenmark | Winter 2014-2015 to present |
| 149. | Neomycin Polymyxin Hydrocortisone | Bausch, Sandoz | Spring 2010 to present |
| 150. | Niacin ER Tablets | Lupin, Teva, Zydus | March 2014 to present |
| 151. | Nitrofurantoin Macrocrystal Capsules | Alvogen, Mylan, Teva | July 2012 to present |
| 152. | Norethindrone Acetate | Amneal, Glenmark, Teva | September 2014 to present |
| 153. | Norethindrone/Ethinyl Estradiol (Balziva) | Lupin, Teva | January 2014 to present |
| 154. | Nortriptyline HCL Capsules | Actavis, Taro, Teva | November 2013 to Present |
| 155. | Nystatin | Actavis, Heritage, Par, Perrigo, Sandoz, Sun, Taro, Teva | Summer 2011 to present |
| 156. | Nystatin Cream | Actavis, Par, Perrigo, Sun, Taro | Summer 2011 to present |
| 157. | Nystatin Ointment | Actavis, Perrigo, Sandoz | Summer 2011 to present |
| 158. | Nystatin Tablets | Teva, Heritage, Sun | April 2013 to present |
| 159. | Nystatin Triamcinolone | Sandoz, Taro, Teva | 2011 to Present |
| 160. | Omega-3-Acid Ethyl Esters | Apotex, Par, Teva | June 2014 to the present |

642

| 161. | Ondansetron | Glenmark, Teva | May 2013 to present |
| 162. | Oxaprozin Tablets | Dr. Reddy's, Greenstone, Sandoz, and Teva | July 2012 to present |
| 163. | Oxybutynin Chloride Tablets | Apotex, Par, Teva, Upsher-Smith | April 2013 to Present |
| 164. | Oxycodone HCL | Glenmark, Lannett, Mallinckrodt, Par, Teva | 2010 to present |
| 165. | Oxycodone/Acetaminophen | Actavis, Alvogen, Amneal, Aurobindo, Mallinckrodt, Mayne, Par, Teva | 2011 to present |
| 166. | Paricalcitol | Dr. Reddy's, Teva, and Zydus | March 2014 to present |
| 167. | Penicillin VK Tablets | Aurobindo, Greenstone, Sandoz Teva | August 2014 to present |
| 168. | Pentoxifylline Tablets | Apotex, Mylan, Teva | April 2014 to present |
| 169. | Permethrin | Actavis, Mylan, Perrigo | Beginning at least as early as 2011 |
| 170. | Perphenazine | Par, Sandoz | Summer 2009 to Present |
| 171. | Phenytoin Sodium | Amneal, Mylan, Sun, Taro | 2014 to Present |
| 172. | Pilocarpine HCL | Actavis, Impax, Lannett | 2010 to Present |
| 173. | Piroxicam | Greenstone, Teva | March 2014 to present |
| 174. | Potassium Chloride | Actavis, Mylan, Sandoz, Upsher-Smith, Zydus | July 2010 to Present |
| 175. | Pravastatin | Apotex, Glenmark, Lupin, Mylan, Teva, Zydus | May 2013 to Present |
| 176. | Prazosin HCL Capsules | Mylan, Teva | May 2013 to Present |
| 177. | Prednisone | Actavis, Cadista, Par, West-Ward | 2013 to Present |
| 178. | Prochlorperazine Tablets | Mylan, Sandoz, Teva | May 2014 to the present |

643

| 179. | Propranolol | Actavis, Breckenridge, Heritage, Mylan, Par, Teva, UDL, Upsher-Smith | November 2013 to present |
|---|---|---|---|
| 180 | Propranolol Capsules | Actavis, Breckenridge, Upsher-Smith | November 2013 to present |
| 181. | Propranolol Tablets | Actavis, Heritage, Mylan Par, Pliva, Teva, UDL | January 2015 to the present |
| 182. | Raloxifene HCL | Teva, Camber, Activis | September 2014 to Present |
| 183. | Ranitidine HCL Tablets | Amneal, Glenmark Sandoz, Teva | May 2013 to Present |
| 184. | Ranitidine HCL Capsules | Dr. Reddy's, Sandoz | 2012 - Present |
| 185. | Silver Sulfadiazine | Ascend, Teva | Spring 2012 to present |
| 186. | Spironolactone HCTZ | Greenstone, Mylan, Sun | 2013 to Present |
| 187. | Tamoxifen Citrate Tablets | Actavis, Mylan, Teva | March 2014 to present |
| 188. | Temozolomide | Sandoz, Teva | July 2013 to present |
| 189. | Theophylline ER | Heritage, Teva | February 2014 to Present |
| 190. | Timolol Maleate | Bausch, Sandoz | 2014 to Present |
| 191. | Tizanidine | Apotex, Dr. Reddy's Mylan Sandoz, and Sun | May 2013 to present |
| 192. | Tobramycin | Sandoz, Teva | October 2013 to present |
| 193. | Tobramycin Dexamethasone | Bausch, Sandoz | Winter 2012-2013 to present |
| 194. | Tolmetin Sodium Capsules | Mylan, Teva | May 2013 to present |
| 195. | Tolterodine | Greenstone, Mylan, Teva | December 2013 to Present |

644

| 196. | Tolterodine ER | Mylan, Teva | October 2013 |
| 197. | Tolterodine Tartrate | Greenstone, Teva | January 2014 |
| 198. | Topiramate Sprinkle Capsules | Actavis, Teva Zydus | April 2014 to Present |
| 199. | Trazodone HCL | Apotex, Par, Sun, Teva | Winter 2014-2015 to present |
| 200. | Triamcinolone Acetonide | Ascend, Par, Perrigo, Sandoz, Taro | Spring 2010 |
| 201. | Triamcinolone Acetonide Cream | Ascend, Par, Perrigo, Sandoz, Taro | Spring 2010 |
| 202. | Triamcinolone Acetonide Ointment | Ascend, Par, Perrigo, Sandoz, Taro | Spring 2010 |
| 203. | Triamterene HCTZ | Actavis, Apotex, Lannett, Mylan, Sandoz | 2013 to present |
| 204. | Trifluoperazine HCL | Mylan, Sandoz, Upsher-Smith | January 2013 to Present |
| 205. | Ursodiol | Actavis, Epic, Lannett | May 2014 to present |
| 206. | Valsartan HCTZ | Mylan, Sandoz | September 2012 to present |
| 207. | Verapamil | Actavis, Heritage, Mylan | April 2014 to present |
| 208. | Warfarin Sodium Tablets | Taro, Teva, Zydus | June 2014 to Present |
| 209. | Zoledronic Acid | Dr. Reddy' s, Heritage | January 2013 to present |

2647.    Beginning on or about the time referenced in the table above and continuing in force or effect, or both, through the date of filing of this Complaint, Defendants and their co- conspirators engaged in a continuing agreement, understanding and conspiracy not to compete  on the sale of the generic drugs referenced in the table above in the United States in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act.

645

2648. The contract, combination, and conspiracy among Defendants and their co-conspirators consisted of a continuing course, pattern, and practice of conduct regarding the production, pricing, marketing, and/or sale of the specified generic drug in violation of Section 1 of the Sherman Act.

2649. The course, pattern, and practice of conduct described above included, among other things, a continuing agreement, understanding and concert of action among Defendants and their co-conspirators, the substantial terms and purpose of which were one or more of the following:

a. To fix, stabilize, maintain, and/or raise prices of the specified generic drug sold to A&P and others in the United States;

b. To allocate customers, the volume of sales, and/or market shares of the specified generic drug sold to A&P and others in the United States;

c. To control the production and/or sale of the specified generic drug and others in the United States; and/or

d. To earn supracompetitive profits on the price of the specified generic drug sold to A&P and others in the United States that resulted from Defendants' collusion.

2650. In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants and their co-conspirators engaged in one or more of the following overt acts (including those overt acts alleged above in this Complaint):

a. They agreed to exchange, and did exchange, current and future price information about the specified generic drug sold in the United States, including the prices quoted or charged to A&P for the sale of the specified generic drug;

b. They agreed to coordinate, and did coordinate, price levels, price terms, and/or price movements for sale of the specified generic drug sold in the United States;

c. They agreed on prices, price levels, and/or production levels of the specified generic drug sold in the United States; and/or

d. They agreed not to compete for certain customers or sales on certain products, and/or in certain regions of the United States.

2651.    Defendants and their co-conspirators entered into and refined their illegal combination and conspiracy through, among other things: the overt acts described above, including, without limitation, participating in conversations and meetings to discuss the prices of each the specified generic drug to be sold to A&P and/or others in the United States; participating in conversations and attending meetings concerning implementation of and adherence to their conspiracy; issuing price announcements and/or price quotations in accordance with the conspiracy; and/or exchanging confidential information on the pricing and/or sale of the specified generic drug to A&P and/or others in the United States.

2652.    As a result of Defendants and their co-conspirators' conspiracy in violation of Section 1 of the Sherman Act and during the time period relevant to Plaintiff's claims:

a.    Price competition in the sale of the specified generic drug among Defendants and their co-conspirators to A&P and others in the United States has been restrained, suppressed, and eliminated;

b.    Prices for the specified generic drug sold by Defendants and their co-conspirators to A&P and others have been raised, fixed, maintained, and/or stabilized at artificially high and supracompetitive levels throughout the United States; and

c.    A&P and other direct purchasers of the specified generic drug produced and sold by Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

d.    A&P has been injured in its business or property by reason of Defendants and their co-conspirators' antitrust violations in amounts not yet ascertained. A&P's injury as a direct purchaser of the specified generic drug is an injury of the type the antitrust laws were designed to prevent and flows from that which makes Defendants and their co-conspirators' conduct unlawful.

## F. Counts 210 Through 420 (Individual Conspiracies) For Indirect Purchases Under Certain State Antitrust and Consumer Protection Statutes Against All Defendants

2653.    Plaintiff repeats and re-alleges paragraphs 1-2603 as if fully set forth

herein.

2654. The individual product conspiracies alleged in Counts 210 through 420 (each plead in the alternative) involve only the respective specified individual generic drug and the specified Defendants as indicated on the table below. For the purposes of Counts 210 through 420, the term "Defendants" and "Co-Conspirators" refers to only those companies identified in each individual Count.

| Count | Drug | Defendants and Co-Conspirators | Time Period (Beginning at least as early as:) |
|---|---|---|---|
| 210. | Acetazolamide Capsules | Heritage, Teva, Zydus | April 2014 to the present |
| 211. | Acetazolamide Tablets | Lannett, Taro | 2012 to the Present |
| 212. | Adapalene Gel | Glenmark, Taro, Teva | May 2013 to Present |
| 213. | Albuterol | Mylan, Sun | March 2013 to present |
| 214. | Alclometasone Dipropionate Cream | Glenmark, Sandoz, Taro | May 1, 2013 |
| 215. | Alclometasone Dipropionate Ointment | Glenmark, Sandoz, Taro | May 1, 2013 |
| 216. | Allopurinol Injection | Actavis, Dr. Reddy's, Mylan, Par | 2014 to Present |
| 217. | Allopurinol Tablet | Actavis, Dr. Reddy's, Mylan, Par | 2014 to Present |
| 218. | Amantadine HCL/HCTZ | Lannett, Sandoz, Upsher-Smith | December 2011 to Present |
| 219. | Amiloride HCL/HCTZ Tablets | Mylan, Teva | May 2013 to Present |
| 220. | Amitriptyline | Mylan, Par, Sandoz | May 2014 to Present |
| 221. | Amoxicillin/Clavulanate Chewable Tablets | Sandoz, Teva | August 2014 to present |
| 222. | Amphetamine/Dextroamphetamine ER (Aka Mixed Amphetamine Salts) | Actavis, Impax, Teva | June 2012 to Present |
| 223. | Amphetamine/Dextroamphetamine IR (Aka Mixed Amphetamine Salts) | Actavis, Aurobindo, Mallinckrodt, Sandoz, Teva | June 2012 to Present |

| 224. | Atenolol Chlortholidone | Actavis,  Mylan | 2014 to the Present |
| 225. | Atropine Sulfate | Bausch, Sandoz | 2010 to Present |
| 226. | Azithromycin Oral Suspension | Greenstone, Teva | November 2013 to present |
| 227. | Azithromycin Suspension | Greenstone, Teva | November 2013 to present |
| 228. | Baclofen | Lannett, Par, Teva, Upsher-Smith | February 2014 to present |
| 229. | Balsalazide Disodium | Apotex, West-Ward | Fall of 2013 to present |
| 230. | Benazepril HCTZ | Mylan, Sandoz, Rising | August 2013 to present |
| 231. | Betamethasone Dipropionate | Actavis, Perrigo, Sandoz, Taro | 2011 to Present |
| 232. | Betamethasone Dipropionate Augmented | Sandoz, Taro | 2011 to present |
| 233. | Betamethasone Dipropionate Clotrimazole | Actavis, Sandoz, Taro | 2011 to present |
| 234. | Betamethasone Valerate | Actavis, Sandoz, Taro | 2011 to Present |
| 235. | Bethanechol Chloride Tablets | Amneal, Teva, Upsher-Smith | January 2015 to present |
| 236. | Bromocriptine Mesylate | Mylan, Perrigo, Sandoz | Winter 2012-2013 to present |
| 237. | Budesonide DR Capsules | Mylan, Par, Teva | April 2014 to present |
| 238. | Budesonide Inhalation | Actavis, Teva | February 2015 to present |
| 239. | Bumetanide Tablets | Sandoz, Teva | April 2014 to the present |

| | | | |
|---|---|---|---|
| 240. | Buspirone Hydrochloride Tablets | Actavis, Mylan, Teva | July 2012 to the present |
| 241. | Butorphanol Tartrate | Apotex, Mylan, West-Ward | 2014 to Present |
| 242. | Cabergoline | Greenstone, Par, Teva | December 2014 to present |
| 243. | Capecitabine | Teva, Mylan | Winter 2013-2014 to present |
| 244. | Captopril | Mylan, West-Ward, Wockhardt | 2014 to Present |
| 245. | Carbamazepine Chewable Tablets | Apotex, Sandoz, Taro, Teva | May 2013 to present |
| 246. | Carbamazepine Extended Release Tablets | Apotex, Sandoz, Taro, Teva | May 2013 to Present |
| 247. | Carbamazepine Tablets | Apotex, Sandoz, Taro and Teva | May 2013 to Present |
| 248. | Carisoprodol | Par, Teva | 2013 to Present |
| 249. | Cefdinir Capsules | Lupin, Sandoz, Teva | May 2013 to present |
| 250. | Cefdinir Oral Suspension | Lupin, Sandoz, Teva | May 2013 to Present |
| 251. | Cefprozil Tablets | Lupin, Sandoz, Teva | May 2013 to present |
| 252. | Cefuroxime Axetil | Aurobindo, Citron, Lupin | May 2014 to present |
| 253. | Celecoxib | Actavis, Teva | November 2014 to present |
| 254. | Cephalexin (Cefalexin) | Lupin, Teva | October 2013 to the present |
| 255. | Chlorpromazine HCL | Sandoz, Upsher-Smith | 2013 to Present |
| 256. | Cholestyramine | Par, Sandoz, Upsher-Smith | June 7, 2013 to present |
| 257. | Ciclopirox | Akorn, G&W, Perrigo | May 9, 2013 to present |
| 258. | Cimetidine Tablets | Mylan, Teva | May 2013 to present |

| 259. | Ciprofloxacin HCL Tablets | Actavis, Dr. Reddy's, Teva | August 2014 to present |
|---|---|---|---|
| 260. | Clarithromycin | Actavis, Teva, Zydus | April 2014 to present |
| 261. | Clemastine Fumarate Tablets | Sandoz, Teva | August 2013 to present |
| 262. | Clindamycin Phosphate | Actavis, Greenstone, Perrigo, Sandoz, and Taro | 2012 to present |
| 263. | Clobetasol | Actavis, Akorn, Fougera, Hi-Tech, Morton Grove, Perrigo, Sandoz, Taro, Wockhardt | June 2014 to present |
| 264. | Clomipramine HCL | Mylan, Sandoz, Taro | May 2013 to the present |
| 265. | Clonidine TTS Patch | Actavis, Mylan, Teva | October 2012 to present |
| 266. | Clotrimazole Tablets | Taro, Teva | May 2014 to Present |
| 267. | Clotrimazole Topical Solution | Taro, Teva | May 2014 to Present |
| 268. | Cyproheptadine HCL Tablets | Breckenridge, Teva | November 2013 to Present |
| 269. | Desmopressin Acetate | Actavis, Teva | August 2014 to present |
| 270. | Desogestrel/Ethinyl Estradiol Tablets (Kariva) | Glenmark, Teva | May 2014 to present |
| 271. | Desonide | Actavis, Fougera Perrigo, Sandoz, Taro | May 2013 to the present |
| 272. | Dexmethylphenidate HCL ER Capsules | Par, Sandoz, Teva | February 2014 to the Present |
| 273. | Dextroamphetamine Sulfate ER | Actavis, Mallinckrodt Teva | June 2014 to present |
| 274. | Diclofenac Potassium Tablets | Mylan, Sandoz, Teva | August 2013 to present |
| 275. | Dicloxacillin Sodium Capsules | Sandoz, Teva | April 2014 to the Present |
| 276. | Diflunisal Tablets | Teva, Rising | April 2014 to Present |

| 277. | Digoxin | Impax, Lannett, Mylan, Par, West-Ward | October 2013 to the present |
|---|---|---|---|
| 278. | Diltiazem HCL Tablets | Mylan, Teva | May 2013 to present |
| 279. | Diphenoxylate Atropine HCL | Greenstone, Mylan | 2014 to Present |
| 280. | Disopyramide Phosphate Capsules | Actavis, Teva | July 2013 to present |
| 281. | Divalproex ER | Dr. Reddy's, Mylan, Par, Zydus | June 2013 to present |
| 282. | Doxazosin Mesylate Tablets | Apotex, Mylan, Teva | May 2013 to Present |
| 283. | Doxycycline | Actavis, Heritage, Lannett, Mayne, Mylan Par, Sun, West-Ward | October 2012 to present |
| 284. | Doxy DR | Emcure, Heritage, Mylan, Mayne | May 2013 to Present |
| 285. | Doxy Hyclate | Actavis, Endo, Mylan Par, Sun, Teva, West-Ward | November 2012 |
| 286. | Doxy Mono | Heritage, Lannett, Mylan Par | February 2013 |
| 287. | Drospirenone And Ethinyl Estradiol (Ocella)) | Actavis, Lupin,Teva | May 2013 to Present |
| 288. | Econazole | Fougera, Perrigo, Taro, Teligent | June 2014 to Present |
| 289. | Enalapril Maleate Tablets | Mylan, Taro, Teva, Wockhardt | July 2013 to Present |
| 290. | Entecavir | Par, Teva | September 2014 to Present |
| 291. | Epitol Tablets | Apotex, Taro, Teva | August 2014 to present |
| 292. | Estazolam Tablets | Actavis, Teva | April 2014 to Present |
| 293. | Estradiol Tablets | Actavis, Mylan, Teva | May 2013 to Present |
| 294. | Ethinyl Estradiol And Levonorgestrel (Portia And Jolessa) | Sandoz, Teva | May 2012 to the Present |
| 295. | Ethosuximide Capsules | Teva, Versapharm | April 2014 to Present |
| 296. | Ethosuximide Oral Solution | Teva, Versapharm | April 2014 to Present |
| 297. | Etodolac | Apotex, Taro, Teva, Sandoz, Zydus | 2012 to Present |

| 298. | Etodolac ER | Taro, Teva, Zydus | Summer 2013 to present |
|---|---|---|---|
| 299. | Exemestane | Greenstone, West-Ward | Winter 2013-2014 to present |
| 300. | Fenofibrate | Lupin, Mylan, Perrigo, Teva, Zydus | February 2013 to Present |
| 301. | Fluconazole Tablets | Citron, Dr. Reddy's Glenmark, Greenstone, Teva | May 2013 to present |
| 302. | Fluocinolone Acetonide | G&W, Sandoz, Taro, Teligent | 2012 to Present |
| 303. | Fluocinonide | Actavis, Sandoz, Taro, Teva | July 2013 to present |
| 304. | Fluocinonide Cream | Actavis, Sandoz, Taro, Teva | July 2013 to Present |
| 305. | Fluocinonide Gel | Actavis, Sandoz, Taro, Teva | July 2013 to Present |
| 306. | Fluocinonide Ointment | Actavis, Sandoz, Taro, Teva | July 2013 to Present |
| 307. | Fluoxetine HCL Tablets | Mylan, Par, Teva | January 2015 to present |
| 308. | Flurbiprofen Tablets | Mylan, Teva | May 2013 to present |
| 309. | Flutamide Capsules | Actavis, Par, Teva | August 2014 to present |
| 310. | Fluticasone Propionate | Akorn, Apotex, West-Ward | Winter 2009-2010 to present |
| 311. | Fluvastatin Sodium Capsules | Mylan, Teva | April 2014 to present |
| 312. | Fosinopril HCTZ | Aurobindo, Citron, Glenmark, Heritage, Sandoz | April 2014 to present |
| 313. | Gabapentin Tablets | Aurobindo, Glenmark, Teva | October 2014 to present |
| 314. | Glimepiride Tablets | Dr. Reddy's, Teva | August 2014 to present |
| 315. | Glipizide Metformin | Heritage, Mylan, Teva | April 2014 to Present |

| 316. | Glyburide | Aurobindo, Citron, Heritage, Teva | April 2014 to present |
| 317. | Glyburide-Metformin | Actavis, Aurobindo, Citron, Heritage, Teva | April 2014 to Present |
| 318. | Griseofulvin Suspension | Actavis, Teva | September 2014 to present |
| 319. | Halobetasol Propionate | G&W, Perrigo, Sandoz, Taro | 2013 to Present |
| 320. | Haloperidol | Mylan, Sandoz, Zydus | August 2013 to present |
| 321. | Hydralazine | Camber, Glenmark, Heritage, Par, Strides, Teva | August 2014 to present |
| 322. | Hydrocodone Acetaminophen | Amneal, Mallinckrodt, Par, Teva | 2014 to Present |
| 323. | Hydrocortisone Valerate | G&W, Perrigo, Taro | 2013 to Present |
| 324. | Hydroxyurea Capsules | Par, Teva | August 2014 to present |
| 325. | Hydroxyzine Pamoate Capsules | Actavis, Rising, Sandoz, Teva | October 2013 to present |
| 326. | Irbesartan | Lupin, Teva | March 2012 to present |
| 327. | Isoniazid | Sandoz, Teva | June 2013 to present |
| 328. | Isosorbide Dinitrate | Par, Sandoz, West-Ward | Spring 2012 to the present |
| 329. | Ketoconazole Cream | G&W, Sandoz, Taro, Teva | February 2014 to Present |
| 330. | Ketoconazole Tablets | Apotex, Mylan, Taro, Teva | February 2014 to Present |
| 331. | Ketoprofen Capsules | Mylan, Teva | July 2013 to Present |
| 332. | Ketorolac Tromethamine Tablets | Mylan, Teva | July 2013 to present |
| 333. | Labetalol HCL Tablets | Actavis, Alvogen, Par, Sandoz, Teva | July 2012 to present |
| 334. | Lamivudine/Zidovudine (Generic Combivir) | Aurobindo, Camber, Lupin, Teva | May 2012 to Present |

| | | | |
|---|---|---|---|
| 335. | Latanoprost | Akorn, Bausch, Greenstone, Sandoz | Fall 2011 to Present |
| 336. | Leflunomide | Apotex, Heritage, Teva | April 2014 to present |
| 337. | Levothyroxine | Lannett, Mylan, Sandoz | August 2013 to present |
| 338. | Lidocaine-Prilocaine | Akorn, Fougera, Hi-Tech,  Impax, Sandoz | March 2014 to present |
| 339. | Loperamide HCL Capsules | Mylan, Teva | April 2014 to the present |
| 340. | Medroxyprogesterone Tablets | Greenstone, Teva | November 2013 to Present |
| 341. | Meprobamate | Dr. Reddy s, Heritage | March 2013 to present |
| 342. | Metformin ER | Actavis, Amneal, Lupin, Sun, Teva | July 2015 to Present |
| 343. | Methadone HCL | Mallinckrodt, West-Ward | 2014 to Present |
| 344. | Methotrexate Tablets | Mylan, Par, Teva, West-Ward | February 2013 to Present |
| 345. | Methylphenidate | Actavis, Impax, Mallinckrodt, Par, Sandoz, Sun | February 2013 to Present |
| 346. | Methylprednisolone | Breckenridge, Cadista, Greenstone, Par, Sandoz | February 2011 to Present |
| 347. | Metronidazole | G&W, Impax, Sandoz, Taro, Teva, Valeant | Summer 2011 to present |
| 348. | Metronidazole Cream | G&W, Sandoz, Teva | Summer 2011 to present |
| 349. | Metronidazole Jelly | G&W, Impax, Sandoz, Taro, Teva | June 2011 to Present |
| 350. | Metronidazole Lotion | Sandoz, Teva | June 2011 to Present |
| 351. | Metronidazole Vaginal | Sandoz, Valeant | February 2015 to Present |
| 352. | Mimvey (Estradiol/Norethindrone Acetate) Tablets | Breckenridge, Teva | July 2012 to present |

655

| 353. | Moexipril Hydrochloride Tablets | Glenmark, Teva | May 2013 to present |
|---|---|---|---|
| 354. | Nabumetone Tablets | Actavis, Glenmark Sandoz, Teva | May2013 to present |
| 355. | Nadolol Tablets | Greenstone, Mylan Sandoz, Teva | May 2013 to present |
| 356. | Naproxen Sodium | Amneal, Glenmark | Winter 2014-2015 to present |
| 357. | Neomycin Polymyxin Hydrocortisone | Bausch, Sandoz | Spring 2010 to present |
| 358. | Niacin ER Tablets | Lupin, Teva, Zydus | March 2014 to present |
| 359. | Nimodipine | Heritage, Sun | June 2012 to present |
| 360. | Nitrofurantoin Macrocrystal Capsules | Alvogen, Mylan, Teva | July 2012 to present |
| 361. | Norethindrone Acetate | Amneal, Glenmark, Teva | September 2014 to present |
| 362. | Norethindrone/Ethinyl Estradiol (Balziva) | Lupin, Teva | January 2014 to present |
| 363. | Nortriptyline HCL Capsules | Actavis, Taro, Teva | November 2013 to Present |
| 364. | Nystatin | Actavis, Heritage, Par, Perrigo, Sandoz, Sun, Taro, Teva | Summer 2011 to present |
| 365. | Nystatin Cream | Actavis, Par, Perrigo, Sun, Taro | Summer 2011 to present |
| 366. | Nystatin Ointment | Actavis, Perrigo, Sandoz | Summer 2011 to present |
| 367. | Nystatin Tablets | Teva, Heritage, Sun | April 2013 to present |
| 368. | Nystatin Triamcinolone | Sandoz, Taro, Teva | 2011 to Present |
| 369. | Omega-3-Acid Ethyl Esters | Apotex, Par, Teva | June 2014 to the present |
| 370. | Ondansetron | Glenmark, Teva | May 2013 to present |

| 371. | Oxaprozin Tablets | Dr. Reddy's, Greenstone, Sandoz, and Teva | July 2012 to present |
|---|---|---|---|
| 372. | Oxybutynin Chloride Tablets | Apotex, Par, Teva, Upsher-Smith | April 2013 to Present |
| 373. | Oxycodone HCL | Glenmark, Lannett, Mallinckrodt, Par, Teva | 2010 to present |
| 374. | Oxycodone/Acetaminophen | Actavis, Alvogen, Amneal, Aurobindo, Mallinckrodt, Mayne, Par, Teva | 2011 to present |
| 375. | Paricalcitol | Dr. Reddy's, Teva, and Zydus | March 2014 to present |
| 376. | Paromomycin | Heritage, Sun | April 2014 to present |
| 377. | Penicillin VK Tablets | Aurobindo, Greenstone, Sandoz Teva | August 2014 to present |
| 378. | Pentoxifylline Tablets | Apotex, Mylan, Teva | April 2014 to present |
| 379. | Permethrin | Actavis, Mylan, Perrigo | Beginning at least as early as 2011 |
| 380. | Perphenazine | Par, Sandoz | Summer 2009 to Present |
| 381. | Phenytoin Sodium | Amneal, Mylan, Sun, Taro | 2014 to Present |
| 382. | Pilocarpine HCL | Actavis, Impax, Lannett | 2010 to Present |
| 383. | Piroxicam | Greenstone, Teva | March 2014 to present |
| 384. | Potassium Chloride | Actavis, Mylan, Sandoz, Upsher-Smith, Zydus | July 2010 to Present |
| 385. | Pravastatin | Apotex, Glenmark, Lupin, Mylan, Teva, Zydus | May 2013 to Present |
| 386. | Prazosin HCL Capsules | Mylan, Teva | May 2013 to Present |
| 387. | Prednisolone Acetate | Greenstone, Sandoz | 2013 to Present |
| 388. | Prednisone | Actavis, Cadista, Par, West-Ward | 2013 to Present |
| 389. | Prochlorperazine Tablets | Mylan, Sandoz, Teva | May 2014 to the present |

| 390. | Propranolol | Actavis, Breckenridge, Heritage, Mylan, Par, Teva, UDL, Upsher-Smith | November 2013 to present |
|---|---|---|---|
| 391. | Propranolol Capsules | Actavis, Breckenridge, Upsher-Smith | November 2013 to present |
| 392. | Propranolol Tablets | Actavis, Heritage, Mylan Par, Pliva, Teva, UDL | January 2015 to the present |
| 393. | Raloxifene HCL | Teva, Camber, Activis | September 2014 to Present |
| 394. | Ranitidine HCL Tablets | Amneal, Glenmark Sandoz, Teva | May 2013 to Present |
| 395. | Ranitidine HCL Capsules | Dr. Reddy's, Sandoz | 2012 - Present |
| 396. | Silver Sulfadiazine | Ascend, Teva | Spring 2012 to present |
| 397. | Spironolactone HCTZ | Greenstone, Mylan, Sun | 2013 to Present |
| 398. | Tamoxifen Citrate Tablets | Actavis, Mylan, Teva | March 2014 to present |
| 399. | Temozolomide | Sandoz, Teva | July 2013 to present |
| 400. | Theophylline ER | Heritage, Teva | February 2014 to Present |
| 401. | Timolol Maleate | Bausch, Sandoz | 2014 to Present |
| 402. | Tizanidine | Apotex, Dr. Reddy's Mylan Sandoz, and Sun | May 2013 to present |
| 403. | Tobramycin | Sandoz, Teva | October 2013 to present |
| 404. | Tobramycin Dexamethasone | Bausch, Sandoz | Winter 2012-2013 to present |
| 405. | Tolmetin Sodium Capsules | Mylan, Teva | May 2013 to present |
| 406. | Tolterodine | Greenstone, Mylan, Teva | December 2013 to Present |

| 407. | Tolterodine ER | Mylan, Teva | October 2013 |
| 408. | Tolterodine Tartrate | Greenstone, Teva | January 2014 |
| 409. | Topiramate Sprinkle Capsules | Actavis, Teva Zydus | April 2014 to Present |
| 410. | Trazodone HCL | Apotex, Par, Sun, Teva | Winter 2014-2015 to present |
| 411. | Triamcinolone Acetonide | Ascend, Par, Perrigo, Sandoz, Taro | Spring 2010 |
| 412. | Triamcinolone Acetonide Cream | Ascend, Par, Perrigo, Sandoz, Taro | Spring 2010 |
| 413. | Triamcinolone Acetonide Ointment | Ascend, Par, Perrigo, Sandoz, Taro | Spring 2010 |
| 414. | Triamterene HCTZ | Actavis, Apotex, Lannett, Mylan, Sandoz | 2013 to present |
| 415. | Trifluoperazine HCL | Mylan, Sandoz, Upsher-Smith | January 2013 to Present |
| 416. | Ursodiol | Actavis, Epic, Lannett | May 2014 to present |
| 417. | Valsartan HCTZ | Mylan, Sandoz | September 2012 to present |
| 418. | Verapamil | Actavis, Heritage, Mylan | April 2014 to present |
| 419. | Warfarin Sodium Tablets | Taro, Teva, Zydus | June 2014 to Present |
| 420. | Zoledronic Acid | Dr. Reddy' s, Heritage | January 2013 to present |

2655.    Beginning on or about the time referenced in the table above and continuing in force or effect, or both, through the date of filing of this Complaint, Defendants and their co- conspirators engaged in a continuing agreement, understanding and conspiracy not to compete  on the sale of the generic drugs referenced in the table above in the United States in unreasonable restraint of trade and commerce in violation of Certain State Antitrust and Consumer Protection Statutes

659

2656.     The contract, combination, and conspiracy among Defendants and their co-conspirators consisted of a continuing course, pattern, and practice of conduct regarding the production, pricing, marketing, and/or sale of the specified generic drug in violation of Certain State Antitrust and Consumer Protection Statutes

2657.     The course, pattern, and practice of conduct described above included, among other things, a continuing agreement, understanding and concert of action among Defendants and their co-conspirators, the substantial terms and purpose of which were one or more of the following:

e.     To fix, stabilize, maintain, and/or raise prices of the specified generic drug sold to A&P and others in the United States;

f.     To allocate customers, the volume of sales, and/or market shares of the specified generic drug sold to A&P and others in the United States;

g.     To control the production and/or sale of the specified generic drug and others in the United States; and/or

h.     To earn supracompetitive profits on the price of the specified generic drug sold to A&P and others in the United States that resulted from Defendants' collusion.

2658.     In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants and their co-conspirators engaged in one or more of the following overt acts (including those overt acts alleged above in this Complaint):

e.     They agreed to exchange, and did exchange, current and future price information about the specified generic drug sold in the United States, including the prices quoted or charged to A&P for the sale of the specified generic drug;

f.     They agreed to coordinate, and did coordinate, price levels, price terms, and/or price movements for sale of the specified generic drug sold in the United States;

g.     They agreed on prices, price levels, and/or production levels of the specified generic drug sold in the United States; and/or

h.     They agreed not to compete for certain customers or sales on certain products, and/or in certain regions of the United States.

660

2659.    Defendants and their co-conspirators entered into and refined their illegal combination and conspiracy through, among other things: the overt acts described above, including, without limitation, participating in conversations and meetings to discuss the prices of each the specified generic drug to be sold to A&P and/or others in the United States; participating in conversations and attending meetings concerning implementation of and adherence to their conspiracy; issuing price announcements and/or price quotations in  accordance with the conspiracy; and/or exchanging confidential information on the pricing and/or sale of the specified generic drug to A&P and/or others in the United States.

2660.    As a result of Defendants and their co-conspirators' conspiracy in violation of Certain State Antitrust and Consumer Protection Statutes and during the time period relevant to Plaintiff's claims:

e.    Price competition in the sale of the specified generic drug among Defendants and their co-conspirators to A&P and others in the United States has been restrained, suppressed, and eliminated;

f.    Prices for the specified generic drug sold by Defendants and their co-conspirators to A&P and others have been raised, fixed, maintained, and/or stabilized at artificially high and supracompetitive levels throughout the United States; and

g.    A&P and other direct purchasers of the specified generic drug produced and sold by Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

h.    A&P has been injured in its business or property by reason of Defendants and their co-conspirators' antitrust violations in amounts not yet ascertained. A&P's injury as an indirect purchaser of the specified generic drug is an injury of the type the antitrust laws were designed to prevent and flows from that which makes Defendants and their co-conspirators' conduct unlawful.

### G. Count 421 (Against Defendant Ara Aprahamian) – For Direct Purchases under Section 1 of the Sherman Act – Horizontal Conspiracy to Allocate Markets and Fix Prices For Multiple Generic Drugs

2661.    Plaintiff repeats and re-alleges every preceding allegation as if fully set forth

661

herein.

2662.    Beginning at least as early as 2013, Defendant Aprahamian took active steps to facilitate market allocation and price fixing agreements between Defendant Taro and its competitors involving numerous generic drugs, as discussed herein.

2663.    Defendant Aprahamian participated directly in these conspiracies by communicating with competitors about market entry, loss of exclusivity, price increases, supply disruptions, and other significant markets events affecting Defendant Taro and its competitors.

2664.    These communications resulted in agreements between Defendant Taro and various competitors to allocate and divide customers and markets for various generic drugs in accordance with the fair share principles discussed above, and to fix and raise prices, and rig bids, for numerous generic drugs. The generic drugs subject to these market allocation and price- fixing agreements include at least the following:

Adapalene Gel
Carbamazepine Chewable Tablets
Carbamazepine Tablets
Clomipramine HCL
Clotrimazole Topical Solution
Enalapril Maleate Tablets Epitol
Tablets
Etodolac ER Tablets
Etodolac Tablets
Fluocinonide Cream
Fluocinonide Emollient Cream
Fluocinonide Gel
Fluocinonide Ointment
Ketoconazole Cream
Ketoconazole Tablets
Nortriptyline Hydrochloride Capsules
Warfarin Sodium Tablets

2665.    These agreements are facially anticompetitive because they allocate customers for the marketing and sale of generic drugs, artificially raise prices, and limit

662

competition between Defendant Taro and its competitors. These agreements have eliminated any meaningful form of price competition in the market for numerous generic drugs, including those identified herein.

2666.    The conspiracies substantially affected and still affect interstate commerce.

2667.    The agreements constitute unreasonable restraints of trade that are *per se* illegal under Section 1 of the Sherman Act. No elaborate analysis is required to demonstrate the anticompetitive character of these agreements.

2668.    As a direct and proximate result of this ongoing conspiracy, A&P has been injured in its business or property because it had to purchase numerous generic drugs, including those identified herein, at supra-competitive prices, and Defendant Aprahamian has personally enjoyed ill-gotten gains from the sales of these generic drugs.

2669.    As a participant in the agreements identified above, Defendant Aprahamian is jointly and severally liable for any harm caused as a result of those conspiracies.

### H. Count 422 (Against Defendant Ara Aprahamian) – For Indirect Purchases under Certain State Antitrust and Consumer Protection Statutes – Horizontal Conspiracy to Allocate Markets and Fix Prices For Multiple Generic Drugs

2670.    Plaintiff repeats and re-alleges every preceding allegation as if fully set forth herein.

2671.    Beginning at least as early as 2013, Defendant Aprahamian took active steps to facilitate market allocation and price fixing agreements between Defendant Taro and its competitors involving numerous generic drugs, as discussed herein.

2672.    Defendant Aprahamian participated directly in these conspiracies by communicating with competitors about market entry, loss of exclusivity, price increases,

supply disruptions, and other significant markets events affecting Defendant Taro and its competitors.

2673. These communications resulted in agreements between Defendant Taro and various competitors to allocate and divide customers and markets for various generic drugs in accordance with the fair share principles discussed above, and to fix and raise prices, and rig bids, for numerous generic drugs. The generic drugs subject to these market allocation and price- fixing agreements include at least the following:

Adapalene Gel
Carbamazepine Chewable Tablets
Carbamazepine Tablets
Clomipramine HCL
Clotrimazole Topical Solution
Enalapril Maleate Tablets
Epitol Tablets
Etodolac ER Tablets
Etodolac Tablets
Fluocinonide Cream
Fluocinonide Emollient Cream
Fluocinonide Gel
Fluocinonide Ointment
Ketoconazole Cream
Ketoconazole Tablets
Nortriptyline Hydrochloride Capsules
Warfarin Sodium Tablets

2674. These agreements are facially anticompetitive because they allocate customers for the marketing and sale of generic drugs, artificially raise prices, and limit competition between Defendant Taro and its competitors. These agreements have eliminated any meaningful form of price competition in the market for numerous generic drugs, including those identified herein.

2675. The conspiracies substantially affected and still affect interstate commerce.

2676. The agreements constitute unreasonable restraints of trade that are *per se*

illegal under Certain State Antitrust and Consumer Protection Statutes. No elaborate analysis is required to demonstrate the anticompetitive character of these agreements.

2677.    As a direct and proximate result of this ongoing conspiracy, A&P has been injured in its business or property because it had to purchase numerous generic drugs, including those identified herein, at supra-competitive prices, and Defendant Aprahamian has personally enjoyed ill-gotten gains from the sales of these generic drugs.

2678.    As a participant in the agreements identified above, Defendant Aprahamian is jointly and severally liable for any harm caused as a result of those conspiracies.

## I. Count 423 (Against Defendant David Berthold) – For Direct Purchases under Section 1 of the Sherman Act – Horizontal Conspiracy to Allocate Markets and Fix Prices for Multiple Generic Drugs

2679.    Plaintiff repeats and re-alleges every preceding allegation as if fully set  forth herein.

2680.    Beginning at least as early as 2012, Defendant Berthold took active steps to facilitate market allocation and price fixing agreements between Defendant Lupin and its competitors involving numerous generic drugs, as discussed herein.

2681.    Defendant Berthold participated directly in these conspiracies by communicating with competitors about market entry, loss of exclusivity, price increases, supply disruptions, and other significant markets events affecting Defendant Lupin and its competitors.

2682.    These communications resulted in agreements between Defendant Lupin and various competitors to allocate and divide customers and markets for various generic drugs in accordance with the fair share principles discussed above, and to fix and raise prices, and rig bids, for numerous generic drugs. The generic drugs subject to these market

allocation and price- fixing agreements include at least the following:

Cefdinir Capsules
Cefdinir Oral Suspension
Cefprozil Tablets
Cephalexin Suspension
Drospirenone and ethinyl estradiol
(Ocella)
Fenofibrate
Irbesartan
Lamivudine/Zidovudine (generic
Combivir)
Niacin ER Tablets
Norethindrone/ethinyl estradiol
(Balziva)
Pravastatin Sodium Tablets

2683.    These agreements are facially anticompetitive because they allocate customers for the marketing and sale of generic drugs, artificially raise prices, and limit competition between Defendant Lupin and its competitors. These agreements have eliminated any meaningful form of price competition in the market for numerous generic drugs, including those identified herein.

2684.    The conspiracies substantially affected and still affect interstate commerce.

2685.    The agreements constitute unreasonable restraints of trade that are *per se* illegal under Section 1 of the Sherman Act. No elaborate analysis is required to demonstrate the anticompetitive character of these agreements.

2686.    As a direct and proximate result of this ongoing conspiracy, A&P has been injured in its business or property because it had to purchase numerous generic drugs, including those identified herein, at supra-competitive prices, and Defendant Berthold has personally enjoyed ill-gotten gains from the sales of these generic drugs.

2687.    As a participant in the agreements identified above, Defendant Berthold

666

is jointly and severally liable for any harm caused as a result of those conspiracies.

**J. Count 424 (Against Defendant David Berthold) – For Indirect Purchases under Certain State Antitrust and Consumer Protection Statutes – Horizontal Conspiracy to Allocate Markets and Fix Prices for Multiple Generic Drugs**

2688.    Plaintiff repeats and re-alleges every preceding allegation as if fully set forth herein.

2689.    Beginning at least as early as 2012, Defendant Berthold took active steps to facilitate market allocation and price fixing agreements between Defendant Lupin and its competitors involving numerous generic drugs, as discussed herein.

2690.    Defendant Berthold participated directly in these conspiracies by communicating with competitors about market entry, loss of exclusivity, price increases, supply disruptions, and other significant markets events affecting Defendant Lupin and its competitors.

2691.    These communications resulted in agreements between Defendant Lupin and various competitors to allocate and divide customers and markets for various generic drugs in accordance with the fair share principles discussed above, and to fix and raise prices, and rig bids, for numerous generic drugs. The generic drugs subject to these market allocation and price- fixing agreements include at least the following:

Cefdinir Capsules
Cefdinir Oral Suspension
Cefprozil Tablets
Cephalexin Suspension
Drospirenone and ethinyl estradiol
(Ocella)
Fenofibrate
Irbesartan
Lamivudine/Zidovudine (generic
Combivir)
Niacin ER Tablets
Norethindrone/ethinyl estradiol

(Balziva)

Pravastatin Sodium Tablets

2692.    These agreements are facially anticompetitive because they allocate customers for the marketing and sale of generic drugs, artificially raise prices, and limit competition between Defendant Lupin and its competitors. These agreements have eliminated any meaningful form of price competition in the market for numerous generic drugs, including those identified herein.

2693.    The conspiracies substantially affected and still affect interstate commerce.

2694.    The agreements constitute unreasonable restraints of trade that are *per se* illegal under Certain State Antitrust and Consumer Protection Statutes. No elaborate analysis is required to demonstrate the anticompetitive character of these agreements.

2695.    As a direct and proximate result of this ongoing conspiracy, A&P has been injured in its business or property because it had to purchase numerous generic drugs, including those identified herein, at supra-competitive prices, and Defendant Berthold has personally enjoyed ill-gotten gains from the sales of these generic drugs.

2696.    As a participant in the agreements identified above, Defendant Berthold is jointly and severally liable for any harm caused as a result of those conspiracies.

### K. Count 425 (Against Defendant James (Jim) Brown) – For Indirect Purchases under Certain State Antitrust and Consumer Protection Statutes – Horizontal Conspiracy to Allocate Markets and Fix Prices for Multiple Generic Drugs

2697.    Plaintiff repeats and re-alleges every preceding allegation as if fully set forth herein.

2698.    Beginning at least as early as 2013, Defendant Brown took active steps to facilitate market allocation and price fixing agreements between Defendant Glenmark

and its competitors involving numerous generic drugs, as discussed herein.

2699.    Defendant Brown participated directly or indirectly in these conspiracies by communicating with competitors, directing others at Glenmark to communicate with competitors, or tacitly approving of those communications by other Glenmark employees, about market entry, loss of exclusivity, price increases, supply disruptions, and other significant markets events affecting Defendant Glenmark and its competitors.

2700.    These communications resulted in agreements between Defendant Glenmark and various competitors to allocate and divide customers and markets for various generic drugs in accordance with the fair share principles discussed above, and to fix and raise prices, and rig bids, for numerous generic drugs. The generic drugs subject to these market allocation and price- fixing agreements include at least the following:

Adapalene Gel
Desogestrel/Ethinyl Estradiol
Tablets (Kariva)
Fluconazole Tablets
Gabapentin Tablets
Moexipril HCL Tablets
Moexipril HCL/HCTZ Tablets
Nabumetone Tablets
Norethindrone Acetate
Pravastatin Sodium Tablets
Ranitidine HCL Tablets

2701.    These agreements are facially anticompetitive because they allocate customers for the marketing and sale of generic drugs, artificially raise prices, and limit competition between Defendant Glenmark and its competitors. These agreements have eliminated any meaningful form of price competition in the market for numerous generic drugs, including those identified herein.

2702.    The conspiracies substantially affected and still affect interstate commerce.

669

2703.     The agreements constitute unreasonable restraints of trade that are *per se* illegal under Certain State Antitrust and Consumer Protection Statutes. No elaborate analysis is required to demonstrate the anticompetitive character of these agreements.

2704.     As a direct and proximate result of this ongoing conspiracy, A&P has been injured in its business or property because it had to purchase numerous generic drugs, including those identified herein, at supra-competitive prices, and Defendant Brown has personally enjoyed ill-gotten gains from the sales of these generic drugs.

2705.     As a participant in the agreements identified above, Defendant Brown is jointly and severally liable for any harm caused as a result of those conspiracies.

### L. Count 426 (Against Defendant Maureen Cavanaugh) – For Direct Purchases under Section 1 of the Sherman Act – Horizontal Conspiracy to Allocate Markets and Fix Prices for Multiple Generic Drugs

2706.     Plaintiff repeats and re-alleges every preceding allegation as if fully set forth herein.

2707.     Beginning at least as early as 2012, Defendant Cavanaugh took active steps to facilitate market allocation and price fixing agreements between Defendant Teva and its competitors involving numerous generic drugs, as discussed herein.

2708.     Defendant Cavanaugh participated directly or indirectly in these conspiracies by communicating with competitors, directing others at Teva to communicate with competitors, or tacitly approving of those communications by other Teva employees, about market entry, loss of exclusivity, price increases, supply disruptions, and other significant markets events affecting Defendant Teva and its competitors.

2709.     These communications resulted in agreements between Defendant Teva and various competitors to allocate and divide customers and markets for various generic drugs in accordance with the fair share principles discussed above, and to fix and raise

prices, and rig bids, for numerous generic drugs. The generic drugs subject to these market

allocation and price- fixing agreements include at least the following:

Adapalene Gel
Amiloride HCL/HCTZ Tablets
Amoxicillin/Clavulanate Chewable Tablets
Amphetamine/Dextroamphetamine ER (aka Mixed Amphetamine Salts) Amphetamine/Dextroamphetamine IR
Azithromycin Oral Suspension
Azithromycin Suspension
Baclofen Tablets
Bethanechol Chloride Tablets
Budesonide DR Capsules
Budesonide Inhalation
Bumetanide Tablets
Buspirone Hydrochloride Tablets
Cabergoline
Capecitabine
Carbamazepine Chewable Tablets
Carbamazepine Tablets
Cefdinir Capsules
Cefdinir Oral Suspension
Cefprozil Tablets Celecoxib
Cephalexin Suspension
Cimetidine Tablets
Ciprofloxacin HCL Tablets
Clarithromycin ER Tablets
Clemastine Fumarate Tablets
Clonidine TTS Patch
Clotrimazole Topical Solution
Cyproheptadine HCL Tablets
Desmopressin Acetate Tablets
Desogestrel/Ethinyl Estradiol Tablets (Kariva)
Dexmethylphenidate HCL ER Capsules
Dextroamphetamine Sulfate ER
Diclofenac Potassium Tablets
Dicloxacillin Sodium Capsules
Diflunisal Tablets
Diltiazem HCL Tablets
Disopyramide Phosphate Capsules
Doxazosin Mesylate Tablets
Drospirenone and ethinyl estradiol (Ocella)
Enalapril Maleate Tablets
Entecavir Epitol Tablets
Estazolam Tablets
Estradiol Tablets
Ethinyl estradiol and levonorgestrel (Portia and Jolessa)

671

Ethosuximide Capsules
Ethosuximide Oral Solution
Etodolac ER Tablets
Etodolac Tablets
Fenofibrate Fluconazole Tablets
Fluocinonide Cream
Fluocinonide Emollient Cream
Fluocinonide Gel
Fluocinonide Ointment
Fluoxetine HCL Tablets
Flurbiprofen Tablets
Flutamide Capsules
Fluvastatin Sodium Capsules
Gabapentin Tablets
Glimepiride Tablets
Griseofulvin Suspension
Hydroxyurea Capsules
Hydroxyzine Pamoate Capsules
Irbesartan
Isoniazid
Ketoconazole Cream
Ketoconazole Tablets
Ketoprofen Capsules
Ketorolac Tromethamine Tablets
Labetalol HCL Tablets
Lamivudine/Zidovudine (generic Combivir)
Loperamide HCL Capsules
Medroxyprogesterone Tablets
Methotrexate Tablets
Mimvey (Estradiol/Norethindrone Acetate) Tablets
Moexipril HCL Tablets
Moexipril HCL/HCTZ Tablets
Nabumetone Tablets
Nadolol Tablets
Niacin ER Tablets
Nitrofurantoin MAC Capsules
Norethindrone/ethinyl estradiol (Balziva)
Norethindrone Acetate
Nortriptyline Hydrochloride Capsules
Omega-3-Acid Ethyl Esters
Oxaprozin Tablets
Oxybutynin Chloride Tablets
Paricalcitol
Penicillin VK Tablets
Pentoxifylline Tablets
Piroxicam
Pravastatin Sodium Tablets
Prazosin HCL Capsules

672

Prochlorperazine Tablets
Propranolol HCL Tablets
Raloxifene HCL Tablets
Ranitidine HCL Tablets
Tamoxifen Citrate Tablets
Temozolomide
Tobramycin
Tolmetin Sodium Capsules
Tolterodine ER
Tolterodine Tartrate
Topiramate Sprinkle Capsules
Warfarin Sodium Tablets

2710.    These agreements are facially anticompetitive because they allocate customers for the marketing and sale of generic drugs, artificially raise prices, and limit competition between Defendant Teva and its competitors. These agreements have eliminated any meaningful form of price competition in the market for numerous generic drugs, including those identified herein.

2711.    The conspiracies substantially affected and still affect interstate commerce.

2712.    The agreements constitute unreasonable restraints of trade that are *per se* illegal under Section 1 of the Sherman Act. No elaborate analysis is required to demonstrate the anticompetitive character of these agreements.

2713.    As a direct and proximate result of this ongoing conspiracy, A&P has been injured in its business or property because it had to purchase numerous generic drugs, including those identified herein, at supra-competitive prices, and Defendant Cavanaugh has personally enjoyed ill-gotten gains from the sales of these generic drugs.

2714.    As a participant in the agreements identified above, Defendant Cavanaugh is jointly and severally liable for any harm caused as a result of those conspiracies.

673

**M. Count 427 (Against Defendant Maureen Cavanaugh) – For Indirect Purchases under Certain State Antitrust and Consumer Protection Statutes – Horizontal Conspiracy to Allocate Markets and Fix Prices for Multiple Generic Drugs**

2715.    Plaintiff repeats and re-alleges every preceding allegation as if fully set forth herein.

2716.    Beginning at least as early as 2012, Defendant Cavanaugh took active steps to facilitate market allocation and price fixing agreements between Defendant Teva and its competitors involving numerous generic drugs, as discussed herein.

2717.    Defendant Cavanaugh participated directly or indirectly in these conspiracies by communicating with competitors, directing others at Teva to communicate with competitors, or tacitly approving of those communications by other Teva employees, about market entry, loss of exclusivity, price increases, supply disruptions, and other significant markets events affecting Defendant Teva and its competitors.

2718.    These communications resulted in agreements between Defendant Teva and various competitors to allocate and divide customers and markets for various generic drugs in accordance with the fair share principles discussed above, and to fix and raise prices, and rig bids, for numerous generic drugs. The generic drugs subject to these market allocation and price- fixing agreements include at least the following:

> Adapalene Gel
> Amiloride HCL/HCTZ Tablets
> Amoxicillin/Clavulanate Chewable Tablets
> Amphetamine/Dextroamphetamine ER (aka Mixed Amphetamine Salts) Amphetamine/Dextroamphetamine IR
> Azithromycin Oral Suspension
> Azithromycin Suspension
> Baclofen Tablets
> Bethanechol Chloride Tablets
> Budesonide DR Capsules
> Budesonide Inhalation
> Bumetanide Tablets
> Buspirone Hydrochloride Tablets

674

Cabergoline
Capecitabine
Carbamazepine Chewable Tablets
Carbamazepine Tablets
Cefdinir Capsules
Cefdinir Oral Suspension
Cefprozil Tablets Celecoxib
Cephalexin Suspension
Cimetidine Tablets
Ciprofloxacin HCL Tablets
Clarithromycin ER Tablets
Clemastine Fumarate Tablets
Clonidine TTS Patch
Clotrimazole Topical Solution
Cyproheptadine HCL Tablets
Desmopressin Acetate Tablets
Desogestrel/Ethinyl Estradiol Tablets (Kariva)
Dexmethylphenidate HCL ER Capsules
Dextroamphetamine Sulfate ER
Diclofenac Potassium Tablets
Dicloxacillin Sodium Capsules
Diflunisal Tablets
Diltiazem HCL Tablets
Disopyramide Phosphate Capsules
Doxazosin Mesylate Tablets
Drospirenone and ethinyl estradiol (Ocella)
Enalapril Maleate Tablets
Entecavir Epitol Tablets
Estazolam Tablets
Estradiol Tablets
Ethinyl estradiol and levonorgestrel (Portia and Jolessa)
Ethosuximide Capsules
Ethosuximide Oral Solution
Etodolac ER Tablets
Etodolac Tablets
Fenofibrate Fluconazole Tablets
Fluocinonide Cream
Fluocinonide Emollient Cream
Fluocinonide Gel
Fluocinonide Ointment
Fluoxetine HCL Tablets
Flurbiprofen Tablets
Flutamide Capsules
Fluvastatin Sodium Capsules
Gabapentin Tablets
Glimepiride Tablets
Griseofulvin Suspension
Hydroxyurea Capsules

675

Hydroxyzine Pamoate Capsules
Irbesartan
Isoniazid
Ketoconazole Cream
Ketoconazole Tablets
Ketoprofen Capsules
Ketorolac Tromethamine Tablets
Labetalol HCL Tablets
Lamivudine/Zidovudine (generic Combivir)
Loperamide HCL Capsules
Medroxyprogesterone Tablets
Methotrexate Tablets
Mimvey (Estradiol/Norethindrone Acetate) Tablets
Moexipril HCL Tablets
Moexipril HCL/HCTZ Tablets
Nabumetone Tablets
Nadolol Tablets
Niacin ER Tablets
Nitrofurantoin MAC Capsules
Norethindrone/ethinyl estradiol (Balziva)
Norethindrone Acetate
Nortriptyline Hydrochloride Capsules
Omega-3-Acid Ethyl Esters
Oxaprozin Tablets
Oxybutynin Chloride Tablets
Paricalcitol
Penicillin VK Tablets
Pentoxifylline Tablets
Piroxicam
Pravastatin Sodium Tablets
Prazosin HCL Capsules
Prochlorperazine Tablets
Propranolol HCL Tablets
Raloxifene HCL Tablets
Ranitidine HCL Tablets
Tamoxifen Citrate Tablets
Temozolomide
Tobramycin
Tolmetin Sodium Capsules
Tolterodine ER
Tolterodine Tartrate
Topiramate Sprinkle Capsules
Warfarin Sodium Tablets

2719.    These agreements are facially anticompetitive because they allocate customers for the marketing and sale of generic drugs, artificially raise prices, and limit

676

competition between Defendant Teva and its competitors. These agreements have eliminated any meaningful form of price competition in the market for numerous generic drugs, including those identified herein.

2720. The conspiracies substantially affected and still affect interstate commerce.

2721. The agreements constitute unreasonable restraints of trade that are *per se* illegal under Certain State Antitrust and Consumer Protection Statutes. No elaborate analysis is required to demonstrate the anticompetitive character of these agreements.

2722. As a direct and proximate result of this ongoing conspiracy, A&P has been injured in its business or property because it had to purchase numerous generic drugs, including those identified herein, at supra-competitive prices, and Defendant Cavanaugh has personally enjoyed ill-gotten gains from the sales of these generic drugs.

2723. As a participant in the agreements identified above, Defendant Cavanaugh is jointly and severally liable for any harm caused as a result of those conspiracies.

### N. Count 428 (Against Defendant Marc Falkin) – For Direct Purchases under Section 1 of the Sherman Act – Horizontal Conspiracy to Allocate Markets and Fix Prices for Multiple Generic Drugs

2724. Plaintiff repeats and re-alleges every preceding allegation as if fully set forth herein.

2725. Beginning at least as early as 2013, Defendant Falkin took active steps to facilitate market allocation and price fixing agreements between Defendant Actavis and its competitors involving numerous generic drugs, as discussed herein.

2726. Defendant Falkin participated directly or indirectly in these conspiracies by communicating with competitors, directing others at Actavis to communicate with

677

competitors, or tacitly approving of those communications by other Actavis employees, about market entry, loss of exclusivity, price increases, supply disruptions, and other significant markets events affecting Defendant Actavis and its competitors.

2727.    These communications resulted in agreements between Defendant Actavis and various competitors to allocate and divide customers and markets for various generic drugs in accordance with the fair share principles discussed above, and to fix and raise prices, and rig bids, for numerous generic drugs. The generic drugs subject to these market allocation and price- fixing agreements include at least the following:

Amphetamine/Dextroamphetamine IR
Budesonide Inhalation
Buspirone Hydrochloride Tablets
Celecoxib
Ciprofloxacin HCL Tablets
Clarithromycin ER Tablets
Clonidine TTS Patch
Desmopressin Acetate Tablets
Dextroamphetamine Sulfate ER
Disopyramide Phosphate Capsules
Drospirenone and ethinyl estradiol (Ocella)
Estazolam Tablets
Estradiol Tablets
Flutamide Capsules
Griseofulvin Suspension
Hydroxyzine Pamoate Capsules
Nortriptyline Hydrochloride Capsules
Propranolol HCL Tablets
Tamoxifen Citrate Tablets
Topiramate Sprinkle Capsules

2728.    These agreements are facially anticompetitive because they allocate customers for the marketing and sale of generic drugs, artificially raise prices, and limit competition between Defendant Actavis and its competitors. These agreements have eliminated any meaningful form of price competition in the market for numerous generic drugs, including those identified herein.

678

2729.    The conspiracies substantially affected and still affect interstate commerce.

2730.    The agreements constitute unreasonable restraints of trade that are *per se* illegal under Section 1 of the Sherman Act. No elaborate analysis is required to demonstrate the anticompetitive character of these agreements.

2731.    As a direct and proximate result of this ongoing conspiracy, A&P has been injured in its business or property because it had to purchase numerous generic drugs, including those identified herein, at supra-competitive prices, and Defendant Falkin has personally enjoyed ill-gotten gains from the sales of these generic drugs.

2732.    As a participant in the agreements identified above, Defendant Falkin is jointly and severally liable for any harm caused as a result of those conspiracies.

### O.  Count 429 (Against Defendant Marc Falkin) – For Indirect Purchases under Certain State Antitrust and Consumer Protection Statutes – Horizontal Conspiracy to Allocate Markets and Fix Prices for Multiple Generic Drugs

2733.    Plaintiff repeats and re-alleges every preceding allegation as if fully set forth herein.

2734.    Beginning at least as early as 2013, Defendant Falkin took active steps to facilitate market allocation and price fixing agreements between Defendant Actavis and its competitors involving numerous generic drugs, as discussed herein.

2735.    Defendant Falkin participated directly or indirectly in these conspiracies by communicating with competitors, directing others at Actavis to communicate with competitors, or tacitly approving of those communications by other Actavis employees, about market entry, loss of exclusivity, price increases, supply disruptions, and other significant markets events affecting Defendant Actavis and its competitors.

2736.    These communications resulted in agreements between Defendant

Actavis and various competitors to allocate and divide customers and markets for various generic drugs in accordance with the fair share principles discussed above, and to fix and raise prices, and rig bids, for numerous generic drugs. The generic drugs subject to these market allocation and price-fixing agreements include at least the following:

Amphetamine/Dextroamphetamine IR
Budesonide Inhalation
Buspirone Hydrochloride Tablets
Celecoxib
Ciprofloxacin HCL Tablets
Clarithromycin ER Tablets
Clonidine TTS Patch
Desmopressin Acetate Tablets
Dextroamphetamine Sulfate ER
Disopyramide Phosphate Capsules
Drospirenone and ethinyl estradiol (Ocella)
Estazolam Tablets
Estradiol Tablets
Flutamide Capsules
Griseofulvin Suspension
Hydroxyzine Pamoate Capsules
Nortriptyline Hydrochloride Capsules
Propranolol HCL Tablets
Tamoxifen Citrate Tablets
Topiramate Sprinkle Capsules

2737.    These agreements are facially anticompetitive because they allocate customers for the marketing and sale of generic drugs, artificially raise prices, and limit competition between Defendant Actavis and its competitors. These agreements have eliminated any meaningful form of price competition in the market for numerous generic drugs, including those identified herein.

2738.    The conspiracies substantially affected and still affect interstate commerce.

2739.    The agreements constitute unreasonable restraints of trade that are *per se* illegal under Certain State Antitrust and Consumer Protection Statutes. No elaborate

680

analysis is required to demonstrate the anticompetitive character of these agreements.

2740.    As a direct and proximate result of this ongoing conspiracy, A&P has been injured in its business or property because it had to purchase numerous generic drugs, including those identified herein, at supra-competitive prices, and Defendant Falkin has personally enjoyed ill-gotten gains from the sales of these generic drugs.

2741.    As a participant in the agreements identified above, Defendant Falkin is jointly and severally liable for any harm caused as a result of those conspiracies.

**P. Count 430 (Against Defendant James (Jim) Grauso) – For Direct Purchases under Section 1 of the Sherman Act – Horizontal Conspiracy to Allocate Markets and Fix Prices for Multiple Generic Drugs**

2742.    Plaintiff repeats and re-alleges every preceding allegation as if fully set forth herein.

2743.    Beginning at least as early as 2012, Defendant Grauso took active steps to facilitate market allocation and price fixing agreements between Defendants Aurobindo and/or Glenmark, and their competitors, involving certain generic drugs, as discussed herein.

2744.    Defendant Grauso participated directly or indirectly in these conspiracies by communicating with competitors, directing others at Aurobindo and/or Glenmark to communicate with competitors, or tacitly approving of those communications by other Aurobindo and/or Glenmark employees, about market entry, loss of exclusivity, price increases, supply disruptions, and other significant markets events affecting Defendants Aurobindo and/or Glenmark, and their competitors.

2745.    These communications resulted in agreements between Defendant Aurobindo and/or Glenmark and various competitors to allocate and divide customers and markets for various generic drugs in accordance with the fair share principles discussed

above, and to fix and raise prices, and rig bids, for certain generic drugs. The generic drugs subject to these market allocation and price-fixing agreements include at least the following:

Desogestrel/Ethinyl Estradiol Tablets (Kariva)
Gabapentin Tablets
Lamivudine/Zidovudine (generic Combivir)

2746. These agreements are facially anticompetitive because they allocate customers for the marketing and sale of generic drugs, artificially raise prices, and limit competition between Defendants Aurobindo and/or Glenmark and their competitors. These agreements have eliminated any meaningful form of price competition in the market for certain generic drugs, including those identified herein.

2747. The conspiracies substantially affected and still affect interstate commerce.

2748. The agreements constitute unreasonable restraints of trade that are *per se* illegal under Section 1 of the Sherman Act. No elaborate analysis is required to demonstrate the anticompetitive character of these agreements.

2749. As a direct and proximate result of this ongoing conspiracy, A&P has been injured in its business or property because it had to purchase certain generic drugs, including those identified herein, at supra-competitive prices, and Defendant Grauso has personally enjoyed ill-gotten gains from the sales of these generic drugs.

2750. As a participant in the agreements identified above, Defendant Grauso is jointly and severally liable for any harm caused as a result of those conspiracies.

**Q. Count 431 (Against Defendant James (Jim) Grauso) – For Indirect Purchases under Certain State Antitrust and Consumer Protection Statutes – Horizontal Conspiracy to Allocate Markets and Fix Prices for Multiple Generic Drugs**

2751. Plaintiff repeats and re-alleges every preceding allegation as if fully

682

set forth herein.

2752.    Beginning at least as early as 2012, Defendant Grauso took active steps to facilitate market allocation and price fixing agreements between Defendants Aurobindo and/or Glenmark, and their competitors, involving certain generic drugs, as discussed herein.

2753.    Defendant Grauso participated directly or indirectly in these conspiracies by communicating with competitors, directing others at Aurobindo and/or Glenmark to communicate with competitors, or tacitly approving of those communications by other Aurobindo and/or Glenmark employees, about market entry, loss of exclusivity, price increases, supply disruptions, and other significant markets events affecting Defendants Aurobindo and/or Glenmark, and their competitors.

2754.    These communications resulted in agreements between Defendant Aurobindo and/or Glenmark and various competitors to allocate and divide customers and markets for various generic drugs in accordance with the fair share principles discussed above, and to fix and raise prices, and rig bids, for certain generic drugs. The generic drugs subject to these market allocation and price-fixing agreements include at least the following:

Desogestrel/Ethinyl Estradiol Tablets (Kariva)
Gabapentin Tablets
Lamivudine/Zidovudine (generic Combivir)

2755.    These agreements are facially anticompetitive because they allocate customers for the marketing and sale of generic drugs, artificially raise prices, and limit competition between Defendants Aurobindo and/or Glenmark and their competitors. These agreements have eliminated any meaningful form of price competition in the market for certain generic drugs, including those identified herein.

2756. The conspiracies substantially affected and still affect interstate commerce.

2757. The agreements constitute unreasonable restraints of trade that are *per se* illegal under Certain State Antitrust and Consumer Protection Statutes. No elaborate analysis is required to demonstrate the anticompetitive character of these agreements.

2758. As a direct and proximate result of this ongoing conspiracy, A&P has been injured in its business or property because it had to purchase certain generic drugs, including those identified herein, at supra-competitive prices, and Defendant Grauso has personally enjoyed ill-gotten gains from the sales of these generic drugs.

2759. As a participant in the agreements identified above, Defendant Grauso is jointly and severally liable for any harm caused as a result of those conspiracies.

### R. Count 432 (Against Defendant Kevin Green) – For Direct Purchases under Section 1 of the Sherman Act – Horizontal Conspiracy to Allocate Markets and Fix Prices for Multiple Generic Drugs

2760. Plaintiff repeats and re-alleges every preceding allegation as if fully set forth herein.

2761. Beginning at least as early as 2012, Defendant Green took active steps to facilitate market allocation and price fixing agreements between Defendants Teva and/or Zydus and their competitors involving numerous generic drugs, as discussed herein.

2762. Defendant Green participated directly or indirectly in these conspiracies by communicating with competitors, directing others at Teva and/or Zydus to communicate with competitors, or tacitly approving of those communications by other Teva and/or Zydus employees, about market entry, loss of exclusivity, price increases, supply disruptions, and other significant markets events affecting Defendants Teva and/or Zydus and their competitors.

684

2763.    These communications resulted in agreements between Defendants Teva and/or Zydus and various competitors to allocate and divide customers and markets for various generic drugs in accordance with the fair share principles discussed above, and to fix and raise prices, and rig bids, for numerous generic drugs. The generic drugs subject to these market allocation and price-fixing agreements include at least the following:

Amiloride HCL/HCTZ Tablets
Amphetamine/Dextroamphetamine ER (aka Mixed Amphetamine Salts)
Buspirone Hydrochloride Tablets
Cefdinir Capsules
Cefdinir Oral Suspension
Cefprozil Tablets
Cimetidine Tablets
Clarithromycin ER Tablets
Clonidine TTS Patch
Diclofenac Potassium Tablets
Diltiazem HCL Tablets
Doxazosin Mesylate Tablets
Drospirenone and ethinyl estradiol (Ocella)
Enalapril Maleate Tablets
Estradiol Tablets
Ethinyl estradiol and levonorgestrel (Portia and Jolessa)
Etodolac ER Tablets
Fenofibrate Fluconazole Tablets
Irbesartan Ketoprofen Capsules
Ketorolac Tromethamine Tablets
Labetalol HCL Tablets
Lamivudine/Zidovudine (generic Combivir)
Levothyroxine
Loperamide HCL Capsules
Methotrexate Tablets
Nadolol Tablets
Niacin ER Tablets
Nitrofurantoin MAC Capsules
Oxaprozin Tablets
Paricalcitol
Pravastatin Sodium Tablets
Prazosin HCL Capsules
Tamoxifen Citrate Tablets
Temozolomide
Tolmetin Sodium Capsules
Topiramate Sprinkle Capsules
Warfarin Sodium Tablets

2764. These agreements are facially anticompetitive because they allocate customers for the marketing and sale of generic drugs, artificially raise prices, and limit competition between Defendants Teva and/or Zydus and their competitors. These agreements have eliminated any meaningful form of price competition in the market for numerous generic drugs, including those identified herein.

2765. The conspiracies substantially affected and still affect interstate commerce.

2766. The agreements constitute unreasonable restraints of trade that are *per se* illegal under Section 1 of the Sherman Act. No elaborate analysis is required to demonstrate the anticompetitive character of these agreements.

2767. As a direct and proximate result of this ongoing conspiracy, A&P has been injured in its business or property because it had to purchase numerous generic drugs, including those identified herein, at supra-competitive prices, and Defendant Green has personally enjoyed ill-gotten gains from the sales of these generic drugs.

2768. As a participant in the agreements identified above, Defendant Green is jointly and severally liable for any harm caused as a result of those conspiracies.

**S. Count 433 (Against Defendant Kevin Green) – For Indirect Purchases under Certain State Antitrust and Consumer Protection Statutes – Horizontal Conspiracy to Allocate Markets and Fix Prices for Multiple Generic Drugs**

2769. Plaintiff repeats and re-alleges every preceding allegation as if fully set forth herein.

2770. Beginning at least as early as 2012, Defendant Green took active steps to facilitate market allocation and price fixing agreements between Defendants Teva and/or Zydus and their competitors involving numerous generic drugs, as discussed herein.

2771. Defendant Green participated directly or indirectly in these conspiracies

686

by communicating with competitors, directing others at Teva and/or Zydus to communicate with competitors, or tacitly approving of those communications by other Teva and/or Zydus employees, about market entry, loss of exclusivity, price increases, supply disruptions, and other significant markets events affecting Defendants Teva and/or Zydus and their competitors.

2772.    These communications resulted in agreements between Defendants Teva and/or Zydus and various competitors to allocate and divide customers and markets for various generic drugs in accordance with the fair share principles discussed above, and to fix and raise prices, and rig bids, for numerous generic drugs. The generic drugs subject to these market allocation and price-fixing agreements include at least the following:

Amiloride HCL/HCTZ Tablets
Amphetamine/Dextroamphetamine ER (aka Mixed Amphetamine Salts)
Buspirone Hydrochloride Tablets
Cefdinir Capsules
Cefdinir Oral Suspension
Cefprozil Tablets
Cimetidine Tablets
Clarithromycin ER Tablets
Clonidine TTS Patch
Diclofenac Potassium Tablets
Diltiazem HCL Tablets
Doxazosin Mesylate Tablets
Drospirenone and ethinyl estradiol (Ocella)
Enalapril Maleate Tablets
Estradiol Tablets
Ethinyl estradiol and levonorgestrel (Portia and Jolessa)
Etodolac ER Tablets
Fenofibrate Fluconazole Tablets
Irbesartan Ketoprofen Capsules
Ketorolac Tromethamine Tablets
Labetalol HCL Tablets
Lamivudine/Zidovudine (generic Combivir)
Levothyroxine
Loperamide HCL Capsules
Methotrexate Tablets
Nadolol Tablets
Niacin ER Tablets
Nitrofurantoin MAC Capsules

Oxaprozin Tablets
Paricalcitol
Pravastatin Sodium Tablets
Prazosin HCL Capsules
Tamoxifen Citrate Tablets
Temozolomide
Tolmetin Sodium Capsules
Topiramate Sprinkle Capsules
Warfarin Sodium Tablets

2773.    These agreements are facially anticompetitive because they allocate customers for the marketing and sale of generic drugs, artificially raise prices, and limit competition between Defendants Teva and/or Zydus and their competitors. These agreements have eliminated any meaningful form of price competition in the market for numerous generic drugs, including those identified herein.

2774.    The conspiracies substantially affected and still affect interstate commerce.

2775.    The agreements constitute unreasonable restraints of trade that are *per se* illegal under Certain State Antitrust and Consumer Protection Statutes. No elaborate analysis is required to demonstrate the anticompetitive character of these agreements.

2776.    As a direct and proximate result of this ongoing conspiracy, A&P has been injured in its business or property because it had to purchase numerous generic drugs, including those identified herein, at supra-competitive prices, and Defendant Green has personally enjoyed ill-gotten gains from the sales of these generic drugs.

2777.    As a participant in the agreements identified above, Defendant Green is jointly  and severally liable for any harm caused as a result of those conspiracies.

**T. Count 434 (Against Defendant Robin Hatosy) – For Indirect Purchases under Certain State Antitrust and Consumer Protection Statutes – Horizontal Conspiracy to Allocate Markets and Fix Prices for Multiple Generic Drugs**

2778.    Plaintiff repeats and re-alleges every preceding allegation as if fully

set forth herein.

2779. Beginning at least as early as 2012, Defendant Hatosy took active steps to facilitate market allocation and price fixing agreements between Defendants Greenstone and Pfizer and their competitors involving numerous generic drugs, as discussed herein.

2780. Defendant Hatosy participated directly or indirectly in these conspiracies by communicating with competitors, directing others at Greenstone and/or Pfizer to communicate with competitors, or tacitly approving of those communications by other Greenstone and/or Pfizer employees, about market entry, loss of exclusivity, price increases, supply disruptions, and other significant markets events affecting Defendants Greenstone and Pfizer and their competitors.

2781. These communications resulted in agreements between Defendants Greenstone and Pfizer and various competitors to allocate and divide customers and markets for various generic drugs in accordance with the fair share principles discussed above, and to fix and raise prices, and rig bids, for numerous generic drugs. The generic drugs subject to these market allocation and price-fixing agreements include at least the following:

> Azithromycin Oral Suspension
> Azithromycin Suspension
> Cabergoline
> Fluconazole Tablets
> Medroxyprogesterone Tablets
> Oxaprozin Tablets
> Penicillin VK Tablets
> Piroxicam
> Tolterodine Tartrate

2782. These agreements are facially anticompetitive because they allocate customers for the marketing and sale of generic drugs, artificially raise prices, and limit

competition between Defendants Greenstone and Pfizer and their competitors. These agreements have eliminated any meaningful form of price competition in the market for numerous generic drugs, including those identified herein.

2783.    The conspiracies substantially affected and still affect interstate commerce.

2784.    The agreements constitute unreasonable restraints of trade that are *per se* illegal under Certain State Antitrust and Consumer Protection Statutes. No elaborate analysis is required to demonstrate the anticompetitive character of these agreements.

2785.    As a direct and proximate result of this ongoing conspiracy, A&P has been injured in its business or property because it had to purchase numerous generic drugs, including those identified herein, at supra-competitive prices, and Defendant Hatosy has personally enjoyed ill-gotten gains from the sales of these generic drugs.

2786.    As a participant in the agreements identified above, Defendant Hatosy is jointly and severally liable for any harm caused as a result of those conspiracies.

U. **Count 435 (Against Defendant Armando Kellum) – For Indirect Purchases under Certain State Antitrust and Consumer Protection Statutes – Horizontal Conspiracy to Allocate Markets and Fix Prices for Multiple Generic Drugs**

2787.    Plaintiff repeats and re-alleges every preceding allegation as if fully set forth herein.

2788.    Beginning at least as early as 2012, Defendant Kellum took active steps to facilitate market allocation and price fixing agreements between Defendant Sandoz and its competitors involving numerous generic drugs, as discussed herein.

2789.    Defendant Kellum participated directly or indirectly in these conspiracies by communicating with competitors, directing others at Sandoz to communicate with competitors, or tacitly approving of those communications by other

Sandoz employees, about market entry, loss of exclusivity, price increases, supply disruptions, and other significant markets events affecting Defendant Sandoz and its competitors.

2790.    These communications resulted in agreements between Defendant Sandoz and various competitors to allocate and divide customers and markets for various generic drugs in accordance with the fair share principles discussed above, and to fix and raise prices, and rig bids, for numerous generic drugs. The generic drugs subject to these market allocation and price- fixing agreements include at least the following:

Amoxicillin/Clavulanate Chewable Tablets
Benazepril HCTZ
Bumetanide Tablets
Cefdinir Capsules
Cefdinir Oral Suspension
Cefprozil Tablets
Clemastine Fumarate Tablets
Clomipramine HCL
Dexmethylphenidate HCL ER Capsules
Diclofenac Potassium Tablets
Dicloxacillin Sodium Capsules
Ethinyl estradiol and levonorgestrel (Portia and Jolessa)
Etodolac Tablets
Fluocinonide Emollient Cream
Fluocinonide Gel
Haloperidol
Hydroxyzine Pamoate Capsules
Ketoconazole Cream
Labetalol HCL Tablets
Levothyroxine Nabumetone Tablets
Nadolol Tablets
Penicillin VK Tablets Prochlorperazine Tablets
Temozolomide Tizanidine
Tobramycin
Trifluoperazine HCL
Valsartan HCTZ

2791.    These agreements are facially anticompetitive because they allocate customers for the marketing and sale of generic drugs, artificially raise prices, and limit competition between Defendant Sandoz and its competitors. These agreements have

eliminated any meaningful form of price competition in the market for numerous generic drugs, including those identified herein.

2792.    The conspiracies substantially affected and still affect interstate commerce.

2793.    The agreements constitute unreasonable restraints of trade that are *per se* illegal under Certain State Antitrust and Consumer Protection Statutes. No elaborate analysis is required to demonstrate the anticompetitive character of these agreements.

2794.    As a direct and proximate result of this ongoing conspiracy, A&P has been injured in its business or property because it had to purchase numerous generic drugs, including those identified herein, at supra-competitive prices, and Defendant Kellum has personally enjoyed ill-gotten gains from the sales of these generic drugs.

2795.    As a participant in the agreements identified above, Defendant Kellum is jointly and severally liable for any harm caused as a result of those conspiracies.

### V. Count 436 (Against Defendant Jill Nailor) – For Indirect Purchases under Certain State Antitrust and Consumer Protection Statutes – Horizontal Conspiracy to Allocate Markets and Fix Prices for Multiple Generic Drugs

2796.    Plaintiff repeats and re-alleges every preceding allegation as if fully set forth herein.

2797.    Beginning at least as early as 2012, Defendant Nailor took active steps to facilitate market allocation and price fixing agreements between Defendants Greenstone and Pfizer and their competitors involving numerous generic drugs, as discussed herein.

2798.    Defendant Nailor participated directly or indirectly in these conspiracies by communicating with competitors, directing others at Greenstone and/or Pfizer to communicate with competitors, or tacitly approving of those communications by other

692

Greenstone and/or Pfizer employees, about market entry, loss of exclusivity, price increases, supply disruptions, and other significant markets events affecting Defendants Greenstone and Pfizer and their competitors.

2799.    These communications resulted in agreements between Defendants Greenstone and Pfizer and various competitors to allocate and divide customers and markets for various generic drugs in accordance with the fair share principles discussed above, and to fix and raise prices, and rig bids, for numerous generic drugs. The generic drugs subject to these market allocation and price-fixing agreements include at least the following:

Azithromycin Oral Suspension
Azithromycin Suspension
Cabergoline
Fluconazole Tablets
Medroxyprogesterone Tablets
Oxaprozin Tablets
Penicillin VK Tablets
Piroxicam
Tolterodine Tartrate

2800.    These agreements are facially anticompetitive because they allocate customers for the marketing and sale of generic drugs, artificially raise prices, and limit competition between Defendants Greenstone and Pfizer and their competitors. These agreements have eliminated any meaningful form of price competition in the market for numerous generic drugs, including those identified herein.

2801.    The conspiracies substantially affected and still affect interstate commerce.

2802.    The agreements constitute unreasonable restraints of trade that are *per se* illegal under Certain State Antitrust and Consumer Protection Statutes. No elaborate analysis is required to demonstrate the anticompetitive character of these agreements.

693

2803.    As a direct and proximate result of this ongoing conspiracy, A&P has been injured in its business or property because it had to purchase numerous generic drugs, including those identified herein, at supra-competitive prices, and Defendant Nailor has personally enjoyed ill-gotten gains from the sales of these generic drugs.

2804.    As a participant in the agreements identified above, Defendant Nailor is jointly and severally liable for any harm caused as a result of those conspiracies.

### W. Count 437 (Against Defendant James Nesta) – For Direct Purchases under Section 1 of the Sherman Act – Horizontal Conspiracy to Allocate Markets and Fix Prices for Multiple Generic Drugs

2805.    Plaintiff repeats and re-alleges every preceding allegation as if fully set forth herein.

2806.    Beginning at least as early as 2012, Defendant Nesta took active steps to facilitate market allocation and price fixing agreements between Defendant Mylan and its competitors involving numerous generic drugs, as discussed herein.

2807.    Defendant Nesta participated directly in these conspiracies by communicating with competitors about market entry, loss of exclusivity, price increases, supply disruptions, and other significant markets events affecting Defendant Mylan and its competitors.

2808.    These communications resulted in agreements between Defendant Mylan and various competitors to allocate and divide customers and markets for various generic drugs in accordance with the fair share principles discussed above, and to fix and raise prices, and rig bids, for numerous generic drugs. The generic drugs subject to these market allocation and price- fixing agreements include at least the following:

Amiloride HCL/HCTZ Tablets
Benazepril HCTZ
Budesonide DR Capsules
Buspirone Hydrochloride Tablets

694

Capecitabine
Cimetidine Tablets
Clomipramine HCL
Clonidine TTS Patch
Diclofenac Potassium Tablets
Diltiazem HCL Tablets
Doxazosin Mesylate Tablets
Enalapril Maleate Tablets
Estradiol Tablets
Fenofibrate
Fluoxetine HCL Tablets
Flurbiprofen Tablets
Fluvastatin Sodium Capsules
Haloperidol
Ketoconazole Tablets
Ketoprofen Capsules
Ketorolac Tromethamine Tablets
Levothyroxine
Loperamide HCL Capsules
Methotrexate Tablets
Nadolol Tablets
Nitrofurantoin MAC Capsules
Pentoxifylline Tablets
Prazosin HCL Capsules
Prochlorperazine Tablets
Propranolol HCL Tablets
Tamoxifen Citrate Tablets
Tizanidine
Tolmetin Sodium Capsules
Tolterodine ER
Trifluoperazine HCL
Valsartan HCTZ

2809.    These agreements are facially anticompetitive because they allocate customers for the marketing and sale of generic drugs, artificially raise prices, and limit competition between Defendant Mylan and its competitors. These agreements have eliminated any meaningful form of price competition in the market for numerous generic drugs, including those identified herein.

2810.    The conspiracies substantially affected and still affect interstate commerce.

695

2811.    The agreements constitute unreasonable restraints of trade that are *per se* illegal under Section 1 of the Sherman Act. No elaborate analysis is required to demonstrate the anticompetitive character of these agreements.

2812.    As a direct and proximate result of this ongoing conspiracy, A&P has been injured in its business or property because it had to purchase numerous generic drugs, including those identified herein, at supra-competitive prices, and Defendant Nesta has personally enjoyed ill-gotten gains from the sales of these generic drugs.

2813.    As a participant in the agreements identified above, Defendant Nesta is jointly and severally liable for any harm caused as a result of those conspiracies.

### X. Count 438 (Against Defendant James Nesta) – For Indirect Purchases under Certain State Antitrust and Consumer Protection Statutes – Horizontal Conspiracy to Allocate Markets and Fix Prices for Multiple Generic Drugs

2814.    Plaintiff repeats and re-alleges every preceding allegation as if fully set forth herein.

2815.    Beginning at least as early as 2012, Defendant Nesta took active steps to facilitate market allocation and price fixing agreements between Defendant Mylan and its competitors involving numerous generic drugs, as discussed herein.

2816.    Defendant Nesta participated directly in these conspiracies by communicating with competitors about market entry, loss of exclusivity, price increases, supply disruptions, and other significant markets events affecting Defendant Mylan and its competitors.

2817.    These communications resulted in agreements between Defendant Mylan and various competitors to allocate and divide customers and markets for various generic drugs in accordance with the fair share principles discussed above, and to fix and raise prices, and rig bids, for numerous generic drugs. The generic drugs subject to these

696

market allocation and price- fixing agreements include at least the following:

Amiloride HCL/HCTZ Tablets
Benazepril HCTZ
Budesonide DR Capsules
Buspirone Hydrochloride Tablets
Capecitabine
Cimetidine Tablets
Clomipramine HCL
Clonidine TTS Patch
Diclofenac Potassium Tablets
Diltiazem HCL Tablets
Doxazosin Mesylate Tablets
Enalapril Maleate Tablets
Estradiol Tablets
Fenofibrate
Fluoxetine HCL Tablets
Flurbiprofen Tablets
Fluvastatin Sodium Capsules
Haloperidol
Ketoconazole Tablets
Ketoprofen Capsules
Ketorolac Tromethamine Tablets
Levothyroxine
Loperamide HCL Capsules
Methotrexate Tablets
Nadolol Tablets
Nitrofurantoin MAC Capsules
Pentoxifylline Tablets
Prazosin HCL Capsules
Prochlorperazine Tablets
Propranolol HCL Tablets
Tamoxifen Citrate Tablets
Tizanidine
Tolmetin Sodium Capsules
Tolterodine ER
Trifluoperazine HCL
Valsartan HCTZ

2818.    These agreements are facially anticompetitive because they allocate customers for the marketing and sale of generic drugs, artificially raise prices, and limit competition between Defendant Mylan and its competitors. These agreements have eliminated any meaningful form of price competition in the market for numerous generic

697

drugs, including those identified herein.

2819.    The conspiracies substantially affected and still affect interstate commerce.

2820.    The agreements constitute unreasonable restraints of trade that are *per se* illegal under Certain State Antitrust and Consumer Protection Statutes.    No elaborate analysis is required to demonstrate the anticompetitive character of these agreements.

2821.    As a direct and proximate result of this ongoing conspiracy, A&P has been injured in its business or property because it had to purchase numerous generic drugs, including those identified herein, at supra-competitive prices, and Defendant Nesta has personally enjoyed ill-gotten gains from the sales of these generic drugs.

2822.    As a participant in the agreements identified above, Defendant Nesta is jointly and severally liable for any harm caused as a result of those conspiracies.

### Y. Count 439 (Against Defendant Konstantin Ostaficiuk) – For Direct Purchases under Section 1 of the Sherman Act – Horizontal Conspiracy to Allocate Markets and Fix Prices for Multiple Generic Drugs

2823.    Plaintiff repeats and re-alleges every preceding allegation as if fully set forth herein.

2824.    Beginning at least as early as 2014, Defendant Ostaficiuk took active steps to facilitate market allocation and price fixing agreements between Camber Pharmaceuticals, Inc. and its competitors involving certain generic drugs, as discussed herein.

2825.    Defendant Ostaficiuk participated directly in these conspiracies by communicating with competitors about market entry, loss of exclusivity, price increases, supply disruptions, and other significant markets events affecting Defendant Mylan and its competitors.

698

2826.    These communications resulted in agreements between Camber Pharmaceuticals, Inc. and various competitors to allocate and divide customers and markets for various generic drugs in accordance with the fair share principles discussed above, and to fix and raise prices, and rig bids, for certain generic drugs. The generic drugs subject to these market allocation and price-fixing agreements include at least the following:

Lamivudine/Zidovudine
(generic Combivir)
Raloxifene HCL Tablets

2827.    These agreements are facially anticompetitive because they allocate customers for the marketing and sale of generic drugs, artificially raise prices, and limit competition between Camber Pharmaceuticals, Inc. and its competitors. These agreements have eliminated any meaningful form of price competition in the market for certain generic drugs, including those identified herein.

2828.    The conspiracies substantially affected and still affect interstate commerce.

2829.    The agreements constitute unreasonable restraints of trade that are *per se* illegal under Section 1 of the Sherman Act. No elaborate analysis is required to demonstrate the anticompetitive character of these agreements.

2830.    As a direct and proximate result of this ongoing conspiracy, A&P has been injured in its business or property because it had to purchase certain generic drugs, including those identified herein, at supra-competitive prices, and Defendant Ostaficiuk has personally enjoyed ill-gotten gains from the sales of these generic drugs.

2831.    As a participant in the agreements identified above, Defendant Ostaficiuk is  jointly and severally liable for any harm caused as a result of those

699

conspiracies.

**Z. Count 440 (Against Defendant Konstantin Ostaficiuk) – For Indirect Purchases under Certain State Antitrust and Consumer Protection Statutes – Horizontal Conspiracy to Allocate Markets and Fix Prices for Multiple Generic Drugs**

2832.    Plaintiff repeats and re-alleges every preceding allegation as if fully set forth herein.

2833.    Beginning at least as early as 2014, Defendant Ostaficiuk took active steps to facilitate market allocation and price fixing agreements between Camber Pharmaceuticals, Inc. and its competitors involving certain generic drugs, as discussed herein.

2834.    Defendant Ostaficiuk participated directly in these conspiracies by communicating with competitors about market entry, loss of exclusivity, price increases, supply disruptions, and other significant markets events affecting Defendant Mylan and its competitors.

2835.    These communications resulted in agreements between Camber Pharmaceuticals, Inc. and various competitors to allocate and divide customers and markets for various generic drugs in accordance with the fair share principles discussed above, and to fix and raise prices, and rig bids, for certain generic drugs. The generic drugs subject to these market allocation and price-fixing agreements include at least the following:

Lamivudine/Zidovudine
(generic Combivir)
Raloxifene HCL Tablets

2836.    These agreements are facially anticompetitive because they allocate customers for the marketing and sale of generic drugs, artificially raise prices, and limit competition between Camber Pharmaceuticals, Inc. and its competitors. These agreements

700

have eliminated any meaningful form of price competition in the market for certain generic drugs, including those identified herein.

2837.    The conspiracies substantially affected and still affect interstate commerce.

2838.    The agreements constitute unreasonable restraints of trade that are *per se* illegal under Certain State Antitrust and Consumer Protection Statutes. No elaborate analysis is required to demonstrate the anticompetitive character of these agreements.

2839.    As a direct and proximate result of this ongoing conspiracy, A&P has been injured in its business or property because it had to purchase certain generic drugs, including those identified herein, at supra-competitive prices, and Defendant Ostaficiuk has personally enjoyed ill-gotten gains from the sales of these generic drugs.

2840.    As a participant in the agreements identified above, Defendant Ostaficiuk is  jointly and severally liable for any harm caused as a result of those conspiracies.

**AA.    Count 441 (Against Defendant Nisha Patel) – For Direct Purchases under Section 1 of the Sherman Act – Horizontal Conspiracy to Allocate Markets and Fix Prices for Multiple Generic Drugs**

2841.    Plaintiff repeats and re-alleges every preceding allegation as if fully set forth herein.

2842.    Beginning at least as early as 2013, Defendant Patel took active steps to facilitate market allocation and price fixing agreements between Defendant Teva and its competitors involving numerous generic drugs, as discussed herein.

2843.    Defendant Patel participated directly or indirectly in these conspiracies by communicating with competitors, directing others at Teva to communicate with competitors, or tacitly approving of those communications by other Teva employees, about

701

market entry, loss of exclusivity, price increases, supply disruptions, and other significant markets events affecting Defendant Teva and its competitors.

2844.    These communications resulted in agreements between Defendant Teva and various competitors to allocate and divide customers and markets for various generic drugs in accordance with the fair share principles discussed above, and to fix and raise prices, and rig bids, for numerous generic drugs. The generic drugs subject to these market allocation and price- fixing agreements include at least the following:

Adapalene Gel
Amiloride HCL/HCTZ Tablets
Amoxicillin/Clavulanate Chewable Tablets
Amphetamine/Dextroamphetamine IR
Azithromycin Oral Suspension
Azithromycin Suspension
Baclofen Tablets
Bethanechol Chloride Tablets
Budesonide DR Capsules
Budesonide Inhalation
Bumetanide Tablets
Cabergoline
Capecitabine
Carbamazepine Chewable Tablets
Carbamazepine Tablets
Cefdinir Capsules
Cefdinir Oral Suspension
Cefprozil Tablets
Celecoxib
Cephalexin Suspension
Cimetidine Tablets
Ciprofloxacin HCL Tablets
Clarithromycin ER Tablets
Clemastine Fumarate Tablets
Clonidine TTS Patch
Clotrimazole Topical Solution
Cyproheptadine HCL Tablets
Desmopressin Acetate Tablets
Desogestrel/Ethinyl Estradiol Tablets (Kariva)
Dexmethylphenidate HCL ER Capsules
Dextroamphetamine Sulfate ER

702

Diclofenac Potassium Tablets

Dicloxacillin Sodium Capsules

Diflunisal Tablets

Diltiazem HCL Tablets

Disopyramide Phosphate Capsules

Doxazosin Mesylate Tablets

Drospirenone and ethinyl estradiol (Ocella)

Enalapril Maleate Tablets

Entecavir

Epitol Tablets

Estazolam Tablets

Estradiol Tablets

Ethosuximide Capsules

Ethosuximide Oral Solution

Etodolac ER Tablets

Etodolac Tablets

Fluconazole Tablets

Fluocinonide Cream

Fluocinonide Emollient Cream

Fluocinonide Gel

Fluocinonide Ointment

Fluoxetine HCL Tablets

Flurbiprofen Tablets

Flutamide Capsules

Fluvastatin Sodium Capsules

Gabapentin Tablets

Glimepiride Tablets

Griseofulvin Suspension

Hydroxyurea Capsules

Hydroxyzine Pamoate Capsules

Isoniazid

Ketoconazole  Cream

Ketoconazole Tablets

Ketoprofen Capsules

Ketorolac Tromethamine Tablets

Loperamide HCL Capsules

Medroxyprogesterone Tablets

Methotrexate Tablets

Mimvey (Estradiol/Norethindrone Acetate) Tablets

Moexipril HCL Tablets

Moexipril HCL/HCTZ Tablets

Nabumetone Tablets

Nadolol Tablets

Niacin ER Tablets

Norethindrone/ethinyl estradiol (Balziva)
Norethindrone Acetate
Nortriptyline Hydrochloride Capsules
Omega-3-Acid Ethyl Esters
Omxaprozin Tablets
Oxybutynin Chloride Tablets
Paricalcitol
Penicillin VK Tablets
Pentoxifylline Tablets
Piroxicam
Pravastatin Sodium Tablets
Prazosin HCL Capsules
Prochlorperazine Tablets
Propranolol HCL Tablets
Raloxifene HCL Tablets
Ranitidine HCL Tablets
Tamoxifen Citrate Tablets
Temozolomide
Tobramycin
Tolmetin Sodium Capsules
Tolterodine ER
Tolterodine Tartrate
Topiramate Sprinkle Capsules
Warfarin Sodium Tablets

2845.    These agreements are facially anticompetitive because they allocate customers for the marketing and sale of generic drugs, artificially raise prices, and limit competition between Defendant Teva and its competitors. These agreements have eliminated any meaningful form of price competition in the market for numerous generic drugs, including those identified herein.

2846.    The conspiracies substantially affected and still affect interstate commerce.

2847.    The agreements constitute unreasonable restraints of trade that are *per se* illegal under Section 1 of the Sherman Act. No elaborate analysis is required to demonstrate the anticompetitive character of these agreements.

2848.    As a direct and proximate result of this ongoing conspiracy, A&P has been injured in its business or property because it had to purchase numerous generic drugs,

704

including those identified herein, at supra-competitive prices, and Defendant Patel has personally enjoyed ill-gotten gains from the sales of these generic drugs.

2849.    As a participant in the agreements identified above, Defendant Patel is jointly and severally liable for any harm caused as a result of those conspiracies.

**BB.    Count 442 (Against Defendant Nisha Patel) – For Indirect Purchases under Certain State Antitrust and Consumer Protection Statutes – Horizontal Conspiracy to Allocate Markets and Fix Prices for Multiple Generic Drugs**

2850.    Plaintiff repeats and re-alleges every preceding allegation as if fully set forth herein.

2851.    Beginning at least as early as 2013, Defendant Patel took active steps to facilitate market allocation and price fixing agreements between Defendant Teva and its competitors involving numerous generic drugs, as discussed herein.

2852.    Defendant Patel participated directly or indirectly in these conspiracies by communicating with competitors, directing others at Teva to communicate with competitors, or tacitly approving of those communications by other Teva employees, about market entry, loss of exclusivity, price increases, supply disruptions, and other significant markets events affecting Defendant Teva and its competitors.

2853.    These communications resulted in agreements between Defendant Teva and various competitors to allocate and divide customers and markets for various generic drugs in accordance with the fair share principles discussed above, and to fix and raise prices, and rig bids, for numerous generic drugs. The generic drugs subject to these market allocation and price- fixing agreements include at least the following:

Adapalene Gel
Amiloride HCL/HCTZ Tablets
Amoxicillin/Clavulanate Chewable Tablets
Amphetamine/Dextroamphetamine IR
Azithromycin Oral Suspension

705

Azithromycin Suspension
Baclofen Tablets
Bethanechol Chloride Tablets
Budesonide DR Capsules
Budesonide Inhalation
Bumetanide Tablets
Cabergoline
Capecitabine
Carbamazepine Chewable Tablets
Carbamazepine Tablets
Cefdinir Capsules
Cefdinir Oral Suspension
Cefprozil Tablets
Celecoxib
Cephalexin Suspension
Cimetidine Tablets
Ciprofloxacin HCL Tablets
Clarithromycin ER Tablets
Clemastine Fumarate Tablets
Clonidine TTS Patch
Clotrimazole Topical Solution
Cyproheptadine HCL Tablets
Desmopressin Acetate Tablets
Desogestrel/Ethinyl Estradiol Tablets (Kariva)
Dexmethylphenidate HCL ER Capsules
Dextroamphetamine Sulfate ER
Diclofenac Potassium Tablets
Dicloxacillin Sodium Capsules
Diflunisal Tablets
Diltiazem HCL Tablets
Disopyramide Phosphate Capsules
Doxazosin Mesylate Tablets
Drospirenone and ethinyl estradiol (Ocella)
Enalapril Maleate Tablets
Entecavir
Epitol Tablets
Estazolam Tablets
Estradiol Tablets
Ethosuximide Capsules
Ethosuximide Oral Solution
Etodolac ER Tablets
Etodolac Tablets
Fluconazole Tablets
Fluocinonide Cream

706

Fluocinonide Emollient Cream
Fluocinonide Gel
Fluocinonide Ointment
Fluoxetine HCL Tablets
Flurbiprofen Tablets
Flutamide Capsules
Fluvastatin Sodium Capsules
Gabapentin Tablets
Glimepiride Tablets
Griseofulvin Suspension
Hydroxyurea Capsules
Hydroxyzine Pamoate Capsules
Isoniazid
Ketoconazole  Cream
Ketoconazole Tablets
Ketoprofen Capsules
Ketorolac Tromethamine Tablets
Loperamide HCL Capsules
Medroxyprogesterone Tablets
Methotrexate Tablets
Mimvey (Estradiol/Norethindrone Acetate) Tablets
Moexipril HCL Tablets
Moexipril HCL/HCTZ Tablets
Nabumetone Tablets
Nadolol Tablets
Niacin ER Tablets
Norethindrone/ethinyl estradiol (Balziva)
Norethindrone Acetate
Nortriptyline Hydrochloride Capsules
Omega-3-Acid Ethyl Esters
Omxaprozin Tablets
Oxybutynin Chloride Tablets
Paricalcitol
Penicillin VK Tablets
Pentoxifylline Tablets
Piroxicam
Pravastatin Sodium Tablets
Prazosin HCL Capsules
Prochlorperazine Tablets
Propranolol HCL Tablets
Raloxifene HCL Tablets
Ranitidine HCL Tablets
Tamoxifen Citrate Tablets
Temozolomide
Tobramycin
Tolmetin Sodium Capsules

707

Tolterodine ER
Tolterodine Tartrate
Topiramate Sprinkle Capsules
Warfarin Sodium Tablets

2854.    These agreements are facially anticompetitive because they allocate customers for the marketing and sale of generic drugs, artificially raise prices, and limit competition between Defendant Teva and its competitors. These agreements have eliminated any meaningful form of price competition in the market for numerous generic drugs, including those identified herein.

2855.    The conspiracies substantially affected and still affect interstate commerce.

2856.    The agreements constitute unreasonable restraints of trade that are *per se* illegal under Certain State Antitrust and Consumer Protection Statutes. No elaborate analysis is required to demonstrate the anticompetitive character of these agreements.

2857.    As a direct and proximate result of this ongoing conspiracy, A&P has been injured in its business or property because it had to purchase numerous generic drugs, including those identified herein, at supra-competitive prices, and Defendant Patel has personally enjoyed ill-gotten gains from the sales of these generic drugs.

2858.    As a participant in the agreements identified above, Defendant Patel is jointly and severally liable for any harm caused as a result of those conspiracies.

**CC.    Count 443 (Against Defendant David Rekenthaler) – For Direct Purchases under Section 1 of the Sherman Act – Horizontal Conspiracy to Allocate Markets and Fix Prices for Multiple Generic Drugs**

2859.    Plaintiff repeats and re-alleges every preceding allegation as if fully set forth herein.

2860.    Beginning at least as early as 2012, Defendant Rekenthaler took active

708

steps to facilitate market allocation and price fixing agreements between Defendant Teva and its competitors involving numerous generic drugs, as discussed herein.

2861.    Defendant Rekenthaler participated directly or indirectly in these conspiracies by communicating with competitors, directing others at Teva to communicate with competitors, or tacitly approving of those communications by other Teva employees, about market entry, loss of exclusivity, price increases, supply disruptions, and other significant markets events affecting Defendant Teva and its competitors.

2862.    These communications resulted in agreements between Defendant Teva and various competitors to allocate and divide customers and markets for various generic drugs in accordance with the fair share principles discussed above, and to fix and raise prices, and rig bids, for numerous generic drugs. The generic drugs subject to these market allocation and price- fixing agreements include at least the following:

Adapalene Gel
Amiloride HCL/HCTZ Tablets
Amoxicillin/Clavulanate Chewable Tablets
Amphetamine/Dextroamphetamine ER (aka Mixed Amphetamine Salts)
Amphetamine/Dextroamphetamine IR
Azithromycin Oral Suspension
Azithromycin Suspension
Baclofen Tablets
Bethanechol Chloride Tablets
Budesonide DR Capsules
Budesonide Inhalation
Bumetanide Tablets
Buspirone Hydrochloride Tablets
Cabergoline
Capecitabine
Carbamazepine Chewable Tablets
Carbamazepine Tablets
Cefdinir Capsules
Cefdinir Oral Suspension
Cefprozil Tablets Celecoxib
Cephalexin Suspension
Cimetidine Tablets
Ciprofloxacin HCL Tablets
Clarithromycin ER Tablets

Clemastine Fumarate Tablets
Clonidine TTS Patch
Clotrimazole Topical Solution
Cyproheptadine HCL Tablets
Desmopressin Acetate Tablets
Desogestrel/Ethinyl Estradiol Tablets (Kariva)
Dexmethylphenidate HCL ER Capsules
Dextroamphetamine Sulfate ER
Diclofenac Potassium Tablets
Dicloxacillin Sodium Capsules
Diflunisal Tablets
Diltiazem HCL Tablets
Disopyramide Phosphate Capsules
Doxazosin Mesylate Tablets
Drospirenone and ethinyl estradiol (Ocella)
Enalapril Maleate Tablets
Entecavir Epitol Tablets
Estazolam Tablets Estradiol Tablets
Ethinyl estradiol and levonorgestrel (Portia and Jolessa)
Ethosuximide Capsules
Ethosuximide Oral Solution
Etodolac ER Tablets
Etodolac Tablets
Fenofibrate
Fluconazole Tablets
Fluocinonide Cream
Fluocinonide Emollient Cream
Fluocinonide Gel
Fluocinonide Ointment
Fluoxetine HCL Tablets
Flurbiprofen Tablets
Flutamide Capsules
Fluvastatin Sodium Capsules
Gabapentin Tablets
Glimepiride Tablets
Griseofulvin Suspension
Hydroxyurea Capsules
Hydroxyzine Pamoate Capsules
Irbesartan
Isoniazid
Ketoconazole Cream
Ketoconazole Tablets
Ketoprofen Capsules
Ketorolac Tromethamine Tablets
Labetalol HCL Tablets
Lamivudine/Zidovudine (generic Combivir)
Loperamide HCL Capsules
Medroxyprogesterone Tablets

710

Methotrexate Tablets
Mimvey (Estradiol/Norethindrone Acetate) Tablets
Moexipril HCL Tablets
Moexipril HCL/HCTZ Tablets Nabumetone Tablets
Nadolol Tablets Niacin ER Tablets
Nitrofurantoin MAC Capsules
Norethindrone/ethinyl estradiol (Balziva)
Norethindrone Acetate
Nortriptyline Hydrochloride Capsules
Omega-3-Acid Ethyl Esters
Oxaprozin Tablets
Oxybutynin Chloride Tablets
Paricalcitol
Penicillin VK Tablets
Pentoxifylline Tablets
Piroxicam
Pravastatin Sodium Tablets
Prazosin HCL Capsules
Prochlorperazine Tablets
Propranolol HCL Tablets
Raloxifene HCL Tablets
Ranitidine HCL Tablets
Tamoxifen Citrate Tablets
Temozolomide Tobramycin
Tolmetin Sodium Capsules Tolterodine ER
Tolterodine
Tartrate
Topiramate Sprinkle Capsules
Warfarin Sodium Tablets

2863.    These agreements are facially anticompetitive because they allocate customers for the marketing and sale of generic drugs, artificially raise prices, and limit competition between Defendant Teva and its competitors. These agreements have eliminated any meaningful form of price competition in the market for numerous generic drugs, including those identified herein.

2864.    The conspiracies substantially affected and still affect interstate commerce.

2865.    The agreements constitute unreasonable restraints of trade that are per *se* illegal under Section 1 of the Sherman Act. No elaborate analysis is required to

711

demonstrate the anticompetitive character of these agreements.

2866.    As a direct and proximate result of this ongoing conspiracy, A&P has been injured in its business or property because it had to purchase numerous generic drugs, including those identified herein, at supra-competitive prices, and Defendant Rekenthaler has personally enjoyed ill-gotten gains from the sales of these generic drugs.

2867.    As a participant in the agreements identified above, Defendant Rekenthaler is jointly and severally liable for any harm caused as a result of those conspiracies.

**DD.    Count 444 (Against Defendant David Rekenthaler) – For Indirect Purchases under Certain State Antitrust and Consumer Protection Statutes – Horizontal Conspiracy to Allocate Markets and Fix Prices for Multiple Generic Drugs**

2868.    Plaintiff repeats and re-alleges every preceding allegation as if fully set forth herein.

2869.    Beginning at least as early as 2012, Defendant Rekenthaler took active steps to facilitate market allocation and price fixing agreements between Defendant Teva and its competitors involving numerous generic drugs, as discussed herein.

2870.    Defendant Rekenthaler participated directly or indirectly in these conspiracies by communicating with competitors, directing others at Teva to communicate with competitors, or tacitly approving of those communications by other Teva employees, about market entry, loss of exclusivity, price increases, supply disruptions, and other significant markets events affecting Defendant Teva and its competitors.

2871.    These communications resulted in agreements between Defendant Teva and various competitors to allocate and divide customers and markets for various generic drugs in accordance with the fair share principles discussed above, and to fix and raise prices, and rig bids, for numerous generic drugs. The generic drugs subject to these market

allocation and price- fixing agreements include at least the following:

Adapalene Gel
Amiloride HCL/HCTZ Tablets
Amoxicillin/Clavulanate Chewable Tablets
Amphetamine/Dextroamphetamine ER (aka Mixed Amphetamine Salts)
Amphetamine/Dextroamphetamine IR
Azithromycin Oral Suspension
Azithromycin Suspension
Baclofen Tablets
Bethanechol Chloride Tablets
Budesonide DR Capsules
Budesonide Inhalation
Bumetanide Tablets
Buspirone Hydrochloride Tablets
Cabergoline
Capecitabine
Carbamazepine Chewable Tablets
Carbamazepine Tablets
Cefdinir Capsules
Cefdinir Oral Suspension
Cefprozil Tablets Celecoxib
Cephalexin Suspension
Cimetidine Tablets
Ciprofloxacin HCL Tablets
Clarithromycin ER Tablets
Clemastine Fumarate Tablets
Clonidine TTS Patch
Clotrimazole Topical Solution
Cyproheptadine HCL Tablets
Desmopressin Acetate Tablets
Desogestrel/Ethinyl Estradiol Tablets (Kariva)
Dexmethylphenidate HCL ER Capsules
Dextroamphetamine Sulfate ER
Diclofenac Potassium Tablets
Dicloxacillin Sodium Capsules
Diflunisal Tablets
Diltiazem HCL Tablets
Disopyramide Phosphate Capsules
Doxazosin Mesylate Tablets
Drospirenone and ethinyl estradiol (Ocella)
Enalapril Maleate Tablets
Entecavir Epitol Tablets
Estazolam Tablets Estradiol Tablets
Ethinyl estradiol and levonorgestrel (Portia and Jolessa)
Ethosuximide Capsules
Ethosuximide Oral Solution
Etodolac ER Tablets

713

Etodolac Tablets
Fenofibrate
Fluconazole Tablets
Fluocinonide Cream
Fluocinonide Emollient Cream
Fluocinonide Gel
Fluocinonide Ointment
Fluoxetine HCL Tablets
Flurbiprofen Tablets
Flutamide Capsules
Fluvastatin Sodium Capsules
Gabapentin Tablets
Glimepiride Tablets
Griseofulvin Suspension
Hydroxyurea Capsules
Hydroxyzine Pamoate Capsules
Irbesartan
Isoniazid
Ketoconazole Cream
Ketoconazole Tablets
Ketoprofen Capsules
Ketorolac Tromethamine Tablets
Labetalol HCL Tablets
Lamivudine/Zidovudine (generic Combivir)
Loperamide HCL Capsules
Medroxyprogesterone Tablets
Methotrexate Tablets
Mimvey (Estradiol/Norethindrone Acetate) Tablets
Moexipril HCL Tablets
Moexipril HCL/HCTZ Tablets Nabumetone Tablets
Nadolol Tablets Niacin ER Tablets
Nitrofurantoin MAC Capsules
Norethindrone/ethinyl estradiol (Balziva)
Norethindrone Acetate
Nortriptyline Hydrochloride Capsules
Omega-3-Acid Ethyl Esters
Oxaprozin Tablets
Oxybutynin Chloride Tablets
Paricalcitol
Penicillin VK Tablets
Pentoxifylline Tablets
Piroxicam
Pravastatin Sodium Tablets
Prazosin HCL Capsules
Prochlorperazine Tablets
Propranolol HCL Tablets
Raloxifene HCL Tablets
Ranitidine HCL Tablets

714

Tamoxifen Citrate Tablets
Temozolomide Tobramycin
Tolmetin Sodium Capsules Tolterodine ER
Tolterodine
Tartrate
Topiramate Sprinkle Capsules
Warfarin Sodium Tablets

2872. These agreements are facially anticompetitive because they allocate customers for the marketing and sale of generic drugs, artificially raise prices, and limit competition between Defendant Teva and its competitors. These agreements have eliminated any meaningful form of price competition in the market for numerous generic drugs, including those identified herein.

2873. The conspiracies substantially affected and still affect interstate commerce.

2874. The agreements constitute unreasonable restraints of trade that are per *se* illegal under Certain State Antitrust and Consumer Protection Statutes. No elaborate analysis is required to demonstrate the anticompetitive character of these agreements.

2875. As a direct and proximate result of this ongoing conspiracy, A&P has been injured in its business or property because it had to purchase numerous generic drugs, including those identified herein, at supra-competitive prices, and Defendant Rekenthaler has personally enjoyed ill-gotten gains from the sales of these generic drugs.

2876. As a participant in the agreements identified above, Defendant Rekenthaler is jointly and severally liable for any harm caused as a result of those conspiracies.

**EE.** **Count 445 (Against Defendant Richard (Rick) Rogerson) – For Direct Purchases under Section 1 of the Sherman Act – Horizontal Conspiracy to Allocate Markets and Fix Prices for Multiple Generic Drugs**

2877. Plaintiff repeats and re-alleges every preceding allegation as if fully

set forth herein.

2878.   Beginning at least as early as 2013, Defendant Rogerson took active steps to facilitate market allocation and price fixing agreements between Defendant Actavis and its competitors involving numerous generic drugs, as discussed herein.

2879.   Defendant Rogerson participated directly or indirectly in these conspiracies by communicating with competitors, directing others at Actavis to communicate with competitors, or tacitly approving of those communications by other Actavis employees, about market entry, loss of exclusivity, price increases, supply disruptions, and other significant markets events affecting Defendant Actavis and its competitors.

2880.   These communications resulted in agreements between Defendant Actavis and various competitors to allocate and divide customers and markets for various generic drugs in accordance with the fair share principles discussed above, and to fix and raise prices, and rig bids, for numerous generic drugs. The generic drugs subject to these market allocation and price- fixing agreements include at least the following:

Amphetamine/Dextroamphetamine IR
Budesonide Inhalation
Buspirone Hydrochloride Tablets
Celecoxib
Ciprofloxacin HCL Tablets
Clarithromycin ER Tablets
Clonidine TTS Patch
Desmopressin Acetate Tablets
Dextroamphetamine Sulfate ER
Disopyramide Phosphate Capsules
Drospirenone and ethinyl estradiol (Ocella)
Estazolam Tablets
Estradiol Tablets
Flutamide Capsules
Griseofulvin Suspension
Hydroxyzine Pamoate Capsules
Nabumetone Tablets

716

Nortriptyline Hydrochloride Capsules

Propranolol HCL Tablets

Tamoxifen Citrate Tablets

Topiramate Sprinkle Capsules

2881.    These agreements are facially anticompetitive because they allocate customers for the marketing and sale of generic drugs, artificially raise prices, and limit competition between Defendant Actavis and its competitors. These agreements have eliminated any meaningful form of price competition in the market for numerous generic drugs, including those identified herein.

2882.    The conspiracies substantially affected and still affect interstate commerce.

2883.    The agreements constitute unreasonable restraints of trade that are per se illegal under Section 1 of the Sherman Act. No elaborate analysis is required to demonstrate the anticompetitive character of these agreements.

2884.    As a direct and proximate result of this ongoing conspiracy, A&P has been injured in its business or property because it had to purchase numerous generic drugs, including those identified herein, at supra-competitive prices, and Defendant Rogerson has personally enjoyed ill-gotten gains from the sales of these generic drugs.

2885.    As a participant in the agreements identified above, Defendant Rogerson is jointly and severally liable for any harm caused as a result of those conspiracies.

**FF.    Count 446 (Against Defendant Richard (Rick) Rogerson) – For Indirect Purchases under Certain State Antitrust and Consumer Protection Statutes – Horizontal Conspiracy to Allocate Markets and Fix Prices for Multiple Generic Drugs**

2886.    Plaintiff repeats and re-alleges every preceding allegation as if fully set forth herein.

2887.    Beginning at least as early as 2013, Defendant Rogerson took active

717

steps to facilitate market allocation and price fixing agreements between Defendant Actavis and its competitors involving numerous generic drugs, as discussed herein.

2888.    Defendant Rogerson participated directly or indirectly in these conspiracies by communicating with competitors, directing others at Actavis to communicate with competitors, or tacitly approving of those communications by other Actavis employees, about market entry, loss of exclusivity, price increases, supply disruptions, and other significant markets events affecting Defendant Actavis and its competitors.

2889.    These communications resulted in agreements between Defendant Actavis and various competitors to allocate and divide customers and markets for various generic drugs in accordance with the fair share principles discussed above, and to fix and raise prices, and rig bids, for numerous generic drugs. The generic drugs subject to these market allocation and price- fixing agreements include at least the following:

Amphetamine/Dextroamphetamine IR
Budesonide Inhalation
Buspirone Hydrochloride Tablets
Celecoxib
Ciprofloxacin HCL Tablets
Clarithromycin ER Tablets
Clonidine TTS Patch
Desmopressin Acetate Tablets
Dextroamphetamine Sulfate ER
Disopyramide Phosphate Capsules
Drospirenone and ethinyl estradiol (Ocella)
Estazolam Tablets
Estradiol Tablets
Flutamide Capsules
Griseofulvin Suspension
Hydroxyzine Pamoate Capsules
Nabumetone Tablets
Nortriptyline Hydrochloride Capsules

Propranolol HCL Tablets
Tamoxifen Citrate Tablets

718

Topiramate Sprinkle Capsules

2890.    These agreements are facially anticompetitive because they allocate customers for the marketing and sale of generic drugs, artificially raise prices, and limit competition between Defendant Actavis and its competitors. These agreements have eliminated any meaningful form of price competition in the market for numerous generic drugs, including those identified herein.

2891.    The conspiracies substantially affected and still affect interstate commerce.

2892.    The agreements constitute unreasonable restraints of trade that are per se illegal under Certain State Antitrust and Consumer Protection Statutes.  No elaborate analysis is required to demonstrate the anticompetitive character of these agreements.

2893.    As a direct and proximate result of this ongoing conspiracy, A&P has been injured in its business or property because it had to purchase numerous generic drugs, including those identified herein, at supra-competitive prices, and Defendant Rogerson has personally enjoyed ill-gotten gains from the sales of these generic drugs.

2894.    As a participant in the agreements identified above, Defendant Rogerson is jointly and severally liable for any harm caused as a result of those conspiracies.

**GG.    Count 447 (Against All Defendants) – Unjust Enrichment**

2895.    Plaintiff repeats and re-alleges every preceding allegation as if fully set forth herein.

2896.    Defendants have unlawfully benefited from their sales of Price-Fixed Generic Drugs because of the unlawful and inequitable acts alleged in this Complaint. Defendants unlawfully overcharged A&P, which purchased generic Price-Fixed Generic Drugs at prices that were more than they would have been but for Defendants' unlawful

719

actions. The pharmacies owned and operated by A&P are intended purchasers of the Price-Fixed Generic Drugs.

2897.   Defendants' financial benefits resulting from their unlawful and inequitable acts are traceable to overpayments by A&P.

2898.   A&P has conferred upon Defendants an economic benefit, in the nature of profits resulting from unlawful overcharges, to the economic detriment of A&P.

2899.   Defendants have been enriched by revenue resulting from unlawful overcharges for Price-Fixed Generic Drugs while A&P has been impoverished by the overcharges it paid for Price-Fixed Generic Drugs imposed through Defendants' unlawful conduct. Defendants' enrichment and A&P's impoverishment are connected.

2900.   There is no justification for Defendants' retention of, and enrichment from, the benefits they received, which caused impoverishment to A&P, because A&P paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges. A&P did not interfere with Defendants' affairs in any manner that conferred these benefits upon Defendants.

2901.   The benefits conferred upon Defendants were not gratuitous, in that they constituted revenue created by unlawful overcharges arising from Defendants' illegal and unfair actions to inflate the prices of Price-Fixed Generic Drugs.

2902.   The benefits conferred upon Defendants are measurable, in that the revenue Defendants have earned due to their unlawful overcharges of Price-Fixed Generic Drugs are ascertainable by review of sales records.

2903.   Defendants have paid no consideration to any other person for any of the unlawful benefits they received from A&P with respect to Defendants' sales of the Price-

Fixed Generic Drugs.

2904.    The economic benefit of overcharges and monopoly profits derived by Defendants through charging supracompetitive and artificially inflated prices for Price-Fixed Generic Drugs is a direct and proximate result of Defendants' unlawful practices.

2905.    The financial benefits derived by Defendants rightfully belong to A&P because they paid supracompetitive prices during the Relevant Period, inuring to the benefit of Defendants.

2906.    It would be inequitable under unjust enrichment principles under the law of the State of Wisconsin for Defendants to be permitted to retain any of the overcharges for Price-Fixed Generic Drugs derived from Defendants' unlawful, unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

2907.    Defendants are aware of and appreciate the benefits bestowed upon them by A&P. Defendants consciously accepted the benefits, as prices for many of the Price-Fixed Generic Drugs remain inflated above pre-conspiracy levels.

2908.    Defendants should be compelled to disgorge in a common fund for the benefit of A&P any and all unlawful or inequitable proceeds they received from their sales of the Price-Fixed Generic Drugs.

2909.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Defendants traceable to indirect purchases of Price-Fixed Generic Drugs by A&P. Plaintiff has no adequate remedy at law.

## XXII.    REQUEST FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

a.  The unlawful conduct, conspiracy or combination alleged herein be adjudged and decreed:

   (1) An unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act and the State Antitrust and Consumer Protection Statutes;

721

(2) Section 1 of the Sherman Act and the State Antitrust and Consumer Protection Statutes; and

(3) Act of unjust enrichment by Defendants.

b. Plaintiff recover damages, to the maximum extent allowed under federal antitrust laws, and that a joint and several judgment in favor of Plaintiff be entered against Defendants in an amount to be trebled under U.S. antitrust laws;

c. Plaintiff be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this complaint;

d. Plaintiff recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

e. Plaintiff receive such other and further relief as the case may require and the Court may deem just and proper.

## XXIII.    **JURY TRIAL DEMANDED**

1998.   Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated: May 1, 2026

/s/ *Patrick J. Ahern*
Patrick J. Ahern
**Ahern and Associates, P.C.**
Willoughby Tower
8 South Michigan Avenue
Chicago, Illinois 60603
Ph: (312) 404-3760
patrick.ahern@ahernandassociatespc.com

*Attorneys for HBP I, LLC, as assignee of all rights of Great Atlantic & Pacific Tea Company*

722

**EXHIBIT 1**

**Trade Association Meeting Attendance**

**GPhA 2010 Annual Meeting** – Naples, Florida (February 16-18, 2010):

a.      **Actavis;**
b.      **Akorn/Hi-Tech;**
c.      **Alvogen;**
d.      **Amneal;**
e.      **Apotex;**
f.      **Aurobindo;**
g.      **Breckenridge;**
h.      **Fougera;**
i.      **Glenmark;**
j.      **Greenstone;**
k.      **Impax;**
l.      **Lupin;**
m.      **Mylan/UDL;**
n.      **Par/Endo;**
o.      **Perrigo;**
p.      **Sandoz;**
q.      **Taro;**
r.      **Teva;**
s.      **Versapharm;**
t.      **West-Ward;**
u.      **Wockhardt;** and
v.      **Zydus.**

**HDMA 2010 Business and Leadership Conference** – Orlando, Florida (June 6-9, 2010):

a.      **Actavis:** Michael Baker, Executive Vice President, Trade Sales and Development (Allergan); John Shane, Director, Trade Relations (Allergan); Jack Ericsson, Senior Regional Manager (Allergan); Roger Maffin (Allergan); Michael Reed, Director, National Trade Accounts (Allergan); Paul Reed, Senior Director, Trade Sales (Allergan);

b.      **Amneal:** Chirag Patel, President; Jim Luce, Executive Vice President, Sales and Marketing; Stephen Rutledge, Vice President, Sales;

c.      **Alvogen:** William Hill, Vice President of Sales and Marketing; Thomas Olivi Michael, Senior Director of Sales;

d.      **Apotex**: Beth Hamilton, Director, National Sales; James Van Liesbout, Vice President Retail Sales;

e.      **Dr. Reddy's:** John Adams, Vice President, Sales and Marketing, North America Generics; Jake Austin, Regional Account Manager; Robert Rodowicz, Director, National Accounts;

1

Cindy Stevens, Senior Director of National Accounts; Tricia Wetzel, Senior Director, National Accounts; Sally Schimelpfenig, Director Rx Marketing;

f.  **Greenstone:** John Calabrese, Director of Sales; James R. Cannon, VP, Business Development; Rick K. Mackenzie, National Accounts Director; Mark Mancinotti, National Accounts Director; Robert Sanderson, National Accounts Director; Christine Versichele, Director, Channel Strategies; Gregory Williams, National Account Director;

g.  **Fougera:** Kian Kazemi, Senior Vice President, Sales; Christopher Bihari, National Accounts Executive; David Klaum, Senior Vice President and General Manager; Anthony Thomassey, National Accounts Executive;

h.  **Lannett:** Richard Matchett, National Account Manager; Kevin Smith, Vice President, Sales & Marketing; Robert Foley, Marketing/Sales Manager; Tracy Sullivan, National Account Manager;

i.  **Mylan:** Jonathan Kerr, Vice President, Sales; James Nesta, Director, National Accounts; Kevin McElfresh, Director, National Accounts; David Workman, Senior Director, Pricing & Contracts;

j.  **Par:** Michael Altamuro, Senior Director, Marketing; Renee Kenney, Vice President, Sales; Paul Campanelli, President, Generics Division; Rich Franchi, Vice President, Sales; Rich Franchi, VP, National Accounts (DAVA); Justin McManus, Regional Account Manager (DAVA); Rick Pallokat, Senior Vice President (DAVA); Sandra Bayer, National Accounts Manager;

k.  **Sandoz:** Christopher Neurohr, Director, National Accounts;

l.  **Teva:** Theresa Coward, Senior Director of National Sales; Kevin Green; National Account Manager; Madelen Renner, National Account Manager;

m.  **Valeant:** JoAnne Kondori, Director, Logistics and Inventory; Asha Soto, Vice President, Supply Chain Operations; and

n.  **Zydus:** Kristy Ronco, Director, National Accounts and Customer Marketing; Laura Short, Director, National Accounts and Customer Strategy; Karen Strelau, Vice President Sales.

**NACDS 2010 Pharmacy and Technology Conference** – San Diego, California (August 30-31, 2010):

a.  **Actavis:** Ara Aprahamian, Vice President, Sales & Marketing; Michael Dorsey, Director National Accounts; Doug Boothe, President Generics Division; Andy Boyer; Executive Vice President, Commercial Operations; Napoleon Clark, Vice President Marketing; Lisa Fiveash, National Account Representative; Anthony Giannone, Executive Director, Sales; Maureen Meehan, Director, National Accounts; Diane Miranda, Vice President, Distribution Services and Generic Marketing; Nimish Muzumdar, Director of Marketing; Toni Picone, Marketing Manager; Vince Rinauder; Director, National Accounts; Gary

Salter, Director National Accounts; David Schmidt, Director, National Accounts; Eric Schumacher, Director, Generic Strategic Initiatives; Allan Slavsky, Sales Consultant;

b.    **Apotex**: Jeff Watson, President & COO; Beth Hamilton, Vice President, Generic Product Sales; Jim Van Lieshout, Trade and Industry Relations; Tina Kaus, National Accounts Director; Tom Axner, National Sales Director, Distribution; Sam Boulton, Director, National Accounts; Ellen Guttenberg, Director, Marketing; Bob Simmons, National Director

c.    **Aurobindo:** Scott White, President; Corinne Hogan, VP Sales & Marketing; Geoff Rouse, Director of Sales; Patricia O'Malley, Director, Sales & Marketing Operation; Paul McMahon, Senior Director, Commercial Operations; Stuart Blaken Director, National Accounts;

d.    **Dr. Reddy's:** Cindy Stevens, Director, National Accounts; Jake Austin, VP, US Sales; John Adams, Senior Vice President, Commercial Operations; Trish Wetzel, Senior Director, National Accounts; Amit Patel, Senior Vice President & Head, North American Generics; Bob Rodowicz, Director, Institutional Sales & Marketing; Hillary Steele, Associate Director, Marketing Communications;

e.    **Fougera:** Christopher Bihari, National Sales Director; Kian Kazemi, Senior Vice President, Sales; Karen Paganuzzi, Product Manager; Anthony Thomassey, Director, National Accounts;

f.    **G&W Laboratories:** Kurt Orlofski, Chief Executive Officer; Jan Bell, National Account Manager, Managed Care; Jim Grauso, EVP, N.A. Commercial Operations; Joel Zaklin, Vice President, Sales and Marketing; Tom Faig, National Account Manager;

g.    **Glenmark:** Dave Irwin, Director of Sales; Jeff Johnson, Director, Sales & Marketing; Jessica Cangemi, Director, Sales & Marketing; Jim Brown, Vice President, Sales; Steve Goodman, Director of Marketing - Generics; Terry Coughlin, Executive Vice President and Chief Operating Officer; Pault Dutra, Executive Vice President;

h.    **Heritage**: Jason Malek, President; Jeff Glazer, Chief Executive Officer; Matt Edelson, Senior Director of Sales; Chip McCorkle, Director National Accounts;

i.    **Lannett**: Arthur Bedrosian, President & Chief Executive Officer; Tracy DiValero, National Account Manager; Rich Matchett, Director, Sales; Jolene McGalliard, National Account Manager; Dwight Nix, Director, National Accounts; Kevin. Smith, Vice President, Sales & Marketing;

j.    **Mylan**: Danielle Barill, Key Account Manager; J. Mark Bover, Senior Director, Pricing & Contracts; Joseph Duda, Director, Pricing & Contracts; Matt Erick, President, Mylan North America & Brazil, Edgar Escoto, Director, National Accounts; Jon Kerr, Director,

National Sales; Dan King, Director, National Accounts; Kevin McElfresh, Executive Director, National Accounts; Dave Workman, Strategic Pricing and Contracts;

k.    **Par**: Karen O'Connor, Vice President, National Accounts; Michael Altamuro, Vice

3

President, Commercial Operations & Marketing; Renee Kenney, Senior Advisor, Generic Sales; Michael Burton, Vice President, National Accounts; Paul Campanelli, President & CEO (Endo); Kevin Campbell, Vice President, Sales & Marketing; Rick Guillory, Vice President, National Accounts; Jon Holden, Vice President Sales; Rich Franchi, Vice President, Sales (DAVA); John Klein, Chair and CEO (DAVA); Lenora Klein, Executive Vice President, Sales and Marketing (DAYA); Justin McMcManus, Senior Director, Sales & Business Development (DAVA), Kim Rothofsky, Senior Director, Trade Relations (DAVA); Sandra Bayer, Sr. Director, National Accounts (Qualitest); James Burnett, National Accounts Manager (Qualitest); Gary Larson, National Accounts Manager (Qualitest); Lori Minnihan, Associate Director, Trade Pricing Operations (Qualitest); Charles Propst, Vice President (Qualitest);

l.    **Perrigo**:  Andrea Felix, National Account Executive; Shelly Snyder, National Account Manager; Tony Polman, National Account Manager; H. James Booydegraaf, Associate Director, Marketing; Ori Gutwerg, National Account Executive; Sharon Kochan, Executive Vice President & GM Perrigo Pharmaceuticals; Matthew Strzeminski, National Account Executive; John Wesolowski, Executive Vice President, President Rx;

m.    **Sandoz**:  Armando Kellum, Vice President, Sales & Marketing; Della Lubke, Director, National Account; Steven Greenstein, Director, Key Customers; Luis Jorge, Director of Marketing; Monika Misiuta, Director, Marketing; Chris Neurohr, Director, National Accounts; Dave Picard, SVP, Global Generic Pharmaceuticals;

n.    **Sun**:  Wayne Fallis, Director, National Accounts; Steven Smith, Sr. Director of Sales; Thomas Versosky, President;

o.    **Taro**:  Doug Statler, Senior Director, Head of Sales; Howard Marcus, Vice President, Sales & Marketing; James Josway, Vice President, RX Sales; Scott Brick, Manager, National Accounts; Sheila Curran, Vice President, Sales Operations; Elizabeth Guerrero, Director, Corporate Accounts, Managed Care; Bill Seiden, Vice President, U.S. Sales & Marketing;

p.    **Teva**: Jessica Peters, National Accounts Manager; Kevin Green, Associate Vice President, National Accounts; Madalen Renner, National Account Manager; Teni Coward, Senior Director Sales and Trade Relations; Darren Alkins, Vice President, Pricing & Contracts; Christine Baeder, SVP Customer and Marketing Operations; Maureen Cavanaugh, Chief Operating Officer NA Gx; Timothy Crew, SVP North American Generics; Robert Cunard; VP Sales; Kevin Galownia; Senior Director, Pricing; Jonathan Kafer, EVP, Sales and Marketing; Teri Mouro Sherman, Director, National Accounts; Dave Rekenthaler, VP Sales; Michael Sine, Sr. Director, Corporate Account Group;

q.    **West-Ward**: Jason Grenfell-Gardner, Senior Vice President, Sales & Marketing; Luis Velez, Senior Director of Sales; Mark Ritchey, Vice President, Sales; Paul Markowitz, Director, National Accounts; Tariq Al Tayeb, Manager, Sales & Marketing; Brian Hoffman, VP Business Development; and

r.    **Zydus**: Michael Keenley, President; Ganesh Nyak, Chief Operating Officer & Executive Director; Sharvil Patel, Managing Director; Barbara Purcell, SVP U.S. Diversified Products; Karen Strelau, Executive Vice President, Sales & Marketing; Laura Short, Vice President Sales

4

**GPhA 2010 Fall Technical Conference** – Bethesda, Maryland (October 19-21, 2010):

a.      **Actavis;**
b.      **Akorn/Hi-Tech;**
c.      **Amneal;**
d.      **Aurobindo;**
e.      **Dr. Reddy's;**
f.      **Fouguera;**
g.      **Glenmark;**
h.      **Lannett;**
i.      **Lupin;**
j.      **Mylan/UDL;**
k.      **Perrigo;**
l.      **Sandoz;**
m.      **Strides;**
n.      **Sun;**
o.      **Taro;**
p.      **Teva;**
q.      **Upsher-Smith;**
r.      **Versapharm;**
s.      **West-Ward;** and
t.      **Zydus.**


**GPhA Annual Meeting** – Orlando, Florida (February 16-18, 2011):

a.      **Actavis;**
b.      **Akorn/Hi-Tech;**
c.      **Apotex;**
d.      **Ascend;**
e.      **Aurobindo;**
f.      **Breckenridge;**
g.      **Dr. Reddy's;**
h.      **Fouguera;**
i.      **Greenstone;**

j.      **Heritage;**
k.      **Impax;**
l.      **Lupin;**
m.      **Mallinckrodt;**
n.      **Mylan/UDL;**
o.      **Par;**
p.      **Sandoz;**
q.      **Taro;**
r.      **Teva;**
s.      **Versapharm;** and

5

t.       **West-Ward.**


**ECRM EPPS Retail Pharmacy Conference** – Champions Gate, Florida (March 6-10, 2011):

a.       **Actavis;**
b.       **Apotex;**
c.       **Amneal;**
d.       **Ascend;**
e.       **Aurobindo;**
f.       **Breckenridge;**
g.       **Camber;**
h.       **Dr. Reddy's;**
i.       **Fougera;**
j.       **Glenmark;**
k.       **Greenstone;**
l.       **Heritage;**
m.       **Hi-Tech;**
n.       **Impax;**
o.       **Lupin;**
p.       **Par/Endo;**
q.       **Perrigo;**
r.       **Sandoz;**
s.       **Sun;**
t.       **Taro;**
u.       **Teva;**
v.       **Upsher-Smith;**
w.       **Wockhardt;**
x.       **West-Ward;** and
y.       **Zydus.**

**NACDS Annual Meeting** – Scottsdale, Arizona (2011):

a.       **Actavis**: Andrew Boyer, EVP, Commerical Operations; Sigurdur Olafsson, President, Chief Executive Officer; Michael Baker, Executive Vice President, Trade Sales and Development; Paul Bisaro, President and Chief Executive Officer; Michael Reed, Executive Director, Trade Relations; Paul Reed, Senior Director, Trade Sales and Operations; John Shane, Director, Trade Relations; Allan Slavsky, Sales Consultant;

b.       **Apotex**: Buddy Bertucci, Vice President, Institutional Sales; Sam Boulton, Director, National Accounts; Lyndon Johnson, Senior Vice President, Sales and Marketing; Jeff Watson, President & COO; Beth Hamilton, Vice President, Generic Product Sales;

c.       **Aurobindo**: Corrine Hogan, VP Sales & Marketing; Scott White, President;

d.       **Dr. Reddy's**: Amit Patel, Senior Vice President & Head, North American Generics; John Adams, SVP, Commercial Operations; Jeff Burd, SVP, Commercial Operations; Gary

6

Benedict, Executive Vice President; Satish Reddy, Chief Operating Officer;

e.   **Fougera**: Steve Andrzejewski, CEO; Kian Kazemi, Senior Vice President, Sales; Anthony Thomassey, Director, National Accounts;

f.   **Glenmark**: Paul Dutra, Executive Vice President;

g.   **Impax**: Doug Boothe, President Generics Division;

h.   **Mylan**: Robert Potter, Head of Global Sales Excellence; Anthony Mauro, Chief Commercial Officer; Matt Erick, President, Mylan North America & Brazil; Debra O'Brien, Chief Marketing Officer; Lloyd Sanders; Chief Operating Officer;

i.   **Par**: Paul Campanelli, President & CEO (Endo); Michael Altamuro, Commercial Operations & Marketing; Renee Kenney, Senior Advisor, Generic Sales;

j.   **Perrigo**: Sharon Kochan, Executive Vice President & GM Perrigo Pharmaceuticals; Richard McWilliams, Senior Vice President & General Manager; Jim Tomshack, Senior Vice President, Sales; Mark Walin, Vice President, Consumer Healthcare Sales; John Wesolowski, Executive Vice President, President Rx; Philip Willis, Innovation and Marketing Strategy; Chris Neurohr; Director, National Accounts;

k.   **Sandoz**: Don DeGolyer, Chief Executive Officer & Board Director; Jeff George, CEO; Steven Greenstein, Director, Key Customers; Armando Kellum, Vice President, Sales & Marketing; Paul Krauthauser, Senior Vice President, Commercial Operations; Della Lubke, Director, National Accounts;

l.   **Taro**: Jim Kedrowski, Interim CEO; Mitchell Bashinsky, Business Development; Jim Josway, Vice President, RX Sales; Bill Seiden, Senior Vice President, U.S. Sales & Marketing;

m.   **Teva**: Theresa Coward, Senior Director Sales & Trade Relations; Maureen Cavanaugh, Chief Operating Officer, North America Generics; Jonathan Kafer, Executive Vice President, Sales and Marketing; Darren Alkins, Vice President, Pricing & Contracts; Timothy Crew, SVP North American Generics; Robert Cunard, VP Sales; John Denman, SVP, Sales & Marketing;

n.   **Upsher-Smith**; and

o.   **Zydus**: Joseph Renner, Chair of the Board; Kristy Ronco, Vice President, Sales; Laura Short, Vice President, Sales; Karen Strelau, Executive Vice President Sales and Marketing.

**HDMA 2011 Business Leadership Conference** – Phoenix, Arizona (June 6-7, 2011):

a.   **Actavis**: Michael Baker, Executive Vice President, Trade Sales and Development; John Shane, Director, Trade Relations;

7

b.    **Amneal**: Thomas Balog; Jim Luce, Executive Vice President, Sales and Marketing; Stephen Rutledge, Vice President of Sales

c.    **Apotex**: Beth Hamilton, Director, National Sales; James Van Liesbout, Vice President Retail Sales; Jeff Watson, Chief Commercial Officer;

d.    **Dr. Reddy's**: John Adams, Vice President, Sales and Marketing, North America Generics; Jake Austin, Regional Account Manager; Jeff Burd, Sr. Director, Generics Rx Marketing, North America; Venkata Jayanti, Associate Director, Rx Generics; Tom McMullen, Director, National Accounts; Katherine Neely, Associate Director, Generics Rx Marketing, North America; Robert Rodowicz, Director, National Accounts; Cindy Stevens, Senior Director of National Accounts; Tricia Wetzel, Senior Director, National Accounts;

e.    **Fougera**: Kian Kazemi, Senior Vice President, Sales; Christopher Bihari, National Accounts Executive; David Klaum, Senior Vice President and General Manager;

f.    **Greenstone**: Lori LaMattina, Sales Operations Manager; Jill K. Nailor, Senior Director of Sales and National Accounts; Robert Sanderson, National Account Director; Robin Strzeminski, National Account Director; Kevin Valade, National Account Director; Vristine Versichele, National Acount Director; Gregory Williams, National Account Director;

g.    **Lannett**: Richard Matchett, National Account Manager; Kevin Smith, Vice President, Sales & Marketing;

h.    **Mylan**: Danielle Barill, Key Account Manager; Edgar Escoto, Director, National Accounts; Jonathan Kerr, Vice President, Sales; Stephen Krinke, National Account Manager; James Nesta, Director, National Accounts; Stephen Stone, Director, National Accounts; Thomass Theiss, National Accounts Manager, Trade Relations; Gary Tighe, Director, Industry Relations; Ashley Vitale, Project Manager, Sales & Marketing;

i.    **Par**: Michael Altamuro, Commercial Operations & Marketing; Renee Kenney, Senior Advisor, Generic Sales; Rich Franchi, Vice President, Sales; Rich Franchi, VP, National Accounts (DAVA); Justin McManus, Regional Account Manager (DAVA); Rick Pallokat, Senior Vice President (DAVA); Sandra Bayer, National Accounts Manager; Robert Enserro, Manager, Trade Relations and National Accounts;

j.    **Sandoz**: Steven Greenstein, Director, National Accounts; Armando Kellum, Director, Contracts & Pricing; Paul Krauthauser, Director, National Accounts; Della Lubke, Director, National Accounts; Christopher Neurohr, Director, National Accounts; Rich Tremonte, Vice President, Sales & Marketing;

k.    **Sun**: Susan Knoblauch, Sales Manager; Anand Shah, Sr. Manager, Sales Operations; Steven Smith, Corporate Account Manager;

l.    **Teva**: Theresa Coward, Senior Director of National Sales; Jonathan Kafer, Vice President, Sales and Marketing; Robert Cunard, Vice President, Sales; John Denman, SVP, Sales &

8

Marketing; Andrew Boyer, Senior Vice President, Generic Sales and Marketing; Kevin Green; National Account Manager; Jeffrey Herzfeld, Senior Vice President, Commercial Operations and America Strategy; Jeff McClard, Director, National Accounts; Jessica Peters, National Account Manager; Allan Slavsky, Vice President, Sales;

m.   **VersaPharm:** Stephen McCune, Chief Sales and Marketing Officer; Grace Wilks, Manager, Pricing, Contracts, Government and National Accounts; and

n.   **Zydus**: Kristy ·Ronco, Director, National Accounts and Customer Marketing; Laura Short, Director, National Accounts and Customer Strategy; Karen Strelau, Vice President, Sales.


**NACDS 2011 Pharmacy & Technology Meeting** – Boston, Massachusetts (August 27-30, 2011):

a.   **Actavis**: Andrew Boyer, EVP, Commercial Operations; Sigurdur Olafsson, Chief Executive Officer; Michael Reed, Executive Director, Trade Relations; Paul Reed, Senior Director, Trade Sales and Operations; John Shane, Director, Trade Relations; Allan Slavsky, Sales Consultant; Napoleon Clark, Vice President, Marketing; Lisa Fiveash, National Account Representative; Anthony Giannone, Executive Director Sales; Maureen Meehan, Director, National Accounts; Diane Miranda, Vice President, Distribution Services and Generic Marketing; Toni Picone, Marketing Manager; Vince Rinaudo, Director, National Accounts; Gary Salter, Director, National Accounts; David Schmidt, Director, National Accounts; Ara Aprahamian, Vice President, Sales & Marketing; Thad Demos, National Accounts Manager; Michael Dorsey, Director, National Accounts; Jinping McCormick, VP, Rx Sales & Marketing, Generics, US; Lisa Pehlke, Director, Corporate Accounts; Michael Perfetto, Chief Commercial Officer Generic RX/OTC, US and Canada;

b.   **Apotex**: Tom Axner, National Sales Director, Distribution; Tim Berry, Tim, National Account Manager; Buddy Bertucci, Vice President, Institutional Sales; Sam Boulton, Director, National Accounts; Jeff Watson, President & COO; Beth Hamilton, Vice President, Generic Product Sales; Gwen Copeland, Manager, National Accounts; John Crawford, National Account Director; Niki Hinman-Smock, National Account Manager; Tina Kaus, National Account Director; Karen Rice, Marketing Manager; Bob Simmons, National Account Director; James Van Lieshout, Vice President, Trade and Industry Relations;

c.   **Aurobindo**: Corrine Hogan, VP Sales & Marketing; Scott White, President; Stuart Blake, Director, National Accounts; Patricia O'Malley, Director, Sales & Marketing Operations; Geoff Rouse, Director of Sales;

d.   **Dr. Reddy's**: Amit Patel, Senior Vice President & Head, North American Generics; John Adams, SVP, Commercial Operations; Jeff Burd, SVP, Commercial Operations; Jake Austin, VP, US Sales; Nimish Muzumdar, Director of Marketing; Katherine Neely, Associate Director Rx Generics; Katherine Neely, Associate Director Rx Generics; Robert Rodowiz, Director, Institutional Sales & Marketing; Hillary Steele, Associate Director, Marketing Communications; Cindy Steven, Director, National Accounts; Tricia Weitzel, Senior Director, National Accounts, Rx Mid-West;

9

e.   **Fougera**: Kian Kazemi, Senior Vice President, Sales; Anthony Thomassey, Director, National Accounts; Christopher Bihari, National Sales Director; Stephen Haag; National Accounts Executive; Brian Markison, CEO; Jeff Wasserstein, Senior Vice President Business Development;

f.   **Glenmark**: Paul Dutra, Executive Vice President; Jessica Cangemi, Director, Sales and Marketing; Jeff Johnson, Director, Sales and Marketing; David Irwin, Director, Sales; Stephanie Picca, Manager, Sales and Marketing; Teny Coughlin, Executive Vice President and Chief Operating Officer;

g.   **G&W Laboratories**: Erika Vogel-Baylor, Vice President, Sales & Marketing; Kurt Orlofski, CEO; Thomas Faig, National Account Manager; James Grauso, EVP, N.A. Commercial Operation; Joel Zaklin, Vice President, Sales and Marketing;

h.   **Heritage**: Jeffrey Glazer, Chair & CEO; Jason Malek, President; Matt Edelson, Senior Director of Sales; Anne Sather, National Account Manager; Neal O'Mara, National Account Manager; Chip McCorkle, Director, National Accounts; Neal O'Mara, National Accounts Manager;

i.   **Lannett**: Tracy DiValero, National Account Manager; Rich Matchett, Director, Sales; Jolene McGalliard, National Account Manager; Dwight Nix, Director, National Accounts; Kevin Smith, Vice President, Sales & Marketing;

j.   **Mylan**: Robert Potter, Head of Global Sales Excellence; Anthony Mauro, Chief Commercial Officer; Danielle Barill, Key Account Manager, J. Mark Bover, Senior Director, Pricing & Contracts; Edgar Escoto, Director, National Accounts; Jon Kerr, Director National Sales; Kevin McElfresh, Executive Director, National Accounts; Sean Reilly, National Account Manager; Gary Tigh, Director National Accounts; Dave Workman, Vice President, Strategic Pricing and Contracts;

k.   **Par**: Paul Campanelli, President & CEO (Endo); Michael Altamuro, Commercial Operations & Marketing; Renee Kenney, Senior Advisor, Generic Sales; Michael Burton, Vice President, National Accounts; Rick Guillony, Vice President, National Accounts; Jon Holden, Vice President, Sales; Karen O'Connor, Vice President, National Accounts; Sandra Bayer, Sr. Director, National Accounts (Qualitest); James Burnett, National Accounts Manager (Qualitest); Gary Larson, National Accounts Manager (Qualitest); Lori Minnihan, Associate Director, Trade Pricing Operations (Qualitest); Charles Propst, Vice President (Qualitest); Warren Pefley, VP, Sales & Marketing (Qualitest);

l.   **Perrigo**: Sharon Kochan, Executive Vice President & GM Perrigo Pharmaceuticals; John Wesolowski, Executive Vice President, President Rx; H. James Booydegraaft: Associate Director, Marketing; Andrea Felix, National Account Executive; Chris Owens, Customer Business Manager; Tony Polman, National Account Manager; Anthony Schott, National Account Mnaager, Retail; Shelly Snyder, National Account Manager;

m.   **Sandoz**: Don DeGolyer, Chief Executive Officer & Board Director; Jeff George, CEO; Steven Greenstein, Director, Key Customers; Armando Kellum, Vice President, Sales & Marketing; Paul Krauthauser, Senior Vice President, Commercial Operations; Della

10

Lubke, Director, National Accounts;

n.      **Sun**: Wayne Fallis, Director, National Accounts; Thomas Versosky, President; Donna Hughes, National Account Manager;

o.      **Taro**: Mitchell Bashinsky, Business Development; Jim Josway, Vice President, Rx Sales; Bill Seiden, Senior Vice President, U.S. Sales & Marketing; Scott Brick, Manager, National Accounts; Howard Marcus, VP Sales & Marketing; Brant Schofield, Vice President, Sales & Marketing;

p.      **Teva**: Theresa Coward, Senior Director Sales & Trade Relations; Maureen Cavanaugh, Chief Operating Officer, North America Generics; Danen Alkins, Vice President, Pricing & Contracts; Timothy Crew, SVP North American Generics; Robert Cunard, VP Sales; John Denman, SVP, Sales & Marketing; Christine Baeder; SVP Customer and Marketing Operations; Kevin Green, Associate Vice President, National Accounts; Teri Mauro Sherman, Director, National Accounts; Jessica Peters, Director, Trade Operations; Dave Rekenthaler, VP Sales;

q.      **West-Ward**: Jason Grenfell-Gardner, Senior Vice President, Sales & Marketing; Luis Velez, Senior Director of Sales; Mark Ritchey, Vice President, Sales; Paul Markowitz,

Director, National Accounts; Tareq Darwazeh, National Account Senior Manager; Spiro Gavaris, Vice President, Sales and Marketing; and

r.      **Zydus**: Joseph Renner, Chair of the Board; Kristy Ronco, Vice President, Sales; Jack Bleau, Director of Trade; Michael Keenley, President; Ganesh Nayak, Chief Operating Officer & Executive Director; Sharvil Patel, Managing Director; Elizabeth Purcell, Sr. Director, Marketing and Portfolio Management; Lisa Ribando, Senior Contact Manager; Kristy Ronco, Vice President, Sales; Laura Short, Vice President, Sales; Karen Strelau, Executive Vice President Sales and Marketing.

**ECRM EPPS Retail Pharmacy Conference** – Atlanta, Georgia (January 29-February 1, 2012):

a.      **Actavis;**
b.      **Akorn;**
c.      **Amneal;**
d.      **Apotex;**
e.      **Ascend;**
f.      **Aurobindo;**
g.      **Breckenridge;**
h.      **Camber;**
i.      **Dr. Reddy's;**
j.      **Epic;**
k.      **Fougera;**
l.      **Greenstone;**
m.      **Heritage;**
n.      **Hi-Tech;**

11

o.    **Impax;**
p.    **Lupin;**
q.    **Mallinckrodt;**
r.    **Par/Endo;**
s.    **Perrigo;**
t.    **Sandoz;**
u.    **Sun;**
v.    **Taro;**
w.    **Teva;**
x.    **Upsher-Smith;**
y.    **West-Ward;**
z.    **Wockhardt;** and
aa.    **Zydus.**

**GPhA Annual Meeting** – Orlando, Florida (February 22-24, 2012):

a.    **Mylan/UDL;**
b.    **Par/Endo;**
c.    **Sandoz**; and
d.    **Teva.**

**NACDS Annual Meeting** – Palm Beach, Florida (April 24-27, 2012):

a.    **Actavis:** Andrew Boyer, EVP, Commercial Operations; Sigurdur Olafsson, Chief Executive Officer; Michael Reed, Executive Director, Trade Relations; Paul Reed, Senior Director, Trade Sales and Operations; John Shane, Director, Trade Relations; Allan Slavsky, Sales Consultant; Michael Perfetto, Chief Commercial Officer Generic RX/OTC, US and Canada; Paul Bisaro, President and Chief Executive Officer; Robert Stewart, President and CEO;

b.    **Akorn/Hi-Tech;**

c.    **Alvogen;**

d.    **Amneal;**

e.    **Apotex**: Buddy Bertucci, Vice President, Institutional Sales; Sam Boulton, Director, National Accounts; Jeff Watson, President & COO; Beth Hamilton, Vice President, Generic Product Sales; James Van Lieshout, Vice President, Trade and Industry Relations; Peter Hardwick, Chief Commercial Officer; Lyndon Johnson, SVP, Sales & Marketing;

f.    **Aurobindo**: Robert Cunard, CEO; James Grauso, EVP, N.A. Commercial Operations;

g.    **Dr. Reddy's:** Amit Patel, Senior Vice President & Head, North American Generics; John Adams, SVP, Commercial Operations; Jeff Burd, SVP, Commercial Operations; Abhijit Murkerjee, President, Global Generics;

12

h.  **Fougera:** Kian Kazemi, Senior Vice President, Sales; Anthony Thomassey, Director, National Accounts; Christopher Bihari, National Sales Director; Brian Markison, CEO; Jeff Wasserstein, Senior Vice President Business Development; Jeff Bailey, Chief Operating Officer;

i.  **G&W Laboratories:** Erika Vogel-Baylor, Vice President, Sales & Marketing; Kurt Orlofski, CEO;

j.  **Glenmark:** Paul Dutra, Executive Vice President;

k.  **Greenstone;**

l.  **Heritage;**

m.  **Impax:** Doug Boothe, President Generics Division;

n.  **Lupin;**

o.  **Mallinckrodt;**

p.  **Mylan/UDL:** Robert Potter, Head of Global Sales Excellence; Anthony Mauro, Chief Commercial Office; Joseph Duda, Director, Pricing and Contracts; Matt Erick, President, Mylan North America & Brazil;

q.  **Par/Endo:** Paul Campanelli, President & CEO (Endo); Michael Altamuro, Commercial Operations & Marketing; Renee Kenney, Senior Advisor, Generic Sales; Thomas Haughey, President;

r.  **Perrigo:** Sharon Kochan, Executive Vice President & GM Perrigo Pharmaceuticals; John Wesolowski, Executive Vice President, President Rx; Joseph Papa, Chair and CEO; Jim Tomshack, Senior Vice President, Sales; Philip Wilis, Innovation and Marketing Strategy;

s.  **Sandoz:** Don DeGolyer, Chief Executive Officer & Board Director; Jeff George, CEO; Armando Kellum, Vice President, Sales & Marketing;

t.  **Sun;**

u.  **Taro:** Mitchell Bashinsky, Business Development ; Jim Josway, Vice President, Rx Sales; Bill Seiden, Senior Vice President, U.S. Sales & Marketing; Jim Kedrowski, Interim Chief Executive Officer; Russell Mainman, Director, Generic Business Unit;

v.  **Teva:** Theresa Coward, Senior Director Sales & Trade Relations; Maureen Cavanaugh, Chief Operating Officer, North America Generics; Danen Alkins, Vice President, Pricing & Contracts; Timothy Crew, SVP North American Generics; John Denman, SVP, Sales & Marketing; Christine Baeder; SVP Customer and Marketing Operations; Jonathan Kafer, EVP, Sales & Marketing; Jeremy Levin, President & CEO; William Marth, President & CEO North America and Europe, Heritage Pharma Holdings; Michael Sine, Sr. Director, Corporate Account Group;

w.  **Versapharm;**

13

x.      **Zydus:** Joseph Renner, Chair of the Board; Kristy Ronco, Vice President, Sales; Laura Short, Vice President, Sales; Karen Strelau, Executive Vice President Sales and Marketing.

**HDMA 2012 Business Leadership Conference** – San Antonio, Texas (June 13, 2012):

a.      **Actavis:** Michael Baker, Executive Vice President, Trade Sales and Development (Allergan); John Shane, Director, Trade Relations (Allergan); Jack Ericsson, Senior Regional Manager (Allergan); Michael Reed, Director, National Trade Accounts (Allergan); Paul Reed, Senior Director, Trade Sales (Allergan); Carrie Wetzel, National Account Manager (Allergan);

b.      **Amneal:** Chip Austin, Mid Atlantic District Manager; Thomas Balog, Trade Consultant; Jim Luce, Executive Vice President, Sales and Marketing Stephen Rutledge; Vice President of Sales

c.      **Apotex:** Beth Hamilton, Director, National Sales; James Van Liesbout, Vice President Retail Sales; Jeff Watson, President;

d.      **Aurobindo**: Corrine Hogan, VP Sales & Marketing; Scott White, President;

e.      **Dr. Reddy's:** John Adams, Vice President, Sales and Marketing, North America Generics; Jake Austin , Regional Sales Manager;  Katherine Neely, Associate Director, Generics Rx Marketing, North America; Amanda Rebnicky, Associate Director, Marketing; Robert Rodowicz, Director, National Accounts; Cindy Stevens, Senior Director of National Accounts; Tricia Wetzel, Senior Director, National Accounts;

f.      **Fougera:** Kian Kazemi, Senior Vice President, Sales; Christopher Bihari, National Accounts Executive; David Klamn, Senior Vice President and General Manager; Walter Kaczmarek, Vice President, National Accounts and Managed Markets;

g.      **Greenstone:** Lori LaMattina, Sales Operations Manager; Jull K. Nailor, Senior Director, Sales and National Accounts; Robin Strzeminski, National Account Director; Kevin Valade, National Account Director; Gregory Williams, National Account Manager

h.      **Heritage:** Jason Malek, President; Matt Edelson, Senior Director of Sales; Anne Sather, National Account Manager; Neal O'Mara, National Account Manager;

i.      **Lannett:** Kevin Smith, Vice President, Sales & Marketing; Lauren Carotenuto; Justin McManus, National Account Manager; Tracy Sullivan, National Account Manager;

j.      **Mylan/UDL:** Janet Bell, Key Accounts Manager; Edgar Escoto, Director, National Accounts; Charesse Forbes, Manager, Market Access Strategy; Stephen Krinke, National Account Manager; Kevin McElfresh, Executive Director, National Accounts; James Nesta, Director, National Accounts; Justin Punkett, Director, Trade Relations; Sean Reilly, Key Account Manager; Stephen Stone, Director, National Accounts; Thomas Theiss, Director, Trade Relations; Gary Tighe, Director, National Account; Lance Wyatt, Director, National Accounts;

14

k.    **Par/Endo:** Sandra Bayer, National Accounts Manager;

l.    **Sandoz:** Steven Greenstein, Director, National Accounts; Paul Krauthauser, Director, National Accounts; Della Lubke, Director, National Accounts; Christopher Neurohr, Director, National Accounts;

m.    **Sun:** Susan Knoblauch, Sales Manager; Anand Shah, Sr. Manager, Sales Operations; Steven Smith, Director of Sales;

n.    **Teva:** Theresa Coward, Senior Director of National Sales; Andrew Boyer, Senior Vice President, Generic Sales and Marketing; Christopher Doerr, Associate Director, Trade Operations; Kevin Green; National Account Manager; Jeff McClard, Director, National Accounts; Jessica Peters, National Account Manager; David Rekenthaier, Director, National Accounts; Richard Rogerson, Director, Pricing; Teri Mauro Sherman, Director, National Accounts; Allan Slavsky, Vice President, Sales;

o.    **Valeant:** Asha Soto, Vice President, Trade Relations & Customer Operations; Cheryl Volker, Senior Manager, Customer Service;

p.    **VersPharm:** Stephen M. McCune, Chief Sales and Marketig Officer; Grace Wilks, Manager, Pricing, Contracts, Government and National Accounts

q.    **West-Ward:** Mark Boudreau, Executive Director of National Sales; John Kline, National Account Director; Joseph Ruhmel, National Account Director; Steven Snyder, National Account Director; and

r.    **Zydus:** Kristy Ronco, Director, National Accounts and Customer Marketing; Laura Short, Director, Associate Vice President, National Account s and Customer Strategies; Karen Strelau, Vice President, Sales.

**NACDS 2012 Pharmacy and Technology Conference** – Denver, Colorado (August 25-28, 2012):

a.    **Actavis:** Andrew Boyer, EVP, Commercial Operations Michael Reed, Executive Director, Trade Relations; Paul Reed, Senior Director, Trade Sales and Operations; John Shane, Director, Trade Relations; Allan Slavsky, Sales Consultant; Michael Perfetto, Chief Commercial Officer Generic RX/OTC, US and Canada; Napoleon Clar, VP, Marketing; John Elliot, Manager, Marketing; Lisa Fiveash, National Account Representative; Anthony Giannone, Executive Director, Sales; Maureen Meehan, Director, National Accounts; Toni Picone, Marketing Manager; Vince Rinaudo, Director, National Accounts; David Schmidt, Director, National Accounts; Michael Baker, Executive Vice President, Trade Sales and Development; Ara Aprahamian, Vice President, Sales & Marketing; Steve Cohen, Vice President, National Accounts; Michael Dorsey, Director, National Accounts; Jinping McCormick, VP, Rx Sales & Marketing , Generics, US; Lisa Pehlke, Director, Corporate Accounts;

b.    **Apotex:** Buddy Bertucci, Vice President, Institutional Sales; Sam Boulton, Director, National Accounts; Beth Hamilton, Vice President, Generic Product Sales; James Van Lieshout, Vice President, Trade and Industry Relations; Tom Axner, National Sales Director, Distribution; Tim Berry, National Account Manager; Gwen Copeland, Manager,

15

National Accounts; John Crawford, National Account Director; Tina Kaus, National Account Director; Bob Sinunons, National Account Director; Debbie Veira, National Account Manager; Pat Walden, Senior Marketing Manager;

c.    **Aurobindo:** Robert Cunard, CEO; James Grauso, EVP, N.A. Commercial Operations; Stuart Blake, Direcor, National Accounts; Geoff Rouse, Director of Sales;

d.    **Dr. Reddy's:** Jake Austin, VP, US Sales; Nimish Muzumdar, Director of Marketing; Katherine Neely, Associate Director Rx Generics; Amanda Rebricky, Associate Director, Marketing; Hillary Steele, Associate Director, Marketing Communications; Cindy Stevens, Director, National Accounts; Tricia Wetzel, Senior Director, National Accounts, Rx Mid-West; John Adams, SVP, Commercial Operations; Jeff Burd, SVP, Commercial Operations;

e.    **Fougera:** Kian Kazemi, Senior Vice President, Sales; Anthony Thomassey, Director, National Accounts; Christopher Bihari, National Sales Director; Ilene Russo, Product Manager;

f.    **Glenmark:** Paul Dutra, Executive Vice President; Mitchell Blashinsky, Business Development; Jessica Cangemi, Director, Sales & Marketing; Terry Coughlin, EVP and COO; David Irwin, Director of Sales; Lyndon Johnson, Director, Sales & Marketing; Jolene McGalliard, National Account Manager;

g.    **Heritage:** Robert Glazer, Chair & CEO; Jason Malek, President; Matt Edelson, Senior Director of Sales; Anne Sather, National Account Manager; Neal O'Mara, National Account Manager; Gina Gramuglia, National Account Manager;

h.    **Impax:** Doug Boothe, President Generics Division;

i.    **Lannett:** Arthur Bedrosian, President and Chief Executive Officer; Tracy DiValero, National Account Manager; Dwight Nix, Director, National Accounts; Kevin Smith, Vice President, Sales & Marketing; Laura Carotenuto, National Accounts Representative; Justin McManus, Senior Director, Sales & Business Development;

j.    **Mylan:** Robert Potter, Head of Global Sales Excellence; Joseph Duda, Director, Pricing and Contracts; Matt Erick, President, Mylan North America & Brazil; Mike Aigner, Director, National Accounts; John Barannick, Director, Trade Relations; Matt Cestra, Senior Director, Marketing; Rosalind Davis, Senior Manager, Contracts; Edgar Escoto, Director, National Accounts; Kevin McElfresh, Executive Director, National Accounts; Rob O'Neal, Head of Global Commercial Excellence & Incentive Comp; Sean Reilly, National Account Manager; Gary Tighe, Director National Accounts; Lance Wyatt, Director, National Accounts;

k.    **Par:** Paul Campanelli, President & CEO (Endo); Michael Altamuro, Commercial Operations & Marketing; Renee Kenney, Senior Advisor, Generic Sales; Michael Burton, Vice President, National Accounts; Rick Guillory, Vice President, National Accounts; Jon Holden, Vice President, Sales; Karen O'Connor, Vice President, National Accounts; Rich Franchi, VP, Sales (DAVA); Kim Rothofsky, Senior Director, Trade Relations (DAVA);

16

Sandra Bayer, Sr. Director, National Accounts (Qualitest); James Burnett, National Accounts Manager (Qualitest); Lori Minnihan, Associate Director, Trade Pricing Operations (Qualitest); Charles Propst, Vice President (Qualitest); Warren Pefley, VP, Sales & Marketing (Qualitest); Kelly Bachmeier, Director, National Accounts (Qualitest);

Walter Busbee, Director of National Accounts (Qualitest); Spike Pannell, National Account Manager (Qualitest);

l.   **Perrigo:** John Wesolowski, Executive Vice President, President Rx; H. James Booydegraaff, Associate Director, Marketing; Andrea Felix, National Account Executive; Ori Gutwerg, National Account Executive; Katie McCormack, National Account Manager; Tony Pelman, National Account Manager; Shelly Snyder, National Account Manager;

m.   **Sandoz:** Armando Kellum, Vice President, Sales & Marketing; Steven Greenstein, Director, Key Customers; Della Lubke, Director, National Accounts; Chris Neurolu, Director, National Accounts;

n.   **Sun:** Wayne Fallis, Director, National Accounts; Thomas Versosky, President; Susan Knoblauch, Synior Manager, Sales; Grace Shen, VP, Marketing; Steven Smith, Sr. Director of Sales;

o.   **Taro:** Jim Josway, Vice President, Rx Sales; Bill Seiden, Senior Vice President, U.S. Sales & Marketing; Scott Brick, Manager, National Accounts; Sheila Curran, Vice President, Sales Operations; Howard Marcus, VP Sales & Marketing; Doug Statler, Sr. Director/Head of Sales;

p.   **Teva:** Theresa Coward, Senior Director Sales & Trade Relations; Maureen Cavanaugh, Chief Operating Officer, North America Generics; Darren Alkins, Vice President, Pricing & Contracts; Timothy Crew, SVP North American Generics; John Demnan, VP Sales & Marketing; Christine Baeder; SVP Customer and Marketing Operations; Christopher Doen-, Vice President, Trade Relations; Kevin Galownia, Senior Director, Pricing; Scott Goldy, Director, National Accounts; Kevin Green, Associate Vice President, National Accounts; Jennifer Guzman, Director, Marketing, Health Systems; Teri Moura Sherman, Director, National Accounts; Jessica Peters, Director, Trade Operations; Dave Rekenthaler, VP Sales;

q.   **West-Ward:** Jason Grenfell-Gardner, Senior Vice President, Sales & Marketing; Luis Velez, Senior Director of Sales; Mark Ritchey, Vice President, Sales; Paul Markowitz, Director, National Accounts; Ta.reg Darwazeh, National Account Senior Manager; Spiro Gavaris, Vice President, Sales and Marketing; Brittany Cummins, Territory Sales Representative; Brian Hoffmann, VP Business Development; and

r.   **Zydus:** Joseph Renner, Chair of the Board; Kristy Ronco, Vice President, Sales; Jack Bleau, Director of Trade; Michael Keenley, President; Patricia Kwilos, VP of Marketing; Ganesh Nayak, Chief Operating Officer & Executive Director; Sharvil Patel, Managing Director; Laura Short, Vice President, Sales; Karen Strelau, Executive Vice President Sales and Marketing.

**GPhA 2012 Technical Conference** – Bethesda, Maryland (October 1-3, 2012):

17

a.    **Actavis:** Joyce DelGaudio, Executive Director, Regulatory Affairs;

b.    **Akorn;**

c.    **Amneal;**

d.    **Apotex:** Bruce Clark, Senior Vice President, Scientific and Regulatory Affairs;

e.    **Ascend;**

f.    **Aurobindo;**

g.    **Breckenridge;**

h.    **Dr. Reddy's:** Nick Cappuccino, Vice-President and Head of Global Quality;

i.    **Fougera;**

j.    **Glenmark;**

k.    **Heritage;**

l.    **Impax:** Marcy Macdonald, Vice President Regulatory Affairs;

m.    **Lannett;**

n.    **Lupin;**

o.    **Mallinckrodt;**

p.    **Mylan:** Marcie McClintic, Vice President and General Counsel;

q.    **Par;**

r.    **Perrigo;**

s.    **Sandoz:** Don DeGolyer, President**;**

t.    **Strides;**

u.    **Sun;**

v.    **Taro;**

w.    **Teva:** Allan Oberman, President and CEO**;**

x.    **Upsher-Smith;**

y.    **Versapharm;**

z.    **Zydus.**


**HDMA 2012 Annual Board & Membership Meeting** – (October 5, 2012):

a.    **Amneal:** Jim Luce, Executive Vice President, Sales and Marketing; Stephen Rutledge, Vice President of Sales;

b.    **Mylan**: Robert Potter, Executive President, Sales & Channel Development; Joseph Duda, Vice President, Sales Operation; James Nesta, Executive Director, National Accounts; Robert O'Neil, Vice President Controller;

c.    **Par**: Scott Littlefield, National Account Director (Endo); and

d.    **Teva**: Christine Baeder, Senior Director, Customer Operations; Maureen Cavanaugh, Senior Vice President, Sales & Marketing; Theresa Coward, Senior Director of National Sales; and Christopher R. Doerr, Associate Director, Trade Operations.

**NACDS 2013 Regional Chain Conference** – (February 3-5, 2013):

a.    **Actavis:** Michael Baker, Executive Vice President, Trade and Sales Department,

18

Executive Vice President, Trade Sales and Development; Paul Reed, Senior Director, Trade Sales and Development; and

b. **Teva:** Theresa Coward, Senior Director Sales and Trade Relations.

**HDMA 2013 Specialty Pharmaceutical Supply Chain Issues & Trends Seminar** – (Feb. 12-13, 2013):

a. **Apotex;**
b. **Lannett;**
c. **Mylan;**
d. **Sandoz;** and
e. **Teva**

**GPhA Annual Meeting** – Orlando, Florida (February 20-22, 2013):

a. **Actavis:** Sigurdur Olafsson, President;
b. **Akorn;**
c. **Alvogen;**
d. **Amneal;**
e. **Apotex;**
f. **Ascend;**
g. **Aurobindo;**
h. **Breckenridge;**
i. **Dr. Reddy's;**
j. **G&W Laboratories;**
k. **Glenmark;**
l. **Greenstone;**
m. **Heritage;**
n. **Impax;**
o. **Lupin;**
p. **Mallinckrodt**;
q. **Mylan**: Anthony Mauro, President;
r. **Par;**
s. **Perrigo:** Douglas Boothe, President of Generics Division; Judy Brown, Chief Financial Officer; Joseph Papa, Chairman and CEO; Richard Stec, Vice President of Global and Regulatory Affairs;
t. **Sandoz:** Donald DeGolyer, President & CEO;
u. **Sun**;
v. **Taro:** Kim DiPadova; Kal Sundaram, CEO;
w. **Teligent (IGI Laboratories):** Jason Grenfell-Gardner, President and CEO;
x. **Teva**:  Allan Oberman, President and CEO;

y. **Versapharm**;
z. **Wockhardt;** and
aa. **Zydus.**

19

**ECRM Annual Retail Pharmacy Efficient Program Planning Session** – (February 24-27, 2013):

a.    **Actavis;**
b.    **Akorn;**
c.    **Amneal;**
d.    **Apotex;**
e.    **Ascend;**
f.    **Aurobindo;**
g.    **Breckenridge;**
h.    **Camber;**
i.    **Dr. Reddy's;**
j.    **Epic;**
k.    **Fougera;**
l.    **Greenstone;**
m.    **Heritage;**
n.    **Hi-Tech;**
o.    **Impax;**
p.    **Lupin;**
q.    **Mallinckrodt;**
r.    **Par/Endo;**
s.    **Perrigo:** Andrea Felix, National Account Executive; Katie McCormack, National Account Manager; Tonly Polman, National Account Executive;
t.    **Sandoz;**
u.    **Sun;**
v.    **Taro**: Doug Statler, Sr. Director/Head of Sales; Howard Marcus, VP Sales & Marketing; Scott Brick, Manager, National Accounts;
w.    **Teligent**: Jason Grenfell-Gardner, President and CEO; Shawn McMorrow, National Accounts Manager;
x.    **Teva;**
y.    **Upsher-Smith**;
z.    **West-Ward**;
aa.    **Wockhardt**; and
bb.    **Zydus**.

**HDMA 2013 Supply Chain Security Seminar** – Wilmington, DE (May 14-15, 2013):

a.    **Actavis;**
b.    **Apotex;**
c.    **Sandoz; and**
d.    **Teva.**


**NACDS 2013 Annual Meeting** – Sands Expo Convention Center, Palm Beach, Florida (April 20-23, 2013):

20

a.  **Actavis**: Andrew Boyer, President and CEO, North America Generics; Sigurdur Olafsson, President, Global Generics Medicines; Robert Stewart, Chief Operating Officer; Michael Baker, Executive Vice President, Trade and Sales Department; Vivek Bachhawat, Vice President, Pacific; Paul Bisaro, Board Member; Jean-Guy Goulet, Regional President, Canada Generics; Michael Reed, Executive Director, Trade Relations; Paul Reed, Senior Director, Trade Sales and Development; John Shane, Director, Trade Relations; Allan Slavsky, Sales Consultant;

b.  **Apotex**: Corey Anquetil, Director Strategic Sales, North America; Buddy Bertucci, Vice President, Institutional Sales; Sam Boulton, Director, National Accounts; Lyndon Johnson, Senior Vice President, Sales and Marketing; Jeff Watson, President Global Generics; Beth Hamilton, Vice President, Marketing and Portfolio Strategy, Sales and Marketing; David Kohler, Vice President and General Manager; Peter Hardwick, Senior Vice President, Sales and Marketing, Canada; Eric Organ, Vice President, Commercial Operations;

c.  **Amneal**: Jim Luce, Executive Vice President, Sales & Marketing; Chirag Patel, Co-CEO & Chairman; Chintu Patel, CEO & Co-Chairman; Stephen Rutledge, Vice President, Sales;

d.  **Aurobindo**: Robert Cunard, CEO; James Grauso, Executive Vice President, North America Commercial Operations;

e.  **Camber**: Brett Barczak, Director, Corporate Accounts; Kon Ostaficiuk, President;

f.  **Dr. Reddy's**: John Adams, Senior Vice President, Sales and Marketing; Jeff Burd,  Vice President, Sales and Marketing; Gary Benedict, Executive Vice  President;

g.  **G&W Laboratories**: Erika Baylor, Vice President, Sales and Marketing; Aaron Greenblatt, Chief Executive Officer; Kurt Orlofski, President & Chief Operating Officer;

h.  **Glenmark**: Jim Brown, Vice President, Sales; Mitchell Blashinsky, Vice President, Sales and Marketing; Paul Dutra, Executive Vice President;

i.  **Greenstone**: James Cannon, General Manager; Greg Williams; Director, National Accounts;

j.  **Impax**: Doug Boothe, President Generics Division;

k.  **Lupin**: Dave Berthold, SVP, Generics; Vinita Gupta, CEO; Robert Hoffman, EVP, U.S. Generics; Paul McGarty, President;

l.  **Mallinckrodt**: Ginger Collier, Senior Director, Marketing; Walt Kaczmarek, Chief Operating Officer; Jane Williams, Vice President-Sales;

21

m.   **Mylan**: Joseph Duda, President; Robert Potter, Senior Vice President, National Accounts and Channel Development, Senior Vice President of National Accounts and Channel Development; Anthony Mauro, Chief Commercial Officer; James Nesta, Vice President of Sales; Jeffrey May, Vice President, North America Product Strategy;

n.   **Par**: Jon Holden, Vice President of Sales; Paul Campanelli, President; Michael Altamuro, Vice President Marketing and Business Analytics; Renee Kenney, Senior Advisor, Generic Sales; Scott Littlefield, Trade Director; Brent Bumpas, National Account Director, Trade;

o.   **Perrigo**: Scott Jamison, Executive Vice President and General Manager; Christopher Kapral, Senior Vice President, Consumer Healthcare Sales; Joseph Papa, Chairman and CEO; Christian Strong, Senior Vice President, Diabetes Care; Jim Tomshack, Senior Vice President, Sales; Mark Walin, Vice President, Consumer Healthcare Sales; John Wesolowski, Acting General Manager; Philip Willis, Innovation and Marketing Strategy;

p.   **Sandoz**: Don DeGolyer, CEO; Jeff George, Global Head of Sandoz; Richard Tremonte, Senior Vice President, Global Generic Pharmaceuticals; Samuele Butera, Vice President and Head, Biopharmaceuticals; Dave Picard, Vice President, Biosimilars and Injectables;

q.   **Sun:** GP Singh Sachdeva, President of Sun Pharmaceuticals, USA; Bill Everett, National Trade Account Manager;

r.   **Taro**: Jim Kedrowski, Interim CEO; Ara Aprahamian, Vice President Sales and Marketing; Michael Perfetto, Chief Commercial Officer, Generics Rx OTC, US and Canada; Carlton Holmes, Vice President Marketing; Elizabeth Ivey, Vice President, Sales and Marketing;

s.   **Teva**: Jeremy Levin, President and CEO; Theresa Coward, Senior Director of Sales; David Rekenthaler, Vice President, Sales; Maureen Cavanaugh, Senior Vice President and Chief Operating Officer, North America Generics; Allan Oberman, President and CEO Teva Americas Generics; Jonathan Kafer, Executive Vice President, Sales and Marketing; Barry Fishman, President and CEO, Teva Canada; Jeffrey Herzfeld, Senior Vice President US Specialty Medicines; David Marshall, Vice President of Operations; Michael Sine, Director, Corporate Account Group; Douglas Sommerville, Senior Vice President and General Manager, Teva Canada;

t.   **Valeant**: Thomas Allison, Senior Director of National Accounts; Eddie Andruss, Assoc. Director of National Accounts; Sultana Kazanas, National Account Manager;

u.   **Versapharm**: Stephen McCune, Chief Sales & Marketing Officer;

v.   **Wockhardt:** Michael Craney, President of Sales & Marketing; and

22

w.    **Zydus**: Michael Keenley, President; Joseph Renner, President and CEO; Kristy Ronco, Vice President, Sales; Laura Short, Vice President, Sales; Karen Strelau, Executive Vice President Sales and Marketing.


**HDMA 2013 Business and Leadership Conference** – Orlando, Florida (June 2-5, 2013):

a.    **Actavis**: Andrew Boyer, President and CEO, North America Generics, Marc Falkin, Vice President of Purchasing; Maureen Barrett, Director of National Accounts; Anthony Giannone, National Accounts Director;

b.    **Akorn/Hi-Tech**;

c.    **Amneal:** Marty Ross, Vice President, Sales Operations; Stephen Rutledge, Vice President Sales;

d.    **Alvogen:** William Hill, Vice President of Sales and Marketing;

e.    **Apotex**: Jeffrey Hampton, Vice President, Commercial Operations; Beth Hamilton, National Sales Director; James Van Lieshout, Vice President, Sales; David Rekenthaler, National Accounts Director; Jane Williams, Vice President Specialty Generic Sales;

f.    **Aurobindo**: Julie Faria, Senior Manager, Sales Operations and Contact Administration;

g.    **Citron**: Karen Strelau, Vice President, Sales; Laura Short, Associate Vice President, Sales;

h.    **Dr. Reddy's:** Victor Borelli, Vice President and Head, National Accounts, North America Generics; Michael Burton, Director National Accounts, Health Systems; Joshua Hudgens, Director of Purchasing; Patricia Wetzel Senior Director, National Accounts;

i.    **Glenmark**: Christopher Bihari, Director National Accounts;

j.    **Greenstone:** Lori LaMattina, Sales Marketing Manager; Jill K. Nailor, Senior Director, Sales and National Accounts; Robin Strzeminski, National Account Director; Kevin Valade, National Account Director; Gregory Williams, National Account Manager;

k.    **Heritage**: Neal O'Mara, National Accounts Manager; Anne Sather, National Account Manager;

l.    **Impax:** Gary Skalski ("Skalski"), Director of Sales; William Ball ("Ball"), Senior National Account Manager; Danny Darnell ("Darnell"), Senior National Account Manager; Todd Engle, Senior Director, Sales Operations;

m.    **Lannett**: Kevin Smith, Vice President of Sales; Grace Wilks, Director, Sales and Marketing; Tracy Sullivan, Director of National Accounts; Robert Foley, Marketing

Manager;

n.  **Lupin**: Dave Berthold, VP, Sales, U.S. Generics; David Shirkey, National Accounts Manager; Lauren Walten, National Account Manager;

o.  **Mallinkrodt**: Steven Becker, National Account Director; Kian Kazemi, Director, Retail National Accounts – Specialty Generics; Jacob Longenecker, Product Manager, Specialty Generics; Jane Williams, Vice President, Sales – Specialty Generics;

p.  **Mylan**: Janet Bell, National Accounts Director; Joseph Duda, Vice President, North America Sales Operations and Customer Excellence; Edgar Escoto, National Accounts Director; Kevin McElfresh, Executive Director, National Accounts; James Nesta, Vice President of Sales; Robert O'Neill, Vice President; Sean Reilly, Key Account Manager; John Shane, Director of National Trade Accounts; Gary Tighe, National Accounts Director; Lance Wyatt, National Accounts Director; Michael Aigner, Director, National Accounts; John Baranick, Director, Trade Relations; Danielle Barill, Director, Sales Support and Customer Relations; Andrew Dobbs, Manager, Supplier Trade Relations; Richard Isaac, Senior Manager, Strategic Accounts; Christopher Neurohr, Director, National Accounts;

q.  **Par**: Jon Holden, Vice President of Sales; Sandra Bayer, National Accounts Manager; Peter Gargiulo, Director, National Accounts; Christopher Neurohr, Director, National Accounts; John Bullock, National Accounts Director;

r.  **Sandoz**: Alan Ryan, Associate Director, National Accounts; Dawn Doggett, National Trade Affairs Executive, Managed Markets;

s.  **Sun**: Scott Littlefield, Trade Director, National Account Director; Daniel Schober, Associate Vice President, Trade Sales; David Moody, CEO, Mutual; David Simoneaux, Marketing Coordinator, Mutual;

t.  **Teva**: Theresa Coward, Senior Director, National Sales; Sal Cuomo, Trade Account Director; Jeffrey Herzfeld, Senior Vice President, Commercial Operations and America Strategy; Jessica Peters, National Accounts Manager; Teri Sherman, National Accounts Director; Christine Baeder, Senior Director Customer Operations; Maureen Barrett, Director, National Accounts; Andrew Boyer, Senior Vice President, Generic Sales and Marketing; Marc Falkin, Vice President, Purchasing; Christopher Doerr, Director Trade Relations;

u.  **Valeant**: Cheryl Volker, Senior Manager, Customer Service;

v.  **VersaPharm:** Tara Demianyk, Pricing, Contracs and Sales Analyst; Stephen M. McCune, Chief Sales and Marketing Officer

w.  **West-Ward**: Mark Boudreau, Executive Director of National Sales; Paul Kersten, Vice President, Sales and Marketing; Neal Gervais, National Account Director; John Kline, National Account Director; Joseph Ruhmel, National Account Director; Marik Soudreau, Executive Director, National Sales; Steven Snyder, National Account Director; and

24

x.        **Zydus**: Scott Goldy, Director, National Accounts; Kevin Green, National Accounts Manager; Marc Kikuchi, Senior Vice President, Global Generics; Phyllis Kidder, Senior Vice President, Global Generics; Kristy Ronco, Associate Vice President, National Accounts.

**GPhA CMC Workshop** – Bethesda, Maryland (June 4-5, 2013):

a.        **Actavis**;
b.        **Apotex**: Kiran Krishnan, Vice President, Regulatory Affairs;
c.        **Breckenridge;**
d.        **Dr. Reddy's**: Nick Cappuccino, Vice-President and Head of Global Quality
e.        **Fougera;**
f.        **G&W Laboratories;**
g.        **Glenmark;**
h.        **Heritage;**
i.        **Hi-Tech;**
j.        **Impax**: Marcy Macdonald, Vice President Regulatory Affairs;
k.        **Lannett;**
l.        **Morton Grove;**
m.        **Mylan;**
n.        **Par;**
o.        **Perrigo**: Richard Stec, Vice President Global Regulatory Affairs;
p.        **Sandoz**: Alison Sherwood, Associate Director, Regulatory Affairs;
q.        **Sun**;
r.        **Taro**;
s.        **Teva**;

t.        **UDL (Mylan Institutional)**;
u.        **Upsher-Smith;** and,
v.        **Zydus.**

**NACDS 2013 Total Store Expo** – Sands Expo Convention Center, Las Vegas, Nevada (August 10-13, 2013):

a.        **Actavis**: Michael Baker, Executive Vice President, Trade and Sales Department; Andrew Boyer, President and CEO, North America Generics; Napolean Clark, Vice President of Marketing; Michael Dorsey, Director of National Accounts; Marc Falkin, Vice President of Purchasing; Anthony Giannone, National Accounts Director; Megan Gorman,  Senior Marketing Manager; Maureen Meehan, Director of National Accounts; Cindy Stevens, Director of National Accounts; Nancy Baran, Director, Customer Relations; Kathleen Conlon, Director, Contract Administration; Lisa Fiveash, National Account Representative; Rob Hooper, Senior Marketing Manager; Richard Rogerson,  Senior Director, New Products; Allan Slavsky, Sales Consultant; Michael Reed,  Executive Director, Trade Relations; Paul Reed, Senior Director, Trade Sales and Development; John Shane, Director, Trade Relations; Michael Dorsey, Director, National Accounts;

b.        **Akorn/Hi-Tech:** John Sabat, Sr. VP of National Accounts; M. Tranter, National

25

Accounts Manager, Sales and Marketing; Mick McCanna, Account Manager;

c.   **Apotex**: Tom Axner, National Sales Director, Distribution; Tim Berry, National Account Manager; Gwen Copeland, Manager, National Accounts; John Crawford, National Account Director; Sam Boulton, Director, National Accounts; Jeffrey Hampton, Senior Vice President and National Manager, US and Latin America; Niki Hinman Smock, National Account Manager; David Kohler, Vice President and General Manager; Chirag Patel, Marketing Director, National Accounts; Shannon Price, Senior Marketing Director; Bob Simmons, National Accounts Director; Debbie Veira, National Accounts Manager; Pat Walden, Senior Marketing Manager; Corey Anquetil, Director, Strategic Sales National Accounts; Beth Hamilton, Vice President, Marketing and Portfolio Strategy, Sales and Marketing; Tina Kaus, National Accounts Director; James Van Lieshout, Senior Director, Commercial Operations; Pat Walden, Senior Marketing Manager;

d.   **Alvogen**: Michael Franks, Regional Vice President, Sales; Todd Graverson, Regional Vice President, Sales; Jeffrey Rumler, Executive Vice President, Sales and Marketing;

e.   **Amneal**: Andy Cline, Account Executive; David Hardin, National Accounts Manager; Liz Koprowski, National Account Manager; Jim Luce, Executive Vice President, Sales & Marketing; Brown Massey, Director, Sales; June Parker, National Accounts Manager; Chintu Patel, CEO & Co-Chairman; Chirag Patel, Co-CEO & Chairman; Becky Reece, Event Coordinator; Shannon Rivero, Vice President, Pricing & Analytics; Stephen Rutledge, Vice President, Sales; Kammi Wilson, Marketing Manager;

f.   **Aurobindo**: Stuart Blake, Director, National Accounts; Robert Cunard, CEO; Patrick Santangelo, Senior Director, Sales; Anthony Thomassey, Director National Accounts;

g.   **Camber**: Brett Barczak, Director, Corporate Accounts; Megan Becker, Marketing Manager; Chris D'India, National Acocunt Manager; Stu Messinger, Director of National Accounts; Kon Ostaficiuk, President; Dan Piergies, Director, Sales Operations, Laura Ricardo, Director of Corporate Accounts; Clayton Smith, Account Manager;

h.   **Citron**: Vimal Kavuru, CEO;

i.   **Dr. Reddy's**: Chris Costa, Vice President of Sales; Victor Borelli, Vice President and Head, National Accounts, North America Generics; Jinping McCormick, Vice President Rx Marketing, US Generics; Nimish Muzumdar, Director of Marketing; Larry Knupp, Director of National Accounts; Gary Benedict, Executive Vice President; Umang Vohra, Executive Vice President and Head of North America Generics;

j.   **Fougera;**

k.   **G&W Laboratories**: Erika Baylor, Vice President, Sales & Marketing; Lauren Connolly, National Account Manager; Aaron Greenblatt, Chief Executive Officer; Kurt Orlofski, President & Chief Operating Officer; Michelle Sisco, Sales Analyst;

l.   **Glenmark**: Jim Brown, Vice President, Sales; Mitchell Blashinsky, Vice President, Sales

26

and Marketing; Paul Dutra, Executive Vice President; Jessica Cangemi, Director, Sales and Marketing; Jeff Johnson, Director, Sales and Marketing; David Irwin, Director, Sales; Stephanie Picca, Manager, Sales and Marketing; Terry Coughlin, Executive Vice President and Chief Operating Officer;

m. **Greenstone**: James Cannon, General Manager; Linda Hannemann; Lori Lamattina, Sales Operations Manager; Jill Nailor, Sr. Director Sales and National Accounts; Robin Strezeminski, National Account Director; Kevin Valade, National Account Director, Christine Versichele, Director of U.S. Generic Channel Strategies; Christopher Weller, Senior Manager, Marketing & Strategy; Greg Williams, Director, National Accounts;

n. **Heritage**: Allen Dunehew, President and CEO; Matt Edelson, Senior Director of Sales; Jeffrey Glazer, CEO; Jason Malek, Senior Vice President; Neal O'Mara, National Accounts Manager; Anne Sather, National Account Manager; Gina Gramuglia, Commercial Operations;

o. **Impax:** Chris Gerber, Director of Pricing and Contracts; Italo Pennella, Account Manager; Dan Rozmiarek, Account Manager;

p. **Lannett**: Arthur Bedrosian, President and CEO; William Schreck, Chief Operating Officer; Justin McManus, Director, National Accounts; Kevin Smith, Vice President, Sales and Marketing; Tracy Sullivan, National Accounts Manager; Lauren Carotenuto, National Accounts Representative; Michael Block, Business Development Manager;

q. **Lupin**: Dave Berthold, SVP, Generics; Robert Hoffman, EVP, U.S. Generics; Paul McGarty, President; Steve Randazzo, SVP; David Shirkey, National Account Manager; Lauren Walten, National Account Manager;

r. **Mallinckrodt**: Scott Parker, Director of Trade, Brand Pharmaceuticals; Steve Becker, Director of National Account; Lisa Cardetti, National Account Manager; Ginger Collier, Senior Director, Marketing; Joe Duarte, Director, Access Marketing; Walt Kaczmarek, Chief Operating Officer; Kian Kazemi, Vice President, Sales; Marc Montgomery, Director of Marketing; Bonnie New, National Account Manager; Pete Romer, National Account Manager; Kevin Vorderstrasse, Director Strategic Marketing; Jane Williams, Vice President-Sales;

s. **Mylan**: James Nesta, Vice President of Sales; Michael Aigner, Director, National Accounts; Joseph Duda, President; Kevin McElfresh, Executive Director, National Accounts; Robert O'Neill, Vice President; Robert Potter, Senior Vice President, North America and Channel Development; Lance Wyatt, National Accounts Director; Matt Cestra, Senior Director Marketing; Rodney Emerson, Director, Pricing and Contracts; Edgar Escoto, National Accounts Director; Stephen Krinke, National Accounts Manager; Damon Pullman, West Regional Account Manager; Sean Reilly, Key Account Manager; John Baranick, Director, Trade Relations; Shane Bartolo, Senior Specialist, Sales Administration; Vive Bridges, Senior Director of Global Events; Martin Fletcher, Senior Director, Commercial Business and Purchasing; Ron Graybill, Vice President Managed Markets; Adrienne Helmick, Associate Product Manager, Marketing; Chad Holland, Vice President, Commercial Operations; Heather Paton, Vice President Sales; Bipan Singh,

27

Director, Marketing; Tom Theiss, Director, Trade Relations;  Christine Waller, Senior Manager, North America Communications;

t.  **Par**: Jon Holden, Vice President of Sales; Michael Altamuro, Vice President Marketing and Business Analytics; Renee Kenney, Senior Advisor, Generic Sales, Senior Advisor Generic Sales; Karen O'Connor, Vice President, National Accounts; Rick Guillory, Vice President of National Accounts; Gerald Burton, Vice President of National Accounts; Christine Caronna, Director National  Accounts; Rich Franchi, Vice President, Sales; Kim Rothofsky, Senior Director, Trade Relations; Scott Littlefield, Trade Director; Brent Bumpas, National Account Director, Trade; Kevin O'Brien, Senior Director Payer Markets; Warren Pefley, Vice President, Sales and Marketing; Charles "Trey" Probst, Vice President; Kelly Bachmeier, Director, National Accounts; Sandra Bayer, Senior Director, National Accounts; James Burnett, National Accounts Manager; Walter Busbee, Director National Accounts; Lori Minnihan, Associate Director, Trade Pricing Operations;  Spike Pannell, National Account Manager; Sandra Parker, Deputy Compliance  Officer; Michael Reiney, Vice President, Purchasing; Jeremy Tatum, Director, Market Insights; Darren Hall, Director, National Accounts;

u.  **Perrigo**: Christopher Kapral, Senior Vice President, Consumer Healthcare Sales; Christian Strong, Senior Vice President, Diabetes Care; Mark Walin, Vice President, Consumer Healthcare Sales; John Wesolowski, Acting General Manager; Philip Willis, Innovation and Marketing Strategy; Tom Cotter, Vice President, OTC Marketing; Andrea Felix, National Account Executive; Kara Goodnature, Marketing Manager; Ori Gutwarg, National Account Executive; Pete Haakenstad, National Account Manager; Larry Hudson, Animal Health; H. James Booydegraaff, Associate Director, Marketing; Andy Kjeelberg, Vice President, Consumer Healthcare Sales; John Klingenmeyer, Vice President, Consumer  Healthcare Sales; Shelley Kocur, Senior Director, Service and Customer Supply  Chains; Elizabeth Lowney, Strategic  and  Pipeline  Plan  Manager; Katie McCormack, National Account Manager; Richard McWilliams, Senior Vice President and General Manager; Kristine Milbocker, Trade Relations Planner; Troy Pelak, Vice President, Consumer Healthcare Sales; Tony Polman, National Account Executive; Neal Wilmore, Vice President Commercial Operations, Animal Health; Michael Yacullo, Vice President, Consumer Healthcare Sales;  Tom Zimmerman, Vice President and General Manager;

v.  **Sandoz**: Peter Goldschmidt, President Sandoz US and Head North America;  Armando Kellum, Vice President, Sales and Marketing; Paul Krauthauser, Senior  Vice President, Sales and Marketing; Della Lubke, National Account Executive; Steven Greenstein, Director, Key Customers; Christopher Bihari, Director, Key  Customers; Anuj Hasija, Executive Director, Key Customers;

w.  **Sun:** William Everett, National Trade Account Manager; Wayne Fallis, Director, National Accounts; Steven Goodman, Director Marketing, Generics; Susan Knoblauch, Senior Manager, Sales; GP Singh Sachdeva, President of Sun Pharmaceuticals, USA; Grace Shen, Vice President, Marketing; Steven Smith,  Senior Director of Sales; Christopher Bihari, Director, Key Customers;

x.  **Taro**: Ara Aprahamian, Vice President, Sales and Marketing; Sheila Curran, Vice President, Sales Operations;  Howard Marcus, Vice President Sales and  Marketing;

28

Michael Perfetto, Group Vice President and Chief Commercial Officer of the Generic Rx Business; Doug Statler, Senior Director, Head of Sales; Elizabeth Guerrero, Director, Corporate Accounts, Managed Care; Carlton Holmes, Vice President Marketing; Tim Kiernan, Director of Marketing Analytics;

y.  **Teva**: Theresa Coward, Senior Director of Sales; David Rekenthaler, Vice President, Sales; Maureen Cavanaugh, Senior Vice President and Chief Operating Officer North America Generics; Kevin Galowina, Head of Marketing Operations; Jessica Peters, Manager of Corporate Accounts; Allan Oberman, President and CEO Teva Americas Generics; Jennifer Chang, Director, Marketing; Scott Goldy, Director, National Accounts; Christine Baeder, Senior Vice President, Customer and Marketing Operations; Christopher Doerr, Senior Director, Trade Operations; Kevin Green, Associate Vice President, National Accounts; Jeffrey Herzfeld, Senior Vice President, US Specialty Medicines; Jonathan Kafer, Executive Vice President, Sales and Marketing; Kayla Kelnhofer, National Account Executive; Jennifer King, Director, New Product

Marketing; David Marshall, Vice President of Operations; Jerry Moore, Director, State Government Affairs; Teri Sherman, Director National Accounts; Jason Nagel, Associate Director; John Wodarczyk, Director, Customer Relations;

z.  **Upsher-Smith;**

aa.  **Valeant**: Thomas Allison, Senior Director of National Accounts; Eddie Andruss, Assoc. Director of National Accounts; Tricia Green, Senior Brand Manager; Jona Mancuso, Brand Manager; John Reed, Director, Marketing; Sultana Kazanas, National Account Manager;

bb.  **Versapharm**: Tara Davis, Pricing, Contracts & Sales Analyst; Jim Josway, Vice President, Sales; Stephen McCune, Chief Sales & Marketing Officer; Carl Merideth, Vice President, Marketing and Clinical Pharmacology;

cc.  **West-Ward:** Spiro Gavaris, Vice President of Sales and Marketing; Sam Goodman, Marketing Manager; Tareq Darwazeh, National Accounts Senior Manager; Paul Markowitz, Director, National Accounts; Ernesto Cividanes, Manager, Trade Relations;

dd.  **Wockhardt:** Karen Andrus, Director of Sales; Michael Craney, President of Sales and Marketing; Sunil Khera, President, The Americas, Japan and Emerging Markets; Kevin Knarr, VP of Sales and Marketing; Scott Koenig, VP of Sales and Marketing, Generics; Bob Watson, VP of National Accounts; and

ee.  **Zydus**: Michael Keenley, President; Joseph Renner, President and CEO; Kristy Ronco, Vice President, Sales; Laura Short, Vice President, Sales; Karen Strelau, Executive Vice President Sales and Marketing; Elizabeth Purcell, Senior Director, Marketing and Portfolio Management; Ganesh Nyak, Chief Operating Officer and Executive Director; Daniel Lukasiewicz, Senior Manager, Marketing Operations; Sharvil Patel, Deputy Managing Director.

**HDMA 2013 Annual Board and Membership Meeting** – White Sulphur Springs, West

29

Virginia (September 29 – October 2, 2013):

a.    **Amneal:** Jim Luce, Executive Vice President, Sales and Marketing; Stephen Rutledge, Vice President of Sales;

b.    **Apotex**: Beth Hamilton, Director, National Sales; Jeffrey Hampton, Vice President, Commercial Operations; James Van Lieshout, Vice President, Sales, Retail Division; Jeff Watson, President;

c.    **Mylan**: Joseph Duda, President; Anthony Mauro, Senior Vice President; Robert O'Neill, Vice President, Commercial Operations; Robert Potter, Senior Vice President, North America; Robert Tighe, CFO;

d.    **Teva**: Robert Tighe, Chief Financial Officer, North America; Theresa Coward, Senior Director, National Sales; Christopher Doerr, Director, Trade Operations; David Rekenthaler, Vice President Sales, US Generics; Christine Baeder, Senior Director, Customer Operations; and

e.    **Upsher-Smith.**


**HDMA 2013 Annual Board & Membership Meeting** – White Sulphur Springs, WV (Sept. 29 - Oct. 2, 2013)

a.    **Apotex;**
b.    **Mylan;**
c.    **Teva;** and
d.    **Upsher-Smith.**


**GPhA 2013 Fall Technical Conference** – Bethesda, Maryland (October 28-30, 2013):

a.    **Actavis;**
b.    **Akorn;**
c.    **Alvogen;**
d.    **Amneal;**
e.    **Apotex:** Kiran Krishnan Vice President, Regulatory Affairs;
f.    **Aurobindo;**
g.    **Breckenridge;**
h.    **Dr. Reddy's:** Nick Cappuccino, Vice-President and Head of Global Quality;
i.    **Fougera;**
j.    **Glenmark;**
k.    **Heritage;**
l.    **Hi-Tech;**
m.    **Impax:** Marcy Macdonald, Vice President Regulatory Affairs;
n.    **Lannett;**
o.    **Lupin;**

30

p.   **Mallinckrodt;**

q.   **Mylan:** Dan Snider, Vice President Morgantown RD; Marcie McClintic, Vice President and Chief of Staff; Carmen Shepard, Senior VP, Global Policy and Regulatory;

r.   **Par;**

s.   **Perrigo:** Richard Stec, Vice President, Global Regulatory Affairs;

t.   **Sandoz;**

u.   **Sun;**

v.   **Taro;**

w.   **Teligent (IGI Laboratories);**

x.   **Teva;**

y.   **UDL (Mylan Institutional);**

z.   **Upsher-Smith;**

aa.   **Versapharm;**

bb.   **Wockhardt;** and,

cc.   **Zydus.**


**NACDS 2013 Foundation and Reception Dinner** – New York, New York (December 1-3, 2013):

a.   **Actavis**: Andrew Boyer, President and CEO, North America Generics; Marc Falkin, Senior Vice President, Sales; Anthony Giannone, Executive Director, Sales; Paul Reed, Senior Director, Trade Sales and Development; Michael Reed, Executive Director, Trade Relations; John Shane, Director, Trade Relations;

b.   **Apotex**: Jeff Watson, President, Global Generics; Tim Berry, National Account Manager; Sam Boulton, Director of National Accounts; Jeffrey Hampton, Senior Vice President and General Manager, US and Latin America; Beth Hamilton, Vice President, Marketing and Portfolio Strategy, Sales and Marketing; James Van Lieshout, Senior Director, Commercial Operations;

c.   **Mylan**: Joseph Duda, President; Robert Potter, Senior Vice President North America National Accounts and Channel Development; Rob O'Neill, Head of Sales; Dave Workman, Vice President, Strategic Pricing and Contracts; James Nesta, Vice President of Sales;

d.   **Perrigo**: Christopher Kapral, Senior Vice President, Consumer Healthcare Sales;

e.   **Sandoz**: Peter Goldschmidt, President Sandoz US and Head North America; Armando Kellum, Vice President, Sales and Marketing; Kirko Kirkov, Executive Director, Key Customers; Dave Picard, Vice President, Biosimilars and Injectables;

f.   **Teva**: Theresa Coward, Senior Director of Sales; David Rekenthaler, Vice President, Sales; Maureen Cavanaugh, Senior Vice President and Chief Operating Officer, North America Generics; David Marshall, Vice President of Operations; and

g.   **Upsher-Smith.**

31

**NACDS 2014 Regional Chain Conference** – (Feb. 2-4, 2014):

a.      **Actavis:** Paul Reed, Sr. Director, Trade Sales & Development;
b.      **Mylan:** Gary Tighe, Director National Accounts;
c.      **Teva:** Teri Coward; Senior Directors Sales & Trade Relations; and
d.      **Upsher-Smith:** Mike McBride, Vice President, Partner Relations; Michael Muzetras, Senior National Account Manager; Mary Rotunno, National Account Manager;

**GPhA 2014 Annual Meeting** – Orlando, Florida (February 19-21, 2014):

a.      **Actavis;**
b.      **Alvogen;**
c.      **Amneal;**
d.      **Apotex:** Jeff Watson, President;
e.      **Aurobindo;**
f.      **Breckenridge;**
g.      **Dr. Reddy's;**
h.      **Epic;**
i.      **Greenstone;**
j.      **Heritage;**
k.      **Hi-Tech;**
l.      **Impax;**
m.      **Lupin;**
n.      **Mallinckrodt;**
o.      **Mylan:** Marcie McClintic Coates, VP and Head of Global Regulatory Affairs; Andrea Miller, Senior Vice President, Head, Global Complex Products Operations; Tony Mauro, President;
p.      **Par;**
q.      **Perrigo;**
r.      **Sandoz:** Carlos Sattler, M.D. Vice President, Clinical Development & Medical Affairs;
s.      **Strides Pharma;**
t.      **Sun;**
u.      **Taro;**
v.      **Teligent (IGI Laboratories);**
w.      **Teva:** Allan Oberman, President and CEO;
x.      **Upsher-Smith;**
y.      **Versapharm;**
z.      **Wockhardt;** and
aa.      **Zydus.**

**ECRM's Annual Retail Pharmacy Efficient Program Planning Session** – (February 23-26, 2014):

a.      **Actavis;**
b.      **Akorn;**
c.      **Amneal;**
d.      **Apotex;**

32

e.    **Ascend;**
f.    **Breckenridge;**
g.    **Camber;**
h.    **Citron;**
i.    **Dr. Reddy's;**
j.    **Epic;**

k.    **Greenstone;**
l.    **Heritage;**
m.   **Hi-Tech;**
n.    **Lannett;**
o.    **Lupin;**
p.    **Mallinckrodt;**
q.    **Par;**
r.    **Perrigo:** Tony Polman, National Account Executive; Andrea Felix, National Account Executive; Jim Booydegraaf, Associate Director, Marketing; John Wesolowski, Acting General Manager, Katie McCormack, National Account Manager;
s.    **Sandoz;**
t.    **Sun;**
u.    **Taro**: Howard Marcus, VP Sales & Marketing; Scott Brick, Manager, National Accounts; Elizabeth Guerrero, Director, Corporate Accounts;
v.    **Teligent**: Jason Grenfell-Gardner, President and CEO; Shawn McMorrow, National Accounts Manager;
w.   **Upsher-Smith;**
x.    **West-Ward;**
y.    **Wockhardt;** and
z.    **Zydus.**


**ECRM 2014 Hospital, GPO & LTC Pharmaceutical** – (February 23-27, 2014):

a.    **Actavis;**
 b.   **Akorn;**
c.    **Apotex;**
d.    **Breckenridge;**
e.    **Citron;**
f.    **Dr. Reddy's;**
g.    **Heritage;**
h.    **Lannett;**
i.    **Lupin;**
j.    **Mylan;**
k.    **Par;**
l.    **Perrigo;**
m.   **Sandoz;**
n.    **Sun;**
o.    **Teligent;**
p.    **Upsher-Smith;**
q.    **West-Ward;**
r.    **Wockhardt;** and

s.    **Zydus.**

**HDMA Sixth Annual CEO Roundtable Fundraiser** – New York, New York (April 1, 2014):

a.    **Actavis**: Andrew Boyer, Senior Vice President, US Generics Sales and Marketing; Napolean Clark, Executive Director, US Generics Marketing; Marc Falkin, Vice President, Marketing, Pricing, and Contracts; Anthony Giannone, Executive Director, Sales; Rick Rogerson, Director, Pricing;

b.    **Amneal**: Chintu Patel, Co-CEO and Chairman; Chirag Patel, President and Co-Chairman

c.    **Apotex**: Beth Hamilton, Director, National Sales; Jeffrey Hampton, Senior Vice President, Commercial Operations; James Van Lieshout, Vice President, Sales; Jeff Watson, President, US and Canada Commercial;

d.    **Aurobindo**: Robert Cunard, CEO; Paul McMahon, Senior Director Commercial Operations;

e.    **Citron**: Vimal Kavuru, CEO; Laura Short, Vice President, Sales; Karen Strelau, Executive Vice President, Sales and Marketing;

f.    **Mylan**: Joseph Duda, President; Hal Korman, Executive Vice President and Chief Operating Officer; Anthony Mauro, Senior Vice President, and President of North America; James Nesta, Vice President of Sales; Robert Potter, Senior Vice President, North America National Accounts and Channel Development; Joseph Zenkis, Vice President, North America Sales and Channel Strategy;

g.    **Par;**

h.    **Perrigo;**

i.    **Sandoz**: Anuj Hasija, Executive Director, Key Accounts; Armando Kellum, Vice President, Contracts, Pricing, and Business Analytics; Kirko Kirkov, Executive Director, Key Accounts; Scott Smith, Vice President, Commercial Operations;

j.    **Taro;**

k.    **Teva**: Maureen Cavanaugh, Senior Vice President, Sales and Marketing; Christopher Doerr, Director, Trade Operations; Jeffrey Herzfeld, Senior Vice President, US Trade Relations, Specialty Medicines; David Rekenthaler, Generic Sales; and

l.    **Upsher-Smith.**

**NACDS 2014 Annual Meeting** – Scottsdale, Arizona (April 26-29, 2014):

a.    **Actavis**: Andrew Boyer, President and CEO, North America Generics; Marc Falkin, Vice President of Purchasing; Sigurdur Olafsson, President; Paul Reed, Senior Director

34

of Trade and Sales Development; Robert Stewart, Chief Operating Officer; Paul Bisaro, Board Member; Jean-Guy Goulet, Regional President, Canada Generics; Michael Reed, Executive Director, Trade Relations;  John Shane, Director, Trade Relations;

b.　**Apotex**: Jeff Watson, President, Global Generics; Sam Boulton, Director of National Accounts; Jeremy Desai, President and CEO; Jeffrey Hampton, Senior Vice President and General Manager, US and Latin America; David Kohler, Vice  President and General Manager; Corey Anquetil, Director, Strategic Sales North America; Buddy Bertucci, Vice President, Institutional Sales; Beth Hamilton, Vice President, Marketing and Portfolio Strategy, Sales and Marketing; James  Van Lieshout, Sr. Director, Commercial Operations; Peter Hardwick, Senior Vice  President, Sales and Marketing, Canada;

c.　**Amneal**: Jim Luce, Executive Vice President, Sales & Marketing; Chirag Patel, Co-CEO & Chairman; Shannon Rivero, Vice President, Pricing & Analytics; Stephen Rutledge, Vice President, Sales;

d.　**Aurobindo**: Robert Cunard, CEO; Paul McMahon, Senior Director Commercial Operations;

e.　**Camber**: Brett Barczak, Director, Corporate Accounts; Kon Ostaficiuk, President;

f.　**Citron**: Vimal Kavuru, CEO; Laura Short, Vice President, Sales; Karen Strelau, Executive Vice President, Sales and Marketing;

g.　**Dr. Reddy's**: Chris Costa, Vice President of Sales; Victor Borelli, Vice President  and Head, National Accounts, North America Generics; Jinping McCormick,  Vice President Rx Marketing, US Generics; Michael Allen, Vice President and Head, Rx Products, North America Generics; Milan Kalawadia, Vice President,  OTC Division;

h.　**G&W Laboratories:** Erika Baylor, Vice President, Sales & Marketing; Aaron Greenblatt, Chief Executive Officer; Kurt Orlofski, President & Chief Operating Officer;

i.　**Glenmark**: Jim Brown, Vice President of Sales; James Grauso, Executive Vice President, North America Sales;

j.　**Greenstone**: James Cannon, General Manager; Jill Nailor, Sr. Director Sales and National Accounts;

k.　**Heritage**: Jeffrey Glazer, CEO;

l.　**Impax:** Doug Boothe, President Generics Division;

m.　**Lannett**;

n.　**Lupin**: Dave Berthold, SVP, Generics; Robert Hoffman, EVP, U.S. Generics; Paul McGarty, President;

o.　**Mallinckrodt**: Ginger Collier, Senior Director, Marketing; Walk Kaczmarek, Chief Operating Officer; Kian Kazemi, Vice President, Sales; Todd Killian, VP, Global Market

35

Access; Scott Parker, Director of Trade, Brand Pharmaceuticals; Jane Williams, Vice President-Sales;

p. **Mylan**: Joseph Duda, President; Anthony Mauro, Chief Commercial Officer; James Nesta, Vice President of Sales; Hal Korman, Executive Vice President and Chief Operating Officer; Robert Potter, Senior Vice President, North America and Channel Development; Rob O'Neill, Head of Sales; John Munson, Vice President Global Accounts Mylan;

q. **Par**: Jon Holden, Vice President of Sales; Paul Campanelli, President; Renee Kenney, Senior Advisor, Generic Sales; Scott Littlefield, Trade Director; Brent Bumpas, National Account Director, Trade; Michael Altamuro, Vice President, Marketing and Business Analytics; Antonio Pera, Chief Commercial Officer;

r. **Perrigo**: Scott Jamison, Executive Vice President and General Manager; Christopher Kapral, Senior Vice President, Consumer Healthcare Sales; Mark Walin, Vice President, Consumer Healthcare Sales; John Wesolowski, Acting General Manager; Andy Kjellberg, Vice President, Consumer Healthcare Sales; Jeff Needham, Executive Vice President and General Manager, Consumer Healthcare; Tony Polman, National Account Executive;

s. **Sandoz**: Peter Goldschmidt, President Sandoz, US and Head, North America; Steven Greenstein, Director, Key Customers; Anuj Hasija, Executive Director Key Customers; Armando Kellum, Vice President, Sales and Marketing; Kirko Kirkov, Executive Director, Key Customers; Scott Smith, Vice President Sales and Marketing; Dave Picard, Vice President, Biosimilars and Injectables; Claude Dupuis, Director of Corporate Accounts Ontario and Western Canada; Jacquelin Gagnon, Vice President, Sales and Marketing, Canada; Michel Rubidoux, President and General Manager, Canada;

t. **Sun**: GP Singh Sachdeva, President of Sun Pharmaceuticals, USA; Steve Smith, Senior Director of Sales; Steven Goodman, Director Marketing, Generics;

u. **Taro**: Ara Aprahamian, Vice President, Sales and Marketing; Michael Perfetto, Chief Commercial Officer Generic RX, OTC, US and Canada; Alex Likvornik, Senior Director, Strategic Pricing and Marketing; Elizabeth Ivey, Vice President, Sales and Marketing;

v. **Teva**: Maureen Cavanaugh, Senior Vice President and Chief Operating Officer, North America Generics; Allan Oberman, President and CEO Teva Americas Generics; Theresa Coward, Senior Director, National Sales; Christopher Doerr, Director, Trade

Operations; David Rekenthaler, Vice President Sales, US Generics; Christine Baeder, Senior Director, Customer Operations; Jeffrey Herzfeld, Senior Vice President US Specialty Medicines; David Marshall, Vice President of Operations; Michael Reid, Vice President, Corporate and Retail Sales; Michael Sine, Director, Corporate Account Group; Douglas Sommerville, Senior Vice President and General Manager, Canada;

w. **Upsher-Smith;**

x. **Valeant:** Thomas Allison, Senior Director of National Accounts; Eddie Andruss, Assoc.

36

Director of National Accounts; Tricia Green, Senior Brand Manager; Jona Mancuso, Brand Manager; John Reed, Director, Marketing; Sultana Kazanas, National Account Manager;

y.   **Versapharm:** Jim Josway, Vice President, Sales; Stephen McCune, Chief Sales & Marketing Officer;

z.   **Wockhardt:** Michael Craney, President of Sales & Marketing; and

aa.   **Zydus**: Michael Keenley, President; Joseph Renner, President and CEO; Kristy Ronco, Vice President, Sales; Scott Goldy, Director, National Account; Kevin Green, Vice President, National Accounts.

**MMCAP 2014 National Member Conference** – Bloomington, Minnesota (May 12-15, 2014):

a.   **Actavis:** Mark Blitman, Executive Director of Sales for Government Markets;
b.   **Apotex:** Bob Simmons, National Account Director;
c.   **Aurobindo;**
d.   **Breckenridge**: Scott Cohon, National Accounts Director;
e.   **Heritage**: Anne Sather, National Account Manager;
f.   **Lannett**: Tracy Sullivan, National Account Manager;
g.   **Mylan**: Janet Bell, Director, National Accounts;
h.   **Par**: Peter Gargiulo, Director, National Accounts; Sandra Bayer, Senior Director, National Accounts; Jon Holden, Vice President of Sales; Karen O'Connor, Vice President, National Accounts;
i.   **Perrigo**: Pete Hakenstad, National Account Manager;
j.   **Sandoz;**
k.   **Teva**: Nick Gerebi, National Account Manager;
l.   **Upsher-Smith:** Michelle Brassington, Regional Account Manager; and
m.   **West-Ward**: Mark Boudreau, Executive Director of National Sales.

**HDMA 2014 Business and Leadership Conference** – JW Marriott Desert Ridge, Phoenix, Arizona (June 1-4, 2014):

a.   **Actavis**: Maureen Barrett, Director of National Accounts; Marc Falkin, Vice President of Purchasing; John Fallon, Director of National Accounts; Anthony Giannone, National Accounts Director; Andrew Boyer, Senior Vice President, Generic Sales and Marketing; Richard Rogerson, Executive Director Pricing and Business Analytics;

b.   **Akorn/Hi-Tech**: Jonathan Kafer, Senior Director;

c.   **Alvogen:** William Hill, EVP, US Commercial Operations

d.   **Amneal:** Marty Ross, Vice President, Sales Operations; Stephen Rutledge, Vice President, Sales;

e.   **Apotex**: Bob Simmons, National Account Director; Jeffrey Hampton, Vice President,

37

Commercial Operations; Beth Hamilton, National Sales Director; Tina Kaus, National Accounts Director; James Van Lieshout, Vice President, Sales; David Rekenthaler, National Accounts Director; Jane Williams, Vice President Specialty Generic Sales;

f.  **Aurobindo:** Julie Faria, Senior Manager, Sales;

g.  **Camber**: Brett Barczak, Director, Corpporate Accounts

h.  **Citron:** Laura Short, Vice President, Sales; Karen Strelau, Executive Vice President, Sales and Marketing;

i.  **Dr. Reddy's**: Chris Costa, Vice President of Sales; Mike Allen, Vice President and Head, Rx Generics; Victor Borelli; Senior Director, National Accounts; Joshua Hudgens, Director of Purchasing; Katherine Neeley, Associate Director; Gunjan Patel, Sales Analyst;

j.  **Glenmark**: Christopher Bihari, Director National Accounts;

k.  **Greenstone:** Lori LaMattina, Manager, Sales and Marketing; Robin Strzeminski, National Account Director; Gregory Williams, National Account Director;

l.  **Heritage**: Anne Sather, National Account Manager; Neal O'Mara, National Accounts Manager; Jeffrey Glazer, Chairman and CEO; Jason Malek, Senior Vice President, Commercial Operations; Matthew Edelson, Associate Director, National Accounts;

m.  **Impax**: Skalski; Darnell; Ball;

n.  **Lannett**: Kevin Smith, Vice President Sales and Marketing; Tracy Sullivan, Director, National Accounts; Grace Wilks, Director Sales and Marketing; Justin McManus,

Director, National Accounts and Sales; Lauren Carotenuto, National Account Representative;

o.  **Lupin**: Dave Berthold, VP, Sales, U.S. Generics; David Shirkey, National Accounts Director; Lauren Walten, National Account Manager; Kevin Walker, National Accounts Manager;

p.  **Mallinckrodt:** Steven Becker, National Account Director; Lisa Cardetti, Director of Key Accounts; Walter Kaczmarek, Vice President, General Manager Specialty Generics; Kian Kazemi, Director, Retail National Accounts - Specialty Generics; Scott D. Parker, Director of Trade; Kevin D. Vorderstrasse, Senior Product Manager; Jane Williams, Vice President, Sales – Specialty Generics;

q.  **Mylan**: Richard Isaac, Senior Manager, Strategic Accounts; Joseph Duda, President; Edgar Escoto, National Accounts Director; James Nesta, Vice President of Sales; Lance Wyatt, National Accounts Director; Michael Aigner, Director, National Accounts; John Baranick, Director of Trade Relations; Joseph Zenkus, Vice President, North America Sales and Channel Strategy; Frank Mullery, Senior Director and Controller; Todd Bebout, Vice President, North America Supply Chain Management; Janet Bell, Director, National

38

Accounts; Steven Krinke, National Account Manager; Robert O'Neill, Head of Sales Generic North America; Sean Reilly, National Account Manager; John Shane,  Trade Relations; Erik Williams, Vice President North America Pricing and  Contracts;

r.    **Par**: Peter Gargiulo, Director, National Accounts; Sandra Bayer, Senior Director, National Accounts; Jon Holden, Vice President of Sales; Karen O'Connor, Vice President, National Accounts; Brent Bumpas, National Account Executive; Lisa  Walker, Associate Director; Michael Reiney, Vice President, Sales; Charles  "Trey" Propst, Vice President, National Accounts; Warren Pefley, Director,  National Accounts;

s.    **Sandoz**: Lisa Badura, Director, National Accounts Sales; Anuj Hasija, Key  Account Executive Director; Kirko Kirkov, Key Account Executive Director; Ryan Alan, Associate Director, National Accounts; Sean Walsh, Key Account Manager; James Hendricks, Key Account Executive Director; Della Lubke, Director, National Accounts; David Picard, Vice President, Generic Sales; Christopher Bihari, Director, National Sales; Steve Greenstein, Director, National  Accounts;

t.    **Sun**: Daniel Schober, Associate Vice President, Trade Sales; Scott Littlefield, Trade Director, National Account Executive; Steven Smith, Senior Director of Sales; Susan Knoblauch, Senior Manager, Sales;

u.    **Taro**: Anand Shah, Associate Director Sales Operations;

v.    **Teva**: Theresa Coward, Senior Director, National Sales; Sal Cuomo, Trade  Account Director; Christopher Doerr, Director, Trade Operations;  Daniel  Driscoll, Vice President Institutional Sales and Marketing; Jeffrey Herzfeld,  Senior Vice President; Jeff McClard,

Senior Director, National Accounts; Jessica  Peters, Director, National Accounts; Teri Sherman, National Accounts Director; Cassie Dunrud, Associate Director; David Rekenthaler, Vice President, Sales, US Generics; Marc Falkin, Vice President, Marketing, Pricing,  and  Contract Operations; Nisha Patel, Director; Nick Gerebi, Director National Accounts;

w.    **Upsher-Smith:** JoAnn Gaio, Sr. National Account Manager, Trade; Scott Hussey, Senior Vice President, Global Sales; Jim Maahs, Sr. Director; Michael (Mike) McBride, Associate Vice President, Partner Relations; Mike Muzetras, Senior National Accounts Manager; Doug Zitnak, National Accounts Senior Director – Trade;

x.    **Valeant:** Thomas Allison, Senior Director of National Accounts; Dean  Cowen, National Account Director; Todd LaRue, Vice President of Sales, U.S.; Barbara Purcell, Executive Director, Global Generics Sales & Marketing;

y.    **West-Ward:** Mark Boudreau, Executive Director of National Sales; Jeff Ruhland, Associate Manager, Supply Chain and Warehouse; Joseph Ruhmel, National Account Director; Steven Snyder, National Account Director;

z.    **Wockhardt**: Karen Andrews, Director of Sales; Scott Koenig, Associate Vice President, Retail Generics; and

39

aa.   **Zydus**: Scott Goldy, Director, National Accounts; Kevin Green, National Accounts Manager; Marc Kikuchi, Senior Vice President, Global Generics; Maria McManus, Corporate Account Manager; Jodi Weber, Corporate Account Manager; Louis Pastor, Senior Director, Trade Operations.

**GPhA CMC Workshop** – Bethesda North Marriott Hotel, Bethesda, Maryland (June 3-4, 2014):

a.   **Actavis;**
b.   **Apotex:** Pradeep Sanghvi, Executive Vice President, Global R&D; Kiran Krishnan, Vice President, Regulatory Affairs; Chetan Doshi, Director of Formulation Development - Solid Dose;
c.   **Dr. Reddy's;**
d.   **Fougera;**
e.   **Glenmark;**
f.   **Heritage;**
g.   **Hi-Tech;**
h.   **Impax:** Marcy Macdonald, Vice President Regulatory Affairs;
i.   **Lannett;**
j.   **Lupin;**
k.   **Morton Grove;**
l.   **Mylan:** Dan Snider, Vice President Morgantown RD;
m.   **Par;**
n.   **Perrigo:** Richard Stec, Vice President, Global Regulatory Affairs;

o.   **Sandoz;**
p.   **Sun;**
q.   **Taro:** Scott Tomsky, Vice President, Generic Regulatory Affairs, North America; Siva Vaithiyalingam, Director, Regulatory Affairs;
r.   **Teligent (IGI Laboratories);**
s.   **Teva:** Scott Tomsky, Generic Regulatory Affairs, North America; Siva Vaithiyalingam, Director, Regulatory Affairs;
t.   **Upsher-Smith**; and,
u.   **Zydus.**

**NACDS 2014 Total Store Expo** – Boston Convention Center, Boston, Massachusetts (August 23-26, 2014):

a.   **Actavis**: Andrew Boyer, President and CEO, North America Generics; David Buchan, Executive Vice President Commercial, North America Generics and International; Napolean Clark, Vice President of Marketing; Ashley Delponte, Manager, Trade Marketing, Sales and Marketing; Michael Dorsey, Director of National Accounts; Marc Falkin, Vice President of Purchasing; Megan Gorman, Senior Marketing Manager; Rob Hooper, Senior Marketing Manager; Randy Hurst, Senior Vice President and General Manager; Christina Koleto, Manager, Pricing Senior; Maureen Meehan; Director National Accounts; Paul Reed, Senior Director, Trade Sales and Development; Richard Rogerson, Senior Director New Products, Business Analytics and Systems; Violet Saakyan, Marketing Manager; Eric Schultz, Senior Marketing Manager; Cindy Stevens,

Director of National Accounts; Nancy Baran, Director, Customer Relations; Christopher Boland, Manager, Pharmacy Innovation; Kathleen Conlon, Director, Contract Administration; Mark Devlin, Senior Vice President, Managed Markets; Anthony Giannone, Executive Director, Sales; Christine Maiolo, Associate Director, Sales Operations; David Myers, Senior Manager, Products and Communications; Kaminie Persuad, Sales Coordinator; Michael Reed, Executive Director, Trade Relations; John Sheehan, Director, OTC; Allan Slavsky, Sales Consultant;

b.    **Akorn/Hi-Tech**: Ed Berrios, VP, Sales and Marketing - Hi-Tech Pharmacal Co., Inc.; Michael Corley, VP, National Accounts; Thomas Kronovich, VP, National Accounts; Bruce Kutinsky, Chief Operating Officer; Mick McCanna, Executive Director of National Accounts; Raj Rai Chief, Executive Officer; John Sabat, Senior Vice President of National Accounts; M. Tranter, National Accounts Manager, Sales & Marketing;

c.    **Apotex**: Carlo Berardi, Sales; Tim Berry, National Account Manager; Gwen Copeland, National Accounts Manager; John Crawford, National Account Director; Sam Boulton, Director of National Accounts; Jeffrey Hampton, Senior Vice President and General Manager, US and Latin America; David Kohler, Vice President and General Manager; Doug Kinna, Sales; Chirag Patel, Marketing Director, National Accounts; Debbie Veira, National Account Manager; Beth Hamilton, Vice President, Marketing and Portfolio Strategy, Sales and Marketing; Tina Kaus, National Account Director; James Van Lieshout, Senior Director, Commercial Operations; Christina De Lima, Marketing

Analyst; Jacquelyn Epstein, Tradeshow Coordinator; Chirag Patel; Director, Marketing; Corey Anquetil; Director, Strategic Sales;

d.    **Alvogen**: Michael Franks, Regional Vice President, Sales; Todd Graverson, Regional Vice President, Sales; Ron Liu; Jeffrey Rumler, Executive Vice President, Sales and Marketing; David Thang;

e.    **Amneal**: Andy Cline, Account Executive; Ashton Elmore, Account Executive; David Hardin, National Accounts Manager; Liz Koprowski, National Account Manager; Allen Lowther, Director of Pricing; Jim Luce, Executive Vice President, Sales & Marketing; Brown Massey, Director, Sales; June Parker, National Accounts Director; Chirag Patel, Co-CEO & Chairman; Chintu Patel, CEO & Co-Chairman; Becky Reece, Event Coordinator, Shannon Rivero, Vice President, Pricing & Analytics, Stephen Rutledge, Vice President, Sales; Kammi Wilson, Marketing Manager;

f.    **Aurobindo:** Robert Cunard, CEO; Tim Gustafson, Director, National Accounts; Jon Kerr, Director, National Accounts; Paul McMahon, Senior Director, Commercial Operations; Ramprasad Reddy, Chairman Aurobindo Pharma Ltd.;

g.    **Camber**: Briggs Arrington; Brett Barczak, Director, Corporate Accounts; Megan Becker, Marketing Manager; Kirk Hessels, Director of Marketing; Rich Matchett, Director, Sales; Victor Mazzacone, VP Sales; Stu Messinger, Director of National Accounts; Kon Ostaficiuk, President; Dan Piergies, Director, Sales Operation; Amanda Rebnicky; Laura Ricardo, Director of Corporate Accounts; Pete Romer, Director of National Accounts; John Segura, VP, Marketing & Operations; Clayton Smith, Account Manager; Robert Weinstein;

41

h.    **Citron:** Vimal Kavuru, CEO; Laura Short, Vice President, Sales; Karen Strelau, Executive Vice President, Sales and Marketing;

i.    **Dr. Reddy's**: Chris Costa, Vice President of Sales; Victor Borelli, Vice President and Head, National Accounts, North America Generics; Jinping McCormick, Vice President Rx Marketing, US Generics; Nimish Muzumdar, Director of Marketing; Larry Knupp, Director of National Accounts; Umang Vohra, Executive Vice President and Head of North America Generics; Jake Austin, Director National Accounts; Stephanie Jomisko, Director, Contracts and Finance; Jeff Jorgenson, Director OTC National Accounts;

j.    **Epic**: Ashok Nigalaye, Chairman & CEO; Angelo Mike Lupo, VP, Sales & Marketing;

k.    **G&W Laboratories:** Erika Baylor, Vice President, Sales & Marketing; Lauren Connolly, National Account Manager; Aaron Greenblatt, Chief Executive Officer; Kevin Knarr, Vice President, Sales & Marketing; Kurt Orlofski, President & Chief Operating Officer; Michelle Sisco, Sales Analyst;

l.    **Glenmark**: Jim Brown, Vice President, Sales; Jessica Cangemi, Director, Sales and Marketing; Jeff Johnson, Director, Sales and Marketing; David Irwin, Director, Sales;

       Robert Matsuk, President, North America; James Grauso, Executive Vice President, North America Commercial Operations; Matt Van Allen, Senior Director, Commercial Operations;

m.    **Greenstone**: James Cannon, General Manager; Christopher Kutyla, Senior Director, Business Alliances Team; Lori La Mattina, Sales Operations Manager; Jill Nailor, Sr. Director Sales and National Accounts; Thomas Nassif, Senior Manager, Marketing & Strategy; Robin Strzeminksi, National Account Director; Kevin Valade, National Account Director; Greg Williams, Director, National Accounts;

n.    **Heritage**: Heather Beem, National Accounts Manager, Institutional; Katie Brodowski, Associate Director Institutional Sales; Matt Edelson, Senior Director of Sales; Jeffrey Glazer, CEO; Jason Malek, Senior Vice President; Gina Gramuglia, Commercial Operations; Neal O'Mara, National Accounts Manager; Anne Sather, National Account Manager;

o.    **Impax**: Chris Gerber, Director of Pricing and Contracts; Doug Boothe, President Generics Division;

p.    **Lannett**: Justin McManus, Director, National Accounts; Kevin Smith, Vice President Sales and Marketing; Tracy Sullivan, National Accounts Manager;

q.    **Lupin**: Alicia Evolga, Director of Marketing; Robert Hoffman, EVP, U.S. Generics; Paul McGarty, President; Lauren Walten, National Account Manager;

r.    **Mallinckrodt**: Lisa Cardetti, National Account Manager; Ginger Collier, Senior Director, Marketing; Ashley Greaving, Senior Event Planning Specialist; Vanessa Harris, Sr. Director, Managed Markets and Trade; Walt Kaczmarek, Chief Operating Officer; Kian

42

Kazemi, Vice President, Sales; Marc Montgomery, Director of Marketing; Bonnie New, National Account Manager; Trudy Nickelson, Dir Key Accts, Generic Sales; Scott Parket, Director of Trade, Brand Pharmaceuticals; Jane Williams, Vice President-Sales;

s.  **Mayne**: Stefan Cross: President; Gloria Schmidt, Director of National Accounts; Chris Schneider, Executive Vice President, Generic Product Division; Melissa Gardner, National Account Executive;

t.  **Mylan**: Anthony Mauro, President; Kevin McElfresh, Executive Director, National Accounts; Joseph Duda, President; Robert Potter, Senior Vice President, National Accounts and Channel Development; Michael Aigner, Director, National Accounts; Gary Tighe, National Accounts Director; Lance Wyatt, National Accounts Director; Michael Scouvart, Head of Marketing North America; John Baranick, Director, Trade Relations; Rameshwan Bhavsar, Manager, Managed Markets; Edgar Escoto, Director, National Accounts; Dawna Johnson, Coordinator, Sales and Marketing; Sherry Korczynski, Vice President, Epipen Marketing; Stephen Krinke, National Account Manager; James Nesta, Vice President, Sales; Heather Paton, Vice President Sales; Sean

Reilly, National Account Manager; Tom Theiss, Director, Trade Relations; Kathleen Theiss, Manager;

u.  **Par**: Jon Holden, Vice President of Sales; Rick Guillory, Vice President of National Accounts; Gerald Burton, Vice President, National Accounts; Christine Caronna, Director, National Accounts; Renee Kenney, Senior Advisor, Generic Sales; Lori Minnihan, Manager, Pricing and Analytics; Charles "Trey" Propst, Vice President, National Accounts; Michael Reiney, Vice President, Sales; Jeremy Tatum, Demand Manager; Antonio Pera, Chief Commercial Officer; Michael Altamuro, Vice President, Marketing and Business Analytics; Karen O'Connor, Vice President, National Accounts; Warren Pefley, Vice President, Sales and Marketing; Sandra Bayer, Senior Director, National Accounts; Kelly Bachmeier, Director, National Accounts; Spike Pannell, National Account Manager; Walter Busbee, Director of National Accounts; Darren Hall, Director, National Accounts; Brent Bumpas, National Account Director, Trade; Scott Littlefield, Trade Director, Kevin O'Brien, Senior Director Payer Markets;

v.  **Perrigo**: Christopher Kapral, Senior Vice President, Consumer Healthcare Sales; Mark Walin, Vice President, Consumer Healthcare Sales; John Wesolowski, Acting General Manager; Tom Cotter, Vice President, OTC Marketing; Ori Gutwarg, National Account Executive; Pete Haakenstad, National Account Manager; H. James Booydegraaff, Associate Director, Marketing; Andy Kjeelberg, Vice President, Consumer Healthcare Sales; John Klingenmeyer, Vice President, Consumer Healthcare Sales; Shelley Kocur, Senior Director, Service and Customer Supply Chains; Katie McCormack, National Account Manager; Richard McWilliams, Senior Vice President and General Manager; Kristine Milbocker, Trade Relations Planner; Troy Pelak, Vice President, Consumer Healthcare Sales; Tony Polman, National Account Executive; Neal Wilmore, Vice President Commercial Operations, Animal Health; Michael Yacullo, Vice President, Consumer Healthcare Sales; Tom Zimmerman, Vice President and General Manager; Jon Baker, Vice President, Consumer Healthcare Sales; Kelly Gillig, International Commercial Operations Manager; Monica Giraldo-Alzate, Assistant Category Manager; Kristine Norman, Account Executive; John Shane, Rx Promotional Analyst;

w. **Sandoz**: Lisa Badura, Director, Key Customers; Christopher Bihari, Director, Key Customers; Steven Greenstein, Director, Key Customers; Anuj Hasija, Executive Director Key Customers; Armando Kellum, Vice President, Sales and Marketing; Della Lubke, National Account Executive; Scott Smith, Vice President Sales and Marketing; Arunesh Verma, Executive Director Marketing; Sean Walsh, Director, Key Customers; Kenneth Baker, Director, Managed Markets; Deb King, Associate Director, Reverse Logistics;

x. **Strides**: Joseph Davis, CCO; Mohan Devineni, President – Technical; Steve Randazzo, Senior Vice President;

y. **Sun**: Susan Knoblauch, Senior Manager, Sales; Grace Shen, Vice President, Marketing; GP Singh Sachdeva, President of Sun Pharmaceuticals, USA; Donna Hughes, National Account Manager; Steven Smith, Senior Director of Sales; Steven Goodman, Director of Generics Marketing; Anand Shah, Director, Strategic Pricing and Marketing; Jolene McGalliard, National Account Manager; Wayne Fallis, Director, National Accounts;

z. **Taro**: Ara Aprahamian, Vice President, Sales and Marketing; Scott Brick, Manager, National Accounts; Kevin Kriel, Executive Director, Marketing and Business Development, US and Canada; Christopher Urbanski, Director, Corporate Accounts; Carol Augias, Director, Customer Service; Kirk Edelman, Director, Customer Logistics; Alex Likvornik, Senior Director, Strategic Pricing and Marketing; Michael Perfetto, Chief Commercial Officer Generic Rx OTC;

aa. **Teva**: David Rekenthaler, Vice President, Sales; Maureen Cavanaugh, Senior Vice President and Chief Operating Office, North America Generics; Kevin Galowina, Head of Marketing Operations; Jessica Peters, Manager of Corporate Accounts; Nisha Patel, Director of National Accounts; Jocelyn Baker, Director, National Accounts; Jennifer Chang, Director, Marketing; Theresa Coward, Senior Director Sales and Trade Relations; Dan Driscoll, Vice President Institutional Sales and Marketing; Cassie Dunrud, Associate Director, National Accounts; Kayla Kelnhofer, National Account Executive; Tim McFadden, Vice President, Marketing; Christine Baeder, Senior Vice President, Customer and Marketing Operations; Bryan Bart, Product Manager; Christopher Doerr, Senior Director, Trade Operations; Jason Grossman, Associate Director; Jennifer King, Director, New Product Marketing; Jason Nagel, Associate Director; Michelle Osmian, Senior Director Customer Service; John Wodarczyk, Director, Customer Operations;

bb. **Upsher-Smith**;

cc. **Valeant:** Thomas Allison, Senior Director of National Accounts; Dean Cowen, National Account Director; Laizer Kornwasser, EVP & Company Group Chairman; Todd LaRue, Vice President of Sales, U.S.; Brian Phillips, Senior Director of Sales; Barbara Purcell, VP US Generics Sales & Marketing; Elva Ramsaran, National Account Director, John Reed , Director, Marketing, Cerave; Natalie Rush, Director, Trade Relations; Steve Saxheli, Director, National Accounts;

dd. **Versapharm**: Tara Davis, Pricing, Contracts & Sales Analyst; Jim Josway, Vice President, Sales; Stephen McCune, Chief Sales & Marketing Officer;

44

ee.    **West-Ward:** Spiro Gavaris, Vice President of Sales and Marketing; Sam Goodman, Marketing Manager; Joel Rosenstack, Senior Director, Marketing; Elizabeth Guerrero, Director, National Accounts; Paul Markowitz, Director, National Accounts; Doug Statler, Senior Director, Head of Sales; Tom Ross, Managed Care Account Manager;

ff.    **Wockhardt**: Karen Andrus, Director of Sales; Michael Craney, President of Sales & Marketing; Sunil Khera, President-The Americas, Japan & Emerging Markets; Scott Koenig, Vice President Sales and Marketing, Generics; Joe Niemi, Manager, National Accounts; Bob Watson, Vice President, National Accounts; and

gg.    **Zydus**: Scott Goldy, Director, National Accounts; Kevin Green, Associate Vice President, National Accounts; Michael Keenley, President; Ganesh Nayak, Chief Operating Officer and Executive Director; Elizabeth Purcell, Senior Director, Marketing and Portfolio Management; Joseph Renner, President and Chief Executive Officer; Kristy Ronco, Vice President, Sales; Maria Bianco-Falcone, Senior Director Contracting.

**LogiPha Supply Chain Conference** – Princeton, New Jersey (September 16-18, 2014):

a.    **Actavis**: Wayne Swanton, Senior Vice President Manufacturing and Supply Chain; Priya Gopal, Associate Director, Strategic Planning;

b.    **Perrigo**: Stuart Glickman, Executive Director Global Logistics;

c.    **Sandoz**: Davis Mason, Serialization Global S upport Lead; Dorris Michele, Director of Supply Chain; Hillel West, Director of Supply Chain; and

d.    **Teva.**

**HDMA 2014 Annual Board and Membership Meeting** – Montage, Laguna Beach, California (September 27 – October 1, 2014):

a.    **Actavis**: Marc Falkin, Vice President, Marketing, Pricing and Contracts; Andrew Boyer, Senior Vice President, Generic Sales and Marketing;

b.    **Amneal**: Jim Luce, Executive Vice President, Sales and Marketing; Stephen Rutledge, Vice Presdient Sales;

c.    **Apotex**: Beth Hamilton, Director, National Sales; Jeffrey Hampton, Vice President, Commercial Operations; James Van Lieshout, Vice President, Sales-Retail Division; David Rekenthaler, Vice President, US Generic Sales;

d.    **Mallinckrod**t: Kaczmarek Walter, President, Multi-Source Pharmaceuticals; Jane Williams, Vice President, Sales – Specialty Generics;

e.    **Mylan**: John Poulin, Senior Vice President, North America National Accounts, James Nesta, Vice President of Sales;

45

f.    **Teva**: Maureen Cavanaugh, Chief Operating Officer, Teva US Generics; Christopher Doerr, Director, Trade Operations; David Rekenthaler, Vice President Sales, US Generics; Christine Baeder, Senior Director, Customer Operations; and

g.    **Zydus**: Marc Kikuchi, Senior Vice President, Global Generic Sourcing.

**GPhA Fall Technical Conference** – Bethesda, Maryland (October 27-29, 2014):

a.    **Actavis:** Michael Kimball, Executive Director, Transdermal Development;
b.    **Alvogen;**
c.    **Amneal;**
d.    **Apotex:** Kiran Krishnan, Vice President, Regulatory Affairs;
e.    **Aurobindo;**
f.    **Breckenridge;**
g.    **Citron;**
h.    **Dr. Reddy's;**
i.    **Fougera;**
j.    **Glenmark;**
k.    **Heritage;**
l.    **Impax:** Marcy Macdonald, Vice President Regulatory Affairs;
m.    **Lannett;**
n.    **Lupin;**
o.    **Mallinckrodt;**
p.    **Mylan:** Marcie McClintic Coates, Vice President and Head of Global Regulatory Affairs;
q.    **Par;**
r.    **Perrigo:** Richard Stec, Vice President, Global Regulatory Affairs;
s.    **Sandoz;**
t.    **Strides;**
u.    **Sun;**
v.    **Taro;**
w.    **Teligent (IGI Laboratories);**
x.    **Teva:** Scott Tomsky, Generic Regulatory Affairs, North America;
y.    **UDL (Mylan Institutional);**
z.    **Upsher-Smith;**
aa.    **Versapharm;**
bb.    **West-Ward;**
cc.    **Wockhardt;** and
dd.    **Zydus.**

**NACDS 2014 Week in New York** – New York, New York (December 1, 2014):

a.    **Actavis;**
b.    **Apotex;**
c.    **Mylan;**
d.    **Perrigo;**
e.    **Sandoz;**
f.    **Teva;** and

46

g.    **West-Ward.**

**NACDS 2014 Foundation and Reception Dinner** – New York, New York (December 3, 2014):

a.    **Actavis**: Andrew Boyer, Senior Vice President, Generic Sales, Marketing, National Accounts; Marc Falkin, Vice President, Marketing, Pricing and Contracts; Brent Saunders, President, CEO and Chairman; Mark Devlin, Senior Vice President, Managed Markets; Paul Reed, Senior Director, Trade Sales and Development; Michael Reed, Executive Director, Trade Relations;

b.    **Apotex**: James Van Lieshout, Vice President Sales and Senior Director, Commercial Operations; Tim Berry, National Account Manager; Sam Boulton, Director, National Accounts; James Van Lieshout, Vice President, Market Access; Beth Hamilton, Vice President, Marketing and Portfolio Strategy; Jeffrey Hampton, Senior Vice President and General Manager;

c.    **Mylan**: Anthony Mauro, Chief Commercial Officer; Robert Potter, Senior Vice President North America National Accounts and Channel Development; Edgar Escoto, Director, National Accounts; Michael Aigner, Director National Accounts;

d.    **Perrigo**: Christopher Kapral, Senior Vice President, Consumer Healthcare Sales;

e.    **Sandoz**: Armando Kellum, Vice President, Sales and Marketing; Scott Smith, Vice President, Sales and Marketing;

f.    **Valeant:** Todd LaRue; VP of Sales, US;

g.    **Teva**: Theresa Coward, Senior Director of Sales; David Rekenthaler, Vice President, Sales; Maureen Cavanaugh, Senior Vice President and Chief Operating Officer North America Generics; Jessica Peters, Director National Accounts; Christine Baeder, Senior Director, Customer Operations; and

h.    **Upsher-Smith**.

**NACDS 2015 Regional Chain Conference** – (February 1-3, 2015):

a.    **Actavis;** and
b.    **Mylan.**

**GPhA 2015 Annual Meeting** – Fontainebleau Miami Beach, Miami, Florida (February 9-11, 2015):

a.    **Actavis;**
b.    **Akorn;**
c.    **Alvogen;**
d.    **Amneal;**

47

e.    **Apotex:** Jeff Watson, President;

f.    **Aurobindo;**

g.    **Breckenridge;**

h.    **Camber;**

i.    **Dr. Reddy's;**

j.    **Epic;**

k.    **Glenmark;**

l.    **Greenstone;**

m.    **Heritage;**

n.    **Impax;**

o.    **Lupin;**

p.    **Mallinckrodt;**

q.    **Mylan:** Rajiv Malik, President; Deborah Autor, Senior Vice President, Strategic Global Quality & Regulatory Policy;

r.    **Par;**

s.    **Perrigo:** Joseph Papa, President, Chief Executive Officer and Chairman;

t.    **Sandoz;**

u.    **Taro;**

v.    **Teligent (IGI Laboratories);**

w.    **Teva:** Sigurdur Olafsson, President and Chief Executive Officer, Global Generic Medicines Group; Brian Rubenstein, Executive Counsel;

x.    **Upsher-Smith;**

y.    **West-Ward;**

z.    **Wockhardt;** and

aa.    **Zydus.**


**HCSCA National Pharmacy Forum** – Marriott Waterside Hotel and Marina, Tampa, Florida (February 16-18, 2015):

a.    **Actavis**: John Fallon, Executive Director of Sales;

b.    **Breckenridge**: David Giering, Marketing and Trade Relations Manager;

c.    **Mylan:** Lee Rosencrance, District Manager; Martin Wingerter, Director of National Accounts; Janet Bell, Director of National Accounts; Mark Pittenger, Senior Director of National Accounts; Cam Bivens, Director of National Accounts; Heather Paton, Vice President, Institutional Sales;

d.    **Taro**;

e.    **Teva:** Brad Bradford, Director of National Accounts; Jeff McClard, Senior Director of National Accounts; Nick Gerebi, Director of National Accounts; and

f.    **West-Ward:** Neal Gervais, National Account Director; Joseph Schrick, Director, National Accounts; Anthony Massaro, Associate Product Manager; Mark Zampella, Director, National Accounts; Brad Bradford, Director of National Accounts.

**HDMA 2015 Annual CEO Roundtable Fundraiser** – New York, New York (April 14, 2015)

a.      **Actavis**: Andrew Boyer, Senior Vice President, Generic Sales, Marketing, National Accounts; Marc Falkin, Vice President, Marketing, Pricing and Contracts; Anthony Giannone, Executive Director, Sales;

b.      **Amneal**;

c.      **Apotex**:  Beth Hamilton, Vice President, Sales & Marketing; Jeffrey Hampton, Senior Vice President, Commercial Operations; Jeff Watson, President Global Generics;

d.      **Dr. Reddy's:** Mike Allen, Vice President & Head, Rx Generics; Victor Borelli, Senior Director, Head of National Accounts Rx Generics; Jinping McCormick, Senior Director, Generic Rx Marketing, North America; Umang Vohra, Executive Vice President and Head North America Generics;

e.      **Mallinckrodt;**

f.      **Mylan**: Robert Potter, Senior Vice President, National Accounts and Channel Development; Anthony Mauro, Chief Commercial Officer; Robert Tighe, Head of Mylan Pharmaceuticals and Canada; Chrys Kokino, Head of Global Biologics Commercial; Frank Mullery, Head of Commercial Finance;  James Nesta, Vice President Sales; David Workman, Vice President Strategic Pricing;

g.      **Par**: Michael Altamuro, Vice President Marketing and Business Analytics; Jon Holden, Vice President of Sales; Paul Campanelli, CEO; Terry Coughlin, Chief Operating Officer; Steve Mock, Corporate Affairs; Joel Morales, Vice President Finance; Antonio Pera, Chief Commercial Officer; Brandon Rockwell, Executive Director, Business;

h.      **Sandoz**: Anuj Hasija, Executive Director, Key Accounts; Victor Moreire, Director Contracts and Analytics; Ted Slack, Senior Director, US Managed  Markets, Robert Spina, Vice President, Pricing; and

i.      **Sun**;

j.      **Teva**: Christine Baeder, Vice President, Customer Operations; Maureen Cavanaugh, Chief Operating Officer; Christopher Doerr, Senior Director, Trade  Operations; Jeffrey Herzfeld, Senior Vice President, US Specialty Medicines  Trade Relations; Adam Levitt, Senior Vice President, Global Commercial  Operations.

k.      **Zydus:** Kevin Green, Sr. Director of Sales; Kristy Ronco, Vice President, Sales


**HDMA 2015 Center for Healthcare Supply Chain Research Board of Directors Meeting** – (April 14, 2015)

a.      **Mylan**; and
b.      **Teva.**

**NACDS 2015 Annual Meeting** – The Breakers, Palm Beach, Florida (April 25-28, 2015):

a.    **Actavis**: Andrew Boyer, Senior Vice President, Generic Sales, Marketing, National Accounts; Marc Falkin, Vice President, Marketing, Pricing and Contracts; Robert Stewart, Chief Operating Officer; Paul Bisaro, Board Member; Jean-Guy Goulet, Regional President, Canada Generics; Michael Reed, Executive Director, Trade Relations; Daniel Motto, Senior Vice President, Global Business Development; Sanjiv Patel, Chief Vice President, Allergan Global Strategic Market; Brent Saunders, President and CEO; Mark Devlin, Senior Vice President, Managed Markets; William Meury, Executive Vice President Branded Pharmaceuticals; Paul Reed, Senior Director, Trade Sales and Development;

b.    **Akorn**: Rai Raj, CEO; Bruce Kutinsky, COO;

c.    **Amneal**: Jim Luce, Executive Vice President, Sales & Marketing; Chirag Patel, Co-CEO & Chairman; Stephen Rutledge, Vice President, Sales;

d.    **Apotex**: Corey Anquetil, Director Strategic Sales, North America; Sam Boulton, Director, National Accounts; Beth Hamilton, Vice President, Marketing and Portfolio Strategy, Sales and Marketing; David Kohler, Vice President and General Manager; Jeremy Desai, President and CEO; Jeffrey Hampton, Senior Vice President and General Manager; Peter Hardwick, Senior Vice President, Sales and Marketing; Steven Lydeamore, President, Global Specialty Pharma; Eric Organ, Vice President, Commercial Operations; James Van Lieshout, Vice President, Market Access; Jeff Watson, Global Generics;

e.    **Aurobindo**;

f.    **Camber**: Brett Barczak, Director, Corporate Accounts; Victor Mazzacone, VP Sales; Kon Ostaficiuk, President;

g.    **Citron**;

h.    **Dr. Reddy's:** Victor Borelli, Vice President and Head, National Accounts, North America Generics; Jinping McCormick, Vice President Rx Marketing, US Generics;

Michael Allen, Vice President, Global Pharmaceutical Sourcing; Milan Kalawadia, Vice President, Head of US OTC Division;

i.    **G&W Laboratories:** Darren Atkins; VP Business Development & Alliance Management; Erika Baylor; Vice President, Sales & Marketing; Aaron Greenblatt; Chief Executive Officer; Kurt Orlofski; President & Chief Operating Officer;

j.    **Glenmark**: Jim Brown, Vice President, Sales; James Grauso, Executive Vice President;

50

k.  **Greenstone**: Jill Nailor, Sr. Director Sales and National Accounts; John Ocejo, Senior Director, Customer Support Services;

l.  **Impax**: Doug Boothe, President Generics Division;

m.  **Mallinckrodt**: Walk Kaczmarek, Chief Operating Officer; Kian Kazemi, Vice President, Sales; Marc Montgomery, Director of Marketing;

n.  **Mylan**: Robert Potter, Senior Vice President, National Accounts and Channel Development; Rob O'Neill, Head of Sales; Anthony Mauro, Chief Commercial Officer; Robert Tighe, National Accounts Director; John Munson, Vice President Global Accounts; James Nesta, Vice President, Sales;

o.  **Par**: Michael Altamuro, Vice President Marketing and Business Analytics; Jon Holden, Vice President of Sales; Antonio Pera, Chief Commercial Officer;

p.  **Perrigo**: Scott Jamison, Executive Vice President and General Manager; Christopher Kapral, Senior Vice President, Consumer Healthcare Sales; Mark Walin, Vice President, Consumer Healthcare Sales; John Wesolowski, Acting General Manager; Andy Kjellberg, Vice President, Consumer Healthcare Sales; Jeff Needham, Executive Vice President and General Manager, Consumer Healthcare; Colter Van Stedum, Vice President Rx Strategic Business Alliances, Corporate Development; Michael Yacullo, Vice President, Consumer Healthcare Sales;

q.  **Sandoz**: Peter Goldschmidt, President Sandoz US and Head, North America; Armando Kellum, Vice President, Sales and Marketing; Scott Smith, Vice President, Sales and Marketing; Arunesh Verma, Executive Director, Marketing; Anuj Hasija, Executive Director, Key Accounts; Kirko Kirkov, Executive Director, Key Customers; Gregory Oakes, Vice President and Head, Biopharmaceuticals; Marco Polizzi, Head, Institutional Sales and Marketing;

r.  **Sun**: Steven Smith, Senior Director of Sales; Anand Shah, Director, Strategic Pricing and Marketing; Dan Schober, Vice President, Trade Sales;

s.  **Taro**: Ara Aprahamian, Vice President, Sales and Marketing; Michael Perfetto, Chief Commercial Officer, Generics RX, OTC US and Canada;

t.  **Teva**: Christine Baeder, Senior Vice President, Customer and Marketing Operations; Maureen Cavanaugh, Senior Vice President and Chief Operating Office, North America Generics; Theresa Coward, Senior Director Sales and Trade Relations; Christopher Doerr, Senior Director, Trade Operations; Jeffrey Herzfeld, Senior Vice President US Specialty Medicines; Michael Sine, Director, Corporate Account Group; Douglas Sommerville, Senior Vice President and General Manager, Teva Canada; Adam Levitt, Senior Vice President, Commercial Operations; Brenden O'Grady, President and CEO, North America; Michael Reid, Vice President, Corporate and Retail Sales;

u.  **Valeant:** Thomas Allison; Senior Director of National Accounts; Dean Cowen; National Account Director; Laizer Kornwasser; EVP & Company Group Chairman; Todd LaRue; Vice President of Sales, U.S.; Brian Phillips; Senior Director of Sales; Barbara Purcell;

VP US Generics Sales & Marketing;

v.  **West-Ward:** Spiro Gavaris, Vice President of Sales and Marketing; Doug Statler, Senior Director, Head of Sales; Joel Rosenstack, Senior Director, Marketing;

w.  **Wockhardt**: Michael Craney, President, Sales & Marketing; Sunil Khera, President, The Americas, Japan, and Emerging Markets; and

x.  **Zydus:** Scott Goldy, Director, National Accounts; Kevin Green, National Accounts Manager; Michael Keenley, President; Joseph Renner, President and CEO; Kristy Ronco, Vice President, Sales.


**HDMA 2015 Business and Leadership Conference** – San Antonio, Texas (June 7-10, 2015):

a.  **Actavis**:  Andrew Boyer, Sr. VP Generic Sales and Marketing; Marc Falkin, VP Marketing, Pricing and Contracts; Anthony Giannone, Exec. Director Sales; Brandon Miller, Exec. Director, Trade Relations; Michael Reed, Director, National Trade Accounts;

b.  **Apotex**: Sam Boulton, Director National Account; John Crawford, Director National Account; Beth Hamilton, VP Sales & Marketing; Jeff Hampton, Sr. VP, Commercial Operations; Tina Kaus, Director National Account; Erin Organ, Director, Commercial Operations; Jim Van Lieshout, VP Market Access and Pharm. Strategy; Debbie Veira, Manager, National Accounts;

c.  **Amneal;**

d.  **Aurobindo:** Julia Faria, Sr. Manager, Sales Operations and Contract Admin.; Charles Rath, National Trade Relations Manager;

e.  **Breckenridge:** Scott Cohon, Director of Sales; David Giering, Manager, marketing & Trade Relations; Philip Goldstein, Director of National Accounts;

f.  **Camber**;

g.  **Citron:** Susan Knoblauch, Director National Accounts; Laura Short, Vice President of Sales; Karen Strelau, EVP of Sales and Marketing;

h.  **Dr. Reddy's**: Victor Borelli; Senior Director, National Accounts; Joshua Hudgens, Director of Purchasing; Katherine Neeley, Associate Director; Patricia  Wetzel, Senior Director, National Accounts;

i.  **Glenmark**: Christopher Bihari, Director National Accounts;

j.  **Heritage**: Matthew Edelson, Associate Director, National Accounts; Jeff Glazer, CEO & Vice Chairman; Jason Malek, Senior VP Commercial Operations; Neal O'Mara, Director, National Accounts; Anne Sather, Director, National Accounts;

k.  **Impax:** William Ball, Senior National Sales Manager; Danny Darnell, Senior National

Accounts Manager; Todd Engle, VP, Sales and Marketing; Michael Grigsby, Senior National Accounts Manager; Italo Pennella, Trade Account Manager; Thomas Sammler, Director, Sales Operations; Gary Skalski, Senior Director Sales;

l.   **Lannett**: Kevin Smith, Vice President Sales and Marketing; Tracy Sullivan, Director, National Accounts; Grace Wilks, Director Sales and Marketing; Breanna Stillman, Sales Analyst;

m.   **Lupin**: David Berthold, VP of Sales, US Generics; William Chase, Director, Managed Markets & Trade (Brand); Jason Gensburger, Director, Financial Services; Kevin Walker, National Account Manager; Lauren Walten, Regional Sales Associate;

n.   **Mallinckrodt;**

o.   **Mylan**: Todd Bebout, VP of Sales, Vice President – NA Supply Chain Management; Janet Bell, Director National Accounts; Richard Isaac, Senior Manager, Strategic Accounts; Stephen Krinke, National Account Manager; Rob O'Neill, Head of Sales Generic, NA; Sean Reilly, National Account Manager; Erik Williams, VP NA Pricing; Lance Wyatt, Director, National Accounts;

p.   **Par**: Peter Gargiulo, Director, National Accounts; Sandra Bayer, Senior Director, National Accounts; Christopher Neurohr, Director, National Accounts;

q.   **Sandoz:** Ken Baker, Director, Managed Markets; Christopher Bihari, Director of National Accounts (Sales); Seth Coombs, Executive Director, Oncology Injectables; Steven Greenstein, Director of National Accounts (Sales); Anuj Hasija, Executive Director Key Customers; Jason Jones, Director of Key Customers; Kirko Kirkov, Executive Director Key Customers; Marco Polizzi, Head, Institutional Sales and Marketing; Arun Varma, Executive Director Marketing; Sean Walsh, Key Account Manager;

r.   **Sun**: Christopher Schoen, Vice President, Trade Sales; Scott Littlefield, Trade Director, National Account Executive;

s.   **Teva**: Christine Bader, Vice President, Commercial Operations; Brad Bradford, Director National Accounts; Theresa (Teri) Coward, Senior Director of National Sales; Christopher (Chris) Doerr, Senior Director, Trade Operations; Cassie Dunrud, Associate Director; Nick Gerebi, Director National Accounts; Jeff Herberholt, Senior Manager, Regional Accounts; Jeff McClard, Senior Director National Accounts; Jason Nagel, Associate Director, Trade Relations; Michelle Osmian, Director, Customer Operations; Nisha Patel, Director, National Accounts;

t.   **Upsher-Smith:** JoAnn Gaio, Senior National Account Manager, Trade; Scott Hussey, Senior Vice President, Global Sales; Brad Leonard, Senior Director, National Accounts; Michael (Mike) McBride, Associate Vice President, Partner Relations; Mike Muzetras, Senior National Accounts Manager; David (Dave) Zitnak, National Accounts Senior Director – Trade; Doug Zitnak, National Accounts Senior Director – Trade;

u.   **Valeant:** Laizer Kornwasser, Executive Vice President; Natalie J. Rush, Director, Trade

53

Relations; Robert J. Sabers, Associate Director, Channel National; Cheryl Volker, Senior Manager, Customer Service;

v.    **West-Ward:** Mark Boudreau, Executive Director of National Sales; Joseph Ruhmel, National Account Director; Steven Snyder, National Account Director;

w.    **Wockhardt:** Karen Andrus, Director of Sales; Scott Koenig, Vice President, Retail Generics; and

x.    **Zydus**: Maria Bianco-Falcone, Director of Offer Development and Trade Operations; Scott Goldy, Sales Director; Kevin Green, Senior Director of Sales; Maria McManus, Corporate Account Manager; Louis Pastor, Senior Director, Trade Operations; Kristy Ronco, Vice President, Sales; Jodi Weber, Corporate Account Manager.


**GPhA CMC Workshop** – Bethesda, MD (June 9-10, 2015):

a.    **Actavis;**
b.    **Akorn/Hi-Tech;**
c.    **Apotex;**
d.    **Citron;**
e.    **Dr. Reddy's;**
f.    **Glenmark;**
g.    **Heritage;**
h.    **Lannett;**
i.    **Mayne;**
j.    **Mylan;**
k.    **Par;**
l.    **Perrigo;**
m.    **Sandoz;**
n.    **Sun;**
o.    **Taro;**
p.    **Teva;**
q.    **West-Ward;** and
r.    **Zydus.**


**GPhA 2015 CMC Conference** – Bethesda, Maryland (June 9-10, 2015):

a.    **Actavis:** Joyce Anne DelGaudio Executive Director, Regulatory Affairs;
b.    **Apotex:** Kiran Krishnan, Vice President, Regulatory Affairs;
c.    **Citron;**
d.    **Dr. Reddy's;**
e.    **Fougera;**
f.    **Glenmark;**
g.    **Heritage;**

h.    **Impax:** Marcy Macdonald, Vice President Regulatory Affairs;

i.    **Lannett;**

j.    **Lupin;**

k.    **Mylan:** Bryan Winship, Senior Director, Quality Management, Strategic Global Quality and Regulatory Policy; Daniel Snider, Vice President, Research and Development; Timothy Ames, Vice President, Global Strategic Regulatory Affairs; Dawn Culp, Vice President, Global Regulatory Affairs Policy;

l.    **Par;**

m.    **Perrigo:** Richard Stec, Vice President, Global Regulatory Affairs;

n.    **Sandoz:** Nicholas Tantillo, Head, Policy and Regulatory Strategy;

o.    **Sun;**

p.    **Taro;**

q.    **Teva:** Scott Tomsky, Generic Regulatory Affairs, North America; Siva Vaithiyalingam, Director, Regulatory Affairs;

r.    **UDL (Mylan Institutional);**

s.    **Upsher-Smith;**

t.    **West-Ward;**

u.    **Wockhardt;** and

v.    **Zydus.**

**NACDS 2015 Total Store Expo** – Denver, Colorado (August 22-25, 2015):

a.    **Actavis**: Andrew Boyer, President and CEO, North America Generics; Napolean Clark, Vice President of Marketing; Michael Dorsey, Director of National Accounts; Marc

Falkin, Vice President of Purchasing; Megan Gorman, Senior Marketing Manager; Rob Hooper, Senior Marketing Manager; Randy Hurst, Senior Vice President and General Manager; Maureen Meehan; Director National Accounts; Richard Rogerson, Senior Director New Products, Business Analytics and Systems; Kathleen Conlon, Director, Contract Administration; Anthony Giannone, Executive Director, Sales; David Myers, Senior Manager, Products and Communications; Kaminie Persuad, Sales Coordinator; John Sheehan, Director, OTC; Allan Slavsky, Sales Consultant; Richard Rogerson, Senior Director New Products; Alexis Evolga, Manager, Pricing;

b.    **Akorn**: Brett Novak, SVP Sales & Marketing; Jonathan Kafer, EVP, Sales & Marketing; Bruce Kutinsky, COO; Mick McCanna, Account Manager; Scott Tranter, National Account Manager, Sales & Marketing;

c.    **Apotex**: Corey Anquetil, Director, Strategic Sales, North America; Michael Bohling, Director, Marketing; Gwen Copeland, Manager, National Accounts; John Crawford, National Account Director; Beth Hamilton, Vice President, Marketing; Jeffrey Hampton, Senior Vice President and General Manager; Tina Kaus, National Account Director; Ryan Kelly, Manager, National Accounts; Chirag Patel, Director, Marketing; Bob Simmons, National Account Director; Debbie Veira, National Account Manager; Pat Walden, Senior Marketing Manager; Jane Williams, National Account Director; Sam Boulton, Director, National Accounts; Erin Organ, Vice President, Commercial Operations; Olivia

55

Smith, Marketing Communications Coordinator;

d.  **Alvogen**: Michael Franks, Regional Vice President, Sales; Todd Graverson, Regional Vice President, Sales; Jeffrey Rumler, Executive Vice President, Sales and Marketing;

e.  **Amneal**: Andy Cline, Account Executive; Ashton Elmore, Account Executive; David Hardin, National Accounts Manager; Katie Hawks, Event Coordinator; Liz Koprowski, National Account Manager; Allen Lowther, Director of Pricing; Jim Luce, Executive Vice President, Sales & Marketing; Brown Massey, Director, Sales; June Parker, National Accounts Manager; Chirag Patel, Co-CEO & Chairman; Shannon Rivero, Vice President, Pricing & Analytics; Stephen Rutledge, Vice President, Sales; Kammi Wilson, Marketing Manager;

f.  **Breckenridge**;

g.  **Camber**: Brett Barczak, Director, Corporate Accounts; Megan Becker, Marketing Manager; James Haselton, National Sales Associate; Kirk Hessles, Director of Marketing; Rich Matchett, Director, Sales; Victor Mazzacone, VP Sales; Stu Messinger, Director of National Accounts; Kon Ostaficiuk, President; Laura Ricardo, Director of Corporate Accounts; Pete Romer, Director of National Accounts; Clayton Smith, Account Manager; Edward Smith, Director, Sales Operations;

h.  **Citron**;

i.  **Dr. Reddy's**: Victor Borelli, Vice President and Head, National Accounts, North America Generics; Larry Knupp, Director of National Accounts; Jake Austin, Director National Accounts; Jeff Jorgenson, Director OTC, National Accounts; Mila Kalawadia, Vice President, Head of US OTC Division;

j.  **Glenmark**: Jim Brown, Vice President, Sales; Jessica Cangemi, Director, Sales and Marketing; Jeff Johnson, Director, Sales and Marketing; Robert Matsuk, President, North America; James Grauso, Executive Vice President, North America Commercial Operations; Sanjeev Krishan, Executive Vice President;

k.  **Greenstone**: James Cannon, General Manager; Cynthia Dever, Senior Manager, Marketing & Strategy; Lori La Mattina, Sales Operations Manager; Jill Nailor, Sr. Director Sales and National Accounts, Robin Strzeminski, National Account Director; Kevin Valade, National Account Director; Greg Williams, Director, National Accounts;

l.  **Heritage**: Jeffrey Glazer, CEO; Jason Malek, Senior Vice President; Gina Gramuglia, Commercial Operations; Neal O'Mara, National Accounts Manager; Anne Sather, National Account Manager; Ashley O'Rourke, Sales Director;

m.  **Lannett**: Kevin Smith, Vice President Sales and Marketing; Tracy Sullivan, National Accounts Manager; Michael Bogda, President; Breanna Stillman, Sales Analyst; Grace Wilks, Director, National Accounts;

n.  **Mallinckrodt**: Lisa Cardetti, National Account Manager; Michael Holmes, National Director, Corporate Account Solutions, Walk Kaczmarek, Chief Operating Officer, Kian

56

Kazemi, Vice President, Sales; Marc Montgomery, Director of Marketing; Bonnie New, National Account Manager; Trudy Nickelson, Dir Key Accts, Generic Sales; Roger Owen, VP Business Operations, Multi-Source Pharmaceuticals; Scott Parker, Director of Trade, Brand Pharmaceuticals; Elva Ramsaran, National Account Director; Jane Williams, Vice President-Sales;

o.   **Mayne**: Chris Schneider, Executive Vice President, Generic Product Division; Melissa Gardner, National Account Executive; Rodney Emerson, Director Pricing and Contracts; Giana Schmidt, Director of National Accounts;

p.   **Mylan**: Anthony Mauro, President; Kevin McElfresh, Executive Director, National Accounts; Robert Potter, Senior Vice President, National Accounts and Channel Development; Michael Aigner, Director, National Accounts; Gary Tighe, National Accounts Director; Michael Scouvart, Head of Marketing North America; Dawna Johnson, Coordinator, Sales and Marketing; James Nesta, Vice President, Sales; Heather Paton, Vice President Sales; Sean Reilly, National Account Manager; Joe Aigner, Director, National Accounts; Edgar Escoto, Director, National Accounts; Sean Foster, Vice President, North America Marketing; Becky Gamble, Vice President, Managed Markets; John Shane, Director, Trade Relations; Tiffany Till, Senior National Account Trade Show Specialist;

q.   **Par**: Jon Holden, Vice President of Sales; Rick Guillory, Vice President of National Accounts; Gerald Burton, Vice President, National Accounts; Christine Caronna, Director, National Accounts; Renee Kenney, Senior Advisor, Generic Sales; Lori Minnihan, Manager, Pricing and Analytics; Charles "Trey" Propst, Vice President, National Accounts; Michael Reiney, Vice President, Sales; Jeremy Tatum, Demand Manager; Antonio Pera, Chief Commercial Officer; Michael Altamuro, Vice President, Marketing and Business Analytics; Karen O'Connor, Vice President, National Accounts; Warren Pefley, Vice President, Sales and Marketing; Sandra Bayer, Senior Director, National Accounts; Kelly Bachmeier, Director, National Accounts; Spike Pannell, National Account Manager; Walter Busbee, Director of National Accounts; Darren Hall, Director, National Accounts;

r.   **Perrigo**: Pete Haakenstad, National Account Manager; H. James Booydegraaff, Associate Director, Marketing; Katie McCormack, National Account Manager; Tony Polman, National Account Executive; Andrea Felix, National Account Executive; Paul Hoeksema, Manager, Corporate Accounts; John Shane, Rx Promotional Analyst; John Wesolowski, Acting General Manager; Doug Boothe, President, Generic Division; Christopher Karpral, Senior Vice President, Consumer Healthcare Sales; Andy Kjellberg, Vice President Consumer Healthcare Sales; Mark Walin, Vice President Consumer Healthcare Sales; Michael Yacullo, Vice President Consumer Healthcare Sales;

s.   **Sandoz**: Christopher Bihari, Director, Key Customers; Anuj Hasija, Executive Director Key Customers; Scott Smith, Vice President Sales and Marketing; Arunesh Verma, Executive Director Marketing; Sean Walsh, Director, Key Customers; Kenneth Baker, Director, Managed Markets; Kirko Kirkov, Executive Director, Key Customers; Frank Davey, Director; Harmonie Franklin, Director, William Giannone, Associate Director, Key Customers; Jason Jones, Director, Key Customers; Bilal Khan, Director, Key Customers; Della Lubke, National Account Executive; Michele Macchia, Associate

Director, Conventions; Tom Parker, Marketing Director; Chad Schwinn, Director, Key Accounts; Andrew Wahba, Associate Director, Key Customers;

t. **Strides**: Joseph Davis, CCO; Jitesh Devendra, President; Mohan Devineni, President – Technical; Kevin Knarr, Vice President – Sales and Marketing; Mohan Kumar, CEO; Steve Randazzo, Senior Vice President; Stephen Turner, VP, North American OTC Division;

u. **Sun**: Steven Smith, Senior Director of Sales; Steven Goodman, Director of Generics Marketing; Anand Shah, Director, Strategic Pricing and Marketing; Jolene McGalliard, National Account Manager; Steven Goodman, Director Marketing; Blynda Masters; Director, Customer Service; Dan Schober, Vice President, Trade Sales; Michael Tolusso, Director, Sales;

v. **Taro**: Ara Aprahamian, Vice President, Sales and Marketing; Scott Brick, Manager, National Accounts; Christopher Urbanski, Director, Corporate Accounts; Carol Augias, Director, Customer Service; Kirk Edelman, Director, Customer Logistics; Alex

Likvornik, Senior Director, Strategic Pricing and Marketing; Michael Perfetto, Chief Commercial Officer Generic Rx OTC; John Francis, Vice President, Sales and Marketing; Stephen Jones, Director, Supply Chain; Lisa Pehlke, Director, Corporate Accounts; Richard Trevor, Corporate Accounts Director;

w. **Teva**: Maureen Cavanaugh, Senior Vice President and Chief Operating Office, North America Generics; Kevin Galowina, Head of Marketing Operations; Jessica Peters, Manager of Corporate Accounts; Nisha Patel, Director of National Accounts; Jocelyn Baker, Director, National Accounts; Theresa Coward, Senior Director Sales and Trade Relations; Cassie Dunrud, Associate Director, National Accounts; Christine Baeder, Senior Vice President, Customer and Marketing Operations; Bryan Bart, Product Manager; Christopher Doerr, Senior Director, Trade Operations; Jason Nagel, Associate Director; Michelle Osmian, Senior Director Customer Service; John Wodarczyk, Director, Customer Operations; Robert Neild, Associate Director, Customer Operations;

x. **Upsher-Smith**;

y. **Valeant:** Thomas Allison, Senior Director of National Accounts; Dean Cowen, National Account Director; Todd LaRue, Vice President of Sales, U.S.; Michelle Nilsson, Associate Sales Director; Brian Phillips, Senior Director Of Sales; Barbara Purcell, VP US Generics Sales & Marketing; Natalie Rush, Director, Trade Relations; Steve Sacheli, Director, National Accounts; Brian Stolz, Senior VP, Generics;

z. **West-Ward:** Spiro Gavaris, Vice President of Sales and Marketing; Sam Goodman, Marketing Manager; Joel Rosenstack, Senior Director, Marketing; Elizabeth Guerrero, Director, National Accounts; Nicki Hanson, Director of Sales, National Accounts; Ernesto Cividanes, Manager, Trade Relations;

aa. **Wockhardt:** Michael Craney, President, Sales & Marketing; Sunil Khera, President, The Americas, Japan, and Emerging Markets; Karen Andrews, Director of Sales; Scott Koenig, VP, Sales & Marketing, Generics; Joe Niemi, Manager, National Accounts; and

58

bb.    **Zydus**: Scott Goldy, Director, National Accounts; Kevin Green, Associate Vice President, National Accounts; Michael Keenley, President; Ganesh Nayak, Chief Operating Officer and Executive Director; Joseph Renner, President and Chief Executive Officer; Kristy Ronco, Vice President, Sales.

**HDMA 2015 Annual Board and Membership Meeting** – Montage, Laguna Beach, California (September 27-30, 2015):

a.    **Actavis;**

b.    **Alvogen;**

c.    **Amneal;**

d.    **Apotex**: Beth Hamilton, Director, National Sales; Jeffrey Hampton, Vice President, Commercial Operations; James Van Lieshout, Vice President, Sales, Retail Division; Steve Giuli, Director, Government Affairs;

e.    **Mallinckrodt;**

f.    **Mylan**: James Nesta, Vice President of Sales; Robert Potter, Senior Vice President, North America National Accounts; Anthony Mauro, Senior Vice President, North America; Robert Tighe, Head of Mylan Pharma; and

g.    **Teva**: Maureen Cavanaugh, Chief Operating Officer, Teva US Generics; Christine Baeder, Senior Director, Customer Operations; Andrew Boyer, Senior Vice President, Generic Sales; Marc Falkin, Vice President, Marketing and Pricing.

**HDMA 2015 Research Foundation Pharmaceutical Seminar** – (October 21-22, 2015):

a.    **Apotex;** and
b.    **Mylan.**

**GPhA 2015 Fall Technical Conference** – Bethesda, Maryland (November 2-4, 2015):

a.    **Actavis;**
b.    **Alvogen;**
c.    **Amneal;**
d.    **Apotex;**
e.    **Aurobindo;**
f.    **Citron;**
g.    **Dr. Reddy's;**
h.    **Glenmark;**
i.    **Heritage;**

59

j.      **Lannett;**
k.      **Mallinckrodt;**
l.      **Mylan;**
m.      **Par;**
n.      **Perrigo;**
o.      **Sandoz;**
p.      **Sun;**
q.      **Taro;**
r.      **Teva;**
s.      **Westward;** and
t.      **Zydus.**

**NACDS 2015 Week in New York** – New York, New York (December 1, 2015):

a.      **Actavis;**
b.      **Apotex;**
c.      **Glenmark;** and
d.      **Mylan/UDL;**

**NACDS 2015 Foundation Reception and Dinner** – New York, New York (December 3, 2015):

a.      **Actavis**: Andrew Boyer, Senior Vice President, Generic Sales, Marketing, National Accounts; Marc Falkin, Vice President, Marketing, Pricing and Contracts; Anthony Giannone, Executive Director, Sales;

b.      **Apotex**: James Van Lieshout, Vice President, Market Access; Beth Hamilton, Vice President, Marketing and Portfolio Strategy; Jeffrey Hampton, Senior Vice President and General Manager;  Steve Giuli, Director, Government Affairs;

c.      **Glenmark**;

d.      **Mylan**;

e.      **Sandoz**: Anuj Hasija, Executive Director, Key Customers; Scott Smith, Vice President, Sales and Marketing; Robert Spina, Vice President, Pricing and Contracts; and

f.      **Teva**: Maureen Cavanaugh, Senior Vice President and Chief Operating Officer  North America Generics; Allan Slavsky, Sales Consultant; Christine Baeder,  Senior Director, Customer Operations; and

g.      **Valeant:** Thomas Allison, Senior Director of National Accounts; Todd LaRue, Vice President of Sales, U.S.

**NACDS 2016 Regional Chain Conference** – (February 7-9, 2016):

a.      **Actavis**: Andrew Boyer, Senior Vice President, Generic Sales, Marketing, National

Accounts; Maureen Meehan, Director, National Accounts;

b.    **Teva**: Jocelyn Baker, Director, National Accounts; Theresa Coward, Senior  Director Sales and Trade Relations; and

c.    **Upsher-Smith**.

**HDMA National Pharmacy Forum** – Scottsdale, Arizona (February 8-10, 2016):

a.    **Actavis;**
b.    **Heritage;**
c.    **Lannett;**
d.    **Mylan;**
e.    **Par;**
f.    **Sun;**
g.    **Taro;**
h.    **Teva;** and
i.    **West-Ward.**

**MMCAP 2016 National Member Conference** – Minneapolis, Minnesota (April 11-14, 2016):

a.    **Mylan**: Mark Pittenger, Senior Director of National Accounts;
b.    **Perrigo**: Pete Hakenstad, National Account Manager;
c.    **Sandoz**: Christopher Bihari; Director, Key Customers;
d.    **Taro**;
e.    **Teva**: Nick Gerbi, Director National Accounts; and
f.    **West-Ward**: Elizabeth Guerrero, Director, National Accounts.

**HDMA 8th Annual CEO Roundtable** – New York, New York (April 12, 2016):

a.    **Mylan;** and
b.    **Sun.**

**HDMA Center for Healthcare Supply Chain Research Board of Directors Meeting** – (April 12, 2016):

a.    **Actavis;**
b.    **Amneal;**
c.    **Apotex;**
d.    **Mallinckrodt**
e.    **Mylan;**
f.    **Sandoz;**
g.    **Teva;**
h.    **Upsher-Smith;**
i.    **West-Ward;** and

61

j.    **Zydus.**

**NACDS 2016 Annual Meeting** – Palm Beach, Florida (April 16-19, 2016):

a.    **Akorn/Hi-Tech**;

b.    **Apotex**: Corey Anquetil, Director Strategic Sales, North America; Beth Hamilton, Vice President, Marketing and Portfolio Strategy, Sales and Marketing; David Kohler, Vice President and General Manager; Jeremy Desai, President and CEO; Jeffrey Hampton, Senior Vice President and General Manager; Peter Hardwick, Senior Vice President, Sales and Marketing; Eric Organ, Vice President, Commercial Operations; James Van Lieshout, Vice President, Market Access; Jeff Watson, Global Generics; Steve Giuli, Director, Government Affairs;

c.    **Amneal**: Jim Luce, Executive Vice President, Sales & Marketing; Chirag Patel, Co-CEO & Chairman, Stephen Rutledge, Vice President, Sales;

d.    **Ascend**: John Dillaway, Executive Vice President, Sales & Marketing; Schuyler Van Winkle, Sr. Vice President, National Accounts; Greg Watkins, Vice President, National Accounts;

e.    **Aurobindo**;

f.    **Breckenridge**;

g.    **Camber**: Victor Mazzacone, VP Sales; Kon Ostaficiuk, President; Edward Smith, Director, Sales Operations;

h.    **Citron**;

i.    **Dr. Reddy's**;

j.    **Glenmark**: Jim Brown, Vice President, Sales; James Grauso, Executive Vice President;

k.    **Greenstone**: James Cannon, General Manager; Jill Nailor, Sr. Director Sales and National Accounts;

l.    **Lupin**;

m.    **Mallinckrodt**: Walt Kaczmarek, Chief Operating Officer; Kian Kazemi, Vice President, Sales; Roger Owen, VP Business Operations, Multi-Source Pharmaceuticals;

n.    **Mylan**: Robert Potter, Senior Vice President, National Accounts and Channel Development; Anthony Mauro, Chief Commercial Officer; Robert Tighe, National Accounts Director; John Munson, Vice President Global Accounts; James Nesta, Vice President, Sales; Michael Aigner, Director, National Accounts; Frank Mullery, Chief Financial Officer, North America;

62

o.  **Par**: Michael Altamuro, Vice President Marketing and Business Analytics; Jon Holden, Vice President of Sales; Antonio Pera, Chief Commercial Officer; Paul Campanelli, President;

p.  **Perrigo**: John Wesolowski, Acting General Manager;

q.  **Sandoz**: Peter Goldschmidt, President Sandoz US and Head, North America; Arunesh Verma, Executive Director, Marketing; Anuj Hasija, Executive Director, Key Accounts; Kirko Kirkov, Executive Director, Key Customers; Gregory Oakes, Vice President and Head, Biopharmaceuticals; Christine Miller, Vice President US Development; Scott Smith, Vice President, Sales and Marketing; Robert Spina, Vice President, Pricing and Contracts;

r.  **Sun**: Steven Smith, Senior Director of Sales; Anand Shah, Director, Strategic Pricing and Marketing; Dan Schober, Vice President, Trade Sales;

s.  **Taro**: Ara Aprahamian, Vice President, Sales and Marketing; Michael Perfetto, Chief Operating Officer, Generics RX, OTC US and Canada; John Francis, Vice President, Sales and Marketing North America;

t.  **Teva**: Christine Baeder, Senior Vice President, Customer and Marketing Operations; Maureen Cavanaugh, Senior Vice President and Chief Operating Office, North America Generics; Christopher Doerr, Senior Director, Trade Operations; Jeffrey Herzfeld, Senior Vice President US Specialty Medicines; Michael Sine, Director, Corporate Account Group; Douglas Sommerville, Senior Vice President and General Manager, Teva Canada; Michael Reid, Vice President, Corporate and Retail Sales; Sigurdur Olafsson, President; Daniel Motto, Senior Vice President, Business Development; Marc Falkin, Senior Vice President, Sales; Andrew Boyer, President North America Generics;

u.  **Upsher-Smith**;

v.  **West-Ward:** Spiro Gavaris, Vice President of Sales and Marketing; William Otterbein, Account Executive;

w.  **Wockhardt**; and

x.  **Zydus:** Scott Goldy, Director, National Accounts; Kevin Green, Associate Vice President, National Accounts; Michael Keenley, President; Joseph Renner, President and Chief Executive Officer; Kristy Ronco, Vice President, Sales; Marc Kikuchi, Senior Vice President, Global Generics.

**HDMA 2016 Business and Leadership Conference** – Colorado Springs, Colorado (June 12-15, 2016):

a.  **Alvogen**;

b.  **Amneal**;

c. **Apotex**: Jeffrey Hampton, Vice President, Commercial Operations; Beth Hamilton, National Sales Director; John Crawford, Director, National Accounts; David Rekenthaler, Vice President, Sales; James Van Lieshout, Vice President, Market Access and Trade Relations;

d. **Camber**;

e. **Dr. Reddy's**: Victor Borelli; Senior Director, National Accounts; Jinping McCormick, Vice President, Sales and Marketing; Cynthia Medalle, Head Sales  and Marketing, Generics;

f. **Glenmark**: Christopher Bihari, Director National Accounts;

g. **Heritage**: Anne Sather, Director, National Accounts;

h. **Lannett**: Tracy Sullivan, Director, National Accounts; Breanna Stillman, Sales  Analyst; Bili Giannone, National Account Representative;

i. **Mallinckrodt**;

j. **Mylan**: Michael Aigner, National Account Director; John Baranick, Director of Trade Relations; Janet Belli, Director, National Accounts; Thomas Boyer, Vice President, Business Development;  Priscilla Lanham, Associate Manager;

k. **Par**: Joe Cappello, Director, National Accounts;

l. **Sandoz:** Kirko Kirkov, Executive Director, Key Customers; Sean Walsh, Key Account Manager; Joe Hodge, Director, Key Customers; Sanket Shah, Manager, Customer Operations; Jason Jones, Director, Key Customers;

m. **Sun**: Christopher Schoen, Vice President, Trade  Sales; Scott Littlefield, Trade Director, National Account Executive;

n. **Teva**: Theresa Coward, Senior Director, National Sales; Christine Baeder, Vice President, Commercial Operations; Sal Cuomo, Director, Trade Relations, Brand Pharmaceuticals; Nick Gerber, Director, National Accounts;

o. **West-Ward:** Joseph Ruhmel, National Account Director; Christopher Bonny,  Executive Director,  Commercial  Business  Development;  Neal  Gervais,  Director, National Accounts; John Kline, National Account Director; and

p. **Zydus**: Linda Andrews, Chargeback Operations Manager; Maria McManus, Corporate Account Manager; Kevin Green, Associate Vice President, National Accounts; Louis Pastor, Senior Director Trade Operations; Kristy Ronco, Vice President, Sales.

**ECRM Hospital & Alternate Site Pharmacy – Branded and Generic Pharmaceuticals EPPS** – Westminster, Colorado (June 13-15, 2016):

a. **Camber;**

b.     **Dr. Reddy's;**
c.     **Lupin;**
d.     **Mayne;**
e.     **Perrigo;**
f.     **Sandoz;**
g.     **Sun;** and
h.     **Upsher-Smith.**

**NACDS 2016 Total Store Expo** – Boston, Massachusetts (August 6-9, 2016):

a.     **Akorn/Hi-Tech**;

b.     **Apotex**: Corey Anquetil, Director, Strategic Sales, North America; Michael Bohling, Director, Marketing; Gwen Copeland, Manager, National Accounts; John Crawford, National Account Director; Beth Hamilton, Vice President, Marketing; Jeffrey Hampton, Senior Vice President and General Manager; Tina Kaus, National Account Director; Ryan Kelly, Manager, National Accounts; Chirag Patel, Director, Marketing; Helen Pejnovich, Associate Director, Commercial Operations; Dave Rekenthaler, Vice President, Sales; Bob Simmons, National Account Director; Dena Van Winkle, Marketing Communication Manager; Debbie Veira, National Account Manager; Pat Walden, Senior Marketing Manager; Jane Williams, National Account Director;

c.     **Amneal**: Andy Cline, Account Executive; Ashton Elmore, Account Executive; David Hardin, National Accounts Manager; Katie Hawks, Event Coordinator; Liz Koprowski, National Account Manager; Allen Lowther, Director of Pricing; Jim Luce, Executive Vice President, Sales & Marketing; Brown Massey, Director, Sales; June Parker, National Accounts Manager; Chirag Patel, Co-CEO & Chairman; Shannon Rivero, Vice President, Pricing & Analytics; Marty Ross, Vice President, Sales Operations; Brittany Russell, Account Executive; Stephen Rutledge, Vice President, Sales; Susan Ryan, National Account Manager;

d.     **Aurobindo**;

e.     **Breckenridge**;

f.     **Camber**: Brett Barczak, Director, Corporate Accounts; Megan Becker, Marketing Manager; James Haselton, National Sales Associate; Kirk Hessles, Director of Marketing; Rich Matchett, Director, Sales; Victor Mazzacone, VP Sales; Stu Messinger, Director of National Accounts; Kon Ostaficiuk, President; Laura Ricardo, Director of Corporate Accounts; Pete Romer, Director of National Accounts; Clayton Smith, Account Manager; Edward Smith, Director, Sales Operations;

g.     **Citron**;

h.     **Dr. Reddy's**;

i.     **Epic**;

65

j.    **Glenmark**: Jim Brown, Vice President, Sales; Jeff Johnson, Director, Sales and Marketing; Robert Matsuk, President, North America; James Grauso, Executive Vice President, North America Commercial Operations; Robert Matsuk, President, North America;

k.    **Greenstone**;

l.    **Heritage**: Jeffrey Glazer, CEO; Jason Malek, Senior Vice President; Gina Gramuglia, Commercial Operations; Neal O'Mara, National Accounts Manager; Anne Sather, National Account Manager; Katie Brodowski, Associate Director, Institutional Sales; Matthew Edelson, Senior Director of Sales; Michael Aigner, Director, National Accounts;

m.    **Lannett**: Kevin Smith, Vice President Sales and Marketing; Tracy Sullivan, National Accounts Manager; Randy Juan Botero, Senior Associate Director, National Accounts; Breanna Stillman, Sales Analyst; Grace Wilks, Director, National Accounts;

n.    **Lupin**;

o.    **Mallinckrodt**;

p.    **Mylan**: Anthony Mauro, President; Kevin McElfresh, Executive Director, National Accounts; Robert Potter, Senior Vice President, National Accounts and Channel Development; Michael Scouvart, Head of Marketing North America; James Nesta, Vice President, Sales; Heather Paton, Vice President Sales; Sean Reilly, National Account Manager; Edgar Escoto, Director, National Accounts; John Shane, Director, Trade Relations; Shane Bartolol, Senior Specialist; Kimberley Brooks, Head of Finance; Katelyn Duchardt, National Account Manager; Joseph Duda, President; Kevin McElfresh, Executive Director, National Accounts; Patrick McIntosh, Vice President, Commercial Operations; John Munson, Vice President Global Accounts; Christine Navarro, Senior Director, Marketing; Rob O'Neill, Head of Sales, Generic North America; Robert Tighe, Head of MPA and Canada; Patrick Weaver, Head of Strategic Government Sales; Dave Workman, Vice President, Strategic Pricing; Michael Altamuro, Vice President, Marketing and Business Analytics;

q.    **Par**: Gerald Burton, Vice President, National Accounts; Christine Caronna, Director, National Accounts; Antonio Pera, Chief Commercial Officer; Sandra Bayer, Senior Director, National Accounts; Darren Hall, Director, National Accounts; Joe Holden, Vice President, Sales; Nancy Buckingham, Vice President, Marketing;

r.    **Perrigo**: H. James Booydegraaff, Associate Director, Marketing; Katie McCormack, National Account Manager; Tony Polman, National Account Executive; Andrea Felix, National Account Executive; Paul Hoeksema, Manager, Corporate Accounts; John Shane, Rx Promotional Analyst; John Wesolowski, Acting General Manager; Lynn Johnson, National Manager, Trade Relations; Christopher Bihari, Director, Key Customers;

s.    **Sandoz**: Anuj Hasija, Executive Director Key Customers; Scott Smith, Vice President Sales and Marketing; Arunesh Verma, Executive Director Marketing; Sean Walsh, Director, Key Customers; Frank Davey, Director; Harmonie Franklin, Director; Jason

Jones, Director, Key Customers; Bilal Khan, Director, Key Customers; Michele Macchia, Associate Director, Conventions; Tom Parker, Marketing Director; Chad Schwinn, Director, Key Accounts; Shakera Ford, Convention Planner; Harmonie Franklin, Director; Julie Kang, Executive Director; Kirko Kirkov, Executive Director, Key Customers; Ludmilla Reina, Director, Key Customers; Yun Shao Taormina, Key Account Manager; Robert Spina, Vice President, Pricing and Contracts; Donna Hughs, National Account Manager;

t.   **Strides**;

u.   **Sun**: Jolene McGalliard, National Account Manager; Dan Schober, Vice President, Trade Sales; Michael Tolusso, Director, Sales; Alex Likvornik, Senior Director, Strategic Pricing; Scott Littlefield, Trade Director; Eric Monzon, Senior Director, Market Access; Ara Aprahamian, Vice President, Sales and Marketing;

v.   **Taro**: Scott Brick, Manager, National Accounts; Christopher Urbanski, Director, Corporate Accounts; Carol Augias, Director, Customer Service; Kirk Edelman, Director, Customer Logistics; Michael Perfetto, Chief Commercial Officer Generic Rx OTC; John Francis, Vice President, Sales and Marketing; Stephen Jones, Director, Supply Chain; Lisa Pehlke, Director, Corporate Accounts; Anand Shah, Director, Strategic Pricing and Marketing; Perry Venugopal, Assistant Vice President, Business Development; Christine Baeder, Senior Vice President, Customer and Marketing Operations;

w.   **Teva**: Jessica Peters, Manager of Corporate Accounts; Nisha Patel, Director of National Accounts; Jocelyn Baker, Director, National Accounts; Theresa Coward, Senior Director Sales and Trade Relations; Cassie Dunrud, Associate Director, National Accounts; Bryan Bart, Product Manager; Christopher Doerr, Senior Director, Trade Operations; Jason Nagel, Associate Director; Michelle Osmian, Senior Director Customer Service; John Wodarczyk, Director, Customer Operations; Robert Neild, Associate Director, Customer Operations; Andrew Boyer, President; Salvatore Cuomo, Director, Trade Relations; Michael Dorsey, Director, National Accounts; Marc Falkin, Senior Vice President, Sales; Kevin Galowina, Head of Marketing Operations; Anthony Giannone, Executive Director, Sales; Rob Hooper, Senior Marketing Manager; Christine Maiolo, Associate Director, Sales Operations; Maureen Meehan, Director, National Accounts; Kaminie Persuad, Sales Coordinator; Richard Rogerson, Senior Director,

New Products; John Sheehan, Director, OTC; Allan Slavsky, Sales Consultant; Christopher Bonny, Executive Director, Commercial Business Development;

x.   **Upsher-Smith**;

y.   **West-Ward:** Spiro Gavaris, Vice President of Sales and Marketing; Elizabeth Guerrero, Director, National Accounts; Nicki Hanson, Director of Sales, National Accounts; Mark Boudreau, Executive Director, Sales; Karen Andrus, Director of Sales; Yaniel Figueroa, Project Manager;

z.   **Wockhardt**; and

aa.    **Zydus**: Kevin Green, Associate Vice President, National Accounts; Michael Keenley, President; Marc Kikuchi, CEO Americas; Maria McManus, Corporate Account Manager.


**NACDS 2016 Total Store Expo** – San Diego, California (August 19-22, 2016):

a.    **Heritage;**
b.    **Mylan;**
c.    **Par;**
d.    **Perrigo;**
e.    **Sandoz;**
f.    **Taro;** and
g.    **Teva.**


**HDMA 2016 Annual Board and Membership Meeting** – Sulphur Springs, West Virginia (September 25-28, 2016):

a.    **Alvogen**;

b.    **Apotex**: Steve Giuli, Vice President, Government Affairs; David Rekenthaler, Vice President, Sales;

c.    **Mallinckrodt**;

d.    **Mylan**: John Poulin, Senior Vice President, North America National Accounts, James Nesta, Vice President of Sales; Patrick Weaver, Head of Strategic Government Sales; Robert Tighe, Head of Mylan Pharmaceuticals;

e.    **Teva**: Jessica Peters, Director, Trade Relations; Theresa Coward, Senior Director, Sales and Trade Relations; and

f.    **Zydus**: Michael Conley, Vice President, Wholesaler Channels.


**NACDS 2016 Week in New York** – New York, New York (December 1, 2016):

a.    **Apotex**;
b.    **Mylan/UDL;**
c.    **Sandoz;**
d.    **Teva;** and
e.    **Zydus.**


**NACDS 2016 Foundation Reception and Dinner** – New York, New York (December 3, 2016):

a.    **Apotex**: Sam Boulton, Director, National Accounts; Jeff Watson, President,  Global

68

Generics; James Van Lieshout, Vice President, Market Access; Beth Hamilton, Vice President, Marketing and Portfolio Strategy; Jeffrey Hampton, Senior Vice President and General Manager; John Crawford, National Account Director; Tina Kaus, National Account Director; Steve Giuli, Director, Government Affairs;

b.  **Sandoz**: Gregory Oakes, Vice President and Head, Biopharmaceuticals; Scott Smith, Vice President, Sales and Marketing; Robert Spina, Vice President, Pricing and Contracts;

c.  **Teva**: Maureen Cavanaugh, Senior Vice President and Chief Operating Officer North America Generics; Christine Baeder, Senior Vice President, Customer and Marketing Operations; Theresa Coward, Senior Director, Sales and Trade Relations; Marc Falkin, Senior Vice President, Sales; Anthony Giannone, Executive Director, Sales; and

d.  **Zydus:** Marc Kikuchi, CEO; Joseph Renner, President and CEO; Kristy Ronco, Vice President, Sales; Alex Yakulis, Executive Vice President, Business Development.